PART B

| | | | Dates Attended | | No. School Years |
|---|---|---|---|---|---|
| | | | From MO. YR. | To MO. YR. | |
| (9) SECONDARY SCHOOL/ COLLEGE UNIVERSITY ATTENDED: | List any secondary school, college, or university attended. | | | | |
| | Name City/State/Country | University of Benin. Nigeria | 10 81 | 10 87 | 6 yrs |
| | Name City/State/Country | Kings College Lagos Nigeria | 06 74 | 06 79 | 5 yrs |

| (10) MEDICAL DEGREE AND | Title of Medical Degree M.B.B.S. | Date Conferred:/Expected: * MO. 10 YR. 87 |
|---|---|---|
| | * If the degree has been conferred, a photocopy must be sent to ECFMG. See Medical Education Credentials section of the ECFMG Information Booklet. | |

| (10.1) MEDICAL SCHOOL: | Name of Medical School from which you graduated or expect to graduate. LIST EXACT NAME AND ADDRESS. | | Dates Attended | | No. of Years Attended |
|---|---|---|---|---|---|
| | | | From MO. YR. | To MO. YR. | |
| | University of Benin | | | | |
| | City/State/Country Edo State Nigeria. | | 10 81 | 10 87 | 6 |

| (10.2) OTHER MEDICAL SCHOOLS ATTENDED: | Name City/State/Country | | | | |
|---|---|---|---|---|---|
| | Name City/State/Country | | | | |
| | Name City/State/Country | | | | |

| (10.3) CLINICAL CLERKSHIPS: | Clinical Discipline | Hospital/Clinic | Location (exact address) | Supervising Physician | Dates of Clerkship |
|---|---|---|---|---|---|
| | See Part D of this application for entering clinical clerkships. | | | | |

| (11) MEDICAL LICENSURE: Present or Future | Date you received (or expect to receive) an unrestricted license or certificate of full registration to practice medicine: MO. 01 YR. 89 Country or state in which you are licensed: * Nigeria |
|---|---|
| | * If the license has been issued, a photocopy must be sent to ECFMG. See Medical Education Credentials section of the ECFMG Information Booklet. |

| (12) HOSPITAL TRAINING: Residency or fellowship | Hospitals | Position(s) | Dates |
|---|---|---|---|
| | | | |

| (13) EMPLOYMENT: Present employment only | Institution/Company | Position | Dates |
|---|---|---|---|
| | Name: | | |
| | Street: | | |
| | City/State/Country: | | |

| (14) BIRTHDATE/ BIRTHPLACE: | Day 01 Month 01 Year 59 Location: Benin City Edo State. City, Province, Country |
|---|---|

| (15) GENDER: | Please check one: ✓ Male ___ Female | (16) NATIVE LANGUAGE: Edo |
|---|---|---|

| (17) CITIZENSHIP: | (Complete all three) |
|---|---|
| | A. AT BIRTH Nigerian USA ☐ or Other ☐ (Specify) |
| | B. UPON ENTERING MEDICAL SCHOOL USA ☐ or Other ☐ (Specify) |
| | C. NOW Nigerian USA ☐ or Other ☐ (Specify) |

| (18) OTHER EXAMINATION HISTORY AND APPLICANT NUMBERS: | Check below the organizations to which you may have applied previously; enter the date of the most recent examination that was administered to you and the identification number that was assigned to you by that organization. |
|---|---|

| ORGANIZATION | DATE OF MOST RECENT EXAMINATION TAKEN MO. 1 9 YR. | APPLICANT IDENTIFICATION NUMBER |
|---|---|---|
| ☐ NATIONAL BOARD OF MEDICAL EXAMINERS | | NBME Parts I/II |
| | MO. 1 9 YR. | USMLE Steps 1/2 - - - - |
| ☐ STATE LICENSING AUTHORITY IN THE UNITED STATES | MO. 1 9 YR. | FEDERATION IDENTIFICATION NUMBER (FIN) FLEX |

PART C

ECFMG-000644

STATE LICENSING AUTHORITY
IN THE UNITED STATES            | | | 1 9 | | |
                                 MO.    YR.

## PART C

Students and graduates must sign the application in the presence of their Medical School Dean, Medical School Vice Dean, or Medical School Registrar. (See A below.)

If a graduate cannot sign the application form in the presence of a medical school official noted above, he/she must sign the application form in the presence of a Consular Official, First Class Magistrate or Notary Public (See B below) and must explain in writing why the application form could not be signed in the presence of a medical school official. (See B.1 below.)

Application forms are to be mailed to ECFMG from the office of the official or notary who witnesses the applicant's signature.

All information on the application form is subject to verification and acceptance by the Educational Commission for Foreign Medical Graduates.

(19) **CERTIFICATION BY APPLICANT**

I hereby certify that the information in this application is true and accurate to the best of my knowledge and that the photographs enclosed are recent photographs of me.

I also certify and acknowledge that I have received the current edition (that which pertains to the administration for which I am registering) of the combined Information Booklet on ECFMG Certification and Application for USMLE Step 1 and Step 2 examinations and USMLE Bulletin of Information, am aware of the contents of both sections and meet the eligibility requirements set therein.

I understand that (1) falsification of this application, or (2) the submission of any falsified educational documents to ECFMG, or (3) the submission of any falsified ECFMG documents to other agencies, or (4) the giving or receiving of aid in the examination as evidenced either by observation at the time of the examination or by statistical analysis of my answers and those of one or more other participants in that examination, or engaging in other conduct that subverts or attempts to subvert the examination process, may be sufficient cause for ECFMG to bar me from the examination, to terminate my participation in the examination, to withhold and/or invalidate the results of my examination, to withhold a certificate, to revoke a certificate, or to take other appropriate action. (See Information Booklet for additional details concerning Validity of Scores and Irregular Behavior.)

I understand that the ECFMG certificate and any and all copies thereof remain the property of ECFMG and must be returned to ECFMG if ECFMG determines that the holder of the Certificate was not eligible to receive it or that it was otherwise issued in error.

I hereby authorize the Educational Commission for Foreign Medical Graduates to transmit any information contained in this application, or information that may otherwise become available to ECFMG, to any federal, state or local governmental department or agency, to any hospital or to any other organization or individual who, in the judgment of ECFMG, has a legitimate interest in such information.

Signature of Applicant   X _Toha aaisa Akoda_        Date _8 /29/96_
(In Latin Characters)

(19) **CERTIFICATION BY MEDICAL SCHOOL OFFICIAL**

**OR**

**CERTIFICATION OF IDENTIFICATION WITH EXPLANATION (Pertains to graduates only)**

A. I hereby certify that the photograph, signature, and information entered on Section 10 of this form accurately apply to the individual named above.

X _____
Signature of Medical School Official (In Latin Characters)

_____        _____        _____
Official Title                    Date                      Institution

B. I certify that on the date set forth below the individual named above did appear personally before me and that I did identify this applicant by: (a) comparing his/her physical appearance with the photograph on the identifying document presented by the applicant and with the photograph affixed hereto, and (b) comparing the applicant's signature made in my presence on this form with the signature on his/her identifying document. The statements in this document are subscribed and sworn to before me by the applicant on this _____ day of _____, 19 _____.

X _____        _____
Signature of Consular Official, First Class Magistrate, Notary Public (In Latin Characters)        Official Title

| FOR OFFICE USE ONLY | |
|---|---|
| FORM | DATE |
| S.A. | |
| I.D. | |
| 338 | |
| 339 | |
| 325 | |
| R | M 9/11/96 |

B.1 Explain in the space below why the application could not be signed in the presence of your medical school dean, vice dean or registrar. Any explanation must be acceptable to ECFMG and must be provided each time you submit an application to ECFMG.

(20) Have you ever been denied licensure or authority to practice medicine by any medical licensing or registering authority, or has any such license or authority to practice medicine ever been suspended or revoked?        ☐ Yes   ☑ No

If the answer to this question is "Yes," please explain fully on a separate sheet of paper, giving details such as date, location, charge, and action taken; and provide any supporting documents.

(21) Provision of the following information is voluntary. The information will be used for research purposes only. You are encouraged to provide the information; however, the processing of your application will not be affected if you choose to leave item (21) blank.

Select the one which best describes your racial/ethnic background.

| 1 ☐ American Indian/ Alaskan Native | 2 ☐ Asian Pacific Islander | 3 ☐ Hispanic | 4 ☑ Black (not of Hispanic Origin) | 5 ☐ White (not of Hispanic Origin) | 6 ☐ Other |

ECFMG-000645

ECFMG_RUSS_0000645

JA270

PART D

| (10.2) CLINICAL CLERKSHIPS: Refers to that period of medical education in the clinical disciplines during which as a medical student you gained practical experience in hospitals or clinics. List clerkships (rotations, pre-graduate internships) for each clinical discipline. | Clinical Discipline | Hospital/Clinic | Location (exact address) | Supervising Physician | Dates of Clerkship |
|---|---|---|---|---|---|
| | medicine | Specialist Hosp. Benin | Warri | Dr Onwuka | 1988 |
| | Pediatrics | specialist Hosp Benin | Warri | Dr Asemota | 1987-1 |
| | OBGYN | specialist Hosp Benin | Warri | Dr Winta | 1988 |
| | Surgery | specialist Hosp Benin | Warri | Dr Idahosa | 1988 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

ECFMG-000646

ECFMG_RUSS_0000646

JA271

**EXHIBIT 18**

# UNIVERSITY OF BENIN



BENIN CITY, NIGERIA

*Johnbull Enosakhare Akoda*

having satisfied all the requirements of the University
and passed the prescribed examinations held in

*October* 1987

has been admitted to the degree

of

Bachelor of Medicine; Bachelor of Surgery

Given at Benin City this 6th day of *February* 1988

M, REGISTRAR

VICE CHANCELLOR

ECFMG-000586

ECFMG_RUSS_0000586

JA273

EXHIBIT 19

IGBERASE_1908

Case 8:16-cr-00277-PWG   Document 79-1   Filed 02/05/18   Page 79 of 121

# EDUCATIONAL COMMISSION
## for
## FOREIGN MEDICAL GRADUATES

CERTIFIES THAT

— JOHN NOSA AKODA

HAS SATISFIED ALL THE REQUIREMENTS OF THE COMMISSION,

SUCCESSFULLY PASSED ITS EXAMINATIONS

R E C E I V E D AND HAS BEEN AWARDED THIS CERTIFICATE.

AUG 1 1 2011

CERTIFICATE NUMBER   0-553-258-5
MARYLAND BOARD
MEDICAL EXAMINATION

BASIC SCIENCE          JUNE 11, 1997

CLINICAL SCIENCE       AUGUST 28, 1996

ENGLISH EXAMINATION    AUGUST 28, 1996

VALID THROUGH

CERTIFICATE NUMBER
0-553-258-5
ENGLISH EXAMINATION
August 28, 1996



CHAIRMAN, BOARD OF TRUSTEES

PRESIDENT, CHIEF EXECUTIVE OFFICER

DATE ISSUED  AUGUST 18, 1997



JA275

EXHIBIT 20

JA276



## EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.

TELEPHONE: 215-386-5900 • CABLE: EDCOUNCIL, PHA.

### REQUEST FOR PERMANENT REVALIDATION OF STANDARD ECFMG CERTIFICATE

This form is to be completed for graduates of foreign medical schools who have entered programs of graduate medical education in the United States accredited by the Accreditation Council for Graduate Medical Education (ACGME) and who are requesting that their Standard ECFMG Certificate be made valid indefinitely.

**I. TO BE COMPLETED BY APPLICANT** (type or print)                    JUL 2 4 1998

| USMLE/ECFMG Applicant Identification No. | Program ID No. (as listed in American Medical Association's *Graduate Medical Education Program Directory*) |
|---|---|
| 0-555-250-5 | 1 7 0 - 3 8 - 2 1 - 2 3 6 |

Name  John-Charles Akoda

U.S. Social Security Number _____ 9065 -5450 Date of Birth  04 / 17 /63
                                                    Month  Day  Year

Mailing Address for Sticker   P. O. Box  192

City  Neptune         State  N.J.    Zip Code  07754.

Country _____ Check Here if this is a Change in Permanent Address for
                                    ECFMG Records ................................ ☐

Telephone Number ( 732 ) 775-1092  Fax ( 732 ) 775-1092
                        Area Code                  Area Code

Signature  John Charles Akoda         Date  7/10/98

VISA STATUS: (if applicable)
(check one)
Immigrant                    ☒
Non-immigrant
    J-1                      ☐
    H-1B                     ☐
    Other (please specify)   ☐

**II. TO BE COMPLETED BY PROGRAM DIRECTOR, DIRECTOR OF GRADUATE MEDICAL EDUCATION, OR OTHER AUTHORIZED OFFICIAL** (type or print)

INSTITUTION (as listed in AMA's *Graduate Medical Education Program Directory*)

    JERSEY SHORE MEDICAL CENTER

CITY  NEPTUNE                          STATE _____

SPECIALTY  INTERNAL MEDICINE

Telephone Number ( 732 ) 776-4420  Fax ( 732 ) 776-4619
                        Area Code                  Area Code

                        JOHN A. CROCCO, M.D.
Name and Title of Institution Official  PROGRAM DIRECTOR / DEPT. CHAIR OF

Signature of Institution Official _____  MEDICINE - 17-98
                                                Date

ENTRY DATE OF APPLICANT TO ACGME ACCREDITED PROGRAM:

    7  / 11  /98
    month    day    year

APPLICANT ENTERED AS:
(check one)
Resident              ☒
Clinical Fellow       ☐
Other (please specify) ☐

Please affix institution or corporate seal, or if not available, complete acknowledgment by a notary.

VALID INDEFINITELY
SENT

INSTITUTION, CORPORATE, OR NOTARIAL SEAL

STATE OF _____

COUNTY OF _____

AUG 2 1998

On this _____ day of _____, 19____, before me appeared _____
_____, satisfactorily proven to me to be the person whose name is subscribed to the within instrument, and acknowledged that he/she executed the same for the purposes therein contained.
In witness whereof, I hereunto set my hand and official seals.

BY _____

_____
Notary Public

Upon receipt of this form and verification of the information, ECFMG will mail a revalidation sticker to the applicant at the mailing address listed in Item I.

SEE REVERSE SIDE OF THIS FORM FOR ECFMG'S POLICY AND PROCEDURES

Form 246

ECFMG-000617

ECFMG_RUSS_0000617

JA277

EXHIBIT 21



to bill

**KSEY SHORE MEDICAL CENTER**
**EDICAL CENTER OF OCEAN COUNTY**
**BRICK AND POINT PLEASANT DIVISIONS**
**VERVIEW MEDICAL CENTER**

*Meridian*
*Health System*®

Friday, August 11, 2000

*via telefax to (215) 386-9196*

Tel 732 775-5500

Meridian Health System
Jersey Shore Medical Center
1945 State Route 33
P.O. Box 397
Neptune, NJ 07754-0397

www.meridianhealth.com

Rice Holmes
Education Commission for Foreign Medical Graduates
364 Market Street
Philadelphia, PA 19104-2685

**RECEIVED**

*Personal and Confidential*

AUG 1 1 2000

ECFMG
A I S

Dear Mr. Holmes:

An allegation has been made that a resident at Jersey Shore Medical Center/Meridian Hospitals Corporation who goes by the name of John Charles Akoda (ECFMG certificate # 0-553-258-5 in the name of John Nosa Akoda, issued August 18, 1997) has also served as a resident in two other U.S. residency programs under the name of Oluwafemi Charles Igberasi. On verifying his social security number ( -9065) we have discovered that it was issued to "Charles Igberase". When presented with this information late yesterday, this doctor stated that he has used all of these names and that he has never served in another U.S. ACGME-accredited residency program. The three birth dates given by this individual are 04/17/62, 1/1/63, and 4/17/63.

This request is that you search your files to ascertain whether there may be a <u>second</u> ECFMG certificate issued in the name of Oluwafemi Charles Igberasi (or Igberase) or some combination of the six names he has given us (John, Nosa, and Akoda being the other three). Also, we would be interested in knowing whether you have had requests for verification of Dr. Akoda AKA Dr. Igberasi's ECFMG certificate(s) status from other teaching hospitals including Harlem Hospital Center in the time period of approx. 1995-96 or JFK Memorial Hospital in 1997-98.

Obviously, we are concerned that we resolve this issue promptly. Your priority attention is requested.

I can be reached by phone at (732) 776-4732. My secretary is Terry Smith, and should I not be available at my private line number as listed, she can be telephoned at (732) 776-4179 in an attempt to reach me.

Thank you in advance for your cooperation.

Very truly yours,

James McCorkel, Ph.D., Vice President, Academic Affairs
Jersey Shore Medical Center, Meridian Hospitals Corporation

ECFMG-000559

ECFMG_RUSS_0000559

JA279

**EXHIBIT 22**

### EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES

PHILADELPHIA OFFICE

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.

TELEPHONE: 215-386-5900 ● FAX: 215-386-9767 ● INTERNET: www.ecfmg.org

Personal and Confidential

August 22, 2000

James McCorkel, Ph.D.
Vice President for Academic Affairs
Jersey Shore Medical Center
1945 State Route 33
Neptune, NJ 07754-0397

Re: Dr. John Nosa Akoda
USMLE™/ECFMG® Identification No. 0-553-258-5

Dear Dr. McCorkel:

This is in response to your letter of August 11, 2000 and telephone conversations of August 14 and 15, 2000. You indicated in your letter and subsequent conversations that Jersey Shore Medical Center/Meridian Hospitals Corporation is conducting an investigation whether a resident at your institution by the name of John Charles Akoda may have also served as a resident at two other institutions using the name Oluwafemi Charles Igberase. To aid in your investigation, you asked for certain information in possession of the Educational Commission for Foreign Medical Graduates (ECFMG).

According to applications submitted to ECFMG, Dr. Akoda's full name is "John Nosa Akoda." He certified his date of birth to be January 1, 1959. The medical diploma he submitted indicated he received his medical degree in 1988 from the Faculty of Medicine, University of Benin, Nigeria. This medical diploma was verified by ECFMG with the medical school. Dr. Akoda was issued ECFMG Certificate No. 0-553-258-5 on August 18, 1997. The social security number he provided ECFMG in 1998 is 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.

ECFMG also has a file for "Oluwafemi Charles Igberase." Using the name "Oluwafemi Charles Igberase," an individual submitted an application and certified his date of birth to be April 17, 1962 and his social security number as 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. The medical diploma he submitted indicated he received his medical degree in 1987 from the Faculty of Medicine, University of Ibadan, Nigeria. This medical diploma was verified by ECFMG with the medical school. He was issued ECFMG Certificate No. 0-482-700-2 on October 4, 1993. This ECFMG Certificate was revoked in November 1995. The revocation is through July 10, 2001.

This same individual also submitted an application using the name "Igberase Oluwafemi Charles." He certified his date of birth to be April 17, 1961. He also certified on the application that he had not previously submitted an application to ECFMG and

*ECFMG® is an organization committed to promoting excellence in international medical education.*

James McCorkel, Ph.D.
August 22, 2000
Page 2

was assigned a new USMLE/ECFMG Identification Number 0-519-573-0.  The medical diploma he submitted indicated he received his medical degree in 1987 from the Faculty of Medicine, University of Ibadan, Nigeria.   This medical diploma was verified by ECFMG with the medical school.  He did not provide a social security number under this USMLE/ECFMG Identification Number.  He was issued ECFMG Certificate No. 0-519-573-0 on December 14, 1994.  This ECFMG Certificate was invalidated in November 1995.

ECFMG has no record of receipt of requests for verification of the ECFMG certification status from Harlem Hospital Center or JFK Memorial Hospital concerning any of these three names or USMLE/ECFMG Identification Numbers.

Thank you for bringing this matter to our attention.

Sincerely,

Stephen S. Seeling, J.D.
Vice President for Operations

SSS/wck

ECFMG-000553

ECFMG_RUSS_0000553

JA282

**EXHIBIT 23**



**EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES**

PHILADELPHIA OFFICE

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.

TELEPHONE: 215-386-5900 ● FAX: 215-386-9767 ● INTERNET: www.ecfmg.org

Personal and Confidential
Via Federal Express

August 22, 2000

Dr. John Akoda
22344 Rolling Hill Lane
Laytonsville, MD 20882

Re: USMLE™/ECFMG® Identification No. 0-553-258-5

Dear Dr. Akoda:

The Educational Commission for Foreign Medical Graduates (ECFMG) has received information alleging that you may have engaged in irregular behavior.

According to ECFMG records, in January 1996, you submitted an application to ECFMG to take the March 1996 United States Medical Licensing Examination (USMLE) Step 2 and June 1996 USMLE Step 1. You certified on the application that your name was "John Nosa Akoda" and that you had not previously submitted an application to ECFMG. You also certified, among other information, that your date of birth was January 1, 1959 and that you graduated from the Faculty of Medicine, University of Benin, Nigeria, in 1987.

According to information recently received by ECFMG, it is alleged you may have previously applied to ECFMG using the names "Oluwafemi Charles Igberase" (USMLE/ECFMG Identification No. 0-482-700-2) and "Igberase Oluwafemi Charles" (USMLE/ECFMG Identification No. 0-519-573-0). In November 1995, the ECFMG Committee on Medical Education Credentials took action to invalidate Standard ECFMG Certificate No. 0-519-573-0 and revoke Standard ECFMG Certificate No. 0-482-700-2. An appeal of these actions was taken to the ECFMG Review Committee on Appeals. After hearing the appeal, the ECFMG Review Committee on Appeals upheld the actions of the ECFMG Committee on Medical Education Credentials, but limited the length of the revocation of Standard ECFMG Certificate No. 0-482-700-2 to five years, i.e., until July 10, 2001.

When you applied to ECFMG, you certified on your application that the "falsification of this application or the submission of any falsified educational documents to ECFMG ...may be sufficient cause for ECFMG to bar me from the examination, to terminate my participation in the examination, to withhold and/or invalidate the results of my examination, to withhold a certificate, revoke a certificate, or to take other appropriate action." A copy of the certification statement you signed is enclosed.

*ECFMG® is an organization committed to promoting excellence in international medical education.*

Dr. John Akoda
August 22, 2000
Page 2

ECFMG requires an explanation from you in writing within fifteen (15) days of your receipt of this letter. The information in your ECFMG file, together with your explanation and any other material you submit, will be referred to the ECFMG Committee on Medical Education Credentials for review at its next scheduled meeting.

Please send all communications and material in this matter to my attention. If you have any questions, please telephone me at (215) 823-2277.

Sincerely,

William C. Kelly
Manager, Medical Education
Credentials Department

/wck
Enclosure

Confidential

EXHIBIT 24

John Akoda
22344 Rolling Hill Lane
Laytonsville, MD 20882

August 29, 2000

Mr. William C. Kelly
Manager, Medical Education
Credentials Department/ECFMG
3624 Market Street
Philadelphia, PA 19104

RECEIVED
CREDENTIALS DEPT

SEP  1 2000

ECFMG

Re: USMILE/ECFMG Identification No. 0-553-258

Dear Mr. Kelly:

I am writing in response to your letter dated August 22, 2000 in which it was alleged that I took ECFMC under various names. **These allegations are false.** The identification numbers listed in your letter apparently belong to my cousin Dr. Igberase Oluwafemi Charles, who left the country to practice, I believe, in South Africa. We are two different persons who attended two different Colleges of Medicine. However, I did use his social security number pending INS clearance of my own social security number. I have only taken the examination in my name, John NOSA Akoda. I will provide you with my country issued passport (presently submitted for renewal) if you so desire.

Thank you for your assistance with resolving this unfortunate confusion.

Sincerely,

John Akoda, MD

Transfer to Lee

ECFMG-000557

ECFMG_RUSS_0000557

JA287

EXHIBIT 25

## EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES

PHILADELPHIA OFFICE

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.

TELEPHONE: 215-386-5900 ● FAX: 215-386-9767 ● INTERNET: www.ecfmg.org

September 27, 2000

Memorandum

To:      File #0-553-258-5
         John Akoda

From:    William Kelly

Dr. Akoda came to the ECFMG office today.  He reiterated that he is not "Igberase Charles" and said he was his cousin.  He said he did use Charles's social security number.

Akoda provided his original Nigerian passport and Nigerian "international driving permit."  I made copies.

Akoda indicated that Jersey Shore Medical Center had suspended him pending outcome of ECFMG's investigation.  Akoda asked when his case will be reviewed.

I told him I understood Jersey Shore was conducting its own investigation.  I asked him to send me a copy of the letter he received form the hospital.

*ECFMG® is an organization committed to promoting excellence in international medical education.*

EXHIBIT 26

JA290

**EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES**

PHILADELPHIA OFFICE

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.
TELEPHONE: 215-386-5900 ● FAX: 215-386-9767 ● INTERNET: www.ecfmg.org

December 21, 2000

**Memorandum**

To:        File #0-553-258-5
           John Akoda

From:      Bill Kelly

Today I spoke by telephone with Jim McCorkel, Ph.D., Jersey Shore Medical Center.
Telephone: (732) 776-4732.

Dr. McCorkel advised that Dr. Akoda was dismissed from Jersey Shore Medical Center
for the following reasons:

- Akoda used a false social security number when he applied to the hospital.  He
  acknowledged he used the social security number of his cousin, Charles Igberase.
  He said his cousin (Igberase) had used Akoda's passport and visa to enter the
  United States, so Igberase allowed Akoda to use his social security number.

- The green card Akoda initailly had provided the hospital was inconsistent with a
  subsequent green card he also provided (different number, name, expiration date
  and date of birth).

Dr. Akoda was suspended August 29, 2000.  He did not appeal.  His official dismissal
date was November 17, 2000.

Dr. McCorkel indicated that he hoped to provide this information in writing to ECFMG in
the future, but it required approval form the hospital counsel.  He also indicated that he
expected to provide information to INS

*ECFMG® is an organization committed to promoting excellence in international medical education.*

EXHIBIT 27



## EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES

PHILADELPHIA OFFICE

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.

TELEPHONE: 215-386-5900 ● FAX: 215-386-9767 ● INTERNET: www.ecfmg.org

December 22, 2000

**Memorandum**

To:        Stephen S. Seeling, JD

From:     William Kelly

Subject:   Dr. John Akoda, ID No. 0-553-258-5

Attached is a copy of a Memorandum for the file.

This memorandum is being written separately since I did not think it should be made part of the official file.

In my discussion with Dr. McCorkel he indicated he believed Igberase and Akoda were one and the same person. He has no proof, just a strong suspicion. Information he received from an "informant" provided details that led him to believe this.

I also believe Akoda and Igberase are one and the same. However, at this point, the only information that we have for the ECFMG Credentials Committee is Akoda's written statement that he is NOT Igberase, although he did admit in writing that he used Igberase's social security number. He has given us a passport that appears to confirm his identity as John Akoda. I don't think this is enough for the Committee.

Igberase has not replied to my letter. The FedEx letter was returned undelivered. I tried the phone number he listed on his application and was told it was a wrong number (although the correct address). I sent Igberase an email (cfemi@hotmail.com) and who should reply, but Akoda!

Akoda still has a valid ECFMG Certificate. We need to brainstorm on this one. Maybe Shirley Williams (Miss Sherlock) could sit in.

*ECFMG® is an organization committed to promoting excellence in international medical education.*

Confidential

ECFMG_RUSS_0004160

JA293

**EXHIBIT 28**

Revised June 2006

Use your browser's print button to print the following ERAS Documen

 Mail Id : 53313

## ERAS® Document Submission Form

**Instructions:**
Please submit this form along with any document(s) you want processed for your ERAS application including: original MSPE, photograph, original Letters of Recommendation (LoRs) and copy of medical school transcript. For LoRs, please be sure to list the names of the letter writers in the grid provided below. If you agreed to waive your right to view your LoR(s), your letter writer(s) must submit the "LOR Cover Sheet / Instructions for International Medical Graduates". The form can be found and downloaded at http://www.aamc.org/students/eras/resources/.

**Note:** Please **do not** send any documents that you do not intend to assign to programs as part of your application.

Applicant Name / AAMC ID: _John. C. Nosa Akoda / 11450936_

Applicant Signature: _Charles Akoda_

**Documents submitted with this form: (Please circle)**

1. MSPE (must be an original)                    YES    (NO)

2. Color Photograph                              (YES)   NO

3. Medical School Transcript (copy)               YES    (NO)
   (ERAS cannot access a medical transcript or photo that you may
   have sent to ECFMG for the purpose of ECFMG Certification.)

4. Original Letter(s) of Recommendation that are included in this mailing (enter name of letter writer):

| Letter Writer Names | |
|---|---|
| Name: Dr A.O. Roberts | Name: |
| Name: Dr Phil Robertson | Name: |
| Name: Dr Charles Francis | Name: |
| Name: | Name: |
| Name: | Name: |

Submit the completed form with your documents to:

**Regular mail:**
ECFMG / ERAS Documents
PO Box 11746
Philadelphia, PA 19101-0746 USA

**Courier service:**
ECFMG / ERAS Documents
3624 Market Street
Philadelphia, PA 19104-2685 USA

For Official Use Only P/CD  S-DM

Date Sent: 10/3/06    Via: USPS(E+R).    SH 10/16

Comments: No Photo in this Packet    **RECEIVED**

OCT 0 5 2006

**ERAS**

ECFMG_RUSS_0003899

JA295

EXHIBIT 29


**ECFMG** | EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATE

24 Market Street
Philadelphia PA 19104-2685 USA
5-386-5900 | 215-386-9767 Fax
www.ecfmg.org

Personal and Confidential
Via Federal Express

November 22, 2006

Charles A. Francis, M.D.
Department of the Air Force
1st Medical Operations Squadron
Langley AFB, VA  23665-2080

Re: Dr. John Nosa Akoda
USMLE™/ECFMG® Identification No. 0-553-258-5

Dear Dr. Francis:

I am enclosing a copy of a "Letter of Recommendation" that Dr. John Nosa Akoda submitted to the Educational Commission for Foreign Medical Graduates (ECFMG) Electronic Residency Application Service (ERAS).

Kindly write to me as soon as possible to advise whether the enclosed letter is authentic. Please fax a copy of your letter to me at (215) 386-9767.

In addition, please provide me with any biographic information you may have concerning Dr. Akoda such as; date of birth, medical school and medical school graduation date.

Thank you for your assistance in this matter. If you have any questions or need additional information, please contact me. My telephone number is (215) 823-2277, my fax number is (215) 386-9767 and my email address is bkelly@ecfmg.org.

Sincerely,

William C. Kelly
Director, Credentialing and Record Services

/wck
Enclosure

ECFMG® is an organization committed to promoting excellence in international medical education.

ECFMG-000647

ECFMG_RUSS_0000647

JA297



**DEPARTMENT OF THE AIR FORCE**
1ˢᵗ MEDICAL OPERATIONS SQUADRON
LANGLEY AIR FORCE BASE, VA

RECEIVED

OCT 05 2006

S/t

ERAS

10/16

757-225-1616

October 1,2006

Re: John- Charles Nosa Akoda  M.D.

LETTER OF REFERENCE

I am very pleased to write this letter of reference on behalf of the above named Physician.

Dr Akoda, "CHUCK" as we know him worked with me as an assistant from July 2005 to date.

His medical knowledge is outstanding, his application to his duties excellent and his interaction with patient and staff tremendously excellent to say the least.

He is very well liked by staff and patient.

I have personally observed and supervised this physician on numerous occasions, He stood out compared to my other assistants in terms of knowledge base and enthusiasm to learn and work.

It is my sincere opinion that he will be an asset to whatever program he is accepted into.

I have no reservation whatsoever in recommending him for his postgraduate pursuit.

Feel free to contact me at the above number 757- 764-4017 if you need more information.

Yours Sincerely,

Charles. A .Francis M.D.
(Dept Of Obstetrics and Gynecology  1ˢᵗ FW LAFB)

COPY
Originals required for
this document type.
ERAS Support Services

Charles A. Francis, M.D., USAF, MC
AU4675027-1194 Civilian Provider
1ST Medical Group (ACC)
Langley AFB, Virginia 23665-2090

*Global Power For America*

ECFMG-000650

ECFMG_RUSS_0000650

JA298



ECFMG™ | EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

3624 Market Street
Philadelphia PA 19104-2685 USA
215-386-5900 | 215-386-9767 Fax
www.ecfmg.org

Personal and Confidential
Via Federal Express

November 22, 2006

A.O. Roberts, M.D., MB.BS., F.R.C.S.
Department of Obstetrics and Gynecology
University of Ibadan
Ibadan, Nigeria

> Re: Dr. John Nosa Akoda
> USMLE™/ECFMG® Identification No. 0-553-258-5

Dear Dr. Roberts:

I am enclosing a copy of a "Letter of Recommendation" that Dr. John Nosa Akoda submitted to the Educational Commission for Foreign Medical Graduates (ECFMG) Electronic Residency Application Service (ERAS).

Kindly write to me as soon as possible to advise whether the enclosed letter is authentic. Please fax a copy of your letter to me at (215) 386-9767.

In addition, please provide me with any biographic information you may have concerning Dr. Akoda such as, date of birth, medical school and medical school graduation date.

Thank you for your assistance in this matter. If you have any questions or need additional information, please contact me. My telephone number is (215) 823-2277, my fax number is (215) 386-9767 and my email address is bkelly@ecfmg.org.

Sincerely,

William C. Kelly
Director, Credentialing and Record
Services

/wck
Enclosure

ECFMG® is an organization committed to promoting excellence in international medical education.

**COLLEGE OF MEDICINE**
*PROVOST:*
PROFESSOR BABATUNDE OSOTIMEHIN
*MD (Birm.) FMC Path, FWACP, FRCP (Lond)*
*SECRETARY:*
MR. C. O. AROWOLO; J.P, LLB (Lond.), M. A., (Illinois.)
*F.C.I.S.; B.L.; M.I.P.M.*

*OUR REF:*

*YOUR REF:*



**UNIVERSITY OF IBADAN,**
**IBADAN, NIGERIA.**
*Cables & Telegram:* UNIVERSITY IBADAN
Telephone: IBADAN UCH 400010—400028
Exts. 3119, 3122, 3287

**FACULTY OF CLINICAL SCIENCES & DENTISTRY**
*DEAN:* · PROFESSOR O. A. ADEBO *M.B., B.S., (Ib), F.R.C.S. C., Dip. A.B.S., Dip, A.B.T.S., F.A.C.S., F.W.A.C.S., F.M.C.S.*

---

**SUB-DEANS:**

*(Postgraduate)*
**Dr. F. Omokhodion**
MB.BS. (Ib), M.Sc. (Lond.), Ph.D.
(Lond.) F.W.A.C.P.

*(Undergraduate)*
**Dr. S. Kadiri**
M.B., B.S. (Ib.), F.M.C.P. (Nig.),
F.W.A.C.P.

*(DENTISTRY):*
**Dr. G. A. Aderinokun**
B.D.S. (Ib.) M.P.H. (U.C.L.A.)

*(FACULTY OFFICER):*
E. B. Famewo (Mrs)
D.P.A. (Ife), D.S.S. (Toronto)

*Dept of Obstetrics and Gynecology*
*University Of Ibadan.*
*20 August, 2006.*

*RE: Dr John-Charles Nosa Akoda,*
*Candidate Number 36682*

<u>*LETTER OF ATTESTATION TO POSTGRADUATE STUDIES*</u>

*The Doctor named above was admitted to the Residency program in*
*the department of Obstetrics and Gynecology as a PGY-1 on*
*30 June 1990.*
*He completed a total of two calendar years and left on his own*
*Volition on 31 July 1992 before completing the entire program.*
*While he was a Resident, he conducted himself with utmost dignity.*
*He was well ahead of his peers in terms of intellect. His attitude*
*towards learning was very commendable. His scores on the*
*Resident's annual aptitude test was in the 99th percentile.*

*Please feel free to contact my office if more Information is required.*

*Sincerely,*

*Dr A.O.Roberts.*
*MB.BS(IB) F.R.C.S.(ENG)*
*Head of Dept. Obstetrics and Gynecology.*
DEPT. OF OBSTETRICS
AND GYNAECOLOGY
UNIVERSITY OF IBADAN
NIGERIA

**RECEIVED** SH
OCT 0 5 2006
**ERAS** 10/14

ECFMG-000651

ECFMG_RUSS_0000651

JA300



EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

3624 Market Street
Philadelphia PA 19104-2685 USA
215-386-5900 | 215-386-9767 Fax
www.ecfmg.org

Personal and Confidential
Via Federal Express

November 22, 2006

Phil Robertson, M.D.
Maxicare, Inc.
P.O.Box 5036
Laytonsville, MD  20882

Re: Dr. John Nosa Akoda
USMLE™/ECFMG® Identification No. 0-553-258-5

Dear Dr. Robertson:

I am enclosing a copy of a "Letter of Recommendation" that Dr. John Nosa
Akoda submitted to the Educational Commission for Foreign Medical Graduates
(ECFMG) Electronic Residency Application Service (ERAS).

Kindly write to me as soon as possible to advise whether the enclosed letter is
authentic. Please fax a copy of your letter to me at (215) 386-9767.

In addition, please provide me with any biographic information you may have
concerning Dr. Akoda such as, date of birth, medical school and medical school
graduation date.

Thank you for your assistance in this matter. If you have any questions or need
additional information, please contact me. My telephone number is (215) 823-2277, my
fax number is (215) 386-9767 and my email address is bkelly@ecfmg.org.

Sincerely,

William C. Kelly
Director, Credentialing and Record
Services

/wck
Enclosure

ECFMG® is an organization committed to promoting excellence in international medical education.



# MAXICARE, INC.
### HEALTH CARE SERVICES

28 September, 2006

## DR JOHN-CHARLES AKODA

### LETTER OF RECOMMENDATION:

I hereby write a letter of recommendation for the Doctor referenced above.

I have known this doctor for approximately 5years through which he worked for my establishment-Maxi care Inc. in various categories including registered Nurse which licensure he obtained through our corporation.

He was very knowledgeable in the field of medicine especially reproductive medicine which he was quick to unassumingly reminded me that he had a 2year residency program in hence he knew a little more than the rest of the staff.
He was very modest, very professional with his staff and patients, everybody loved him.
He was usually the first to arrive at the office and the last to leave.
He had a very voracious appetite for learning and he is well verse about life in general.

Without hesitation or reservations, I write this letter knowing what a brilliant Physician he is.

For questions, please contact me at 301-802-0481.

Thank you,

Phil Robertson M.D.
(Medical Director)

**RECEIVED** SH
OCT 05 2006
ERAS 10/16

EXHIBIT 30

Case: 20-2128    Document: 21-2    Page: 36    Date Filed: 09/02/2020

Case 2:18-cv-05629-JDW   Document 32-32   Filed 10/07/19   Page 2 of 11
ATTACHMENT 1
Case 8:16-cr-00277-PWG   Document 49   Filed 11/15/16   Page 1 of 7

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Southern Division*

| | | | |
|---|---|---|---|
| *Kelly O. Hayes*<br>*Assistant United States Attorney*<br>*Kelly.Hayes@usdoj.gov* | *Mailing Address:*<br>*6500 Cherrywood Lane, Suite 200*<br>*Greenbelt, MD 20770-1249* | *Office Location:*<br>*6406 Ivy Lane, 8ᵗʰ Floor*<br>*Greenbelt, MD 20770-1249* | *DIRECT: 101-344-0041*<br>*MAIN: 301-344-4433*<br>*FAX: 301-344-4516* |

October 31, 2016

Peter Goldman, Esq.
O'Reilly & Mark, P.C.
524 King Street
Alexandria, VA 22314

PWG 16-0277

Re:   United States v. Oluwafemi Charles Igberase,
      a/k/a "Charles John Nosa Akoda,"
      Criminal No. PWG-16-277

Dear Mr. Goldman,

This letter confirms the plea agreement, together with the sealed supplement, which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by November 4, 2016, it will be deemed withdrawn. **The plea agreement is entered into and will be submitted to the Court pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C).** The terms of the agreement are as follows:

### Offense of Conviction

1.     The Defendant agrees to plead guilty to Count One of the Superseding Indictment now pending against him, which charges him with misuse of a Social Security Account Number, in violation of 42 U.S.C. § 408(a)(7)(B). The Defendant admits that he is, in fact, guilty of this offense and will so advise the Court.

### Elements of the Offense

2.     The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: (1) the Defendant falsely represented a number to be the Social Security Account Number assigned to him by the Commissioner of Social Security; (2) the Defendant made that false statement with the intent to deceive or for any other purpose; and (3) the Defendant acted knowingly and willfully.

ECFMG-000011

ECFMG_RUSS_0000011

JA304

<u>Penalties</u>

3.    The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is as follows: five years of imprisonment, a fine of $250,000, and a period of supervised release of three years. In addition, the Defendant must pay $100 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

<u>Waiver of Rights</u>

4.    The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

a.    If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b.    If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.    If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

---

[1] Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

ECFMG-000012

ECFMG_RUSS_0000012

JA305

      d.    The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

      e.    If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

      f.    By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

      g.    If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

      h.    By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Indeed, because the Defendant is pleading guilty to the identity fraud charges in this case, and because he is an illegal alien, removal is presumptively mandatory. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences, even if the consequence is his automatic removal from the United States.

<u>Advisory Sentencing Guidelines Apply</u>

      5.    The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

ECFMG-000013

ECFMG_RUSS_0000013

JA306

Factual and Advisory Guidelines Stipulation

6.      This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors:

        a.      The base offense level is 6, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2B1.1(a)(2).

        b.      Pursuant to U.S.S.G. § 2B1.1(b)(10)(C), because the offense involved sophisticated means and the Defendant intentionally engaged in or caused the conduct constituting sophisticated means, and because the resulting offense level is less than level 12, the offense level is increased to 12.

        c.      A 3-level enhancement applies, pursuant to U.S.S.G. § 3B1.3, because the Defendant abused a position of public or private trust in a manner that significantly facilitated the commission or concealment of the offense.

        d.      This Office does not oppose a 2-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty. If the Defendant receives a 2-level reduction, the final offense level will be 13.

7.      The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a Career Offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

8.      This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.

Rule 11(c)(1)(C) Plea

9.      The parties stipulate and agree pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that a sentence of **six months of imprisonment, followed by three years of supervised release, which includes as a condition of supervised release six months of home confinement**, is the appropriate disposition of this case. This agreement does not affect the Court's

4

ECFMG-000014

ECFMG_RUSS_0000014

JA307

discretion to impose any lawful fine or to set any additional lawful conditions of probation or supervised release. In the event that the Court rejects this plea agreement, either party may elect to declare the agreement null and void. Should the Defendant so elect, he will be afforded the opportunity to withdraw his plea pursuant to the provisions of Federal Rule of Criminal Procedure 11(c)(5).

### Obligations of the United States Attorney's Office and the Defendant

10.     At the time of sentencing, the parties will jointly request the Court to accept the stipulated sentence of **six months of imprisonment, followed by three years of supervised release, which includes as a condition of supervised release six months of home confinement.** At the time of sentencing, this Office will move to dismiss all open counts.

11.     The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct.

### Agreement Not to Prosecute Other Offenses the Defendant May Have Committed

12.     Other than the offense to which the Defendant has agreed to plead guilty, and with the exception of crimes of violence, crimes against children and tax violations, this Office will not prosecute the Defendant for any other violations of federal criminal law that arise from the facts stipulated by the Defendant and this Office, attached hereto and incorporated herein as Attachment A, that form the basis of this plea agreement.

### Waiver of Appeal

13.     In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

a.     The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction.

b.     If the Court accepts this Plea Agreement and imposes the agreed-upon sentence, the Defendant and this Office knowingly waive all rights, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal the sentence imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

c.     Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

5

ECFMG-000015

ECFMG_RUSS_0000015

JA308

Case: 20-2128    Document: 21-2    Page: 41    Date Filed: 09/02/2020

Case 2:18-cv-05629-JDW    Document 32-32    Filed 10/07/19    Page 7 of 11

Case 8:16-cr-00277-PWG    Document 49    Filed 11/15/16    Page 6 of 7

d.    The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Obstruction or Other Violations of Law

14.    The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, (iii) moves to withdraw his guilty plea or (iv) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

## Entire Agreement

15.    This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Rod J. Rosenstein
United States Attorney

By: _Kelly O. Hayes_
Kelly O. Hayes
Assistant United States Attorney

6

ECFMG-000016

ECFMG_RUSS_0000016

JA309

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

11/15/16
Date

Oluwafemi Charles Igberase
a/k/a "Charles John Nosa Akoda"

I am Oluwafemi Charles Igberase's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

11/15/16
Date

Peter Goldman, Esq.

7

ECFMG-000017

ECFMG_RUSS_0000017

JA310

<u>**ATTACHMENT A - Stipulated Facts**</u>

*The United States and the Defendant stipulate and agree that if this case proceeded to trial, the United States would prove the facts set forth below beyond a reasonable doubt. The parties further stipulate and agree that these are not all of the facts that the United States would prove if this case proceeded to trial.*

In October 1991, the Defendant, **OLUWAFEMI CHARLES IGBERASE** ("**IGBERASE**"), entered the United States pursuant to a Nonimmigrant Visa.

In November 1991, **IGBERASE** applied for and obtained a Social Security number ("SSN"), XXX-XX-5054 (the "5054 SSN"), using the name "Igberase Oluwafemi Charles" and date of birth April 17, 1962. In January 1995, **IGBERASE** applied for and obtained a second SSN, XXX-XX-9065 (the "9065 SSN"), using the name "Charles Oluwafemi Igberase Jr." and a false date of birth. In September 1998, **IGBERASE**, this time using the name "Oluwafemi Igberase," and a false date of birth, applied for and obtained a third SSN, XXX-XX-7353 (the "7353 SSN"). In or about 2011, **IGBERASE** fraudulently used the 7353 SSN to apply for federal education loans for his children.

In April 1992, **IGBERASE** submitted an application for certification by the Educational Commission for Foreign Medical Graduates ("ECFMG"). **IGBERASE** submitted the application using the name "Oluwafemi Charles Igberase," and indicated SSN ending in 5054 and date of birth April 17, 1962. ECFMG is an organization which, among other things, provides certification to international medical school graduates before such individuals may enter graduate medical education programs in the United States, where they provide supervised patient care. Foreign medical graduates must obtain ECFMG certification in order to take the three-step United States Medical Licensing Examination ("USMLE"). All medical graduates must pass all three steps of the USMLE in order to obtain an unrestricted license to practice medicine in the United States. In July 1992, **IGBERASE** failed both the basic medical science (Day 1) and clinical science (Day 2) components of the Foreign Medical Graduate Examination in Medical Sciences ("FMGEMS"), which is Step 2 of the USMLE. In January 1993, **IGBERASE** again failed the basic medical science (Day 1) component of the FMGEMS. In September 1993, **IGBERASE** failed Step 1 of the USMLE. Eventually, between July 1992 and September 1993, **IGBERASE** passed all three steps of the USMLE and, in October 1993, was issued ECMFG Certification under the name "Oluwafemi Charles Igberase."

In March 1994, **IGBERASE** submitted a second application for ECFMG certification, this time under the name "Igberase Oluwafemi Charles," using a false date of birth. Between August 1994 and September 1994, **IGBERASE** passed all three steps of the USMLE and was issued a second ECFMG certificate under the name "Igberase Oluwafemi Charles."

In 1995, the ECFMG Committee on Medical Education Credentials became aware that **IGBERASE** had fraudulently applied for and obtained two ECFMG certifications under different names and dates of birth. In December 1995, ECFMG revoked or suspended both ECFMG certifications assigned to **IGBERASE**.

8

ECFMG-000018

ECFMG_RUSS_0000018

In August 1996, **IGBERASE** submitted a third application for ECFMG certification, this time using the name "John Nosa Akoda." Along with this third application, **IGBERASE** submitted to ECFMG a false Nigerian passport in the name of "John Nosakhane Charles Akoda." Between 1996 and 1998, **IGBERASE**, as "John Nosa Akoda," passed all three steps of the USMLE and received ECFMG certification under the "Akoda" name.

After receiving ECFMG certification under the "Akoda" name, **IGBERASE** applied for and was accepted into a residency program at Jersey Shore Medical Center ("JSMC"). In 2000, JSMC learned that the SSN that **IGBERASE** used belonged not to "Akoda" but rather to **IGBERASE**. **IGBERASE** was suspended from JSMC's residency program in August 2000 and ultimately dismissed in November 2000.

In 1999, Individual A applied for and obtained SSN XXX-XX-1623 (the "1623 SSN").

In 2006, **IGBERASE**, using the name "John-Charles Akoda," and the 1623 SSN assigned to Individual A, applied for residency at Howard University. In March 2007, Howard University accepted **IGBERASE** into its residency program, and asked **IGBERASE** to submit evidence of legal residence in the United States. In response, **IGBERASE** submitted a false permanent resident card in the name "N. Akoda, John Charles."

In 2011, after the completion of his residency at Howard University, **IGBERASE**, using the name "Charles John Nosa Akoda" and the 1623 SSN, applied for medical licensure with the Maryland Board of Physicians. In support of this application, **IGBERASE** submitted a false permanent residence card, as well as a false Nigerian passport. In September 2011, the Maryland Board of Physicians granted the requested medical license to **IGBERASE** under the name "Charles John Nosa Akoda," and **IGBERASE** began practicing medicine in the field of obstetrics and gynecology.

In 2012, **IGBERASE**, using the "Akoda" identity, sought and obtained medical privileges at Prince George's Hospital Center ("PGHC") in Maryland. To do so, **IGBERASE** submitted a false permanent residence card, as well as a false Maryland driver's license.

On March 1, 2012, **IGBERASE** submitted a Medicare Enrollment Application to the Center of Medicare and Medicaid Services ("CMS") using the "Akoda" identity and the 1623 SSN. CMS denied **IGBERASE**'s application based, in part, on CMS's determination that **IGBERASE** did not provide an accurate SSN.

On June 9, 2016, law enforcement executed search warrants at **IGBERASE**'s residence, medical practice, and vehicle. From **IGBERASE**'s vehicle, law enforcement seized a Maryland driver's license in the "Akoda" name. From **IGBERASE**'s residence, law enforcement seized (1) a false Social security card for the 1623 SSN in the name "John Charles N. Akoda," (2) a false Nigerian passport for "Akoda," and (3) a false United States visa in the "Akoda" name. Law enforcement also found fraudulent or altered documents related to immigration, medical diplomas, medical transcripts, letters of recommendation, and birth certificates.

9

ECFMG-000019

ECFMG_RUSS_0000019

JA312

Throughout the above-referenced scheme, **IGBERASE** also used the 1623 SSN and false documentation to open various bank accounts using the "Akoda" identity.

\* \* \*

I have read this statement of facts and carefully reviewed it with my attorney. I acknowledge that it is true and correct.

11/15/16
Date

Oluwafemi Charles Igberase
a/k/a Charles John Nosa Akoda

I am Oluwafemi Charles Igberase's attorney. I have carefully reviewed the statement of facts with him.

11/15/16
Date

Peter Goldman, Esq.

10

ECFMG-000020

ECFMG_RUSS_0000020

JA313

EXHIBIT 31

JA314



EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

3624 Market Street
Philadelphia PA 19104-2685 USA
215-386-5900  |  215-386-9767 Fax
www.ecfmg.org

PERSONAL AND CONFIDENTIAL
VIA E-MAIL: adcfrancis@aol.com

December 19, 2016

John Nosa Akoda
3013 Kasar Ct
Waldorf, MD 20603

Re: USMLE®/ECFMG® Identification No. 0-553-258-5

Dear Mr. Akoda:

I am writing to inform you that the Educational Commission for Foreign Medical Graduates has received a copy of an October 31, 2016 document from the U.S. Department of Justice which outlines a plea agreement between you (under the name Oluwafemi Charles Igberase) and the United States. A copy of this document is enclosed for your reference.

In this document, you in stipulated to a number of facts, including that you applied to ECFMG under the name "John Nosa Akoda" and that you provided a false Nigerian passport to ECFMG.

As you are aware, you had previously obtained two ECFMG Certificates which have both been revoked, as you were determined to have engaged in irregular behavior because you provided false information to ECFMG in order to obtain or attempt to obtain additional ECFMG Certificates. Those revoked ECFMG Certificates were issued under the following names and ECFMG ID numbers:

| Name | ECFMG ID Number |
|---|---|
| Oluwafemi Charles Igberase | 0-482-700-2 |
| Igberase Oluwafemi Charles | 0-519-573-0 |

In addition to the revocation of these ECFMG Certificates, you were permanently barred from ECFMG Certification.

In light of the revocation and permanent bar from ECFMG Certification in your previous ECFMG record and the information received in the October 31, 2016 U.S. Department of Justice letter, specifically that John Nosa Akoda is an alias for Oluwafemi Charles Igbarese, the ECFMG Certificate issued to you under the name John Nosa Aokda has been revoked.  In accordance with ECFMG procedures, your records have been consolidated under the USMLE/ECFMG Identification number: 0-482-700-2. Please be sure to use this number in all correspondences with ECFMG in the future.

ECFMG® is an organization committed to promoting excellence in international medical education.
ECFMG-000021

ECFMG_RUSS_0000021

JA315

John Nosa Akoda
December 19, 2016
Page 2 of 2

In accordance with procedures, ECFMG will report the revocation of your Standard ECFMG Certificate to the Federation of State Medical Boards of the United States, U.S. state and international medical licensing authorities, directors of graduate medical education programs, and to any other organization or individual who, in the judgment of ECFMG, has a legitimate interest in such information.

If you have any questions or need additional information, please telephone me at (215) 823-2273 or e-mail me at kcorrado@ecfmg.org.

Sincerely,

Kcorrado

Ms. Kara Corrado, J.D.
Assistant Vice President for Operations

Encl: As noted.

ECFMG-000022

ECFMG_RUSS_0000022

JA316

EXHIBIT 32

Case 2:18-cv-05629-JDW   Document 32-31   Filed 10/07/19   Page 2 of 8

| | | |
|---|---|---|
| IN THE MATTER OF | * | BEFORE THE MARYLAND |
| CHARLES J.N. AKODA, M.D. | * | STATE BOARD OF PHYSICIANS |
| Respondent. | * | Case Number 2017-0083B |
| License Number D73049 | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## FINAL DECISION AND ORDER

### PROCEDURAL HISTORY

On November 15, 2016, Charles J.N. Akoda, M.D., a physician licensed[1] by the Maryland State Board of Physicians ("Board"), entered a plea of guilty to one count of Social Security Account Number Fraud in the United States District Court for the District of Maryland ("U.S. District Court"), in violation of 42 U.S.C. § 408(a)(7)(B). (Case No. PWG-8-16-CR-00277-001). On March 2, 2017, Dr. Akoda was sentenced to six months incarceration, three years of supervised release, home detention for six months, and an assessment of $100.00. Dr. Akoda has not filed an appeal of his conviction and the time for filing an appeal has passed.

On April 4, 2017, the Office of the Attorney General filed with the Board a Petition to Revoke Dr. Akoda's license to practice medicine, pursuant to section 14-404(b)(2) of the Health Occupations Article, which provides:

> After completion of the appellate process if the conviction has not been reversed or the plea has not been set aside with respect to a crime involving moral turpitude, a disciplinary panel shall order the revocation of a license on the certification by the Office of the Attorney General.

---

[1] Dr. Akoda allowed his license to expire on September 30, 2016. The Board was notified of Dr. Akoda's criminal indictment in August of 2016 and began its investigation prior to the expiration of Dr. Akoda's license. Pursuant to Section 14-403 of the Health Occupations Article, the license of an individual regulated by the Board "may [not] lapse by operation of law while the individual is under investigation . . ." Md. Code. Ann., Health Occ. § 14-403(a) (2014 Repl. Vol.). Therefore, by operation of law, Dr. Akoda's license was not permitted to expire during the pendency of these proceedings.

Attached to the Petition were certified copies of the criminal docket entries, indictment, superseding indictment, plea agreement with stipulated facts, sentencing order, the judgment entered, and a show cause order[2] mandating that Dr. Akoda show cause in writing by May 8, 2017 if there were any reason why his license to practice medicine should not be revoked. To date, the Board has not received a response from Dr. Akoda.

Having reviewed and considered the entire record in these § 14-404(b)(2) proceedings, Panel B issues this Final Decision and Order.

## FINDINGS OF FACT

Panel B finds the following facts by a preponderance of the evidence:

1.   Dr. Akoda was originally licensed to practice medicine in the State of Maryland on September 14, 2011, having been issued License Number D73049. Dr. Akoda continuously renewed his license until September 30, 2016 when his license expired.[3]

2.   On June 1, 2016, in Case No. PWG-8-16-CR-00277-001, the United States Attorney filed an indictment charging Dr. Akoda[4] with social security account number fraud, 42 U.S.C. § 408(a)(7)(B), and aggravated identity theft, 18 U.S.C. § 1028A(a)(1).

3.   On October 19, 2016, in a superseding indictment, Dr. Akoda was charged with an additional count of social security account number fraud, 42 U.S.C. § 408(a)(7)(B); false statement relating to a health care matter, 18 U.S.C. § 1035(a); an additional count of aggravated identity theft, 18 U.S.C. § 1028A(a)(1); and fraud and misuse of an immigration document, 18 U.S.C. § 1546(a).

4.   On November 15, 2016, Dr. Akoda pled guilty to social security account number fraud, in violation of 42 U.S.C. § 408(a)(7)(B).[5] The plea agreement was based on the following statement of facts, which Dr. Akoda acknowledged were true and correct:

---

[2] An updated show cause order was mailed to Dr. Akoda on April 6, 2017 with the same response date of May 8, 2017.

[3] As discussed above, because of the Board's continuing investigation of Dr. Akoda throughout these proceedings, his license to practice medicine did not lapse or expire.

[4] The indictment included eleven different names for Dr. Akoda, including Charles John Nosa Akoda, the name under which Dr. Akoda applied for and was granted a license by the Board.

[5] 42 U.S.C. § 408(a)(7)(B) provides: "Whoever . . . for the purpose of causing an increase in any payment authorized under this title (or any other program financed in whole or in part from Federal funds), or for the purpose of causing a payment under this title (or any such other program) to be made when no payment is authorized thereunder, or for the purpose of obtaining (for himself or any other person) any payment or any other benefit to which he (or such

2

JA319

In October 1991, [Dr. Akoda] entered the United States pursuant to a Nonimmigrant Visa.

In November 1991, [Dr. Akoda] applied for and obtained a Social Security Number ("SSN"), XXX-XX-5054 (the "5054 SSN"), using the name "Igberase Oluwafemi Charles" and date of birth April 17, 1962. In January 1995, [Dr. Akoda] applied for and obtained a second SSN, XXX-XX-9065 (the "9065 SSN"), using the name "Charles Oluwafemi Igberase, Jr." and a false date of birth. In September 1998, [Dr. Akoda] this time using the name "Oluwafemi Igberase," and a false date of birth, applied for and obtained a third SSN, XXX-XX-7353 (the "7353 SSN"). In or about 2011, [Dr. Akoda] fraudulently used the 7353 SSN to apply for federal education loans for his children.

In April 1992, [Dr. Akoda] submitted an application for certification by the Educational Commission for Foreign Medical Graduates ("ECFMG"). [Dr. Akoda] submitted the application using the name "Oluwafemi Charles Igberase," and indicated SSN ending in 5054 SSN and date of birth April 17, 1962. ECFMG is an organization which, among other things, provides certification to international medical school graduates before such individuals may enter graduate medical education programs in the United States, where they provide supervised patient care. Foreign medical graduates must obtain ECFMG certification in order to take the three-step United States Medical Licensing Examination ("USMLE"). All medical graduates must pass all three steps of the USMLE in order to obtain an unrestricted license to practice medicine in the United States. In July 1992, [Dr. Akoda] failed both the basic medical science (Day 1) and clinical science (Day 2) components of the Foreign Medical Graduate Examination in Medical Sciences ("FMGEMS"), which is step 2 of the USMLE. Eventually, between July 1992 and September 1993, [Dr. Akoda] passed all three steps of the USMLE and, in October 1993, was issued ECMFG Certification under the name "Oluwafemi Charles Igberase."

In March 1994, [Dr. Akoda] submitted a second application for ECFMG certification, this time under the name "Igberase Oluwafemi Charles," using a false date of birth. Between August 1994 and September 1994, [Dr. Akoda] passed all three steps of the USMLE and was issued a second ECMFG Certification under the name "Igberase Oluwafemi Charles."

In 1995, the ECFMG Committee on Medical Education Credentials became aware that [Dr. Akoda] had fraudulently applied for and obtained two ECFMG certifications under different names and dates of birth. In December

---

other person) is not entitled, or for the purpose of obtaining anything of value from any person, or for any other purpose . . . with intent to deceive, falsely represents a number to be the social security account number assigned by the Commissioner of Social Security to him or to another person, when in fact such number is not the social security account number assigned by the Commissioner of Social Security to him or to such other person . . . shall be guilty of a felony and upon conviction thereof shall be fined under title 18, United States Code, or imprisoned for not more than five years, or both."

1995, ECFMG revoked or suspended both ECFMG certifications assigned to [Dr. Akoda].

In August 1996, [Dr. Akoda] submitted a third application for ECFMG certification, this time using the name "John Nosa Akoda." Along with this third application, [Dr. Akoda] submitted to ECFMG a false Nigerian passport in the name of "John Nosakhane Charles Akoda." Between 1996 and 1998, [Dr. Akoda], as "John Nosa Akoda," passed all three steps of the USMLE and received ECFMG certification under the "Akoda" name.

After receiving ECFMG certification under the "Akoda" name, [Dr. Akoda] applied for and was accepted into a residency program at [Facility A].[6] In 2000, [Facility A] learned that the SSN that [Dr. Akoda] used belonged not to "Akoda" but rather to Igberase. [Dr. Akoda] was suspended from [Facility A's] residency program in August 2000 and ultimately dismissed in November 2000.

In 1999, Individual A applied for and obtained SSN XXX-XX-1623 (the "1623 SSN").

In 2006, [Dr. Akoda], using the name "John-Charles Akoda," and the 1623 SSN assigned to Individual A, applied for residency at [Facility B]. In March 2007, [Facility B] accepted [Dr. Akoda] into its residency program, and asked [Dr. Akoda] to submit evidence of legal residence in the United States. In response, [Dr. Akoda] submitted a false permanent resident card in the name "N. Akoda, John Charles."

In 2011, after completion of his residency at [Facility B], [Dr. Akoda], using the name "Charles John Nosa Akoda" and the 1623 SSN, applied for medical licensure with the Maryland Board of Physicians. In support of this application, [Dr. Akoda] submitted a false permanent residence card, as well as a false Nigerian passport. In September 2011, the Maryland Board of Physicians granted the requested medical license to [Dr. Akoda] under the name "Charles John Nosa Akoda," and [Dr. Akoda] began practicing medicine in the field of obstetrics and gynecology.

In 2012, [Dr. Akoda], using the "Akoda" identity, sought and obtained medical privileges at [Facility C] in Maryland. To do so, [Dr. Akoda] submitted a false permanent residence card, as well as a false Maryland driver's license.

On March 1, 2012, [Dr. Akoda] submitted a Medicare Enrollment Application to the Center of Medicare and Medicaid Services ("CMS") using the "Akoda" identity and the 1623 SSN. CMS denied [Dr. Akoda]'s application based, in part, on CMS's determination that [Dr. Akoda] did not provide an accurate SSN.

---

[6] In order to maintain confidentiality, facility names will not be used in this Order.

On June 9, 2016, law enforcement executed search warrants at [Dr. Akoda]'s residence, medical practice, and vehicle. From [Dr. Akoda]'s vehicle, law enforcement seized a Maryland driver's license in the "Akoda" name. From [Dr. Akoda]'s residence, law enforcement seized (1) a false Social security card for the 1623 SSN in the name "John Charles N. Akoda," (2) a false Nigerian passport for "Akoda," and (3) a false United States visa in the "Akoda" name. Law enforcement also found fraudulent or altered documents related to immigration, medical diplomas, medical transcripts, letters of recommendation, and birth certificates.

Throughout the above-referenced scheme, [Dr. Akoda] also used the 1623 SSN and false documentation to open various bank accounts using the "Akoda" identity.

5.    On March 2, 2017, Dr. Akoda was sentenced to six months incarceration, three years of supervised release, home detention for six months, and an assessment of $100.00.

6.    April 4, 2017, the Office of the Attorney General filed with the Board a Petition to Revoke Dr. Akoda's license to practice medicine pursuant to Health Occ. § 14-404(b)(2).

7.    Dr. Akoda did not appeal his conviction within the time prescribed by law and the guilty plea and conviction have not been set aside.

### CONCLUSIONS OF LAW

Dr. Akoda does not dispute that he pled guilty to a crime involving moral turpitude and has not filed a response to the petition to revoke his license. Panel B makes the following conclusions of law.

Dr. Akoda's plea of guilty to social security account number fraud, a felony, in violation of 42 U.S.C. § 408(a)(7)(B), constitutes a crime involving moral turpitude *per se*. The essential elements of the crime include intent to deceive. Dr. Akoda admitted that he knowingly and willfully falsely represented several different numbers to be the social security number assigned to him with the intent to deceive.

Maryland appellate courts have repeatedly held that if dishonesty, fraud, or intent to deceive is an essential element of a statute under which a defendant is convicted, the crime involves moral turpitude as a matter of law. *See Board of Physician Quality Assurance v.*

5

Case 2:18-cv-05629-JDW   Document 32-34   Filed 10/07/19   Page 7 of 8

*Felsenberg,* 351 Md. 288, 295 (1998) (crimes involving fraud are crimes involving moral turpitude); *Attorney Grievance Comm'n v. Klauber,* 289 Md. 446, 457-59, *cert. denied,* 451 U.S. 1018 (1981) (the term "moral turpitude" connotes a fraudulent or dishonest intent); *Attorney Grievance Comm'n v. Walman,* 280 Md. 453, 459-60 (1977) (a crime of moral turpitude is characterized by dishonesty, fraud, or deceit); *Oltman v. Maryland State Bd. of Physicians,* 162 Md. App. 453, 485-87, *cert. denied,* 389 Md. 125 (2005) (crime was one of moral turpitude [because] it was dishonest, and characterized by fraud).

It is also settled that "the related group of offenses involving intentional dishonesty for purposes of personal gain are crimes involving moral turpitude." *Oltman,* 162 Md. App. at 486 (citations and quotation marks omitted). By using false social security numbers to open bank accounts, apply for federal education loans for his children and obtain a medical license, Dr. Akoda intended to defraud and deceive the government and Board for purposes of personal financial gain to which he was not entitled. His conduct involved repeated fraud, deceit, and intentional dishonesty for purposes of his own personal gain. The facts underlying Dr. Akoda's criminal offenses, therefore, also establish moral turpitude. *Oltman,* 162 Md. App. at 486.

In the instant case, Dr. Akoda was convicted of social security number fraud, in violation of 42 U.S.C. § 408(a)(7)(B). Dr. Akoda was intentionally dishonest in committing an act of willful deception on a massive scale for a prolonged duration of time for purposes of his own personal financial gain. Panel B concludes that Dr. Akoda was convicted of a crime involving moral turpitude and the time for filing an appeal has passed, thus the revocation of Dr. Akoda's license to practice medicine is required under Health Occ. § 14-404(b)(2).

JA323

## ORDER

It is, on the affirmative vote of a majority of the quorum of Disciplinary Panel B, hereby

**ORDERED** that the medical license of Charles J.N. Akoda, M.D., license number

**D73049**, is **REVOKED**, as mandated by Health Occ. §14-404(b)(2); and it is further

**ORDERED** that this final decision and order is a **PUBLIC DOCUMENT**.

_____07/10/2017_____
Date

_Christine A. Farrelly_
Christine A. Farrelly, Executive Director
Maryland State Board of Physicians

### NOTICE OF RIGHT TO PETITION FOR JUDICIAL REVIEW

Pursuant to Md. Code Ann., Health Occ. § 14-408, Dr. Akoda has the right to seek judicial review of this Final Decision and Order. Any petition for judicial review shall be filed within thirty (30) days from the date of mailing of his Final Decision and Order. The cover letter accompanying this final decision and order indicates the date the decision is mailed. Any petition for judicial review shall be made as provided for in the Administrative Procedure Act, Md. Code Ann., State Gov't § 10-222 and Title 7, Chapter 200 of the Maryland Rules of Procedure.

If Dr. Akoda files a petition for judicial review, the Board is a party and should be served with the court's process at the following address:

> **Maryland State Board of Physicians**
> **Christine A. Farrelly, Executive Director**
> **4201 Patterson Avenue**
> **Baltimore, Maryland 21215**

Notice of any petition should also be sent to the Board's counsel at the following address:

> **Stacey M. Darin**
> **Assistant Attorney General**
> **Department of Health and Mental Hygiene**
> **300 West Preston Street, Suite 302**
> **Baltimore, Maryland 21201**

7

JA324

EXHIBIT 33



# Transcript of William C. Kelly

**Date:** August 20, 2019

**Case:** Russell, et al. -v- Educational Commission for Foreign Medical Graduates

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

JA326

Transcript of William C. Kelly
Conducted on August 20, 2019

### Page 1

```
1                                    Volume I
                                     Pages 1 224
2
3        IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
4            Case No. 2:18 cv 05629 JW
5             Hon. Joshua D. Wolson
6
7
8  MONIQUE RUSSELL, JASMINE RIGGINS
9  ELSA M. POWELL AND DESIRE EVANS,
10      Plaintiffs,
11  vs.
12  EDUCATIONAL COMMISSION FOR
13  FOREIGN MEDICAL GRADUATES
14      Defendant.
15
16
17        DEPOSITION OF WILLIAM C. KELLY
18      Tuesday, August 20, 2019 at 9:40 a.m.
19    Law Offices of Morgan, Lewis & Bockius, LLP
20            One Federal Street
21         Boston, Massachusetts 02110 176
22
23
24        Jennifer A. Doherty, CSR
25        Certified Shorthand Reporter
```

### Page 2

```
1  APPEARANCES:
2  LAW OFFICE OF PETER G. ANGELOS, P.C.
    BY: Paul M. Vettori, Esq.
3   One Charles Center
    100 North Charles Street
4   Baltimore, Maryland 21201
    410 649 2000
5   pvettori@lawpga.com
    For the Plaintiffs.
6
7  JANET, JANET & SUGGS, LLC
    BY: Patrick A. Thronson, Esq.
8   4 Reservoir Circle, Suite 200
    Baltimore, Maryland 21208
9   410 653 3200
    For the unnamed class members.
10
11  SCHORCHOR FEDERICO AND STATON, P.C.
    BY:  Brent Ceryes, Esq.
12   1211 St. Paul Street
    Baltimore, Maryland, 21202
13   310 234 1000
    bceryes@sfspa.com
14   For the Plaintiffs.
15
    MORGAN LEWIS
16   BY: Elisa P. McEnroe, Esq. and
    Matthew Klayman, Esq
17   1701 Market Street
    Philadelphia, Pennsylvania 19103
18   215 963 5917
    elisa.mcenroe@morganlewis.com
19   For the Defendant.
20
21
22
23
24
25
```

### Page 3

```
1                  I N D E X
2  Testimony of:       Direct  Cross
3  WILLIAM KELLY
    by Mr. Vettori        6
4    by Mr. Ceryes              179
5
6              E X H I B I T S
7  No.        Description         For I.D.
8  Exhibit 1 Bates ECFMG RUSS 0000982 1032      15
9  Exhibit 2 Bates ECFMG RUSS 0000155 158      27
10 Exhibit 3 Bates ECFMG RUSS 0000105          31
11 Exhibit 4 Bates ECFMG RUSS 0000407 409      35
12 Exhibit 5 Bates ECFMG RUSS 0003572 3573     40
13 Exhibit 6 Bates ECFMG RUSS 0000433 437      41
14 Exhibit 7 Bates ECFMG RUSS 0000167          45
15 Exhibit 8 Bates ECFMG RUSS 0000074 167      47
16 Exhibit 9 Bates ECFMG RUSS 0000440          54
17 Exhibit 10 Bates ECFMG RUSS 0003465 3468    55
18 Exhibit 11 Bates ECFMG RUSS 0003463 3468    58
19 Exhibit 12 Bates ECFMG RUSS 0000446 447     60
20 Exhibit 13 Bates ECFMG RUSS 0000202         61
21 Exhibit 14 Bates ECFMG RUSS 0000268 269     63
22 Exhibit 15 Bates ECFMG RUSS 0000116 119     65
23 Exhibit 16 Bates ECFMG RUSS 0000267         67
24 Exhibit 17 Bates ECFMG RUSS 0003471 3472    68
25 Exhibit 18 Bates ECFMG RUSS 0004007 4014    70
```

### Page 4

```
1              E X H I B I T S
2  No.    Description          For I.D.
3  Exhibit 19 Bates ECFMG 000464-462          78
4  Exhibit 20 Bates ECFMG RUSS 0000348-351     81
5  Exhibit 21 Bates ECFMG RUSS 0000021-22      86
6  Exhibit 22 Bates ECFMG RUSS 0000023         86
7  Exhibit 23 Bates ECFMG RUSS 0000703-706     87
8  Exhibit 24 Bates ECFMG RUSS 0000643         90
9  Exhibit 25 Bates ECFMG RUSS 0000586         94
10 Exhibit 26 Bates IGBERASE 1908              95
11 Exhibit 27 Bates ECFMG RUSS 0000567         97
12 Exhibit 28 Bates ECFMG RUSS 0000666         99
13 Exhibit 29 Bates ECFMG RUSS 0000679        100
14 Exhibit 30 Bates ECFMG RUSS 0000568        102
15 Exhibit 31 Bates ECFMG RUSS 0000640-641    103
16 Exhibit 32 Bates ECFMG RUSS 0000576        105
17 Exhibit 33 Bates ECFMG RUSS 0000617        106
18 Exhibit 34 Bates ECFMG RUSS 0000559        110
19 Exhibit 35 Bates ECFMG RUSS 0000552-553    112
20 Exhibit 36 Bates ECFMG RUSS 0004194-4195   115
21 Exhibit 37 Bates ECFMG RUSS 0000560        118
22 Exhibit 38 Bates ECFMG RUSS 0000557        119
23 Exhibit 39 Bates ECFMG RUSS 0000555        120
24 Exhibit 40 Bates ECFMG RUSS 0004476        121
25 Exhibit 41 Bates ECFMG RUSS 0000556        123
```

Transcript of William C. Kelly
Conducted on August 20, 2019

2 (5 to 8)

---

**5**

1          E X H I B I T S
2
3  No.       Description         For I.D.
4  Exhibit 42 Bates ECFMG RUSS 0000544    127
5  Exhibit 43 Bates ECFMG RUSS 0000352-392   132
6  Exhibit 44 Bates ECFMG RUSS 0003742   134
7  Exhibit 45 Bates ECFMG RUSS 000671    137
8  Exhibit 46 Bates ECFMG RUSS 0000554   139
9  Exhibit 47 Bates ECFMG RUSS 0003905   140
10 Exhibit 48 Bates ECFMG RUSS 0004160   145
11 Exhibit 49 Bates ECFMG RUSS 0000262-271   159
12 Exhibit 50 Bates ECFMG RUSS 0003899   161
13 Exhibit 51 Bates ECFMG RUSS 0000647-652   164
14 Exhibit 52 Bates ECFMG RUSS 0000569   168
15 Exhibit 53 Bates ECFMG RUSS 0000594-596   175
16
17
18
19
20
21
22
23
24
25

---

**6**

1          P R O C E E D I N G S
2          WILLIAM KELLY, having been
3  satisfactorily identified by the Notary Public was
4  duly sworn and testified as follows:
5          DIRECT EXAMINATION
6  BY MR. VETTORI:
7      Q.  Good morning, Mr. Kelly.
8      A.  Good morning.
9      Q.  Again, thank you for appearing.  My name
10 is Paul Vettori.  As I told you before, I represent
11 two of the named plaintiffs in this case and I'm
12 going to ask you a series of questions about
13 information we need to learn about the case.  Is
14 that fair?
15     A.  Yes.
16     Q.  So have you ever had your deposition taken
17 before?
18     A.  Yes.
19     Q.  Multiple times, two times, how many
20 times?
21     A.  Multiple times.
22     Q.  So I don't have to go through a lot of
23 rules with you.  The only rule I have is I'll try
24 not to talk over you, you try not to talk over me.
25 If you don't understand a question I ask you, please

---

**7**

1  tell me.
2      A.  I will.
3      Q.  Because if you answer the question, I'm
4  going to assume you understood it.  Fair enough?
5      A.  Fair enough.
6      Q.  Can we have, for the record, your full
7  name and address?
8      A.  My name is William Kelly, K-E-L-L-Y.  My
9  home address is 47 Powerhouse, P-O-W-E-R-H-O-U-S-E,
10 Hill, H-I-L-L, Lane.  That's in Rockport, Maine
11 04856.
12     Q.  So you at one time worked for ECFMG, the
13 Educational Commission for Foreign Medical
14 Graduates?
15     A.  Yes.
16     Q.  And when did you leave that company's
17 employment?
18     A.  I retired in May 2015.
19     Q.  So when you left ECFMG, you didn't take
20 employment elsewhere?
21     A.  When I left ECFMG, I worked full-time.  I
22 worked as a consultant for them for one year
23 part-time.
24     Q.  What years would that be?
25     A.  That would be May 2015 until I think it

---

**8**

1  was June 2016.
2      Q.  Okay.  But since June 2016 you've been
3  completely retired?
4      A.  No.  I do contracting work with the State
5  Department, their International Visitor Leadership
6  Program.  I'm a liaison officer.
7      Q.  How much of your time does that take?
8      A.  It varies from year to year and this year
9  it will be a total of maybe ten weeks.
10     Q.  What's your educational background?
11     A.  My undergraduate, I have a Bachelor of
12 Arts from LaSalle University in Philadelphia and
13 graduate school I have a Master of Science from the
14 University of Pennsylvania.
15     Q.  Did you work in Pennsylvania?
16     A.  Yes.
17     Q.  When you graduated from college, did you
18 go immediately into your master's program or did you
19 work first?
20     A.  I worked first.
21     Q.  For how long?
22     A.  About twenty years.
23     Q.  So who did you work for in that twenty
24 year period?
25     A.  From when I graduated from college?

---

Case 2:18-cv-05629-JDW    Document 32-35    Filed 10/07/19    Page 5 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

3 (9 to 12)

---

9

1    Q.  Yes, sir.
2    **A.  I first worked for an insurance company,**
3    **Liberty Mutual Insurance Company.  And then I worked**
4    **for ECFMG.**
5    Q.  When did you start with ECFMG?
6    **A.  October 1977.**
7    Q.  Is that thirty-eight years you were with
8    the company?
9    **A.  Almost.**
10   Q.  Congratulations.
11   **A.  Thank you.**
12   Q.  And congratulations on your
13   semi-retirement.
14   **A.  Okay.**
15   Q.  I need to ask you, what did you do to
16   prepare for this deposition once you learned you
17   were coming here for this deposition?
18   **A.  On my own?**
19   Q.  Well, in any way.  Did you do anything on
20   your own?  Did you talk with anybody?  Did you
21   review any documents?  I can ask those as separate
22   questions, but basically I will start with:  What
23   did you do to prepare for this deposition?
24       MS. MCENROE:  Objection to form.
25   **A.  Well, I met with counsel.**

---

10

1    BY MR. VETTORI:
2    Q.  And I'm not going to ask you what counsel
3    asked you or what you told them, but how many times
4    did you meet with counsel?
5    **A.  Once.**
6    Q.  And did you review any documents in
7    preparation for this deposition?
8    **A.  Yes.**
9    Q.  What type of documents did you review?
10       MS. MCENROE:  Objection to form.
11   **A.  What do you mean by what type?**
12   BY MR. VETTORI:
13   Q.  Well, I want to know what it is you
14   reviewed.  Were there certain files that you asked
15   for or were directed to?
16       MS. MCENROE:  Objection to form.
17   **A.  Paper documents.**
18   BY MR. VETTORI:
19   Q.  Okay.  Of?
20       MS. MCENROE:  Objection to form.
21   BY MR. VETTORI:
22   Q.  Of whom or relating to what?  Akoda?
23   **A.  ECFMG applicants, yes.**
24   Q.  And is one of the -- did you review any
25   documents relating to a gentleman by the name of

---

11

1    John Charles or John Noka Shami Akoda.  I'm not
2    pronouncing it correctly.
3    **A.  Akoda, yes.**
4    Q.  And did you review any documents with
5    respect to an individual by the name of Charles
6    Oluwafemi Igberase?
7    **A.  Yes.**
8    Q.  Did you review any document relating to a
9    person by the name of Igberase Oluwafemi Charles?
10   **A.  That could be one of the names.**
11   Q.  Is there an individual with the last name
12   of Oluwafemi sound like someone whom you looked at
13   documents?
14   **A.  That name was in the documents.**
15   Q.  And about how many hours did you spend
16   preparing for this deposition in either reviewing
17   for documents or meeting with counsel?
18   **A.  The four hours.**
19   Q.  Most of the events I'm going to ask you
20   about, Mr. Kelly, relate to the period from
21   approximately 1992 through at least 2000 and perhaps
22   some limited documents thereafter.
23       Do you have independent recollection of
24   those events?
25       MS. MCENROE:  Objection to form.

---

12

1    **A.  No, not really.**
2    BY MR. VETTORI:
3    Q.  So I'm going to ask you some general
4    questions before I ask specific questions about some
5    of the names I just mentioned.  Can you explain to
6    us, at least in general terms, how the ECFMG
7    certification of foreign medical graduates process
8    worked?
9        MS. MCENROE:  Objection to form.
10   Calls for a narrative.
11   BY MR. VETTORI:
12   Q.  Do you understand my question?
13   **A.  Yes.  I can only speak at the time I**
14   **worked there.**
15   Q.  Fair enough.  I don't want to speak over
16   you.  I don't mean to interrupt you, but I'm only
17   interested in an answer to that question based on
18   the time period that you were there.  I don't want
19   to know anything since you left.
20   **A.  Well, they -- so you're talking about the**
21   **ECFMG certification program?**
22   Q.  Yes.  Of --
23   **A.  -- international --**
24   Q.  I call them IMGs, international medical
25   graduates.

---

Transcript of William C. Kelly
Conducted on August 20, 2019

4 (13 to 16)

---

3

1    A.  Could you repeat the question?
2    Q.  Could you explain how that certification
3  process works or worked at the time you were
4  employed at ECFMG?
5          MS. MCENROE:  Objection to form.
6    A.  There was an evaluation and certification
7  process where international medical graduates passed
8  a series of examinations, documented their education
9  and credentials and -- that were verified by
10 ECFMG.
11   Q.  So fair enough.  What is the first step in
12 this process that ultimately leads to certification
13 by ECFMG?
14         MS. MCENROE:  Objection to form.
15 BY MR. VETTORI:
16   Q.  Do you understand my question?
17   A.  The first step related to ECFMG?
18   Q.  Yes, yes.
19   A.  My recollection is it would be an
20 application to ECFMG.
21   Q.  So is that an application to take steps
22 one and/or two of the USLME?  Is that what that
23 application is all about?
24   A.  Those were some of the exams.  There were
25 different exams over time, but those were some of

---

4

1  the exams that were administered.
2    Q.  Was the English examination another one of
3  those?
4    A.  There was an English test, yes.
5    Q.  So at the time you -- again, all of my
6  questions are directed to the time period right now,
7  between 1992 and the end of year 2000.  Fair
8  enough?
9    A.  Yes.
10   Q.  And if there is any question in your mind
11 about the period I'm asking about, please tell me
12 and I'll tell you again.
13         So in or around 1992 when an applicant, an
14 IMG applicant filled out a form to take one of the
15 USLME exams, was it the practice of ECFMG to assign
16 an identification number to that application?
17         MS. MCENROE:  Objection to form.
18   A.  First let me circle back.  My recollection
19 is in 1992 the USLME exams weren't given.  It was a
20 different exam.  But they would submit an
21 application and an identification number would be
22 assigned to them.
23   Q.  Okay.  So I know I haven't established yet
24 what is required in order to get a certification,
25 but for the purposes of my question right now, let

---

5

1  me fast-forward.  If that same applicant to whom a
2  number had been assigned, when he filed his
3  application or her application, ultimately became
4  certified, would the certification number be the
5  same as that identification number?  Again, I'm
6  talking abut the '92, '93 period.
7    A.  Yes.
8          MR. VETTORI:  So can you mark
9  Exhibit 1?
10         (Exhibit No. 1 marked for
11 identification.)
12 BY MR. VETTORI:
13   Q.  So again, I'm not trying to mislead you.
14 This is a 1996 booklet, not a 1992 or 1993 booklet.
15 Okay?
16   A.  Okay.
17   Q.  But do you recognize the document that's
18 been marked as Exhibit 1?
19   A.  Yes.
20   Q.  And is this the type -- is this document
21 given to any applicant -- was this document given
22 to any IMG applicant who applied to take any of the
23 USLME exams in 1996?
24         MS. MCENROE:  Objection to form.
25   A.  I think they would have had to have it in

---

6

1  order to apply.  That was the sequence.
2  BY MR. VETTORI:
3    Q.  Would you go about halfway through that?
4  I think attached as part of that document is also
5  the USMLE booklet.
6          MS. MCENROE:  Do you have a specific
7  Bates number?
8          MR. VETTORI:  I'm looking for it.
9          MS. MCENROE:  Thank you.
10         (Discussion off the record.)
11 BY MR. VETTORI:
12   Q.  Do you want me to repeat the question?
13   A.  Yeah.
14   Q.  Is the 1996 USMLE bulletin of information
15 part of the document that's marked as Exhibit 1?
16   A.  Yes.  That appears to be so, yes.
17   Q.  And does this -- would this document be
18 provided to people who want to apply to take the
19 USLME exams in 1996?
20         MS. MCENROE:  Objection to form.
21   A.  As with the ECFMG information booklet, I
22 think the applicant would have had to have this in
23 order to apply.
24 BY MR. VETTORI:
25   Q.  And if you'll back up to the end of the

---

Transcript of William C. Kelly
Conducted on August 20, 2019

---

7

1  ECFMG document, I guess it's page -- I'm sorry, it's
2  at the end. Would you please go to -- it's not Bate
3  stamped. Yeah, they are, sorry. I think it's
4  001028. While --
5       For the record, all of these documents to
6  date will have Bates numbers on them provided by
7  counsel for ECFMG. For the most part, I'm just
8  going to use the actual number part as opposed to
9  ECFMG underline Russ underline and the number.
10      So is the page that I'm directing you to
11 the first page of the application that's filled out
12 by the IMG when they want to apply to take the
13 examinations that are required in order to be
14 certified by ECFMG?
15      A. To the best of my recollection, yes.
16      Q. Do you -- sitting here today, do you
17 recall what the step one exams, the step two exams,
18 the English exam, and the step three exams were in
19 the period, say, from 1992 through 1996?
20      MS. MCENROE: Objection to form.
21      A. I have a good recollection, yes.
22 BY MR. VETTORI:
23      Q. So is it accurate -- would it be correct
24 for me to say step one is essentially basic science
25 material? When I say, "is," "was" is the word I

---

8

1  meant.
2       A. Yes.
3       Q. And was step two basic clinical science
4  material?
5       A. Yes.
6       Q. And both were, at that time, two-day
7  multiple choice tests administered by ECFMG; is that
8  correct?
9       A. My -- that -- I have no independent
10 recollection of that. Just from what's on the form
11 the answer would be yes.
12      Q. So am I correct that in addition to
13 successfully -- again, I'm in this 1992 to 1996
14 period. Am I correct that in addition to pass --
15 successfully completing steps one and two of the
16 USLME exams an applicant would also -- an IMG
17 applicant would also have to pass an English test?
18      A. Yes.
19      Q. And in addition, before ECFMG would
20 certify an applicant there had to be primary source
21 verification of that applicant's medical
22 credentials; is that correct?
23      A. Of their medical diploma, yes.
24      Q. Nothing more than their diploma?
25      A. Generally not.

---

9

1       Q. And am I correct also that in that same
2  time period in order -- I'm sorry, was -- in that
3  time period were steps one and two and was the
4  English exam administered by ECFMG?
5       A. To the best of my recollection, yes.
6       Q. Step three was not administered by ECFMG,
7  was it?
8       A. It was not.
9       Q. It was administered by whom?
10      A. My recollection was that it was
11 administered by state medical boards.
12      Q. And am I correct in saying that an IMG
13 applicant could not sit for step three of the USLME
14 unless he or she was certified by ECFMG?
15      MS. MCENROE: Objection to form.
16      A. I believe that was the process in most, if
17 not all states, yes.
18 BY MR. VETTORI:
19      Q. So again, this is just a general question,
20 Mr. Kelly. And again, we're referring to this time
21 period that I framed from 1992 through 2000. Let's
22 say through 1996.
23      Is it correct to say that an IMG couldn't
24 practice medicine in the United States without being
25 certified by ECFMG?

---

20

1       MS. MCENROE: Objection to form.
2       A. That is not correct.
3 BY MR. VETTORI:
4       Q. How would they practice without a
5  certification from ECFMG?
6       A. My -- the best of my recollection is that
7  state licenses are granted by the individual state
8  medical boards and there were different pathways,
9  for example, the Fifth Pathway program for graduates
10 of medical schools in Mexico that were not required
11 to have ECFMG certificates.
12      Q. Are there any other countries where that
13 applied?
14      A. I don't recall.
15      Q. How about Nigeria? Did it apply to
16 graduates of medical schools in Nigeria?
17      A. I do not believe so.
18      Q. So with respect to graduates of Nigeria
19 medical schools in the time period we're talking
20 about, an IMG couldn't obtain a medical license in
21 the United States without being certified by ECFMG,
22 correct?
23      MS. MCENROE: Objection to form.
24      A. It would have been very, very unlikely,
25 yes.

---

Transcript of William C. Kelly
Conducted on August 20, 2019

2

1  BY MR. VETTORI:
2      Q.  Well, can you even sit for the -- at that
3  time period, could you even sit for step three exams
4  without being certified by ECFMG?
5          MS. MCENROE:  Objection to form.
6      **A.  A graduate of a Nigerian medical school?**
7  BY MR. VETTORI:
8      Q.  Yes.
9      **A.  To best of my recollection, no.**
10     Q.  And in that same time period a graduate of
11 a Nigerian medical school wouldn't be permitted to
12 take -- wouldn't be licensed by any state in the
13 United States unless he or she successfully
14 completed step three of USMLE; isn't that correct?
15         MS. MCENROE:  Objection to form.
16     **A.  If they were applying for an initial**
17 **license and had not passed the earlier licensing**
18 **examination, yes.**
19 BY MR. VETTORI:
20     Q.  So would you agree with me that ECFMG
21 works on behalf of domestic and international
22 regulatory authorities to protect the public for
23 which programs and services, including primary
24 source verification, of physician credentials?
25         MS. MCENROE:  Objection.

22

1  BY MR. VETTORI:
2      Q.  Do you agree with that statement?
3      **A.  Would you repeat that for me, please?**
4  BY MR. VETTORI:
5      Q.  ECFMG works on behalf of domestic and
6  international regulatory authorities to protect the
7  public through its programs and services, including
8  primary source verification of physician
9  credentials?
10         MS. MCENROE:  Objection to form.
11     **A.  That appears to be a statement of what it**
12 **currently does and I really don't have any direct**
13 **knowledge of that.  It appears to be a contemporary**
14 **statement.**
15 BY MR. VETTORI:
16     Q.  You don't believe that statement applied
17 during the period of time you were employed by
18 ECFMG?
19     **A.  During part of that period.**
20     Q.  When did that --
21     **A.  The international part I don't think was**
22 **part of it back in the time frame you're talking**
23 **about.**
24     Q.  Okay.  So let me rephrase it, give you --
25 ask you if you agree with the following statement.

23

1  ECFMG works on behalf of domestic regulatory
2  authorities to protect the public through its
3  programs and services including primary source
4  verification of physician credentials?
5          MS. MCENROE:  Objection to form.
6      **A.  I would say yes.**
7  BY MR. VETTORI:
8      Q.  Would it be accurate to say that ECFMG
9  protects the public by, among other ways, seeing
10 that foreign medical graduates have completed an
11 acceptable medical education?
12         MS. MCENROE:  Objection to form.
13     **A.  In that that's part of the certification**
14 **process, yes.**
15 BY MR. VETTORI:
16     Q.  And would it be accurate to say that ECFMG
17 serves to protect the public by seeing to it that
18 foreign medical graduates can successfully pass the
19 requirements of the USLME examinations?
20         MS. MCENROE:  Objection to form.
21     **A.  Yes.**
22 BY MR. VETTORI:
23     Q.  Would it also be accurate to say that
24 ECFMG protects the public by ensuring that foreign
25 medical graduates meet certain standards of

24

1  professional conduct, such as honesty?
2          MS. MCENROE:  Objection to form.
3      **A.  That's difficult for me to say.  I don't**
4  **know that that's specifically spelled out.**
5  BY MR. VETTORI:
6      Q.  Well, isn't that what happened in the
7  situation that brings us here today?
8          MS. MCENROE:  Objection to form.
9  BY MR. VETTORI:
10     Q.  Do you understand what I'm asking you?
11     **A.  Yes.**
12     Q.  Yes, you understand what I'm asking you or
13 yes, that's what happened here?
14     **A.  Oh, I don't know that that's what happened**
15 **here.**
16     Q.  So you understand my question?
17     **A.  Could you repeat the question?**
18     Q.  What I'm asking you is, isn't one of the
19 ways that the ECFMG protects the public is to ensure
20 that an IMG reports with certain standards of
21 conduct including honesty?
22         MS. MCENROE:  Objection to form.
23     **A.  I don't know if I can say that.**
24 BY MR. VETTORI:
25     Q.  Well, from your review of the material

Transcript of William C. Kelly                    7 (25 to 28)
Conducted on August 20, 2019

25

1  that you reviewed in preparation for this
2  deposition, are you aware that, for example, the
3  person who identified himself with the last name of
4  Igberase successfully completed steps one and two
5  and the English examination? Were you aware of
6  that?
7      **A. Independently?**
8      Q. Yes.
9      **A. No.**
10     Q. When you say independently -- let me
11 rephrase.
12         From your review of the material that you
13 reviewed in this case, are you aware that this
14 gentleman with the last name Igberase successfully
15 completed steps one and two of the USLME?
16     **A. I don't recall that.**
17     Q. Let me ask you: Do you recall that he was
18 certified at one point by ECFMG?
19     **A. That I recall, yes.**
20     Q. He couldn't have been certified by ECFMG
21 unless he met the examination requirements, could he
22 have been?
23     **A. Yes, but the examinations could have been**
24 **different examinations.**
25     Q. But whatever examinations were required

26

1  for him, he would have had to have successfully
2  completed them in order to become certified?
3      **A. Yes.**
4      Q. So do you also recall from your review of
5  material in this case that this gentleman by the
6  name of Igberase met all of the medical education
7  requirements, that is they were verified by ECFMG?
8      **A. Yes, I recall that.**
9      Q. And do you recall that he was actually
10 certified? I may have asked that already, but --
11     **A. At one point, yes.**
12     Q. And his certification was revoked,
13 correct?
14     **A. That is my recollection.**
15     Q. And I'm going to get into that detail
16 about later. For general purposes, I'm asking
17 that question.
18         And wasn't his certification revoked
19 because he was dishonest, he lied on his
20 applications?
21         MS. MCENROE: Objection to form.
22     **A. He answered a question incorrectly is my**
23 **recollection, yes.**
24 **BY MR. VETTORI:**
25     Q. You're not willing to concede that he was

27

1  dishonest?
2          MS. MCENROE: Objection to form.
3      **A. I don't know that it's up to me to make**
4  **that...**
5  **BY MR. VETTORI:**
6      Q. All right. So his -- the revocation of
7  his certificate had nothing to do with his medical
8  ability, for want of a better term, correct?
9      **A. That is my recollection.**
10     Q. It had to do with the way in which he made
11 applications to ECFMG on multiple occasions and/or
12 took examinations on multiple occasions, correct?
13         MS. MCENROE: Objection to form.
14     **A. It was based -- my recollection is it was**
15 **based on providing false information on an**
16 **application.**
17 **BY MR. VETTORI:**
18     Q. Isn't that equivalent to dishonesty?
19         MS. MCENROE: Objection to form.
20 Calls for opinion.
21     **A. It wouldn't be up to me to characterize**
22 **that.**
23         (Exhibit No. 2 marked for
24 identification.)
25 BY MR. VETTORI:

28

1      Q. So I believe the document that you've been
2  handed, Mr. Kelly, begins on the first page with the
3  Bates number 0000155; is that correct?
4      **A. Yes.**
5      Q. Have you -- in your preparation for this
6  deposition did you review that document?
7      **A. I don't recall.**
8      Q. You see the number up at the right-hand
9  corner of the document on the first page?
10     **A. Yes.**
11     Q. Is that like an incomplete number because
12 of the way it was copied or for any other reason?
13     **A. The long answer is this was printed by**
14 **machine and although the applicant identification**
15 **numbers were 7 digits, the machine only printed the**
16 **first six and the seventh was added by hand.**
17     Q. So I take it that this identification
18 number, the 482-700, whatever the last number is, I
19 have the document, I can find it if you need it, was
20 assigned to this gentleman by the name of Igberase
21 when he made, as part of his application, to take
22 certain examinations; is that correct?
23     **A. That is my recollection of the process at**
24 **that time, yes.**
25     Q. And as I look at this stamp on the bottom

JA333

Transcript of William C. Kelly                    8 (29 to 32)
Conducted on August 20, 2019

---

29

1  left, it looks like it was filed, that is received
2  by ECFMG on April 6, 1992; is that correct?
3      **A.  Yes.**
4      Q.  And do you see in the middle of page 1
5  that he submitted a Social Security number ending in
6  5054?
7      **A.  Yes.**
8      Q.  Item four?
9      **A.  Yes, I see that.**
10     Q.  If you'll turn to page 2, what is the date
11 of birth he provided?
12     **A.  It looks as though it says the 17th of**
13 **April 1962.**
14     Q.  When ECFMG receives -- I'm sorry.  When
15 ECFMG received this application, was any of the
16 information contained on this form, I guess it's
17 Exhibit 2, inputted into a -- this is a dinosaur
18 talking, I don't know computer terminology -- into a
19 computer program?
20     MS. MCENROE:  Objection to form.
21     **A.  That was the procedure at this time.  What**
22 **happened to this specific one, I could not say for**
23 **certain.**
24 BY MR. VETTORI:
25     Q.  And this may be difficult to answer, but

---

30

1  just in general terms was there a specific computer
2  program set up to deal with IMGs who applied to take
3  certain medical examinations?
4      MS. MCENROE:  Objection to form.
5      **A.  When you say computer program, I know we**
6  **captured certain information from the application in**
7  **the computer system, yes.**
8  BY MR. VETTORI:
9      Q.  And for the most part -- strike that.
10     Would ECFMG do that, I mean, input the
11 information on the application any time an IMG
12 submitted this application, this type of
13 application?
14     MS. MCENROE:  Objection to form.
15     **A.  The procedure was to enter some, but not**
16 **all of the information from the application.**
17 BY MR. VETTORI:
18     Q.  Was your computer program like a software
19 package that you either developed internally or
20 acquired commercially?
21     MS. MCENROE:  Objection to form.
22     **A.  My recollection is yes.**
23 BY MR. VETTORI:
24     Q.  Which?
25     **A.  In 1992 I think it was developed**

---

3

1  outside.
2      Q.  And how about in 1996?
3      **A.  I don't recall.**
4          (Exhibit No. 3 marked for
5  identification.)
6  BY MR. VETTORI:
7      Q.  As part of your review in preparation for
8  this deposition, did you review this document?
9      **A.  I don't recall this specific one, but I**
10 **may have.**
11     Q.  For the record, this is what purports to
12 be a diploma from the University of Ibadan for
13 someone by the name of Charles Olufemi,
14 O-L-U-F-E-M-I, Igberase, I-G-B-E-R-A-E-S-E.  Would
15 it be the normal practice of ECFMG in 1992 to
16 require someone like Mr. Igberase who filled out the
17 application we just reviewed to also submit a
18 diploma?
19     **A.  Yes.**
20     Q.  But you don't have any specific
21 recollection about this diploma?
22     **A.  No.**
23     Q.  Do you have an independent recollection or
24 a recollection that's been refreshed by your review
25 of documents in this case as to whether ECFMG issued

---

32

1  a certificate to someone with the last name
2  Igberase?
3      **A.  Yes.**
4      Q.  Do you have any recollection,
5  independently or as refreshed by your review of
6  records in this case approximately when that was
7  done?
8      **A.  I don't recall.**
9      Q.  So I think the last digit that's missing
10 is zero.  We'll show that later.  It says zero.
11         MR. VETTORI:  Off the record.
12         (Discussion off the record.)
13 BY MR. VETTORI:
14     Q.  So accept for the purposes of my next
15 question that he was certified, he being
16 Mr. Igberase, on October 4, 1993, okay?  I know you
17 didn't remember that, but accept it for purposes of
18 my next question.
19         Would I be correct in stating that
20 that means he had passed the required medical
21 examinations and the English examination -- when I
22 say required, either steps one and two of the USMLE
23 or the equivalent, and you had verified his diploma?
24     MS. MCENROE:  Objection to form.
25     **A.  That was the process for certification,**

---

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

JA334

Transcript of William C. Kelly                    9 (33 to 36)
Conducted on August 20, 2019

33

1  yes.
2  BY MR. VETTORI:
3      Q.  Certification --
4      A.  ECFMG certification.
5      Q.  To be clear, ECFMG will not issue a
6  certificate to an IMG -- I hate to sound like
7  alphabet soup, but -- unless the applicant passes
8  the required medical examinations and the English
9  exam and ECFMG is able to verify the medical
10 credentials, I think you said the diploma; is that
11 correct?
12         MS. MCENROE:  Objection to form.
13     A.  As a general rule.  There are always
14 exceptions.
15 BY MR. VETTORI:
16     Q.  So what type of exceptions?
17     A.  My recollection was that, for example, for
18 the diploma verification the board had authorized
19 use of sworn affidavits in the case of people who
20 were refugees from certain countries where the
21 schools would not respond to verification or they
22 had fled their country and couldn't bring out their
23 diploma and there was review by a standing
24 committee, the board of credentials committee would
25 look at individuals on a case-by-case basis.

34

1      Q.  Thank you.  You testified a little earlier
2  that ECFMG required IMGs to submit diplomas,
3  correct?
4      A.  Yes.
5      Q.  And it was only the diploma that had to be
6  verified; is that your testimony?
7      A.  At that time, yes.
8      Q.  When did that change?
9      A.  I don't know that it changed.  I have no
10 independent knowledge that it changed.
11     Q.  So your recollection is that during the
12 entire -- what did we say, thirty-five, thirty-eight
13 years that you were at ECFMG?
14     A.  Thirty-seven and a half.
15     Q.  It didn't change, only the diplomas were
16 required?
17     A.  Not the whole time.  And there was a
18 period before 1986 -- 1984 or 1986 where we did not
19 require primary source verification directly with
20 the medical school.
21     Q.  But in the period of time that we're
22 talking about here today, which I've mentioned
23 probably too many times already, the diploma was the
24 only thing that had to be verified?
25         MS. MCENROE:  Objection to form.

35

1      A.  As a general rule, yes.
2  BY MR. VETTORI:
3      Q.  IMGs who applied for certification by
4  ECFMG were not required to submit transcripts of
5  their medical school, were they, or were they?
6         MS. MCENROE:  Objection to form.
7      A.  At that time, no.
8  BY MR. VETTORI:
9      Q.  So when an applicant such as Mr. Igberase
10 provided you -- I'm sorry -- provided ECFMG with a
11 diploma, would I be correct in stating that ECFMG
12 would forward that with a form to the medical school
13 for the medical school to verify the accuracy or the
14 authenticity of that document, the diploma?
15     A.  That was the procedure, yes.
16         (Exhibit No. 4 marked for
17 identification.)
18 BY MR. VETTORI:
19     Q.  Do you recall reviewing this document as
20 part of the review you did in preparation for this
21 deposition?
22     A.  I have no recollection of this specific
23 document.
24     Q.  I'll represent to you that this is an
25 application filed by someone with the last name

36

1  Charles, first name Igberase, middle name Oluwafemi,
2  and this looks like -- I'm going to ask you to
3  verify this -- that it was received by ECFMG on
4  March 30, 1994?
5      A.  I can't make out the date, but it could be
6  that, yes.  It's difficult to say.
7      Q.  Do you see anywhere -- do you see in item
8  four whether a Social Security number was
9  provided?
10     A.  I do not see one on this copy.
11     Q.  And again, I'm sorry, for the record this
12 is Bates number 0000407, correct?
13     A.  Yes.
14     Q.  So turn to page 408, the next page.  What
15 date of birth is provided?
16     A.  17th day, fourth month, year '61.
17     Q.  So I take it since you don't recall
18 reviewing this, you can't tell me whether the
19 medical information -- the medical school
20 information on that form is almost identical to the
21 information on the form filed by Mr. Igberase,
22 correct?
23         MS. MCENROE:  Objection to form.
24 BY MR. VETTORI:
25     Q.  You didn't make that comparison?

Transcript of William C. Kelly
Conducted on August 20, 2019                    10 (37 to 40)

---

37

1    A.  I don't recall.
2    Q.  Do you know, either independently of your
3  own personal knowledge or from any review you made
4  in this case prior to this deposition, whether a new
5  identification number was assigned to a gentleman
6  with the last name Charles?
7    A.  On this document I see where there's -- an
8  identification number has been put on it.
9    Q.  Is that the 51?
10    A.  It looks -- that's what it appears to be,
11  519-573.
12    Q.  And that would be consistent with ECFMG's
13  then practice to assign an identification number to
14  an applicant when he or she first applies,
15  correct?
16    A.  Yes.
17    Q.  So would you agree with me that ECFMG
18  interpreted this application as coming from someone
19  other than Mr. Igberase?
20        MS. MCENROE:  Objection to form.
21    A.  Yeah, I don't know that I understand the
22  question.
23  BY MR. VETTORI:
24    Q.  Okay.  So Mr. Igberase, we've looked at
25  his application.  Do you need to look at it again?

---

38

1    A.  No, I recall it.
2    Q.  He's assigned an identification number,
3  correct?
4    A.  According to that application, yes.
5    Q.  And it's different from the identification
6  number assigned to this gentleman by the name of
7  Charles, correct?
8    A.  Yes.
9    Q.  ECFMG wouldn't assign a new number if it
10  thought these were one and the same person, would
11  it?
12        MS. MCENROE:  Objection to form.
13    A.  This number -- the procedure would have
14  been that this number would have been assigned
15  because we checked that he had not previously
16  applied for an examination.
17    Q.  And that implies that ECFMG didn't think
18  he was the same person as Mr. Igberase, correct?
19        MS. MCENROE:  Objection to form.
20    A.  I don't know that.  Just that I think what
21  we felt was he had not previously applied, yeah.
22  BY MR. VETTORI:
23    Q.  And consistent with ECFMG's practice at
24  the time, do you have any personal knowledge as to
25  whether the information on this application --

---

39

1        MR. VETTORI:  What's the exhibit
2  number, I'm sorry?
3        MS. MCENROE:  Four.
4    A.  Four.
5    Q.  -- was, quote, inputted into the computer
6  program?
7        MS. MCENROE:  Objection to form.
8    A.  I have no personal knowledge that that was
9  done.
10  BY MR. VETTORI:
11    Q.  And you don't have any refreshed
12  recollection as a result of the review you did in
13  this case?
14    A.  No.
15    Q.  So is it fair for me to say that within
16  several months of the receipt by ECFMG of the
17  application by the gentleman with the last name
18  Charles --
19    A.  Exhibit 4.
20    Q.  Exhibit 4.
21    A.  Right.
22    Q.  -- ECFMG became suspicious that he and
23  Mr. Igberase were one and the same person?
24        MS. MCENROE:  Objection to form.
25    A.  I have no knowledge of that.

---

40

1        (Exhibit No. 5 marked for
2  identification.)
3  BY MR. VETTORI:
4    Q.  I know you haven't had time to read it
5  because I'm watching you.  Did you review this
6  document in preparation for this deposition?
7    A.  I may have, I don't recall this specific
8  one.
9    Q.  So this is your letter; is it not?
10    A.  Yes, it appears to be.
11    Q.  So I'm prepared for you to take as much as
12  as you want to read it, if you feel it necessary in
13  order to answer my questions.
14        MS. MCENROE:  It's a short letter,
15  why don't we just give him a quick minute to scan
16  over it.
17        MR. VETTORI:  Sure.  Fairness to the
18  witness, I'm happy to do that.
19    A.  (Complies.) I finished reading it.
20    Q.  So wouldn't you agree with me that when
21  you wrote that letter, ECFMG had decided that there
22  was a possible connection between Mr. Charles and
23  Mr. Igberase?
24        MS. MCENROE:  Objection to form.
25    A.  That the -- that these two applications

---

JA336

Transcript of William C. Kelly
Conducted on August 20, 2019

4

1  were for the same individual, yes.
2      Q.  Correct.  Right.  And you in fact told him
3  that you were conducting an investigation in this
4  matter, correct?
5      A.  In the letter, yes.
6      Q.  And you told him he needed to write to
7  ECFMG to explain why he certified on his Charles
8  application that he had never taken the exams
9  before, correct?
10     A.  That he had not previously applied for
11 exams, yes.
12     Q.  Do you have any independent recollection
13 of what it is that triggered ECFMG to write -- to
14 have you write this letter?
15     A.  No.
16     Q.  How did you catch on to them?
17     A.  I don't recall.
18     Q.  That's not an unfair way to characterize
19 it, is it?
20         MS. MCENROE:  Objection.
21 BY MR. VETTORI:
22     Q.  How you caught on to him?
23         MS. MCENROE:  Objection.
24     A.  Why we started the investigation, yeah.
25         (Exhibit No. 6 marked for

42

1  identification.)
2          (Discussion off the record.)
3  BY MR. VETTORI:
4      Q.  So Mr. Kelly, Exhibit 6 is a handwritten
5  letter, which is dated in the upper right-hand side
6  July 14, 1995, and received at ECFMG on July 20,
7  1995.  Can we agree on that?
8      A.  Yes.
9      Q.  And it's Bates number 0000433 through 437.
10 Can we agree on that?
11     A.  Yes.
12     Q.  And it is signed -- well, it says,
13 "Sincerely, Igberase Oluwafemi Charles" and it has
14 that 519 certification number.  Do you see that?
15     A.  Yes.
16     Q.  And is it your understanding -- I'm sorry,
17 have you had time to look at it?
18     A.  Give me a minute.  I can look at this,
19 yeah.
20         (Complies.)
21         MS. MCENROE:  I've finished reviewing
22 it.
23 BY MR. VETTORI:
24     Q.  Okay.  Do you remember this letter?
25     A.  Remember?

43

1      Q.  Do you have an independent recollection of
2  receiving this letter?
3      A.  No.
4      Q.  As part of your review to prepare for this
5  deposition, did you review it?
6      A.  This letter, yes.
7      Q.  So would you agree with me that this is a
8  letter in response to the prior exhibit when you
9  wrote to him saying you were investigating the
10 matter and he should write to you?
11     A.  Yes.
12     Q.  And would you agree with me that in this
13 letter he confesses to the fact that he's really
14 Igberase, that he and Igberase are one and the same
15 person?
16     A.  Yes.
17     Q.  And would you agree with me that basically
18 he blamed what he did on his friends?
19         MS. MCENROE:  Objection to form.
20     A.  I don't know that I would characterize it
21 that way.
22 BY MR. VETTORI:
23     Q.  Well, take a look at the middle of page 2.
24 He says, "As a result of these" -- meaning his
25 inability to get into 150 residency programs, any of

44

1  150 -- "I explained to my friends, who felt I should
2  take the test over again to improve on my scores
3  despite my difficult position, they suggested that
4  since I had already been issued one ECFMG
5  certificate I could not possibly use that same
6  number again to sit for new tests."
7          Do you see that?
8      A.  Yes.
9      Q.  Isn't that, in fact, blaming it on his
10 friends?
11         MS. MCENROE:  Objection to form.
12     A.  To me they're suggesting a course of
13 action for him to take.
14 BY MR. VETTORI:
15     Q.  And he followed that course of action?
16     A.  I don't see that they're telling him to
17 provide a false response on the application.  That's
18 what he did.
19     Q.  But he did admit to lying on the
20 application, correct?
21     A.  In his letter, yes.
22     Q.  And would you turn to page 436, page 4 of
23 the letter?
24     A.  Yes.
25     Q.  Isn't it true that he told you that in the

Transcript of William C. Kelly                    12 (45 to 48)
Conducted on August 20, 2019

45

1  future -- that the future records he was going to
2  use the name Igberase Oluwafemi Charles?
3  **A.  Yes.**
4  Q.  So after receiving this handwritten letter
5  in response to your letter, did the committee on
6  medical education credentials meet to review the
7  matter?
8  **A.  That is my recollection, yes.**
9  MR. VETTORI:  Let me show him the
10 letter and we can stop right here after this.
11 (Exhibit No. 7 marked for
12 identification.)
13 BY MR. VETTORI:
14 Q.  It's a short letter.  Why don't you read
15 it, please.
16 **A.  (Complies.)  I finished reading it.**
17 Q.  So this letter is signed by you?
18 **A.  Yes.**
19 Q.  And this letter is telling, I guess both
20 Charles and Igberase, what the results are of the
21 meeting of the education -- ECFMG committee on
22 medical education credentials; is that correct?
23 **A.  Yes.**
24 Q.  And as I understand it, the decision of
25 the committee was to invalidate the ECFMG

46

1  certificate issued as 0519573-0, correct?
2  **A.  Yes.**
3  Q.  That's the one that was issued to the
4  gentleman by the name of Charles, correct?
5  **A.  I have no independent knowledge of that.**
6  Q.  And also is telling Charles and Igberase
7  that ECFMG was revoking the certificate issued under
8  0482700-2, correct?
9  **A.  Yes.**
10 Q.  And isn't that the certificate issued to
11 Mr. Igberase?
12 **A.  That I don't know.**
13 MR. VETTORI:  This is a good time to
14 take a break.
15 MS. MCENROE:  Off the record.
16 (Discussion off the record.)
17 MS. MCENROE:  So can we hop back on
18 the record just for two quick things for the
19 purposes of the record?
20 On behalf of ECFMG we are reserving
21 the right to review and sign today's transcript.
22 And we've also discussed with counsel a stipulation
23 that all objections, except as to the form, are
24 reserved for the time of trial, if that is
25 acceptable with you-all as well.

47

1  MR. VETTORI:  It is with me.
2  MR. KLAYMAN:  And with me.
3  MS. MCENROE:  Thank you.  Go back
4  off.
5  (Recess taken at 10:35 a.m.)
6  (Back on the record at 10:45 a.m.)
7  (Exhibit No. 8 marked for
8  identification.)
9  BY MR. VETTORI:
10 Q.  So I'm going to let you read this letter,
11 but let me just point out to you, first of all, it's
12 Bates number 5074 through 5076 with attachments,
13 okay?
14 **A.  I have --**
15 Q.  Multiple attachments.
16 **A.  My last one is 167.**
17 MS. MCENROE:  You know what, it looks
18 like, just for purposes of the record, that last
19 page looks to have been a duplicate of Exhibit 7
20 stapled to the back of Exhibit 8.
21 BY MR. VETTORI:
22 Q.  Okay.  So before you read it, okay, take a
23 look at it.  This appears to me to be a letter that
24 you wrote dated December 7, 1995, which, Mr. Kelly,
25 I'll point out to you is the same date that you

48

1  wrote the letter to Igberase, correct?
2  **A.  Yes.**
3  Q.  Which was Exhibit 6 -- no, 7.  And this is
4  a letter that you're writing to a Mr. Kenneth Cotton
5  at USLME; is that correct?
6  **A.  Yes.**
7  Q.  I want you to take as much time as you
8  want to read it, but I would suggest to you at the
9  end I'm going to ask you would you agree with me
10 that this is pretty much summarizing all of the
11 events leading up to your December 7th letter.
12 Okay.  So take your time.
13 MS. MCENROE:  Objection to form.
14 **A.  (Complies.)  Okay, I finished reading the**
15 **letter.**
16 BY MR. VETTORI:
17 Q.  So would you agree with me that this is
18 pretty much summarizing what's taken place up to and
19 including your December 7th letter?
20 **A.  It appears to be a well-written summary.**
21 Q.  So you know something?  I wrote that on
22 there.  It is a very good summary.
23 So I had asked you previously a question
24 something like what is it that triggered ECFMG to
25 suspect that Charles and Igberase were the same

Transcript of William C. Kelly
Conducted on August 20, 2019                    13 (49 to 52)

---

49

1  person. Do you remember that?
2      **A. Yes, I recall you asked.**
3      Q. And you don't remember?
4      **A. I do not.**
5      Q. So at the bottom of page 1 of your letter
6  you wrote to Mr. Cotton saying "since the name on
7  the application was altered" -- I'm going to stop
8  you right there. When you say "altered," do you
9  mean rearranged?
10     **A. That may be what I meant.**
11     Q. And then you said, "and the year of birth
12 changed."
13         My recollection is that Igberase had
14 a 1962 birth date and Charles had a 1961 birth date?
15     **A. And that's stated in this letter, yeah.**
16     Q. Right. And you say that ECFMG's search of
17 its database at that time did not show that he had
18 previously applied and been assigned an ECFMG
19 identification number.
20         What search of the database had taken
21 place, do you remember?
22     **A. I can tell you what the procedure or**
23 **process was at that time.**
24         MR. VETTORI: Objection as to form.
25     Q. Go ahead, please.

---

50

1          MS. MCENROE: You may answer the
2  question.
3      **A. Okay. The procedure at that time was any**
4  **individual indicating he or she had not previously**
5  **applied and not providing an ID number, part of the**
6  **process was to search the database against certain**
7  **biographical elements, and I can't remember**
8  **specifically which ones they were, to see if that**
9  **individual could potentially already have an**
10 **identification number.**
11 **BY MR. VETTORI:**
12     Q. I appreciate the fact that you can't
13 remember, we're going back a long time now. But it
14 seems to me, at least implicitly, that by your
15 statement at the bottom of page 2, two of the ways
16 you would have searched your database would have
17 been by the name and by the date of birth; would
18 that be correct?
19     **A. Yes, that's fair.**
20     Q. So let me ask you this: Has ECFMG ever
21 had a practice, policy, or procedure whereby if a
22 name of an applicant on a diploma is different than
23 the name on the application, you required that
24 application to do something to satisfy ECFMG that
25 the name on the -- that the person whose name is on

---

5

1  the diploma and the person whose name is on the
2  application are really the same person?
3          MS. MCENROE: Objection to form.
4      **A. Yes.**
5  **BY MR. VETTORI:**
6      Q. Okay. When did that policy, practice, or
7  procedure first go into effect?
8      **A. I don't recall the date.**
9      Q. Was it effective as of 1995?
10     **A. I don't recall it being in effect at that**
11 **time.**
12     Q. What is that policy, practice, or
13 procedure?
14     **A. Okay. And I'm -- again, this is at the**
15 **time it was in place when I was there. I mean,**
16 **again, I don't know what it is now, that if there is**
17 **a -- a significant -- a discrepancy between the name**
18 **on the diploma and the name they're using when they**
19 **apply for the examination that they provide**
20 **certain -- some sort of documentation to connect**
21 **that -- to indicate the two names belong to the same**
22 **person.**
23     Q. But is it your testimony that you don't
24 believe that policy was in effect, at least not in
25 1995?

---

52

1      **A. I don't recall it being in effect.**
2      Q. Well, is it that it was -- you don't
3  recall whether --
4      **A. I don't believe it was in effect.**
5      Q. Thank you. So will you turn to, again to
6  page -- well, not again. Turn to page 2 of this
7  letter, that being Exhibit 8, and it's Bates number
8  5075. Do you see what I call a chart at the bottom
9  of the page?
10     **A. Yes.**
11     Q. And as I understand it, this is a chart of
12 the examinations, the dates of the examination, and
13 the scores taken by, I think it's both Igberase and
14 Charles; am I correct in that?
15     **A. You keep saying both and I'm -- I don't**
16 **know that they're two different individuals, but**
17 **under one identification number, under the two**
18 **different identification numbers.**
19     Q. Under the two identification numbers?
20     **A. Right.**
21     Q. Okay. So these are the examinations,
22 dates, and scores for the person who had
23 identification number 04827002 and the person who
24 had identification number 05195730, correct?
25     **A. Yes.**

---

Transcript of William C. Kelly

14 (53 to 56)

Conducted on August 20, 2019

53

1    Q.   Okay.  And so it looks to me like the
2  person who took the July 1992 day one and day two
3  exams failed; is that correct?
4    A.   Failed in July 1992.
5    Q.   Correct.
6    A.   Yes.
7    Q.   And failed step one in September 1992; is
8  that correct?
9    A.   Yes.
10   Q.   And failed day one in January 1993; is
11 that correct?
12   A.   Yes.
13   Q.   Do you have an independent recollection or
14 a recollection refreshed by any review of documents
15 you made prior to this deposition as to whether the
16 applicant by the name of Charles took an appeal from
17 the decision of the committee that's reflected in
18 your December 7, 1995, letter?
19   A.   My recollection is that he took an appeal,
20 but I don't know which -- I don't recall which
21 decision.
22   Q.   Do you remember whether that appeal
23 resulted in a hearing?
24   A.   My recollection is that there was a
25 hearing, yes.

54

1    Q.   And bear with me one second.
2        Do you remember when that appeal hearing
3  took place?
4    A.   No.
5    Q.   I'll come back to that later.  Do you
6  remember the outcome of the appeal?
7    A.   Yes.
8    Q.   What was the outcome?
9    A.   My recollection is that the appeal was
10 denied.
11   Q.   Is that the same thing as saying the
12 decision to invalidate one certificate and revoke
13 the other was affirmed?
14   A.   Yes, but that there was a -- a change in I
15 believe the length of time of the revocation of the
16 one certificate, the specification of the date.
17       (Exhibit No. 9 marked for
18 identification.)
19 BY MR. VETTORI:
20   Q.   It's a one-page letter, sir.  If you take
21 your time to read it, I'd appreciate it.  Thank you,
22 Mr. Kelly.
23   A.   (Complies.)  Yes, I've read it.
24   Q.   So who is Marie Shafron?
25   A.   At that time Ann Marie Shafron was the

55

1  vice president of operations at ECFMG.
2    Q.   And would you agree with me that this
3  letter is outlining to the gentleman by the name of
4  Charles the results of the appeal hearing?
5    A.   Yes.
6    Q.   And do you see where this letter recites
7  that the appeal was considered on July 10, 1996?
8  It's in the middle paragraph.
9    A.   Yes.
10   Q.   In Washington, DC?
11   A.   Yes.
12   Q.   And would you agree with me that the
13 decision of the review committee affirmed the
14 decision invalidating one certificate and revoking
15 the other, but limited the length of the revocation
16 of certificate 04827002 to five years from July 10,
17 1996, until July 10, 2001?
18   A.   Yes.
19   Q.   Thank you.
20       (Exhibit No. 10 marked for
21 identification.)
22 BY MR. VETTORI:
23   Q.   So Mr. Kelly, what is this document?
24   A.   It appears to be a photocopy of an
25 application for USMLE exams.

56

1    Q.   Which exams was he applying for?
2    A.   According to the application, the -- both
3  the step one and the step two.
4    Q.   And what is the name of the applicant?
5    A.   On the application it's Femi Charles
6  Igberase.
7    Q.   Do you see whether any Social Security
8  number was provided?
9    A.   I see no Social Security number on the
10 application.
11   Q.   And can you tell from the Bates stamp on
12 the document when it was received by ECFMG?
13   A.   Yes.
14   Q.   When was it received?
15   A.   October 23, 2000.
16   Q.   Do you see the date of birth on the --
17 towards the bottom of Page 1 of that application?
18   A.   Yes.
19   Q.   What is the date of birth?
20   A.   17th day of the fourth month in 1962.
21   Q.   April 17?
22   A.   Yes.
23   Q.   Isn't that the same date as on the 1992
24 application by Igberase?
25   A.   I would have to look.

Transcript of William C. Kelly                    15 (57 to 60)
Conducted on August 20, 2019

57

1    Q.  Please do.  It's one of the early -- it's
2  the second exhibit, I think.
3    A.  Yes, it is.
4    Q.  So did you review this document, the
5  application, Exhibit 10, in preparation for this
6  deposition?
7    A.  I don't recall this specific -- no.
8    Q.  Am I correct that ECFMG pretty quickly
9  picked up on the fact this is the same Igberase
10  whose certificate had been revoked for five years
11  through and including July 10, 2001.
12    A.  My recollection is that at some point, I
13  don't know the time period, but I know subsequent to
14  this, there was an allegation that he provided false
15  information on his application, yes.
16    Q.  What do you mean by there was an
17  allegation?
18    A.  My recollection is subsequent to this we
19  alleged that he had engaged in irregular behavior.
20    Q.  Just to help answer this question, I'm
21  going to show you in a minute your letter dated
22  November 16, 2000, about this application.
23    A.  Okay.
24    Q.  So it appears to me that within less than
25  a month's time ECFMG has concluded that this is the

58

1  same Igberase who had been told that his
2  certification was revoked through July 10, 2001.
3  Would you agree with me?
4        MS. MCENROE:  Objection.
5    A.  We made that allegation, yes.
6  BY MR. VETTORI:
7    Q.  So do you have an independent recollection
8  as to how you came to that determination?
9    A.  No.
10    Q.  So do you remember me reading to you from
11  Charles's handwritten letter that for future records
12  he is going to use the name Igberase Oluwafemi
13  Charles?  Do you recall that?
14    A.  Yes, I do.
15    Q.  He didn't do that here, did he?
16    A.  No, he did not.
17        (Exhibit No. 11 marked for
18  identification.)
19  BY MR. VETTORI:
20    Q.  Let me know after you've read it, okay,
21  Mr. Kelly?  Thank you.
22    A.  (Complies.)  I finished reading it.
23    Q.  Okay.  Can we go back to the prior
24  exhibit, No. 10?  Put that in front of you, please.
25        Would you agree with me that this

59

1  applicant, Femi Charles Igberase, checked no to the
2  question, "Have you ever submitted an application to
3  ECFMG for an examination" -- I'm sorry.  I talk
4  fast -- "even if you did not take the examination?"
5  Do you see where he checked the no?
6    A.  Yes.
7    Q.  Okay.  And there is non identification
8  number included on that application, is there?
9    A.  I don't see one.
10    Q.  When you wrote to him, your Exhibit 11,
11  you used the ECFMG identification number 0482700-2,
12  didn't you?
13    A.  Yes.
14    Q.  And isn't it correct that in your letter
15  of November 16, 2000, Exhibit 11, you advised
16  Mr. Igberase that ECFMG requires an explanation in
17  writing within fifteen days of receiving this
18  letter?
19    A.  Yes.
20    Q.  So you addressed your letter to
21  Mr. Igberase?
22    A.  Dr. Igberase.
23    Q.  I'm sorry, Dr. Igberase.  Thank you.  I
24  apologize.
25        Did you or did anyone at ECFMG ever

60

1  receive an explanation?
2    A.  I don't recall.
3    Q.  So do you have a recollection, either
4  independently or as a result of the review you did
5  in your case, whether the ECFMG committee on medical
6  education credentials met to review this matter?
7    A.  I don't have an independent or I don't
8  have a recollection of that, no.
9        (Exhibit No. 12 marked for
10  identification.)
11    A.  Yes, I've finished reviewing Exhibit 12.
12  BY MR. VETTORI:
13    Q.  Okay.  So in your first sentence you
14  indicate that the committee on -- ECFMG committee on
15  medical education credentials made -- a decision was
16  made by the ECFMG medical -- committee on medical
17  education credentials on April 18, 2001, correct?
18    A.  Yes.
19    Q.  And your writing this letter is being
20  written to Dr. Igberase Oluwafemi Charles
21  referencing the identification number 0482700-2
22  advising him of the outcome of that -- I'm sorry --
23  as to what that decision was?
24    A.  Yes.
25    Q.  And in this letter you recite many of the

Transcript of William C. Kelly          16 (61 to 64)
Conducted on August 20, 2019

---

6

1  events we've talked about today up to and including
2  the October 2000 application that was submitted,
3  correct?
4    A. Yes.
5    Q. And was it the decision of the ECFMG
6  committee to revoke his standard certificate for a
7  yet to be specified period of time?
8    A. To extend the length of the revocation,
9  yes.
10    Q. For an as yet unspecified period of
11  time?
12    A. Yes.
13    Q. And also to refer it to the USMLE
14  committee on irregular behavior, correct?
15    A. Yes.
16    Q. And you advised him that ECFMG was going
17  to review the matter again after the USMLE
18  committee's decision, correct?
19    A. Yes.
20        (Exhibit No. 13 marked for
21  identification.)
22  BY MR. VETTORI:
23    Q. One-page letter, would you read it,
24  please?
25    A. (Complies.) I finished reading it.

---

62

1    Q. Okay. See if you agree with this. It
2  appears to me that this is a response letter from
3  Igberase to your November 16, 2000, letter. Would
4  you agree with me, even though he says 2001?
5    A. That is correct.
6    Q. And it's coming -- I'm sorry, I spoke over
7  you. I apologize. Did you finish your --
8    A. Yes, I did.
9    Q. It appears to me that it's actually coming
10  too late, the committee has already made its
11  decision, correct?
12    A. This is after the committee had made its
13  decision, yes.
14    Q. So would you agree with me that in this
15  letter he is blaming his application on his
16  cousin?
17        MS. MCENROE: Objection to form.
18    A. He appears to be doing that, yes.
19  BY MR. VETTORI:
20    Q. And I think basically what he's saying is
21  the cousin filled out the wrong form?
22    A. Well, he says, "my childhood friend."
23    Q. Childhood friend, I'm sorry. The
24  childhood friend filled out the wrong form?
25    A. Filled out the wrong form incorrectly

---

63

1  somehow, yes.
2    Q. And he makes a reference to the Social
3  Security number not being applicable because the INS
4  was going to discontinue the number due to the
5  problems involving my, I think it means cousin, Dr.
6  Akoda, do you see that?
7    A. Yes.
8    Q. Akoda was not a name that was unfamiliar
9  to you at that time; isn't that correct?
10        MS. MCENROE: Objection to form.
11    A. I don't recall.
12  BY MR. VETTORI:
13    Q. As a result of the review of documents you
14  undertook to prepare for this deposition, you don't
15  recall that as of June of 2001 you were familiar
16  with the name Akoda?
17        MS. MCENROE: Objection.
18    A. I don't recall the dates.
19        (Exhibit No. 14 marked for
20  identification.)
21        MR. VETTORI: I had that same
22  question.
23        MS. MCENROE: Is there a question
24  pending?
25        MR. VETTORI: No. He had a quizzical

---

64

1  look on his face and I think I had the same one, but
2  I think I got the answer.
3    A. Okay. I finished reading.
4  BY MR. VETTORI:
5    Q. So this is a letter dated May 22, 2002,
6  this being Exhibit 14, correct?
7    A. Yes.
8    Q. And it's your letter?
9    A. It's from me, yes.
10    Q. This is approximately a year after your
11  previous letter, correct?
12    A. Yes.
13    Q. Can I offer what I think is the
14  explanation for that period of time and see if you
15  agree with me?
16    A. Yes.
17    Q. I think in an earlier letter you wrote
18  that you would reconsider the matter after the
19  decision by the USMLE and their remand to you. Do
20  you remember that?
21    A. Yes.
22    Q. Is that the reason for this letter being
23  almost a year later?
24    A. That would have been the process, yes.
25    Q. Thank you.

---

Transcript of William C. Kelly
Conducted on August 20, 2019

17 (65 to 68)

65

1     (Exhibit No. 15 marked for
2  identification.)
3     **A. I finished reviewing, yes.**
4  **BY MR. VETTORI:**
5     Q.  So what is Exhibit 15?
6     **A. It's a photocopy of an application for**
7  **USLME examination.**
8     Q.  And this applicant checked no to the
9  question, "Have you ever submitted an application to
10 ECFMG for any examination even if you did not take
11 the examination," correct?
12    **A. Correct.**
13    Q.  And would you agree with me that this
14 appears to be a different name than the Igberase and
15 Charles names that we've been discussing up until
16 now?
17    **A. There is a difference, yes.**
18    Q.  So the last name is Oluwafemi,
19 O-L-U-W-A-F-E-M-I, correct?
20    **A. On this application yes.**
21    Q.  First name Charles?
22    **A. Yes.**
23    Q.  Middle initial, Ugberaese,
24 U-G-B-E-R-A-E-S-E, correct?
25    **A. Yes.**

66

1     Q.  No Social Security number listed,
2  correct?
3     **A. That is correct.**
4     Q.  Date of birth of March 1, 1967, correct?
5     **A. Yes.**
6     Q.  There is no identification number on this,
7  is there?
8     **A. An ECFMG USLME identification number,**
9  **no.**
10    Q.  And it appears to have been -- I know it's
11 hard to read, but I think some iteration of this
12 I've seen.  I think it's March 18, 2002.  It's
13 clearly --
14    **A. I see 18 and 2002.**
15    Q.  Okay, fair enough.  And this application
16 is received by ECFMG in the period of time after
17 Igberase wrote you that letter, which was after the
18 decision had been made.  In other words, it was an
19 untimely response to your earlier letter.  Do you
20 follow me?
21    **A. Yes.**
22    Q.  But before May of 2002 when you reviewed
23 this matter again upon remand for the USLME,
24 correct?  This falls within that time period?
25    **A. If it were in April.  You're saying it was**

67

1  received April 18th?
2     Q.  March 18th.
3     **A. March 18th, yes, that would have been.**
4        MS. MCENROE:  Do you want to take a
5  break?
6        MR. VETTORI:  No.
7        (Exhibit No. 16 marked for
8  identification.)
9  BY MR. VETTORI:
10    Q.  Mr. Kelly, Exhibit 16, which is Bates
11 number 0000267, appears to be a copy of something
12 that purports to be a diploma from the University of
13 Ibadan for a person named Charles Igberase
14 Oluwafemi.  Do you see that?
15    **A. Yes.**
16    Q.  Do you know whether this was submitted to
17 ECFMG as part of the application we just
18 discussed?
19    **A. I do not know.**
20    Q.  You don't have any independent
21 recollection of this?
22    **A. I do not.**
23    Q.  Do you have any recollection whether this
24 diploma was ever verified with the University of
25 Ibadan?

68

1     **A. I have no knowledge.**
2     Q.  Do you have any knowledge whether any
3  information was inputted into the computer system
4  when this application was filed?
5     **A. I have no knowledge.**
6     Q.  Do you have a recollection that ECFMG
7  determined within a short period of time after this
8  application was filed by this gentleman with the
9  last name Oluwafemi that it was the same person that
10 applied as Igberase and as Charles?
11    **A. I don't recall that, no.**
12        (Exhibit No. 17 marked for
13 identification.)
14 BY MR. VETTORI:
15    Q.  March 18, 2002.
16    **A. Okay, I finished.  I read -- reviewed the**
17 **letter.**
18    Q.  So does this refresh your recollection
19 that ECFMG realized pretty quickly after the March
20 18, 2002, application that this person by the name
21 of Oluwafemi is really the same as the person
22 identified as Charles and as Igberase?
23    **A. It doesn't refresh my recollection, but**
24 **the letter tells me that that is what happened.**
25    Q.  You wouldn't have written that if it

Transcript of William C. Kelly                    18 (69 to 72)
Conducted on August 20, 2019

69

1  weren't accurate, would you?
2  **A. I would hope not.**
3  Q. Again, I know this may sound petty, but
4  I'm doing this for a particular reason so humor me.
5  We couldn't be sure on the
6  application whether it was March 18, 2002, but there
7  are several references in your letter to that date;
8  am I correct?
9  **A. That is correct.**
10  Q. And you asked for an explanation from him,
11  didn't you?
12  **A. Well, it references several letters that I**
13  **haven't seen. And it's likely the explanation would**
14  **have been -- request would have been in, for**
15  **example, the May 22 letter.**
16  Q. Apparently I didn't ask a very good
17  question. I apologize.
18  You would agree with me that in this
19  letter you told Oluwafemi that he should write ECFMG
20  immediately to explain the reason why he indicated
21  on his application received on March 18, 2002 that
22  he had not previously submitted an application to
23  ECFMG when in fact he had previously submitted
24  applications and taken the examinations, correct?
25  MS. MCENROE: Objection to form.

70

1  **A. This letter does not ask for that. This**
2  **is the decision of the credentials committee. This**
3  **letter, this November 12, Exhibit 17 letter.**
4  BY MR. VETTORI:
5  Q. I'm sorry, I apologize, I got out of order
6  here.
7  What is -- may I see the letter, the
8  original?
9  **A. (Complies.)**
10  Q. Hold that letter. I apologize.
11  MR. VETTORI: Can we take a quick
12  break?
13  MS. MCENROE: Sure.
14  (Recess taken at 11:30 a.m.)
15  (Back on the record at 11:35 a.m.)
16  BY MR. VETTORI:
17  Q. Did you -- do you remember whether in your
18  review of documents in preparation for this
19  deposition you saw any documents indicating that the
20  person named Charles's diploma was verified by his
21  medical school?
22  MS. MCENROE: Objection to form.
23  **A. I recall seeing a verification of his**
24  **diploma, but I don't recall whose it was.**
25  (Exhibit No. 18 marked for

7

1  identification.)
2  MR. VETTORI: Off the record a
3  minute.
4  (Discussion off the record.)
5  **A. I've reviewed this document, Exhibit 18.**
6  BY MR. VETTORI:
7  Q. Have you seen these before or do you
8  recall seeing them before?
9  **A. Yes, I do.**
10  Q. As part of your preparation for this
11  deposition?
12  **A. Yes.**
13  Q. This page 1, 4007 -- 4007 appears to me to
14  be an ECFMG form; is that correct?
15  **A. Yes.**
16  Q. And if I understand from your prior
17  testimony, the practice would have been for ECFMG to
18  use this form to forward the diploma provided to it
19  by the applicant; is that correct?
20  **A. That was the process, yes.**
21  Q. And so I'm just going by the sequence of
22  numbers that they were produced to us. Immediately
23  following 4007 is page 4008 and it's a diploma,
24  correct?
25  **A. Yes.**

72

1  Q. But it's not a diploma for somebody by the
2  name of Charles, is it?
3  MS. MCENROE: Objection to form.
4  **A. It says Charles right on it.**
5  BY MR. VETTORI:
6  Q. What is the last name?
7  **A. It's Charles Oluwafemi Igberase.**
8  Q. It's not Igberase Oluwafemi Charles, is
9  it?
10  MS. MCENROE: Objection to form.
11  **A. The names are in a different order.**
12  BY MR. VETTORI:
13  Q. Correct. And you were treating the person
14  with the name Igberase Oluwafemi Charles as someone
15  different from the person with the name Charles
16  Oluwafemi Igberase, weren't you?
17  MS. MCENROE: Objection to form. Are
18  you asking --
19  BY MR. VETTORI:
20  Q. When I say "you," I mean ECFMG for
21  purposes of its certification.
22  **A. I don't recall that.**
23  Q. Well, you assigned it a separate
24  identification number to Igberase Oluwafemi Charles
25  than you did to Charles Oluwafemi Igberase. We've

Transcript of William C. Kelly

Conducted on August 20, 2019

19 (73 to 76)

---

73

1  already established that, Mr. Kelly.
2            MS. MCENROE: Objection to form.
3  BY MR. VETTORI:
4      Q.  Isn't that correct?
5      A.  If that is what we did, then this was a
6  different applicant, yes.
7      Q.  Correct. Are you aware that this is the
8  identical diploma submitted by the person with the
9  name Charles Oluwafemi Igberase that you verified
10  with the school?
11      A.  I'm not aware of that.
12      Q.  So again, we have a situation where the
13  applicant's name is different than the name on the
14  diploma, correct?
15            MS. MCENROE: Objection.
16      A.  The name -- the sequence of names is
17  different, yes.
18  BY MR. VETTORI:
19      Q.  Correct. And is there any documentation
20  to indicate to ECFMG an explanation for that?
21      A.  I see none.
22      Q.  So as I -- is it correct to say that ECFMG
23  relied on a verification of a diploma for someone
24  whose name is different than the applicant Igberase
25  Oluwafemi Charles?

---

74

1            MS. MCENROE: Objection to form.
2      A.  What I can say is I, at this time in 1994,
3  I do not believe ECFMG considered either, the name not
4  to do -- to belong to this applicant. It was not
5  uncommon for people from different cultures and
6  certain countries to have their name, you know, in
7  different sequences.
8  BY MR. VETTORI:
9      Q.  Then why did you apply -- I'm sorry. Why
10  did you assign different identification numbers to
11  these two people?
12            MS. MCENROE: Objection to form.
13      A.  Yeah, you have me a little confused.
14  My -- I don't know. I don't have the two records in
15  front of me so I would have to see.
16      Q.  I understand, but let me tell you what the
17  record that we developed here today shows. A
18  gentleman by the name of Charles Oluwafemi Igberase,
19  a name on a diploma, filed an application with ECFMG
20  in 1992 and you assigned -- ECFMG assigned to him
21  the O482700-2 number. That's established in the
22  record.
23      A.  Yes.
24      Q.  A gentleman by the name of Igberase
25  Oluwafemi Charles applied to ECFMG in 1994 and ECFMG

---

75

1  assigned to him the number 0519573-0. ECFMG
2  certified both of those individuals with different
3  certification numbers.
4      A.  Yes.
5      Q.  And that's because, isn't it, Mr. Kelly,
6  that ECFMG thought they were two different people?
7      A.  I don't know that I would have used that
8  language, but they were two separate applicants,
9  yes, individuals, yes.
10      Q.  ECFMG would never assign two certification
11  numbers and -- I'm sorry -- two identification
12  numbers and actually certify with two different
13  certification numbers the same person, would it?
14            MS. MCENROE: Objection to form.
15      A.  Not knowingly.
16  BY MR. VETTORI:
17      Q.  So again, ECFMG relied on a verification
18  of a diploma for a person whose name is different
19  than the name on the application. You would agree
20  with that, wouldn't you?
21            MS. MCENROE: Objection to form.
22      A.  The sequence of names on the diploma are
23  different than the sequence of names on the
24  application.
25  BY MR. VETTORI:

---

76

1      Q.  And do you see on the first page at the
2  top where those two certificate numbers appear, one
3  of which is crossed out?
4      A.  Yes.
5      Q.  Do you know why that is? Do you have any
6  explanation for that?
7      A.  I can -- I know what the process was.
8      Q.  What was the process?
9      A.  Okay. At some point after it was
10  determined that both numbers belonged to the same
11  individual, all the records that had the second
12  number, the 05195730, would have been marked with
13  the original identification number 04827002.
14      Q.  So you -- ECFMG at some point -- we know
15  from the record we established, at some point
16  determined that they're one and the same person?
17      A.  That's correct.
18      Q.  Did it raise any red flags at ECFMG that
19  the University of Ibadan would verify a diploma for
20  someone named Charles Oluwafemi Igberase when ECFMG
21  was requesting verification of a diploma for
22  Igberase Oluwafemi Charles?
23            MS. MCENROE: Objection to form.
24      A.  At that time it was not uncommon for names
25  to be in a different sequence so it would not have

---

Transcript of William C. Kelly
Conducted on August 20, 2019

77

1  raised a flag.
2  BY MR. VETTORI:
3     Q.  So why then when Igberase Oluwafemi
4  Charles applied, didn't ECFMG question whether it
5  was just a rearrangement of names or not?
6        MS. MCENROE:  Objection to form.
7     A.  I would have to go back to the application
8  and look.
9  BY MR. VETTORI:
10    Q.  Well, we know from one of your letters
11 that you said the reason why you didn't make that
12 determination when the application, the second
13 application was filed, that is the one by
14 Mr. Charles or Dr. Charles was because his date of
15 birth was different and the order of his name was
16 different, correct?  You remember that letter?
17    A.  Yes, yes, yes.
18    Q.  So you thought they were two different
19 people, even though the names were similar, they
20 were in a different arrangement; isn't that
21 correct?
22       MS. MCENROE:  Objection to form.
23    A.  That would be correct, yes.
24 BY MR. VETTORI:
25    Q.  I'm just curious why there's not a diploma

78

1  with the names ordered Igberase Oluwafemi Charles?
2        MS. MCENROE:  Objection to form.
3  Asked and answered.
4  BY MR. VETTORI:
5     Q.  Can you tell me why?
6     A.  I don't.
7     Q.  But that never raised a question with
8  ECFMG?
9        MS. MCENROE:  Objection to form.
10 Asked and answered.
11    A.  I couldn't answer that.
12       (Exhibit No. 19 marked for
13 identification.)
14    A.  I completed reviewing this document.
15 BY MR. VETTORI:
16    Q.  Okay.  Let me see if I can put this back
17 into the context where I was reading from a letter I
18 hadn't shown to you.
19       So if you recall, Mr. Kelly, someone by
20 the name of Charles Igberase Oluwafemi filed an
21 application with ECFMG to take certain medical
22 examinations on March 18, 2002.  We've established
23 that.
24    A.  Yes.
25    Q.  And although we couldn't read the date

79

1  stamp, we established from some other letters that
2  it clearly was March 18, 2002; do you agree?
3     A.  Yes.
4     Q.  I think my question to you was, it appears
5  to me -- I'm sorry.
6        Would you agree with me that ECFMG
7  realized within a short period of time after this
8  March 18, 2002 application was filed that this
9  person using the name Charles Igberase Oluwafemi was
10 really the person certified under number
11 0482700-2?
12    A.  Yes.
13    Q.  And so you wrote a letter on July 22,
14 2002, to someone by the name of Charles Igberase
15 Oluwafemi, correct?
16    A.  Yes.
17    Q.  His application had not referenced any
18 identification or certification number, had it?
19    A.  Yes.
20    Q.  Yes, it had not?
21    A.  That is correct.
22    Q.  But you referenced the 0482700-2
23 certification number, correct?
24    A.  Correct.
25    Q.  And that was the one assigned to Igberase

80

1  who had applied in 1992, correct?  I think it's
2  Exhibit 2.
3     A.  Yes.
4     Q.  So would I be incorrect in assuming that
5  that meant that ECFMG had concluded that the person
6  holding certificate 0482700-2 and this individual by
7  the name of Charles Igberase Oluwafemi were one and
8  the same?
9     A.  That was our suspicion, yes.
10    Q.  Again, in your letter you recite the
11 history of ECFMG's involvement with Igberase and
12 Charles ad nauseam.  I'm sorry, that wasn't a
13 criticism.  You recite all that again?
14    A.  There's a history, yes.
15    Q.  Thank you.  And then you discussed the
16 application filed by this Charles Igberase Oluwafemi
17 on March 18, 2002, and you tell him to write ECFMG
18 immediately to explain the reason why he indicated
19 on his application received on March 18, 2002, that
20 he had not previously submitted an application to
21 ECFMG when, in fact, he had previously submitted an
22 application and taken examinations, correct?
23    A.  Yes.
24    Q.  I apologize for the confusion, sir.  So
25 I'm sorry.  Can we pull the November 12th letter

Transcript of William C. Kelly
Conducted on August 20, 2019                    21 (81 to 84)

8

1  now?
2    A.  (Complies.)
3        MS. MCENROE:  Exhibit 17.
4        MR. VETTORI:  Thank you.
5  BY MR. VETTORI:
6    Q.  This is your letter?
7    A.  Yes.
8    Q.  It's Bates 0003471-3472; is that
9  correct?
10   A.  Yes.
11   Q.  And is this advising a gentleman with the
12 last name Charles that he's barred permanently from
13 admission to all ECFMG examinations and from ECFMG
14 certification?
15   A.  Yes.
16   Q.  Thank you.
17       (Exhibit No. 20 marked for
18 identification.)
19 BY MR. VETTORI:
20   Q.  Mr. Kelly, I'm going to give an
21 opportunity to review it as thoroughly as you want,
22 but just for the record let's establish that this
23 letter is Bates number 0000348 through 351.  It's a
24 letter dated June 17, 2003, to Charles Oluwafemi
25 Oluwafemi referencing the number 0482700-2 from

82

1  Susan Deitch, Office of the USLME secretary, with a
2  copy to ECFMG.  Do you see that?
3    A.  Yes.
4    Q.  Do you have any recollection, either
5  independently or from your review of records in this
6  case, of having seen this letter?
7    A.  Yes.
8    Q.  And now take as much time as you want to
9  look at it or whenever you're ready my question is
10 going to be:  What was the gist of this letter?
11       MS. MCENROE:  Objection to form.
12   A.  The gist of this letter is that the USLME
13 had received the information from ECFMG's finding of
14 irregular behavior and specifically July 22, 2002
15 letter Exhibit 19.  They had reviewed that material
16 and separately determined that the individual had
17 engaged in irregular behavior and took certain
18 actions.
19 BY MR. VETTORI:
20   Q.  What actions did they take?
21   A.  They annotated the USMLE record and said
22 there was an annotation that he engaged in irregular
23 behavior and barred him from taking future
24 administrations of USMLE, suspension of the bar to
25 be considered at such time as a request is received

83

1  from the medical licensing authority, and after full
2  disclosure to such authority of events that led to
3  the bar.
4    Q.  Thank you.  Do you have any personal
5  knowledge or is your memory refreshed at all with
6  respect to whether anybody by the name of Igberase
7  or Charles ever received a medical license in
8  Maryland?
9    A.  I have no knowledge of that.
10       MR. VETTORI:  This would be a good
11 time to take a break.
12       MS. MCENROE:  Great.
13       (Recess taken at 12:00 p.m.)
14       (Back on the record at 12:25 p.m.)
15 BY MR. VETTORI:
16   Q.  Just one clean-up question with respect to
17 the subject we've been talking about.
18       I know that when we looked at Exhibit 20,
19 the last letter you have there, the USMLE discusses
20 the fact that any USMLE transcripts or any third
21 party submitted to you or any third party will
22 include this annotation, in other words, the action
23 that they have taken.
24       But my question is:  Would it have been
25 ECFMG's practice in this June 2003 period to notify

84

1  any organizations or regulatory authorities about
2  the action with respect to Igberase and Charles?
3    A.  All findings of irregular behavior were
4  reported to a host of different organizations and
5  agencies.
6    Q.  So do you remember seeing any documents to
7  that effect in your review in preparation for this
8  deposition?
9    A.  I remember seeing a notification.
10   Q.  With respect to Igberase and --
11   A.  I don't know who it was for, but I think
12 it's for --
13   Q.  I'm getting way ahead of myself.  So you
14 weren't with ECFMG when the individual with the last
15 name Akoda pled guilty to certain criminal offenses,
16 correct?
17   A.  I believe I was not, yeah.
18   Q.  Well, that was October 2016.  I think you
19 told us you had left in 2015?
20   A.  That is correct.
21   Q.  And so you weren't with ECFMG in December
22 of 2016 when Karen Corrada -- do you know her?
23   A.  Yes.
24   Q.  Was she working at ECFMG when you were
25 there?

JA347

Transcript of William C. Kelly
Conducted on August 20, 2019

22 (85 to 88)

85
```
1      A.  Yes.
2      Q.  So you weren't at ECFMG in December of
3  2016 when Karen Corrada wrote to this gentleman by
4  the name of Akoda and indicated that the report of
5  the revocation of the standard ECFMG certificate --
6  I'm sorry.  That ECFMG would report the revocation
7  of his ECFMG certificate to the Federation of State
8  Medical Boards, US State and International Medical
9  Licensing Authorities, the Records of Graduate
10 Medical Education Programs, and to any other
11 organization or individual who in the judgment of
12 ECFMG has a legitimate interest in such
13 information?
14     A.  I was not there.
15     Q.  Do you know whether the organizations or
16 bodies that I just referenced in her letter are the
17 ones you were talking about with respect to
18 notification that would have been --
19     A.  That was our procedure.
20         MS. MCENROE:  Let him finish.
21         MR. VETTORI:  He's good.  That's the
22 first time it happened.
23 BY MR. VETTORI:
24     Q.  Those are the organizations that would
25 have received notice about Igberase?
```

86
```
1      A.  Yes.
2      Q.  But again, do you remember any notices
3  other than the one I just referenced in your
4  review?
5         MS. MCENROE:  Objection to form.
6      A.  No, I don't recall.
7  BY MR. VETTORI:
8      Q.  So let me ask it a little different way.
9  Did you review this December 19, 2016 letter that
10 Karen Corrada wrote?
11     A.  No.
12         MS. MCENROE:  Can you mark that or do
13 you want --
14         MR. VETTORI:  I can, if you want me
15 to.
16         MS. MCENROE:  Just for purpose of the
17 record of what it was he did not review.
18         (Exhibit No. 21 marked for
19 identification.)
20         (Exhibit No. 22 marked for
21 identification.)
22 BY MR. VETTORI:
23     Q.  So Mr. Kelly, before you look at it I'm
24 telling you this is an incomplete document.  This is
25 just page 1 of a multiple page document.  Take a
```

87
```
1  look at it for a moment and then I'm going to ask
2  you a question about it.
3      A.  (Complies.)  Okay.
4      Q.  So this is dated March 1, 2017, and I
5  think we've already agreed that you weren't with
6  ECFMG at the time?
7      A.  That's correct.
8      Q.  So you don't know what information is
9  contained on the other pages of this document,
10 obviously?
11     A.  That is correct.
12     Q.  Have you even seen this document before?
13     A.  No.
14         MR. VETTORI:  Let's mark it as 23
15 anyway.
16         (Exhibit No. 23 marked for
17 identification.)
18 BY MR. VETTORI:
19     Q.  So tell us what Exhibit 23 is.
20     A.  It is a photocopy of an application for a
21 USMLE examination.
22     Q.  By whom?
23     A.  The name on the application is John Nosa
24 Akoda.
25     Q.  A-K-O-D-A.  It appears to me that it's
```

88
```
1  dated January 3, 1996.  Can you confirm that?
2      A.  That appears to be the receipt date,
3  yes.
4      Q.  Right.  Does it list a Social Security
5  number?
6      A.  There is none listed on there.
7      Q.  What is the date of birth?  Second page.
8      A.  January 1, 1959.
9      Q.  And does this applicant, John Nosa Akoda,
10 indicate what medical school he attended?
11     A.  Yes.
12     Q.  Which one?
13     A.  University of Benin, Nigeria.
14     Q.  Does he indicate when he graduated?
15     A.  He does not list the degree date.  He
16 lists his attendance dates.
17     Q.  What are the attendance dates?
18     A.  October '81 to October '87.
19     Q.  If you look at Bates page 40705, which I
20 think is the third page of the application, part C.
21     A.  Yes.
22     Q.  There is a photograph attached or there is
23 a photograph on that page; is there not?
24     A.  It appears to be a photograph.
25     Q.  Isn't that a requirement of all
```

Transcript of William C. Kelly                    23 (89 to 92)
Conducted on August 20, 2019

89

1  applications, that they attach a photograph?
2          MS. MCENROE:  Objection to form.
3      A.  That is, yes.
4  BY MR. VETTORI:
5      Q.  And doesn't that photograph have to be
6  verified by the dean of the medical school?
7          MS. MCENROE:  Objection to form.
8      A.  It does not have to be.
9  BY MR. VETTORI:
10     Q.  What was the procedure in 1996 at ECFMG
11  with respect to the verification of a photograph on
12  an application?
13     A.  I don't recall.
14     Q.  So in section B1, down towards the bottom,
15  the form says, "Explain in the space below why the
16  application could not be signed in the presence of
17  your medical school dean, vice dean, or register --
18  any registrar.  Any explanation must be acceptable
19  to ECFMG and must be provided each time you submit
20  an application to ECFMG."
21         Do you see that?
22     A.  Yes.
23     Q.  And the handwritten answer was "because
24  the postal system to Nigeria could not be guaranteed
25  within the available time."  Did I read that

90

1  correctly?
2      A.  That's what I read as well.
3      Q.  Okay.  So when did ECFMG require
4  verification of the photo and when did it not in
5  1996, if you recall?
6          MS. MCENROE:  Objection to form.
7      A.  I don't recall.
8  BY MR. VETTORI:
9      Q.  Also on this application John Nosa Akoda
10  indicates that he's never submitted an application
11  to ECFMG for any examination, correct?
12     A.  That is correct.
13         MR. VETTORI:  What number was this?
14         MS. MCENROE:  23.
15         MR. VETTORI:  Thank you.
16         (Exhibit No. 24 marked for
17  identification.)
18     A.  Okay.
19  BY MR. VETTORI:
20     Q.  So what is Exhibit 24?
21     A.  It is a photocopy of an application for
22  USMLE.
23     Q.  By the same John Nosa Akoda?
24     A.  John Akoda, yes.
25     Q.  Doesn't it say the middle name is Nosa?

9

1      A.  I believe he has it on the wrong line, but
2  that appears to be what he meant.
3      Q.  And I think this is dated August 30, 1996.
4  Can you verify that or deny that?
5      A.  The received date appears to be August 30,
6  1996, yes.
7      Q.  And on this application he indicates that
8  he has applied previously for examination,
9  correct?
10     A.  He has checked the yes box, yes.
11     Q.  Is this identification number the same as
12  his identification number on Exhibit 23?
13     A.  I can't say for the last digit, but it
14  appears to be, yes.
15     Q.  Again, no Social Security number,
16  correct?
17     A.  None listed, correct.
18     Q.  The rest of the information is the same?
19     A.  I would have to compare them.
20     Q.  Do a quick comparison as of the dates of
21  attendance and medical school, the name of the
22  medical school, his birth date.
23         MS. MCENROE:  Can we do them one at a
24  time because some of the things are different, his
25  address is different.  What is it that you want him

92

1  to compare?
2  BY MR. VETTORI:
3      Q.  So is this the same applicant that applied
4  in Exhibit 23?
5          MS. MCENROE:  Objection to form.
6  BY MR. VETTORI:
7      Q.  If you know.
8      A.  It appears to be, yes.
9      Q.  And if you look at page 000645, the last
10  page there is a -- I'm sorry, the next to last page,
11  there is a photograph?
12     A.  Yes.
13     Q.  And does that have a -- some kind of a
14  stamp or symbol of the dean of college in
15  medicine?
16     A.  It appears to be, yes.
17     Q.  And are you familiar with that kind of a
18  stamp or were you then?
19     A.  I don't recall.
20     Q.  So what, if anything, was ECFMG's practice
21  in 1996 to verify that the person in effect stamping
22  this picture is, in fact, an authorized
23  representative of the university?
24     A.  In 1996 I don't recall.
25     Q.  Do you recall what the procedure was at

Transcript of William C. Kelly
Conducted on August 20, 2019                    24 (93 to 96)

---

93

1 any time while you were employed by ECFMG?
2    A.  Yes.
3    Q.  What?
4    A.  You would check the name and the seal
5 against samples in the reference library, in the
6 credential reference library.
7    Q.  But you don't know when that was?
8    A.  No.
9    Q.  You don't know if that reference library
10 was utilized in the 1996 time period?
11   A.  I don't recall.
12   Q.  Does it appear to you that the dates of
13 attendance at the University of Benin are the same
14 on Exhibits 24 and 23?
15   A.  Yes.
16   Q.  From your review of the many records in
17 preparation for this deposition or from your
18 independent personal knowledge, do you know why this
19 occurred, the individual applied once, didn't take
20 any exams and then applied again?
21   A.  No, I don't know.
22   Q.  You don't remember?
23       MS. MCENROE:  I'm just going to -- he
24 stated he didn't remember, but I think testified he
25 didn't know.

---

94

1    A.  I don't know why.
2 BY MR. VETTORI:
3    Q.  Did you ever know why?
4    A.  I don't recall.
5       (Exhibit No. 25 marked for
6 identification.)
7 BY MR. VETTORI:
8    Q.  Can you tell us what Exhibit 25 is?
9    A.  It appears to be a photocopy of a medical
10 diploma.
11   Q.  For whom?
12   A.  The name on it is Johnbull, middle name,
13 I'll spell it, E-N-O-S-A-K-H-A-R-E, last name,
14 Akoda.
15   Q.  And would you agree with me that that name
16 is different than the name on Exhibit 24, the
17 application to take certain exams?
18   A.  There is a difference in the name, yes.
19   Q.  So the application is John, first name,
20 correct?
21   A.  Yes.
22   Q.  The diploma is Johnbull, correct?
23   A.  Yes.
24   Q.  The middle name on the application is
25 Nosa, correct?

---

95

1    A.  Yes.
2    Q.  And the middle name on the diploma is
3 Enosekhare, E-N-O-S-E-K-H-A-R-E, correct?
4    A.  Yes.
5    Q.  And Akoda is the same on both, correct?
6    A.  Yes.
7    Q.  Do you know if ECFMG verified this
8 diploma?
9    A.  I do not know.
10   Q.  Do you know whether John Nosa Akoda was
11 ever certified by ECFMG?
12   A.  My recollection is that he was.
13       MR. VETTORI:  Off the record.
14       (Discussion off the record.)
15       (Exhibit No. 26 marked for
16 identification.)
17 BY MR. VETTORI:
18   Q.  So Mr. Kelly, what is this document?
19   A.  It -- to me it's got a photocopy of an
20 ECFMG certificate.
21   Q.  Are you familiar with this form of
22 document?
23   A.  Yes.
24   Q.  So would I be correct in stating that when
25 an applicant is certified, they receive one of

---

96

1 those -- a document like this?
2    A.  Yes.
3    Q.  So should there be somewhere in the files
4 of ECFMG a copy of a similar certificate for
5 somebody by the name of Igberase and somebody by the
6 name of Charles, if you know?
7       MS. MCENROE:  Objection.
8    A.  It was not our procedure to have physical
9 copies of certificates, just a record of when it was
10 issued.  We didn't keep actual copies.
11      MR. VETTORI:  So off the record.
12      (Discussion off the record.)
13 BY MR. VETTORI:
14   Q.  So is it your testimony that when ECFMG --
15 the practice of ECFMG was to issue a certificate
16 like Exhibit 26 to the certified IMG, but not keep a
17 copy of that certificate?
18   A.  That is correct.
19   Q.  I think you added something that I sort of
20 didn't pay any attention to and I should have.
21       You would have made some notation in
22 your records that the person had been certified?
23   A.  In the person's ECFMG record would be an
24 indication when this certificate was issued and that
25 they were certified.

---

Transcript of William C. Kelly                25 (97 to 100)
Conducted on August 20, 2019

97

1    Q.  When you say, "in the record," you mean as
2  part of their computer program, profile, whatever
3  you call it?
4    A.  Yes, and if I can just interject, at this
5  time perhaps also in their paper file.  We keep
6  paper file paper records.
7        (Exhibit No. 27 marked for
8  identification.)
9  BY MR. VETTORI:
10   Q.  Let me know when you're finished reading
11 it.
12   A.  I'm finished reading it.
13   Q.  So what is this document?
14   A.  I know what I believe it to be.  This is a
15 photocopy of a section of one of the ECFMG internal
16 software applications listing various components of
17 an individual's record with ECFMG.
18   Q.  Part of a computer program?
19   A.  Yes, it's a printout of one of the
20 screens.
21   Q.  So if you wanted to know when someone's
22 certificate was issued, you would go into your
23 computer program under his name or his
24 identification number or hers and punch in
25 certificate information?

98

1    A.  You can access it a number of different
2  ways.
3    Q.  But this document confirms that Akoda's
4  certificate was issued August 18, 1987, correct?
5    A.  It does have that issue date.  Yes.
6    Q.  Okay.
7    A.  1997.
8    Q.  And I think I know this answer, but it
9  will save me asking questions later.  So there is a
10 section on here that says English pass date
11 8/28/1996.  Do you see that?
12   A.  Yes.
13   Q.  Valid through 9/1/1998.  What does that
14 mean?
15   A.  At this time a passing performance on the
16 English test had a limited period of time of
17 validity during which time the holder of the
18 certificate had to start a residency program.  And
19 if he or she then started the residency program and
20 provided documentation, it would -- that expiration
21 date would be removed and it becomes valid
22 indefinitely.  If they did not, they were required
23 to take the English test.
24       MR. VETTORI:  Off the record.
25       (Discussion off the record.)

99

1  BY MR. VETTORI:
2    Q.  I'm going to ask you about that later
3  again, but thank you very much.
4        (Exhibit No. 28 marked for
5  identification.)
6    A.  I reviewed it.
7  BY MR. VETTORI:
8    Q.  This is another copy of a portion of the
9  computer program relating to this guy Akoda?
10   A.  I'm looking for the name.  I don't see the
11 name of the candidate on it, but it's a screen, it's
12 a print of a screen print from one of these ECFMG
13 programs.  I don't see a name.  I can barely make
14 out an ID number, though.
15   Q.  I can tell you, if I'm reading this
16 accurately, the user ID number is the same on the
17 previous exhibit.
18   A.  What do you mean user ID?
19       MS. MCENROE:  The USLME.
20   A.  The USMLE ID?
21 BY MR. VETTORI:
22   Q.  USMLE ID, the 553 --
23   A.  055332585?
24   Q.  Correct.
25   A.  So this would be the exam history.

00

1    Q.  So it's titled -- I'm sorry.  The heading
2  on the top of this form is ECFMG applicant
3  information management system V2.  What is it?  Is
4  that the computer program that's used?
5    A.  Yes.
6    Q.  That's like the universal program for all
7  of these?
8    A.  It's one of the programs.
9    Q.  And what this document reflects is when
10 the individual named Akoda passed step one, the
11 English exam, and step two, correct?
12   A.  I don't know when this was -- this screen
13 print was -- you know, when the screen was done, but
14 at the time it was done, that would have been -- it
15 looks like they checked the entire exam history.  It
16 would show, yes.
17       (Exhibit No. 29 marked for
18 identification.)
19   A.  Okay, I read it.
20 BY MR. VETTORI:
21   Q.  This is another screen shot from the same
22 program?
23   A.  I actually think it's a different program,
24 but it's an ECFMG program.  This one I think is the
25 verification information processing of electronic

Transcript of William C. Kelly
Conducted on August 20, 2019                      26 (101 to 104)

---

01

1    requests program.
2        Q.   What is VIPER?
3        A.   The acronym for Verification Information
4    Processing of Electronic Requests.
5        Q.   What is it used for?
6        A.   At that time it was used to track requests
7    from outside organizations and agencies of the ECFMG
8    status using the certification status of
9    individuals.
10       Q.   Do you know what outside organization was
11   seeking such information at that time?
12       A.   According to this information, the request
13   was sent to, so I -- you know, a presumption is
14   that's the person who requested it was the State
15   Board of Medical Examiners of New Jersey.
16       Q.   Is there any way to tell from this
17   printout the date that that information was sent?
18       A.   There is a print date, which I'm having a
19   hard time reading, but it is the third column under
20   record status.
21       Q.   Oh, I see print date, 01 -- it looks like
22   1999.  Do you see the date 1999 in there?
23       A.   It could be.  You know, I'm under oath so
24   I'm not going to say.
25       Q.   I will let the younger eyes in here tell

---

02

1    us.
2            Anybody want to volunteer anything?
3            MR. CERYES:  Nope.
4            MR. VETTORI:  All right.  Let's move
5    on.
6            (Exhibit No. 30 marked for
7    identification.)
8    BY MR. VETTORI:
9        Q.   Again, what is this document?
10       A.   Okay.  This is a photocopy of a screen
11   print from one of the ECFMG programs.
12       Q.   What is an AVTS report?
13       A.   I don't recall.
14       Q.   In any event, there is no information
15   entered in that field, is there?
16       A.   I don't see any.
17       Q.   Then there is a portion that says, "Exam
18   history, all exams?"
19       A.   I see that, yes.
20       Q.   It again talks about steps one, two,
21   English, and step one that we've seen on a previous
22   form, correct?
23       A.   Yes.
24       Q.   What's the update column mean?
25       A.   I don't know.  I don't recall what that

---

03

1    is.
2        Q.   In the heading column, the next one
3    following update dates it says "IB."  Do you know
4    what that stands for?
5        A.   My recollection is whether there was a
6    determination of irregular behavior.
7        Q.   What does TA stand for?
8        A.   Whether test accommodations were
9    administered.
10       Q.   Thank you.  So you don't have to look at
11   these unless you don't trust me, but the two
12   applications for Akoda that we identified a moment
13   ago didn't include Social Security numbers?
14       A.   That's correct, yes.
15       Q.   So at some point in time he provided a
16   Social Security number to ECFMG.  Do you remember
17   that?
18       A.   I don't remember him providing it, the
19   Social Security number.
20           (Exhibit No. 31 marked for
21   identification.)
22   BY MR. VETTORI:
23       Q.   Mr. Kelly, before you read the letter, let
24   me just make a statement.  I'm going to come back to
25   this letter later and ask you some questions about

---

04

1    it.  The only purpose in my showing it to you now is
2    with respect to the question I asked about Social
3    Security number, okay?
4            Let me just confirm.  This is an August
5    22, 2000, letter from Stephen Seeling, J.D., vice
6    president of operations of ECFMG to James McCorkel,
7    Ph.D. at Jersey Shore Medical Center.  Can we agree
8    on that?
9        A.   Yes.
10       Q.   If you will take a look at the second full
11   paragraph of that letter, the last sentence, read it
12   aloud, please.
13       A.   "The Social Security number he provided
14   ECFMG in 1998 is," and then part of it is --
15       Q.   And my letter says 9065?
16       A.   Then it has 9065.
17       Q.   You saw this letter contemporaneously with
18   it being written, didn't you?
19       A.   Frankly, I wrote the letter.
20       Q.   I was going to ask you that later because
21   I thought you did, but thank you.
22           We know because you said so, in 1998 he
23   provided a Social Security number.  Can you tell us
24   why he did that?  What was the reason for supplying
25   it then?

---

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

JA352

Transcript of William C. Kelly                      27 (105 to 108)
Conducted on August 20, 2019

| 05 |
| --- |

1          MS. MCENROE:  Objection.
2      A.  I don't recall.
3   BY MR. VETTORI:
4      Q.  You don't recall?
5      A.  I don't.
6          MS. MCENROE:  Again, he said I don't
7   recall or I don't know, he said I don't recall.  I
8   want to make sure the record is straight what the
9   witness said.
10  BY MR. VETTORI:
11     Q.  Is the answer I don't know because I don't
12  recall?
13     A.  I do not know the reason why he provided
14  this number.
15     Q.  Do you know if at the time he did so you
16  knew the reason he provided it?
17     A.  That I do not know.  I do not know if I
18  ever knew.
19         (Exhibit No. 32 marked for
20  identification.)
21     A.  I'm ready.
22  BY MR. VETTORI:
23     Q.  What is this document?
24     A.  This is a screen print of one of the
25  sections of an ECFMG program concerning Akoda,

| 06 |
| --- |

1   comma, John Nosa.
2      Q.  What does CIBIS stand for?
3      A.  I don't recall what the acronym stands
4   for, but CIBIS was the common USMLE database for the
5   three organizations that used the USLME.
6      Q.  Which three organizations?
7      A.  They were ECFMG, National Board of Medical
8   Examiners, and the Federation of State Medical
9   Boards.
10     Q.  It looks to me like this document reflects
11  that this person by the name of Akoda passed step
12  three at the exam of May 12, 1998.  Am I reading
13  that correctly?
14     A.  Yes.
15         (Exhibit No. 33 marked for
16  identification.)
17     A.  I reviewed this.
18  BY MR. VETTORI:
19     Q.  This is what we were talking about
20  earlier?
21     A.  Right, this is a request to permanently
22  revalidate the certificate with respect to the
23  English test expiration.
24     Q.  And this Exhibit 33 is Bates stamp
25  0000617.  And it's -- does this document indicate

| 07 |
| --- |

1   that the gentleman by the name of Akoda is
2   participating in a residency program at Jersey Shore
3   Medical Center?
4      A.  Strictly speaking that he had started the
5   program.
6      Q.  And this completed form was received by
7   ECFMG on July 24, 1990 -- I can't tell the date.
8   Can you read that date?
9      A.  I can read the July 24, but not the
10  rest.
11     Q.  I think it's '99.
12     A.  Since the valid indefinitely sticker was
13  sent in 1998, it's likely 1998 is the date it was
14  received.
15     Q.  So it's my somewhat limited understanding
16  that as of 1998 when a IMG who has been certified by
17  ECFMG and who has passed step three of the USMLE
18  applies to a residency program, ECFMG in some
19  fashion assists in that application if requested to
20  do so?  Is that understanding correct?
21         MS. MCENROE:  Objection for form.
22     A.  Assist in the application?
23  BY MR. VETTORI:
24     Q.  Yes.  And you can restate it, if it helps
25  you

| 08 |
| --- |

1      A.  Yeah.  I mean, we work with the
2   Association of Medical -- American Medical Colleges
3   for the electronic residency application service
4   where we serve as the dean station for international
5   medical graduates applying for residency programs.
6   So in that sense we are a part of that process.
7      Q.  So as part of your participation in the
8   ERAS process, is it correct that -- when an
9   applicant -- I'm sorry.  When an IMG applies to a
10  residency program using ERAS, another acronym, ECFMG
11  transmits a status report to the residency program;
12  is that correct?
13     A.  That was the process, yes.
14     Q.  As part of that ERAS process, again I'm
15  talking about this 1998 time period, did the -- was
16  the applicant required to send to ECFMG supporting
17  documents for further transmission to the residency
18  program?
19     A.  I am not sure.
20     Q.  As part of the ERAS program, in the time
21  period we're talking about, was it the practice for
22  ECFMG to transmit the IMGs USMLE transcripts as
23  requested by the applicant?
24     A.  If requested by the applicant, yes.
25     Q.  Do you know what, generally speaking,

Transcript of William C. Kelly
Conducted on August 20, 2019

28 (109 to 112)

09

1  application materials would have been provided to
2  the residency program through this ERAS process?
3      A.  I don't recall.
4      Q.  How about a curriculum vitae, would that
5  be part of it?
6      A.  I believe that was something they would
7  look for, yes.
8      Q.  Is there something called a universal
9  residency application form?
10     A.  There may be, but I have no knowledge.
11     Q.  Would the application materials also
12 include evidence of graduation from medical
13 school?
14     A.  I don't know.
15     Q.  Would it also include ECFMG
16 certification?
17     A.  The application itself?
18     Q.  Or anything that ECFMG did in connection
19 with this ERAS process.
20     A.  The ECFMG status report sent to the
21 program would indicate their certification status.
22     Q.  Were letters of recommendation a part of
23 this ERAS process?
24     A.  Yes.
25     Q.  Let's talk about that for a minute.  What

0

1  was the applicant's role in submitting letters of
2  recommendation, if any, and what was ECFMG's role in
3  following up on those letters of recommendation, if
4  any?
5          MS. MCENROE:  Objection to form.
6      A.  I believe the process changed
7  significantly over time and at this period of time I
8  really don't recall what the specific process was.
9  BY MR. VETTORI:
10     Q.  Well, do you recall what the process was
11 before it evolved at some point, because if you do,
12 you can tell what it was and what it became?
13     A.  First I circle back.  ERAS was not part of
14 my area.  I just want to let you know that so -- but
15 I found it significantly a lot about it.
16         I know letters of recommendation were
17 submitted to ECFMG in hard copy.  Whether they were
18 submitted directly by the person who wrote them or
19 by the applicant I don't recall.
20     Q.  Fair enough.  More to come.
21     A.  Pardon?
22     Q.  More to come on that subject.
23     A.  Okay.
24         (Exhibit No. 34 marked for
25 identification.)

1      A.  Okay.  I reviewed it.
2      Q.  Okay.  Are you familiar with this
3  letter?
4      A.  I've seen this letter before, yes.
5      Q.  This is a letter from James McCorkel who
6  is vice president of academic affairs at Jersey
7  Shore Medical Center to Eric Holmes at ECFMG
8  dated -- I don't know what the date is, but it was
9  received by ECFMG on August 11, 2000, correct?
10     A.  That's the received date, yes.  There is a
11 Friday, August 11, 2000, that date under Meridian
12 Health Systems.
13     Q.  Thank you.  What does the AIS stand for
14 under ECFMG?
15     A.  Applicant Information Services.
16     Q.  Are you the "To Bill" on the top?
17     A.  Very likely, yes.
18     Q.  I take it Mr. Holmes holds a pretty steep
19 position or did at ECFMG?
20     A.  His name was Royce, R-O-Y-C-E, and he
21 since died and he was in the information services
22 department.
23     Q.  Would you agree with me that in this
24 letter Doctor McCorkel is notifying ECFMG that John
25 Charles Akoda certificate 05532585 who is a resident

2

1  in the Jersey Shore residency program presented to
2  Jersey Shore Medical Center a Social Security number
3  that was issued to Igberase?
4      A.  That is what he states, yes.
5      Q.  That Social Security number ended in
6  9065?
7      A.  That's what the letter says, yes.
8      Q.  That's the same 9065 number that was
9  provided to you in Exhibit 32 in 1998, correct?
10     A.  Exhibit 31, yes.
11     Q.  Did I mix my numbers up?  Okay.  I stand
12 corrected.  Thank you.  It looks to me like Stephen
13 Seeling replied to that letter on August 22, 2000.
14 Do you remember we talked about that earlier?
15     A.  That's Exhibit 31.
16         MR. VETTORI:  Can we mark that,
17 please?
18     A.  I have a letter.
19     Q.  I think you told me you wrote this
20 letter?
21     A.  Yes, I'm sure I did.
22         (Exhibit No. 35 marked for
23 identification.)
24     Q.  This letter that you ghosted for
25 Mr. Seeling indicates that the medical diploma of

Transcript of William C. Kelly
Conducted on August 20, 2019

29 (113 to 116)

3

1  the individual certified under 482700-2 was verified
2  with the medical school.  Do you see that in the
3  third paragraph?
4      A.  Yes.
5      Q.  And it says the same thing in the second
6  paragraph about the diploma of the individual
7  certified as number 0553-285-5, correct?
8      A.  Yes.
9      Q.  We've already established for the record
10  that it was the same diploma, correct?
11          MS. MCENROE:  Objection to form.
12      Q.  Let me restate the question.  There is no
13  diploma in the name of -- hold on a second.  Let me
14  make sure I got the right name -- Igberase Oluwafemi
15  Charles?
16          MS. MCENROE:  Objection to form.
17      A.  I have to go back and look at the
18  diploma.
19      Q.  I can represent to you -- you can look at
20  anything you want.  I can represent to you we talked
21  about this for about five minutes and the last name
22  on the diploma is Igberase.  This is the one you
23  said was the order of the names was different?
24      A.  Yes.
25      Q.  But there is in fact no diploma with the

4

1  last name Charles on it?
2          MS. MCENROE:  Objection.
3      A.  Listed as the last name on the diploma?
4      Q.  Correct.
5      A.  Yes.
6      Q.  In Mr. McCorkel's letter to you, the prior
7  exhibit, he also talks about the fact that Jersey
8  Shore Medical Center would be interested in knowing
9  whether ECFMG had requested for verification of
10  Doctor Akoda, also known as Doctor Igberase, ECFMG's
11  certification status from other teaching hospitals
12  including Harlem Hospital Center in the period of
13  time of approximately 1995 to '96 or JFK Memorial
14  Hospital in 1997, '98.  Do you see that?
15      A.  Yes, I do.
16      Q.  In the letter you ghosted for Mr. Seeling
17  it was stated that on the last paragraph, "ECFMG has
18  no record of receipt of request for verification of
19  the certification status from Harlem Hospital Center
20  or JFK Memorial Hospital Center."  Do you see
21  that?
22      A.  Yes.
23      Q.  I take it you or somebody at your
24  direction made an investigation of that before
25  writing that letter?

5

1      A.  That's correct.
2      Q.  Do you have a specific recollection of
3  that?
4      A.  I do not.
5          (Exhibit No. 36 marked for
6  identification.)
7      Q.  Have you read the letter?
8      A.  Yes.
9      Q.  I'm not trying to rush you.
10      A.  No, I read it.
11      Q.  This is a letter from you to Akoda dated
12  August 22, 2000, correct?
13      A.  That is correct.
14      Q.  And it's basically telling Akoda you want
15  an explanation in writing within fifteen days of the
16  information that had been submitted to you by Doctor
17  McCorkel, correct?
18      A.  I don't think it makes any reference to
19  McCorkel in this letter, but we asked for an
20  explanation, yes.
21      Q.  But it's because of Doctor McCorkel's
22  letter that you're writing this letter, correct?
23          MS. MCENROE:  Objection to form.
24      A.  It appears to be, yes.
25      Q.  And in your opening sentence you said that

6

1  ECFMG has received information alleging that he may
2  have engaged in irregular behavior, correct?
3      A.  Yes.
4      Q.  And irregular behavior would have been
5  using somebody else's Social Security number?
6          MS. MCENROE:  Objection to form.
7      A.  Including that, yes.
8      Q.  What else?
9      A.  It also indicates that there may be a
10  question with a name and date of birth.
11      Q.  And so your reference to irregular
12  behavior would have included all of those things?
13      A.  Yeah, but this letter does not
14  specifically spell it out like a routine allegation
15  would.
16      Q.  What would a routine allegation say
17  instead?
18      A.  It would be more specific about what the
19  alleged irregular behavior is.  It would say you
20  were led to irregular behavior with respect to and
21  then specify what that irregular behavior was.
22      Q.  Well, in this letter you set out that
23  according to the information recently received by
24  ECFMG, it's alleged that Akoda may have previously
25  applied to ECFMG using the name Igberase and the

Transcript of William C. Kelly
Conducted on August 20, 2019
30 (117 to 120)

7

1  name Charles, correct?
2      A.  Yes.
3      Q.  And it also goes on to say, next
4  paragraph, when Akoda applied to ECFMG, he certified
5  on his application that the falsification of the
6  application or submission of any falsified
7  educational documents may be sufficient to cause --
8  sufficient cause for ECFMG to bar, et cetera, et
9  cetera.  You were telling him that he may have
10  engaged in that illegal behavior?
11      A.  Yes.
12      Q.  May have engaged in that illegal behavior;
13  is that correct?
14      A.  Yes.
15      Q.  And you also told him in this letter that
16  ECFMG required an explanation from him in writing
17  within fifteen days, correct?
18      A.  Yes.
19      Q.  And you also told him that his file
20  together with any explanation he would provide and
21  any other material he wanted to submit would be
22  referred to the ECFMG committee on medical education
23  credentials for review at its next scheduled
24  meeting, correct?
25      A.  Yes.

8

1      Q.  You never did that, did you?
2      A.  I don't recall.
3          (Exhibit No. 37 marked for
4  identification.)
5      Q.  What is Exhibit 37, Mr. Kelly?
6      A.  It's a copy of a memorandum from me to the
7  file of 05532585, Doctor John Akoda.
8      Q.  And it recites that he spoke with James
9  McCorkel that day?
10      A.  Yes.
11      Q.  And that among other things, Doctor
12  McCorkel had contacted Harlem Hospital and sent a
13  photograph to them and he was waiting to hear back
14  from them?
15      A.  Yes.
16          MR. VETTORI:  This is a good time to
17  stop.
18          (Recess taken at 1:30 p.m.)
19          (Back on the record at 1:35 p.m.)
20  BY MR. VETTORI:
21      Q.  Can you go back to Exhibit 34?
22      A.  (Complies.)
23      Q.  So in the first paragraph Doctor McCorkel
24  writes -- I'm sorry.  He indicates that there has
25  been an allegation that Akoda also served as a

9

1  resident -- I'm in the first paragraph -- two other
2  U.S. residency programs under the name of Oluwafemi
3  Charles Igberase.  Do you see that?
4      A.  Yes.
5      Q.  And he says, "On verifying his Social
6  Security number, 9065, we have discovered that it
7  was issued to Charles Igberase.  When presented with
8  this information late yesterday, this doctor stated
9  that he had used all of these names and that he has
10  never served in another USACG accredited residency
11  program."  Do you see that?
12      A.  Yes.
13          (Exhibit No. 38 marked for
14  identification.)
15      Q.  Let me know when you're finished reading
16  it, sir.
17      A.  I've read it.
18      Q.  Is this the letter that was received by
19  ECFMG from Akoda in response to your August 22, 2000
20  letter?
21      A.  That's what it states, yes.
22      Q.  In this letter he denies that he has taken
23  the examination under different names; is that
24  correct?
25      A.  That's correct.

20

1      Q.  He admits, however, that he used -- he
2  used Igberase Social Security number; is that
3  correct?
4      A.  Yes.
5      Q.  And he tells you that he's going to
6  provide you with a country issued passport,
7  correct?
8      A.  That's what it says, yes.
9      Q.  Whose handwriting is at the bottom,
10  transfer to something?
11      A.  That looks like it's mine.
12      Q.  Can you read "transfer to"?
13      A.  I would just be guessing.
14      Q.  Don't.
15          (Exhibit No. 39 marked for
16  identification.)
17      A.  I've read it.
18      Q.  So this is a memorandum that you wrote to
19  file on September 13, 2000, correct?
20      A.  Yes.
21      Q.  It's a memorandum of a conversation you
22  had with Doctor McCorkel?
23      A.  Yes.
24      Q.  And he's telling you that Akoda has been
25  suspended, correct?

JA356

Transcript of William C. Kelly
Conducted on August 20, 2019

21

1    A.  Yes.
2    Q.  And that's for, quote, inconsistencies,
3  closed quotes?
4    A.  Yes.
5    Q.  Do you remember any more discussion or any
6  elaboration of that?
7    A.  No.
8    Q.  Also it appears in the last sentence that
9  McCorkel told you Akoda claims he and Igberase and
10 Charles are cousins, correct?
11   A.  That Akoda claimed that was a cousin,
12 yes.
13   Q.  And McCorkel says his discussions with
14 Harlem Hospital were, quote, not definitive,
15 right?
16   A.  Yes.
17   Q.  Do you remember any more details about
18 what "not definitive" meant?
19   A.  No.
20      (Exhibit No. 40 marked for
21 identification.)
22   A.  I've read this.
23   Q.  So am I correct these are your handwritten
24 notes of your conversation with McCorkel reflected
25 in Exhibit 39?

23

1  have elaborated on this last sentence?
2    A.  That's correct.
3    Q.  If it happened?
4    A.  Yeah, which leads me to think it may
5  not.
6       (Exhibit No. 41 marked for
7  identification.)
8    Q.  Can we go back to the previous exhibit,
9  Exhibit No. 40?
10   A.  Yes.
11   Q.  Sort of like in the left-hand margin
12 there's a couple of entries.  Can you read that
13 "more than ECFMG" -- I can't read that.
14   A.  It says, "More than ECFMG, it looks to me
15 we'll be interested."
16   Q.  And is there an arrow down to the next
17 entry?
18   A.  It looks as those there is some connecting
19 line.
20   Q.  What does it say?
21   A.  If I'm reading correctly, sometimes it's
22 hard to read your own handwriting from 20 something
23 years ago.
24   Q.  Amen.
25   A.  It looks like "A waiver in name Akoda, not

22

1    A.  That's what they appear to be, yes.
2    Q.  So at the bottom of the page you write,
3  Received, I think, communications, hyphen, off
4  record, and above it is written CEO.  What does that
5  mean, CEO?
6    A.  Chief executive officer, I believe.
7    Q.  So can you put that into context?  What
8  does "received CEO communications" mean?
9    A.  What McCorkel was telling me was -- and
10 these were notes I would have been taking during the
11 time of the telephone call.
12   Q.  Sure.
13   A.  But that he had said he received CEO
14 communications at his institution, but off the
15 record he's telling me he cannot share -- he cannot
16 share them, and it's not definitive, but whatever
17 information they had did not ease his concern.
18   Q.  Did you ask him what he meant by that?
19   A.  I may have.
20   Q.  You don't recall?
21   A.  I don't recall.
22   Q.  You didn't put it in your notes?
23   A.  I have nothing in my notes.
24   Q.  And you didn't put it in a memorandum?
25 You didn't put in your memorandum anything that may

24

1  Igberase.
2    Q.  What does waiver mean?
3    A.  I don't know.
4    Q.  So in the middle of the page of your notes
5  it says, "He'll talk to attorney," meaning
6  McCorkel?
7    A.  That is my understanding of what I mean
8  here, yes.
9    Q.  "If appeal will not" -- can you read the
10 rest of that for me?
11   A.  It says, "Communicate additional fifteen
12 days.  We'll hear otherwise in a week."
13   Q.  Is that pretty much what you said in your
14 memorandum, 39?
15   A.  Yes.
16   Q.  Is that what you're referring to?
17   A.  Yes.
18   Q.  Let's go to 41, would you, please?  What
19 is 41?
20   A.  It's a memorandum from me to file 0553258
21 John Akoda.
22   Q.  Does this memorandum reflect the fact that
23 Akoda came to your office?
24   A.  Yes.
25   Q.  On that date, September 27, 2000?

Transcript of William C. Kelly
Conducted on August 20, 2019

32 (125 to 128)

25

1   A.  Yes.
2   Q.  He told you that he's not Igberase
3  Charles, but rather than he's his cousin?
4   A.  That's what he said, yes.
5   Q.  And --
6   A.  -- according to the memo.
7   Q.  I apologize, Mr. Kelly. He again admits
8  to using his cousin's Social Security number,
9  correct?
10   A.  Yes.
11   Q.  And so he provided you with an original
12  Nigerian passport and Nigerian international driving
13  permit and you made copies, right?
14   A.  That's what it says.
15   Q.  He told you that he'd been suspended by
16  Jersey Shore?
17   A.  Yes.
18   Q.  Did you make any attempt at that time to
19  verify the authenticity of his passport?
20      MS. MCENROE:  Objection to form.
21   A.  I don't remember.
22   Q.  Did you at any time make an attempt to
23  verify the authenticity of his passport?
24      MS. MCENROE:  Objection to form.
25   A.  I don't remember.

26

1   Q.  Do you remember whether his passport
2  showed a date of birth?
3   A.  I would have to look at it, but generally
4  I know passports have dates of birth.
5   Q.  And did you ever go back and check the
6  date of birth on his passport in comparison with the
7  date of birth on Exhibit 33, his request for
8  permanent revalidation of standard ECFMG
9  certificate?
10   A.  I don't know if I did.
11   Q.  Do you know how you would go about
12  checking the authenticity of a Nigerian passport?
13      MS. MCENROE:  Objection to form.
14   A.  Do I know?
15   Q.  Did you know at that time?
16   A.  I may have.  That would be trying to
17  project or guessimate what would have happened.
18      MR. VETTORI:  Shut up. That was my
19  watch I was talking to.
20      MS. MCENROE:  Let the record
21  reflect.
22   Q.  Take a look at Exhibit 33 for me, would
23  you, please?
24   A.  Yes.
25   Q.  What is the date of birth listed on

27

1  there?
2   A.  April 17, 1963.
3      (Exhibit No. 42 marked for
4  identification.)
5   Q.  While looking at -- Mr. Kelly, this is a
6  copy of Federal Republic of Nigeria passport
7  produced to us by ECFMG.  Would you agree with what
8  I just said?
9   A.  Is this the copy that was in his ECFMG
10  record?
11   Q.  It was produced to us by ECFMG.  It's got
12  a Bates number on it.
13   A.  Then it is.
14   Q.  Would this have been what he produced to
15  you at this meeting?
16   A.  If this is in the ECFMG records as having
17  been produced, yes.  I don't know just by looking at
18  it.
19   Q.  I appreciate that.  What is his date of
20  birth on his passport?
21   A.  It looks like January 1, 1959.
22   Q.  That's different from the birth date on
23  Exhibit 33?
24   A.  Yes.
25   Q.  So I'm not sure, maybe this is a function

28

1  of my age, whether Google even existed in the year
2  2000, but I can tell you, I Googled Nigerian
3  passports and that search tells me that a Nigerian
4  passport has eight digits and one letter.
5      How many digits do you see on the
6  passport that I just marked as an exhibit?
7      MS. MCENROE:  Objection to form.
8   A.  Are you talking about the passport number?
9   Q.  Yes, sir.
10   A.  It looks like one letter and six
11  numbers -- six digits.
12   Q.  I think it is seven.
13   A.  Counting æro, yes.
14   Q.  That's still part of our numbering system,
15  isn't it?  Don't answer that question.  So if in
16  fact a simple search can lead to a determination
17  that Nigerian passports have to have at least eight
18  numbers in them and the passport he presented to you
19  only has seven, wouldn't that have heightened ECFMG
20  suspicion in light of all things that are being said
21  by Doctor McCorkel about Akoda's true identity?
22      MS. MCENROE:  Objection to form.
23   A.  You said the numbering system in 2000 was
24  the same that you're saying?
25   Q.  I don't know the answer to that.  I'm

Transcript of William C. Kelly                    33 (129 to 132)
Conducted on August 20, 2019

29

1 telling you that is the number system now.
2        MS. MCENROE: Objection to form.
3    Q. I don't think there's a question pending.
4 I think he's told me he doesn't know.
5    A. I don't know.
6    Q. It's fair to say that, though, that you
7 have no recollection of making any attempt to verify
8 the authenticity of that passport?
9        MS. MCENROE: Objection to form.
10   A. I do not remember making an attempt,
11 yes.
12   Q. So either before Akoda came into your
13 office on September 27 or after he came into your
14 office, did you undertake any investigation of your
15 database to try to determine whether Akoda and
16 Igberase were one and the same person?
17   A. I don't remember.
18   Q. I think we've established from some of the
19 applications that we've gone over here today that
20 photographs are attached to the applications?
21   A. Photographs of the applicant, yes.
22   Q. Those are maintained in ECFMG's
23 database?
24   A. Yes.
25   Q. If you, either before or after September

30

1 27, had gone into the database to look for a
2 photograph of Igberase and looked for a photograph
3 of Akoda, you could have done that?
4        MS. MCENROE: Objection to form.
5    A. I believe I could have, yes.
6    Q. You didn't do that?
7    A. I don't know if I did.
8    Q. So how long did Igberase spend in your
9 office on the 27th of September 2000?
10   A. I do not know.
11   Q. I take it you didn't recognize him as
12 somebody you'd seen before?
13   A. I don't know. I don't recall.
14   Q. Well, I take it if you had recognized him
15 as someone you had seen before, you would have
16 memorialized that in some fashion, wouldn't you?
17       MS. MCENROE: Objection to form.
18   A. It depends on what you mean by someone
19 I've seen before.
20   Q. Seen as a someone holding himself out to
21 be someone by the name of Charles or by the name of
22 Igberase?
23       MS. MCENROE: Objection to form.
24   A. I believe I would have, yes.
25   Q. So you actually had seen Charles before,

3

1 hadn't you?
2        MS. MCENROE: Objection to form.
3    A. I don't recall.
4    Q. So do you remember when I asked you some
5 questions earlier today about -- humor me -- the
6 history of the events with Igberase and Charles?
7    A. Yes.
8    Q. Do you remember you told me, because you
9 wrote it in a letter when you were reciting that
10 history, that he took an appeal from the original
11 invalidation and revocation of the two
12 certificates?
13   A. Yes.
14   Q. And that there was an appeal hearing in
15 Washington, D.C. on July 11, 2016.
16   A. I remember there was an appeal hearing.
17   Q. And you were there?
18   A. Yes.
19   Q. And you were there for a number of
20 hours?
21   A. Okay.
22       MS. MCENROE: Objection to form.
23   Q. Is that correct?
24   A. I remember being there, yes.
25   Q. And so you sat in a room with this person

32

1 calling himself Charles for several hours in July of
2 1996 but you didn't recognize him as the same person
3 when he came into your office on September 27,
4 2000?
5        MS. MCENROE: Objection to form.
6    A. I don't know how long he was in the room,
7 first of all.
8    Q. You mean back in 1996?
9    A. Yes.
10       MS. MCENROE: Off the record for a
11 second.
12       (Recess taken at 2:00 p.m.)
13       (Back on the record at 2:30 p.m.)
14       MR. VETTORI: I'm going to have to
15 ask for a favor from you. I made copies of the
16 cover sheet of the appeal hearing.
17       MS. MCENROE: Yes.
18       MR. VETTORI: But I didn't make
19 copies of the entire transcript.
20       MS. MCENROE: Just mark that one. Is
21 that okay?
22       MR. VETTORI: This one.
23       MS. MCENROE: That one you have
24 complete.
25       (Exhibit No. 43 marked for

Transcript of William C. Kelly
Conducted on August 20, 2019                    34 (133 to 136)

33

1  identification.)
2      A.  I'm leafing through it.
3      Q.  Please do.  I can tell you that I didn't
4  find any start date for that transcript, but if you
5  look on the last page it ends at 11:50.
6      A.  Okay.
7      Q.  Don't take my word for it.  Please verify
8  it.
9      A.  Okay.  Yes.
10     Q.  And on the cover sheet it shows you as
11  being present, correct?
12     A.  Yes.
13     Q.  And I'll represent to you that this
14  individual who goes by the name of Charles who is
15  also we know now Igberase testified at this
16  hearing?
17     A.  Yes.
18     Q.  So whether it's an hour or two hours or
19  three hours, it's some period of time that you were
20  present in Washington, D.C. at a proceeding where
21  the individual calling himself Charles appeared and
22  testified, correct?
23     A.  Yes.
24     Q.  And a person calling himself Akoda, who
25  was in your office having been accused of really

34

1  being Igberase, who was really Charles, and you
2  didn't know it was the same person you'd seen
3  testifying?
4          MS. MCENROE:  Objection.
5      A.  From four years before, I did not know.
6          (Exhibit No. 44 marked for
7  identification.)
8      Q.  Is that your handwriting?
9      A.  Yes.  Okay.  I've read it.
10     Q.  These are your notes of the telephone
11  conversation with Doctor McCorkel on October 5,
12  2000; is that correct?
13     A.  That's what they appear to be, yes.
14     Q.  So it starts off by saying, "Akoda meeting
15  schedule with Akoda at 11 a.m. and at 2 p.m."  What
16  meeting is that referencing?
17     A.  I believe it's a meeting Akoda was having
18  with McCorkel.
19     Q.  And "inconsistencies in file."  Can you
20  read the next sentence for me?
21     A.  "With Doctor Frank, the program director."
22     Q.  Do you know what that means?  What do you
23  remember what that means?
24     A.  Whether it means that the meeting is going
25  to include the program director or not, I don't

35

1  know.
2      Q.  "Final meeting next week," do you know
3  what was meant by that?
4      A.  No.
5      Q.  You write, "Akoda on suspension until 10/1
6  asking him to clarify inconsistencies."  Did I read
7  that correctly?
8      A.  I think that's correct, yes.
9      Q.  That was related to you by Doctor
10  McCorkel?
11     A.  That would have been, yes.
12     Q.  It says, "Two different green cards,
13  slash, different dates."  Am I reading that
14  correctly?
15     A.  That's what it looks like, yes.
16     Q.  Do you remember that conversation?
17     A.  I don't remember the conversation.
18     Q.  "Fingerprints, birth dates, numbers,
19  driver license."  Am I reading that accurately?
20     A.  Yes.
21     Q.  What is the significance of that or what
22  do you recall about it?
23     A.  I have no recollection of it.
24     Q.  So you don't really recall this
25  conversation, we're just going over your notes?

36

1      A.  Yes.
2      Q.  "Indicated he was going to Nigeria and
3  return on 10/15 but he is in USA"?
4      A.  That would be what McCorkel would have
5  told me.
6      Q.  Over on the left -- I saw you tilt your
7  head too, which I have to do too.  I guess I can
8  turn to the page.
9      A.  That's what I should have done.
10     Q.  "Currently suspended and will not be
11  reinstated"?
12     A.  Yes.
13     Q.  "Unless satisfactory explanation for
14  inconsistencies, will notify ECFMG"?
15     A.  That's what I read as well.
16     Q.  Is that what McCorkel told you when he
17  reported it?
18     A.  Yes.
19     Q.  "Due process review panel Wednesday 2 p.m.
20  10/11, question mark, not yet there."  Do you
21  remember what that was all about?
22     A.  I don't.
23     Q.  "Harlem Hospital thinks he may be the
24  same."  Can you explain that?
25     A.  I would only be guessing what I meant by

Transcript of William C. Kelly
Conducted on August 20, 2019

35 (137 to 140)

---

**37**

1 that. I don't know.
2    Q. You don't remember what he was referring
3 to?
4    A. No.
5    Q. "10/19 notice to Akoda he will be
6 terminated in thirty days. If he does not appeal in
7 ten days, re, two Social Security numbers"?
8    A. That's what it says.
9    Q. Did I read that correctly? That's what
10 Doctor McCorkel told you?
11    A. That what's he would have told me, yes.
12      (Exhibit No. 45 marked for
13 identification.)
14    A. Okay. I read it.
15    Q. So it looks to me like on this document --
16 it's an e-mail chain -- it's you to Igberase and
17 Akoda back to you. Am I correct?
18    A. Yes.
19    Q. The bottom e-mail is the first e-mail in
20 time?
21    A. Yes.
22    Q. You e-mailed Cfeme, C-F-E-M-E, at
23 hotmail.com on Thursday, December 21, 2000 at 1638
24 hours. What is that? 4:38? Who is in the
25 military?

**38**

1    A. Yes.
2    Q. Thank you.
3    A. It looks like 39.
4    Q. You said, "Doctor Igberase, I've been
5 trying to contact you concerning your application
6 submitted to ECFMG. Please contact me as soon as
7 possible."
8      Do you know if that's referring to
9 the 2000 application we saw where he blamed it on
10 his friends and his cousin?
11    A. I don't.
12    Q. You don't remember?
13    A. No.
14    Q. Okay. So then you get an e-mail back from
15 Akoda, correct?
16    A. Yes.
17    Q. Not Igberase?
18    A. Yes.
19    Q. And he says he's been trying to reach you.
20 Left several messages on your machine. Do you have
21 any recollection of that?
22    A. No.
23    Q. He's questioning why Igberase gave you his
24 e-mail because he doesn't use it anymore, correct?
25    A. That's what he says, yes.

**39**

1    Q. Fair enough.
2      (Exhibit No. 46 marked for
3 identification.)
4    A. I've read this.
5    Q. So Exhibit 46, am I correct, is your
6 December 21, 2000 memorandum to the file?
7    A. To file 05532585, John Akoda.
8    Q. Correct. It's memorializing a telephone
9 conversation you had that day with Doctor
10 McCorkel?
11    A. Yes.
12    Q. And in the telephone call Doctor McCorkel
13 told you Akoda had been dismissed from the Jersey
14 Shore Medical Center, correct?
15    A. That's what it says, yes.
16    Q. He says it was because, one, Akoda used a
17 false Social Security number when he applied to the
18 hospital?
19    A. Yes.
20    Q. And that he acknowledged to McCorkel that
21 he had used the Social Security number of his cousin
22 Charles Igberase; is that correct?
23    A. Yes.
24    Q. He also says because the green card he
25 provided the hospital was inconsistent with the

**40**

1 subsequent green card he also provided; different
2 number, name, expiration date, and date of birth,
3 correct?
4    A. Yes.
5    Q. Did you ever do anything to check into
6 those green cards?
7      MS. MCENROE: Objection to form.
8    A. When you say ECFMG normally doesn't
9 receive green cards, so, you know...
10    Q. Were you curious as to whether there was
11 some inconsistences with this gentleman's green
12 card?
13      MS. MCENROE: Objection to form.
14    A. I don't remember.
15      (Exhibit No. 47 marked for
16 identification.)
17    A. I finished reading it.
18    Q. Can you tell me what this document is?
19    A. It appears to be an internal, meaning
20 ECFMG produced comparison chart of two records.
21    Q. Have you ever seen it before? I'm
22 sorry --
23    A. Yes.
24    Q. -- do you recall ever seeing it before?
25    A. Yes, I do.

---

Transcript of William C. Kelly

36 (141 to 144)

Conducted on August 20, 2019

---

**4**

1  Q.  And do you know when it was generated?

2  A.  No, I do not.

3  Q.  Do you know the purpose for which this

4  document was generated?

5  A.  I believe it was to compare the records.

6  Q.  To what end?  Why was ECFMG comparing the

7  records?

8        MS. MCENROE:  Objection to form.

9  A.  It looks as though to see what is

10 comparable and what's not.

11 Q.  Did you participate in providing any of

12 the information that's contained on this document?

13 A.  I'm not sure I understand what you mean

14 by --

15 Q.  Okay.

16 A.  I don't think I prepared the document.

17 Q.  Okay.  Do you know who did?

18 A.  I don't know for sure, no.

19 Q.  Would it more likely have been some staff

20 at the direction of someone who would have tasked

21 them with doing this?

22        MS. MCENROE:  Objection to form.

23 A.  That is very likely.

24 Q.  You don't remember who that might have

25 been?

---

**42**

1  A.  No.

2  Q.  Do you recall this document ever being

3  used for any purpose after it was generated?

4  A.  I don't recall, no.

5  Q.  So at the bottom of the page it looks to

6  me like it's got the medical examination

7  information, much of which we've gone over before,

8  correct?

9  A.  Yes.

10 Q.  So under the -- strike that.

11        There is no particular name given to

12 this form; this was just an internal document

13 generated for some purpose?

14 A.  Yes.

15 Q.  So on the left-hand side, am I correct,

16 this document recounts historical information about

17 the person certified under 04827-2 and the person

18 certified under 0519573-0, correct?

19 A.  Yes.

20 Q.  And you remember from our probably very

21 boring and tedious testimony earlier today that it

22 was as of October 2002 that USMLE barred this person

23 permanently from ECFMG exams and ECFMG

24 certification?

25        MS. MCENROE:  Objection to form.

---

**43**

1  A.  Such a bar would be the ECFMG -- USMLE.

2  Q.  That's as of October 2002, correct?

3  A.  That's what it says, yes.

4  Q.  On the right-hand side, am I correct this

5  is all information about the individual by the name

6  of Akoda?

7  A.  Yes.

8  Q.  I think if you compare most of the dates

9  in that part of the document with the documents

10 we've already been over, they're consistent?

11 A.  Yes.

12        MS. MCENROE:  Objection to form.

13 Q.  Like you sent a letter on August 22 after

14 McCorkel contacted you guys, ECFMG?

15 A.  Yes.

16 Q.  And on September 1, 2000 we talked about

17 the letter Akoda wrote back to you where he stated

18 the allegations were false but admitted that he used

19 Charles' Social Security number, correct?

20 A.  Yes.

21 Q.  And it recites that he came to your office

22 and provided a Nigerian passport, right?

23 A.  Yes.

24 Q.  So can you focus on that 9/27/2000

25 entry?

---

**44**

1  A.  Yes.

2  Q.  And read it into the record aloud, please.

3  A.  "Akoda came to ECFMG providing a Nigerian

4  passport.  Claimed Charles was his cousin and he had

5  not used his SS number."

6  Q.  That's incorrect, isn't it?

7        MS. MCENROE:  Objection to form.

8  A.  There are other documents in which he

9  admits he used the number.

10 Q.  Right, and he told you when he came to

11 your office that he had used his cousin's Social

12 Security number --

13 A.  Yes.

14 Q.  -- correct?  So why does this document say

15 he had not used his cousin's Social Security

16 number?

17        MS. MCENROE:  Objection to form.

18 A.  That's an error, isn't it?

19 A.  I don't know why it says that.

20 Q.  Okay.  That answers that question.  Thank

21 you.  The next question is:  That is an error that is

22 incorrect, is it not?

23 A.  It's incorrect based on the other

24 documents.

25 Q.  Is there any way in which it is correct?

---

Transcript of William C. Kelly
Conducted on August 20, 2019                    37 (145 to 148)

---

**45**

1          MS. MCENROE:  Objection to form.
2      A.  Not that I'm aware of.
3      Q.  The last entry says, "Stated in a separate
4   memo, Bill sent Charles an e-mail.  Akoda replied,
5   Not enough documentation for credentials today."  Do
6   you see that?
7      A.  Yes.
8      Q.  Do you know who authored that entry?
9      A.  I do not.
10     Q.  Similarly, do you know who authored the
11  entry we went over a moment ago on line 27, 2000
12  that he erroneously states that he said he was
13  not -- he did not use his cousin's Social Security
14  number?
15     A.  No.
16         (Exhibit No. 48 marked for
17  identification.)
18     A.  I've read it.
19     Q.  Is it correct this is a memo dated
20  December 20, 2000 from you to Stephen Seeling, JD?
21     A.  Yes.
22     Q.  And it's referencing Akoda ID number
23  05532595; is that correct?
24     A.  Yes.
25     Q.  And the first sentence says, "Attached is

---

**46**

1   a copy of a memorandum for the file."  Is that
2   Exhibit 46, the one dated the day before?
3      A.  It appears to be.
4      Q.  So then you say, "This memorandum is being
5   written separately since I did not think it should
6   be made part of the official file."  Why didn't you
7   think it should be made part of the official file?
8      A.  I don't remember.
9      Q.  You don't remember why you made that
10  statement?
11     A.  No.
12     Q.  So did you look at this document in
13  preparation for this deposition today?
14     A.  Yes.
15     Q.  And did you reflect upon this
16  memorandum?
17     A.  Yes.
18     Q.  Did you ask yourself, Why did I say
19  that?
20     A.  Yes.
21     Q.  And you can't tell me?
22     A.  I cannot tell you.
23     Q.  So in your memorandum you're telling
24  Mr. Seeling that in your discussion with Doctor
25  McCorkel, Doctor McCorkel told you he believed

---

**47**

1   Igberase and Akoda were one the same person,
2   correct?
3      A.  Yes.
4      Q.  And he said he has no proof, just a strong
5   suspicion, correct?
6      A.  Yes.
7      Q.  And he said information he received from
8   an informant provided details that led him to
9   believe this, correct?
10     A.  Yes.
11     Q.  Do you know who that informant is?
12     A.  No.
13     Q.  Did you ever ask him?
14     A.  I don't recall.
15     Q.  You didn't memorialize that anywhere in
16  any memos or notes, did you?
17     A.  If I had, it would be in the record.
18     Q.  "I also believe Akoda and Igberase are one
19  and the same," that's you talking, correct?
20     A.  Yes.
21     Q.  Why did you believe that?
22     A.  I don't remember, but from reviewing the
23  records I thought there was a nexus between the
24  two.
25     Q.  After all the time we spent here today

---

**48**

1   don't you believe it was because of all of the
2   information we've talked about?
3          MS. MCENROE:  Objection to form.
4      A.  In hindsight, yes.
5      Q.  At the time it wasn't hindsight; it was
6   based on information made available to you then,
7   correct?
8      A.  Yes.
9      Q.  You indicate that, "The only information
10  that you have for the committee is Akoda's statement
11  that he's not Igberase, although he did admit in
12  writing that he used Igberase's Social Security
13  number."  Did I read that correctly?
14     A.  Yes.
15     Q.  Didn't you tell Akoda in the letter that
16  you wrote to him after McCorkel brought it to
17  ECFMG's attention that you were going to refer this
18  to the credentials committee including his response,
19  if any?
20     A.  Yes.
21     Q.  Again, "he has given us a passport that
22  appears to confirm his identify as John Akoda."  You
23  didn't verify the authenticity of that passport, did
24  you?
25         MS. MCENROE:  Objection to form.

---

Transcript of William C. Kelly

38 (149 to 152)

Conducted on August 20, 2019

49

1     A.  I don't remember.
2     Q.  So in many of the letters we've reviewed
3  here today when you talked about verifying
4  applicant's credentials, you also go out and state
5  you verified their medical school credentials
6  including their diploma, correct?
7     A.  Yes.
8     Q.  Would it be safe or fair for me to assume
9  that if you had verified the accuracy or
10  authenticity of his passport, you would have made a
11  statement to that effect somewhere?
12         MS. MCENROE:  Objection to form.
13     A.  Yes.
14     Q.  So you indicate that you sent Igberase an
15  e-mail, correct?
16     A.  Yes.
17     Q.  That's the one we went over a little while
18  ago, right?
19     A.  Yes.
20     Q.  And you state, quote, "And who should
21  reply but Akoda, exclamation mark"?
22     A.  Yes.
23     Q.  Correct?  That's your emphasis?
24     A.  Yes.
25     Q.  That surprised you, didn't it?

50

1     A.  You mean at the time he answered?
2     Q.  At the time you wrote this memo.  Why did
3  you put an exclamation "but Akoda, exclamation
4  mark"?
5     A.  For emphasis or something like that,
6  yes.
7     Q.  Emphasis to what effect?
8     A.  That it seemed strange.
9     Q.  Okay.  "We need to brainstorm on this
10  one." You wrote that, correct?
11     A.  Yes.
12     Q.  "Maybe Shirley Williams, parens, Ms.
13  Sherlock"-- is that a reference to Sherlock
14  Holmes?
15     A.  Most likely, yes.
16     Q.  I'm sure it's an affectionate reference.
17  I don't know Ms. Williams.  "Maybe Shirley Williams,
18  parens, Ms. Sherlock could sit in." You wrote that,
19  correct?
20     A.  Yes.
21     Q.  Did you and Mr. Seeling with or without
22  the assistance of Ms. Sherlock brainstorm this
23  matter further?
24     A.  I don't remember.
25     Q.  Can you point to me any record, any

5

1  document that would indicate that such brainstorming
2  took place?
3     A.  No, I have no document.
4     Q.  In your review for today's deposition did
5  you see any such information?
6     A.  No.
7     Q.  So why did you suggest Ms. Shirley
8  Williams participate?  Who is she?  What is her
9  expertise?  Why?
10         MS. MCENROE:  Objection.  Compound.
11     A.  This period she worked with Steve, and a
12  part of her responsibility was researching difficult
13  issues and items.
14     Q.  So Mr. Kelly, I took some time to run
15  through the events as I can put them together from
16  the documents that counsel provided to me in this
17  August to December 2000 period concerning, if you'll
18  allow me, this Jersey Shore Medical Center matter.
19  Okay?
20     A.  Yes.
21     Q.  I've gone through them with you.  And I
22  want to ask you some questions now that we've been
23  through those documents.  Fair enough?
24     A.  Yes.
25     Q.  As of the last record that we have dealing

52

1  with this matter, late December 2000, the year 2000,
2  correct?
3     A.  The last document, yes.
4     Q.  As of late December 2000, you were
5  personally familiar with the complete history of the
6  fraud committed by Igberase, slash, Charles,
7  correct?
8     A.  I was personally.
9         MS. MCENROE:  Objection to form.
10     Q.  Familiar with it.
11     A.  I would have had access to that
12  information, yes.
13     Q.  You were personally involved in writing
14  letters to him about the irregular behavior he
15  participated in, correct?  We've been through them
16  all today.
17     A.  Yes.
18     Q.  Again, as of that same time period, the
19  end of December 2000, you knew that Igberase -- I'm
20  saying Igberase, slash, Charles because both of
21  those names were used.  Do you understand what I'm
22  referring to?
23     A.  I understand.
24     Q.  So you knew Igberase Charles had falsified
25  answers on documents submitted to ECFMG, correct?

Transcript of William C. Kelly
Conducted on August 20, 2019                    39 (153 to 156)

53

1    A.  Yes.
2    Q.  And you knew as of late December 2000 that
3  ECFMG had invalidated and/or revoked the
4  certificates issued to Igberase and Charles,
5  correct?
6    A.  Yes.
7    Q.  You knew there was some connection, a
8  relationship between Igberase and Akoda, correct?
9    A.  Yes.
10   Q.  And you knew that Akoda had used a Social
11 Security number of Igberase when he applied to the
12 residency program at Jersey Shore Medical Center,
13 correct?
14   A.  Yes.
15   Q.  And I think we've already established
16 this, I know I'm repeating myself, but bear with me,
17 you had the ability to look up all the computer
18 photographs of Igberase and Akoda to verify whether
19 they were one and the same person, correct?
20       MS. MCENROE:  Objection to form.
21   A.  Yes.
22   Q.  And you didn't do that, correct?
23       MS. MCENROE:  Objection to form.
24   A.  If I can circle back, the internal
25 document with the comparison, so it would have had

54

1  the applications -- the applications would have been
2  looked at, I believe, yeah.
3    Q.  All right. I'm talking about in the
4  period when you were investigating whether Akoda had
5  used someone else's Social Security number or had
6  otherwise acted improperly in connection with the
7  matter brought to your attention by the Jersey Shore
8  Medical Center.
9    A.  Okay.
10   Q.  So for example, when he came into your
11 office, you could have looked at photographs on the
12 computer, correct?
13   A.  Yes, that is correct.
14   Q.  Or when he left the office, you could have
15 done it?
16   A.  That is correct.
17   Q.  And you didn't?
18   A.  I don't remember doing it.
19   Q.  Well, I think we've also established that
20 as of this date in late December 2000, you were
21 present during the July 10, 1996 appeal hearing
22 where Charles testified, correct?
23   A.  Yes.
24   Q.  And you had the ability to hear him
25 testify at that proceeding?

55

1    A.  Yes.
2    Q.  And you heard him talk to you in your
3  office in September 2000, correct?
4    A.  When he came to the office, yes.
5    Q.  And you knew according to Doctor McCorkel,
6  at least, that Akoda had presented false green
7  cards, correct?
8    A.  He had stated that, yes.
9    Q.  You could have but didn't verify that the
10 passport that Akoda gave you when he came to the
11 your office was authentic, correct?
12       MS. MCENROE:  Objection to form.
13   A.  I did not verify the passport.
14   Q.  And as of late December 2000, you knew
15 that Jersey Shore Medical Center has dismissed Akoda
16 from its residency program, correct?
17   A.  Yes.
18   Q.  You knew that was at least in part due to
19 the fact he used someone else's Social Security
20 number?
21   A.  Yes.
22   Q.  And you sent Igberase an e-mail at the
23 address he provided and Akoda replied to it.  We've
24 already established that, correct?
25   A.  Yes.

56

1    Q.  You were really surprised at that,
2  correct?
3    A.  Apparently, yes.
4    Q.  So Doctor McCorkel told you that he
5  believed Igberase and Akoda were one and the same
6  person as of December 2000, correct?
7    A.  Yes.
8    Q.  And you also believed Igberase and Akoda
9  were one and the same person, correct?
10   A.  Yes.
11   Q.  And you were so concerned about this that
12 you wrote a memorandum to Stephen Seeling that you
13 didn't think should be made part of the file,
14 correct?
15       MS. MCENROE:  Objection to form.
16   A.  Yes.
17   Q.  And in your original letter to Akoda after
18 Doctor McCorkel contacted ECFMG, you told him that
19 all of the information would be referred to the
20 ECFMG committee on medical credentials for review,
21 correct?
22   A.  Yes.
23   Q.  You didn't do that, right?
24   A.  Correct.
25   Q.  So despite all of these things that we

JA365

Transcript of William C. Kelly                    40 (157 to 160)
Conducted on August 20, 2019

57

1  just went over for the last couple of hours and in
2  this last series of questions, ECFMG took no action
3  against Akoda until December 2016 following his
4  conviction, isn't that true?
5          MS. MCENROE: Objection to form.
6      A. I don't know that.
7      Q. Prior to the time you left in 2015, had
8  ECFMG taken any action against Akoda?
9      A. I don't recall.
10     Q. Would you admit in having made a
11 mistake?
12         MS. MCENROE: Objection to form.
13     A. Would I admit?
14     Q. Yes.
15     A. If I had, yes.
16     Q. Would you admit that you made a mistake
17 not referring Akoda to the ECFMG credentials
18 committee?
19         MS. MCENROE: Objection to form.
20     A. I don't think it was a mistake.
21     Q. So if he had been referred to the
22 credentials committee, would he have been charged
23 with irregular behavior for using someone else's
24 Social Security number?
25         MS. MCENROE: Objection to form.

58

1      A. The irregular behavior he would have been
2  charged with would be providing false information
3  to ECFMG on an application, among other things.
4      Q. Which would be the Social Security
5  number?
6      A. If he provided it on an application.
7      Q. So you're aware that Jersey Shore Medical
8  Center dismissed him from a residency program he was
9  participating in and had been participating in for
10 several years for, among other things, submitting
11 and using someone else's Social Security number?
12     A. Yes.
13     Q. You may not be able to answer this. Have
14 you ever been advised of what he was convicted of or
15 what he pled guilty to in the federal court?
16     A. No.
17     Q. Do you recall that apparently Igberase was
18 licensed as a -- I'm sorry -- Akoda was licensed as
19 a nurse in New York?
20     A. No.
21     Q. Do you remember any information provided
22 to ECFMG by Akoda about him being licensed as a
23 nurse in the State of New York?
24     A. No.
25     Q. Same set of questions about Igberase. Do

59

1  you remember whether he was licensed as a -- did you
2  ever learn he was licensed as a nurse in New York?
3      A. I don't recall.
4          (Exhibit No. 49 marked for
5  identification.)
6      A. I've read this.
7      Q. So Exhibit 49 is a series of letters back
8  and forth between ECFMG, either Steve Seeling and
9  you and someone by the name of Raymond Heard,
10 H-E-A-R-D, senior investigator, Office of
11 Professional Discipline, New York State Education
12 Department; is that correct?
13     A. Yes.
14     Q. I don't want to spend a lot of time on
15 this, but would you agree with me Mr. Heard is
16 inquiring about action that ECFMG took concerning
17 Igberase that may affect his nursing status?
18     A. It references his license.
19     Q. So it looks to me the December 17, 2002
20 letter from Mr. Heard indicates that his
21 organization received notice from ECFMG about the
22 revocation of Igberase's standard certification,
23 correct?
24     A. Yes.
25     Q. And he's talking about investigating

60

1  allegations against the person licensed by the State
2  of New York Education Department, correct?
3      A. Yes.
4      Q. So the next letter, which is Bates number
5  000253, is from you to Mr. Heard basically telling
6  him what action had been taken with respect to
7  Igberase, correct?
8      A. Yes.
9      Q. And then Heard writes back to you on March
10 31, 2003 asking for some certified documents
11 including the application that contains Igberase's
12 false response, correct?
13     A. Yes.
14     Q. And I think the final letter in this
15 series is your letter of April 29, 2003, Bates
16 number 0000260 through, if you will, 262, which you
17 supply a certified copy of the October 23, 2000
18 application for Igberase, correct?
19     A. Yes.
20     Q. Do you know whether there's any document
21 in ECFMG's files that ever reflects that Igberase
22 was licensed as a nurse in New York?
23     A. Separate from this statement here?
24     Q. Separate from the information here.
25     A. I have no knowledge.

Transcript of William C. Kelly
Conducted on August 20, 2019                    41 (161 to 164)

---

6

1    Q.    Was this a surprise to you?
2          MS. MCENROE:  Objection to form.
3    A.    I don't remember.
4    Q.    Okay.  You don't remember this incident at
5    all?
6    A.    No.
7    Q.    Do you have a recollection sitting here
8    today, either based on your personal knowledge or
9    anything that in any way your recollection was
10   refreshed in preparation for this deposition, that
11   Akoda applied for a residency program at Howard
12   University, Washington, DC?
13   A.    No.
14   Q.    You don't remember that at all?
15   A.    No.
16         (Exhibit No. 50 marked for
17   identification.)
18   A.    Okay.  I looked at the document.
19   Q.    This appears to be a -- well, it says ERAS
20   document submission form, correct?
21   A.    Yes.
22   Q.    I think you told me you weren't really
23   involved in the ERAS process, correct?
24   A.    It was not part of my department.
25   Q.    But you're familiar with it?

---

62

1    A.    Yes.
2    Q.    At the bottom it looks like -- is that the
3    ECFMG ERAS stamp or did I miss --
4    A.    Yes.
5    Q.    And that's October 5, 2006, correct?
6    A.    Yes.
7    Q.    So given that this is an ERAS document
8    submission form, wouldn't that necessarily mean that
9    this is related to some attempt to obtain a
10   residency program?
11         MS. MCENROE:  Objection to form.
12   A.    It's part of the electronic residency
13   application service, yes.
14   Q.    But it doesn't have any use outside
15   residency programs, does it?
16         MS. MCENROE:  Objection to form.
17   A.    The form?
18   Q.    The whole ERAS process.
19   A.    Not to my knowledge.
20   Q.    Because you told me before that as part of
21   the ERAS program, ECFMG in effect acts as the dean's
22   office for foreign medical graduates or
23   international medical graduates to assist them in
24   applying for residency programs, correct?
25   A.    Yes.

---

63

1    Q.    You don't know -- do you know what was
2    going on in 2006 that caused the ERAS process to be
3    implemented for Akoda?
4          MS. MCENROE:  Objection to form.
5    A.    I can only make a guess that he submitted
6    an application.
7    Q.    But you don't have any recollection about
8    him applying to Howard University?
9    A.    No.
10   Q.    So this document indicates that -- it says
11   "documents submitted with this form, please circle."
12   What is MSPE?
13   A.    It stands for medical school performance
14   elevation.  It's often called the dean's letter.
15   Q.    But that wasn't included, according to the
16   form?
17   A.    Right.
18   Q.    I'm just asking you to help me understand
19   this form.  Color photograph, that was included?
20   A.    It says yes.
21   Q.    Medical school transcript was not
22   included?
23   A.    That's correct.
24   Q.    So then it says, No. 4, "Original letters
25   of recommendation that are included in this

---

64

1    mailing."  Did I read that correctly?
2    A.    Yes.
3    Q.    It lists Doctor A.O. Roberts, Doctor Phil
4    Robertson, and Doctor Charles Francis, correct?
5    A.    Yes.
6    Q.    Do you know who they are?
7    A.    No.
8    Q.    You didn't have any personal knowledge
9    about any of them, do you?
10   A.    That's correct.
11   Q.    You didn't know if they are real people,
12   do you?
13   A.    I do not know.
14   Q.    I think you told me you don't have any
15   knowledge of or recollection of his applying to
16   Howard University?
17   A.    That is correct.
18   Q.    Okay.  That eliminates a bunch of
19   questions.
20         (Exhibit No. 51 marked for
21   identification.)
22   A.    Okay.  I've finished reviewing this.
23   Q.    Okay.  So let me see if we can agree on
24   what we have here.  The first page of Exhibit 51 is
25   Bates stamped 40467 and it's a letter from you to an

---

JA367

Transcript of William C. Kelly

42 (165 to 168)

Conducted on August 20, 2019

65

1 individual by the name of Charles A. Francis, MD,
2 correct?
3    A.  Yes.
4    Q.  And you enclose a copy of a letter of
5 recommendation that Akoda submitted to ECFMG as part
6 of the ERAS process, correct?
7    A.  Yes.
8    Q.  Is it ERAS services?  Help out me out.
9    A.  Electronic residency application
10 service.
11    Q.  That's like saying ATM machine.  ATM is a
12 machine.  So we'll just call it ERAS.
13        So you asked in this first page
14 Charles A. Francis MD to write to you to advise
15 whether the enclosed letter is authentic, correct?
16    A.  Yes.
17    Q.  And immediately following Bates stamp 650,
18 40650, is the letter of reference that you're
19 referring to, some letter purportedly by Charles A.
20 Francis, MD about Doctor John Charles Nosa Akoda
21 dated October 1, 2006, correct?
22    A.  Yes.
23        MS. MCENROE:  Just for purposes of
24 the record the Bates stamps seem to be a little
25 jumbled together in this exhibit.

66

1        MR. VETTORI:  You mean out of order?
2        MS. MCENROE:  Yes.
3        MR. VETTORI:  They are because they
4 were not produced in a particular order.
5        MS. MCENROE:  In terms of making
6 representations -- that's just not how they were
7 produced so I'm just making sure it's clear.
8        MR. VETTORI:  Okay.  But for the
9 record what I would like to make clear is the two
10 letters go together.
11        MS. MCENROE:  That's fine that you're
12 representing that, but I want to make it clear that
13 was not how they were produced.
14 BY MR. VETTORI:
15    Q.  So Mr. Kelly, do you have any reason to
16 believe that Bates number 0000650 is not the letter
17 of reference referred to in your letter Bates number
18 000647?
19    A.  I have no reason.
20    Q.  So continuing on with this exhibit, on
21 November 22, 2006 you wrote a letter to A.O.
22 Roberts, MD and enclosed or attached a letter of
23 reference purportedly written by him on behalf of
24 Akoda on August 20, 2006, correct?
25    A.  Yes.

67

1    Q.  That's Bates stamp 000651?
2    A.  Yes.
3    Q.  And you'll note on Bates stamp 000651
4 there is a stamp received October 5, 2006 ERAS,
5 correct?
6    A.  Yes.
7    Q.  If you go back to Exhibit 50, the ERAS
8 document submission form that references these three
9 letters of reference you'll see the ERAS form was
10 received on the same date; is that correct?
11    A.  Yes.
12    Q.  Continuing, the next page in this exhibit
13 is Bates stamp 000649, November 22, 2006, your
14 letter to Phil Robertson, MD, correct?
15    A.  Yes.
16    Q.  Again, enclosing a letter of reference
17 purportedly from Phil Robertson, MD on behalf of
18 Doctor John Charles Akoda dated 28 September, 2006,
19 correct?
20    A.  Yes.
21    Q.  It's got the same October 5, 2005 ERAS
22 stamp on it, does it not?
23    A.  Yes.
24    Q.  Do you have any recollection whether
25 Doctor A.O. Roberts, Doctor Phil Robertson, or

68

1 Doctor Charles Francis ever replied to your
2 letters?
3    A.  I have no recollection.
4    Q.  In your review in preparation for this
5 deposition, did you see any such records?
6    A.  I don't recall seeing any.
7        (Exhibit No. 52 marked for
8 identification.)
9    A.  Okay.  I've read this.
10    Q.  What is this document?
11    A.  It is a screen print from the ECFMG
12 applicant status program.
13    Q.  About Akoda?
14    A.  Yes.
15    Q.  What does applicant restrictions mean?
16    A.  That's what we called flags from the flag
17 file.
18    Q.  Flag to file for what purpose?
19    A.  There are myriad a number of reasons.
20    Q.  Like in this case what was the reason?
21    A.  There would always be a reason listed
22 here.  It's other, other, credentials investigation,
23 credentials investigation, credentials
24 investigation, other.
25    Q.  What does release date mean?

Transcript of William C. Kelly
Conducted on August 20, 2019

69

1    A.    The flag was removed.
2    Q.    So does the applicant restriction date
3    column mean the date it was flagged?
4    A.    The first column would be the date it was
5    flagged, yes.
6    Q.    Ms. Sherlock?
7    A.    Shirley Williams, yes.
8    Q.    So I see that on Exhibit 52, the last
9    entry but the earliest in time entry is there was a
10    flag placed on 8/14/2000 for other reasons; is that
11    correct?
12    A.    Yes.
13    Q.    What is the level?  What's the series
14    of --
15    A.    Four.
16    Q.    Is that bad?
17    A.    The number doesn't -- it's not on a grade.
18    It's what can be done with the applicant record
19    based on the restriction and who can see it.
20    Q.    What does level four mean?
21    A.    I don't know off the top of my head what
22    that would be.
23    Q.    Would your answer be the same for level
24    three?
25    A.    Yes.

70

1    Q.    Okay.  So let's help me with this.  On
2    August 14, 2000 for some other reason Akoda's file,
3    if you will, was flagged.  Is that the way to say
4    it?
5    A.    The computer record would have been
6    flagged.
7    Q.    Meaning what?  If somebody tried to access
8    it?
9    A.    If they accessed it.
10    Q.    What would happen?  Things would burn?
11    A.    Depends on what the level was, so, yeah.
12    Q.    So --
13    A.    So in some cases it may say you can see
14    this but not see that.
15    Q.    Okay.  So that flag, the other reason was
16    under the comments section, because the comment
17    section explains what other means or what CREDS
18    investigation means?
19    A.    It could add -- it would be reason.
20    There's reasons -- there was a whole menu of level
21    three means this, level four means this.
22    Q.    On August 14, 2000 Akoda's computer
23    program was flagged by Ms. Williams.
24    A.    That's what that would mean.
25    Q.    And she or someone else entered a comment

7

1    because a duplicate record examinee barred under
2    other number.  Is that what it says?
3    A.    That's what it says.
4    Q.    And do you know why it was released?
5    A.    I don't.
6    Q.    So is this examinee barred under other
7    number is that a reference to Akoda being the
8    examinee?
9    A.    I don't know.
10    Q.    And is the other number the Igberase
11    number we've been talking about all day?
12    A.    I don't know.
13    Q.    You just don't know what this means?
14    A.    Not on this one, no.
15    Q.    The one immediately above it, the next
16    date, August 17, 2000, reason for flag, abbreviation
17    for credentials is CREDS, hyphen, invest.  Does that
18    stand for investigation?
19    A.    Yes.
20    Q.    So there's a credential investigation
21    going on, correct?
22    A.    Yes.
23    Q.    And it was released on August 30 by you?
24    A.    Yes.
25    Q.    And the comment says investigation of

72

1    allegation this applicant is 0482700-2, correct?
2    A.    Yes.
3    Q.    Why did you release this on August 30 when
4    you were still actively investigating the Jersey
5    Shore Medical Center allegations?
6    A.    If you see, it was re-restricted the very
7    same day on the road.  So why it was don't, I don't
8    know.
9    Q.    So on the same date that you released it,
10    August 30, 2000 for credentials investigation, it
11    was flagged again by somebody with the initial V,
12    last name Kesting, K-E-S-T-I-N-G?
13    A.    Yes.
14    Q.    "Applicant may have a previous ID number
15    0482700-2"?
16    A.    Yes.
17    Q.    Who is WK?  William Kelly?
18    A.    I'm assuming that's me, yeah.
19    Q.    Why are your initials after that?
20    A.    I don't know.
21    Q.    That was released on September 26, 2006?
22    A.    That's what it says.
23    Q.    By whom?  This Kesting individual?
24    A.    I don't know whether the user is
25    referencing who restricted or released the

Transcript of William C. Kelly
Conducted on August 20, 2019

44 (173 to 176)

73

1  restriction.
2  Q. Do you know why it was released?
3  A. I don't know, but it was restricted again
4  the same day.
5  Q. There you go.
6  A. It's chronological from the bottom to the
7  top.
8  Q. Do you know why it was flagged -- why it
9  was released and then flagged again?
10  A. I don't know.
11  Q. But the comment is the same thing?
12  A. Yes.
13  Q. So it was re-flagged on the same day and
14  released on October 9, 2006, correct?
15  A. Correct.
16  Q. And re-flagged the same day?
17  A. Correct.
18  Q. And then the October 9, 2006 re-flagging
19  is released February 20, 2007, correct?
20  A. Correct.
21  Q. Do you know why?
22  A. No.
23  Q. Then on February 27 it was reinstated, the
24  flag that is, February 20, 2007?
25  A. Yes, it was released on February 20, 2007

74

1  and the same date it was flagged again.
2  Q. Flagged again?
3  A. Yes.
4  Q. And the last entry is it was released on
5  September 13, 2011?
6  A. Yes.
7  Q. Do you know why?
8  A. No.
9  Q. So from February 20, 2007 to September 10,
10  2011 this program remained flagged?
11  A. This applicant's computer record was
12  flagged, yes.
13  Q. So if in the period from February 20, 2007
14  to September 10, 2011 an applicant, any applicant's
15  file had been flagged, what information would ECFMG
16  according to its practices and procedure have
17  provided to any residency program to which the
18  applicant was applying?
19        MS. MCENROE: Objection to form.
20  A. I really don't know. I don't recall.
21  Q. Do you know whether any of the information
22  about this flagging would have been provided to any
23  other organization about this applicant?
24        MS. MCENROE: Objection to form.
25  A. The flagging of the record?

75

1  Q. Yes.
2  A. I don't think so.
3  Q. So am I to understand that this flagging
4  is just for internal purposes only, to restrict
5  certain people's access to the file?
6        MS. MCENROE: Objection to form.
7  A. Yes, yes.
8  Q. Why? Why is ECFMG restricting personnel's
9  access to the computer record of this applicant?
10        MS. MCENROE: Objection to form.
11  A. Of course it would be for different
12  things, but usually there would be a note about --
13  for this person to refer to the restricter.
14  Q. It's not on here.
15  A. It may have been at the bottom of the
16  computer screen during the time it was restricted.
17  Q. But you've told me everything that you
18  know about this?
19  A. Yes.
20        MS. MCENROE: Objection to form.
21        (Exhibit No. 53 marked for
22  identification.)
23  A. I have reviewed the document.
24  Q. So it looks to me that Exhibit 53 consists
25  of three pages. Is that what you have?

76

1  A. Yes.
2  Q. Tell me what is this three-page document.
3  A. Actually, I don't know.
4  Q. That hurts.
5  A. And --
6  Q. You don't know?
7  A. I'm not familiar with these documents.
8  Q. But does it appear to you to be some kind
9  of a screenshot of the ECFMG computer system for
10  Akoda?
11        MS. MCENROE: Objection to form.
12  A. That's what it appears to be.
13  Q. But you're not familiar with --
14  A. With these screens or this program.
15  Q. So you can't interpret it for us?
16  A. Not definitively, yeah, you know.
17  Q. So just a couple of general questions on
18  the first page which is Bates 0000594. What does
19  Token ID mean?
20  A. When an individual applied to be an ECFMG
21  participate in ERAS, they received a token, a
22  permission to submit documents, and so that's what
23  the token -- each one had a unique identification
24  number.
25  Q. You don't -- I take it sitting here today,

Transcript of William C. Kelly
Conducted on August 20, 2019                45 (177 to 180)

77

1  because you told me you didn't participate in or
2  have any knowledge of Akoda applying to Howard
3  University for a residency program, you don't know
4  whether he even completed that program?
5      A.  I have no knowledge.
6      Q.  Do you know whether he was ever licensed
7  by the Maryland Board of Physicians?
8      A.  No, I do not know.
9      Q.  Do you know whether ECFMG provided any
10 documentation to the Maryland Board of Physicians in
11 connection with any application Akoda may have
12 made --
13     A.  I have no knowledge of that.
14     Q.  That's beyond your scope of your duties at
15 the time?
16         MS. MCENROE:  Objection to form.
17     A.  It would not necessarily have been beyond
18 the scope, but it could happen and I would have no
19 knowledge.
20     Q.  Do you remember anything at all about
21 Akoda after the December 2000 period we talked about
22 in detail?
23     A.  No.
24     Q.  Do you know anything about how, if at all,
25 ECFMG assists in a graduate of a residency program

78

1  obtaining privileges at a hospital, for example?
2         MS. MCENROE:  Objection to form.
3      A.  No.
4      Q.  You don't have anything to do with that?
5      A.  I don't know that it is something that we
6  did -- ECFMG did.
7      Q.  You don't know whether ECFMG provides
8  documentation or other information at the request of
9  an IMG when he or she applies to a hospital for
10 privileges?
11     A.  We did provide an ECFMG status report.
12 Either the program or the hospital or the candidate
13 would request from ECFMG that we send a report of
14 their status with us.
15     Q.  Meaning whether they were certified?
16     A.  Certified, right.
17     Q.  You don't have any personal knowledge
18 whether that happened with Akoda?
19     A.  That is correct.
20     Q.  And after you left in 2015, you don't know
21 what, if anything, happened with Akoda?
22     A.  That is correct.
23     Q.  You don't know anything about his plea
24 agreement?
25     A.  I have no knowledge of that.

79

1      Q.  You don't know whether his certification
2  was ever revoked by ECFMG?
3      A.  I think I was told it was, yes.
4         MR. VETTORI:  Give me five minutes to
5  talk to these people.
6         MS. MCENROE:  Take a quick break.
7         (Recess taken at 3:05 p.m.)
8         (Back on the record at 3:10 p.m.)
9            CROSS-EXAMINATION
10 BY MR. CERYES:
11     Q.  Mr. Kelly, my name is Brent Ceryes.  I
12 represent the plaintiffs in this as well.  I
13 promised your counsel I will be as efficient as
14 possible and avoid going over material we already
15 discussed, and I promised to do that.
16         I think you have your copies of your
17 exhibits there.  I want to run through just a few of
18 these exhibits very briefly.
19         First of all, if I could direct your
20 attention to Exhibit No. 2.  I want to confirm
21 something that I think is fairly obvious.  This is a
22 form that, generally speaking, is completed by the
23 applicant, not by the ECFMG, correct?
24     A.  Correct.
25     Q.  And the potential exception may be these

80

1  boxes in which it's indicated that the applicant
2  should not write in this space and that's for office
3  use only?
4      A.  Correct.
5      Q.  Now, if we turn to the second-to-the-last
6  page of that exhibit, Bates stamp 157?
7      A.  I see it.
8      Q.  We have the section here which requests a
9  certification from medical school official regarding
10 the photograph that is included as part of the
11 application.  To your understanding, Mr. Kelly, what
12 is the purpose of having a medical school official
13 certify that the photograph, signature, and
14 information on the form accurately applies to the
15 individual named above?
16         MS. MCENROE:  Objection to form.
17     A.  My recollection it was to help confirm
18 this was the individual who went to that medical
19 school.
20     Q.  Now, in this particular application on
21 behalf of Igberase, there is no certification from a
22 medical school official, correct?
23     A.  That is correct.
24     Q.  However, there is an option as I
25 understand it that there would be a notarized -- a

Transcript of William C. Kelly
Conducted on August 20, 2019

46 (181 to 184)

8

1  signature from a Notary and an explanation as to why
2  the form could not be signed in the presence of a
3  medical school dean; is that correct?
4      **A. That is correct.**
5      Q. Those are two separate options that the
6  applicant can select in completing this
7  application?
8      **A. Yes.**
9      Q. On this particular application there's no
10  explanation provided at all, correct?
11      **A. On this form, that is correct.**
12      Q. With respect to this form, it would not
13  represent a completed application on behalf of
14  Igberase?
15      MS. MCENROE: Objection to form.
16      **A. Yeah, I don't know that I would say -- all**
17  **the information is not on this form, yes.**
18      Q. What kinds of explanations are deemed
19  acceptable on behalf of an applicant in failing to
20  provide a signature of a medical school official?
21      MS. MCENROE: Objection.
22      **A. The most common one was they were no**
23  **longer in the country where they went to medical**
24  **school and could not go to the dean's office.**
25      Q. And was that fact alone considered an

82

1  acceptable reason for not having a signature of a
2  medical school official, that they are now outside
3  of the country for which they graduated medical
4  school?
5      MS. MCENROE: Objection to form.
6      **A. For not having the signature on the**
7  **application, yes.**
8      Q. Approximately what percentage of
9  applicants apply for ECFMG certification while still
10  in the country where they went to medical school?
11      MS. MCENROE: Objection to form.
12      **A. I do not know.**
13      Q. Is it most students?
14      MS. MCENROE: Objection to form.
15      **A. Most individuals who are still students,**
16  **but with respect to graduates I don't know.**
17      Q. To the extent that applicants are
18  permitted to submit an application without having a
19  signature of a medical school official verifying
20  that they are in fact the person submitting the
21  application, that would reduce the credibility of
22  that application in terms of, is this person who
23  they say they are?
24      MS. MCENROE: Objection to form.
25      **A. There is a Notary making that**

83

1  certification rather than the school, yes.
2      Q. In terms of whether the individual
3  pictured is in fact the person signing the
4  application, is that also a role the Notary plays in
5  this instance?
6      **A. Yes.**
7      Q. Now, how does ECFMG determine from which
8  schools they will accept medical degrees?
9      MS. MCENROE: Objection to form.
10      **A. I can state going back to what the**
11  **requirement was when I was there, and it had to be a**
12  **medical school that was recognized by the**
13  **appropriate agency in the country where the school**
14  **was located, which was a ministry of health or a**
15  **licensing board and also list it in either -- at**
16  **this period of time I think it was World Director of**
17  **Medical Schools which was published and maintained**
18  **by the World Health Organization and later it was**
19  **the International Medical Education Director, but at**
20  **this period I believe it was World Director of**
21  **Medical Schools.**
22      Q. From the period of time from approximately
23  1990 to 2000, was there any process by which ECFMG
24  would develop relationships with these medical
25  schools in order to make sure that they had an open

84

1  line of communication with those institutions?
2      MS. MCENROE: Objection to form.
3      **A. In some cases, yes.**
4      Q. Do you know if ECFMG had such a
5  relationship with the University of Ibadan College
6  of Medicine?
7      **A. I do not know.**
8      Q. What about the University of Benin?
9      **A. I do not know.**
10      Q. I assume there are cases in which ECFMG
11  determines an applicant has engaged in some fraud in
12  the course of submitting an application? Fair?
13      **A. Yes, there were instances.**
14      Q. Can you provide me some estimate in terms
15  of how frequent an occurrence that was, let's say
16  between 1990 and 2000, maybe as a percentage of
17  total applicants?
18      MS. MCENROE: Objection to form.
19      **A. I really don't have any idea how many were**
20  **done, but just to let you know that we always**
21  **reported and there is notification so it could be**
22  **reconstructed.**
23      Q. And as I understand it, one of the
24  principle goals at ECFMG is to make sure or to do --
25  is to verify that those people who are applying to

JA372

Transcript of William C. Kelly                47 (185 to 188)
Conducted on August 20, 2019

85

1  practice medicine here in the United States have
2  authentic credentials when they come here to
3  practice medicine.  Fair?
4      A.  To assure they're competent physicians,
5  yes.
6      Q.  And in your role with ECFMG you understood
7  that one of the -- well, that residency programs and
8  state medical boards rely upon ECFMG to conduct that
9  verification of foreign medical graduate credentials
10  prior to those individuals coming here to practice
11  medicine.  Fair?
12          MS. MCENROE:  Objection to form.
13      A.  That was one of the components of ECFMG
14  certification, yes.
15      Q.  And would you agree that ECFMG plays an
16  important role in public health by verifying that
17  physicians who come here to practice medicine have
18  the necessary and requisite credentials to do so?
19          MS. MCENROE:  Objection to form.
20      A.  That is part of it, to protect the
21  American public, yes.
22      Q.  And another role that ECFMG plays is
23  detecting or endeavoring to detect when an
24  individual lacks the -- well, when an individual has
25  not been honest in presenting their identity or

86

1  credentials.
2          MS. MCENROE:  Objection to form.
3      Q.  Fair?
4      A.  Yes, that -- yes.
5      Q.  Were there occasions in your experience
6  with ECFMG where you found that certain medical
7  schools -- well, strike that.
8          Were there occasions when you found
9  that certain medical schools were not credible in
10  terms of the process of verifying the credentials of
11  foreign medical graduates.
12          MS. MCENROE:  Objection to form.
13      A.  Of their own graduates?
14      Q.  Yes.
15      A.  I don't recall such an instance.
16      Q.  Okay.  Do you have a recollection of ever
17  finding that the University of Ibadan in particular
18  had been in any way fraudulent or misleading in
19  response to requests from ECFMG?
20      A.  I have no knowledge of that.
21      Q.  Same question with regard to the
22  University of Benin?
23      A.  I have no knowledge of that.
24      Q.  What is the credentialing committee at
25  ECFMG?  What was it when you worked there?

87

1      A.  It was standing committee of the ECFMG at
2  Board of Trustees for the specific charge of
3  reviewing policies and procedures, making
4  recommendations to the Board for any changes or
5  modifications to the certification requirements, and
6  to review allegations for irregular behavior.
7      Q.  And who, if any, at ECFMG had the ability
8  to elevate potential suspicious conduct such that it
9  would be considered by the credentialing
10  committee?
11      A.  It was generally a group, a review of a
12  group recommendation or decision of staff.
13      Q.  Sure.  If you in particular -- and did you
14  hold the same position from approximately 1991 until
15  your retirement?
16      A.  No.
17      Q.  Can you describe how your position with
18  ECFMG changed during that period of time?
19          MS. MCENROE:  Objection to form.
20  Calls for a narrative over 38 years.
21      A.  And I'm not sure of the exact dates for
22  some of these, but around 1991 I think I was the
23  manager of the information services department.  I
24  was not involved in credentials, but around 1992 or
25  1993 I became a manager of the credentials

88

1  department for a period of time, and then I became
2  director of the credentials and records services,
3  and then at the time I retired, I was associate vice
4  president for operations areas of credentials and
5  information services, records-keeping, and a number
6  of other areas.
7      Q.  Okay.  So from the time beginning when you
8  were the manager of the credentialing department
9  through until your retirement, if you had a
10  particular concern about an applicant, would you
11  have the ability to elevate that concern to the
12  credentialing committee?
13      A.  By myself solely?  So long as nobody
14  objected, I think I might have.
15      Q.  Okay.  What was Stephen Seeling's role
16  with ECFMG?
17      A.  He was the vice president for operations.
18      Q.  If Mr. Seeling had a concern about a
19  potential applicant, would he also have the ability
20  to independently bring that before the credentialing
21  committee?
22          MS. MCENROE:  Objection to form.
23      A.  When you say independently, he would have
24  done that in conjunction with me.  I would have been
25  part of that.  I don't know that he would take an

JA373

Transcript of William C. Kelly                    48 (189 to 192)
Conducted on August 20, 2019

89

1    independent action.
2        Q.  Generally speaking, if Mr. Seeling had a
3    concern about an applicant and expressed that to
4    you, would you tend to escalate that to the
5    credentialing committee?
6            MS. MCENROE:  Objection to form.
7        A.  Yes.
8        Q.  Is there anyone else who was -- during the
9    period from approximately, let's say, 1990 to 2006,
10   during that window of time, was there anyone else at
11   ECFMG who was actively involved in the decision to
12   elevate potential suspicious behavior to the
13   credentialing committee?
14       A.  Mr. Seeling's predecessor Marie Shafron
15   who was vice president of operations prior to him.
16       Q.  Do you recall when that transition took
17   place between Shafron and Seeling?
18       A.  I think she left around 1998.
19       Q.  And under what criteria were you to
20   determine that an issue should be brought before the
21   credentialing committee?
22           MS. MCENROE:  Objection to form.
23       A.  There are a couple criteria or factors,
24   and one was something that fell under our definition
25   of irregular behavior, an action or attempted

90

1    action, that could or would subvert the ECFMG
2    certification process, et cetera, and so it had to
3    be something that directly concerned us.  And then
4    you would have to have enough information to take to
5    the credentials committee for them to be able to
6    make an informed decision.  And at due notice you
7    would follow procedures, send an allegation to the
8    candidate, put them on notice, give then an
9    opportunity to respond.
10       Q.  Okay.  And were these criteria set forth
11   in any written policies or protocols maintained by
12   ECFMG?
13       A.  There were policies and procedures
14   regarding irregular behavior written, yes.
15       Q.  And where were they maintained?
16       A.  At different times at different places,
17   and in the earlier periods they were hard copy typed
18   printout.  Later they were actually in the ECFMG
19   information booklet and on the website.
20       Q.  Okay.  And so were -- was this typically a
21   decision -- strike that.
22           Unless you or Mr. Seeling or Ms.
23   Shafron brought an issue to the credentialing
24   committee, they would have no way to address it.  Is
25   that fair?

9

1            MS. MCENROE:  Objection to form.
2        A.  An allegation of irregular behavior, yeah,
3    but it would go through staff first.  It's possible
4    the CEO, something might originate with them, but
5    very, very unlikely.
6        Q.  Who was the CEO during the period of 1990
7    to 2006?
8        A.  They were a couple of different ones.
9        Q.  Okay.  Can you do your best?
10       A.  Yeah, yeah, and one of James Hallock,
11   H-A-L-L-O-C-K, MD.  One, because it was in the
12   proceedings there, was Nancy Gary, G-A-R-Y, MD.  And
13   there may have been Marjorie Wilson, W-I-L-S-O-N,
14   MD.  Those were the three names, I think.
15       Q.  All right.  Okay.  Let's go back to the
16   exhibits, if you would?
17       A.  Sure.
18       Q.  If you would go to No. 22 -- 23.
19       A.  Okay.
20       Q.  Now, you reviewed this document with
21   Mr. Vettori, and in the section four, as you
22   previously addressed, this individual applying under
23   the name Akoda did not enter a US Social Security
24   number, correct?
25       A.  Yes.

92

1        Q.  Certainly the expectation is if an
2    individual has a Social Security number, that they
3    would write that on the application?
4            MS. MCENROE:  Objection to form.
5        A.  That's a reasonable expectation, yes.
6        Q.  And is entering a Social Security number a
7    requirement of completing the form?
8        A.  No.
9        Q.  Why not?
10       A.  In many cases individuals did not have
11   Social Security numbers.
12       Q.  Retrospeculatively we know that -- well,
13   in fact subsequent to his application, this
14   individual under the name of Akoda did provide a
15   Social Security number?
16       A.  I think --
17           MS. MCENROE:  Objection to form.
18       A.  -- there's reference in the letter to
19   ECFMG's receipt of a Social Security number.
20       Q.  All right.  What, if anything, did ECFMG
21   do with the Social Security information when
22   received through an application such as this?
23           MS. MCENROE:  Objection to form.
24       A.  I know it was entered into the database.
25       Q.  Okay.

Transcript of William C. Kelly
Conducted on August 20, 2019                              49 (193 to 196)

93

1         A. And it was one of the items that would be
2   used if we had for some individual to check to see
3   if they were potentially duplicate records.
4         Q. Was there any effort made to investigate
5   the owner of the Social Security number?
6              MS. MCENROE: Objection.
7         A. I'm not sure what you mean by --
8         Q. Was there any -- I'll rephrase the
9   question and ask a new question.
10             Was there any effort made in the
11  period of time between 1990 and 2006 to run the
12  Social Security number against any databases to find
13  out any information that you might be able to about
14  a particular applicant?
15             MS. MCENROE: Objection to form.
16        A. Do you mean databases outside of ECFMG?
17        Q. Correct.
18        A. I have no knowledge that we did that.
19        Q. Presumably if that was something ECFMG
20  did, you would have knowledge of it in your role
21  within the organization?
22             MS. MCENROE: Objection to form.
23        A. Yes.
24        Q. All right. I think when asked about the
25  ECFMG role in the ERAS system you referred to it as

94

1   a dean station?
2         A. Dean's office.
3         Q. Dean's office. So what do you mean by
4   that?
5         A. It's the facilitator for the process to
6   gather together all the components of an application
7   for a residency program and submit them on behalf of
8   the graduate. Unlike in the US, the University of
9   Pennsylvania School of Medicine, that dean's office,
10  would gather together all the documents for its
11  graduates to submit to the residency programs.
12  ECFMG did that for international medical
13  graduates.
14        Q. And how was ECFMG compensated for that
15  effort?
16        A. There was a fee for the ERAS token, and my
17  recollection is that that's how it was
18  compensated.
19        Q. That was paid by the applicant?
20        A. By the -- yes.
21        Q. And so is it generally the fact that
22  residency programs require letters of reference as
23  part of an application?
24             MS. MCENROE: Objection to form.
25        A. Letters of recommendation they called

95

1   them, but yes.
2         Q. And ECFMG undertook the role to provide
3   some verification with respect to those letters of
4   recommendation?
5         A. No.
6         Q. In this particular case you reviewed with
7   Mr. Vettori a series of letters that you wrote in
8   response to an application written by Akoda asking
9   those individuals to verify that the letters of
10  recommendation were authentic. Do you recall
11  that?
12        A. Yes.
13        Q. Is that not something that you would do in
14  the normal course?
15        A. That was not a routine procedure.
16        Q. And why is it that you elected to do it in
17  this case?
18        A. My belief is that because he was otherwise
19  being investigated.
20        Q. And so safe to say that at that point in
21  2006 you had some concerns about Akoda's
22  credibility?
23             MS. MCENROE: Objection to form.
24        A. Yes.
25        Q. And so under these circumstances you

96

1   thought it was important to reach out to those
2   individuals from whom Akoda had offered letters of
3   recommendation to find out if they were in fact
4   authentic?
5              MS. MCENROE: Objection to form.
6         A. That is correct.
7         Q. And as far as what is reflected in the
8   record and to the best of your recollection, none of
9   those individuals responded to your letters,
10  correct?
11        A. That is correct.
12        Q. In other words, your concerns regarding
13  Akoda's credibility were not alleviated by that
14  process that you went through in sending out these
15  letters to those individuals?
16             MS. MCENROE: Objection to form.
17        A. We did not receive verification of those
18  letters of recommendation.
19        Q. Did you -- if you would turn to Exhibit
20  51.
21        A. Yes.
22        Q. First of all -- actually, if we would go
23  to the actual letter of reference reportedly from a
24  Charles Francis, when -- actually, I'm going to step
25  back just a minute.

97

1          At some point you received notice
2    that Akoda sought to use ECFMG's ERAS service for
3    some purpose, correct, in 2006.
4       A.  At that time I was obviously aware that he
5    was participating in the ERAS, yes.
6       Q.  I assume that ECFMG would have some
7    knowledge of why the applicant was trying to use
8    ERAS as between applying to different residency
9    programs?
10      A.  Yes.
11          MS. MCENROE:  Objection.
12      Q.  So they would fill out some application
13   and presumably as part of that application would
14   notify ECFMG where they sought to obtain a
15   residency?
16          MS. MCENROE:  Objection to form.
17      A.  I'm trying to remember where the
18   designation of -- where they were applying comes in.
19   Yes, we did have that information of the
20   institutions to which they were applying, yes.
21      Q.  In review of the file -- is there an
22   application that Akoda would have to have submitted
23   to ECFMG to receive this service?
24      A.  I don't know that it was an application.
25   There was a request for a token. I don't recall

98

1    what that entailed.
2       Q.  Do you write for it or is it something you
3    do online?
4       A.  I know at some point it was online. At
5    this point I don't know whether it was a written
6    request or not.
7       Q.  Since the ultimate purpose here is to
8    actually send documents out to different residency
9    programs, at some point ECFMG would have to know
10   where they're sending these materials, correct?
11      A.  The documents, yes, yes.
12      Q.  That would have to be included within the
13   file somewhere in order for you as ECFMG to know
14   where to send these materials?
15          MS. MCENROE:  Objection to form.
16   Asked and answered.
17      A.  The applicant would have provided us with
18   information as to which programs he or she was
19   applying to, yes.
20      Q.  Based on your review of the materials in
21   preparation for the deposition today, have you seen
22   any application or any other documentation submitted
23   by Akoda, by an individual named Akoda, related to
24   this application for ERAS services?
25          MS. MCENROE:  Objection to form.

99

1       A.  I remember seeing that ERAS transmittal
2    sheet we saw in these materials.
3       Q.  Okay.  Anything else?
4       A.  Not that I recall.
5       Q.  Now, getting back to this letter of
6    reference -- well -- so still not there yet.
7              When you would receive a request such
8    as this or when your office would receive a request
9    such as this, would you then go back and review the
10   applicant's file?
11          MS. MCENROE:  Objection to form.
12   What kind of such as this?
13      A.  That's what I'm trying to say.
14      Q.  When an ERAS request for an individual
15   seeking to apply for residency programs, how would
16   you go about processing that?  Can you walk me
17   through the steps?
18          MS. MCENROE:  Objection for form.
19      A.  I want to clarify that.  That was not in
20   my particular area of operations, so I don't know
21   that I could speak to it.
22      Q.  At some point you became aware that this
23   individual named Akoda was seeking to use the ERAS
24   services?
25      A.  In this particular case, yes.

200

1       Q.  How did that come to your attention?
2       A.  In looking at the totality of documents it
3    most likely was through the flag.
4       Q.  And so because the existence of this flag
5    you believe that someone processing ERAS
6    applications brought this to your attention?
7       A.  To someone's attention, whether it was me
8    particularly, but someone in my area, yes.
9       Q.  But at some point they brought this to
10   your attention as well because you're the one who
11   wrote the letters?
12      A.  Yes.
13      Q.  Now, I presume that once this was brought
14   to your attention, you would make an effort to
15   review this applicant's file?
16          MS. MCENROE:  Objection to form.
17      A.  Yes.
18      Q.  And we've already addressed that
19   presumably after you reviewed this file of Akoda,
20   you had some concerns regarding credibility which is
21   what prompted you to send these letters?
22          MS. MCENROE:  Objection to form.
23      A.  Yes.
24      Q.  Now, if we go to this letter from Charles
25   A. Francis, MD, reportedly from the First Medical

Transcript of William C. Kelly
Conducted on August 20, 2019                    51 (201 to 204)

201

1  Operations Squadron, you of course would have
2  reviewed this letter of reference prior to writing
3  this letter to Charles A. Francis, MD, correct?
4        MS. MCENROE: Objection to form.
5     A.  I don't know -- I don't know that I
6  personally may have reviewed it, but someone would
7  have reviewed it.
8     Q.  Okay. You, I'm sure -- well. Had you
9  reviewed this letter of reference, can we agree that
10 this document would raise red flags for you based
11 upon your years of experience in terms of the
12 credibility assigned to this particular letter of
13 reference?
14       MS. MCENROE: Objection to form.
15    Q.  Is it what it purports to be?
16       MS. MCENROE: Objection.
17    A.  I've seen all kinds of letters of
18 recommendation, and I can't say that there is any
19 one that I would be more concerned about this than
20 maybe other ones that turned out to be legitimate.
21    Q.  Did you make any effort or did anyone in
22 your office make any effort to confirm that Charles
23 A. Francis is in fact a licensed medical
24 physician?
25    A.  Verifying someone's licensure status would

202

1  not have been something we would have done.
2     Q.  Okay. Certainly you would have the
3  ability to do that if you wanted to. Someone in
4  Virginia in 2006, you could have determined whether
5  they had a -- there's a licensed physician by the
6  name of Charles A. Francis as of that point in
7  time?
8        MS. MCENROE: Objection.
9     A.  I'm sure there was a process, yes.
10    Q.  Did you make any effort to find out if
11 Charles A. Francis actually existed as a person?
12    A.  By writing to him would be the only way I
13 see here.
14    Q.  Your effort in that regard was not -- did
15 not neither confirm nor deny that he was an existing
16 person?
17    A.  That is correct.
18    Q.  At the top of Exhibit 51 there are some
19 notes. Is it your handwriting?
20    A.  Part of it is my handwriting, I believe,
21 yes.
22    Q.  Can you read for me what's written up
23 there?
24    A.  Okay. The part that's in my handwriting
25 is, "Igberase transcript, question mark," and the

203

1  letters SSS.
2     Q.  Can you read what's below that?
3     A.  I believe it says, "Why some things are
4  suspicions or suspicious." And that's in a
5  different handwriting.
6     Q.  All right. This is a letter of
7  recommendation purportedly on behalf of Akoda and
8  not Igberase, correct?
9        MS. MCENROE: Objection to form.
10    A.  Correct.
11    Q.  What were you indicating by writing
12 "Igberase transcript, question mark"?
13    A.  I don't know.
14    Q.  Fair to say at this point you had some
15 concerns that Igberase and Akoda maybe have been one
16 and the same person?
17       MS. MCENROE: Objection.
18    A.  Based on the other documents, yes.
19    Q.  Do you know what transcript you're
20 referring to?
21    A.  No.
22    Q.  What does the SSS mean?
23    A.  I believe it referenced Stephen Seeling
24 the vice president of operations.
25    Q.  And to what purpose or to what end?

204

1     A.  I don't recall.
2     Q.  Do you think this is something you would
3  have spoken with him about in around 2006?
4        MS. MCENROE: Objection to form.
5     A.  It's possible.
6     Q.  The letter of reference from Charles A.
7  Francis lists a couple of telephone numbers. Did
8  you make any effort to call those telephone
9  numbers?
10    A.  There is nothing in the record to indicate
11 that I did, no.
12    Q.  Typically that's something you would
13 document had you done it?
14    A.  Had I done it, yes.
15    Q.  Going on to the letter to Phil Robertson,
16 MD, Maxicare, Incorporated?
17    A.  Okay.
18    Q.  First of all, just to be clear, it seems
19 to be a similar letter to each individual, but one
20 of the things that you request is any biographic
21 information you may have concerning Doctor Akoda
22 such as date of birth, medical school, and medical
23 school graduation date?
24    A.  Yes, I see that.
25    Q.  That's because you had concerns about each

JA377

Transcript of William C. Kelly

52 (205 to 208)

Conducted on August 20, 2019

205

1 of those elements of Doctor Akoda's background at
2 this point. Fair?
3      MS. MCENROE: Objection to form.
4      A. They were the items that were at question
5 in the investigation, yes.
6      Q. And in particular as of 2006 you had seen
7 various dates of birth assigned to Doctor Akoda, the
8 individual named Doctor Akoda, correct?
9      A. I think the -- I know -- I don't know
10 that -- it may have just been, you know, as part of
11 biographic data. I don't know that we were -- that
12 this means necessarily that we were questioning that
13 or who the medical school was as much to confirm who
14 Akoda was.
15      Q. This is not a request that you typically
16 make to individuals submitting letters of
17 recommendation on behalf of applicants for ERAS
18 service, correct?
19      MS. MCENROE: Objection to form.
20      A. At that time that is correct.
21      Q. Okay. So the letter from Phil
22 Robertson -- similar questions as before -- did you
23 make any effort to verify as to whether Phil
24 Robertson is in fact the name of a licensed
25 physician in the State of Maryland?

206

1      A. Other than sending a letter to a Phil
2 Robertson as shown here, not that I see.
3      Q. Certainly if you want to confirm whether
4 there was a licensed medical doctors named Phil
5 Robertson, that's something you would have had the
6 ability to do in 2006?
7      MS. MCENROE: Objection to form.
8      A. There was a process in place to do that,
9 yes.
10      Q. And there is a reference -- this is a
11 document from Maxicare, Incorporated. Did you make
12 any effort to investigate what Maxicare,
13 Incorporated is?
14      A. I don't see that.
15      Q. Again, that's something that you would
16 have done -- if that's something you did, it is
17 something you would have documented in the file?
18      MS. MCENROE: Objection to form.
19      A. That is correct.
20      Q. There is also a telephone number indicated
21 here on this letter of recommendation. Had you made
22 that phone call to speak with the purported Phil
23 Robertson, that's something you would have
24 documented in the file?
25      A. Yes.

207

1      Q. And next to the receive date there is a
2 reference handwritten SH10-16. Do you know what
3 that is?
4      A. I don't. That would have been in the ERAS
5 department.
6      Q. Doctor, if you would go to Exhibit 25 -- I
7 mean, Mr. Kelly?
8      A. Okay. I'm looking at Exhibit 25.
9      Q. And this has been addressed before in Mr.
10 Vettori's questions. This is a medical degree of
11 some sort, a purported medical degree for Johnbull
12 Nosa Akoda. In your review of the medical chart,
13 you never received a medical degree in the name of
14 John Nosa Akoda, correct?
15      MS. MCENROE: Objection to form.
16      A. There is none in these records.
17      Q. Okay. If we go to Exhibit 26. Despite
18 the fact that ECFMG had not received a medical
19 diploma in the name of John Nosa Akoda, it
20 nevertheless certified that John Nosa Akoda had
21 satisfied the requirements of ECFMG and could
22 proceed on with residency training. Fair?
23      MS. MCENROE: Objection to form.
24      A. And apply to residency training, yes.
25      Q. Let's go to 41 -- actually, start with 42.

208

1 Towards the lower part of the page there is
2 reference here -- this, by the way, is notes that
3 you took contemporaneous with your phone call with
4 Doctor McCorkel?
5      A. Yes.
6      Q. And you write, "While Akoda said he was
7 going to Nigeria, they have info he's in Maryland."
8 Is that something that you learned from Mr.
9 McCorkel -- Doctor McCorkel?
10      A. Yes.
11      Q. That was further evidence that Akoda or
12 this individual going by the name of Akoda was
13 misrepresenting certain facts about his background.
14 Fair?
15      MS. MCENROE: Objection to form.
16      A. I don't know that I would necessarily say
17 that, but...
18      MS. MCENROE: Are you pretty close to
19 wrapping up?
20      MR. CERYES: Yes.
21      Q. Moving on to 41, there is a -- this is the
22 discussion that -- the memo you wrote to the file
23 regarding this Nigerian passport that you obtained
24 from this individual.
25      What ability did you have in

Transcript of William C. Kelly
Conducted on August 20, 2019

53 (209 to 212)

---

209

1 approximately 2000 to verify passports at ECFMG?
2        MS. MCENROE: Objection to form.
3 Already covered this with co-counsel.
4     A. When you say what ability, you mean?
5     Q. What resources did you have at your
6 disposal to verify the authenticity of this Nigerian
7 passport?
8        MS. MCENROE: Objection to form.
9     A. I don't know that there were any in-house
10 resources. Is that what you're referring to?
11     Q. In-house or out of house.
12     A. Right.
13     Q. Any databases or other sources in which
14 you could have verified?
15     A. I don't recall any, no.
16     Q. Now, moving on to 48 -- actually, go to
17 47, if you would.
18     A. Okay.
19     Q. Do you know when this document was
20 prepared?
21     A. No.
22     Q. Do you know if it was before or after
23 2006?
24     A. No.
25     Q. All right. So on 48 you write that, "The

---

2 0

1 memorandum was being written separately since I did
2 not think it should be made part of the official
3 file."
4        If not in the official file, where
5 was this document located?
6     A. I don't know.
7     Q. Okay. What was your thinking or purpose
8 in not including this within an official file on
9 behalf of Akoda?
10        MS. MCENROE: Objection to form.
11 Covered extensively by co-counsel.
12     A. Yeah, I don't know.
13     Q. What is the significance of a document
14 being inside the file versus outside the file?
15        MS. MCENROE: Objection to form.
16     Q. What are the criteria that would dictate
17 whether a document goes in an applicant file versus
18 outside a file?
19        MS. MCENROE: Objection to form.
20     A. I don't know.
21     Q. Presumably on December 22, 2000 there was
22 some purpose in not including this document within
23 Akoda's file, correct?
24        MS. MCENROE: Objection to form.
25     A. Or an intention not to include it. It

---

2

1 obviously was included.
2     Q. Do you know if this was in fact within a
3 file on behalf of an official file for Akoda versus
4 kept somewhere else with ECFMG's records?
5        MS. MCENROE: Objection to form.
6     A. I don't know.
7     Q. Is there any justification that you can
8 think of as we sit here today as to why a document
9 concerning a physician's credibility and honesty
10 would not be included within their official file?
11        MS. MCENROE: Objection to form.
12     A. I don't know.
13     Q. You conclude that in the conclusion of
14 Paragraph No. 4 that you don't think this is enough
15 for the committee.
16        Help me understand in view of the
17 various documents previously discussed why you did
18 not believe that this was sufficient evidence to
19 even raise before a credentialing committee.
20        MS. MCENROE: Objection to form.
21     A. Based on experience and working with the
22 documents and presumably maybe talking with other
23 people that, you know, there was a staff had to
24 review all the materials that were part of the --
25 that were the result of the investigation, and part

---

2 2

1 of it was a determination whether there was
2 enough -- we thought there was enough information
3 for the committee in its review to make an informed
4 decision.
5     Q. Were you ever part of any presentation to
6 the credentials committee regarding a Doctor John
7 Akoda?
8     A. I don't believe so.
9     Q. Mr. Kelly, after -- well, do you know
10 how -- we discussed previously the letters of
11 recommendation that were sent out or sent to you in
12 2006 or to ECFMG.
13        Do you have any understanding as to
14 how that concern that you articulated previously was
15 ultimately addressed? Was there any formal decision
16 that we should proceed with sending out these
17 materials on behalf of a Doctor Akoda?
18        MS. MCENROE: Objection to form.
19     A. Can you restate that?
20     Q. Sure. At what point was it determined
21 that despite some concerns regarding Akoda's
22 credentiality that ECFMG through the ERAS service
23 should proceed with sending out this material on
24 behalf of Akoda the individual to various residency
25 programs or a program?

---

Transcript of William C. Kelly                    54 (213 to 216)
Conducted on August 20, 2019

2 3

1          MS. MCENROE:  Objection to form.
2      A.  I don't know.
3      Q.  You've not seen any documentation in the
4  file reflecting a decision one way or the other in
5  that regard?
6      A.  I have not.
7      Q.  You've not seen any correspondence to any
8  particular residency program regarding Akoda --
9  well, strike that -- with the exception of the ERAS
10 form that you previously alluded to?
11     A.  That is correct.
12     Q.  With respect to the levels of flags that
13 we discussed that concept generally, I understand
14 you might not have a recollection specifically of
15 what the different levels mean.  This is Exhibit 52.
16     A.  I have it.
17     Q.  What is the general concern that is being
18 addressed through the use of flags on internal ECFMG
19 servicers with regard to who can see what?
20         MS. MCENROE:  Objection to form.
21     A.  Well, it's not just who can see what.
22 It's what you can do with the record, and that would
23 vary based upon the reason behind it.
24     Q.  Certainly one of the purposes of the flags
25 in situations like in 2006 when someone went to

2 4

1  Akoda's file, there was presumably a flag that
2  alerted them that they should take some further
3  investigation on this case.  Fair?
4      A.  They would need to check with the person
5  who flagged it to see if they could proceed, yes,
6  and what they can proceed with.
7      Q.  I think you mentioned another purpose is
8  actually to hide certain information from certain
9  staff at ECFMG?
10         MS. MCENROE:  Objection to form.
11     A.  That's -- not really not so much that.  I
12 think maybe I misspoke with that.
13     Q.  All right.  Do you know what the range of
14 levels is?
15         MS. MCENROE:  Objection --
16     A.  My recollection was there were five
17 separate restriction levels.
18     Q.  You mentioned in your prior testimony that
19 ECFMG would send a status report to individuals
20 requesting a status report on someone's ECFMG
21 certification; is that correct?
22     A.  Yes.
23     Q.  Was that essentially a binary
24 determination, either they're certified or not
25 certified?

2 5

1      A.  No.  In some cases if there had been a
2  finding of irregular behavior that we would tell the
3  applicant their status report was annotated.
4      Q.  As of 2006 there had not been a finding of
5  irregular behavior with respect to Akoda, correct?
6      A.  That is correct.
7      Q.  And so would it be your expectation in
8  view of that that the status -- ECFMG status that
9  ECFMG would send out would not contain any
10 information about the various concerns that we've
11 addressed previously?
12         MS. MCENROE:  Objection to form.
13     A.  That is correct.
14     Q.  All right.  In this particular case you
15 made the decision in 2000 that this -- the Akoda
16 matter should not proceed to the credentialing
17 committee, correct?
18     A.  It was my belief that it should not at
19 that time go to the credentialing committee, yes.
20     Q.  Did you -- and ultimately you were the one
21 responsible for, following discussion with staff as
22 to making that decision whether it should or should
23 not.  Fair?
24     A.  At that time, yes.
25     Q.  Would it have been reasonable for you to

2 6

1  have decided to the contrary, that let's have the
2  credentialing committee look at this and see what
3  they think?
4          MS. MCENROE:  Objection to form.
5      A.  When you say reasonable, based on the
6  record, at the time I didn't think it was reasonable
7  action to take at that time based on the information
8  I had.
9      Q.  Certainly when we make decisions sitting
10 like this, we look at the risks versus the benefits.
11 Fair?
12         MS. MCENROE:  Objection to form.
13     A.  But you're looking at -- this decision not
14 to provide it?
15     Q.  Right.
16     A.  Yes.
17     Q.  And so in this situation what were the
18 risks or what were the potential bad outcomes or
19 consequences that would be associated with bringing
20 this issue to the credentialing committee for their
21 consideration?
22         MS. MCENROE:  Objection to form.
23     A.  That there was not enough information for
24 them to be make an informed decision.
25     Q.  Certainly that's a conclusion the

JA380

Transcript of William C. Kelly
Conducted on August 20, 2019                    55 (217 to 220)

27

1  credentialing committee could come to on their own
2  account, correct?
3          MS. MCENROE: Objection to form.
4      A. Yes.
5          MS. MCENROE: We've been going almost
6  an hour. You said you're going to be brief.
7          MR. CERYES: Yes.
8      Q. Does the credentialing committee meet on
9  some regular basis?
10         MS. MCENROE: Objection to form.
11     Q. Or did they?
12     A. At that time it varied according to this,
13 but I think for a long period there is no set
14 schedule. It was if there were just allegations for
15 it to review, you would set up a meeting, but at
16 some point we started having them in conjunction
17 with the periodic Board of Trustees meetings.
18     Q. When there would be a meeting, would
19 multiple issues typically be discussed at that
20 time?
21     A. Yes.
22     Q. Mr. Kelly, you mentioned that you had
23 given testimony on other cases in the past,
24 deposition testimony, correct?
25     A. Yes.

28

1      Q. Can you estimate on practically --
2  approximately how many depositions you've given?
3      A. Fewer than ten. Anywhere from five to
4  ten, maybe.
5      Q. In what circumstances have you been asked
6  to give deposition testimony?
7      A. I think they were all ECFMG related when I
8  was employed at ECFMG.
9      Q. And so you were testifying as a
10 representative or employee of ECFMG with regard to
11 certain aspects of their operations?
12     A. Yes.
13     Q. Have you had the -- well, were those
14 generally lawsuits in which ECFMG was a defendant?
15         MS. MCENROE: Objection to form.
16     A. The cases that I recall, the answer is
17 yes.
18     Q. To your knowledge, has ECFMG ever been
19 sued or been a defendant in a case involving
20 negligent credentialing of a physician?
21         MS. MCENROE: Objection to form.
22     A. I have no knowledge.
23     Q. I know ECFMG has been sued by physicians
24 in the past for their -- for being deprived
25 privileging through ECFMG or credentialing through

29

1  ECFMG; is that correct?
2      A. Yes.
3      Q. Would that represent the majority if not
4  all of the cases in which you've given deposition
5  testimony or were they in other matters?
6      A. Those are some of the cases, yes.
7      Q. Have you given testimony in any other case
8  regarding -- strike that.
9          Have you given testimony in any case
10 wherein there was an allegation that ECFMG was in
11 some way negligent in its credentialing of a
12 physicians.
13         MS. MCENROE: Objection to the form.
14 Asked and answered.
15     A. I don't remember.
16         MR. CERYES: Do you want to take a
17 minute?
18         MR. VETTORI: I'm good.
19         MR. CERYES: Okay. I'm sorry, one
20 other question for you. I don't mean to get
21 everybody excited.
22 BY MR. CERYES:
23     Q. If we go to Exhibit 53.
24     A. I have it in front of me.
25     Q. Great. There is in the text box toward

220

1  the bottom of this document a reference from -- it
2  says, "Anna, do not scan any document into applicant
3  file, period. Bring all documents to Anna,
4  parentheses, CREDS, invest, bring to Virginia, end
5  parentheses."
6          Why was it the case that there was
7  some instruction here to not scan documents into an
8  applicant file.
9          MS. MCENROE: Objection to form.
10 Also a reminder the witness testified earlier he
11 didn't know anything about this document when
12 counsel asked him.
13     A. That's correct, I don't know what this
14 document is.
15     Q. Okay. I'll re-ask the question. Are you
16 aware of any reason why documents from -- for an
17 applicant would not be scanned into an applicant
18 file?
19         MS. MCENROE: Objection to form.
20     A. I don't know any reason why.
21     Q. All right. Have you seen any -- is it
22 commonplace for an applicant through the ERAS system
23 to include a personal statement?
24     A. My recollection is that that was one of
25 the expected documents.

Transcript of William C. Kelly
Conducted on August 20, 2019

221

1    Q.   And your expectation would be in this case
2  that the applicant Akoda would have produced such a
3  document?
4    A.   It was one of the expected documents.
5    Q.   Have you seen a personal statement from
6  Akoda --
7    A.   I don't recall.
8    Q.   All right.  That's a wrap.
9         MS. MCENROE:  We'll take a quick
10 minute to make sure we don't have anything.
11        MR. VETTORI:  Sure.
12        (Recess taken.)
13        MS. MCENROE:  Nothing from us today.
14 Thank you very much.
15        THE COURT REPORTER:  Before we go off
16 the record, orders?
17        MR. VETTORI:  I'm ordering one.
18        MS. MCENROE:  Us as well.  Get an
19 electronic.  We don't need a hard copy --
20        MR. VETTORI:  Likewise here,
21 electronic transcript.
22        THE COURT REPORTER:  And minuscript.
23        (Whereupon, the deposition was
24 concluded at 4:20 p.m.)
25

223

1  WITNESS:  William Kelly
2  DATE:  August 20, 2019
3  CASE:  Monique Russell, et al v. ECFMG
4
5
6  DISTRIBUTION TO COUNSEL:  The original signature
7  page/errata sheet was sent to Elisa McEnroe, Esq. to
8  obtain signature for the deponent.  When signed,
9  please forward same to Paul Vettori, Esq. for
10 inclusion with the original of the deposition
11 transcript.
12
13 WITNESS INSTRUCTIONS:  After reading the transcript
14 of your deposition, please not any change or
15 correction and the reason for it on the errata
16 sheet.  DO NOT make any notations on the transcript
17 itself.  Use additional sheets if necessary.
18
19 SIGN AND DATE THE ERRATA SHEET and return it, along
20 with the transcript, to your counsel.
21
22
23
24
25

222

1         C  R T F  C AT
2  COMMONW  A TH OF MASSACHUS TTS
   Worcester, ss
3
         , Jenni er A  Doherty, Certi ied
4  Shorthand Reporter and Notary Pub ic du y
   commissioned and qua i ied in and or the
5  Commonwea th o  Massachusetts, do hereby certi y
   that there came be ore me on the 20th day o  August,
6  2019, the person hereinbe ore named, who was by me
   du y sworn to testi y to the truth and nothing but
7  the truth o  their know edge touching and concerning
   the matters in controversy in this cause  that they
8  were thereupon examined upon their oath, and their
   examination reduced to typewriting under my
9  direction and that the deposition is a true record
   o  the testimony given by the deponent
10        urther certi y that   am neither
   attorney nor counse   or, nor re ated to or emp oyed
11 by, any o  the parties to the action in which this
   deposition is taken, and  urther that   am not a
12 re ative or emp oyee or  inancia  y interested in
   this action
13
      N W TN SS WH R OF,  HAV  H R  UNTO S T MY
14 HAND AND S A  TH S 1ST DAY OF S  PT  MB R, 2019
15
16
17
   Notary Pub ic
18 My Commission  xpires
   October 19, 2023
19 CSR No  1398F95
20
21
22
23
24
25

224

1        ACKNOW  DG M NT OF D PON NT
2         , Wi  iam Ke y, do hereby certi y
3  that   have read the  oregoing transcript o  my
4  testimony taken on August 20, 2019, and  urther
5  certi y that it is a true and accurate record o  my
6  testimony, with the exception o  the
7  changes  corrections  isted be ow
8
9  PAG     N      CHANG  OR CORR CT ON
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20              Wi  iam Ke y
21
22
23
24
25

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

EXHIBIT 34

JA383

Monique Russell

```
 1          IN THE UNITED STATES DISTRICT COURT

 2       FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4   - - - - - - - - - - - - - - - - - X

 5   MONIQUE RUSSELL, JASMINE          :

 6   RIGGINS, ELSA M. POWELL           :

 7   and DESIRE EVANS,                 : Civil Action No.

 8              Plaintiffs,            :  18-5629

 9   v.                                :

10   EDUCATIONAL COMMISSION FOR        :

11   FOREIGN MEDICAL GRADUATES,        :

12              Defendant.             :

13   - - - - - - - - - - - - - - - - - X

14

15      Videotaped Deposition Of MONIQUE RUSSELL

16                Washington, D.C.

17          Monday, September 16, 2019

18                   1:51 p.m.

19

20

21   Job No. 88394

22   Pages:  1 - 136

23   Reported by:  Dana C. Ryan, RPR, CRR, CSR (GA)

24

25
```

JA384

Monique Russell

Page 2

```
 5              September 16, 2019
 6                 1:51 p.m.
10      Videotaped Deposition of MONIQUE RUSSELL,
11  held at the law offices of Morgan, Lewis &
12  Bockius, LLP, 1111 Pennsylvania Avenue, Northwest,
13  Washington, D.C., before Dana C. Ryan, Registered
14  Professional Reporter, Certified Realtime
15  Reporter, Certified Shorthand Reporter (GA) and
16  Notary Public in and for the District of Columbia.
```

Page 4

```
 1              C O N T E N T S
 2  EXAMINATION OF MONIQUE RUSSELL:       PAGE:
 3  By Mr. Shaffer              7
 4  By Mr. Zajdel              133

 8              E X H I B I T S
 9      (Attached to the Transcript)
10  RUSSELL DEPOSITION              PAGE:
11  Exhibit 1   Screenshot Of A July 2017    16
12              Facebook Messenger Messaging
13              Stream Between Jasmine
14              Riggins And Monique Russell
15  Exhibit 2   May 14, 2016 Prince George's    87
16              Hospital Center Report, Bates
17              Stamped Plaintiffs0000001082
18  Exhibit 3   May 14, 2016 Prince George's    89
19              Hospital Center Social
20              History Report Of Monique
21              Russell, Bates Stamped
22              Plaintiffs0000001123 Through
23              0000001131
```

Page 3

```
 1      A P P E A R A N C E S
 3  ON BEHALF OF THE PLAINTIFFS:
 4      CORY L. ZAJDEL, Esquire
 5      Z Law, LLC
 6      2345 York Road, #B-13
 7      Timonium, Maryland 21093
 8      Telephone:  (443) 213-1977
 9      Email: clz@zlawmaryland.com

11  ON BEHALF OF THE DEFENDANT:
12      BARRY W. SHAFFER, Esquire
13      MATTHEW D. KLAYMAN, Esquire
14      Morgan, Lewis & Bockius, LLP
15      1701 Market Street
16      Philadelphia, Pennsylvania 19103
17      Telephone: (215) 963-5100
18      Email: barry.shaffer@morganlewis.com
19      Email: matthew.klayman@morganlewis.com

21  Also present:
22      David Campbell, Videographer
```

Page 5

```
 2      E X H I B I T S   C O N T I N U E D
 3      (Attached to the Transcript)
 4  RUSSELL DEPOSITION              PAGE:
 5  Exhibit 4   Medical Records From Major    91
 6              Medical, LLC, For Monique
 7              Russell, Bates Stamped
 8              Plaintiffs0000118654 Through
 9              0000118679
10  Exhibit 5   June 27, 2017 Facebook Post    105
11              By Monique Russell To The
12              MaMa Sisterhood Of Prince
13              George's County Facebook
14              Group
15  Exhibit 6   Stipulation Of Dismissal    113
16              Without Prejudice, Bates
17              Stamped Plaintiffs0000118860
18              Through 0000118863
19  Exhibit 7   Plaintiff Monique Russell's    116
20              Responses To Defendants'
21              Requests For Admission
```

JA385

Monique Russell

Page 6

1        P R O C E E D I N G S
2        THE VIDEOGRAPHER:  We are now on the
3   record.  My name is David Campbell, and I am a
4   videographer for Golkow Litigation Services.
5   Today's date is September 16th, 2019, and the time
6   is 1:51 p.m.  This deposition is being held at
7   1111 Pennsylvania Avenue, Northwest, Washington,
8   D.C. 20004.
9        This is in the matter of Monique
10  Russell, et al., versus Educational Commission for
11  Foreign Medical Graduates.  This is in the United
12  States District Court for the Eastern District of
13  Pennsylvania, number 18-5629.
14       The deponent is Monique Russell.  The
15  court reporter is Dana Ryan.
16       Counsel, will you please identify
17  yourselves for the record, and then the court
18  reporter will please swear in the witness and we
19  can proceed.
20       MR. ZAJDEL:  Cory Zajdel on behalf of
21  the plaintiff.
22       MR. SHAFFER:  Brian Shaffer on behalf
23  of the Educational Commission for Foreign Medical
24  Graduates.
25       MR. KLAYMAN:  And Matthew Klayman for

Page 7

1   the defendant the Educational Commission for
2   Foreign Medical Graduates.
3        EXAMINATION BY COUNSEL FOR THE DEFENDANT
4   BY MR. SHAFFER:
5   Q    Good afternoon, Ms. Russell.
6   A    Good afternoon.
7   Q    We met briefly before we started here
8   today.  My name is Brian Shaffer, and I'm a lawyer
9   represent -- representing the Educational
10  Commission for Foreign Medical Graduates,
11  sometimes known at ECFMG.  We're here to take your
12  deposition in connection with a lawsuit that you
13  have filed against ECFMG.
14       Will you understand that that's who I'm
15  referring to if I use those initials?
16  A    Yes, I do.
17  Q    Great.
18       Have you had your deposition taken
19  before?
20  A    I don't think so.
21  Q    Okay.  I'll give you a few basic ground
22  rules --
23  A    Okay.
24  Q    -- to hopefully make this go as
25  smoothly as possible here today.

Page 8

1        The oath that you just took from the
2   court reporter is the same one that you would take
3   in a court of law before a judge and a jury.
4        Do you understand that?
5   A    Yes, I do.
6   Q    And the court reporter sitted to my --
7   seated to my left is taking down my questions and
8   your answers into a little booklet that will be
9   transcribed, and you'll have the opportunity to
10  review after we complete the deposition today.
11       Do you understand that?
12  A    Yes.
13  Q    And, so, because she's going to be
14  taking down the questions and the answers, it's
15  important that we try not to talk over top of each
16  other because she can't take us both down at the
17  same time.
18       I'll try to do that on my part.  Will
19  you -- will you do the same?
20  A    Yes.
21  Q    We also have a videographer here who's
22  taking the deposition on video so that we'll be
23  able to see the questions and answers as well.
24  But even so, the court reporter -- it's hard for
25  her to take down nonverbal responses.  So a shake

Page 9

1   of the head, we might be able to see it on the
2   video, but it might not be clear on the
3   transcript.  And, so, if I ask you for an audible
4   response or if I repeat your answer to make sure
5   that I heard it correctly, that's why I'm doing
6   it, so that the court reporter can take down the
7   questions and answers as best she can.
8        Is that understood?
9   A    Yes.
10  Q    This is not an endurance contest.  If
11  you need to take a break at any point in time, use
12  the facilities, talk to your counsel, that's fine.
13  Just let me know and we'll -- we'll go ahead and
14  do that, okay?
15  A    Okay.
16  Q    There may be questions that I have to
17  ask you today that relate to subjects of a
18  personal nature, and I'm not trying to pry or do
19  anything other than get facts that I need to have
20  to understand the basis for the lawsuit, and
21  that's why I'm asking those questions, okay?
22  A    Okay.
23  Q    If at any time you don't understand my
24  question or didn't hear my question and want me to
25  repeat it or rephrase it, just let me know, and

Page 10

1 either the court reporter will read it back to you
2 or I'll try again to do a better job of asking my
3 question, okay?
4     A    Okay.
5     Q    Are you on any medication today that
6 would affect your ability to remember things or to
7 testify truthfully?
8     A    No.
9     Q    Okay.  As you sit here today, can you
10 think of any reason why you couldn't testify
11 truthfully and answer questions to the best of
12 your ability?
13    A    No.
14    Q    Okay.  Do you have any questions for me
15 before we start?
16    A    Not at this time.
17    Q    Okay.  Can you give me your full name,
18 please?
19    A    Sure.  My name is Monique Melissa
20 Russell.
21    Q    Okay.  And your date of birth?
22    A    July 16th, 1977.
23    Q    And what's your current address?
24    A    In the States, it is 1906 Beeches Glory
25 Path, Annapolis, Maryland 21401, but I am

Page 11

1 currently residing in Costa Rica on a two-year
2 contract.
3     Q    Okay.  And when did you start your time
4 in Costa Rica?
5     A    On August of last year.
6     Q    So August of 2018?
7     A    Yes.
8     Q    And when are you scheduled to return
9 completely from the two-year contract?  August of
10 '20?
11    A    I'm in the second year of my two-year
12 contract.
13    Q    And who is the contract with?
14    A    Country Day School.
15    Q    And what job are you doing in Costa
16 Rica for them?
17    A    I'm the curriculum coordinator for the
18 early childhood and elementary schools.
19    Q    And what is your responsibilities in
20 that job?
21    A    I work with the principals of both
22 schools on alignment of curriculum from
23 prekindergarten to fifth grade, and provide
24 training and professional development to all of
25 the teachers and work with them in planning

Page 12

1 meetings.
2     Q    And when you say the two schools, there
3 are two separate schools in Costa Rica?
4     A    No, they call them schools.  Country
5 Day School is a campus that goes from early
6 childhood to high school, and so there are four
7 schools, the early childhood, elementary, middle
8 and high school, and I work with the two lower
9 schools.
10    Q    And are you in Costa Rica by yourself,
11 or is your family with you?
12    A    My family is with me.
13    Q    And who is that that's with you there?
14    A    My husband and my son.
15    Q    Okay.  And your husband's name is?
16    A    Christopher William Russell.
17    Q    Okay.  And how old is he?
18    A    He is -- how old am I? -- 46.
19    Q    And your son?
20    A    Is Luka.
21    Q    Okay.  And how old is Luka?
22    A    Three.
23    Q    Okay.  And was Luka born or May 25th,
24 2016?
25    A    Yes.

Page 13

1     Q    Okay.  Do you have any other children?
2     A    No.
3     Q    And how long have you been married?
4     A    For five years in October.
5     Q    Okay.  And you are here in Washington,
6 D.C. today having returned from Costa Rica;
7 correct?
8     A    Yes, I flew from Costa Rica.
9     Q    Okay.  And when did you arrive here in
10 Washington?
11    A    Last night.
12    Q    Okay.  And what, if anything, have you
13 done to prepare to come and testify here today in
14 this deposition?
15    A    I reviewed my interrogatories and the
16 paperwork of the course --
17    Q    Uh-huh.
18    A    -- of the case, but that's about it.
19    Q    Okay.  You -- you have filed, as I
20 understand it, two different lawsuits related to
21 your interactions with a Dr. Charles Akoda;
22 correct?
23    A    Yes.
24    Q    Did you review materials related to
25 both of those cases before coming in to testify

JA387

Monique Russell

---

Page 14

1  today, or just the case against ECFMG?
2    A    Just this case.
3    Q    Okay.  And did you talk with your
4  counsel to prepare for the deposition today?
5    A    Yes.
6    Q    When did you do that?
7    A    At lunch.
8    Q    Today before coming in; correct?
9    A    Yes.
10    Q    And that's Mr. -- it's Cory sitting
11  next to me; correct?
12    A    Yes.
13    Q    Did you speak with any other lawyers to
14  prepare for your deposition today?
15    A    No.  I did email with another lawyer
16  from the team.
17    Q    Okay.  Did that lawyer provide you any
18  documents to review or information to review?
19         MR. ZAJDEL:  Objection.  That would be
20  attorney-client privilege.
21  BY MR. SHAFFER:
22    Q    Did you review any documents that were
23  provided to you by your attorneys before coming in
24  to testify today?
25    A    The same interrogatories that I

---

Page 15

1  mentioned earlier.
2    Q    Okay.  Apart from reviewing the
3  interrogatories, did you do any other research or
4  review any other materials before coming in to
5  testify today?
6    A    No.  I'm not sure what . . .
7    Q    Like googling Dr. Akoda --
8    A    No.
9    Q    -- or Googling ECFMG or Googling
10  Dimensions Health Care or anything like that.
11    A    No, I did not.
12    Q    Okay.  You also provided, I think, to
13  your lawyers some screenshots of some
14  communications you had with a Jasmine Riggins?
15    A    Yes, I did.
16    Q    Okay.  And when did you -- when did you
17  provide those?
18    A    Are you referencing the screenshot
19  that's in front of you?
20    Q    (Indicated affirmative.)
21    A    I believe yesterday or the day before.
22    Q    Okay.  And somehow you became aware
23  that we were asking if there were communications
24  between you and Ms. Riggins related to any of the
25  allegations regarding Dr. Akoda?

---

Page 16

1    A    Yes.
2    Q    Okay.  Let's mark this and just make
3  sure we understand what it is.
4         (Russell Deposition Exhibit 1 was
5  marked for identification and attached to the
6  transcript.)
7  BY MR. SHAFFER:
8    Q    I'm going to hand this to you.  This is
9  a printout of some screenshots, I believe, from
10  your phone or your computer; is --
11    A    Yes.
12    Q    -- that right?
13    A    Yes.
14    Q    And -- well, why don't you tell me in
15  more detail what it is since you -- since you
16  collected it?
17    A    Sure.  These are -- this is the only
18  conversation that I have had with Jasmine Riggins
19  aside from saying hello to each other in the lobby
20  this morning.
21    Q    Okay.  Ms. Riggins testified on
22  Thursday of last week that she believed she had
23  conversations or communications with you a month
24  or so ago.
25         Is that consistent with your

---

Page 17

1  recollection?
2    A    I don't remember having any
3  conversations with her a month ago.
4    Q    Okay.
5    A    And if I did, then I would think they'd
6  be in this same conversation thread.
7    Q    Okay.  What kind of thread is the
8  document that's Russell 1 in front of you?  Is
9  this an app?
10    A    This is from Facebook Messenger.
11    Q    And I understand from your lawyer that
12  there may be some materials on your Facebook page
13  that relate to Dr. Akoda; is that correct?
14    A    Not on my Facebook page.
15    Q    Okay.  A posting of some kind by you
16  that relates to Dr. Russell -- or Dr. Akoda,
17  sorry?
18    A    I posted about Akoda in a mommy group
19  on Facebook.
20    Q    Okay.  And there is -- what's a mommy
21  group?
22    A    A mommy group is a, like, community of
23  mothers that talk about mom things, like --
24    Q    Uh-huh.
25    A    -- so . . .

---

JA388

Monique Russell

Page 18

1    Q    And so you posted something on -- on
2  Facebook in this group and -- about Dr. Akoda, and
3  there have been comments or messages by people
4  left with respect to this --
5    A    Yes.
6    Q    -- posting?
7    A    Yes.
8    Q    And that's what you provided to your
9  counsel?
10   A    Yes.
11   Q    Okay.  And I understand that we're
12 trying to get a copy of it in here so we can ask
13 you about it.
14       Apart from that posting in the mommy
15 group on Facebook and this (indicating) string
16 with Jasmine Riggins, have you had communications
17 in writing with anyone other than your lawyers
18 about Dr. Akoda?
19   A    Only from people who responded to the
20 post in the mommy group.
21   Q    Okay.  Would you have had similar
22 Messenger communications like the one that's
23 marked Russell 1 with other women besides
24 Ms. Riggins?
25   A    With one other woman.

Page 19

1    Q    Okay.  And who is that?
2    A    I don't know if this is her actual
3  name --
4    Q    Uh-huh.
5    A    -- but it was Amber -- I think Amber
6  Loftin.
7    Q    And do you still have that
8  communication?
9    A    It would be in my inbox -- or in my
10 messages.
11   Q    Is that something that you could
12 provide to your counsel if we requested it and
13 your counsel agreed to request it from you?
14   A    Yes.
15       MR. SHAFFER:  Counsel, we'll make a
16 request if the person with whom she's referencing
17 is a putative class member, we'll make a request
18 for production of that communication.
19       MR. ZAJDEL:  Yeah.  Sure.  Do you know
20 how to spell the name that you said?
21       THE WITNESS:  I believe it would be
22 L-O-F-T-I-N.
23       MR. ZAJDEL:  Okay.  We'll take a look
24 for it.
25       BY MR. SHAFFER:

Page 20

1    Q    Let's take a quick look at what's been
2  marked as Russell 1.  And I apologize, it's
3  oversized, but sometimes when you print
4  screenshots, they get big; and my eyesight is bad
5  anyway.
6        So does this look to be a complete
7  exchange between you and Ms. Riggins related to
8  Dr. Akoda?
9    A    Yes.
10   Q    Okay.  Did you have any phone calls
11 with Ms. Riggins either as a follow-up to this
12 exchange or otherwise?
13   A    I don't believe so.
14   Q    And it looks like the time period here
15 for this exchange is July 3rd to July 13th of
16 2017.
17   A    Yes, it does look like that.
18   Q    And, so, again to just make sure I'm
19 understanding your testimony, since July 13th of
20 2017 until this morning, you'd not had any
21 communications, interactions, emails,
22 messengering, commenting with Ms. Riggins?
23   A    Not that I know of.  This is the only
24 way that I would know to communicate with her.
25   Q    Okay.  In your communication with

Page 21

1  Ms. Riggins, you notified her, among other things,
2  that you were going to be filing a class action
3  lawsuit against Dimensions Health Care.
4        Do you see that?
5    A    Yes.
6    Q    And you noted that you have a very
7  experienced and successful class action lawyer.
8        Do you see that?
9    A    Yes.
10   Q    Who were you referring to there?
11   A    I was referring to my counsel, Cory
12 Zajdel.
13   Q    Okay.  And how did you become aware of
14 Cory?
15   A    A friend referred me to him.
16   Q    Okay.  And did you ever have
17 communications with Ms. Riggins at her Yahoo email
18 address that's referenced on the fourth page of
19 your screenshot?
20   A    No, I did not.
21   Q    Let me ask a couple more background
22 questions.  So in Costa Rica, is Lukao in school?
23   A    Yes, he is.
24   Q    Okay.
25   A    Luka.

Page 22

1   Q    Luka with an A?
2   A    Yes.
3   Q    Okay.  I apologize for that.
4         Who takes care of him when he's not in
5   school?
6   A    His father.
7   Q    Okay.  And is your father -- is your
8   husband working outside of taking care of Luka?
9   A    He returns to the States to work
10  periodically.
11  Q    Okay.  What does he do?
12  A    He's a musician and a deejay.
13  Q    Okay.  Does he go by a name that I
14  would know?
15  A    Ty Hussell.
16  Q    Ty Hussell, I'll have to look that one
17  up.
18        Do you have help with child care in
19  Costa Rica when your husband is traveling for
20  work?
21  A    Yes.
22  Q    Who do you use for that?
23  A    I use either a friend who is also a
24  teacher --
25  Q    Uh-huh.

Page 23

1   A    -- or the assistant teachers in the
2   early childhood program.
3   Q    And how many hours a week do they
4   typically help you with Luka?
5   A    Maybe once a month for a couple of
6   hours.
7   Q    Otherwise, you and your husband are
8   able to -- to manage coverage?
9   A    Yes.
10  Q    What is your typical day like down
11  there?
12  A    I typically get up at -- pretty early
13  and walk and do some yoga before I go to work.  We
14  all get ready.  Luka attends the school that I
15  teach at now -- or that I work at.
16  Q    Uh-huh.
17  A    I'm not a teacher anymore.  And I go to
18  work from 7:30 to 4:30.  Luka gets out at 3:00 so
19  his father picks him up, and then they hang out
20  and do something until I get off.  And then we go
21  home and make dinner and maybe take a walk.
22  Q    Okay.  And how much sleep do you
23  usually get per night?
24  A    It depends.  Say, typically, six to
25  seven hours.

Page 24

1   Q    And what kinds of things do you like to
2   do on the weekends?
3   A    Walk, go to parks.
4   Q    And where in -- I should have asked
5   this earlier.  Where in Costa Rica do you -- is
6   the school and where do you live?
7   A    We're located just outside of San Jose.
8   Q    Is that one of the larger cities in
9   Costa Rica?
10  A    Yes, it's the capital.
11  Q    Okay.  And your position is a two-year
12  contract, you said?
13  A    My position is a one-year contract.
14  Q    Okay.
15  A    I'm in the middle of a two-year
16  contract.  I was hired as a teacher and promoted.
17  Q    Great.
18        And how did you find out about this
19  opportunity?
20  A    Through a job fair.
21  Q    Okay.  And approximately when did you
22  apply to or -- or learn about this opportunity?
23  A    I went to the job fair in February of
24  2018.
25  Q    Okay.  And were you working at that

Page 25

1   time?
2   A    Yes.
3   Q    And where were you working then?
4   A    For D.C. Public Schools.
5   Q    And what was your position?
6   A    Instructional specialist.
7   Q    And was there a particular school that
8   you were assigned to?
9   A    No, I worked for the department -- for
10  the division of early childhood, and I was
11  assigned anywhere from three to nine schools at a
12  time.
13  Q    And how long did you work for the D.C.
14  Public Schools?
15  A    For nine years.
16  Q    And did you have the same position the
17  entire time?
18  A    No, for six years I was a classroom
19  teacher, and for the last three I was an
20  instructional specialist.
21  Q    What -- what grades did you teach when
22  you were a teacher?
23  A    Prekindergarten.
24  Q    And is that mandatory in the District?
25  A    No.

Monique Russell

Page 26

1    Q    Okay.  So this was an optional --
2    A    Encouraged.
3    Q    Correct.  Strongly encouraged; right?
4         Did you have to resign from the D.C.
5    Public Schools to take this position in Costa
6    Rica?
7    A    Yes.
8    Q    Okay.  And when did you do that?
9    A    Probably in -- in the spring.  I don't
10   know exactly what day.
11   Q    Spring of 2018?
12   A    Yes.
13   Q    And my understanding of the claims that
14   you're making in the case against ECFMG is that
15   you are not seeking any economic damages, loss of
16   wages, loss of revenue from jobs or anything like
17   that; is that correct?
18   A    That is correct.
19   Q    Okay.  So then I don't need to ask you
20   how much you make and all that kind of thing if
21   you're not going to be saying that you have lost
22   money related to any of the allegations that
23   you're making.
24        Do you understand that?
25   A    Yes.

Page 27

1    Q    Okay.  Can you give me a little bit of
2    your educational background?
3    A    Sure.  I studied art education at the
4    University of Maryland, and then got a teacher
5    certification in early childhood education through
6    the Center for Inspired Teaching.  And then did a
7    master's in teaching at Trinity Washington
8    University.
9    Q    When did you graduate from University
10   of Maryland?
11   A    2009.
12   Q    And when did you get your teacher
13   certification?
14   A    2009.
15   Q    Was that contemporaneous with your
16   graduation or -- or afterwards?
17   A    No, it happened afterwards.
18   Q    Okay.  How long did it take you to get
19   the certification?
20   A    I don't know.  You get a -- like a
21   temporary certification first, and then I was
22   involved in a certification program, so when you
23   finish it, then you get a different type of
24   certification.
25   Q    Okay.  And then when did you get your

Page 28

1    master's?
2    A    That's terrible.  I don't -- when did I
3    get married?  It was the same year.  2015 -- '14.
4    2014.
5    Q    Okay.  That would be five years ago
6    which is I think what you --
7    A    Yes.
8    Q    -- said earlier, so you were correct
9    then.
10   A    I should be better at math as a
11   teacher.
12   Q    What was your subjects that you would
13   teach?  I guess if it was early education, did it
14   cover a lot of different topics?
15   A    Everything.
16   Q    And the school that you're at now, is
17   it an English-speaking or bilingual or Spanish?
18   A    It is -- it's an English-speaking
19   school.
20   Q    And is it a private school --
21   A    Yes.
22   Q    -- that people pay to go to in Costa
23   Rica?
24   A    Yes.
25   Q    Okay.  And before you moved to Costa

Page 29

1    Rica, you lived here in Washington, D.C.?
2    A    Yes, and in Maryland.
3    Q    Okay.  Where did you live in Maryland?
4    A    In Cheverly, Maryland.
5    Q    And where is that?
6    A    It's just over the D.C. line, over the
7    northeast section of the D.C. line.
8    Q    Okay.  And did you live -- did you move
9    to -- well, strike that.
10        Where did you live after you graduated
11   from University of Maryland and started working?
12   A    When I graduated from the University of
13   Maryland, I first lived in Takoma Park and then
14   moved into D.C., I believe in the same school
15   year.
16   Q    And did you go to work immediately upon
17   graduation to the D.C. Public Schools?
18   A    Yes.
19   Q    And did you work in the summertimes?
20   Is the D.C. public school calendar one that goes
21   through the summer, or did you do something
22   different in the summers?
23   A    When I was an instructional specialist,
24   I worked year round.
25   Q    Okay.  How about when you were a

JA391

Page 30

1 teacher?
2    A    When I was a classroom teacher, I
3 worked ten months.  I did not work summers.
4    Q    Okay.  And what did you do during the
5 summers?
6    A    Some summers I would work; I would wait
7 tables.
8    Q    Uh-huh.
9    A    Or -- I'm trying to think what other --
10 but jobs like that.  One summer I traveled.
11    Q    Okay.  Recuperated and got ready for
12 the next school year?
13    A    Yes.
14    Q    I don't blame you.
15        I want to talk a little bit about --
16 what do I want to talk about?  Strike that.
17        Let me ask you some background
18 questions about the lawsuit so I understand
19 what -- what you know and what you're familiar
20 with.
21        When did you first decide to retain
22 Mr. Zajdel as your -- as your counsel?
23    A    I don't know exactly what month, but it
24 was probably more than a month after I found out
25 about Akoda.

Page 31

1    Q    And if I understand from your discovery
2 responses in the case, you believe that you found
3 out about the fact that Dr. Akoda, who I believe
4 helped deliver your son, Luka, you found out he
5 had pled guilty in June of 2017?
6    A    I'm not sure if that's the time, but if
7 that's what your record shows, probably.
8    Q    We can go through, and we probably will
9 go through, some of the questions.  I'm not trying
10 to -- to trick you on that, so . . .
11        Why don't you tell me just generally
12 how you came to learn about any issues with
13 Dr. Akoda?
14    A    Sure.  So I -- in the neighborhood
15 where I lived at the time, there was a parent
16 listserv where people would post recommendations
17 or ask for advice and things like that.  And
18 someone asked for a recommendation for an OB/GYN.
19 And I wanted to recommend my OB/GYN, Dr. Waldrop,
20 but I wanted to make sure that the person knew if
21 they went to Dr. Waldrop that there was a chance
22 that they would end up having their baby delivered
23 with Akoda, and I did not have a good experience
24 with him during the delivery, and I wanted to
25 make sure the person was aware of that.

Page 32

1        And I went to his Web site to confirm
2 the spelling of his name, and he wasn't on their
3 Web site anymore.  So I went and looked at my
4 paperwork, confirmed the spelling, I looked him up
5 to see like, maybe he moved somewhere else so that
6 wouldn't be an issue for this person.  And I
7 discovered a press release from the Department of
8 Justice saying that he had been arrested for
9 charges of fraud very shortly after he performed a
10 C-section on me.
11    Q    And the physician that you mentioned,
12 Dr. Waltrop?
13    A    Waldrop.
14    Q    Waldrop.  That was your OB/GYN?
15    A    Yes.
16    Q    How long -- when did you first start
17 going to see Dr. Waldrop?
18    A    I'm not sure.  Maybe three months into
19 my pregnancy.
20    Q    And how did you come to start visiting
21 Dr. Waldrop?
22    A    She was recommended by a woman that I
23 met on the hospital tour.
24    Q    Okay.  And what hospital was that?
25    A    P.G. County, Dimensions Hospital.

Page 33

1    Q    And did you have a OB/GYN before
2 Dr. Waldrop?
3    A    I had a -- I saw a high-risk
4 specialist, but I didn't have a regular OB/GYN.
5    Q    Okay.  And what was the name of the
6 high-risk specialist?
7    A    I don't remember.  I didn't see that
8 doctor for the most of my pregnancy.
9        Dr. Footer, I think.
10    Q    F-O-O-T-E-R?
11    A    Yes.  But there are two Dr. Footers.
12    Q    Okay.
13    A    The older Dr. Footer.
14    Q    And that was -- and, again, I'm not
15 trying to be overly personal on this.  I'm just
16 trying to get the information.
17        Were you at high risk because of your
18 age or because of other conditions?
19    A    Yes, primarily because of my age, and I
20 had bleeding at the beginning of my pregnancy, and
21 so they wanted to monitor that.
22    Q    And, so, who was it that -- if anyone,
23 that directed you to Dr. Footer as the high-risk
24 specialist?
25    A    A coworker.

Monique Russell

Page 34

1   Q    Okay.  So this was someone at the D.C.
2   Public Schools who said here's someone to -- to go
3   see as a high-risk specialist?
4       A    Yes.
5       Q    Okay.  And I think you were saying that
6   you didn't see Dr. Footer for all that long during
7   your pregnancy, but within about the first three
8   months, you had decided to go see Dr. Waldrop?
9       A    Yes.
10      Q    And how did you come to see
11  Dr. Waldrop?  That was a recommendation on the
12  hospital tour?
13      A    Yes, from another -- another woman in
14  the tour was asking a lot of the same questions
15  that I would be asking, and so she seemed to want
16  the same things in her birth, and I asked her who
17  she -- who her doctor was, and she recommended
18  Dr. Waldrop.
19      Q    Okay.  I saw references in your
20  discovery responses to a Dr. Moore.
21      A    Yes.
22      Q    Who is Dr. Moore?
23      A    Dr. Moore owns the practice that
24  Dr. Waldrop works for and Akoda was working for.
25      Q    And -- and is that Moore and

Page 35

1   Associates; is that --
2       A    Yes.
3       Q    -- how they're known as?
4       A    Yes.
5       Q    Okay.  And did you ever meet Dr. Moore
6   during your pregnancy?
7       A    I did.
8       Q    Okay.
9       A    I may have been seen by Dr. Moore once.
10  I met him for sure, like, just to see -- know who
11  he was in case he were to deliver my baby, and I
12  may have been seen by him once when Dr. Waldrop
13  wasn't available.
14      Q    Okay.  Do you know how many other
15  doctors besides Dr. Akoda and Dr. Waldrop and
16  Dr. Moore that were in the practice when you were
17  going there?
18      A    I believe there were only those three.
19      Q    Okay.  Did you ever hear of a
20  Dr. Chaudry?
21      A    I have heard of him.
22      Q    And how do you know of Dr. Chaudry?
23      A    I believe that Akoda was working for
24  him in a separate practice at the time.
25      Q    And how did you come to learn that?

Page 36

1       A    From Dr. Moore.
2       Q    When you -- when you decided to go with
3   Dr. Waldrop of Dr. Moore's practice as your
4   primary OG -- OB/GYN, what type of research did
5   you do on Dr. Waldrop?
6       A    I looked up her -- I looked up reviews.
7   I looked her up on different sites where they give
8   information about credentials and patient reviews.
9       Q    Do you remember what any of those were
10  called?
11      A    I don't know all of them.  I know I
12  looked on Yelp because they give patient reviews,
13  and I think they're pretty honest, but I don't
14  know where I looked up her affiliations.
15      Q    Okay.  Do you know whether you went to
16  State of Maryland licensing or credential sites to
17  look up Dr. Waldrop?
18      A    No, I did not.
19      Q    Do you know whether you went to the
20  American Medical Association to look up
21  Dr. Waldrop?
22      A    I may have gone to the American Medical
23  Association.
24      Q    Okay.
25      A    Or the association for gynecologists.

Page 37

1       Q    Okay.  And do you know whether there
2   was information on Dr. Waldrop there?
3       A    If there was, I didn't find anything
4   negative.
5       Q    Okay.  And when you went to meet with
6   Dr. Waldrop -- I think you mentioned already you
7   met with Dr. Moore at least once, perhaps, as
8   well -- did you ever meet with Dr. Akoda?
9       A    I did not before I was in labor.
10      Q    Okay.  But you understood he was a
11  member of the practice of Dr. Moore; correct?
12      A    Yes, but he did not see patients.
13      Q    How do you know he didn't see patients?
14      A    They told me that he did not see
15  patients; that he only assisted them at the
16  hospital.
17      Q    Okay.  Who told you that?
18      A    Dr. Moore.
19      Q    Okay.  And was that after you gave
20  birth to Luka or was that in an earlier meeting
21  while you were --
22      A    That was before.
23      Q    Okay.  Did you understand from
24  Dr. Waldrop that it was possible that she would
25  not be available to help you in labor and

JA393

Page 38

1  delivery, including a C-section if that were
2  necessary?
3      A    Yes, I did.
4      Q    How did you know that?
5      A    Because Dr. Moore told me that there
6  were three doctors and that if Dr. Waldrop was not
7  available, that Dr. Moore or Akoda would deliver
8  the baby.  And that if Waldrop was not available
9  during the practice, then he could see me --
10  Dr. Moore could see me but Akoda would not see me
11  because he only worked at the hospital.
12      Q    And do you recall whether you filled
13  out a consent with Dr. Waldrop that acknowledged
14  that that could be the case and that you could be
15  seen by other doctors other than her if she was
16  not available?
17      A    I don't recall, but I'm sure that I
18  did.
19      Q    Okay.
20          MR. SHAFFER: I'll mark this.  Well,
21  hold on.  We'll get to it.
22          BY MR. SHAFFER:
23      Q    Did you have any issues with your
24  pregnancy?
25      A    I did have some complications.  As I

Page 39

1  mentioned, I had some bleeding early on.  I also
2  have a -- a uncommon but benign
3  cardio-neurological disorder called vasovagal
4  syncope that under everyday conditions is truly
5  benign, but pregnancy exacerbated the condition.
6      Q    Uh-huh.  And what are some of the risks
7  or symptoms that go along with that condition?
8      A    Getting dizzy and passing out.
9      Q    Okay.
10      A    Which is benign unless you hurt
11  yourself on the way down.
12      Q    Right.  Or -- or a baby if you have a
13  baby?
14      A    Yes.
15      Q    And, so, as a result of that, were you
16  taking any extra precautions while you were
17  pregnant?  Were you anticipating the possibility
18  of having to have medication or anything like
19  that?
20      A    I was not anticipating the need for any
21  medication.  I was seeing a cardiologist in
22  conjunction with my gynecological visits.  And
23  after seven months, I was put on essentially kind
24  of house arrest where I could do everything.  I
25  just couldn't be alone for much unless -- in case

Page 40

1  I got dizzy.
2      Q    Uh-huh.  And did you get -- I saw some
3  reference in your -- your medical records to an
4  accommodation from D.C. Public Schools where maybe
5  you were able to work at home for a period of
6  time.
7          Was that part of this situation?
8      A    Yes.
9      Q    Okay.  And . . .
10      A    So and --
11      Q    I'm sorry.  Go ahead.
12      A    I could be alone.  I couldn't be, like,
13  out driving alone or, so I worked from home.  But
14  if I was going to go out and do things, then I
15  needed somebody to be with me.
16      Q    Okay.  Did -- did this condition and
17  having this condition and worrying about it cause
18  you stress during the time that you were pregnant?
19      A    No, not really because I've had the
20  condition for most of my life.
21      Q    Uh-huh.
22      A    It was -- once I realized that it
23  wouldn't impact my job, there wasn't much stress
24  related to it.
25      Q    Okay.  And -- and I think you said

Page 41

1  earlier that -- that Luka was born in May of 2017;
2  correct?
3      A    Yes.
4      Q    And was he born by C-section?
5      A    Yes.
6      Q    And was that a planned C-section?
7      A    No, it was not.
8      Q    What were the circumstances that led to
9  him being born by C-section?
10      A    I had been in labor for, I believe, 32
11  hours at that point, and after a period of time,
12  they recommended that I take a drug called Pitocin
13  that they hoped would -- Akoda recommended it to
14  speed up contractions so that I would dilate.
15      Q    Uh-huh.
16      A    It did not have that effect.
17          And then after 30, 32 hours, he
18  recommended an epidural.  Immediately after he did
19  the epidural, he said that my baby was in distress
20  and that he needed an emergency C-section.
21      Q    Okay.  And was your original plan for
22  birth to go to the hospital and have someone from
23  Dr. Moore's practice deliver vaginally?
24      A    Yes, that was my original plan.
25      Q    Okay.  I saw a reference in your

Monique Russell

Page 42

1 records to a doula or maybe two doulas?
2    A    Yes.
3    Q    What role, if any, had you anticipated
4 doulas playing in the birth?
5    A    Doulas provide emotional support during
6 the birth.  They also help to give the father a
7 break and help the father or partner --
8    Q    Uh-huh.
9    A    -- to be a more supportive partner.
10    Q    And had you planned on having a doula
11 present for your birth?
12    A    I did.
13    Q    Okay.  And did that occur?
14    A    Yes.
15    Q    Okay.  And who was that?
16    A    Her name is Emily.  I forget her last
17 name right now.  But it was Doulas of Capitol
18 Hill.
19    Q    Uh-huh.
20    A    And in the contract, the doula is
21 present for the first 24 hours and then after that
22 they can switch to a backup.  I believe that Emily
23 was there for maybe 28 hours before she switched
24 to a backup which was her partner Nicole.
25    Q    And did the doula meet you at the

Page 43

1 hospital or were you with the doula before you
2 went to the hospital?
3    A    I believe that she met me at the
4 hospital.
5    Q    And when you were describing the length
6 of your labor -- and I'm sorry for that length of
7 labor -- was that all at the hospital, or did it
8 start at home and then continue while you were
9 there?
10    A    It started at Dr. Waldrop's office --
11    Q    Okay.
12    A    -- during an examination.  My water
13 broke.
14    Q    And -- and my understanding, because I
15 have children, too, is that sometimes when your
16 water breaks, the rest of the body may not be
17 ready to give birth vaginally, but that once the
18 water breaks, there's a certain period of time
19 before a baby is supposed to be gotten out.
20        Is that -- is that a fair summary of
21 your understanding at the time?
22    A    That is my understanding.
23    Q    Okay.  And Pitocin, which you indicated
24 Dr. Akoda gave you, is one of the very common
25 medicines that they will give to try to move along

Page 44

1 contractions when somebody's water breaks, isn't
2 it?
3    A    That is my understanding.
4    Q    Okay.  And -- and -- and is it also
5 your understanding that sometimes it works and
6 sometimes it doesn't work as well?
7    A    I did not have much -- much
8 understanding of Pitocin.
9    Q    Okay.  Did you receive any information
10 from your husband or either of the doulas that
11 were in the room with you that -- when Dr. Akoda
12 said a C-section was necessary because of the baby
13 being in distress, that that wasn't a good idea;
14 that you shouldn't go ahead with that?
15    A    My husband did not agree.
16    Q    Okay.  What did he want to do?
17    A    He had been watching the monitors, and
18 he saw that the stats had gone back up and thought
19 that, you know, it looked better; that it should
20 be waited out.
21    Q    Okay.  And what about the doulas?
22    A    The doulas do not advise on medical
23 decisions.
24    Q    Okay.
25    A    They're there for emotional support.

Page 45

1    Q    And ultimately, the decision to have
2 the C-section was yours then?
3    A    Yes.
4    Q    And --
5    A    I followed Akoda's advice because at
6 the time I believed him to be a real doctor.
7    Q    And when you say "a real doctor," you
8 believe today that he is not a real doctor;
9 correct?
10    A    He is a fake doctor.
11    Q    And what do you mean when you say he's
12 a fake doctor?
13    A    That he was not properly trained as a
14 doctor or credentialed as a doctor.
15    Q    What -- what is it about his training
16 that you believe either does or does not make him
17 a doctor?
18    A    That he used fake documents to get into
19 the country and was allowed to take medical boards
20 without proper credentials.
21    Q    As you sit here today, do you know
22 whether or not Dr. Akoda has gone to medical
23 school?
24    A    I do not know.  The federal trial
25 transcript that I read, the U.S. government said

JA395

Monique Russell

Page 46

1 that there was no evidence that he ever attended
2 or graduated from medical school.
3      Q    Okay.  Do you know whether or not
4 Dr. Akoda's medical school in Nigeria ever
5 verified the authenticity of his diploma to
6 anyone?
7      A    I do not --
8           MR. ZAJDEL:  Objection.  Hold on for a
9 second.
10          Objection:  The question assumes facts.
11          But you can answer.
12          THE WITNESS:  I don't know.
13 BY MR. SHAFFER:
14     Q    Do you know whether Dr. Akoda's medical
15 school in Nigeria ever verified the authenticity
16 of Dr. Akoda's diploma to ECFMG?
17          MR. ZAJDEL:  Objection:  The question
18 assumes facts.  You can answer it.
19          THE WITNESS:  I'll decline.
20          Should I answer these?
21          MR. ZAJDEL:  Yeah, you can answer.
22          THE WITNESS:  I don't know.
23          MR. ZAJDEL:  Okay.
24 BY MR. SHAFFER:
25     Q    Did -- I take it from your answers that

Page 47

1 you have looked at some of the materials including
2 a press release and, I guess, a transcript of
3 Dr. Akoda's guilty plea with the Department of
4 Justice?
5      A    Yes.
6      Q    Do you know whether Dr. Akoda pled
7 guilty to not having gone to medical school?
8      A    I do not know.
9      Q    Okay.  Do you know whether or not
10 Dr. Akoda pled guilty to falsifying his diploma?
11     A    I don't know, but since he was found
12 guilty of fraud, I'm not sure what things were
13 true and what were not.
14     Q    And the thing that he pled guilty to as
15 fraud, do you remember what specifically he
16 admitted doing?
17     A    I don't know.
18     Q    Okay.  And I take it from your answer,
19 then, that -- that having pled guilty to fraud,
20 you don't believe he's a real doctor from your
21 perspective?
22     A    I know that he used three -- at least
23 three different Social Security numbers to be
24 approved by the foreign medical board, the board
25 to certify foreign medical graduates, in order to

Page 48

1 take his -- his medical boards.
2          I'm sorry.  Can you repeat the
3 question?
4      Q    That -- that's okay.  I think you
5 answered -- you answered that part of the
6 question.  I'll ask you a different question
7 and -- and if it triggers something else, you can
8 add it.
9          I guess I was asking what it was that
10 you knew of that, in your mind, made you say that
11 he was not a real doctor.
12     A    That he used multiple different Social
13 Security numbers in order to be approved to take
14 the medical boards; that the U.S. government said
15 there is no evidence that he ever attended medical
16 school or graduated from med- -- medical school.
17 That he was kicked out of a residency program in
18 New Jersey when they discovered that he did not
19 have the credentials to be in that program; that
20 he had been somehow approved by the commission to
21 certify foreign medical graduates.  That he took
22 the medical board and failed multiple times, so
23 many times by the time that he passed it nobody
24 would hire him, so then he used another Social
25 Security number to get approved to take the boards

Page 49

1 again under another different name.  He used three
2 different names.  And that he did practices like
3 this in multiple states.
4          So if you were a real doctor, why would
5 you do that?
6      Q    Do you know what steps Dr. Akoda had to
7 go through to be able to work in the Prince
8 George's County Hospital where he delivered Luka
9 through C-section?
10     A    I don't know all of them.
11     Q    Okay.  Which ones do you know?
12     A    I know that first he'd have to go
13 through the education commission that certifies
14 foreign medical graduates and have all of his
15 documents to be approved to be able to take the
16 medical boards.  He'd have to pass the medical
17 boards.  He'd have to get into a residency program
18 and be hired and get privileges.
19     Q    Okay.  Have you ever discussed your
20 experiences with Dr. Akoda with anyone from the
21 Educational Commission for Foreign Medical
22 Graduates?
23     A    No, I have not.
24     Q    Okay.  Have you ever spoken with anyone
25 there?

JA396

Monique Russell

Page 50

1    A    No, I have not.
2    Q    Not -- for any reason?
3    A    No.
4    Q    No.
5         Have you -- what information, if any,
6    do you have about ECFMG?
7    A    My understanding is that if you are a
8    graduate of a medical program from outside of the
9    United States, then that is where you first have
10   to get approved to be able to do any next steps.
11   Q    And what's --
12   A    And your --
13   Q    I'm sorry.
14   A    Your documentation has to be verified
15   at that office.
16   Q    And how -- what's the basis for that
17   information?  How do you know that?
18   A    I looked it up when I found out from
19   the Justice Department that Akoda was a fraud.  I
20   looked up what that government agency did.
21   Q    And when you say "that government
22   agency," who are you referring to?
23   A    The educational commission to certify
24   foreign medical graduates.
25   Q    And what --

Page 51

1    A    I think I'm calling them the wrong
2    thing, but you know what I mean.
3    Q    I understood when you were saying that
4    the commission to certify foreign medical
5    graduates --
6    A    Okay.
7    Q    -- you were meaning --
8    A    Yes.
9    Q    -- the company that you sued in
10   Philadelphia, the ECFMG; is that --
11        We've been saying -- meaning the same
12   thing?
13   A    Yes.
14   Q    Okay.  Great.
15        And you mentioned it, I think -- we
16   could check your answer.  I'm just trying to make
17   sure I understand -- that ECFMG is -- is a
18   governmental entity of some kind?
19   A    That's what I thought.  Is that --
20   Q    And what -- what part of the government
21   does ECFMG work with?
22   A    I don't know.
23   Q    Do you know on what basis you think
24   that would be the case?
25   A    I don't know.  I thought that when I

Page 52

1    looked them up, but that was two years ago.
2    Q    Okay.  Do you know whether or not --
3    strike that.
4         You mentioned that you understood that
5    ECFMG -- I forget what the word is -- verifies
6    documentation of foreign medical students or
7    graduates; correct?
8    A    Yes.
9    Q    What documents is it your understanding
10   ECFMG is supposed to verify?
11   A    I don't know exactly, but I would
12   understand a diploma --
13   Q    Okay.
14   A    -- for one.  From my -- it's been a
15   while since I looked this up, but I remember that
16   there were schools that were specifically, like,
17   vetted or listed with the commission, and so they
18   would have to verify that those diplomas were real
19   or that the person graduated from that
20   institution.
21   Q    Anything else?
22   A    I don't know.
23   Q    Do you know where Dr. Waldrop went to
24   medical school?
25   A    I believe she did a residency at

Page 53

1    Howard.
2    Q    Okay.  And how about medical school
3    before that?
4    A    I don't remember.
5    Q    Okay.  And do you know where Dr. Moore
6    went to medical school?
7    A    I don't remember.
8    Q    Okay.  Do you know whether Dr. Moore is
9    a -- went to a U.S. medical school or a foreign
10   medical school?
11   A    I do not know.
12   Q    Okay.  I'll finish up on -- on the
13   birth of Luka.  You had the C-section after a very
14   lengthy labor.
15        Was -- how was Luka's birth?  Was he
16   born okay?  Any health problems?
17   A    Luka has had no health problems.
18   Q    Great.
19        And did you have any symptoms or
20   physical conditions after the C-section?
21   A    No, I did not, nothing atypical.
22   Q    Right.
23        It's a major abdominal surgery, so
24   there was probably some recovery; right?
25   A    Yes.

Monique Russell

Page 54

1    Q    Okay.
2    A    Having knowing what -- that Akoda is a
3 fraud, I do question whether or not my C-section
4 was necessary.
5    Q    Okay.  And that was something that you
6 started -- you thought of after you found the
7 information sometime in 2017 related to
8 Dr. Akoda's guilty plea?
9    A    Well, before that because my husband at
10 the time did not believe that it was necessary,
11 and then once I found that information out, it
12 made me question it more.
13    Q    Okay.  Do you know what the -- did you
14 ever ask Dr. Moore or Dr. Waldrop whether they
15 would have had you do a C-section after 32 hours
16 of labor and a baby in distress?
17    A    I did not speak to Dr. Moore --
18 Dr. Waldrop once I found out Akoda was a fraud.
19    Q    Did you speak with Dr. Moore at any
20 point after you learned the information about
21 Dr. Akoda?
22    A    I did.
23    Q    Okay.  Tell me about that.
24    A    I went to him to find out, A, if he
25 knew; and why he had not notified patients that

Page 55

1 Akoda was a fraud.
2    Q    And at this point in time, you were not
3 a patient in that practice anymore; correct?
4    A    No, I was no longer --
5    Q    Okay.  And --
6    A    I would have still been, but I wasn't
7 pregnant or needing women's care.
8    Q    Right.
9        So you -- why did you go to Dr. Moore
10 instead of Dr. Waldrop?
11    A    Because Dr. Moore is the head of the
12 practice.
13    Q    Okay.  And how did you make contact to
14 go meet with Dr. Moore?
15    A    I set an appointment.
16    Q    Okay.
17    A    I called the office.
18    Q    Okay.  Did you tell them what you
19 wanted to talk about?
20    A    No.  I might have.  I don't know.
21    Q    Okay.  And do you remember how long
22 after you had met with -- you had seen the
23 information of Dr. Akoda's guilty plea that you
24 went to talk to Dr. Moore?
25    A    I don't know, but it was fairly soon.

Page 56

1    Q    Okay.  And what do you recall about
2 that meeting with Dr. Moore?
3    A    Dr. Moore seemed just as surprised, and
4 he told me that he had also been working for
5 another doctor's office, Dr. Chaudry.
6    Q    Okay.  Did you ask Dr. Moore any
7 questions or express any views to him?
8    A    I did.  I asked him -- I was trying to
9 make sense of what happened, and he told me they
10 raided his -- Akoda's office, I believe, at
11 Chaudry's office and his home, and they discovered
12 machines that make, like things to make diplomas
13 with and details like that.
14        I asked him why he didn't notify
15 patients.
16    Q    Uh-huh.
17    A    And he said that wasn't a requirement
18 or . . .
19    Q    How did you feel about that response?
20    A    It's upsetting because I think every
21 woman who has ever been a patient of Akoda should
22 know that he was not a real doctor.
23    Q    And the response you got from Dr. Moore
24 who, if I'm understanding it correctly, had hired
25 Dr. Akoda into his practice, was it wasn't his

Page 57

1 place to do it or he didn't have to do it; it
2 wasn't a requirement for him to do it?
3    A    He felt -- and I don't remember exactly
4 how he said it, but he felt that he had been duped
5 as well.
6    Q    Okay.  Did you ask him what type of
7 investigation or vetting he had done of Dr. Akoda
8 before hiring him?
9    A    I did, and he said he had worked with
10 him in the residency program at Howard University.
11    Q    Did you ask him about doing any kind of
12 background check or investigation of him before
13 hiring him?
14    A    I did, and he said that he had worked
15 with him in the Howard residency program.
16    Q    Okay.  Did he tell you whether he had
17 done a background check or not?
18    A    He did not.
19    Q    He did not tell you or he did not do
20 one?
21    A    He said he did not do one.
22    Q    Okay.  What was your reaction to that
23 answer?
24    A    I was surprised, but he said that
25 because of all of the certifications and everyone

Page 58

1 who had would have had to do it by contracts, that
2 he didn't feel it was necessary --
3    Q    Okay.
4    A    -- because he had been -- he had gotten
5 privileges at P.G. County; he had been approved
6 from these other organizations.
7    Q    Did he tell you whether or not he in
8 the future would be considering doing background
9 checks of people he hired to be doctors in his
10 practice?
11    A    Yes, he did.
12    Q    What did he say?
13    A    He said he would consider doing that.
14    Q    And what was your reaction to that?
15    A    I thought that that would be a good
16 idea.
17    Q    In your position at D.C. Public
18 Schools, did they have to do a background check on
19 you before hiring you?
20    A    Yes, they do.
21    Q    And they're your employer; right?
22    A    Yes.
23        MR. SHAFFER:  Let's take a short --
24 short five-minute break --
25        THE WITNESS:  Okay.

Page 59

1        MR. SHAFFER:  -- and then we'll pick
2 back up.
3        THE VIDEOGRAPHER:  Off the record at
4 2:50.
5        (Recess -- 2:50 p.m.)
6        (After recess -- 3:15 p.m.)
7        THE VIDEOGRAPHER:  We are back on the
8 record at 3:15.
9    BY MR. SHAFFER:
10    Q    Ms. Russell, we're back on the record
11 after a short break.  You understand you're still
12 under oath?
13    A    Yes.
14    Q    Okay.  I'm going to talk a little bit
15 about some of the doctors that you've seen over
16 your adult life and I'll just make sure I
17 understand some of the chronology on that.
18        Do you currently have a primary care
19 doctor that you see?
20    A    Not really.
21    Q    Do you have a doctor that you've seen
22 from time to time for general issues, colds or
23 antibiotics or anything like that?
24    A    I did, but not since discovering about
25 Akoda.  I have not found a primary care doctor.

Page 60

1    Q    So as of today, you don't have a
2 primary care doctor?
3    A    No.
4    Q    Have you seen -- have you seen any
5 doctor of any kind since June of 2017?
6    A    Yes.
7    Q    Who is that?
8    A    I have seen -- I don't know the
9 doctor's name.  It was at an urgent care facility
10 in Costa Rica called (speaking Spanish).
11    Q    Okay.  And why did you go there?
12    A    I -- Dr. Waldrop, after my son was
13 born --
14    Q    Uh-huh.
15    A    -- placed an IUD --
16    Q    Uh-huh.
17    A    -- and I was having complications from
18 the IUD.
19    Q    Okay.  And, again, just so I get the
20 timeline correct, Luka was born in May of '16.
21    A    Yes.
22    Q    When did you have the IUD implanted?
23    A    Probably six months after.
24    Q    Okay.  So end of 2016?
25    A    That's pretty -- yes.

Page 61

1    Q    Beginning of 2017, something like that?
2    A    Something around there.
3    Q    Okay.  And when did your contract
4 with -- when did you go to Costa Rica?
5    A    In the last week of July of 2018.
6    Q    And -- and since July of 2018, when
7 have you come back to the States?
8    A    I came back for the December break last
9 year.
10    Q    So that would have been December of
11 '18?
12    A    Yes.
13        And then I came back this summer in
14 July -- essentially the month of July.
15    Q    Okay.  And in neither December of
16 '18 or summer of '19, you didn't see any doctors
17 here in the U.S.; correct?
18    A    No.
19    Q    Okay.  And before going to Costa Rica
20 in around July of '18, had you seen any doctors
21 between when you got the IUD put in and you went
22 to Costa Rica?
23    A    I -- I'm not sure when I last saw
24 Dr. Major.  Dr. Major was my primary care
25 physician for about ten years.

Monique Russell

Page 62

1    Q    Okay.
2    A    And I'm not sure when I last saw him,
3 but it was -- I did see him after I found out
4 about Akoda.
5    Q    Okay.  And Dr. Major is his name?
6    A    Yes.
7    Q    And you said he is a primary care
8 doctor?
9    A    Yes.
10    Q    And where is his office?
11    A    He has an office in Silver Spring,
12 Maryland, and in Clinton, Maryland, I believe is
13 the other one.
14    Q    And where did you see him?
15    A    I've seen him at both, but mostly the
16 Silver Spring office.
17    Q    And you said he's been your primary
18 care doctor for about ten years?
19    A    Yes.
20    Q    And you saw him at some point between
21 June of 2017 and today?
22    A    Yes.
23    Q    How many times?
24    A    Once.
25    Q    Okay.  When do you think that was,

Page 63

1 approximately?
2    A    Maybe July.  It was shortly after I
3 found out.
4    Q    Okay.
5    A    And I didn't know when I saw him what I
6 was -- what I was going to do.  I didn't -- so it
7 must have been soon after I found out.
8    Q    And did you make an appointment to go
9 in and see him?
10    A    Yes.
11    Q    Okay.  And did you get any treatment
12 from him while you were there?
13    A    I don't remember why I went to see him.
14    Q    Okay.  But you think this was probably
15 shortly after you found out about Dr. Akoda in the
16 2017 -- summer of 2017?
17    A    Yes, because I told him about it.
18    Q    Okay.  And what -- what did you tell
19 him?
20    A    I told him that I found out that the
21 doctor was a fake.
22    Q    Okay.
23    A    And that he -- had been charged and
24 tried by the U.S. government.
25    Q    Okay.  What did Dr. Major say?

Page 64

1    A    He was really surprised, and he --
2 during my pregnancy, he told me that he knew
3 Daniel Waldrop, my OB/GYN, and that they had known
4 each other for a number of years, but he didn't
5 say much about it.  He was just really surprised.
6        But knowing that he had a close
7 relationship with the office, I did not feel
8 comfortable seeing him anymore.
9    Q    Okay.  And did you tell him that when
10 you went and met with him?
11    A    No.
12    Q    Okay.  Did you --
13    A    I just stopped going.
14    Q    Okay.  And I think you -- you said that
15 you don't recall why you went to see Dr. Major?
16    A    No, I don't know.
17    Q    How did you originally start going to
18 see Dr. Major?
19    A    I was a teacher.  I got sick a lot.
20 And the -- my -- the primary care physician I had
21 at the time, Ms. Shelly something, she could never
22 see me on the day that I was sick.  And, so, I
23 went on my insurance Web site and found another
24 doctor, looked up reviews and everything, and this
25 doctor -- people said that they were able to get

Page 65

1 in quickly and, you know, really positive
2 experiences.  And, so, I switched to Dr. Major.
3    Q    Okay.  And where did Dr. Major go to
4 medical school?
5    A    I don't remember.
6    Q    Do you know if Dr. Major has ever been
7 convicted to a crime?
8    A    Not to my knowledge.  I looked him up
9 on a -- a state of Maryland site where you can
10 look for sanctions and things --
11    Q    Okay.
12    A    -- and there was nothing there.
13    Q    Okay.  When did you do that?
14    A    I don't remember.
15    Q    Was it after you found out about
16 Dr. Akoda?
17    A    Yes.  I didn't know that the site
18 existed before then.
19    Q    Okay.  And other than Dr. Major, have
20 you seen any other doctors since the middle of
21 2017?
22    A    Only in Costa Rica and only in urgent
23 care.
24    Q    Okay.  You currently have an OB/GYN?
25    A    No.  I have seen an OB/GYN because of

JA400

Monique Russell

Page 66

1 the problem with my IUD, but I don't currently
2 have one.
3     Q     And was that someone you saw in Costa
4 Rica or someone you saw here?
5     A     I saw someone in Costa Rica.
6     Q     Okay.  And when was that,
7 approximately?
8     A     It was last year.  I don't -- I don't
9 remember when last year, but I went to urgent care
10 because I was having pain and bleeding, and they
11 did an x-ray and confirmed my IUD was still
12 there --
13    Q     Uh-huh.
14    A     -- but were concerned that it had moved
15 or shifted somehow.  And, so, they wanted me to
16 see an OB/GYN.
17    Q     Okay.  And you went and did that?
18    A     Uh-huh.
19    Q     Okay.
20    A     Yes.
21    Q     And were you treated for issues with
22 the IUD?
23    A     Yes.
24    Q     Okay.  And was that successful?  Did
25 they --

Page 67

1     A     Yes.
2     Q     -- fix it?
3     A     Sorry.
4     Q     That's okay.  Sure.
5     A     Yes.  I was treated.  They removed the
6 IUD, the doctor did.
7     Q     Okay.  And that was down in Costa
8 Rica --
9     A     Yes.
10    Q     -- sometime last year?
11    A     Yes.  It wasn't a surgical procedure.
12    Q     Uh-huh.  Okay.  And other than the
13 urgent care and the doctor in Costa Rica and
14 seeing Dr. Major, have you seen any other doctors
15 or -- or health care providers in -- since the
16 mid-2017?
17    A     I get physical therapy, but not from a
18 doctor.
19    Q     Okay.  Where do you get that?
20    A     In Costa Rica and in the States.  In
21 the States, I see a woman that my husband has seen
22 for 15 years, maybe.
23    Q     Uh-huh.
24    A     And in Costa Rica, I see a physical
25 therapist that I found through the same place that

Page 68

1 I go for urgent care.
2     Q     Okay.  And, excuse me, what -- what are
3 you doing physical therapy for?
4     A     My back.
5     Q     Okay.  And is that -- how long have you
6 had that condition?
7     A     Probably since my son was about a year
8 old, so about 2017.
9     Q     And has it -- has it been diagnosed
10 as --
11    A     Stress related.
12    Q     Okay.  And when did the stress start or
13 the stress that -- that you've been told relates
14 to the back injury?
15    A     The pain started after my son was about
16 a year, which would have been June of 2017.
17    Q     And had you ever suffered from stress
18 or anxiety prior to June of 2017?
19    A     Yes.
20    Q     Okay.  And what -- what can you tell me
21 about that?
22    A     When I lost my sister in 2007, I had
23 stress-related back pain.
24    Q     Okay.  And that was -- were you treated
25 for depression or anxiety or stress in -- in 2007?

Page 69

1     A     I was treated for depression, briefly.
2     Q     Okay.
3     A     And for, maybe two weeks, given
4 medication for my back and then taught breathing
5 exercises to alleviate the pain when stressful
6 situations occurred.
7     Q     Were you ever provided an
8 antidepressant or anything like that?
9     A     I was shortly after my sister's death.
10    Q     Okay.  And do you remember which one?
11    A     I think it was Lexapro.
12    Q     Okay.  And for how long did you take
13 that?
14    A     Several months, maybe -- no more than
15 six months.
16    Q     Okay.  Are you on any medications
17 today?
18    A     No.
19    Q     Okay.
20    A     Just vitamins.
21    Q     In terms of other types of treatment,
22 have you ever in your adult life seen a
23 psychologist or a psychiatrist for treatment?
24    A     No.
25    Q     Have you ever gone into therapy at any

Monique Russell

Page 70

1  point in your adult life?
2     A    No.
3     Q    And, so, you're not currently being
4  treated by a psychiatrist or psychologist?
5     A    No, I'm not.
6     Q    Other than Dr. Major and Dr. Moore's
7  practice, and the doctor at urgent care and the
8  doctor that you saw in Costa Ricia -- Rica
9  regarding the IUD and your physical therapist,
10 what other doctors have you seen in your adult
11 life?
12    A    I have a cardiologist who helped
13 diagnose my condition.
14    Q    And that's the --
15    A    Dr. Howell, Shawn Howell.
16    Q    And that's the condition you were
17 talking about earlier?
18    A    Yes, vasovagal syncope.
19    Q    You said it better than me.
20    A    And I did see her periodically
21 throughout my pregnancy for monitoring.
22    Q    And this is Shawn Howell?
23    A    Yes.
24    Q    And where is she -- where does she
25 practice?

Page 71

1     A    I believe on K Street.
2     Q    A couple of blocks from us here?
3     A    Yes, very close by.
4     Q    Does she have hospital privileges?
5     A    I don't know.
6     Q    Okay.  Do you know where she went to
7  medical school?
8     A    I don't remember.  It might have been
9  Howard.
10    Q    Okay.  And do you know if she's board
11 certified?
12    A    I believe she is.
13    Q    Okay.  Do you know by what board?
14    A    I do not.
15    Q    Okay.  Any other doctors?
16    A    In my adult life, certainly.  I don't
17 remember any more that that.  I know there are --
18 I know it -- before Dr. Major I had a different
19 primary care physician and a different OB/GYN.  I
20 don't remember their names.
21    Q    Okay.  And do you know how you went to
22 start seeing Dr. Howell?
23    A    I was recommended by Dr. Major.
24    Q    Okay.  And I apologize if I asked you
25 this already, but I can't remember the answer.

Page 72

1        How did you come to see Dr. Major?
2     A    I found him through my insurance --
3     Q    You did say that, okay.
4        Do you -- do you ever have to take Luka
5  to the doctor?
6     A    Yes.
7     Q    Where -- where does he go to the
8  doctors?
9     A    He goes to a doctor in Costa Rica.
10    Q    Okay.  Is it a pediatric practice?
11    A    Yes.
12    Q    Okay.  What -- what's the name of the
13 practice?
14    A    Dr. Holtermann.
15    Q    Okay.  And how did you find
16 Dr. Holtermann?
17    A    Through the same way they found my
18 physical therapist.
19    Q    Okay.
20    A    The -- I don't know what it's called.
21 They call it a hospital, but it's like more than a
22 hospital --
23    Q    Sort of a --
24    A    More of a center.
25    Q    -- like a clinic provider, something

Page 73

1  like that?
2     A    Yes.
3     Q    A one-stop shop for --
4     A    Yes.
5     Q    -- primary care, pediatrics, maybe a
6  pharmacy, maybe physical therapy?
7     A    It's not all in one place, but it's
8  like a network.
9     Q    Got it.  And that is through the school
10 that you are with --
11    A    No.
12    Q    -- that you were given that?  No?
13       Okay.  Do you have health insurance?
14    A    I do.
15    Q    Okay.  And does the health insurance
16 cover Dr. Holtermann and --
17    A    The health insurance doesn't cover
18 much.  It doesn't cover my child.
19    Q    Okay.  And so when you go to see
20 Dr. Holtermann, do you pay for it or --
21    A    Yes.
22    Q    And --
23    A    I -- I use a -- in Costa Rica, they
24 have a medical discount program that -- because
25 Costa Rica has socialized health care.

JA402

Monique Russell

Page 74

1    Q    Uh-huh.
2    A    And I have international health
3  insurance because I go back and forth.
4    Q    Uh-huh.
5    A    But in the country, I used -- I use
6  this medical discount program that feels like what
7  we would think of as insurance --
8    Q    Uh-huh.
9    A    -- but it's not insurance.
10    Q    Got it.
11         Other than Dr. Holtermann, have you had
12  to take your son to see any other doctors?
13    A    I did have to take him to urgent care.
14    Q    And what types of things have you taken
15  him to see Dr. Holtermann or urgent care?  Typical
16  colds and --
17    A    For urgent care, I took him for a
18  fever.
19    Q    Uh-huh.
20    A    And for Holtermann I took him because
21  the school requires an annual wellness check.
22    Q    Okay.  And so, you've taken him two
23  times now to do that or just once?
24    A    And he had hand, foot and mouth.
25    Q    Also a right of passage probably in the

Page 75

1  lower school; right?
2    A    Yes.
3    Q    Okay.  And I understand that you, as
4  you've said in -- in written responses to
5  interrogatories, that you -- you have suffered
6  from emotional distress as a result of learning
7  about Dr. Akoda; is that right?
8    A    Yes.
9    Q    And what in particular is it that you
10  are experiencing as a result of what you found out
11  about Dr. Akoda?
12    A    I feel violated by Dr. Akoda.  I feel a
13  sense of distrust in the medical community in
14  general.  Like I wouldn't want, for example, to go
15  find a therapist to see to talk to about these
16  things because how do I what their certification
17  is worth or their licensure is worth based on how
18  far doctor -- not even a doctor, how far Akoda got
19  with false papers.
20         I don't trust the institutions that are
21  in place to -- to check that these doctors are who
22  they say they are, doing the right thing, or have
23  the credentials they do, which makes it very hard
24  for me to then use sources I would have used to
25  check on a doctor.

Page 76

1         And I don't feel equipped to do
2  background checks on doctors myself.
3         I feel violated, and it makes it very
4  difficult to -- I'm sorry.  It makes it very
5  difficult to see an OB/GYN.
6    Q    And I take it that when you found out
7  about Dr. Akoda's guilty plea regarding the use of
8  Social Security numbers, that . . .
9         MR. SHAFFER:  There's some tissues back
10  there.
11         BY MR. SHAFFER:
12    Q    Here you go.
13         I take it when you found out about the
14  guilty plea, you -- you were angry with Dr. Moore
15  and Dr. Waldrop who you had seen in connection
16  with that pregnancy; right?
17    A    No.  I was angry in general, but I
18  don't necessarily hold blame or anger towards
19  Dr. Waldrop and Dr. Moore because they relied on
20  sources they should have been able to trust.  For
21  example, I was a teacher.  I had to have
22  background -- extensive background checks done in
23  order to hold a job within DCPS.  So when I rented
24  my basement apartment, and as a mother I wanted to
25  find somebody safe to live in the home with us,

Page 77

1  and a teacher applied, I didn't feel like I needed
2  to run the full background check on them because I
3  knew that they had gone through that background
4  check with the public school system.  So, instead,
5  I could do -- rely on other sources because I
6  trusted the school system's background check.
7         So I didn't hold anger.  I was very
8  surprised that Dr. Moore hadn't done a background
9  check, but I understood why he relied on
10  institutions like the commission to certify
11  foreign medical graduates instead of doing it all
12  over again himself.
13    Q    And your view there is that your
14  understanding of ECFMG as a governmental entity,
15  that it would do background checks on people like
16  Dr. Akoda --
17    A    Yes.
18    Q    -- correct?
19         And I --
20    A    Yes --
21    Q    I'm sorry.  Go ahead.
22    A    At least to verify that they had
23  attended and graduated school.
24    Q    And do you know whether ECFMG tried to
25  do that?

Monique Russell

Page 78

1    A    I do not know.
2    Q    Okay.
3    A    But if they did, they seemed to have
4  failed.
5    Q    Do you know whether ECFMG ever
6  identified that Dr. Akoda had used multiple names
7  to try to come and take examinations with ECFMG?
8    A    I do not know.
9    Q    Do you know whether ECFMG ever helped
10  the Department of Justice build a case and
11  prosecute a case against Dr. Akoda?
12    A    I do not know.
13    Q    Okay.  And do you know whether or not
14  ECFMG ever received verification from Dr. Akoda's
15  Nigerian medical school as to whether or not his
16  diploma was authentic?
17        MR. ZAJDEL:  Objection.  That assumes
18  facts.
19        You can answer.
20        THE WITNESS:  I do not know.
21        MR. SHAFFER:
22    Q    You filed a suit against Dimensions
23  Health Care in Maryland; correct?
24    A    Yes.
25    Q    When did you do that?

Page 79

1    A    I don't remember exactly --
2    Q    Okay.
3    A    -- but . . .
4    Q    We probably have a document in all our
5  documents here that --
6    A    Probably --
7    Q    -- says --
8    A    -- so.
9    Q    -- when that occurred.
10        You think it was sometime in 2018 or
11  earlier than that?
12    A    I don't know.
13    Q    Okay.  And when you were suing
14  Dimensions Health Corporation, who did you
15  understand that that encompassed?  Who was that?
16    A    The company that owns the hospital
17  where my son was born where Akoda performed a
18  C-section.
19    Q    Did that include Dr. Moore's practice?
20    A    I don't know.  I don't know.
21    Q    I'm sorry?
22    A    I don't know.
23    Q    Okay.  Did it include Dr. Akoda's --
24  personally Dr. Akoda?
25    A    I don't know.

Page 80

1    Q    Okay.  Did it include the other
2  practice with Dr. Chaudry that Dr. Akoda was
3  apparently associated with?
4    A    I don't know.
5    Q    Okay.  What did you understand that you
6  were saying in filing that lawsuit?
7    A    That I was suing similarly to this suit
8  for emotional distress and representing a class.
9    Q    Okay.  And -- and you were suing
10  Dimensions Health Corporation which you understood
11  to be the Prince George's County Hospital, among
12  others, because you believed that they should
13  have -- they were responsible for the emotional
14  distress that you felt from Dr. Akoda's actions?
15    A    I believe that they share in the
16  responsibility along with the commission to
17  certify foreign medical graduates.
18    Q    Okay.  Who else shares in that
19  responsibility?
20    A    I don't know, but I think they are the
21  two most responsible because the commission to
22  certify foreign medical graduates is the first
23  gatekeeper, and Dimensions is the -- oversees the
24  entire hospital.
25    Q    Do you know whether ECFMG licenses

Page 81

1  physicians to practice in the U.S.?
2    A    Not to my knowledge.
3    Q    Okay.  Do you know who licenses
4  physicians to practice in hospitals in Maryland?
5    A    I do not, but I would assume it's a
6  state organization.
7    Q    Okay.  And do you believe that the
8  state bears any responsibility for what -- your
9  emotional distress that you feel from Dr. Akoda?
10    A    I think it would depend on the nature
11  of the relationship between -- and the process of
12  how state licensure is determined based on what
13  the foreign medical -- the commission to certify
14  foreign medical graduates does.
15    Q    And, so, if the licensure board has
16  responsibility to do its own investigation of
17  anybody it's going to license, would you agree
18  with me that they would share responsibility, in
19  your view, for any of the emotional distress that
20  you believe was caused by Dr. Akoda?
21    A    Yes, I would, but I think it would not
22  be possible for them to license if the commission
23  to certify foreign medical graduates had stopped
24  Akoda from being able to enter the country and
25  take the medical boards in the first place.

Monique Russell

Page 82

1  Q    And do you know whether Dr. Akoda ever
2  lied to ECFMG?
3  A    To my understanding, he did.  He used
4  three different Social Security numbers and
5  multiple names to come through and get approved to
6  take boards multiple times.
7  Q    Do you know whether Dr. Akoda did a
8  residency in the U.S.?
9  A    My understanding is that he started a
10  residency in New Jersey before they discovered
11  that he was a fraud and referred back to the
12  commission to certify foreign medical graduates,
13  and that he was still then approved again through
14  the commission and eventually received residency
15  at Howard University.
16  Q    And what's the basis for that
17  understanding?
18  A    The court documents that I read from
19  his federal trial.
20  Q    This is the -- the guilty plea of
21  Dr. Akoda.
22  A    The transcript of the trial.
23  Q    Okay.  And do you know whether ECFMG
24  certification is sufficient to allow a person to
25  obtain a residency in the United States?

Page 83

1  A    I don't understand the --
2  Q    Well, I -- I -- I've heard you say that
3  you blame ECFMG, at least in part, because I think
4  you've called them the first gatekeeper, and I was
5  trying to understand whether you believe that
6  ECFMG certification in and of itself is sufficient
7  to allow a person to be in a residency program.
8  A    I don't think so.  I think that it's
9  required for them to be able to take the medical
10  boards in the first place which is a requirement
11  for a residency program.
12  Q    And the basis for that understanding
13  is?
14  A    The documents that I read from the
15  federal trial.
16      MR. SHAFFER:  Okay.  Let's go ahead and
17  mark this.  You know what?  Off the record a
18  second.
19      THE VIDEOGRAPHER:  Off the record at
20  3:47.
21      (Recess -- 3:47 p.m.)
22      (After recess -- 3:50 p.m.)
23      THE VIDEOGRAPHER:  Back on the record
24  at 3:50.
25      BY MR. SHAFFER:

Page 84

1  Q    Okay.  We're back on the record.  You
2  understand you're still under oath?
3  A    Yes.
4  Q    Okay.  I need to ask you a couple of
5  questions about some of the statements that are in
6  your discovery responses.
7  A    Okay.
8  Q    And one of them asks -- and I know you
9  reviewed these in advance of coming in, and I can
10  show them to you if it would be helpful, but if
11  not, I'll just ask you some of the questions.
12      I think you've described here that you
13  feel emotional distress as a result of what you
14  learned about Dr. Akoda; correct?
15  A    Yes.
16  Q    Are there any physical conditions that
17  today you attribute to that emotional distress?
18  A    I had not thought of this until you
19  asked me about the date that my current back pain
20  started which coincides with when I learned about
21  Akoda.  And, so, I don't know if they are related
22  or not.
23  Q    Okay.  None of the doctors that you've
24  seen for that have told you that that's likely
25  related to Dr. Akoda; correct?

Page 85

1  A    None of the doctors I've seen of that
2  know about doctor -- know about Akoda.
3  Q    Okay.  Well, Dr. Major did; correct?
4  A    Yes, but I didn't see Dr. Major for my
5  back pain.
6  Q    The doctor you saw for back pain was?
7  A    I saw a physical therapist here, ATI
8  Physical Therapy.  And I see a physical therapist
9  in Costa Rica named Eduardo Reyes.
10  Q    Do you know --
11  A    And I see a family -- someone my
12  husband has seen for a long time who is a
13  structural integrationist named Priscilla Soto.
14  Q    Is Priscilla a M.D.?
15  A    No, none of these are M.D.s.
16  Q    And your physical therapists were not
17  M.D.s --
18  A    No.
19  Q    -- correct?
20      Your supplemental answer to
21  interrogatory number 2 we asked said that you are
22  a survivor of previous sexual abuse --
23  A    Yes.
24  Q    -- is that correct?
25  A    Yes.

Page 86

1    Q    When did that occur?
2    A    I was molested as a child, and I was a
3 victim of sexual assault as an adult.
4    Q    Okay.  As an adult what year
5 approximately would that have been?
6    A    On multiple -- twice.
7    Q    Okay.  Did you ever -- I'm sorry to
8 hear that.
9        Did you ever speak to any of your
10 doctors about that experience?
11    A    No.
12    Q    Why not?
13    A    Because it's very difficult to talk
14 about.
15    Q    Okay.  And I apologize for having to
16 ask you those questions, but it was -- it was in
17 your response.
18        And I take it -- go ahead.
19    A    I did -- I would have spoken to a
20 doctor.  I did not tell the doctor that I was
21 sexually assaulted, but I did have a STD check --
22    Q    Okay.
23    A    -- afterwards.
24    Q    And in seeing doctors even before you
25 heard about Dr. Akoda in June of 2017, would you

Page 87

1 have mentioned that prior abuse to any of those
2 doctors?
3    A    No, it wouldn't have been as relevant.
4    Q    Okay.  Do you know whether they asked
5 those questions when you would go in?
6    A    I'm sure in some cases and if they had
7 asked I would say, but it's not something I would
8 bring up as a concern.
9    Q    Okay.
10        (Russell Deposition Exhibit 2 was
11 marked for identification and attached to the
12 transcript.)
13    BY MR. SHAFFER:
14    Q    I've handed you, Ms. Russell, what
15 we've marked as Exhibit 2 which is a report from
16 Prince George's Hospital Center.  It looks like it
17 was May 14th, 2016; correct?
18    A    Yes.
19    Q    So that would have been shortly before
20 Luka was born?
21    A    Yes, I think I remember this
22 appointment.
23    Q    Okay.  And you're seeing, it looks like
24 attending at the bottom it says Dr. Waldrop;
25 correct?  Do you see that?

Page 88

1    A    Yes.
2    Q    Okay.  And I also see a reference to
3 Traci Gore, R.N.?
4    A    Okay.  Right.  Because Dr. Waldrop was
5 not at this appointment.
6    Q    Okay.  And do you think Traci Gore was
7 the person at this appointment?
8    A    Yes.  I believe she would be a nurse
9 midwife.
10    Q    Okay.  It looks like she has R.N. --
11    A    Okay.
12    Q    -- so a registered nurse would be
13 consistent.
14        And I -- again, I'm just trying to make
15 sure I understand the facts here.  Under sexual
16 detail, it says history of sexual abuse, no.
17        So I'm wondering -- you said previously
18 that if you were asked you would have said
19 something, but it looks like here you responded
20 no; correct?
21    A    Or that I wasn't asked.  I don't
22 remember.
23    Q    Okay.  So you think the reference to
24 "no" means that you weren't asked?
25    A    I would assume that.

Page 89

1    Q    Okay.
2    A    Because it's not a secret.
3    Q    Okay.  And this appointment would have
4 been well before you heard anything about
5 Dr. Akoda in 2017; correct?
6    A    Yes.
7        (Russell Deposition Exhibit 3 was
8 marked for identification and attached to the
9 transcript.)
10    BY MR. SHAFFER:
11    Q    Ms. Russell, I've handed you what's
12 been marked as Exhibit 3 which is an obstetrical
13 form from the Prince George's Hospital Center.
14 Again, this one looks like it references a series
15 of medical triage and assessments for May 14th,
16 2016.
17        Do you see that?
18    A    Yes.
19    Q    Okay.  Do you know whether this was the
20 same appointment that we just looked at or a
21 different one?
22    A    It appears to be since this marks the
23 same date and only minutes apart.
24    Q    And if you turn to the page which has
25 the Bates number, which is the big number at the

Monique Russell

Page 90

1  bottom, 1129, at the top it references questions
2  about substance abuse, and the answer is none.
3          Was that accurate from your perspective
4  there; that if you were asked about substance
5  abuse, you would say there was none?
6      A    Yes.
7      Q    Okay.  And then there's a reference to
8  sexual -- a history of sexual abuse, and the
9  answer is, referenced here again, no; correct?
10     A    Yes.
11     Q    In connection with your discovery
12  responses, you say that your experiences with
13  Dr. Akoda have flowed into your marriage and
14  created intimacy issues; correct?
15     A    Yes.
16     Q    In what way has that interfered with
17  your marital relationship?
18     A    It has been difficult to be sexually
19  intimate, and it's impacted family planning
20  because we want more children, and that is
21  challenging when it is hard to see an OB/GYN.  And
22  it's -- intimacy with my husband is better now,
23  but it's -- it's not like it was before.  And
24  after I found out about this, it was very
25  difficult.

Page 91

1      Q    And have you seen or talked to anyone?
2  I know you mentioned sort of doing yoga in the
3  morning and doing walks, and things like that.
4          Have you spoken with a therapist or
5  anyone in the health care facility, or is this
6  something you've handled on your own?
7      A    No, I've not spoken to anybody in the
8  health care industry.  Just on my own.
9      Q    Okay.
10     A    With my husband.
11     Q    Okay.  Did you see a counselor -- a
12  marriage counselor or it's something you've worked
13  on together?
14     A    No, we just work on it together.
15     Q    Okay.
16          (Russell Deposition Exhibit 4 was
17  marked for identification and attached to the
18  transcript.)
19     BY MR. SHAFFER:
20     Q    Here's more paper for you.
21          Ms. Russell, I've handed you what's
22  been marked as Exhibit 4 which, I think -- and you
23  can tell me if I've got it wrong -- but I think
24  are a series of records from Dr. Major's office.
25     A    Yes.

Page 92

1      Q    And you had mentioned previously that
2  Dr. Major was someone who's been your primary care
3  or was your primary care physician for about ten
4  years up through sometime in 2018?
5      A    Yes.
6      Q    Okay.  I have some questions about this
7  group of -- of records which I'll represent were
8  provided to us by your lawyers.
9      A    Uh-huh.
10     Q    So the first page which has 118654 at
11  the bottom looks like it references a visit from
12  2015, 10/8/2015?
13     A    That's correct.
14     Q    And that would have been, looks like,
15  in connection with maybe a pregnancy test related
16  to Luka?
17     A    Yes.
18     Q    Okay.  And then on the second page, you
19  went to see -- when you were in to see Dr. Major,
20  there were reported findings on the visit.  I'm
21  looking at the box that says ROS up on the top
22  left-hand side there.
23     A    Okay.
24     Q    And there's a number of reports, most
25  of -- if not all of them saying no this, no that,

Page 93

1  no the other thing.
2          And you can look through the whole
3  discussion there, but I wanted to turn your
4  attention to sort of the -- the -- I guess the
5  last three sentences.  It states that she -- and
6  this is referring to you -- reports no depression,
7  no sleep disturbances, feeling safe in a
8  relationship, no alcohol abuse, no anxiety, no
9  hallucinations, no sui- -- suicidal thoughts, no
10  fatigue and thereon.
11          Does that all sound consistent with how
12  you were feeling at that point in time?
13     A    I don't know when this is from.
14     Q    This is still from October of 2015?
15     A    Yes.
16     Q    Okay.  If we keep going, it looks like
17  there is another visit to see Dr. Major, and this
18  page is 118664.
19          Do you see that one?
20     A    Yes.
21     Q    It looks like that was from May of
22  2017; correct?
23          I'm looking --
24     A    Where -- okay.
25     Q    -- under the vitals there in the middle

Page 94

1  of the page?
2      A    Yes.
3      Q    Which is the same place we looked at
4  the October date from the last report.
5          It says up above under chief complaint,
6  patient is here today for physical exam only; had
7  blood work; eye exam; swelling lymph nodes; and
8  looks like neck mass?
9      A    Uh-huh.
10     Q    Do you see that?
11         Do you recall why you went to see
12 Dr. Major in May of 2017?
13     A    For this (indicating).
14     Q    Okay.  You can see it a little bit
15 there.  Still there?
16     A    Yep, still there.
17     Q    Okay.  As part of your examination with
18 Dr. Major in May of 2017, and now I'm turning to
19 the page that has 666 at the bottom of it -- it
20 might be two pages later.  It's got a -- it starts
21 at the bottom of 65.  It's the ROS section?
22     A    ROS, okay.
23     Q    And again, I'm focusing the attention
24 on the reports in here that she -- that's
25 referring to you -- reports no depression, no

Page 95

1  sleep disturbances, feeling safe in a
2  relationship, no alcohol abuse, no anxiety, no
3  hallucinations and no suicidal thoughts.
4          MR. ZAJDEL:  Hold on.
5      BY MR. SHAFFER:
6      Q    And my question is the same as I asked
7  you on the other report.  This would be consistent
8  with how you reported to Dr. Major you were
9  feeling at that time?
10     A    Yes.
11     Q    Okay.  If we turn to the next report in
12 here which is the page that starts 668 or ends
13 with 668.  Sorry.
14         If you look under the vitals section,
15 it looks like this is a report of June 28th, 2018.
16     A    Uh-huh.
17     Q    Do you see that?
18     A    Yes.
19     Q    Okay.  And the chief complaint
20 referenced here is a follow-up.  Patient complains
21 of muscle spasm since pregnancy -- since after
22 pregnancy.  Also complains of right elbow pain and
23 lump on right side of neck.
24         Do you recall what led you to go see
25 Dr. Major in June of 2018?

Page 96

1      A    I do not.
2      Q    Do you know what the muscle spasm since
3  pregnancy is that's referenced under the
4  complaint?
5      A    It says since after pregnancy.
6      Q    Uh-huh.
7      A    I would think my back because this is
8  about when it started.  6/28.  June.  After my son
9  was a year.
10     Q    Well, this, I guess, would actually be
11 two years; right?  June of 20 --
12     A    This is two years, yeah.
13     Q    This would have been last summer, I
14 guess, before you --
15     A    This would have been --
16     Q    I'm sorry.  Go ahead.
17     A    So this would have been after.
18     Q    It seems like this would have been
19 before you were going to Costa Rica.
20     A    Yes, yes.  So I would have already been
21 getting -- having trouble with this for a year.
22     Q    And that's your --
23     A    And I wanted to get physical -- I
24 wanted to get therapy?
25     Q    Got it.  And that's your testimony;

Page 97

1  that you believe it started about a year after
2  your -- his pregnancy.  That's not reflected in
3  this report; right?
4      A    No.
5          MR. ZAJDEL:  Objection.  I think that
6  misstates facts.  I just think you misspoke.
7          THE WITNESS:  Can you restate?
8      BY MR. SHAFFER:
9      Q    I'll ask you the question again just to
10 make sure we're clear.
11     A    Thank you.
12     Q    You were -- you were saying that -- I
13 think you testified here earlier today that the
14 back pain that you were experiencing you think
15 started about a year after Luka was born; right?
16     A    Yes.
17     Q    Okay.  And this report doesn't
18 reference --
19     A    It does --
20     Q    -- Monique has had back pain for the
21 past year; it just says muscle spasm since after
22 pregnancy.  It's not specific as to time.
23     A    Correct.
24     Q    Okay.  It also makes reference to right
25 elbow pain.  Do you know what that was?

Monique Russell

Page 98

1    A    It was a pain in my right elbow. I
2  don't know why.
3    Q    Okay. Do you recall being treated for
4  it?
5    A    The pain in my elbow?
6    Q    Uh-huh.
7    A    Yes.
8    Q    Okay.
9    A    Dr. Major recommended that I get a
10  brace -- a compression brace.
11    Q    Uh-huh.
12    A    That helped.
13    Q    Okay. Looking again at the report
14  again here from June of 2018, under the ROS
15  section, this is on page 670.
16        It references that you were reporting
17  arthralgias and joint pain.
18    A    It was a shooting pain up my legs.
19    Q    Okay. And so that was accurate in
20  terms of what was reflected there; correct?
21    A    Yes.
22    Q    Okay. And then later down in the
23  report there, it states that she -- referring to
24  you -- reports no depression, no sleep
25  disturbances, feeling safe in a relationship, no

Page 99

1  alcohol abuse, no anxiety, no hallucinations, and
2  no suicidal thoughts; correct?
3    A    Yes.
4    Q    And that's what you would have reported
5  at that time to Dr. Major?
6    A    If he asked, then I would. But when I
7  go see a doctor, they don't ask you all of those
8  questions every time.
9    Q    Okay. If we turn to page 672 are the
10  last three, this is -- it looks like a visit to
11  see Dr. Major again in July of 2018.
12    A    Yes.
13    Q    Do you see that?
14        Okay. So that was an additional time
15  you went to see Dr. Major, after the June visit?
16    A    Yes. I'm looking to see why.
17    Q    Under the chief complaint box on 672,
18  it says, Patient was seen in office today for a
19  physical exam only.
20    A    That may have been a requirement for my
21  new job.
22    Q    Okay. You had to get a physical exam
23  before you went to --
24    A    Costa Rica.
25    Q    -- Costa Rica?

Page 100

1        Okay. And you would have gone to see
2  Dr. --
3    A    Major.
4    Q    -- Major for that?
5    A    Yes.
6    Q    And, again, looking at the report of
7  that visit, if we turn to the page 674, there's
8  the ROS section. Again it reports, No fever, no
9  night sweats, no significant weight gain, no
10  significant weight loss, no exercise intolerance,
11  a bunch of other negative responses.
12        And then it again states, She reports
13  no depression, no sleep disturbances, feeling safe
14  in a relationship, no alcohol abuse, no anxiety,
15  no hallucinations and no suithidal -- suicidal
16  thoughts.
17        Correct?
18    A    It also says that I report no GERD, no
19  vomiting blood, no hematuria, which are not things
20  that I would have been asked.
21    Q    Okay. So you don't believe you were
22  asked about these things?
23    A    I do not believe I was asked about
24  these each visit.
25    Q    Okay. You were asked about them at

Page 101

1  some visits?
2    A    I don't ever remember being asked if I
3  felt safe in a relationship by any doctor in my
4  entire life.
5    Q    Okay.
6    A    I've never been asked about many of
7  these things.
8    Q    Turn to the report that is 676. Do you
9  see that one?
10    A    Uh-huh.
11    Q    It looks like that's a visit on
12  July 20th, 2018, again to Dr. Major?
13    A    Yes.
14    Q    And this one says, Follow-up,
15  injection, lab review and injection, Tetanus shot.
16        Do you have a recollection of why you
17  went to see Dr. Major for this visit?
18    A    For my new job in Costa Rica.
19    Q    Okay. What -- what do you -- do you
20  recall either based on being refreshed by the
21  report or from your own memory why you went to see
22  Dr. Major on July 20th?
23    A    Because I needed a tetanus shot.
24    Q    Okay. Is that the only reason for the
25  visit?

JA409

Monique Russell

Page 102

1    A    I don't know, but I know I did need a
2  tetanus shot for my job, and that's on here.
3    Q    If you turn to page 677, which is the
4  second page of that report, if you look under some
5  of the boxes on this page, including family
6  history, social history, surgical history,
7  gynecological history, all of those expressly
8  state that history was not reviewed at this visit;
9  correct?
10   A    Where is this?  Reviewed, okay.
11   Q    Sorry.  If you look under problems, it
12  says, Problems not reviewed, last reviewed
13  May 2017.  Same thing with family history, social
14  history, surgical history, GYN history, obstetric
15  history.
16   A    Yes.
17   Q    Okay.  On page 8 -- 678 where you've
18  got HPI and ROS and physical exam, none of those
19  states not reviewed; correct?
20   A    HPI, ROS, yes.
21   Q    Yes.  None of those make that same
22  reference?
23   A    Correct.
24   Q    Okay.
25   A    What does ROS stand for?

Page 103

1    Q    I guess would be report on symptoms,
2  but I'm not a doctor either, so I tried to answer
3  it to the best of my ability.
4        And if you look under the ROS
5  section -- well, if you look under the HPI
6  section, you see a reference to back pain reported
7  by patient; correct?
8    A    Yes.
9    Q    And I think you've described that
10  before and said that's accurate.  At the time last
11  summer you were feeling back pain; correct?
12   A    Yes.
13   Q    And under the ROS section you also
14  reported back pain; correct?
15   A    Yes, except that it also says no muscle
16  aches which is not -- I could not have back pain
17  without muscle aches, so this doesn't really make
18  sense.
19   Q    Okay.  And, so, you think again that
20  none of the items that were in the ROS discussion
21  which again here in July of 2018 states that she
22  reports no depression, no sleep disturbances,
23  feeling safe in a relationship, no alcohol abuse,
24  no anxiety, no hallucinations and no suicidal
25  thoughts, you believe that you didn't discuss any

Page 104

1  of those things with Dr. Major?
2    A    Correct.
3    Q    Do you think you discussed back pain
4  with Dr. Major?
5    A    Yes.
6    Q    Do you think you discussed the
7  location, quality, severity, alleviating factors
8  and aggravating factors with Dr. Major?
9    A    Yes, I did.
10   Q    Okay.
11   A    I do believe I did.  I was not asked on
12  every visit that I went to Dr. Major whether or
13  not I was experiencing sinus problems or
14  depression or GERD, and so I doubt that I was
15  asked about all of these things unless I
16  specifically said these are my symptoms.
17   Q    Which one of these appointments with
18  Dr. Major did you talk about Dr. Akoda?
19   A    I don't know.  It would have been -- I
20  don't know.
21   Q    Okay.
22        MR. SHAFFER:  Let's take another short
23  five-minute break if that's okay.
24        THE VIDEOGRAPHER:  Off the record at
25  4:20.

Page 105

1        (Recess -- 4:20 p.m.)
2        (After recess -- 4:31 p.m.)
3        THE VIDEOGRAPHER:  We are back on the
4  record at 4:31.
5        BY MR. SHAFFER:
6    Q    Okay.  Ms. Russell, we're back on the
7  record.  Do you understand you're still under
8  oath?
9    A    Yes.
10   Q    Great.
11       (Russell Deposition Exhibit 5 was
12  marked for identification and attached to the
13  transcript.)
14       BY MR. SHAFFER:
15   Q    I'll hand you what's been marked as
16  Russell 5, which I understand to be a screenshot
17  from your posting in the mommy group that we
18  talked about this morning.
19   A    Yes.
20   Q    And I guess it's not just a mommy
21  group.  It's the MaMa Sisterhood of Prince
22  George's County?
23   A    Yes.
24   Q    Did you name it that?
25   A    I did not.  I did not start the group.

Monique Russell

Page 106

1    Q    Okay.  So this was an existing kind of
2  mom's Web site, and you posted this posting --
3    A    Yes.
4    Q    -- to that group?
5    A    Yes.
6    Q    Did you have to be invited to join that
7  group?
8    A    No, you have to request to join it
9  which I would have done probably during my
10 pregnancy.
11   Q    Uh-huh.  And -- and, so, you had been a
12 part of this group before you posted this?
13   A    Yes.
14   Q    Okay.  And it looks like you posted
15 this around June 27th, 2017; correct?
16   A    Yes.
17   Q    Okay.  And looking at Russell 5,
18 there's some text underneath your name and the --
19 the date and time.
20        Did you write that?
21   A    Yes.
22   Q    Okay.  And did anybody help you write
23 that or you wrote that yourself?
24   A    No, I wrote that myself.
25   Q    Okay.  And then you have a link, it

Page 107

1  looks like, at the bottom of the post to the
2  Department of Justice press release for
3  Dr. Akoda's guilty plea?
4    A    Yes.
5    Q    Okay.  What happens in the group once
6  you post something like this?
7    A    People can comment on it.
8    Q    Okay.  Did anyone comment on this?
9    A    Many people did.
10   Q    Okay.  And can you see -- do the
11 comments come back to you?
12   A    Anyone in the group can see the
13 comments.
14   Q    Okay.  And did you get -- you were able
15 to look at the comments because you're in the
16 group; correct?
17   A    Yes.
18   Q    Okay.  Do you have access to the
19 comments that are associated with this?
20   A    Yes.
21   Q    Okay.  Did you send those comments to
22 Cory or any other of your lawyers?
23   A    No.  They're difficult to -- to
24 screenshot like that because it would be a long
25 list.

Page 108

1    Q    Understood.
2        But it sounds like it's all in one
3  place and it's a running list of comments like you
4  would see on Facebook --
5    A    Yes.
6    Q    -- in response to any post; right?
7    A    Yes.
8    Q    And, so, it is possible for somebody to
9  take screenshots or send a link or something to be
10 able to get those comments; right?
11   A    It's possible to take screenshots, but
12 you wouldn't be able to access a link unless you
13 were a member of the group.
14   Q    Got it.
15        But you could do screenshots even if
16 you had to piece it together like we did with
17 your --
18   A    Yes.
19   Q    -- text with Ms. Riggins; right?
20   A    Yes.
21   Q    Okay.  Is that something that you could
22 do if we asked your lawyers for copies of the
23 comments that go along with this post?  You'd be
24 physically able to do it?
25   A    Yes.

Page 109

1        MR. SHAFFER:  Okay.  Counsel, we're
2  going to make a request for the complete posting
3  and comments that are associated with
4  Ms. Russell's posting here that is Russell 5 and
5  that she indicated are in response to her posting
6  about Dr. Akoda.  They're -- they're responsive to
7  numerous of our request for production of
8  documents, and so we would -- we would ask for
9  those as soon as possible and hopefully don't need
10 to ask follow-up questions of Ms. Russell about
11 those, but at a minimum, we need to see them.
12       MR. ZAJDEL:  We'll -- we'll look into
13 it.  I've never tried to produce something like
14 that, so we'll see what we can come up with.
15       MR. SHAFFER:  Great.
16       BY MR. SHAFFER:
17   Q    Is that something that people could
18 still post to today?  It's like a living post?
19 Somebody could add a post today or it closed up at
20 some point in time?
21   A    I don't know if it's still open.
22   Q    Okay.  But you were able to go to this
23 either yesterday or over the weekend to be able to
24 screenshot this post at least?
25   A    Yes.  You can still find it.  I don't

JA411

Page 110

1 know if you can still comment on it or not.
2    Q    Got it. Okay. All right. Well, we
3 made our request and so we'll move on to
4 other questions.
5        We talked a little bit earlier about
6 the lawsuit that you filed in Maryland. Is that
7 case still active today?
8    A    No, it's not.
9    Q    Okay. What's your understanding of the
10 current status of that case?
11    A    That it's been dismissed.
12    Q    Okay. And when did you -- when did you
13 find out that it was dismissed?
14    A    I'm not sure.
15    Q    Okay. Do you know whether -- well, you
16 were consulted before you filed the case; right?
17    A    Before I filed the case in the first
18 place?
19    Q    Uh-huh.
20    A    Yes.
21    Q    Okay. Were you consulted before you
22 dismissed the case?
23    A    Yes.
24    Q    Okay. What's your understanding of the
25 terms on which your case has been dismissed?

Page 111

1    A    That it's not active right now, but I
2 intend to pursue it later, and if I want to, then
3 I can.
4    Q    Okay. And what do you mean it's not
5 active but you can pursue it later?
6    A    Like if I want to go back and continue
7 to sue the hospital, that I can.
8    Q    Okay. And did you have any discussions
9 with anyone other than your lawyers about
10 dismissing that case?
11    A    No.
12    Q    Did you receive any money in connection
13 with dismissing that case?
14    A    No.
15    Q    Did you -- did you consult with members
16 of the putative class you were representing in the
17 case before you dismissed the case?
18    A    I acted on advice of my counsel.
19    Q    But did you speak with any of those
20 class members before you dismissed the case?
21    A    No. The only class member that I've
22 spoken to is Jasmine Riggins, and you have the
23 conversation that we had.
24    Q    Okay. And that was in 2017?
25    A    Yes.

Page 112

1    Q    Okay. It is your understanding that in
2 addition to being able to pursue the case in the
3 future if you want, that you will receive money in
4 the future in connection with dismissing the case?
5    A    No.
6    Q    Okay. Did you dismiss the case because
7 any of the facts that you provided in connection
8 with that litigation you believe now are false?
9    A    No.
10    Q    Okay. You believe that the answers,
11 for example, to interrogatories that you provided
12 under oath in that litigation are still true and
13 correct to the best of your understanding?
14    A    To the best of my knowledge.
15    Q    Okay. And answers that you gave to
16 requests for admissions that were asked of you,
17 written questions to admit or deny a particular
18 fact that you answered in that litigation are
19 still true and correct to the best of your
20 knowledge?
21    A    To the best of my knowledge.
22    Q    And do you know when the case
23 was dismissed?
24    A    I don't know exactly.
25    Q    Okay.

Page 113

1        (Russell Deposition Exhibit 6 was
2 marked for identification and attached to the
3 transcript.)
4        THE WITNESS: (Reviews document.)
5    BY MR. SHAFFER:
6    Q    Okay. Ms. Russell, I've given you
7 what's been marked as Exhibit 6, and it's a
8 stipulation of dismissal without prejudice. That
9 if you turn to the last page called a certificate
10 of service, it says that it was mailed on
11 September 3rd, 2019, so about two weeks ago.
12    A    Okay.
13    Q    Do you see that?
14    A    Yeah.
15    Q    Does that refresh your recollection as
16 to when you dismissed your case against Dimensions
17 Health Care in Maryland?
18    A    I guess so, but I'm in Costa Rica, so
19 when we discuss things and when things are -- are
20 exactly happening or dated, there's -- it's not
21 always clear or then they -- we talk and then this
22 happens the next day.
23    Q    Okay. So it would have been sometime
24 before September 3rd, but might have been earlier
25 than September 2nd?

Monique Russell

---

**Page 114**

1    A    Yes.

2    Q    Okay.  And have you seen this document

3 itself before I showed it to you now?

4    A    I believe I have it in my email.

5    Q    Okay.  And do you know who Christina

6 Dews is?

7    A    I do not.

8    Q    Do you know who Latisa Gaymon is?

9    A    I do not recognize any of the names of

10 the other plaintiffs other than Jasmine Riggins.

11    Q    And you've never spoken with any of

12 them?

13    A    Not to my knowledge.

14    Q    In the second paragraph of the first

15 page, it says that the parties further agree and

16 stipulate that the filing of case numbers

17 CAL-17-22761, and the other two numbers, the

18 earliest of which was filed on September 7, 2017,

19 had the effect of tolling any applicable statutes

20 of limitations, statutes of repose or other

21 time-based defenses on behalf of patients of

22 Oluwafemi Charles Igberase, a/k/a Charles Akoda

23 during the pendency of this litigation as to

24 claims arising out of defendants' credentialing,

25 supervising, retaining and employment of Akoda and

---

**Page 115**

1 those claims set forth in the class action

2 complaints.

3    Do you see that?

4    A    Yes.

5    Q    What does that mean?

6    MR. ZAJDEL:  Objection: calls for a

7 legal conclusion.

8    You can answer.

9    THE WITNESS:  I don't know the

10 legalese, but my understanding is that it's

11 dismissed, but that I or any of the other class

12 members can continue to pursue it at any time.

13    BY MR. SHAFFER:

14    Q    Do you know who Thomas Bojko is?

15    A    No.

16    Q    Did you ever see any documents in

17 connection with your lawsuit in Maryland against

18 Dimensions Health Corp. that related to

19 conclusions about whether Dimensions had been

20 negligent in its hiring, supervising,

21 credentialing, background checks of Dr. Akoda?

22    A    Did I ever see any documents --

23    Q    Speaking to that issue.

24    A    Not to my knowledge.

25    Q    You're aware that in the complaint that

---

**Page 116**

1 you filed you made numerous allegations that

2 Dimensions had been negligent in doing all those

3 things; right?

4    A    Well, if he used three different Social

5 Security numbers and if he were fingerprinted the

6 way that I am in -- as a D.C. public school

7 teacher, then I would assume that they would be

8 able to catch that.

9    Q    Right.  And, again, I think -- I

10 think -- I'm just trying to make sure I understand

11 it -- your -- your belief was they didn't do that

12 and the steps that Dimensions did take were not

13 appropriate and, in fact, were below the standard

14 that they should have done; correct?

15    A    I believe that of Dimensions and of the

16 commission that certifies foreign medical

17 graduates.

18    Q    And you didn't say the foreign medical

19 graduates piece in your Maryland litigation;

20 right?

21    A    I don't know.

22    (Russell Deposition Exhibit 7 was

23 marked for identification and attached to the

24 transcript.)

25    BY MR. SHAFFER:

---

**Page 117**

1    Q    Ms. Russell, I've handed you what's

2 been marked as Exhibit 7, and these are Plaintiff

3 Monique Russell's Responses to Defendants'

4 Requests for Admissions in the Dimensions Health

5 Corporation lawsuit that you filed in Prince

6 George's County, Maryland.

7    Do you see that?

8    A    Yes.

9    Q    Have you seen this document before?

10    A    Yes.

11    Q    And as we were talking before, this is

12 one of the sets of discovery or information

13 requests that were asked of you by Dimensions'

14 lawyers in that case in Maryland; correct?

15    A    Yes.

16    Q    And you -- you, under the rules, were

17 to provide written admits or denies in response to

18 these requests and worked with your lawyers to do

19 that; correct?

20    A    Yes.

21    Q    And did you, in looking at these, have

22 a chance to review these before they were sent to

23 the lawyers for Dimensions?

24    A    Yes.

25    Q    And when you sent them, were they true

---

Monique Russell

Page 118

1 and correct to the best of your knowledge?

2     A    To the best of my knowledge.

3     Q    Okay.  And as you sit here today,

4 when's the last time you looked at these?

5     A    I looked over all of the documents,

6 about a hundred pages of documents yesterday.

7     Q    Okay.

8     A    And looked through a little bit more

9 earlier today.

10     Q    Okay.  Do you know whether this

11 particular set of responses was part of that?

12     A    I believe so, but I'm not sure.

13     Q    Okay.  I want to ask you about a couple

14 of them in particular just to make sure that we're

15 refreshed and that you're not changing your answer

16 on any of these.

17         If we look at request number 6, which

18 is on the page 790, it asks that you admit at this

19 time you are still unaware that the individual

20 known to defendants as Akoda had been certified by

21 ECFMG to practice medicine, had applied for, was

22 accepted and successfully completed an accredited

23 residency program through Howard University

24 Hospital, was licensed to practice medicine in you

25 the state of Maryland, was licensed to practice

Page 119

1 medicine in the Commonwealth of Virginia and was

2 board certified by the American College of

3 Obstetricians and Gynecologists.

4         In response you said, Denied that Akoda

5 had been certified by ECFMG to practice medicine.

6         Do you see that?

7     A    Uh-huh.

8     Q    Why did you deny that Akoda had been

9 certified by ECFMG to practice medicine?

10     A    I don't know, and I don't quite

11 understand -- you're unaware that this person is

12 certified.  I don't really understand what request

13 number 6 is saying.

14     Q    Do you see that you denied that Akoda

15 had been certified by ECFMG to practice medicine?

16     A    Yes.

17     Q    Do you -- so is it your position that

18 Dr. Akoda had not been certified by ECFMG to

19 practice medicine?

20     A    No, I believe that he was -- he faked

21 his way through certification.

22     Q    Okay.  And that's the reason that you

23 denied the request?

24     A    Yes.

25     Q    Okay.  And when you say he faked his

Page 120

1 way through, he faked his way through ECFMG?

2     A    Right.  ECFMG accepted fake documents.

3     Q    Or that he submitted fake documents to

4 ECFMG?

5     A    Which they accepted.

6     Q    Request number 9 says, You did not and

7 have not specifically verified the facts about the

8 qualifications to practice medicine of the

9 individual known to defendants at Dr. Akoda, which

10 were provided to you as the basis of the events

11 giving rise to your claim.

12         And you admitted that; correct?

13     A    Right.  I did not call his school to

14 verify.

15     Q    Any of the qualifications of his to

16 practice medicine; correct?

17     A    Any of the qualifications?  Such as?

18     Q    Such as whether he had applied for,

19 been accepted to and completed an accredited

20 residency program at Howard University Hospital.

21         You didn't verify any facts about that?

22     A    I did look up credentials.

23     Q    How about specifically with respect to

24 his application, acceptance and completion of an

25 accredited residency program through Howard

Page 121

1 University Hospital?

2     A    I did not.

3     Q    How about --

4     A    I saw that he was board certified.

5     Q    How about through his licensure to

6 practice medicine in the state of Maryland?

7     A    I did look to see that he was on the

8 Web site for licensed doctors.

9     Q    How about whether he was licensed to

10 practice medicine in the Commonwealth of Virginia?

11     A    No.

12     Q    And how about if he was board certified

13 by the American College of Obstetricians and

14 Gynecologists?

15     A    I saw it, but I did not go to the

16 board.

17     Q    Okay.  Request number 12, turning back

18 to page 791, says, You claim that you suffer from

19 post-traumatic stress disorder as result of

20 allegations against defendants.

21         And you denied that; correct?

22     A    Yes.

23     Q    You're not claiming post-traumatic

24 stress disorder?

25     A    No.

Monique Russell

Page 122

1  Q    Request number 18 at the bottom of 792
2  says, You do not suffer depression as a result of
3  the events giving rise to your claim.
4       And you admit that; correct?
5  A    Correct.
6  Q    You're not claiming that you suffer
7  from depression as a result of the events
8  involving Dr. Akoda?
9  A    No.
10 Q    And request number 24 -- I'm jumping
11 ahead a little bit to try to move this along, 794,
12 question number 24, says, You have never been
13 formally diagnosed with depression.
14      And you admit that; correct?
15 A    Correct. I did see a doctor after --
16 my family doctor after my sister died who
17 prescribed antidepressants --
18 Q    Uh-huh.
19 A    -- but I was not formally diagnosed.
20 Q    And since June of 2017, no diagnosis or
21 treatment for depression of any kind?
22 A    No.
23 Q    On page 795, request 31 says, You claim
24 that you suffer from anxiety as a result of your
25 allegations against the defendants.

Page 123

1  A    Yes.
2  Q    And you admit that, so you do say you
3  have anxiety from these issues; correct?
4  A    Yes.
5  Q    Okay. And 32 says, You claim that
6  you're alleged anxiety has affected your
7  relationship with your family.
8       And you deny that --
9  A    Yes.
10 Q    -- correct?
11      So you have anxiety, but it's not
12 affected your relationship with your family?
13 A    Correct.
14 Q    Okay. And 37 on the next page says,
15 You have never been formally diagnosed with
16 anxiety.
17      That's correct?
18 A    Correct.
19 Q    And 39 says, You claim that you suffer
20 from physical pain as a result of your allegations
21 against the defendants.
22      And that is denied?
23 A    That is correct.
24 Q    Okay.
25 A    That's what I wrote.

Page 124

1  Q    Is that true today?
2  A    Since you brought up the timeline of
3  when my back pain started, I'm not sure that it's
4  true.
5  Q    Okay. And this is your reference to
6  your testimony that about a year after your son
7  was born, you started having back pain?
8  A    Yes.
9  Q    And request number 40 says, You have
10 never been diagnosed with a physical injury
11 resulting from your allegations against the
12 defendants.
13      And that's admitted; correct?
14 A    Correct.
15 Q    Is that true today?
16 A    Again, I don't know if my back pain is
17 related to that because of the timeline.
18 Q    Okay. And no doctor has told you that
19 it is related to that --
20 A    No.
21 Q    -- correct?
22 A    But I've not talked to any doctor I've
23 seen for my back pain about Akoda.
24 Q    Other than Dr. Major?
25 A    Yes, but Dr. Major didn't treat my back

Page 125

1  pain. He just referred me out to be treated.
2  Q    Okay. And he did not, in the reports
3  that we saw from the summer of 2018, associate
4  your back pain with any of the allegations
5  regarding Dr. Akoda; correct?
6  A    The reports that we show don't say
7  anything about what he attributes the pain to at
8  all.
9  Q    And they don't make any reference to
10 Dr. Akoda?
11 A    No. Which would not make sense to put
12 into a medical report.
13 Q    Even if the patient had reported that
14 was the basis for -- for coming to see the doctor?
15 A    I didn't go to see the doctor because
16 of Akoda. I went to see the doctor because of the
17 back pain. Whether or not the stress from
18 discovering that my doc -- my baby was delivered
19 by a fake doctor contributed to my back pain, I
20 didn't know at the time. I still don't know. And
21 Dr. Major wouldn't have had any reason to write
22 that in the report.
23 Q    And who did he refer you out to?
24 A    To ATI Physical Therapy.
25 Q    Okay. And has ATI Physical Therapy

Page 126

1  attributed your back pain to issues with
2  Dr. Akoda?
3      A    They don't know anything about issues
4  with Dr. Akoda.
5      Q    And so the answer is, no, they have
6  not; correct?
7      A    That is correct.
8      Q    Looking at paragraph 45 on page 797,
9  that says that you claim that you suffer
10 difficulty sleeping as a result of your
11 allegations against the defendants.
12          And that's denied; correct?
13     A    Yes.
14     Q    So you are not claiming that you suffer
15 difficulty sleeping as a result of the
16 allegations?
17     A    No, I'm not.
18     Q    Okay.  In request number 47, you were
19 asked whether you suffer from permanent disability
20 as a result of the care you received from
21 Dr. Akoda, and you said that emotional --
22 plaintiff's emotional injuries are permanent;
23 correct?
24     A    Correct.
25     Q    You admit that the last time you saw

Page 127

1  Dr. Akoda was on or about May 28th, 2016; correct?
2      A    Correct.
3      Q    Is that accurate?
4      A    That would have been when I was
5  discharged from the hospital.
6      Q    Paragraph 49 -- request 49, sorry, it
7  says, you claim your alleged permanent disability
8  has affected your relationship with your family.
9          And you denied that; correct?
10     A    Correct.
11     Q    So your emotional injuries you denied
12 have an affect on your relationship with your
13 family?
14     A    Correct.
15     Q    Is that true today?
16     A    They had relationship on our sex life
17 but not our relationship.
18     Q    And request number 50 is that you have
19 never been diagnosed with a permanent disability;
20 correct?
21     A    Correct.
22     Q    And that is accurate today?
23     A    Yes.
24     Q    Okay.
25     A    My ears just popped.  Finally.

Page 128

1      Q    Request number 53 at the bottom of 798
2  says, You have not done any independent research
3  to determine the status of ECFMG certification,
4  residency program completion, licensure or board
5  certification for the individual known to
6  defendants as Akoda.
7          And you admitted that; correct?
8      A    Yes.
9      Q    Is that true today?
10     A    Correct.  I've been notified, but I
11 haven't done any research to find these things.
12     Q    What do you mean you've been notified?
13     A    Like I was notified that -- after he
14 was kicked out of the residency program in New
15 Jersey, that they reported it to ECFMG, but that's
16 all.
17     Q    And how were you notified of that?
18     A    In the legal documents.
19     Q    This is the transcript of the federal
20 court trial or something else?
21     A    No.  I'm not sure.
22     Q    Okay.  Do you believe the competency to
23 practice medicine includes honesty and
24 truthfulness?
25     A    Yes, I do.

Page 129

1      Q    And as to what -- and do you believe
2  that a physician who lies about anything is not
3  competent to treat patients?
4      A    No, but I believe that a physician who
5  lies about his credentials is not competent to
6  practice medicine.
7      Q    Okay.  Have you ever reported any
8  concerns about Dr. Akoda's competency to practice
9  medicine to any law enforcement or hospital
10 personnel at any time?
11     A    No.  At the time that I discovered,
12 Dr. Akoda was in -- awaiting sentencing for fraud.
13     Q    Okay.  Do you know what he's doing
14 today?
15     A    I do not.
16     Q    Jumping ahead to page 807 and request
17 number 99, it says, You do not claim that you were
18 abused sexually by Dr. Akoda; correct?
19     A    That is correct.
20     Q    And you admitted -- your answer is an
21 admittance so you're not claiming that; correct?
22     A    I'm not claiming that.
23     Q    And request number 101 says, During
24 your visits with Dr. Akoda you never felt as if
25 you were being abused sexually.

Monique Russell

Page 130

1     And you admit that; correct?
2   A   I do.
3   Q   So you did not feel that during your
4 visits with Dr. Akoda that you were being abused
5 sexually?
6   A   At the time I did not feel that way.
7   Q   Do you believe -- do you feel that way
8 now?
9   A   I feel violated for a fake doctor to be
10 in my vagina, yes.  I feel like I'm a victim of
11 sexual assault now.
12   Q   Have you reported that to the
13 authorities?
14   A   No, that's why I'm doing a class action
15 lawsuit so that every woman who he has ever seen
16 can be notified.
17   Q   Do you know whether any of them have
18 been notified?
19   A   I'm sure some have because there have
20 been ads, I understand.  I posted where I could
21 notify women.  So I know that some have.  I don't
22 know how many women there are over the close to
23 ten years that he's been doing this who would
24 still need to be notified.
25     MR. SHAFFER:  Let's go off the record

Page 131

1 for a second.
2     THE VIDEOGRAPHER:  Off the record at
3 5:03.
4     (Recess -- 5:03 p.m.)
5     (After recess -- 5:06 p.m.)
6     THE VIDEOGRAPHER:  Back on the record
7 at 5:06.
8   BY MR. SHAFFER:
9   Q   Ms. Russell, we're back on the record.
10 You understand you're still under oath?
11   A   Yes.
12   Q   Okay.  Apart from the answers you've
13 given me today, and I appreciate your willingness
14 to talk about some of those things, are there any
15 other emotional experiences or conditions or
16 impacts from Dr. Akoda that we haven't talked
17 about already that you believe you're experiencing
18 from having found out about his guilty plea in
19 2017?
20   A   I believe we've covered everything.
21   Q   In some of the all- -- in some of the
22 pleadings that you filed whether in Maryland or
23 Pennsylvania related to the Dr. Akoda situation,
24 you've made references to the circumstances of
25 other women who were treated by Dr. Akoda.

Page 132

1     Are you aware of that?
2   A   Yes.
3   Q   And is it fair to say that having
4 reviewed those documents that your experience with
5 Dr. Akoda is your personal experience; it's
6 certainly not the same as anyone else's; right?
7   A   I would believe that many of the women
8 have different experiences.
9   Q   And -- and you haven't talked to any of
10 them other than what we've talked about with
11 Ms. Riggins to know exactly how different or
12 varied they may be; correct?
13   A   Right.  And I have not talked to
14 Ms. Riggins about the details of her experience.
15   Q   Apart from the comment section of that
16 Facebook mommy group post, have you posted any
17 other information about Dr. Akoda anywhere on the
18 Internet, Twitter or Instagram or other apps?
19   A   Not on any other social media or sites,
20 and I don't think on any other groups because I
21 think that is the only group that would be
22 relevant.
23   Q   And when are you returning to Costa
24 Rica?
25   A   On Wednesday.

Page 133

1   Q   And have you decided what your plans
2 are at the end of your contract year this year?
3   A   We have not.  My husband and I are
4 still discussing.
5     MR. SHAFFER:  I thank you for your time
6 this afternoon.  I appreciate you coming.  I don't
7 have any questions.  We obviously reserve the
8 right to have to ask additional questions related
9 to the documents we don't have, but I appreciate
10 the time in answering our questions.
11     MR. ZAJDEL:  I'm going to -- I'm going
12 to ask, if you don't mind.
13     MR. SHAFFER:  Yeah.
14   EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
15   BY MR. ZAJDEL:
16   Q   Do you -- is it your belief that Akoda
17 should have touched any of the women who you are
18 trying to represent in this case?
19   A   Absolutely not.  If I had known what I
20 know about him now, I would have never allowed him
21 to touch me.
22     MR. ZAJDEL:  That's all I have.
23     MR. SHAFFER:  Nothing further at this
24 time.
25     MR. ZAJDEL:  Okay.

Monique Russell

Page 134

```
1          THE VIDEOGRAPHER:  All right.  That is
2   everything.  We are off the record at -- on
3   September 16th, 2019, at 5:10 p.m.
4
5
6
7          (Signature having not been waived, the
8   Videotaped Deposition of MONIQUE RUSSELL ended at
9   5:10 p m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 135

```
1   CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2          I, Dana C. Ryan, Registered Professional
3   Reporter, Certified Realtime Reporter, the officer
4   before whom the foregoing proceedings were taken
5   do hereby certify that the foregoing transcript is
6   a true and correct record to the best of my
7   ability of the proceedings; that said proceedings
8   were taken by me stenographically and thereafter
9   reduced to typewriting under my supervision; and
10  that I am neither counsel for, related to, nor
11  employed by any of the parties to this case and
12  have no interest, financial or otherwise, in its
13  outcome.
14         IN WITNESS WHEREOF, I have hereunto set
15  my hand and affixed my notarial seal this 26th day
16  of September 2019.
17  My Commission expires:
18  July 15, 2020
19
20
21
22  _____
23  NOTARY PUBLIC IN AND FOR THE
24  DISTRICT OF COLUMBIA
25
```

Page 136

```
1          ACKNOWLEDGMENT OF DEPONENT
2          I, Monique Russell, do hereby
3   acknowledge that I have read and examined the
4   foregoing testimony, and the same is a true,
5   correct and complete transcription of the
6   testimony given by me and any corrections appear
7   on the attached Errata sheet signed by me.
8
9
10
11  _____     _____
12  (DATE)                  (SIGNATURE)
13
14
15         CERTIFICATE OF NOTARY PUBLIC
16  Sworn and subscribed to before me this
17  _____ day of _____, _____
18
19
20  _____     _____
21  NOTARY PUBLIC           MY COMMISSION EXPIRES
22
23
24
25
```

JA418

EXHIBIT 35

Jasmine Riggins

```
 1              IN THE UNITED STATES DISTRICT COURT
 2           FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3
 4    -------------------------------
 5    MONIQUE RUSSELL, JASMINE
      RIGGINS, ELSA M. POWELL, and
 6    DESIRE EVANS,
                    Plaintiffs,        Case No. 18-5629
 7         v.
      EDUCATIONAL COMMISSION FOR
 8    FOREIGN MEDICAL GRADUATES,
                    Defendants.
 9    -------------------------------
10                    Washington, D.C.
11               Friday, September 12, 2019
12           Deposition of JASMINE RIGGINS, a witness
13    herein, called for examination by counsel for the
14    Defendant in the above-entitled matter, pursuant
15    to notice, the witness being duly sworn by Barbara
16    DeVico, a Notary Public in and for the District of
17    Columbia, taken at the offices of MORGAN, LEWIS &
18    BOCKIUS, LLP, 1111 Pennsylvania Avenue,
19    Washington, D.C., at 11:33 a.m.,
20    Thursday,September 12, 2019, and the proceedings
21    being taken down by Stenotype by BARBARA De VICO,
22    CRR, RMR, and transcribed under her direction.
23
24
25
```

Jasmine Riggins

Page 2

1  APPEARANCES:
2    On Behalf of the Plaintiffs
3      CORY L. ZAJDEL, ESQUIRE
4      Z LAW, LLC
5      2345 York Road, #B-13
6      Timonium, MD   21093
7
8    On behalf of the Defendant:
9      BRIAN W. SHAFFER, ESQUIRE
10     MORGAN, LEWIS & BOCKIUS, LLP
11     1701 Market Street
12     Philadelphia, PA   19103-2921
13     brian.shaffer@morganlewis.com
14
15
16
17 Also Present:  Nam Ngo, Videographer
18
19
20
21
22
23
24
25

Page 4

1  P R O C E E D I N G S
2      THE VIDEOGRAPHER:  This is the
3  start of the videotaped deposition of
4  Jasmine Riggins in the matter of Monique
5  Russell et al. versus Educational
6  Commission for Foreign Medical Graduates
7  in the United States District Court for
8  the Eastern District of Pennsylvania.
9      This deposition is being held at
10 Morgan Lewis, 1111 Pennsylvania Avenue, NW
11 about, Washington, D.C. on September 12,
12 2019, at approximately 11:34 a.m.
13     My name is Nam Ngo from Golkow
14 Litigation Services, and I'm the legal
15 video specialist.  The court reporter is
16 Barbara DeVico.  Would counsel please
17 introduce yourself.
18     (Attorneys stated their
19     appearances for the record.)
20     THE VIDEOGRAPHER:  Would the court
21 reporter please swear in the witness.
22 ************************
23
24
25

Page 3

1        TABLE OF CONTENTS
2            WITNESSES
3  WITNESS                    PAGE
4  BY MR. SHAFFER               5
5
6
7
      _____EXHIBITS_____
8
   EXHIBIT    DESCRIPTION        PAGE
9
   Exhibit 1  Medical records        36
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1      JASMINE RIGGINS,
2  having been called as a witness on behalf of the
3  Plaintiffs and having been first duly sworn, was
4  examined and testified as follows:
5  EXAMINATION BY
6  MR. SHAFFER:
7      Q.   Ms. Riggins, good morning.
8      A.   Good morning.
9      Q.   We met very briefly this morning.
10 My name is Brian Shaffer.  I'm an attorney that
11 represents the defendant in a lawsuit that you and
12 several other plaintiffs have brought.  My client
13 is the Educational Commission for Foreign Medical
14 Graduates, ECFMG.  Do you understand that if I call
15 it ECFMG what we're referring to?
16     A.   Yes.
17     Q.   Great.  We're here to take your
18 deposition in connection with the lawsuit that you
19 filed in Pennsylvania against ECFMG, correct?
20     A.   Correct.
21     Q.   And have you had your deposition
22 taken before?
23     A.   Yes.
24     Q.   How many times?
25     A.   Once.

Jasmine Riggins

Page 6

1     Q.    And was that earlier this year?
2     A.    Yes.
3     Q.    Okay.  Was that in connection with
4  another lawsuit that you filed?
5     A.    Yes.
6     Q.    And was that a lawsuit that was
7  filed in Maryland against Dimensions Healthcare?
8     A.    Yes.
9     Q.    And that's the only deposition
10 you've ever given besides this one?
11    A.    Correct.
12    Q.    Okay.  A few ground rules just to
13 remind you about how a deposition works.
14        The oath that you gave this morning is the
15 same one that you would give in a courtroom before
16 a judge and a jury.
17        Do you understand that?
18    A.    Yes.
19    Q.    And we're here to ask you some
20 questions and get your best answer and
21 understanding as to those questions.
22        Do you understand that?
23    A.    Yes.
24    Q.    If I ask a question and you don't
25 understand what I'm asking, will you tell me that?

Page 7

1     A.    Yes.
2     Q.    And I'll be happy to try to correct
3  it.  That's what I want you to tell me.
4     A.    Okay.
5     Q.    If you don't hear me, the court
6  reporter can read the question back or I'll repeat
7  the question for you.  Is that fair?
8     A.    Sure.
9     Q.    We're taking your testimony down
10 both by the court reporter here that will come in a
11 little booklet on a page as well as on a videotape.
12        Do you understand that?
13    A.    Yes.
14    Q.    It's important that you speak as
15 loudly and as clear as you can.  We all have little
16 microphones, but it will still be easier for
17 everyone if you try to speak up.  If somebody
18 doesn't hear you, I may ask you to repeat yourself
19 just so everyone can hear you.  Is that okay?
20    A.    Yes.
21    Q.    Same thing, even though on the
22 videotape we might see a nod of the head or a shake
23 of the head, the court reporter can't take that
24 down as clearly, so I may ask you for an audible
25 response.  Again I'm not trying to be difficult.

Page 8

1  I'm just trying to make sure there's no confusion
2  as to what you meant when you shake your head.
3        Is that fair?
4     A.    Yes.
5     Q.    We'll take a break at any point that
6  you need to today as long as there's not a question
7  that's pending.  This isn't an endurance contest.
8  If you need to take a break for any reason, we'll
9  do that, okay?
10    A.    Okay.
11    Q.    There are some topics that we may
12 talk about today about your personal health that
13 may be sensitive or uncomfortable, and I apologize
14 for that.  I'm not trying to be intrusive.  But
15 there are certain questions that I may need to ask,
16 and I'm going to try to do that as best I can.  If
17 you feel uncomfortable about that, will you let me
18 know?
19    A.    Yes.
20    Q.    Thank you.
21        Do you have any questions before we begin
22 the deposition?
23    A.    No.
24    Q.    What did you do to prepare, if
25 anything, for coming in here today?

Page 9

1     A.    Just practiced, talked to my
2  attorneys.
3     Q.    Okay.  So you met with your
4  attorney, Mr. Zajdel, who is here with us this
5  morning?
6     A.    Yes.
7     Q.    How many times did you meet with him
8  to prepare for the deposition?
9     A.    Just once.
10    Q.    When was that?
11    A.    No.  Tuesday.  I spoke with Cory,
12 I'm sorry.  Not Cory, David, my apologies.
13    Q.    Okay.
14    A.    I spoke with David on Tuesday.
15    Q.    Okay.  And David is another one of
16 your lawyers?
17    A.    Yes.
18    Q.    So you spoke with David by the
19 telephone on Tuesday?
20    A.    Yes.
21    Q.    Okay.  For how long did you talk to
22 David?
23    A.    Not long.  A few minutes.
24    Q.    Less than 30 minutes?
25    A.    Yes.

Jasmine Riggins

Page 10

1      Q.     Did you look at any documents while
2  you were talking to David?  Did David show you any
3  documents?
4          MR. ZAJDEL:  Objection.  Don't
5      answer that.
6      Q.    I'll rephrase.
7      Did you look at any documents in connection
8  with preparing for the deposition?
9      A.    Yes.
10     Q.    What documents did you look at?
11     A.    My deposition documents.
12     Q.    So your deposition transcript from
13  the Maryland Dimensions case?
14     A.    Yes.
15     Q.    The transcript, the little booklet
16  that had questions and answers, is that what you're
17  referring to?
18     A.    Yes.
19     Q.    When did you review that?
20     A.    A few days ago.
21     Q.    What other documents did you review
22  before coming in to testify today?
23     A.    Just that.
24     Q.    Okay.  Did you do any online
25  Internet research or review before coming in to

Page 11

1  testify today?
2      A.    Not today.
3      Q.    Have you done any Internet research
4  in connection with this lawsuit ever?
5      A.    Yes.
6      Q.    When was that?
7      A.    About a few weeks ago.  It's been
8  ongoing, different times.
9      Q.    What did you look at a few weeks ago
10  online in connection with this lawsuit?
11     A.    Just the Akoda case, just about the
12  case and what was going on with him.  Just
13  basically researching him pretty much.
14     Q.    Okay.  So you were, for lack of a
15  better word, Googling Dr. Akoda's name and looking
16  online for information about him?
17     A.    Something like that, yes.
18     Q.    You tell me what you did.  I wasn't
19  there.
20     A.    Well, basically I was just looking
21  at, just looking at the things that were posted
22  years ago.
23     Q.    Okay.
24     A.    About, you know, the fraud, him
25  being a fraud and everything like that.

Page 12

1      Q.     And what kind of things were they?
2  Were they newspaper articles?
3      A.    No.
4      Q.    Were they court filings?
5      A.    I don't recall.
6      Q.    Were they -- what do you recall
7  about what they were?
8      A.    Just about him being fraudulent.  I
9  don't really recall word for word.
10     Q.    And you said you looked at those few
11  weeks ago?
12     A.    Uh-huh.
13     Q.    Was that before or after you knew
14  you were going to give a deposition in this case?
15     A.    It was before.
16     Q.    And other than talking with your
17  counsel on Tuesday of this week, did you have any
18  additional conversations with anyone before coming
19  in to testify here today?
20     A.    I've spoken to Monique Russell, but
21  I haven't spoken to her in the past month or so.
22     Q.    When was the last time you spoke
23  with Ms. Russell?
24     A.    I don't recall.  It's been a little
25  while.

Page 13

1      Q.     Would it be more than a month or
2  less than a month?
3      A.    A little more than a month.
4      Q.    Did you ever text with Ms. Russell?
5      A.    No.
6      Q.    Did you ever email with Ms. Russell?
7      A.    I have.
8      Q.    And when was the last time you
9  emailed Ms. Russell?
10     A.    The last time I spoke with her.
11     Q.    So the last communication you had
12  with her, more than a month ago, was by email?
13     A.    Yes.
14     Q.    And what was the -- did your
15  communications have anything to do with Dr. Akoda?
16     A.    Yes.
17     Q.    What was the nature of your
18  communications with Ms. Russell about Dr. Akoda?
19     A.    Just about how I felt and how she
20  felt.
21     Q.    Okay.  Was this a communication that
22  she initiated or that you initiated?
23     A.    I initiated it.
24     Q.    And this is something that you have
25  in your emails?

Jasmine Riggins

Page 14

1    A.   I should.
2    Q.   Did you communicate with her through
3 like a Facebook direct message, or this was direct
4 message?
5    A.   Just like a Facebook message.
6    Q.   And this was a Facebook message in
7 the last month or so, a little more than a month
8 ago?
9    A.   Yes.
10   Q.   Okay.  And have you spoken with
11 Ms. Russell or communicated with Ms. Russell at any
12 time in the last month?
13   A.   No.
14   Q.   Have you spoken with Ms. Russell
15 about your lawsuit against ECFMG?
16   A.   I don't recall.
17   Q.   Did you speak with Ms. Russell about
18 your lawsuit against Dimensions Healthcare in
19 Maryland?
20   A.   Yes.
21   Q.   And what did you and Ms. Russell
22 discuss about the lawsuit against Dimensions
23 Healthcare in Maryland?
24   A.   We just talked about the lawsuit.
25 We didn't really -- I don't recall the full details

Page 15

1 of our conversation.  She was asking me about how I
2 felt about it.  Just basically about our feelings.
3    Q.   And this was by email again, or was
4 this a phone call?
5    A.   I believe this was a phone call.  I
6 don't recall.  It could have been an email or phone
7 call.
8    Q.   As you sit here today, have you had
9 discussions with Ms. Russell at any point in time
10 about your lawsuit against ECFMG?
11   A.   I don't recall.
12   Q.   Do you still have a Facebook account
13 where you and Ms. Russell are connected as friends
14 through Facebook?
15   A.   Yes, but I don't have the password.
16 I can't recover the password.
17   Q.   Okay.  How did you communicate with
18 her by Facebook if you couldn't recover the
19 password?
20   A.   It's a messenger app that I had on
21 my old phone, but I have a new phone.
22   Q.   So some time between the last time
23 you communicated with Ms. Russell and today, you no
24 longer have access to the Facebook directory?
25   A.   I can get it, but I don't have

Page 16

1 access at this moment, no.
2    Q.   But that's something you can get?
3    A.   Yes.  It's a process you have to go
4 through.
5    Q.   At any point in time were you asked
6 to provide lawyers for ECFMG with any documents you
7 have related to Dr. Akoda or the lawsuit or your
8 feelings about Dr. Akoda, anything like that?
9         MR. ZAJDEL:  Objection.  Form.
10        You can answer.
11   A.   So what is your question?
12   Q.   At any point in time after having
13 filed a lawsuit against ECFMG, did you ever become
14 aware of a request by lawyers for ECFMG for any
15 documents that you might have related to Dr. Akoda?
16        MR. ZAJDEL:  Objection.  That's
17        attorney-client privilege.
18        MR. SHAFFER:  I'm not asking for
19        the substance of the communication.  I'm
20        asking if she was aware.
21        MR. ZAJDEL:  I would suggest that
22        you ask it differently.
23 BY MR. SHAFFER:
24   Q.   Did you ever collect Facebook direct
25 messages, email communications, text messages that

Page 17

1 you might have in your possession related to
2 Dr. Akoda and give them to anybody?
3    A.   No.  Did I ever collect it and give
4 it to anyone?
5    Q.   Yes.
6    A.   No.
7    Q.   Did you ever forward it to anybody
8 or pull it all together and provide it to anybody?
9    A.   No.
10   Q.   And I take it you were not asked to
11 do that?
12   A.   No.
13   Q.   And I think as you testified, at
14 least email communications or direct messaging
15 application messages you could still access, you
16 just can't do it while we're sitting here with your
17 new phone; correct?
18   A.   Correct.
19   Q.   Okay.
20        MR. SHAFFER:  Counsel, I'm going
21        to make a request for the documents that
22        are in the possession of Ms. Riggins that
23        are responsive to our requests for
24        production of documents which would
25        include these types of communications and

Page 18

1    which have not been produced.
2        MR. ZAJDEL:  I would suggest that
3    you do that in writing so that we can
4    respond in writing.
5    BY MR. SHAFFER:
6        Q.    Ms. Riggins, in preparing for the
7    deposition today, you said you reviewed your
8    deposition transcript from your deposition earlier
9    this year in the Dimensions Healthcare case;
10   correct?
11       A.    Right.
12       Q.    In reviewing that deposition
13   transcript, did you identify any answers that you
14   gave that you now believe are wrong?
15       A.    I'm not sure.  Can you ask me that
16   again.
17       Q.    In reviewing the transcript, you
18   were under oath like you are today; right?
19       A.    Uh-huh.
20       Q.    You've now had a chance to review
21   that transcript before coming in to testify today.
22   And my question is whether when you read through
23   the transcript this week you said Oh, boy, I made a
24   mistake.  What I testified to wasn't correct in my
25   deposition in the Dimension case.

Page 19

1        A.    No.
2        Q.    And part of this is to try to save
3    time today.  So I guess my question having read the
4    deposition just a few days ago, as you sit here
5    today do you still believe that everything you
6    testified earlier this year in the Dimensions
7    Healthcare deposition is true and accurate to the
8    best of your ability?
9        A.    Yes.
10       Q.    I'm going to jump around a little
11   bit then and try to hit on some questions just to
12   make sure I'm correct.  But if I jump around too
13   quickly and you don't follow where I'm going, just
14   let me know because I'm trying to, again, save some
15   time because we won't need to ask every question
16   that was asked in the Dimensions deposition again
17   today, okay?
18       A.    Okay.
19       Q.    Are you currently on any medication?
20       A.    No.
21       Q.    Is there any reason that you can
22   think of sitting here today that you couldn't
23   testify truthfully and to the best of your ability?
24       A.    No.
25       Q.    You mentioned your full name before

Page 20

1    as Jasmine Riggins, correct?
2        A.    Yes.
3        Q.    Is your birthday July 4, 1992?
4        A.    Yes.
5        Q.    And how old would that make you?
6        A.    27.
7        Q.    Are you currently married?
8        A.    No.
9        Q.    Do you have any children?
10       A.    Yes.
11       Q.    How many children?
12       A.    Three.
13       Q.    And can you give me their names and
14   their current ages?
15       A.    Santana is 10, Messiah is 10, Taniya
16   will be two next month.
17       Q.    Are Santana and Messiah both boys?
18       A.    Yes.
19       Q.    And Taniya is a girl?
20       A.    Yes.
21       Q.    And earlier this year in your
22   deposition in the Dimensions case you indicated
23   that you were engaged.  Is that status the same, or
24   has it changed?
25       A.    It's the same.

Page 21

1        Q.    What's your current address?
2        A.    3699 J Street, Apartment 301, N.E.,
3    Washington, D.C. 20019.
4        Q.    How long have you lived there?
5        A.    Almost a year.
6        Q.    You have a high school GED, is that
7    right?
8        A.    Yes.
9        Q.    Do you have any other subsequent
10   education beyond that?
11       A.    No.
12       Q.    Are you currently employed?
13       A.    Yes.
14       Q.    Where is that?
15       A.    Potbelly Sandwich Shop.
16       Q.    When did you start working there?
17       A.    April of this year.
18       Q.    And you've worked at Potbelly's
19   since April of this year?
20       A.    Yes.
21       Q.    And how many hours a week,
22   approximately, do you work?
23       A.    About 22.  Slower season.
24       Q.    So is this part-time work?
25       A.    Yes.

Page 22

1    Q.    Prior to working at Potbelly
2  starting earlier this year, had you worked -- had
3  you worked anywhere else in 2019, or was there a
4  period of time when you weren't working?
5    A.    I was working at the Home Depot.
6    Q.    And how long -- did you leave
7  directly from Home Depot and go to Potbelly, or was
8  there a break?
9    A.    There was about a month break, a
10 month or so.
11   Q.    And again for purposes of trying to
12 speed this up, in the Maryland Dimensions
13 Healthcare litigation you gave some written
14 response to questions.
15        Do you recall having done that?  We call
16 them interrogatories.
17   A.    Yes.
18   Q.    And one of the interrogatories you
19 were asked in that case was to list your prior
20 employment.  And you indicated in that case that
21 you had started working at Home Depot in March of
22 2017.  Does that sound correct?
23   A.    Yes.
24   Q.    And so you worked at Home Depot from
25 March of 2017 to about February or March of 2019?

Page 23

1    A.    Yes.
2    Q.    And then you started at Potbelly in
3  April of 2019 and are still working there through
4  today?
5    A.    Yes.
6    Q.    Great.  Prior to working at Home
7  Depot starting in March of 2017, was there a period
8  of time before that that you were not working?
9  Immediately before, I'm looking at the beginning
10 part of 2017.
11   A.    No. No.
12   Q.    Where were you working when you
13 went, before you went to Home Depot?
14   A.    At Paul Bakery.
15   Q.    Got it.  And how long did you work
16 there, approximately?
17   A.    About almost two years.
18   Q.    And would it be correct then to say
19 that you worked at Paul Bakery from about March of
20 2015 to March of 2017?
21   A.    Yes.
22   Q.    Was there a period of time between
23 Paul Bakery and Home Depot when you weren't
24 working, or did you go right from one to the next?
25   A.    Yes, that's exactly what happened.

Page 24

1  I went from one to the next.
2    Q.    Again, just to make sure that I'm
3  not missing anything, before coming in to testify
4  today, you didn't review the complaint that was
5  filed against ECFMG in the federal court or the
6  court in Pennsylvania; correct?
7    A.    You said I didn't.
8    Q.    You didn't review that?
9    A.    Not that I can recall.  I'm sorry.
10 I can't recall.
11   Q.    Okay.  As you sit here today, you
12 don't have a recollection of looking at the
13 complaint that you filed against ECFMG?
14   A.    Oh, yes.  I'm sorry.  I'm sorry.
15 I'm sorry.  I didn't understand what you were
16 asking me.
17   Q.    That's all right.
18   A.    I did receive that -- did I get that
19 in the email?  I believe so.  I'm sorry.
20   Q.    That's okay.  When you say you think
21 you may have received it in an email, who was the
22 email from?
23   A.    I'm sure I've seen it.  I'm sure
24 I've seen it.  Yeah, I'm sure I've seen it.
25   Q.    Do you know when it was filed,

Page 25

1  approximately?
2    A.    I don't recall.
3    Q.    Do you know whether it was filed in
4  2019?  Since January or earlier than that.
5    A.    I'm sorry, I don't recall.
6    Q.    Okay.  That's okay.  Again, I'm just
7  asking for your best understanding and recollection
8  as you sit here today without guessing.
9        But I take it that since you can't remember
10 when you might have seen it but you think you did
11 that you didn't review it specifically to come in
12 here today.  Is that correct?
13   A.    That's correct.
14   Q.    And I take it from your earlier
15 answers, but I just want to make sure, that when
16 you said a couple of weeks ago you went online
17 looking at Dr. Akoda information, you didn't go to
18 the ECFMG website, for example; correct?
19   A.    Correct.
20   Q.    Have you ever gone to the ECFMG
21 website?
22   A.    No.
23   Q.    And you've not ever reviewed any of
24 the information that is on the ECFMG website,
25 correct?

Jasmine Riggins

Page 26

1    A.    No.
2    Q.    When was the first time you ever
3  heard of ECFMG?
4    A.    From my attorneys.
5    Q.    Okay.  And approximately when was
6  that?
7    A.    I don't recall.
8    Q.    Is it fair to say that at no point
9  prior to having spoken with the attorneys that
10  currently represent you that you had ever heard of
11  ECFMG?
12    A.    Repeat that again.
13    Q.    Sure.  Prior to speaking with your
14  current attorneys who are bringing the lawsuit
15  against ECFMG, you had never even heard of ECFMG?
16    A.    That is correct.
17    Q.    Okay.  As you sit here today, what
18  do you know about ECFMG?
19    A.    I know that they're a business who
20  gives foreigners their certificates or give them
21  permission to practice medicine in the United
22  States.
23    Q.    Do you know whether or not ECFMG is
24  a nonprofit organization?
25    A.    I do not.

Page 27

1    Q.    Do you know whether people who apply
2  to ECFMG could be U.S. citizens or not?
3    A.    I do not.
4    Q.    You don't know?
5    A.    You said -- no, because it's for
6  foreigners; correct?
7    Q.    I'm trying to get your
8  understanding.  So your understanding is that a
9  U.S. citizen could not apply to ECFMG for
10  certification or any services by ECFMG.  It's only
11  for foreigners?
12    A.    Correct.
13    Q.    And is it your understanding, I
14  think you said that -- and please correct me
15  because I'm just trying to remember back what you
16  said -- that ECFMG is responsible for certifying
17  you to practice medicine in the United States.  Is
18  that correct?
19    A.    I believe so.
20    Q.    Okay.  And what is it that you think
21  ECFMG does to certify people to practice medicine
22  in the United States?
23    A.    Give an exam.  I'm not -- give an
24  exam.
25    Q.    Okay.

Page 28

1    A.    Questions, interviews, background
2  checks.
3    Q.    Okay.  And your understanding is
4  that among the things that ECFMG does is do
5  background checks on foreigners who want to come
6  and practice medicine in the United States?
7    A.    Yes.
8    Q.    And what's the basis for that
9  understanding?
10        MR. ZAJDEL:  Objection.  You can
11    answer.
12        MR. SHAFFER:  I'll rephrase the
13    question.
14  BY MR. SHAFFER:
15    Q.    Other than from information told to
16  you by your lawyers, do you have any other source
17  of information of any kind about what ECFMG is,
18  what it does, what it doesn't do, who can apply,
19  who can't apply, what types of things ECFMG
20  requires?
21        Do you have any source of information about
22  any of that other than your lawyers?
23    A.    No.
24    Q.    I'm sorry?
25    A.    No.

Page 29

1    Q.    Okay.  We asked a couple of
2  questions earlier that referenced, and I think your
3  answer might have been the first to reference a
4  Dr. Akoda.
5        Do you recall mentioning Dr. Akoda?
6    A.    Not a Dr. Akoda, no.
7    Q.    You understand that there is an
8  individual who you saw in connection with one of
9  the children that you gave birth to, correct?
10    A.    I'm sorry?
11    Q.    Well, I'll rephrase that.
12        So you're not aware of a Dr. Akoda.  You
13  never heard that phrase before?
14    A.    Yes, I've heard that -- I heard that
15  phrase, yes.
16    Q.    Okay.
17    A.    Can I run to the bathroom, please?
18  I'm sorry.  You're in the middle of a question.  My
19  apologies.
20    Q.    You answered the question, which was
21  you've heard reference to a Dr. Akoda.  So we'll
22  take a break and then go ahead to the rest room and
23  then we'll come back.
24        THE VIDEOGRAPHER:  We are going
25    off the record.  The time is 11:53 a.m.

Jasmine Riggins

Page 30

1          (Recess)
2          THE VIDEOGRAPHER:  We are back on
3     the record.  The time is 11:57 a.m.
4   BY MR. SHAFFER:
5     Q.    Okay, Ms. Riggins, we're back on the
6   record, and we were talking before a quick break
7   there about an individual named Dr. Akoda, an
8   individual, and I think you took some issue with
9   calling him Dr. Akoda.  Why is that?
10    A.    He's not a doctor.
11    Q.    And why do you say that?
12    A.    Because he doesn't have credentials
13  and certifications to be a doctor.
14    Q.    Do you know -- and just so again I
15  want to make sure that we're talking about the same
16  things today so we don't have to go back later on,
17  when we refer to an individual known as Dr. Akoda
18  or the person that you believe is not a doctor
19  about, we're talking about the person that you saw
20  in connection with the birth of your second child;
21  correct?
22    A.    Correct.
23    Q.    And, at the time that you were being
24  seen by him and actually gave birth with him
25  through C-section, correct?

Page 31

1     A.    Correct.
2     Q.    You understood and knew him to be
3   Dr. Akoda?  Correct?  I'm sorry.
4     A.    Correct.
5     Q.    And since that time you've come to
6   learn that Dr. Akoda pled guilty to using a
7   different Social Security number, correct?
8     A.    Correct.
9     Q.    Okay.  And so based on that
10  information, it's your belief that the person that
11  you knew as Dr. Akoda is not a doctor?
12    A.    Correct.
13    Q.    Okay.  Do you know whether that
14  individual went to medical school?
15    A.    No, no.
16    Q.    He did not go to medical school?
17    A.    No.
18    Q.    How do you know that?
19    A.    I'm saying no, I don't.
20    Q.    You don't know whether he went?
21    A.    Yeah.
22    Q.    As you sit here today, do you have
23  any information or facts that would allow you to
24  say he didn't go to medical school?
25    A.    The fact that he pled guilty and the

Page 32

1   fact that he had fake credentials.
2     Q.    Okay.  And the fact that he pled
3   guilty, he didn't plead guilty to not going to
4   medical school; correct?
5     A.    Correct.
6     Q.    And do you know whether or not
7   Dr. Akoda's medical school in Nigeria ever verified
8   the authenticity of his diploma to Educational
9   Commission?
10          MR. ZAJDEL:  Objection.  Assumes
11      facts.  You can answer that question.
12    Q.    Do you know whether or not?
13    A.    No.
14    Q.    Would it surprise you to learn that
15  a medical school in Nigeria verified Dr. Akoda's
16  diploma to ECFMG?
17          MR. ZAJDEL:  Objection.  Assumes
18      facts.
19    Q.    You can go ahead and answer.
20    A.    Okay.  You said would it surprise
21  me?
22    Q.    Yes.
23    A.    Yes.
24    Q.    Why is that?
25    A.    Because it would be a surprise to me

Page 33

1   that he had information provided that he's a real
2   doctor or went to medical school.
3     Q.    During the time that you were being
4   treated by Dr. Akoda, you never had any reason to
5   question whether or not he had gone to medical
6   school; correct?
7     A.    When I was being seen by him?  No.
8   I wouldn't -- had I have known I wouldn't have
9   chosen him.
10    Q.    And there was nothing about his care
11  and treatment of you in connection with your
12  pregnancy and the birth of Messiah that ever caused
13  you to doubt that he had gone to medical school and
14  was a real medical doctor, correct?
15    A.    You said during my treatment with
16  him, no.
17    Q.    When was it that you first received
18  any information that caused you to question whether
19  the person you had seen, Dr. Akoda, was not a real
20  doctor, as you say?
21    A.    You said when was --
22    Q.    When did you first, first come to
23  have any information where you said everything
24  seemed fine while I was being treated with him but
25  now there's a problem?  When was that?

Page 34

1    A.    Well, there were problems after my
2  pregnancy, after the delivery, I had issues.
3    Q.    What were those issues?
4    A.    Pain, severe pain in my stomach and
5  my abdominal at work, I would have pain throughout
6  the day.  And I couldn't have my tubes tied due to
7  the damaged tissues on my C-section, which caused a
8  lot of pain.
9    Q.    And so this is after the birth of
10 Messiah, and Messiah was born by C-section;
11 correct?
12   A.    Correct.
13   Q.    And you said at a later point in
14 time you wanted to have a tubal ligation and were
15 told you couldn't have one?
16   A.    Correct.
17   Q.    And you were told it was because of
18 scarring that was present from earlier C-sections?
19   A.    Correct.
20   Q.    And was that scarring that you say
21 precluded you from having the tubal ligation, that
22 was something you attribute to the C-section
23 Dr. Akoda did?
24   A.    Correct.
25   Q.    And why do you -- why do you do that?

Page 35

1    A.    Because it was able to be done
2  before, but I decided against it.
3    Q.    When was it able to be done before?
4    A.    With my first son.
5    Q.    Do you know whether or not -- and
6  your first son, Santana; correct?
7    A.    Correct.
8    Q.    Was born by C-section, correct?
9    A.    Correct.
10   Q.    And who was the doctor that you saw
11 for Santana?
12   A.    I don't recall her name.
13   Q.    Was it at Howard University?
14   A.    Correct.
15   Q.    And do you know whether or not there
16 was any scarring that was later identified from the
17 C-section that you received at Howard University?
18   A.    No, there was not.  There wasn't
19 any.
20   Q.    If there had been some, do you think
21 that's the kind of thing that would be shown in
22 medical records of you that would have come later?
23   A.    Could you repeat your question.
24   Q.    Sure.  You told me you don't think
25 there was any scarring from the first C-section,

Page 36

1  correct?
2    A.    Correct.
3    Q.    And I take it that that's because
4  immediately following the C-section you were told
5  you could have a tubal ligation?
6    A.    No.  Correct, correct, I'm sorry.
7    Q.    Okay.  But then after the second,
8  the birth of your second child and the second
9  C-section, you were told you couldn't have one?
10   A.    After the third.
11   Q.    After the third?
12   A.    Correct.
13   Q.    And after the third, you were told
14 that there was significant scarring from your other
15 C-section; correct?
16   A.    Correct.
17   Q.    If Dr. Akoda had seen significant
18 scarring at the time that he did the second
19 C-section, that would suggest that that scarring
20 came from the first C-section; right?
21   A.    Correct.
22   Q.    Because scarring doesn't happen
23 overnight.  It takes time to develop.  Correct?
24   A.    Correct.
25              (Exhibit 1, medical records,

Page 37

1              was marked for identification.)
2    Q.    Ms. Riggins, we're handing you
3  what's been marked as Riggins-1, which I'll
4  represent to you are medical records that relate to
5  your treatment at Prince George Hospital Center in
6  2013.
7          Could you take a quick look at that, and
8  then I'll have some quick questions.
9    A.    (Witness complies with request.)
10   Q.    Just let me know when you're ready.
11       MR. ZAJDEL:  Put it on the record
12     that we reserve the right to make
13     everything confidential after the
14     deposition.
15   Q.    I'm not going to ask you about every
16 word, but let me focus on a couple of things here.
17       So Riggins-1 is a document Bates labeled
18 Plaintiff's -2024 and -2025, which again I'll
19 represent to you was produced to us in this case,
20 and it appears to be an operative report for you,
21 Jasmine Riggins.  And it references a date of a
22 procedure on 3/18/2013.
23       Do you see on the top part of the page?
24   A.    Yes.
25   Q.    Did you have a procedure at Prince

JA429

Jasmine Riggins

Page 38

1  George's County on 3/18/2013?
2      A.    Yes.
3      Q.    What did you have?
4      A.    A C-section.
5      Q.    That's when Messiah was born?
6      A.    Yes.
7      Q.    And you can see that this is a
8  two-page record signed by Charles Akoda, M.D. --
9  not signed but his name appears at the end of the
10 document.  Correct?
11     A.    Yes.
12     Q.    And if you look -- well, the top of
13 the page there's a fax server date and time.  It
14 says, "3/19/2013 at 2:42:42 p.m."
15     Do you see that?
16     A.    Yes.
17     Q.    So does this appear to be a record
18 then that would have been created and sent
19 immediately after your C-section with Messiah in
20 March of 2013?
21         MR. ZAJDEL:  Objection.
22     A.    Yes.
23     Q.    That's the date you had the
24 C-section, right, 3/18/2013?
25     A.    Yes.

Page 39

1      Q.    If you look at the description here
2  of what occurred, and it's a little bit technical
3  in medical terms, but if you look at the findings
4  at the bottom of page 1.  So flip back to the first
5  page of it.  Under Findings it says, "Male infant,
6  encephalic presentation."
7      Do you see that?
8      A.    Yes.
9      Q.    Do you understand that to be
10 Messiah, when he went in to do the C-section,
11 that's the male infant that he saw?
12     A.    Yes.
13     Q.    Okay.  And the next sentence,
14 section of that finding says, "Significant scarring
15 and adhesion formation."
16     Do you see that?
17     A.    Yes.
18     Q.    And so does that indicate that in
19 addition to finding Messiah when he went in to do
20 the C-section, he also saw significant scarring and
21 adhesion formation section?
22     A.    Okay.
23     Q.    Right?
24     A.    Okay, yes.
25     Q.    That's what it says, right?

Page 40

1      A.    Uh-huh.
2      Q.    I'm sorry.
3      A.    Yes, yes, yes, yes.  My children,
4  I'm sorry.
5         THE VIDEOGRAPHER:  We are going
6  off the record.  The time is 12:11 p.m.
7         (Recess)
8         THE VIDEOGRAPHER:  We are back on
9  the record.  The time is 12:24 p.m.
10        MR. SHAFFER:  This is Brian
11 Shaffer for ECFMG.  We're back on the
12 record after a short break.
13        We've had a couple of logistical
14 issues come up this morning with respect
15 to Ms. Riggins and her child care, and we
16 got started a little bit late this morning
17 due to some travel and traffic issues.
18 And so we've been talking offline here to
19 try to solve for those things and make
20 sure that we get the deposition completed.
21        And what we've discussed here is
22 that we will adjourn the deposition today
23 now with the questions that we've gotten
24 asked and answered so far.  We will
25 reconvene on Monday morning, the 16th,

Page 41

1  here at the same place starting at 9:30,
2  and we will pick up with Ms. Riggins'
3  deposition at that point in time.
4      This is being done as an
5  accommodation to schedules and not for any
6  other reason, and so for that reason I've
7  discussed with both counsel and
8  Ms. Riggins the understanding that she'll
9  have no substantive discussions with
10 anyone, including her counsel, any person,
11 witness, Ms. Russell, anybody else about
12 the case, about her testimony here today,
13 her testimony that she'll give on Monday.
14 It will be as if we were picking up right
15 now.  Instead we will be picking up Monday
16 at 9:30.
17     That will include no text messages,
18 no, emails.  She also had agreed that
19 she'll not do any research or go online or
20 look at any documents or do anything other
21 than what she came here today prepared to
22 talk about.
23     Is that a correct recitation of our
24 agreement?
25        MR. ZAJDEL:  Yes.

JA430

Jasmine Riggins

Page 42

1      THE WITNESS:  Yes.
2      MR. ZAJDEL:  With the exception
3  that I'm certainly going to send an email
4  with a date and the time to be here on
5  Monday.  You said no communication.  I
6  just want to make sure, no substantive
7  communication about the contents of the
8  deposition.  That's agreed.
9      MR. SHAFFER:  And then we will
10  continue with Ms. Riggins' deposition on
11  Monday at 9:30.  After we complete that
12  we'll move forward with the other
13  deposition that's been noticed for 10:30
14  but that we've agreed will start after
15  the completion of Ms. Riggins.  Correct?
16      MR. ZAJDEL:  Yes, and I will take
17  care of adjusting Ms. Russell to let her
18  know.
19      MR. SHAFFER:  I think that is it
20  for the record here today, and we will
21  pick back up on Monday.
22      THE VIDEOGRAPHER:  We are going
23  off the record.  The time is 12:27 p.m.
24      (Proceedings adjourned at
25      12:26 p.m.)

Page 43

1  DISTRICT OF COLUMBIA:          SS
2      I, Barbara DeVico, a Registered Court Reporter
3  of the District of Columbia, do hereby certify
4  that these proceedings took place before me at the
5  time and place herein set out, and the proceedings
6  were recorded stenographically by me and this
7  transcript is a true record of the proceedings.
8
9      I further certify that I am not of counsel to
10  any of the parties, nor an employee of counsel nor
11  related to any of the parties, nor in any way
12  interested in the outcome of this action.
13
14
15
16      _____
17      BARBARA DeVICO, CRR, RMR
18
19  _____
20  My Commission Expires:
21  July 31, 2023
22
23
24
25

JA431

Jasmine Riggins

```
 1            IN THE UNITED STATES DISTRICT COURT

 2        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4    - - - - - - - - - - - - - - - - X

 5    MONIQUE RUSSELL, JASMINE           :

 6    RIGGINS, ELSA M. POWELL            :

 7    and DESIRE EVANS,                  : Civil Action No.

 8              Plaintiffs,    :   18-5629

 9    v.                                 :

10    EDUCATIONAL COMMISSION FOR         :

11    FOREIGN MEDICAL GRADUATES,         :

12              Defendant.     :

13    - - - - - - - - - - - - - - - - X

14

15                 Volume II

16    Continued Videotaped Deposition Of JASMINE RIGGINS

17                 Washington, D.C.

18            Monday, September 16, 2019

19                  9:56 a.m.

20

21

22    Job No. 88391

23    Pages:  44 - 145

24    Reported by:  Dana C. Ryan, RPR, CRR, CSR (GA)

25
```

JA432

Jasmine Riggins

<table>
<tr><td colspan="2">Page 45</td><td colspan="2">Page 47</td></tr>
</table>

**Page 45**

1
2
3
4
5                 September 16, 2019
6                 9:56 a.m.
7
8
9
10      Continued Videotaped Deposition of JASMINE
11  RIGGINS, held at the law offices of Morgan, Lewis
12  & Bockius, LLP, 1111 Pennsylvania Avenue,
13  Northwest, Washington, D.C., before Dana C. Ryan,
14  Registered Professional Reporter, Certified
15  Realtime Reporter, Certified Shorthand Reporter
16  (GA) and Notary Public in and for the District of
17  Columbia.
18
19
20
21
22
23
24
25

**Page 47**

1              C O N T E N T S
2  EXAMINATION OF JASMINE RIGGINS:        PAGE:
3  By Mr. Klayman              51
4  By Mr. Shaffer              111
5
6
7
8              E X H I B I T S
9      (Attached to the Transcript)
10  RIGGINS DEPOSITION              PAGE:
11  Exhibit 2   September 23, 2016 J Unity      71
12              Health Care Progress Note
13              For Jasmine Riggins, Bates
14              Stamped Plaintiffs0000006408
15              Through 0000006411
16  Exhibit 3   February 19, 2017 J Unity      78
17              Health Care Progress Note
18              For Jasmine Riggins, Bates
19              Stamped Plaintiffs0000007576
20              Through 0000007579
21
22
23
24
25

**Page 46**

1           A P P E A R A N C E S
2
3    ON BEHALF OF THE PLAINTIFFS:
4        CORY L. ZAJDEL, Esquire
5        Z Law, LLC
6        2345 York Road, #B-13
7        Timonium, Maryland 21093
8        Telephone:  (443) 213-1977
9        Email: clz@zlawmaryland.com
10
11    ON BEHALF OF THE DEFENDANT:
12        BARRY W. SHAFFER, Esquire
13        MATTHEW D. KLAYMAN, Esquire
14        Morgan, Lewis & Bockius, LLP
15        1701 Market Street
16        Philadelphia, Pennsylvania 19103
17        Telephone: (215) 963-5100
18        Email: barry.shaffer@morganlewis.com
19        Email: matthew.klayman@morganlewis.com
20
21    Also present:
22        David Campbell, Videographer
23
24
25

**Page 48**

1      E X H I B I T S   C O N T I N U E D
2      (Attached to the Transcript)
3  RIGGINS DEPOSITION              PAGE:
4  Exhibit 4   Plaintiff Jasmine Riggins'      82
5              Supplemental Answers To First
6              Set Of Interrogatories And
7              Supplemental Responses To
8              First Set Of Requests For
9              Production Of Documents
10  Exhibit 5   September 7, 2017 J Unity      87
11              Health Care Progress Note
12              For Jasmine Riggins, Bates
13              Stamped Plaintiffs0000006442
14              Through 0000006444
15  Exhibit 6   October 13, 2017 J Unity      90
16              Health Care Progress Note
17              For Jasmine Riggins, Bates
18              Stamped Plaintiffs0000006478
19              Through 000000479
20  Exhibit 7   Class Action Complaint      95
21  Exhibit 8   November 9, 2017 J Unity      96
22              Health Care Progress Note
23              For Jasmine Riggins, Bates
24              Stamped Plaintiffs0000006480
25              Through 0000006482

JA433

Page 49

1      E X H I B I T S   C O N T I N U E D
2      (Attached to the Transcript)
3  RIGGINS DEPOSITION                    PAGE:
4  Exhibit 9    Complaint Filed To Initiate    101
5              The Lawsuit On November 14,
6              2018
7  Exhibit 10   April 18, 2019 J Unity       103
8              Health Care Progress Note
9              For Jasmine Riggins, Bates
10             Stamped Plaintiffs0000006488
11             Through 0000006490
12 Exhibit 11   Plaintiff Jasmine Riggins'    105
13             Responses To Defendants'
14             Requests For Admissions,
15             Bates Stamped
16             Plaintiffs0000006513 Through
17             0000006537
18 Exhibit 12   Stipulation Of Dismissal      114
19             Without Prejudice, Bates
20             Stamped Plaintiffs0000118860
21             Through 0000118863
22 Exhibit 13  First Amended Class Action     120
23             Complaint
24 Exhibit 14  Claimants' Certificate Of      124
25             Merit

Page 50

1        P R O C E E D I N G S
2        THE VIDEOGRAPHER:  We are now on the
3  record.  My name is David Campbell.  I am the
4  videographer for Golkow Litigation Services.
5        Today's date is September 16th, 2019,
6  and the time is 9:56 a.m.
7        This video deposition is being held at
8  1111 Pennsylvania Avenue, Northwest, Washington,
9  D.C. 20004, in the matter of Monique Russell, et
10 al., versus Educational Commission for Foreign
11 Medical Graduates.  This is in the United States
12 District Court for the Eastern District of
13 Pennsylvania, Number 18-5629.
14       The deponent today is Jasmine Riggins.
15       The court reporter is Dana Ryan.
16       Counsel, will you please identify
17 yourselves for the record, and then the court
18 reporter will please swear in the witness and we
19 can proceed.
20       MR. ZAJDEL:  Cory Zajdel on behalf of
21 Ms. Riggins.
22       MR. SHAFFER:  Brian Shaffer on behalf
23 of defendant Educational Commission for Foreign
24 Medical Graduates.
25       MR. KLAYMAN:  Matthew Klayman, counsel

Page 51

1  for the Educational Commission for Foreign Medical
2  Graduates, the defendant.
3        (Mr. Shaffer exits the deposition
4  proceedings.)
5        - - - - - - - - - - - - - - -
6              JASMINE RIGGINS,
7  having been duly sworn, testified as follows:
8        - - - - - - - - - - - - - - -
9      EXAMINATION BY COUNSEL FOR THE DEFENDANT
10     BY MR. KLAYMAN:
11     Q    Good morning, Ms. Riggins.
12     A    Good morning.
13     Q    We met a moment ago, but I'm Matthew
14 Klayman.  I'm colleagues with Brian Shaffer.  I'm
15 going to ask you some questions this morning.
16     A    Okay.
17     Q    We're picking up from a deposition that
18 began on Thursday; correct?
19     A    Correct.
20     Q    Now, between Thursday and today, have
21 you had any substantive communications about your
22 testimony with anybody?
23     A    No.
24     Q    Have you done any independent research
25 about the substance of your testimony or the facts

Page 52

1  or circumstances of the case?
2      A    No.
3      Q    I understand that on Thursday you were
4  asked about certain communications that you had
5  with Monique Russell.
6        Do you -- do you remember that?
7      A    Yes.
8      Q    Certain written communications.
9        And I understand that you are -- that
10 there was some discussion about you going to look
11 for them or gather them.
12       Do you recall that?
13     A    Correct.
14     Q    Did you do anything like that?
15     A    I have not.
16     Q    Were you asked to do that?
17       MR. ZAJDEL:  Objection.  That would be
18 attorney-client privilege.
19       Well, to the extent you're not asking
20 attorney-client privilege, I could see how that
21 would be answerable.
22       So you can answer the question to the
23 extent he's not asking you about communications
24 between you or any of your attorneys.
25       THE WITNESS:  Okay.  So could you

JA434

Jasmine Riggins

Page 53

1  repeat your question?
2     BY MR. KLAYMAN:
3     Q    So were you asked to look for copies of
4  communications you had with Monique Russell?
5     A    Yes.
6     Q    Did you find any communications with
7  Monique Russell?
8     A    I didn't look for them.
9     Q    Oh, you didn't look for them?
10    A    No.
11    Q    Okay.  Is that something you would be
12 willing to do?
13    A    Yes.
14    Q    Okay.  Is that -- when do you think
15 you'd be able to complete a search for
16 communications you had with Monique Russell?
17    A    I will try to get that done by the end
18 of this week.
19    Q    Okay.
20    A    Yes.
21    Q    Great.
22         This was the subject of written
23 communications from Mr. Shaffer, my colleague, so
24 I want to just make sure that we have on the
25 record that you'll go take a look and that

Page 54

1  responsive communications would be produced.
2         MR. ZAJDEL:  Well, she testified she
3  will look for them and she'll produce them to me,
4  and then we'll decide whether it's discoverable,
5  and if they are, we'll produce them.
6         MR. KLAYMAN:  Sure.
7     BY MR. KLAYMAN:
8     Q    Now, at the beginning of your
9  deposition on Thursday, I understand Mr. Shaffer
10 went through some -- some ground rules about
11 telling the truth, not speaking over one another,
12 that kind of thing.
13         Do you remember that?
14    A    Yes.
15    Q    Is that -- I just want to make sure
16 that we're still on the same page, so I don't --
17 so if you could, to make sure that the transcript
18 is clear, I won't speak over you and you won't
19 speak over me.
20    A    We didn't --
21    Q    Do you --
22    A    -- have --
23    Q    -- understand?
24    A    -- that issue.
25    Q    Great.

Page 55

1     A    We didn't have that issue at all.
2     Q    Just making sure.
3     A    No, that was not an issue.
4     Q    Okay.  Great.
5          Okay.  Now, we're here today because
6  you've brought a lawsuit against the Educational
7  Commission for Foreign Medical Graduates; correct?
8     A    Correct.
9     Q    I'm going to refer to them as ECFMG, so
10 you'll understand what I mean when I say ECFMG?
11    A    Correct.
12    Q    And you allege that you've suffered
13 emotional distress; correct?
14    A    Correct.
15    Q    And that distress was the result of
16 learning about Dr. Akoda's guilty plea; is that
17 correct?
18    A    I'm sorry?
19    Q    So the -- the emotional distress that's
20 the subject of the lawsuit --
21    A    Uh-huh.
22    Q    -- when did that start?
23    A    Right when I found out about him being
24 a fake doctor.
25    Q    And when about was that, if you recall?

Page 56

1     A    A couple of years ago.
2     Q    Was it, you know, talking 2015, 2016?
3     A    Yeah, around that time, 2016.
4     Q    Okay.  Now, is emotional distress the
5  only injury that you're suing for in this lawsuit?
6     A    Correct.
7     Q    And you're suing ECFMG because you
8  contend that ECFMG is responsible, in whole or in
9  part, for your emotional distress?
10    A    Correct.
11    Q    Do you also contend that Prince
12 George's Hospital Center is responsible, in whole
13 or in part, for your emotional distress?
14    A    Correct.
15    Q    Do you also contend that the Maryland
16 Board of Physicians is responsible, in whole or in
17 part, for your emotional distress?
18    A    Correct.
19    Q    Do you also contend that Dr. Abdul
20 Chaudry is responsible, in whole or in part, for
21 your emotional distress?
22    A    Correct.
23    Q    Do you also contend that the American
24 Board of Obstetricians and Gynecologists are
25 responsible, in whole or in part, for your

Jasmine Riggins

Page 57

1  emotional distress?
2      A    Correct.
3      Q    So you would say that anyone that you
4  contend did anything to enable Dr. Akoda to
5  practice medicine is responsible, in whole or in
6  part, for your emotional distress?
7      A    Correct.
8      Q    Tell me about your emotional distress.
9      A    I feel angry, sad, embarrassed,
10  ashamed.  My emotions are, like, all over the
11  place.  I can't even put them into as many words
12  that I can think of.  I just can't believe that
13  someone would do that.  It's beyond me.
14      Q    And when you say "that," what are you
15  referring to?
16      A    To pretend to be someone that they're
17  not, to practice something that they had no rights
18  to practice without the proper process of it all.
19      Q    And by "proper process of it all," what
20  do you mean?
21      A    Going about it the correct way.
22      Q    And by "the correct way," you mean
23  what?
24      A    Receiving proper documents, being
25  truthful, being honest, doing the things that a

Page 58

1  real doctor would do.
2      Q    So you're saying that a real doctor
3  would be honest?
4      A    Correct.
5      Q    And someone who is not honest is not a
6  real doctor?
7      A    No, not necessarily.  But if you're
8  pretending to be something that you're not, that's
9  not being honest.
10      Q    And by "something that you're not,"
11  what do you mean?
12      A    Not a real doctor.  By practicing on
13  women, you have no rights to do that, period, if
14  you don't have the proper credentials.  Just going
15  through school, anything that you need to do
16  properly to become a doctor, you should do that
17  before you do anything that a doctor does.
18      Q    Do you know one way or the other if
19  Dr. Akoda went to medical school?
20      MR. ZAJDEL:  Objection: asked and
21  answered.
22      But you can answer.
23      THE WITNESS:  No, I do not.
24  BY MR. KLAYMAN:
25      Q    Now, getting back to when you first

Page 59

1  learned about the basis for this lawsuit, you
2  learned about it from Facebook; is that correct?
3      A    Correct, from --
4      Q    And that was from a post by Monique
5  Russell?
6      A    Correct.
7      Q    And that's one of the communications
8  that we were talking about this morning; right?
9      A    Correct.
10      Q    So -- so you'll go take a look to see
11  if you can find that post that Monique Russell
12  made that you saw?
13      A    I can try to find that, yes.
14      Q    Now, with respect to your emotional
15  distress, do you have anxiety or worry?
16      A    When it comes to physicians.
17      Q    So not in general?
18      A    No, not necessarily.
19      Q    Do you have a depressed mood?
20      A    No.
21      Q    Do you have suicidal thoughts?
22      A    No.
23      Q    Are you able to laugh and see the funny
24  side of things?
25      A    Yes.

Page 60

1      Q    Do you look forward with enjoyment to
2  things?
3      A    Yes.
4      Q    Do you blame yourself unnecessarily
5  when things go wrong?
6      A    No.
7      Q    Are you anxious or worried for no good
8  reason?
9      A    No.
10      Q    Do you feel scared or panicky for no
11  good reason?
12      A    No.
13      Q    Do you feel that things are getting on
14  top of you?
15      MR. ZAJDEL:  Objection.  It --
16      You can answer the question.
17      THE WITNESS:  What -- what do you mean?
18  BY MR. KLAYMAN:
19      Q    Do you feel that things overwhelm you
20  sometimes?
21      A    Yes.
22      Q    Do you have difficulty sleeping?
23      A    Sometimes.
24      Q    How long has that been going on?
25      A    For some time -- quite some time.

JA436

Jasmine Riggins

Page 61

1    Q    If you had to give your best estimate,
2  are we talking a few -- a few weeks, many years?
3    A    Yeah, probably like a couple of years.
4    Q    Couple of years?
5    A    (Witness nods head.)
6    Q    If you had to give your best estimate
7  about when that began --
8    A    I can't.
9    Q    You can't.
10        Do you feel sad or miserable?
11    A    Not miserable, no.  I -- I mean, in
12  general, no, not sad.
13    Q    Are you so unhappy that you cry?
14    A    Are we, like, in general?  At times --
15  I feel like these questions can be -- at times I
16  can feel sad to the point where I want to cry, so
17  are you speaking in general, at times?
18    Q    Sure.
19        Let's say over the last six months,
20  have you -- have you at any time been so unhappy
21  that you've cried?
22    A    Yes.
23    Q    And do you recall what made you
24  unhappy?
25    A    Yes.

Page 62

1    Q    And what was that?
2    A    I don't want to talk about it.
3    Q    I -- I understand that you might not
4  want to talk about it, but you're under oath so
5  I -- I need an answer to the question.
6        MR. ZAJDEL:  Objection.  If it's
7  unrelated -- if the question is related to the
8  case, then I would agree she would have to talk
9  about it.  But if it's -- I'm sorry, if she's
10  saying it's unrelated to the case, I don't know
11  why it would be relevant.
12        MR. KLAYMAN:  Well, it's -- she's
13  bringing a claim for emotional distress, so other
14  things going on in her life that might be factors
15  in emotional distress that she's suffering is
16  directly relevant to the claim.
17        MR. ZAJDEL:  Well, I wouldn't agree
18  with that.  I'll have --
19        MR. KLAYMAN:  Let me -- maybe I'll --
20  let me try a question.
21        BY MR. KLAYMAN:
22    Q    Is the cause of that unhappiness that
23  you referred to completely unrelated to the facts
24  of this case?
25    A    Sometimes.  So the things that make me

Page 63

1  unhappy for -- so far as this case, just knowing
2  what I know about it, the way it makes me feel,
3  the fact that I had to -- I got a second -- second
4  C-section, and I didn't have to get that.  That
5  makes me very unhappy sometimes, yes.
6    Q    But to your testimony just now, there
7  are other things going on in your life that also
8  make you very unhappy or, as I asked, so unhappy
9  that you cry?
10    A    Okay.  So there's one thing.  My
11  grandmother had back surgery and it made me sad.
12  That was about it.
13    Q    I'm sorry to hear that.  That just --
14    A    Yeah, so . . .
15    Q    And that's what you were referring to
16  when you --
17    A    Correct.
18    Q    -- said you'd rather not talk about it?
19        Now, does the thought of harming
20  yourself occur to you?
21    A    No.
22    Q    Do you have post-traumatic stress
23  disorder because of the events giving rise to this
24  lawsuit, sometimes known as PTSD?
25    A    No.

Page 64

1    Q    Have you suffered any physical distress
2  after learning about Dr. Akoda in -- from Monique
3  Russell's Facebook post?
4    A    Physically -- no, not necessarily.
5    Q    When you say "not necessarily," is that
6  a no?
7    A    No.
8    Q    Have you ever been diagnosed with
9  depression?
10    A    No.
11    Q    Have you ever seen a medical
12  professional to discuss depression?
13    A    No.
14    Q    Have you ever discussed your emotional
15  distress with a medical professional?
16    A    No.
17    Q    If you were asked by a medical
18  professional about your emotional distress, would
19  you tell the truth?
20    A    Yes.
21    Q    And if you had been asked by a medical
22  professional in the past about your emotional
23  distress, you would have told the truth?
24    A    Yes.
25    Q    Do you typically tell the truth to

Jasmine Riggins

Page 65

1  medical professionals when they ask you questions
2  in the course of treatment?
3      A    Yes.
4      Q    Have you always told the truth to
5  medical professionals when they're treating you?
6      A    Yes.
7      Q    When was the last time you saw a
8  medical professional for treatment, any -- any
9  medical professional?
10     A    Okay.  I went to the doctor last month,
11 not -- yeah, last month I had a doctor's
12 appointment.
13     Q    So that would be -- I forget what
14 month -- August?
15     A    Yes, in August.
16     Q    August of 2019?
17     A    Yes.
18     Q    Okay.  And where was that?
19     A    That was Unity Health Care.
20     Q    What is Unity Health Care?
21     A    It's a doctor's office.  It's a clinic.
22     Q    If you recall -- do you recall which
23 doctor you were seeing?
24     A    Dr. King.
25     Q    Dr. King.

Page 66

1          Do you know Dr. King's first name?
2      A    I don't recall.
3      Q    Is Dr. King a man or a woman?
4      A    A woman.
5      Q    What kind of doctor is Dr. King?
6      A    She's a physician.
7      Q    Is she a specialist or a general
8  practitioner, if you know?
9      A    I don't recall.
10     Q    Were you going for a routine physical?
11     A    Correct.
12     Q    How did you choose Dr. King as your
13 doctor?
14     A    Well, I was referred to her.
15     Q    Okay.  And referred by whom?
16     A    My cousin.
17     Q    Okay.  Your cousin.
18          And who is your cousin?
19     A    You need her name?
20     Q    Just for the record, yeah.
21     A    Oh, okay.  Her name is Davida Limes.
22     Q    How do you spell the last name?
23     A    L-I-M-E-S.
24     Q    L-I-M-E-S.
25          So -- so your cousin referred you to

Page 67

1      Dr. King.
2          Did you do anything to research
3  Dr. King before you went to see her for treatment?
4      A    Yes.
5      Q    What did you do?
6      A    I asked my cousin about her.  I went to
7  the doctor's office to meet her prior to my visit.
8      Q    So you met Dr. King once before you
9  became a patient?
10     A    Yes.
11     Q    Did you look at Dr. King's resume?
12     A    No.
13     Q    Did you ask for references beyond that
14 of your cousin?
15     A    No.
16     Q    Did you check to see if Dr. King had
17 any specific credentials or certificates?
18     A    No.
19     Q    Did you ask to see Dr. King's test
20 scores or medical school transcript or anything
21 like that?
22     A    No.
23     Q    Have you ever switched doctors?
24     A    Yes.
25     Q    So if you don't like a doctor you're

Page 68

1  seeing, you -- you find a new doctor?
2      A    Yes.
3      Q    Now, other than to deliver a child,
4  have you ever been hospitalized?
5      A    Yes.
6      Q    And when was that?
7      A    I think it was 2015, I believe.
8      Q    And what was the reason for the
9  hospitalization?
10     A    My birth control was giving me some bad
11 side effects.
12     Q    Do you remember how long you were in
13 the hospital?
14     A    I'm just a -- overnight, maybe a few
15 hours.
16     Q    What was that?  I'm sorry.
17     A    It was late morning, and I didn't leave
18 until, like, the next morning, so I don't know if
19 that's considered overnight or a few hours or --
20     Q    Sure.
21          But you came in on one date and you
22 left on the next date?
23     A    It was the same day I got there, maybe
24 midnight; and I left maybe 9:00 in the next
25 morning.

Jasmine Riggins

Page 69

1    Q    Oh, I see.
2    A    So that's why -- yeah, I didn't know if
3 that was -- just to be technical.
4    Q    I appreciate that.
5        So you got in really late at night or
6 really early in the morning?
7    A    Yeah.
8    Q    Depending on how you're looking at it,
9 I guess?
10   A    Yes.
11   Q    And then you left on the same date; it
12 was just several hours later?
13   A    Correct.
14   Q    Any other times that you were
15 hospitalized that you recall other than child
16 birth, again?
17   A    No, not that I can recall.
18   Q    Have you ever been to an emergency
19 room?
20   A    Yes.
21   Q    About how many times?
22   A    A few.  I don't recall.
23   Q    Do you recall what -- what was the
24 reason for going to the emergency room?
25   A    Being sick, you know.

Page 70

1    Q    A variety of reasons?
2    A    Yes.  Correct.
3    Q    Anything traumatic like a -- for a car
4 accident, for example, or --
5    A    No.
6    Q    All right.  Do you have health
7 insurance?
8    A    Yes.
9    Q    Does insurance play a role in which
10 medical professionals you use?
11   A    Yes.
12   Q    Tell me about what role it plays.
13   A    Because of the insurance, I have these
14 certain doctors I can go -- certain offices that
15 accepts my insurances, and some doesn't.
16   Q    What insurance is that, if -- if you
17 know?
18   A    Amerigroup.
19   Q    Does your insurance company assign you
20 doctors?
21   A    Yes, but you don't have to stick with
22 that doctor.
23   Q    Okay.  So -- so the -- so am I right to
24 say that the insurance company will assign you a
25 doctor, but then you have the choice to then go to

Page 71

1 some -- another doctor if you prefer?
2    A    Correct.
3    Q    Did you have insurance when you were
4 treated by Dr. Akoda?
5    A    Yes.
6    Q    Do you remember if he was in network or
7 if he -- if he -- if his treatment was covered by
8 insurance?
9    A    Yes.
10   Q    Okay.
11       (Riggins Deposition Exhibit 2 was
12 marked for identification and attached to the
13 transcript.)
14   BY MR. KLAYMAN:
15   Q    So --
16   THE COURT REPORTER:  Wait a minute.
17   BY MR. KLAYMAN:
18   Q    The court reporter --
19   THE COURT REPORTER:  Let me give it to
20 her.
21       There you go.  Thank you.
22   BY MR. KLAYMAN:
23   Q    So you've just been handed a document
24 that we've marked Riggins 2.  It's a record
25 produced by the plaintiffs that they received from

Page 72

1 Unity Health Care which is the company we were
2 just discussing; right?
3    A    Yes.
4    Q    Okay.  And you see that it's dated
5 September 23rd, 2016?
6    A    Yes.
7    Q    And just for the record, it's Bates
8 number Plaintiffs, and then a bunch of zeros, and
9 then 6408.  So if I ask you to turn to a
10 particular page as we go through, I'm just going
11 to refer to the number at the end of --
12   A    Okay.
13   Q    -- that stamp.  We call it a Bates
14 stamp.  I don't know who Mr. Bates was.
15       So I want to ask you a couple of
16 questions about this.  Do you recall -- how long
17 have you been a patient at Unity Health Care?
18   A    It's been years.  I don't recall the
19 exact year, but I've always been in that area with
20 that doctor, this office.
21   Q    This office?
22   A    Yeah.
23   Q    So -- so this would have been your
24 doctor's office in September 2016?
25   A    Correct.

Jasmine Riggins

Page 73

1    Q    Do you know who Alison Lesht is?  Her
2    name is on the top right next to progress note.
3    A    I don't recall.
4    Q    From the "NP," I would gather that
5    she's a nurse practitioner.
6         Does that refresh your recollection
7    or --
8    A    No.
9    Q    Now, you see the first bolded language
10   at the top of page 6408, it says, Reason for
11   Appointment.
12        Do you see that?
13   A    Yes.
14   Q    And it says, Medical - Adult EST
15   Patient.  That was next to 1.
16        And then 2, Accepted HIV Test - Serum
17   Test Needed.
18        3, Physical Exam.
19        Do you see that?
20   A    Yes.
21   Q    Does that sound like the kinds of
22   treatment you've gotten from Unity Health Care in
23   the past?
24   A    Yes.
25   Q    Okay.  So next it says, History of

Page 74

1    Present Illness.  And then it starts, PHQ-2.
2         Do you know what PHQ-2 means?
3    A    No.
4    Q    So in the text underneath it, it says,
5    PHQ-2 Little interest or pleasure in doing things.
6    And then it again repeats, Little interest or
7    pleasure in doing things: No.  Feeling down,
8    depressed or hopeless: No.
9         Do you see that?
10   A    Yes.
11   Q    Were those questions that you were
12   asked?
13   A    I don't recall.
14   Q    You don't recall.
15        But in September 2016, were those true
16   statements?
17   A    Yes.
18   Q    And it wouldn't surprise you if you had
19   told that to your treating physician --
20   A    No.
21   Q    -- if asked these questions?
22   A    Right.
23        No.
24   Q    If you could turn to the next page, so
25   it's Bates 6409.  Under Family History, which is

Page 75

1    the first item at the top, in the third line down
2    all the way on the right, it says, Two sons -
3    Healthy.
4         Is that -- do you see what I'm -- what
5    I'm referring to?
6    A    Yes.
7    Q    Was that true at the time -- that was
8    true at the time that this was written; right?
9    A    Yes.
10   Q    All right.  Now, under -- moving on to
11   the next section, which is Social History, we're
12   going to go through -- the first one is tobacco
13   use.  And it says, Tobacco Use Questions Current
14   or past tobacco use:  Current some day smoker.
15        Do you see that?
16   A    Yes.
17   Q    Was that -- and that was true and
18   correct in September 2016?
19   A    Correct.
20   Q    Skipping ahead to Drug/Alcohol Use, do
21   you see where I'm --
22   A    Yes.
23   Q    Do you see where I am?
24   A    Yes.
25   Q    So it says, Drug Use Questions.  Date

Page 76

1    updated 09/23/2016.  Past or current drug use?
2    Yes - current use.  Which drugs used:  Marijuana.
3    Current Use/Frequency - Marijuana: occasionally.
4         Alcohol Use Questions.  Dated updated:
5    09/23/2016.  Past or current alcohol use:  Yes.
6    What type of alcohol?  Wine.  (One drink equals
7    one glass equals five ounces.)  How often?  Once
8    or a few times a week.  How many drinks in one
9    sitting?  Four drinks (guideline for max per
10   sitting, for men).
11        Did I read that right?
12   A    Uh-huh.
13   Q    Was that true and acc- -- and that was
14   true and accurate in September 2016?
15        MR. ZAJDEL:  Objection.  And I'm going
16   to instruct the witness not to answer the question
17   with respect to marijuana use.
18        You can answer the rest of that
19   question.
20   BY MR. KLAYMAN:
21   Q    So you can -- yeah, you can go ahead.
22   A    Okay.  So to the drinking, yes.
23        MR. KLAYMAN:  Are you -- are you
24   instructing her to assert her Fifth Amendment
25   privilege?

Jasmine Riggins

Page 77

1    MR. ZAJDEL:  Yes.  You're -- you're
2 asking a question about -- I've instructed her not
3 to answer, and --
4    MR. KLAYMAN:  I'm just trying to
5 understand the basis.  Is it the Fifth Amendment?
6    MR. ZAJDEL:  Yes.
7 BY MR. KLAYMAN:
8    Q    And you're accepting counsel's
9 instruction not to answer?
10    A    Yes.
11    MR. ZAJDEL:  Also, just -- and I'm not
12 trying to make a speaking objection.  I just want
13 to put on the record -- and we did this in the
14 previous deposition -- that there's a -- with all
15 these medical records and some testimony will be
16 some information that we think deserves a
17 confidentiality stamp.  We just want to reserve
18 the right to mark anything confidential before a
19 final transcript is released, including any
20 exhibits.
21    MR. KLAYMAN:  Okay.  That's -- that's
22 a -- your comment is noted, and we can -- we can
23 discuss that.
24 BY MR. KLAYMAN:
25    Q    Now, going down to the section on OB

Page 78

1 History.  If you'll see, it's right in the middle
2 of that page?
3    A    Yes.
4    Q    It says, Total pregnancies, four;
5 abortions, two; C-sections, two.
6    Do you see that?
7    A    Yes.
8    Q    Was that a true -- that was a true and
9 accurate statement in September 2016; correct?
10    A    Correct.
11    Q    When, if you recall, were the
12 abortions?  Ballpark time period.
13    A    I don't recall.
14    Q    Were they -- do you recall if they were
15 before the C-sections?
16    A    Yes.
17    Q    And they -- and they were before the
18 C-sections?
19    A    Yes.
20    Q    Okay.  I'm sorry.  I just -- I asked a
21 bad question, so . . .
22    (Riggins Deposition Exhibit 3 was
23 marked for identification and attached to the
24 transcript.)
25 BY MR. KLAYMAN:

Page 79

1    Q    So the court reporter just handed you
2 the document beginning with Bates number 7576
3 that's been marked Riggins Exhibit 3.
4    And this, again, is a Unity Health Care
5 record; right?
6    A    Yes.
7    Q    And the date for this one is
8 February 19th, 2017.  Do you see that --
9    A    Yes.
10    Q    -- on the top left?
11    And you were still a patient at Unity
12 Health Care at this time?
13    A    Yes.
14    Q    Have you been a patient at Unity Health
15 Care continuously from, I guess, the last record,
16 September 2016, at least until today?
17    A    Correct.
18    Q    And, again, next to the progress note,
19 it says Martine H. Tchinda, NP.
20    Do you know who Martine H. Tchinda, NP
21 is?
22    A    No.
23    Q    But, again, the "NP" seems to signify
24 nurse practitioner, so it could be someone that
25 treated you; correct?

Page 80

1    MR. ZAJDEL:  Objection.
2    THE WITNESS:  Right.
3 BY MR. KLAYMAN:
4    Q    So moving down to the reason for
5 appointment.  Do you see where I'm at?
6    A    Yes.
7    Q    It says, 1, Medical - Walk-in pregnancy
8 test.
9    Does that sound like a reason you
10 would -- does that refresh your recollection --
11 let me strike that.
12    Do you recall why you were going to
13 Unity Health Care in February 2017?
14    A    Yes.
15    Q    And why was that?
16    A    For a pregnancy test.
17    Q    If you skip down to the section on
18 surgical history -- that's still on page 7576.
19 It's the third bolded section from the bottom.
20    Do you see where it is?
21    A    Yes.
22    Q    So it says, C-sections times two;
23 surgical abortion 2/2016.
24    Do you see that?
25    A    Yes.

Page 81

1    Q    Does that refresh your recollection at
2  all about when the abortions happened?
3    A    Yes.
4    Q    And when did those happen?
5    A    2016.
6    Q    2016.
7    A    About that time somewhat.
8    Q    Now, if you move out -- move on to the
9  next page, so 7577.  I'm looking at smack in the
10  middle where it says, Review of Systems.
11        Do you see that in the bolded language?
12    A    Yes.
13    Q    So if you go down to the last
14  underlined item in that section where it says,
15  Psych, do you see that?
16    A    Yes.
17    Q    And it says, Negative for
18  anxiety/worry, depressed mood, suicidal thoughts.
19        Did I read that right?
20    A    Yes.
21    Q    And that was a true and accurate --
22  accurate statement of your well-being in
23  February 2017?
24    A    Yes.
25        MR. KLAYMAN:  That will be 4.

Page 82

1        (Riggins Deposition Exhibit 4 was
2  marked for identification and attached to the
3  transcript.)
4  BY MR. KLAYMAN:
5    Q    So the court reporter has just handed
6  you the document that's been marked Riggins
7  Exhibit 4.
8        Do you recognize the document?
9    A    I can't say yes or no.
10    Q    Are you familiar with -- with
11  interrogatories?
12    A    Yes.
13    Q    So -- so as you can see from the title
14  there, this document is entitled, Plaintiff
15  Jasmine Riggins' Supplemental Answers to First Set
16  of Interrogatories and Supplemental Responses to
17  First Set of Requests for Production of Documents.
18    A    Uh-huh.
19    Q    Right?
20    A    Yes.
21    Q    So these are discovery requests that
22  were served by your counsel on ECFMG in response
23  to certain interrogatories and document requests.
24        Does it -- and if you turn to the back,
25  let's see, there's a long list of names, but right

Page 83

1  before that, there's a certificate of service, and
2  then the page before that, there's a page called
3  Verification.
4    A    Oh, yeah.
5    Q    It has a 14 at the bottom.
6        Do you see that?
7    A    Yes.
8    Q    Okay.  And it says, I, Jasmine Riggins,
9  hereby aver that the factual statements in the
10  foregoing answers to interrogatories are true and
11  correct to the best of my knowledge, information
12  and belief, and that these answers are made
13  subject to the penalties relating to unsworn
14  falsification to authorities.
15        Right?
16    A    Yes.
17    Q    And then it's dated June 13, 2019; is
18  that right?
19    A    Yes.
20    Q    And then there's a line for -- and a
21  signature that -- are those your signature for
22  Jasmine Riggins?
23    A    Yes.
24    Q    Does that refresh your recollection
25  about if whether you've seen this document before?

Page 84

1    A    Yes.
2    Q    Earlier today, you testified that you
3  weren't sure of when you saw the Facebook post
4  from Monique Russell.
5        Do you recall that?
6    A    You said that I wasn't sure that --
7    Q    Yeah, that you said you weren't sure.
8    A    Okay.
9    Q    Of the date; is that right?
10    A    The date, yes.
11    Q    Yes.
12    A    Correct.
13    Q    So if you could turn to page 3 of the
14  interrogatories.
15    A    Okay.
16    Q    I'll just direct you to the very
17  bottom, the first full line where it says,
18  Plaintiff began experiencing these injuries when
19  she learned in July 2017 that Akoda was not really
20  a doctor.
21        Do you see that?
22    A    Yes.
23    Q    Does that refresh your recollection
24  about when you saw Monique Russell's Facebook post
25  about Dr. Akoda?

Jasmine Riggins

Page 85

1    A    Correct.
2    Q    And -- and when was that?
3    A    In 2017.
4    Q    In July 2017; right?
5    A    Yes.
6    Q    Okay.  So all of the medical records
7  that we've looked at so far -- so that would be
8  Riggins Exhibit 2 and Exhibit 3 -- were from
9  before July of 2017; right?
10        You can pull them up again if you want
11 to --
12   A    Yeah, they say -- this is 2016.
13        Yes.
14   Q    How soon after learning, as you say in
15 your interrogatory response, that Akoda was not
16 really a doctor, did you begin experiencing
17 emotional distress?
18   A    Immediately once I --
19   Q    Immediately?
20   A    Yeah, once I found out, I just felt
21 really bad, yeah.
22   Q    Did you experience the emotional
23 distress continuously after that time, or was it
24 intermittent?
25   A    Yeah, intermittent.

Page 86

1    Q    Intermittent?
2    A    Yeah.
3    Q    So it would come and it would go, in
4  other words?
5    A    Yes.
6    Q    How frequently would you experience the
7  emotional distress?
8    A    More often than not, yeah.  The more I
9  thought about it, it weighed on me, yeah.
10   Q    And how often would you think about it?
11   A    Almost every day, every other day.  I
12 tried not to think about it, but it would always
13 come up in my mind.
14   Q    So on page 3 of the -- of Exhibit 4,
15 the second line from the bottom says, Plaintiff
16 has not seen any health care providers for
17 treatment of these injuries.
18        Do you see that?
19   A    Yes.
20   Q    And that was a true and accurate
21 statement when these were -- when you signed the
22 verification in June of 2019; correct?
23   A    Correct.
24   Q    And that's still a true and accurate
25 statement --

Page 87

1    A    Correct.
2    Q    -- correct?
3        Have you thought about going to see a
4  health care provider for treatment of your
5  injuries?
6    A    Yeah, I thought about it.
7    Q    And you decided against it?
8    A    It just so -- it was just a thought,
9  like -- yeah, you could say I decided against it.
10 Just wasn't something I really wanted to keep
11 talking about.
12        (Riggins Deposition Exhibit 5 was
13 marked for identification and attached to the
14 transcript.)
15        BY MR. KLAYMAN:
16   Q    So the court reporter has handed you
17 the document that's been marked Riggins Exhibit 5
18 which begins on Bates number 6442.  And this again
19 looks like a Unity Health Care record; right?
20   A    Yes.
21   Q    And in the top left, the date here is
22 September 7th, 2017 --
23   A    Yes.
24   Q    -- is that right?
25        So that's after the July 2017 date that

Page 88

1  was referred to in the interrogatories?
2    A    Correct.
3    Q    And up in the top right where it says
4  progress note, this time it says, Yolanda E.
5  Klemmer, CNM.
6        Do you know who Dr. Klemmer is?
7    A    Yes.
8    Q    And who is Dr. Klemmer?
9        MR. ZAJDEL:  Objection: misstates
10 facts.  It says certified nurse --
11       MR. KLAYMAN:  Oh, sure.  I forgot.
12 Forgive me.
13       BY MR. KLAYMAN:
14   Q    So do you know who Yolanda Klemmer is?
15   A    Yes.
16   Q    And who is Yolanda Klemmer?
17   A    She was my OB when I was at Unity.
18   Q    Was it your understanding that she was
19 a medical doctor or that she is a medical doctor?
20       Do you still -- strike that.  Let me
21 start again.
22       Do you still see Yolanda Klemmer?
23   A    No.
24   Q    When was the last time you saw Yolanda
25 Klemmer for treatment?

Jasmine Riggins

| Page 89 | Page 91 |
|---|---|
| 1  A    Back in 27 -- 2018 after I had my baby. | 1  Yolanda E. Klemmer; right? |
| 2  Q    But you're not a current patient of | 2  A    Yes. |
| 3  Yolanda Klemmer? | 3  Q    And here it says -- go through again |
| 4  A    No. | 4  what we did in the last record. |
| 5  Q    And it was your understanding when you | 5  So Reason for Appointment, 1, medical, |
| 6  were a patient that she was a medical doctor? | 6  dash, OB visit. |
| 7  A    Yes. | 7  Do you see that? |
| 8  Q    Would you refer to her as Dr. Klemmer | 8  A    Yes. |
| 9  when you saw her? | 9  Q    And that's a true and accurate |
| 10  A    Yes. | 10  statement for why you were seeing Yolanda Klemmer |
| 11  Q    Now, if you look at, again, the Reason | 11  in October 2017? |
| 12  for Appointment -- | 12  A    Yes. |
| 13  That will be the first bolded language. | 13  Q    Klemmer was treating you in connection |
| 14  Do you say where I'm at? | 14  with your -- with the birth of your third child; |
| 15  A    Yeah. | 15  is that right? |
| 16  Q    Okay.  So it says, 1, medical - OB | 16  A    Yes. |
| 17  visit.  2, prenatal care. | 17  Q    So again moving down to the PHQ-2, |
| 18  And that's a true and accurate | 18  PHQ-2, little interest or pleasure in doing |
| 19  statement of the treatment you were receiving from | 19  things.  Little interest or pleasure in doing |
| 20  Klemmer in September 2017? | 20  things, no.  Feeling down depressed or hopeless, |
| 21  A    Yes. | 21  no. |
| 22  Q    Moving on to the next bolded language | 22  Do you see that? |
| 23  where it says History of Present Illness, do you | 23  A    Yes. |
| 24  see that? | 24  Q    And that's a true and accurate |
| 25  A    Yes. | 25  statement of your well-being in October 2017? |

| Page 90 | Page 92 |
|---|---|
| 1  Q    So here is again that reference to | 1  A    Yes. |
| 2  PHQ-2.  And it says PHQ-2, little interest or | 2  Q    Now, moving down to the next underlined |
| 3  pleasure in doing things.  Little interest or | 3  section which is postpartum visit. |
| 4  pleasure in doing things, no.  Feeling down, | 4  So I gather from postpartum that this |
| 5  depressed or hopeless, no. | 5  is after you gave birth? |
| 6  Did I read that right? | 6  A    Yes. |
| 7  A    Yes. | 7  Q    When -- when -- when did you give birth |
| 8  Q    And that's -- and that's a true and | 8  for -- in 2017? |
| 9  accurate statement of your well-being in | 9  A    It was on October 2nd. |
| 10  September 2017; correct? | 10  Q    Okay.  So this is within two weeks of |
| 11  A    Yes. | 11  the -- of the birth? |
| 12  (Riggins Deposition Exhibit 6 was | 12  A    Yes. |
| 13  marked for identification and attached to the | 13  Q    Okay.  We're going to read through it |
| 14  transcript.) | 14  and I'll ask you a couple of questions. |
| 15  BY MR. KLAYMAN: | 15  So, Delivery (if not captured in |
| 16  Q    So the court reporter just handed you | 16  flowsheet), Maternal date of discharge October 4, |
| 17  another document.  This one is Riggins Exhibit 6. | 17  2017.  Newborn date of discharge, October 4, 2017. |
| 18  And it begins on Bates number 6478.  And this also | 18  Date of delivery, October 2nd, 2017. |
| 19  appears to be a Unity Health Care medical record; | 19  So that's the same date you just said; |
| 20  right? | 20  right? |
| 21  A    Yes. | 21  A    Yes. |
| 22  Q    And the date up in the top left is | 22  Q    Right. |
| 23  October 13, 2017. | 23  Intrapartum complications, none.  Type |
| 24  A    Yes. | 24  of delivery, C/S.  That's probably a reference to |
| 25  Q    And again, next to Progress Note it has | 25  a C-section; is that right? |

Page 93

1    A    I believe so.
2    Q    You delivered your child in 2017
3  through a C-section?
4    A    Yes.
5    Q    Place of delivery, Washington Hospital
6  Center; is that right?
7    A    Yes.
8    Q    Anesthesia, epidural/spinal.  And
9  that's the correct method of anesthesia that you
10  had during delivery?
11    A    Correct.
12    Q    Gender, female.  I take it that
13  that's -- I take it that's --
14    A    Correct.
15    Q    -- for your daughter?
16    A    Yes.
17    Q    Birth weight pounds, 7; birth weight
18  ounces, 13.
19         So next is postpartum depression
20  screening.  I have been able to laugh and see the
21  funny side of things: 0 - As much as I always
22  could.  I have looked forward with enjoyment to
23  things: 0 - As much as I ever did.  I have blamed
24  myself unnecessarily when things went wrong: 0 -
25  No, never.  I have been anxious or worried for no

Page 94

1  good reason: 0 - No, not at all.  I felt scared or
2  panicky for no good reason: 0 - No, not at all.
3  Things have been getting on top of me:  0 - No, I
4  have been coping as well as ever.  I have been so
5  unhappy that I have had difficulty sleeping: 0 -
6  No, not at all.  I have felt sad or miserable:
7  0 - No, not at all.  I've been so unhappy that I
8  have been crying: 0 - No, never.  The thought of
9  harming myself has occurred to me: 0 - Never.
10  Total score: 0.  Score is 12 or higher:  No.
11  Negative screening result: Yes.
12         Did I read that all correctly?
13    A    Yes.
14    Q    Now, I know that was a lot of
15  questions, but was that a true and correct
16  statement of your well-being in October 2017?
17    A    Correct.
18    Q    And then name of child, Taniya?
19    A    Taniya.
20    Q    Taniya?
21    A    Yes.
22    Q    Oh.  Even better.  Taniya Richardson.
23  Great.
24         Just give me one second while I figure
25  something out.

Page 95

1         So you're the named plaintiff in --
2  strike that.
3         You were a named plaintiff in
4  litigation relating to Dr. Akoda in Maryland; is
5  that right?
6    A    Yes.
7    Q    Do you recall when that lawsuit was
8  filed?
9    A    No, I don't recall.
10         MR. KLAYMAN:  This is 7.
11         (Riggins Deposition Exhibit 7 was
12  marked for identification and attached to the
13  transcript.)
14         BY MR. KLAYMAN:
15    Q    So the court reporter has just handed
16  you a document that's been marked Riggins
17  Exhibit 7.
18         Do you recognize the document?
19    A    Yes.
20    Q    And what is it?
21    A    It's a class action complaint.
22    Q    And it's in the Circuit Court for
23  Prince George's County, Maryland?
24    A    Correct.
25    Q    And your name is in the top left of the

Page 96

1  caption, so it says -- right underneath Monique
2  Russell, it says Jasmine Riggins, 312 37th Street,
3  Apartment Number 304, Washington, D.C., 20019?
4    A    Yes.
5    Q    And that's you?
6    A    Yes.
7    Q    And then if you look at the stamp
8  that's kind of sideways on the front page, you see
9  the -- the year is a little fuzzy, I guess, but it
10  looks like 2000 -- to my eye it looks like 2017,
11  September 11.
12         Do you see that?
13    A    Yes.
14    Q    So does that refresh your recollection
15  about when the lawsuit was filed in Maryland?
16    A    Yes.
17    Q    And when was that?
18    A    In September of 2017.
19    Q    Okay.
20         (Riggins Deposition Exhibit 8 was
21  marked for identification and attached to the
22  transcript.)
23         BY MR. KLAYMAN:
24    Q    So the court reporter has handed you a
25  document that's been marked Riggins Exhibit 8, and

Jasmine Riggins

Page 97

1  the Bates number on the bottom is 6480.  And it
2  looks like another united -- Unity Health Care
3  medical record; right?
4      A    Yes.
5      Q    And in the top left of this first page,
6  the date on it is November 9th, 2017.
7          Do you see that?
8      A    Yes.
9      Q    And again, the progress note has
10 Yolanda E. Klemmer; right?
11     A    Yes.
12     Q    And this time the Reason for
13 Appointment is -- you see where I'm at --
14     A    Yes.
15     Q    -- looking at the top?
16         So 1, Medical - OB visit; 2, Pregnancy
17 test; 3, Postpartum exam.
18         Is that a true and correct statement of
19 the reasons you went to Unity Health Care in
20 November 2017?
21     A    Correct.
22     Q    Again, under History of Present
23 Illness, it says at the first couple of lines,
24 PHQ-2, little interest or pleasure of doing
25 things.  Little pleasure or interest in doing

Page 98

1  things, no.  Feeling down, depressed or hopeless,
2  no.
3          Do you see that?
4      A    Yes.
5      Q    And that's a true and accurate
6  statement of your well-being in November of 2017?
7      A    Yes.
8      Q    And again if you go down to postpartum
9  visit, so it's underlined, I'm going to skip the
10 first couple of lines, but in the fifth line down
11 right in the middle, do you see the words
12 "postpartum depression screening"?
13     A    Yes.
14     Q    Okay.  I'm just going to read it into
15 the record.  I have been able to laugh and see the
16 funny side of things: 0 - As much as I always
17 could.  I have looked forward with enjoyment to
18 things: 0 - As much as I ever did.  I have blamed
19 myself unnecessarily when things went wrong: 2 -
20 Yes, some of the time.  I have been anxious or
21 worried for no good reason: 0 - No, not at all.
22 I have felt scared or panicky for no good reason:
23 0 - No, not at all.  Things have been getting on
24 top of me: 0 - No, I have been coping as well as
25 ever.  I have been so unhappy that I have had

Page 99

1  difficulty sleeping:  0 - No, not at all.  I have
2  felt sad or miserable:  0 - No, not at all.  I
3  have been so unhappy that I have been crying:  0 -
4  No, never.  The thought of harming myself has
5  occurred to me:  0 - Never.  Total score: 2.
6  Score is 12 or higher:  No.  Negative screening
7  result:  Yes.
8          Did I read that all correctly?
9      A    Yes.
10     Q    And is that a true and accurate
11 statement of your well-being in November of 2017?
12     A    Yeah.
13         MR. ZAJDEL:  Objection.
14         THE WITNESS:  Sorry.  Sorry.
15         MR. ZAJDEL:  Objection: compound
16 question.
17         She can answer it.
18         MR. KLAYMAN:  Sure.  So -- so --
19         MR. ZAJDEL:  I think she already did,
20 but --
21         BY MR. KLAYMAN:
22     Q    Yeah.  So each of those -- so each of
23 those is a true statement of your well-being in
24 November 2017?
25     A    Yes.

Page 100

1      Q    If you recall earlier, I asked you
2  about your difficulty sleeping.
3          Do you remember I asked you that -- a
4  question about that?
5      A    Yes.
6      Q    So does the statement here from
7  November 2017, I've been so unhappy that I've had
8  difficulty sleeping, 0, no, not at all.  Does that
9  refresh your recollection about when any sleep
10 difficulties you've testified to earlier began?
11     A    Yes, but this is -- I haven't been so
12 unhappy that it caused difficulty sleeping.
13     Q    Oh, okay.  So the difficulty sleeping
14 is unrelated to your emotional distress?
15         MR. ZAJDEL:  Objection.  The question
16 was asked and answered.
17         You can answer -- you can answer the
18 question.
19         THE WITNESS:  What was the question?
20         BY MR. KLAYMAN:
21     Q    The question was so is the difficulty
22 sleeping that you testified to earlier unrelated
23 to your emotional distress?
24     A    Correct.  I'd say that.
25         MR. KLAYMAN:  I'm sorry.  Just give me

Jasmine Riggins

Page 101

1   one second.
2       BY MR. KLAYMAN:
3       Q    Do you recall when this lawsuit was
4   filed?
5       A    In 2017?  This one?
6       Q    So, I'm not talking about the Maryland
7   litigation.  I'm talking about the litigation
8   that's here against ECFMG that we're here for
9   today?
10      A    I believe it was -- I don't recall.  I
11  don't want to give the wrong day.
12          (Riggins Deposition Exhibit 9 was
13  marked for identification and attached to the
14  transcript.)
15      BY MR. KLAYMAN:
16      Q    So the court reporter has just handed
17  you a document that is marked Riggins Exhibit 9.
18          Have you seen this document before?
19          You can flip through it to see if
20  it . . .
21      A    (Witness reviews document.)
22          I honestly . . .
23          (Witness continues reviewing document.)
24          Okay.  I'm not honestly sure.
25          Sorry.  I don't recall seeing this.

Page 102

1   Some of it looks familiar, but I can't --
2       Q    Okay.  Well, on the third page of the
3   document, which has a -- a case caption, you'll
4   see -- or, yeah, right there.
5           Underneath Monique Russell, it says
6   Jasmine Riggins, 312 37th Street, Apartment Number
7   304 --
8       A    Yes.
9       Q    -- Washington, D.C. 20019.
10          Right?
11      A    Yes.
12      Q    And that's you?
13      A    Yes.
14      Q    So this is the complaint that was filed
15  to initiate this lawsuit?
16      A    (Witness nods head.)
17      Q    And on the front page, do you see --
18  there's a stamp -- there are two stamps, actually.
19          One says -- one in the middle says,
20  Filed Pro Prothy, November 14, 2018.
21          Do you see that?
22      A    Yes.
23      Q    Does that refresh your recollection at
24  all as to when the lawsuit was filed?
25      A    Yes.

Page 103

1       Q    And -- and when was it filed?
2       A    November of 2018.
3       Q    Okay.  You can set that aside for a
4   moment.
5           (Riggins Deposition Exhibit 10 was
6   marked for identification and attached to the
7   transcript.)
8       BY MR. KLAYMAN:
9       Q    So the court reporter has handed you a
10  document that's marked Riggins Exhibit 10, and the
11  Bates number is 6488 is where it begins.
12          And again this looks like a Unity
13  Health Care medical record; right?
14      A    Yes.
15      Q    And this time the date is April 18th,
16  2019, in the top left; is that right?
17      A    Yes.
18      Q    And next to the progress note, it says,
19  Taisei Suzuki, DO.
20          Do you know who that is?
21      A    Yes.
22      Q    And who is that?
23      A    He's a doctor at Unity Health Care, but
24  he's a -- he's a doctor at Unity Health Care.
25      Q    He's a doctor at Unity Health Care you

Page 104

1   said?
2       A    Yeah.
3       Q    I'm sorry.  I just couldn't hear you.
4       A    Yeah.  Sorry about that.
5       Q    Do you know what kind of doctor, like,
6   an OB or a general practitioner or you're not
7   sure?
8       A    I'm not sure.
9       Q    Okay.  And moving to the first, it
10  says, Reason for Appointment, 1, Medical - adult
11  EST patient, patient request birth control
12  referral; 2, FP - birth control.
13          Do you see -- did I read that right?
14      A    Yes.
15      Q    And that's a true and accurate
16  statement of the reasons why you went to Unity
17  Health Care in April of 2019?
18      A    Yes.
19      Q    And moving down, excuse me, to -- under
20  History of Present Illness, so the second
21  underline is PHQ-2 where it says, PHQ-2, little
22  interest or pleasure in doing things.  Little
23  interest or pleasure in doing things, no.  Feeling
24  down, depressed or hopeless, no.
25          Do you see that?

Jasmine Riggins

Page 105

1    A    Yes.
2    Q    Is that a true and accurate statement
3  of your well-being in April 2019?
4    A    Yes.
5    Q    Have you ever testified to feeling
6  depressed?
7    A    I'm sorry?
8    Q    Have you ever testified to feeling
9  depressed?
10    A    I don't recall.
11        MR. KLAYMAN:  Is this 11?
12        THE COURT REPORTER:  Uh-huh.
13        (Riggins Deposition Exhibit 11 was
14  marked for identification and attached to the
15  transcript.)
16        BY MR. KLAYMAN:
17    Q    So the court reporter has just handed
18  you what's been marked Russell or Riggins -- I
19  get them confused here -- Riggins Exhibit 11.
20        Do you recognize this document?
21    A    (Witness reviews document.)  Yes.
22  Yes.
23    Q    Yes?
24        And what is it?
25    A    Response to defendants' request for

Page 106

1  admissions.
2    Q    And you can see from the top of the
3  first page it's in the Circuit Court for Prince
4  George's County, Maryland?
5    A    Yes.
6    Q    And in the case caption, it's Monique
7  Russell, et al. -- there are multiple names,
8  but -- versus Dimensions Health Corp.
9        Do you see that?
10    A    Yes.
11    Q    Okay.  And this is the other lawsuit
12  that you were a plaintiff in?
13    A    Correct.
14    Q    So if you turn to request number 21, it
15  says, You claim that you suffer from depression as
16  a result of your allegations against the
17  defendants.
18        And then the response is an objection.
19  And then it says, As plaintiff testified at her
20  deposition, she has been depressed.
21    A    Okay.
22    Q    Do you see that?
23    A    Yes.
24    Q    So does that refresh your recollection
25  about whether you testified --

Page 107

1    A    Yes.
2    Q    -- about feeling depressed?
3    A    Uh-huh.  I don't recall the dates.
4    Q    You don't recall the dates, you said?
5    A    Yeah.
6    Q    Oh, okay.
7    A    Yeah.
8    Q    Of -- the dates of what?
9    A    Of the question.
10    Q    Oh, of when the -- when you answered
11  this question?
12    A    Yes.
13    Q    Okay.  But you -- but you do recall
14  having testified at your deposition --
15    A    Correct.
16    Q    -- that you were feeling depressed?
17    A    Correct.
18        It's cold in here.
19    Q    So in April 2019, in Riggins
20  Exhibit 10, you told your medical professional
21  that you were not feeling depressed; right?
22    A    Yes.
23    Q    But then at your deposition in the
24  Maryland litigation, you testified that you were
25  feeling depressed?

Page 108

1    A    Correct.  I was not feeling depressed
2  at that time of my visit.
3    Q    At the time of your visit?
4    A    Yeah, I was not feeling depressed at
5  that time.
6    Q    Okay.  So you're -- and you're talking
7  about your visit to Unity Health Care?
8    A    Correct.
9    Q    Okay.  Do you recall being asked about
10  feeling depressed when you visited Unity Health
11  Care?
12    A    Yes.  They always ask those questions.
13    Q    Okay.  Did you ever think to say to
14  them that you had been feeling depressed in
15  between visits?
16    A    No.
17    Q    Did they ever ask if you were feeling
18  depressed in between visits?
19    A    No.
20    Q    Did they ask these orally or did they
21  ask them in writing, if you recall?
22    A    They asked them orally.
23    Q    Orally.
24        And you gave the same answer from
25  Riggins Exhibit 10 in several of the other Unity

Jasmine Riggins

|  | Page 109 |
|---|---|
| 1 | Health Care medical records that we went through; |
| 2 | right? |
| 3 | A    Correct.  They asked about that day. |
| 4 | Q    Okay.  So each time you -- you went, |
| 5 | you were answering about that day? |
| 6 | A    Correct. |
| 7 | Q    And you never thought to tell them that |
| 8 | you were feeling depressed in between your visits? |
| 9 | A    No. |
| 10 | Q    During any of these time periods? |
| 11 | A    No. |
| 12 | Q    Why do you think your -- that Unity |
| 13 | Health Care was asking you these questions? |
| 14 | A    Because it's just something that they |
| 15 | want to know how you feel during that day at the |
| 16 | time of visit. |
| 17 | Q    Do you think they would be interested |
| 18 | to -- in -- in terms of treating you, do you think |
| 19 | they would have wanted to know if you had been |
| 20 | depressed in between visits? |
| 21 | A    I'm not honestly sure.  I don't think |
| 22 | there's something -- I didn't think that that was |
| 23 | something that they would consider, something that |
| 24 | they would deal with.  I would think that I would |
| 25 | go to another place for that. |

|  | Page 110 |
|---|---|
| 1 | Q    Another place? |
| 2 | A    Yeah. |
| 3 | Q    What do you mean? |
| 4 | A    Like to see someone else versus this |
| 5 | Unity Health Care. |
| 6 | Q    Where else would you have gone to seek |
| 7 | treatment? |
| 8 | A    Other places that help, like a |
| 9 | therapist or anybody else that has to do with |
| 10 | emotional depression, things like that, how you |
| 11 | feel. |
| 12 | Q    Do you know whether Unity Health Care |
| 13 | has therapists on staff? |
| 14 | A    I do -- no, not really. |
| 15 | Q    Did you ever ask? |
| 16 | A    No. |
| 17 | Q    Why not? |
| 18 | A    It just didn't seem like that type of |
| 19 | place. |
| 20 | Q    Did you ever ask them for a referral to |
| 21 | a -- to a -- a place that would be more equipped |
| 22 | in your estimation to treat your feeling -- your |
| 23 | intermittent depression, I guess? |
| 24 | A    You said would I ask them? |
| 25 | Q    Would you have asked -- or did you ask |

|  | Page 111 |
|---|---|
| 1 | them for a referral to somewhere that could treat |
| 2 | your depression? |
| 3 | A    No. |
| 4 | Q    Do you think they would be able to |
| 5 | refer you to someone who could treat your -- your |
| 6 | feeling depressed? |
| 7 | A    I'm not honestly sure. |
| 8 | MR. KLAYMAN:  We've been going for a |
| 9 | little while, so why don't we take a quick break |
| 10 | if that's all right. |
| 11 | THE WITNESS:  Okay. |
| 12 | THE VIDEOGRAPHER:  Off the record at |
| 13 | 11:23. |
| 14 | (Recess -- 11:23 a.m.) |
| 15 | (After recess -- 11:35 a.m.) |
| 16 | THE VIDEOGRAPHER:  We are back on the |
| 17 | record at 11:35. |
| 18 | EXAMINATION BY COUNSEL FOR THE DEFENDANT |
| 19 | BY MR. SHAFFER: |
| 20 | Q    Ms. Riggins, I want to ask you some |
| 21 | questions about the litigation that you initiated |
| 22 | in Maryland state court against Dimensions Health |
| 23 | Care, okay? |
| 24 | A    Okay. |
| 25 | Q    When did you file that lawsuit? |

|  | Page 112 |
|---|---|
| 1 | MR. ZAJDEL:  Objection: asked and |
| 2 | answered. |
| 3 | You can answer. |
| 4 | MR. SHAFFER:  When?  This morning? |
| 5 | MR. ZAJDEL:  (Indicating |
| 6 | affirmatively.) |
| 7 | BY MR. SHAFFER: |
| 8 | Q    Okay.  So you told my colleague that it |
| 9 | was in September of 2017; is that correct? |
| 10 | A    Correct. |
| 11 | Q    Okay.  And why did you file that |
| 12 | lawsuit? |
| 13 | A    I'm sorry. |
| 14 | Q    That's okay. |
| 15 | My question was why you filed the |
| 16 | lawsuit.  Was -- was the reason you filed the |
| 17 | lawsuit because you believed that Dimensions |
| 18 | Health Care was responsible for your emotional |
| 19 | injuries related to your interactions with |
| 20 | Dr. Akoda. |
| 21 | A    Correct. |
| 22 | Q    Okay.  And you're one of the named |
| 23 | plaintiffs in that lawsuit; correct? |
| 24 | A    Correct. |
| 25 | Q    Okay.  Is that lawst- -- lawsuit still |

JA449

Page 113

1  active today?
2      A   Correct.
3      Q   It is?
4      A   I believe -- I'm sorry.
5      Q   If you don't know, just --
6      A   Yeah.  I don't recall.  I'm sorry.
7      Q   Okay.  Have you gotten any money from
8  Dimensions Health Care in connection with your
9  lawsuit?
10     A   No.
11     Q   Has anybody told you that you will be
12 getting money from Dimensions Health Care?
13     A   No.
14     Q   Okay.  Did anybody tell you whether
15 they were going to dismiss your lawsuit against
16 Dimensions Health Care?
17         MR. ZAJDEL:  Objection.  That would be
18 attorney-client privilege.
19         BY MR. SHAFFER:
20     Q   Well, do you know whether your lawsuit
21 against Dimensions Health Care has been dismissed
22 or not?
23     A   I don't recall.
24     Q   Okay.  So it might have been, but it
25 might not have been?

Page 114

1      A   Correct.  It might have --
2      Q   Isn't that kind of a big deal, like if
3  you filed a lawsuit and then it got dismissed, you
4  would know?
5      A   Correct.
6      Q   But you -- as you sit here today, you
7  don't know?
8      A   I don't recall, correct.
9      Q   Okay.
10         (Riggins Deposition Exhibit 12 was
11 marked for identification and attached to the
12 transcript.)
13         BY MR. SHAFFER:
14     Q   Ms. Riggins, I've handed you what's
15 been marked as Exhibit 12 in your deposition.
16 It's a pleading in the Circuit Court for Prince
17 George's County, Maryland, entitled Stipulation of
18 Dismissal Without Prejudice.
19         Take a look at that and let me know
20 when you're finished.
21     A   (Witness reviews document.)  Okay.
22     Q   Okay.  Have you had a chance to look at
23 that?
24     A   Yes.
25     Q   And if you flip over to the very last

Page 115

1  page, which has the Bates number ending in 8683,
2  you'll see that it's a certificate of service
3  dated September 3rd, 2019, which was 13 days ago.
4          Have you ever seen this document
5  before?
6      A   No.
7      Q   Do you know what this document is?
8      A   A stipulation of dismissal without
9  prejudice in the Circuit Court of Prince George's
10 County, Maryland.
11     Q   What's your understanding of what
12 this -- what this document does?
13     A   Dismisses a case.
14     Q   Okay.  Do you know whether this is the
15 lawsuit that you held -- you are a plaintiff in
16 against Dimensions Health Care?
17     A   Yes.
18     Q   It is?
19     A   Yes, I see my name.
20     Q   Okay.  I think you have some exhibits
21 in front of you.  Do you want to look back at
22 Exhibit 7 that Mr. Klayman showed you this
23 morning?
24         And if you take a look at the first
25 page of Riggins 7, there's a case number on the

Page 116

1  right-hand side in the middle, handwritten,
2  CAL17-22761 --
3      A   Uh-huh.
4      Q   Do you see that?
5      A   Yes.
6      Q   And then if you look at Riggins 12 and
7  look at the top caption on the first page, it
8  says, Monique Russell, et al., versus Dimensions
9  Health Corp., et al., and the number is the same,
10 CAL17-22761?
11     A   Correct.
12     Q   Okay.  Looking at Riggins 7 and
13 Riggins 12, as you sit here today, do you have an
14 understanding of whether your case against
15 Dimensions Health Care in Maryland has been
16 dismissed?
17     A   Yes.
18     Q   It has; correct?
19     A   Correct.
20     Q   And how do you know that?
21     A   From the information.
22     Q   What information?
23         MR. ZAJDEL:  Objection to the extent
24 you're asking questions about communications
25 between attorney-client.

Jasmine Riggins

Page 117

BY MR. SHAFFER:
1  Q    Well, here's what I'm trying to get at.
2  I asked you a few moments ago if you knew whether
3  the case was dismissed or not, and you said you
4  didn't remember.
5        We had that discussion --
6  A    Okay.
7  Q    -- do you recall that?
8  A    Yes.
9  Q    Okay.  And now I've showed you these
10 two documents including a stipulation of dismissal
11 from 13 days ago.
12       My question is:  Do you now recall that
13 your case has been dismissed against Dimensions
14 Health Care?
15 A    Yes.
16 Q    And how long ago did you learn that
17 your case against Dimensions Health Care had been
18 dismissed?
19 A    My memory was refreshed today.
20 Q    Okay.  Did you know that your case
21 against Dimensions Health Care had been dismissed
22 before September 3rd?
23 A    Yes.  I don't recall.  I'm sorry.  I
24 don't recall.

Page 118

1  Q    Okay.
2  A    I don't recall the dates.
3  Q    But you are aware, as you sit here
4  today, that sometime before today you were aware
5  that your case had been dismissed?
6  A    Correct.
7  Q    Okay.  And what are the terms on which
8  you understand that dismissal occurred?
9  A    I'm sorry?
10 Q    Are you getting any money for
11 dismissing the case?
12 A    No.
13 Q    Did you have to agree to pay any money
14 to Dimensions Health Care as part of dismissing
15 that case?
16 A    No.
17 Q    Did you have to agree whether the
18 statute of limitations would or would not be
19 impacted by your dismissal of the case?
20 A    No.
21 Q    Did you have any discussions with
22 anyone besides your lawyers about dismissing that
23 case?
24 A    No.
25 Q    Okay.  You believed Dimensions Health

Page 119

1  Care was responsible for what you say are your
2  emotional injuries from Dr. Akoda, but yet you
3  dismissed the case against them without getting
4  any money; correct?
5  A    Correct.
6  Q    Why did you do that?
7        MR. ZAJDEL:  Objection.
8        To the extent he's asking for
9  communications between your attorneys and
10 yourself.
11       THE WITNESS:  So what's the question?
12 BY MR. SHAFFER:
13 Q    I don't want to know about your
14 communication with your lawyers.  I'm just asking
15 you the question why did you agree to dismiss this
16 case.
17       Well, let me -- let me back up.  Did
18 you agree to dismiss the case?
19 A    Correct.
20 Q    Why did you agree?
21 A    Something I talked to my attorneys
22 about.
23 Q    Did you agree to dismiss the case
24 because statements you made in that litigation
25 against Dimensions Health were not true?

Page 120

1  A    No.
2  Q    Okay.  You still believe everything you
3  said in that case is true and correct to the best
4  of your ability; right?
5  A    Correct.
6  Q    Let's take a look at -- at Riggins 7
7  which is the class action complaint that was
8  filed.
9  A    Okay.
10 Q    Actually, I'm going to give you an
11 amended complaint that you filed in that case,
12 just because that's the one I have marked up so it
13 will be easier if we go through that one.  I'm
14 going to mark it as exhibit Riggins 13 and give
15 you a copy.
16       (Riggins Deposition Exhibit 13 was
17 marked for identification and attached to the
18 transcript.)
19 BY MR. SHAFFER:
20 Q    And, Ms. Riggins, looking at what has
21 been marked as Exhibit 13, do you recognize that
22 as the first amended class action complaint that
23 you filed in Prince George's County, Maryland,
24 against Dimensions Health Corporation --
25 A    Yes.

Jasmine Riggins

Page 121

1    Q    -- in December of 2017?
2    A    Yes.
3    Q    If we turn to page 3 of that document,
4    paragraph 14, just at the bottom.
5    Okay.
6    Q    You state, Jasmine Riggins was a
7    patient of Oluwafemi Charles Igberase between
8    August 2012 and March 2013 at Dimensions, period.
9    Jasmine Riggins knew Oluwafemi Charles Igberase as
10   Akoda.
11        Is that true to the best of your
12   knowledge?
13   A    Yes.
14   Q    Turn to page 11, and look at
15   paragraph 66 where you state, Between 2008 and
16   2016, Akoda was an actual and/or apparent, duly
17   authorized agent, servant and/or employee of
18   Dimensions, holding a medical staff position
19   and/or enjoying hospital privileges.
20        Is that true and correct to the best of
21   your knowledge?
22   A    Yes.
23   Q    I'm sorry?
24   A    Yes.
25   Q    Okay.  Okay.  Turn to the next page.

Page 122

1    Actually, let's -- let's go back to paragraph 67
2    where you state, Between 2008 and 2016, Dimensions
3    was responsible to assure and maintain patient
4    safety and privacy for members of the public who
5    received treatment from its agents, servants
6    and/or employees, such as physicians who were
7    medical staff members and/or enjoyed hospital
8    privileges, including specifically but not limited
9    to Akoda.
10        Again, true and correct to the best of
11   your knowledge?
12   A    Yes.
13   Q    Okay.  Paragraph 71 on the next page,
14   you wrote, Dimensions knew or should have known,
15   that Oluwafemi Charles Igberase had assumed a fake
16   identity using the name Charles J. Akoda, M.D.;
17   correct?
18   A    Correct.
19   Q    And that was true and correct to the
20   best of your knowledge --
21   A    Correct.
22   Q    -- correct?
23        Okay.  If you look at paragraphs 72,
24   73, 74, 75, 76, 77, 78, 79, 80, all of those
25   statements relate to things that you believed

Page 123

1    Dimensions knew or should have done to protect you
2    from Dr. Akoda; correct?
3    A    Correct.
4    Q    And those are true and correct to the
5    best of your knowledge?
6    A    Correct.
7    Q    Okay.  And in paragraph 81, you state
8    that Dimensions' negligence was the sole and
9    proximate cause of the injuries, damages, and
10   permanent disability of named plaintiffs and class
11   members with named plaintiffs and class members
12   being in no way contributorily negligent.
13        Again, that's your statement and true
14   and correct to the best of your knowledge?
15   A    Correct.
16   Q    Turning to page 16 of this document,
17   you stated, Dimensions is liable and vicariously
18   liable for Akoda's conduct.
19        And you believe that to be true and
20   correct to the best of your knowledge?
21   A    Correct.
22   Q    In paragraph 88 you say that
23   Dimensions' negligence was the sole and proximate
24   cause of the injuries, damages and permanent
25   disability of named plaintiffs in the class, with

Page 124

1    named plaintiffs in the class being in no way
2    contributorily negligent.
3        Correct?
4        MR. ZAJDEL:  Okay.  Before you answer,
5    what paragraph was --
6        MR. SHAFFER:  88.
7        MR. ZAJDEL:  Okay.  You can answer.
8    BY MR. SHAFFER:
9    Q    I'm going to rephrase the question.
10        In paragraph 88 you wrote that
11   Dimensions' negligence was the sole and proximate
12   cause of the injuries, damages and permanent
13   disability of named plaintiffs in the class, with
14   named plaintiffs in the class being in no way
15   contributorily negligent.
16        And you understand and believe that to
17   be true and correct; right?
18   A    Correct.
19        (Riggins Deposition Exhibit 14 was
20   marked for identification and attached to the
21   transcript.)
22   BY MR. SHAFFER:
23   Q    I'm going to hand you what's been
24   marked as Exhibit 14.
25        Riggins 14 is a document again from the

Jasmine Riggins

Page 125

1  matter of Monique Russell versus Dimensions Health
2  Corporation entitled Claimants' Certificate of
3  Merit.
4        Take a quick look at this if you would.
5    A   (Witness reviews document.)
6    Q   Ms. Riggins, this document is entitled
7  Claimants' Certificate of Merit, and the first
8  page is a certificate by a gentleman named Thomas
9  Bojko.
10       Do you see that?
11   A   Yes.
12   Q   I'm sorry.  Just try to keep your voice
13  up.
14   A   Yeah, it's a little cold in here.  I'm
15  sorry. I'm just trying --
16   Q   That's okay.  We'll try to get it
17  warmer.
18       Okay.  Do you know who Mr. Bojko is?
19   A   I do not.
20   Q   Okay.  Do you see in the second
21  paragraph that he says he has reviewed the
22  captioned Class Action Amended Statement of Claim,
23  a final decision and order of the Board of
24  Maryland Board of Physicians, Department of
25  Justice materials, proceedings of the criminal

Page 126

1  case against Dr. Charles Akoda/Igberase and other
2  related materials regarding the above captioned
3  case?
4    A   Yes.
5    Q   Okay.  Do you know whether or not
6  Mr. Bojko was hired by your lawyers to offer
7  opinions about Dimensions Health Corporation's
8  conduct?
9    A   No.
10   Q   Okay.  Do you see in paragraph 3 of
11  Riggins 14 where Mr. Bojko certifies that there
12  have been violations of the applicable standards
13  of administrative care by Dimensions Health
14  Corporation and Dimensions Health Corporation
15  d/b/a Prince George's Hospital Center,
16  individually and through their duly authorized
17  agents, apparent agents, servants and/or
18  employees, including but not limited to Charles J.
19  Akoda/Oluwafemi Charles Igberase which have
20  directly and proximately resulted in damages,
21  injuries and permanent disability to the claimants
22  and others situated.
23       Do you understand what Mr. Bojko is
24  saying there?
25   A   Not really.

Page 127

1    Q   Okay.  Were you aware of these
2  certifications and statements by Mr. Bojko before
3  you dismissed your case against Dimensions Health
4  Corporation?
5    A   No.
6    Q   Okay.  Turn to the third page of
7  Exhibit 14, which is a letter dated February 26th,
8  2018, to a Paul Vettori.
9        Do you know Mr. Vettori?
10   A   Yes.
11   Q   Who is he?
12   A   He's an attorney.
13   Q   Okay.  Is he one of your attorneys in
14  the lawsuit in Maryland and in Philadelphia?
15   A   Yes.
16   Q   Okay.  This is a letter to him from
17  Thomas Bojko, M.D., M.S., J.D., president and
18  managing partner of Aviva Healthcare Solutions.
19  And he writes to Mr. Vettori in the first
20  paragraph, This is to acknowledge that after a
21  review of materials involved in the
22  above-referenced case, I have concluded that there
23  have been violations of the applicable standards
24  of administrative care by Dimensions Health
25  Corporation d/b/a Prince George's Hospital Center,

Page 128

1  individually and through their duly authorized
2  agents, apparent agents, servants and/or
3  employees, including but not limited to Charles J.
4  Akoda/Oluwafemi Charles Igberase ("Akoda"), which
5  have directly and proximately resulted in
6  injuries, damages and permanent disability to the
7  claimants and others similarly situated.
8        Do you see that?
9    A   Yes.
10   Q   Were you aware of Mr. Bojko's opinions
11  related to the activities of Dimensions Health
12  Corporation?
13   A   No.
14       MR. ZAJDEL:  Objection: asked and
15  answered.
16       BY MR. SHAFFER:
17   Q   Okay.  Look at the second paragraph of
18  this letter.  Mr. Bojko states, It is my opinion
19  the defendants, Dimensions Health Corporation,
20  breached the applicable standards of
21  administrative care by negligently failing to use
22  required and reasonable care to investigate,
23  credential, grant privileges, monitor and
24  supervise their medical personnel, including but
25  not limited to, Akoda and to discover, stop and

Page 129

1  report any professional misconduct of which they
2  should have known.
3      Do you agree with Mr. Bojko?
4  A   Yes.
5  Q   Okay.  Next sentence he writes, As a
6  direct and proximate result of the defendants'
7  continuing negligence, the claimants, and others
8  similarly situated, suffered physical pain,
9  emotional anguish, and damages as well as personal
10 disability.
11     Do you agree with that?
12 A   Yes.
13 Q   Is that a yes?
14 A   Yes.
15 Q   Thank you.
16     And then he writes, Had the defendants
17 complied with the applicable standards of
18 administrative care the claimants, and others
19 similarly situated, would not have suffered their
20 injuries, damages and permanent disability.
21     Do you agree with that?
22     MR. ZAJDEL:  Objection: calls for a
23 legal conclusion.
24     You can answer.
25     THE WITNESS:  Yes.

Page 130

1      BY MR. SHAFFER:
2  Q   Okay.  Do you know who hired Dr. Akoda
3  to work at Prince George's?
4  A   No.
5  Q   I just want to ask a question to make
6  sure that we're on the same page.  When we talked
7  on Thursday, I think you told me that you did not
8  have any information about ECFMG except what you
9  may have been told by your lawyers; correct?
10 A   Correct.
11 Q   Okay.  And is it fair for me to then
12 assume that if this matter were to go to a trial,
13 that you would not come to trial and expect to
14 testify about ECFMG; is that fair?
15 A   Could you repeat your question?  I'm
16 sorry.
17 Q   Sure.
18     You don't know anything about ECFMG
19 today other than what your lawyers told you;
20 right?
21 A   Correct.
22 Q   You don't have any firsthand knowledge,
23 firsthand interactions, never spoke to anybody at
24 ECFMG, never went to their Web site, never looked
25 at any of their materials; correct?

Page 131

1  A   Correct.
2  Q   Okay.  And my question is, if you come
3  to trial in this matter, will you agree that
4  because you don't have that information and
5  anything your lawyers told you isn't something you
6  know personally, that you're not going to come to
7  trial and testify about things regarding ECFMG?
8      MR. ZAJDEL:  Objection.  That's a
9  decision that's going to be made by her attorneys,
10 so I -- don't answer that question.  I instruct
11 the witness not to answer that question.
12     MR. SHAFFER:  On what grounds?
13     MR. ZAJDEL:  You're asking her about a
14 decision that's to be made between her and her
15 counsel.  You're going to -- you -- you've
16 propounded discovery.  I'm sure we've listed who
17 our witnesses are, or whatever the deadline date
18 is for discovery closing we'll list who the
19 witnesses are, and if her name is not there, she
20 won't be testifying at trial.  If her name is
21 there, she'll be testifying at trial.
22     MR. SHAFFER:  And my question was a
23 little -- it was a little more specific.
24     BY MR. SHAFFER:
25 Q   I understand you may come testify at

Page 132

1  trial.  What I don't want to have happen is
2  there's a situation where you come and you've
3  looked at a whole bunch of documents and materials
4  that you didn't look at before you came in here
5  today.
6      MR. SHAFFER:  So that's my question.
7  If the answer is the same, we'll take it up at the
8  appropriate time.
9      MR. ZAJDEL:  Well, I'm still going to
10 object to that question because I can't confirm or
11 deny what Ms. Riggins will see or not see before
12 the trial in preparing for a trial.
13     But if what you're trying to find out
14 is is she going to testify to her personal
15 knowledge about ECFMG differently than what she
16 testified to today, then I -- I believe that
17 answer is not going to change.  Her knowledge as
18 of today was her knowledge as of today.
19     MR. SHAFFER:  Right.
20     BY MR. SHAFFER:
21 Q   Again, in the interest of trying to
22 move this along, take a look at Riggins 11 which
23 has already been marked this morning.
24     And these are Plaintiff Jasmine Riggins
25 Responses to Defendants' Requests for Admissions

**Page 133**

1  that you served on the defendants in the
2  Dimensions Health Care Corporation case in
3  Maryland, and I think Mr. Klayman asked you a
4  question or two about this?
5      A    Yes.
6      Q    And my question is in responding to
7  these requests for admissions, were you trying to
8  be as truthful and as accurate as you could be in
9  answering the questions that were asked?
10     A    Yes.
11     Q    And as you sit here today, do you
12 believe that the answers that you gave in response
13 to these requests for admissions back in the
14 Dimensions Health Care case are still true and
15 accurate to the best of your ability?
16     A    Yes.
17     Q    You don't want to change any of these
18 answers today based on the dismissal of the
19 Dimensions Health Care case; right?
20     A    No.
21     Q    Okay.
22         MR. SHAFFER:  Let's go off the record
23 for a minute.
24         THE VIDEOGRAPHER:  Off the record at
25 12:06.

**Page 134**

1      (Recess -- 12:06 p.m.)
2      (After recess -- 12:14 p.m.)
3         THE VIDEOGRAPHER:  We are back on the
4  record at 12:14.
5      BY MR. SHAFFER:
6      Q    Ms. Riggins, we're almost done here.  I
7  have a few more questions for you.  I want to make
8  sure I cover a couple of things that we started to
9  talk about on Thursday and didn't get to finish.
10         I think we talked a little bit about
11 the different doctors that you have seen in
12 connection with your three children.  There were
13 three different doctors that you saw, one for each
14 birth; correct?
15     A    Correct.
16     Q    And you had a C-section in connection
17 with each of them; correct?
18     A    Correct.
19     Q    And I think we saw in the medical
20 record that was prepared after your C-section
21 involving Messiah reporting the existence of
22 significant scarring at that time.
23         Do you recall that?
24     A    Correct.
25     Q    And I think we talked about how that

**Page 135**

1  was something you were not aware of prior to
2  Thursday; correct?
3      A    Correct.
4      Q    Prior to Thursday, what you had been
5  told or assumed was that that scarring had
6  occurred during the second C-section because it
7  was noted in your discussions with your third
8  doctor; correct?
9      A    Correct.
10     Q    Okay.  I think you also mentioned
11 briefly on Thursday that following the birth of
12 Messiah -- and it was a good birth; right?  He was
13 born healthy; correct?
14     A    Correct.
15     Q    -- that you have had some pain
16 resulting after the birth; is that correct?
17     A    Correct.
18     Q    What -- what exactly were you
19 describing there?  What was the condition that you
20 were describing?
21     A    The abdominal pains in my stomach.
22     Q    And do you think that was the
23 result of having had the C-section?
24     A    Yes.
25     Q    Okay.  And have you had pain following

**Page 136**

1  each of the C-sections that you've had in your
2  abdominal area?
3      A    No, not as bad, no.
4      Q    Okay.  It might not have been as bad,
5  but is it fair to say that C-section is a major
6  surgery in your abdominal area?
7      A    Correct, but I was --
8      Q    Okay.  Did you have abdominal pain
9  after the first C-section?
10     A    Slight.
11     Q    And if you were experiencing pain as a
12 result of the C-section, that's something that you
13 would have reported to your doctors; correct?
14     A    I'm sorry?
15     Q    If you were experiencing pain --
16 abdominal pain following the C-sections, that's
17 something you would have reported to your doctors?
18     A    Correct.
19     Q    Okay.  I saw somewhere in -- in the
20 documents we've received reference to Charter
21 Health Clinic.
22         Do you know who that is?
23     A    Yes.
24     Q    Who is that?
25     A    It's the office -- doctor's office I

Jasmine Riggins

Page 137

1  used to go to.
2    Q    Okay.  When did you go there?
3    A    Years ago.
4    Q    Okay.  What kind of doctor's office?
5    A    The same as Unity.  It was actually
6  Charter before it was Unity.
7    Q    Okay.  So it was your general
8  practitioner physician?
9    A    Correct.
10    Q    Okay.  For what reasons would you go to
11  Charter Health Clinic?
12    A    Regular checkups, if I was feeling ill.
13    Q    When was the last time you were there?
14    A    I don't recall.
15    Q    Do you know whether they still have any
16  medical records from you?
17    A    I do not know that.
18    Q    Okay.  And I apologize.  I know you
19  went over this, I think, with Mr. Klayman.  But
20  when we talked on Thursday, you had mentioned some
21  communications with Monique Russell a month or so
22  ago, and we talked about and made a request at the
23  deposition that you bring those with you today.
24        And you have not done that; correct?
25    A    Correct.

Page 138

1    Q    And you have not looked for those;
2  correct?
3    A    Correct.
4    Q    Why not?
5    A    I've had other things going on,
6  unfortunately.
7    Q    Is that something that you are still
8  willing to collect and provide to your attorneys
9  to provide to us?
10    A    Yes.
11    Q    Okay.  And just so I'm clear, the
12  things that you think Dr. Akoda did that were
13  wrong are what?
14    A    Performing on women, doing C-sections,
15  looking at women's private parts, violating them,
16  touching them, not being honest with them.
17    Q    And what is it that you think ECFMG
18  should have done?
19    A    Paid attention to his credentials and
20  actually paid attention to him being interviewed
21  under two different names.  Just be more careful
22  about their job, pretty much.  Be more careful
23  about who they certify.
24    Q    And do you know whether or not they
25  identified instances where Dr. Akoda had used

Page 139

1  multiple names?
2    A    I'm sorry?
3    Q    Are you aware of whether or not ECFMG
4  actually identified situations where Dr. Akoda had
5  used different names?
6    A    Could you rephrase your question?  I'm
7  sorry.
8        MR. SHAFFER:  Can you read it back?
9        (The Record was read as requested.)
10        THE WITNESS:  I'm not aware.
11        MR. ZAJDEL:  I'm sorry.  I didn't hear
12  that.
13        MR. SHAFFER:  She said, I think, I'm
14  not aware.
15        THE WITNESS:  I -- no.  Sorry.
16        MR. ZAJDEL:  Can -- are you answering
17  the question no, you're not aware?  I want to make
18  sure --
19        MR. SHAFFER:  Yeah.
20        MR. ZAJDEL:  -- I understand.  I'm not
21  trying to be in the way.
22        THE WITNESS:  Right.
23        So you're asking if I'm aware -- I'm
24  sorry.
25        MR. SHAFFER:  That's all right.

Page 140

1  Let's --
2        THE WITNESS:  I'm --
3        MR. SHAFFER:  -- try --
4        THE WITNESS:  -- having --
5        MR. SHAFFER:  -- again.
6        THE WITNESS:  -- a hard time
7  comprehending this question.
8        MR. ZAJDEL:  So you haven't answered
9  the question yet?
10        THE WITNESS:  No.
11        MR. ZAJDEL:  Okay.  I didn't know if
12  she was answering your question or.
13        MR. SHAFFER:  I'm not sure either.  So
14  we're going to have --
15        THE WITNESS:  Sorry.
16        MR. SHAFFER:  -- the court reporter --
17  that's okay.  We're going to have the court
18  reporter read it back and see if -- see if we can
19  get there.
20        (The Record was read as requested.)
21        THE WITNESS:  No.  I'm sorry.  I'm
22  having a hard time comprehending that question.
23        BY MR. SHAFFER:
24    Q    Well, let me -- let me ask it again
25  because I don't want there to be any confusion

Jasmine Riggins

Page 141

1  about it.
2       You said ECFMG should be more careful;
3  right?
4    A    Uh-huh.
5    Q    Those were your words?
6    A    Yes.
7    Q    All right.  And my question, you said
8  sort of -- strike that.
9       And I guess my question was, do you
10  know or would it make a difference in your mind if
11  you were to learn that ECFMG actually did find
12  situations where Dr. Akoda had tried to use
13  different names?
14    A    Would it make a difference in my mind?
15  I'm sorry.
16    Q    You don't know?
17    A    No.
18    Q    Would it make a difference in your mind
19  if you were to learn that ECFMG had cooperated
20  with the U.S. Attorney's Office and helped them
21  build a case against Dr. Akoda?
22    A    Possibly, you know.
23    Q    Okay.  And tell me again what you think
24  Dimensions Health Care should have done to prevent
25  Dr. Akoda from seeing you?

Page 142

1       MR. ZAJDEL:  Objection: asked and
2  answered.
3       You can answer.
4       THE WITNESS:  Okay.  Just be more
5  careful about who they allow to practice in their
6  offices, hospitals; pay more attention; be more --
7  take more pride in what they do, you know what I
8  mean, like -- just being on top -- being more
9  careful.
10       MR. SHAFFER:  Okay.  I don't -- I don't
11  have any more questions at this time.  We reserve
12  the right to -- to requestion Ms. Riggins in light
13  of additional documents that might be produced or
14  a change in her position regarding the information
15  that she has not been able to speak to from
16  personal knowledge here today, whether regarding
17  ECFMG or something else.
18       But subject to those comments, we'll
19  adjourn the deposition.
20       MR. ZAJDEL:  Okay.  I don't have any
21  questions.
22       THE VIDEOGRAPHER:  If that is
23  everything, we are off the record on
24  September 16th, 2019, at 12:26.
25

Page 143

1       (Signature having not been waived, the
2  Videotaped Deposition of JASMINE RIGGINS ended at
3  12:26 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 144

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2       I, Dana C. Ryan, Registered Professional
3  Reporter, Certified Realtime Reporter, the officer
4  before whom the foregoing proceedings were taken
5  do hereby certify that the foregoing transcript is
6  a true and correct record to the best of my
7  ability of the proceedings; that said proceedings
8  were taken by me stenographically and thereafter
9  reduced to typewriting under my supervision; and
10  that I am neither counsel for, related to, nor
11  employed by any of the parties to this case and
12  have no interest, financial or otherwise, in its
13  outcome.
14       IN WITNESS WHEREOF, I have hereunto set
15  my hand and affixed my notarial seal this 26th day
16  of September 2019.
17  My Commission expires:
18  July 15, 2020
19
20
21
22  _____
23  NOTARY PUBLIC IN AND FOR THE
24  DISTRICT OF COLUMBIA
25

JA457

Jasmine Riggins

Page 145

```
1           ACKNOWLEDGMENT OF DEPONENT
2           I, Jasmine Riggins, do hereby
3   acknowledge that I have read and examined the
4   foregoing testimony, and the same is a true,
5   correct and complete transcription of the
6   testimony given by me and any corrections appear
7   on the attached Errata sheet signed by me.
8
9
10
11  _____   _____
12  (DATE)              (SIGNATURE)
13
14
15          CERTIFICATE OF NOTARY PUBLIC
16  Sworn and subscribed to before me this
17  _____ day of _____, _____
18
19
20  _____   _____
21  NOTARY PUBLIC           MY COMMISSION EXPIRES
22
23
24
25
```

JA458

EXHIBIT 36

Elsa M. Powell                                    March 27, 2019

                                                   Page 1

1    IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY

2   MONIQUE RUSSELL, et al.  :

3      Plaintiffs           : Case No.:

4          Vs.              : CAL17-22761

5   DIMENSIONS HEALTH CORP., : CAL17-37091

6   et al.                  : CAL18-07863

7      Defendants           :

8              --------------------

9

10          Deposition of ELSA MIGUELINA POWELL, was

11   taken via Videotape on Wednesday, March 27, 2019,

12   commencing at 9:56 a.m., at Schochor, Federico &

13   Staton, P.A., The Paulton, 1211 St. Paul Street,

14   Baltimore, Maryland, before MICHELE D. LAMBIE,

15   Notary Public.

16              --------------------

17

18

19

20

21   Reported By:  Michele D. Lambie, CSR-RPR

JA460

Elsa M. Powell                                                    March 27, 2019

|  | Page 2 |
|---|---|
| 1 | APPEARANCES: |
| 2 | ON BEHALF OF THE PLAINTIFFS: |
| 3 | Schochor, Federico & Staton, P.A. |
| 4 | TARA CLARY, ESQUIRE |
| 5 | tclary@sfspa.com |
| 6 | The Paulton |
| 7 | 1211 St. Paul Street |
| 8 | Baltimore, Maryland 21202 |
| 9 | (410) 234-1000 |
| 10 | |
| 11 | ON BEHALF OF THE DEFENDANTS: |
| 12 | Pessin Katz Law, P.A. |
| 13 | BRIAN M. CATHELL, ESQUIRE |
| 14 | bcathell@pklaw.com |
| 15 | 901 Dulaney Valley Road, Suite 400 |
| 16 | Towson, Maryland 21204 |
| 17 | (410) 938-8800 |
| 18 | |
| 19 | ALSO PRESENT:  Curtis Roginski - Videographer |
| 20 | |
| 21 | |

|  | Page 3 |
|---|---|
| 1 | EXAMINATION INDEX |
| 2 | |
|  | WITNESS:  ELSA MIGUELINA POWELL          PAGE |
| 3 | DIRECT BY MR. CATHELL                          5 |
| 4 | |
| 5 | EXHIBIT INDEX |
| 6 | (Attached to Transcript.) |
| 7 | MARKED |
|  | ELSA MIGUELINA POWELL |
| 8 | Exhibit 1 Answers to Interrogatories        12 |
| 9 | Exhibit 2 Consent Form                          56 |
| 10 | Exhibit 3 Consent Form                          57 |
| 11 | Exhibit 4 Consent Form                          58 |
| 12 | Exhibit 5 Birth Band                              64 |
| 13 | Exhibit 6 Consent Form                          67 |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |

|  | Page 4 |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | THE VIDEOGRAPHER:  Good morning.  We are |
| 3 | going on the record at 9:56 a.m. on March 27th, |
| 4 | 2019.  This media unit one of the video-recorded |
| 5 | deposition of Elsa Powell taken in the matter of |
| 6 | Monique Russell, et al. v Dimensions Health Corp, |
| 7 | et al. filed in the Circuit Court for Prince |
| 8 | George's County, Maryland.  The Case Number is |
| 9 | CAL17-22761, and Case Number CAL17-37091, and Case |
| 10 | Number CAL18-07863. |
| 11 | This deposition is being held at |
| 12 | Schochor, Federico and Staton located at 1211 |
| 13 | St. Paul Street, Baltimore, Maryland 21202. |
| 14 | My name is Curtis Roginski, and I'm the |
| 15 | videographer.  The court reporter is Michele |
| 16 | Lambie. |
| 17 | Will counsel please identify yourselves |
| 18 | and state whom you represent? |
| 19 | MS. CLARY:  Tara Clary for the |
| 20 | Plaintiffs. |
| 21 | MR. CATHELL:  Brian Cathell on behalf of |

|  | Page 5 |
|---|---|
| 1 | the Defendants. |
| 2 | THE VIDEOGRAPHER:  Will the court |
| 3 | reporter please swear in the witness. |
| 4 | ELSA MIGUELINA POWELL |
| 5 | the Deponent, called for examination by the |
| 6 | Defendants, being first duly sworn to tell the |
| 7 | truth, the whole truth, and nothing but the truth, |
| 8 | testified as follows: |
| 9 | DIRECT EXAMINATION |
| 10 | BY MR. CATHELL: |
| 11 | Q.   Good morning, Ms. Powell.  I introduced |
| 12 | myself informally off the record.  Have you had |
| 13 | your deposition taken before? |
| 14 | A.   No. |
| 15 | Q.   Okay.  So, just a few rules before we get |
| 16 | started, okay?  The first rule or -- the first rule |
| 17 | is if you need a break at any time, you're allowed |
| 18 | to do so.  You can take a break for any reason or |
| 19 | no reason.  Just let one of us know, and we may |
| 20 | take a break as well. |
| 21 | So, if -- if you need to go to the |

JA461

Elsa M. Powell                                    March 27, 2019

Page 6

1 bathroom or get a drink or something, that's
2 certainly okay, all right?
3    A.   (Nodding head yes.)
4    Q.   We're not holding you hostage, fair?
5    A.   Fair.
6    Q.   Okay.  She is taking down everything that
7 we say.  Because of that, your responses need to be
8 verbal; yes, no, I don't know.  But they can't be
9 head nods or um-hums or huh-uhs because she has
10 difficulty typing that down, is that fair?
11    A.   Fair.
12    Q.   Okay.  If -- if I ask you a question
13 today that you don't understand, which is entirely
14 possible, please let me know, and I'm happy to
15 rephrase it as many times as I need to, okay?
16    A.   Yes, sir.
17    Q.   If we're talking about a topic that
18 you're confused about, which is likely my fault,
19 just let me know, and I'm happy to try to clarify
20 my questions and to drill down on what it is I'm
21 asking for, okay?

Page 7

1    A.   Yes, sir.
2    Q.   And, lastly, I think we're going to talk
3 about some personal and -- and difficult topics
4 today, and it is not my intention to embarrass you.
5 This is our opportunity to explore the topic of
6 class certification, and so there are certain areas
7 that I need to explore with you here today.  So,
8 I -- I don't want you to embarrass you, and I
9 certainly don't want to upset you, okay?
10    A.   I understand.
11    Q.   Okay.  What is your name?
12    A.   Elsa Powell.
13    Q.   And what is your date of birth,
14 Ms. Powell?
15    A.   April 14, 1987.
16    Q.   And what is your current address?
17    A.   12705 Livo Place, Upper Marlboro,
18 Maryland 20772.
19    Q.   Okay.  And have you gone by any other
20 names or aliases?
21    A.   My maiden name, which is Delvillar-Mejia.

Page 8

1    Q.   And what did you assume the new name,
2 take the new name of Powell?
3    A.   January 13, 2015.
4    Q.   And are you currently married?
5    A.   Yes.
6    Q.   And I assume you've been married
7 continuously since January 13th, 2015?
8    A.   Correct.
9    Q.   And was that your first marriage?
10    A.   Yes.
11    Q.   And what's the name of your spouse?
12    A.   Gregory Lamont Powell, III.
13    Q.   And how many children do you have?
14    A.   Five.
15    Q.   Okay.  Can you tell me their names and
16 ages starting with the oldest?
17    A.   Lucy, she's 13.  Nestor, he's 12.
18 Josiah, he's eight.  Jaiden, he's four, and
19 Tatiana, she's two.
20    Q.   Who lives in your home with you now?
21    A.   Myself, my husband, and my children.

Page 9

1    Q.   All five children?
2    A.   Yes.
3    Q.   And which children do you share in common
4 with Mr. Powell?
5    A.   Jaiden and Tatiana.
6    Q.   And do Lucy, Nestor, and Josiah share a
7 father?
8    A.   Lucy and Nestor do.
9    Q.   Okay.  What was his name or is his name?
10    A.   Nestor Mercedes.
11    Q.   Okay.  And what is the name of the father
12 of Josiah?
13    A.   Waldemar Rodriguez.
14    Q.   Can you spell the first part for me?
15    A.   W-A-L-D-E-M-A-R.
16    Q.   Rodriguez?
17    A.   Yes.
18    Q.   Okay.  And who was living with you in
19 September of 2014 when you -- when you were in
20 contact with Dr. Akoda or when -- I assume that's
21 when you gave birth to Jaiden, correct?

3 (Pages 6 - 9)

Elsa M. Powell                                        March 27, 2019

Page 10

1    A.   That's correct.

2    Q.   Okay.  Who was living with you at that

3 time?

4    A.   My three oldest children.

5    Q.   And Mr. Powell?

6    A.   No.

7    Q.   And when did Mr. Powell first start

8 living with you?

9    A.   January 2015.

10    Q.   So, after the marriage?

11    A.   Yes.

12    Q.   I'd like to talk about your educational

13 background.  Do you hold any degrees or

14 certifications?

15    A.   Certifications, yes.

16    Q.   Okay.  And which certifications do you

17 hold?

18    A.   I'm certified in the Spanish language.  I

19 also hold a Maryland guard card.

20    Q.   Is that National Guard?

21    A.   No.  It's a security guard card.  They

Page 11

1 call it certification card.  A CPR certification

2 card as well.

3    Q.   And a certification in Spanish language,

4 I -- I won't go into that too much, but that's a

5 certification that you're proficient in --

6    A.   In the Spanish language.

7    Q.   -- speaking or teaching Spanish, correct?

8    A.   Correct.

9    Q.   Are you employed currently?

10    A.   Yes.

11    Q.   So, for the sake of brevity, I -- you

12 participate -- I assume you participated in -- in

13 drafting Answers to Interrogatories, and in the

14 interrogatories, you include your employment

15 positions.  So, I will show you what I've marked

16 as -- what I'm going to mark.  Instead of us going

17 through all of them, I'm just going to show you the

18 interrogatories, and then ask you questions about

19 each, is that fair?

20    A.   Um-hum.  Yes, sir.

21        (Whereupon, Powell Deposition Exhibit 1,

Page 12

1 Answers to Interrogatories, marked for

2 identification.)

3 BY MR. CATHELL:

4    Q.   And if you'll turn to the second to the

5 last page I believe -- the third to the last page.

6        MS. CLARY:  Are you looking for the

7 signature line?

8        MR. CATHELL:  Yes.

9        MS. CLARY:  Do you mind if I grab it for

10 you?

11        (Document tendered.)

12        MS. CLARY:  I'm not sure I'm doing any

13 better here.  There you go.

14 BY MR. CATHELL:

15    Q.   In the top-left portion of the document,

16 is that your signature, Ms. Powell?

17    A.   That's correct.

18    Q.   Okay.  And did you participate or provide

19 information for your attorneys to draft the Answers

20 to Interrogatories?

21    A.   That's correct.

Page 13

1    Q.   Okay.  If you'll turn to page 12,

2 specifically answer to Interrogatory Number 16,

3 your employment history is listed?

4    A.   Page 12?

5    Q.   Yes.  If you'll just review that for me

6 briefly.  Is that employment history still accurate

7 as we sit here today?

8    A.   No.  There's been some change.

9    Q.   Okay.  And what are those changes?

10    A.   MVM, it's partner with Paragon Systems,

11 and we're contractors for NIH.

12    Q.   So, the entity title has changed, but

13 you're still employed at the same --

14    A.   Yes.

15    Q.   -- in the same position, correct?

16    A.   Correct.

17    Q.   And you started with MVM in June of 2018,

18 correct?

19    A.   Correct.

20    Q.   And what are your responsibilities at

21 MVM?

4 (Pages 10 - 13)

Elsa M. Powell                                                    March 27, 2019

Page 14

1   A.   Administrative.

2   Q.   Okay.  And are you in a particular

3   department, or are you just administrative?

4   A.   Building 31 at NIH.

5   Q.   And what are your daily roles and

6   responsibilities?

7   A.   Answer the phone, do reports, cover

8   shifts.

9   Q.   Okay.

10  A.   It's a lot.

11  Q.   All right.

12  A.   It's --

13  Q.   I'm sure it is.  Are you full time?

14  A.   Yes.

15  Q.   And is that five days a week?

16  A.   Yes.

17  Q.   Okay.  And prior to MVM, you were with

18  Blueline Security Services, correct?

19  A.   That's correct.

20  Q.   And what were the circumstances under

21  which you left Blueline Security Ser- -- Services?

Page 15

1   A.   MVM offered a better opportunity for me.

2   Q.   And what did you do between April of

3   18 -- 2018 and June of 2018?

4   A.   I was taking care of my two-year-old

5   daughter, who was born with a kidney issue.

6   Q.   Okay.  And would that have been Tatiana?

7   A.   Yes.

8   Q.   Okay.  Prior to Blueline Security

9   Services, you were a front-desk agent at VMG

10  Resources, correct?

11  A.   That's correct.

12  Q.   And you were there from February 2014 to

13  July 2014?

14  A.   That's correct.

15  Q.   What employment outside of the

16  home -- understanding that employment inside of the

17  home is much more rigorous than employment outside

18  of the home.  What employment, if any, did you hold

19  outside of the home between July 2014 and November

20  2017?

21  A.   I was not working outside of the home at

Page 16

1   the time.

2   Q.   And what were the circumstances under

3   which you left VMG Resources in July 2014?

4   A.   My other three children needed full-time

5   care that I wasn't provided with my schedule at VMG

6   Resources.

7   Q.   And prior to VMG Resources, you were with

8   Little Imaginations Development Center.  Is that a

9   child-care facility?

10  A.   Yes.

11  Q.   Okay.  And you were there from April 2013

12  to June 2013?

13  A.   Correct.

14  Q.   And what were the circumstances under

15  which you left Little Imaginations in June of 2013?

16  A.   The pay was not what I expected.

17  Q.   And did you work outside of the home

18  between June 2013 and February of 2014?

19  A.   No, I did not.

20  Q.   And I assume that was also to care for

21  your children at that time?

Page 17

1   A.   Yes.

2   Q.   I notice in your Answers to

3   Interrogatories, you listed George Washington

4   Hospital special police officer.  Are you still

5   credentialed as a police officer?

6   A.   No.  I'm credentialed as a security

7   guard.

8   Q.   Okay.  Were you credentialed as a special

9   police officer?

10  A.   Yes, I was.

11  Q.   And it's my understanding that that is a

12  certification that you have to maintain as the

13  years pass; is that correct?

14  A.   Correct.

15  Q.   And I assume you just, for whatever

16  reason, didn't maintain that certification?

17  A.   That's correct.

18  Q.   So, this is a question that we're -- that

19  I have to ask everybody, so it's not particular to

20  you.

21       Have you since your 18th birthday, while

5 (Pages 14 - 17)

JA464

Elsa M. Powell                                                    March 27, 2019

Page 18

1  you were represented by counsel, ever pleaded
2  guilty to or have been convicted of any crime,
3  other than a minor traffic violation?
4      MS. CLARY:  Objection, but you can
5  answer.
6      THE WITNESS:  Never.
7  BY MR. CATHELL:
8      Q.  I didn't -- I didn't suspect so.  And
9  you've never had your deposition taken before,
10  correct?
11     A.  Correct.
12     Q.  Have you ever been a Plaintiff or a
13  defendant in any lawsuit?
14     A.  No.
15     Q.  Have you ever made a claim for injury
16  against any individual, business, or other entity?
17     A.  Yes.
18     Q.  Okay.  And tell me about that claim.
19     A.  CVS about nine years ago gave me the
20  wrong medication.
21     Q.  And was that in Baltimore?

Page 19

1      A.  No.
2      Q.  Or in Maryland?
3      A.  Maryland, yes.
4      Q.  Okay.  And what type of claim did
5  you -- did you make?
6      A.  I do not recall.  I -- my lawyer handled
7  everything.  I know there was a settlement for
8  10,000.
9      Q.  Okay.  Do you know if a lawsuit was ever
10  filed on your behalf?
11     A.  I do not recall.
12     Q.  And the medication error, did it cause
13  you injury?
14     A.  Yes.
15     Q.  And tell me about the injury it caused
16  you.
17     A.  It caused me to bleed out.
18     Q.  Can you describe that for me?
19     A.  I was in the process of having a
20  miscarriage, and CVS gave me aspirin, which led for
21  me to bleed out.

Page 20

1      Q.  When -- when you say you bled out, did
2  you -- were you hospitalized as a result of
3  the -- the -- taking the aspirin?
4      A.  Not hospitalized.  They let me go the
5  same day, but it kind of pushed the miscarriage.
6      Q.  I'm sorry.  Did you have any lasting or
7  permanent injury as a result of the medication
8  error?
9      A.  No.
10     Q.  Did you make a claim for that same
11  scenario for any mental health damages, --
12     A.  No.
13     Q.  -- such as depression or anxiety?
14     A.  No.
15     Q.  Is that the only claim you've made?
16  Other than the current lawsuit, is that the only
17  claim you've made against a healthcare provider?
18     A.  Yes.
19     Q.  Have you ever made a Workers'
20  Compensation claim?
21     A.  No.

Page 21

1      Q.  Have you ever suffered physical,
2  emotional, or sexual abuse of any kind by any
3  person at any time in your life?
4      A.  No.
5      Q.  Have you ever been injured physically,
6  mentally, or emotionally in any way by any other
7  person at any time?
8      A.  No.
9      Q.  Have you ever been hospitalized, other
10  than to deliver one of your children?
11     A.  No.
12     Q.  I know you have five children.
13  How -- how many times have you been pregnant?
14     A.  Six.
15     Q.  Have you ever been diagnosed with a
16  condition that affects or limits your activities in
17  any way?
18     A.  No.
19     Q.  And that would include a mental or a
20  physical condition?
21     A.  No.

6 (Pages 18 - 21)

JA465

Elsa M. Powell                                      March 27, 2019

|  | Page 22 |
|---|---|

1   Q.  Have you ever been diagnosed with a
2 mental illness of any kind?
3   A.  No.
4   Q.  Have you taken any medications at any
5 time in your life for a mental illness, which would
6 also include depression or anxiety?
7   A.  No.
8   Q.  Have you ever been diagnosed with
9 posttraumatic stress disorder?
10   A.  No.
11   Q.  Talking about your prior medical history,
12 who is -- starting with your current primary care
13 provider.  Do you have a current primary care
14 provider?
15   A.  Yes, I do.
16   Q.  And what is his or her name?
17   A.  Emily Lo, L-O.
18   Q.  And where is Dr. Lo located?
19   A.  Kaiser Permanente', Camp Springs,
20 Maryland.
21   Q.  And how long have you been a patient of

|  | Page 23 |
|---|---|

1 Dr. Lo, if you know?
2   A.  Three to four years.
3   Q.  And how often do you see Dr. Lo?
4   A.  Not often.
5   Q.  Do you see her once a year, once every
6 six months, once every two years?
7   A.  Unless I'm really sick and I can't take
8 it any more, then I'll go see her.  Other than
9 that, I don't see her.
10   Q.  When is the last time you saw Dr. Lo, if
11 you can recall?
12   A.  The last time I saw her was some time in
13 February.
14   Q.  Of 2019?
15   A.  Yes.
16   Q.  Okay.  And what was that for?
17   A.  I had a terrible cough, so I went to see
18 her.
19   Q.  And did she prescribe you medication or
20 offer other treatment for the cough?
21   A.  Yeah.  She said I had an upper-body

|  | Page 24 |
|---|---|

1 respiratory infection, so she prescribed some cough
2 pills and an inhaler.
3   Q.  Do you currently have an OB/GYN?
4   A.  Yes, I do.
5   Q.  And who is that?  What is that person's
6 name?
7   A.  I do not know his name.
8   Q.  And the doctor is a male?
9   A.  Yes.
10   Q.  Do you know where his office is located?
11   A.  Kaiser Permanente', Marlton.
12   Q.  Are you saying --
13   A.  Marlton.
14   Q.  -- Marlton?
15   A.  Yes.  It's -- it's in Marlton,
16 and --
17   Q.  Marlton as -- as in the city of Marlton?
18   A.  In Maryland.  Well, it's considered
19 Temple Hills as well.
20   Q.  Okay.
21      MS. CLARY:  M-A-R-L-T-O-N.

|  | Page 25 |
|---|---|

1      MR. CATHELL:  Thank you.  I had not heard
2 of that.
3      MS. CLARY:  I had not either, but I have
4 an IPad in front of me, so I looked it up.
5 BY MR. CATHELL:
6   Q.  Do you have any other identifying
7 information that I could use to try to find
8 this -- this doctor?  It's a male at Kaiser
9 Perm -- Permanente' in Marlton.  Do you know, is he
10 part of a practice group?
11   A.  I just know that he's with Kaiser.
12   Q.  Okay.  Is he -- do you know, is he
13 Caucasian or African American?
14   A.  I haven't -- I haven't -- I haven't seen
15 him yet.  They told me to make an appointment, and
16 I haven't -- I haven't gone and seen him.
17   Q.  So, you haven't actually received
18 treatment from this doctor, correct?
19   A.  No.
20   Q.  Prior to deciding that you would see
21 the -- this -- the male doctor at Kaiser

Veritext Legal Solutions

Elsa M. Powell                                      March 27, 2019

Page 26

1 Permanente', did you have an OB/GYN?
2    A.   Yes, when I was pregnant with my youngest
3 daughter.
4    Q.   And who was that doctor?
5    A.   I had Dr. Kingsley.  The same location.
6    Q.   Kingsley?
7    A.   Yes, and it was -- it was another female
8 doctor.  I can't remember her name.
9    Q.   And how often did you say or
10 what -- strike that.
11         What years did you see Dr. Kingsley?
12    A.   I saw Dr. Kingsley from 2015 till 2016.
13    Q.   So, from 2016 until making arrangements
14 with the unidentified male physician at Kaiser
15 Permanente', did you see any other OB/GYNs?
16    A.   No.
17    Q.   Would your primary care provider during
18 that time perform yearly wellness checks, or did
19 you just not get the yearly wellness checks?
20    A.   I did not get them.
21    Q.   Prior to Dr. Kingsley, who was your

Page 27

1 OB/GYN?
2    A.   Prior to Dr. Kingsley?
3    Q.   Yes.
4    A.   Dr. Akoda.
5    Q.   And we're going to explore that in detail
6 in a couple of minutes, but what years did you see
7 Dr. Akoda, if you recall?
8    A.   I saw Dr. Akoda from 2014 to 2015.
9    Q.   And prior to Dr. Akoda in -- do you
10 remember the specific month, by chance, that you
11 first came into contact with Dr. Akoda?
12    A.   If I'm not mistaken, it was around April
13 or May of 2014.
14    Q.   And prior to Dr. Akoda, who was your
15 OB/GYN?
16    A.   I do not remember her name.
17    Q.   Had that OB/GYN -- you said her, so I
18 assume it was a female, correct?
19    A.   It was a female, yes.
20    Q.   Had that OB/GYN been the OB/GYN who cared
21 for you during your pregnancies and delivered your

Page 28

1 first three children?
2    A.   No.  She was my OB/GYN with Jaiden, my
3 four-year-old.  I started with her.  Her
4 practice -- at her office, you only could go a
5 certain amount of months, and then she would refer
6 you.
7    Q.   And I assume she referred you in 2014 to
8 Dr. Akoda, correct?
9    A.   Not him, per se.
10    Q.   Fair enough.  To Dr. -- to Dr. Chaudry's
11 practice, correct?
12    A.   Correct.
13    Q.   Who was the OB/GYN that -- if there -- if
14 there was one single doctor, who was the OB/GYN
15 that cared for you and delivered the first three
16 children, if you -- if there is one specific
17 person?
18    A.   It was in Virginia.  Arlington Hospital.
19 It's a prac- -- an office -- a doctor's office,
20 OB/GYN.  I do not remember his name.  It's so long
21 ago.

Page 29

1    Q.   Have you since your involvement with
2 Dr. Akoda seen any healthcare provider of any kind
3 for any issue you claim is related to your
4 involvement with Dr. Akoda?
5    A.   No.
6    Q.   What medications do you currently take?
7    A.   Ibuprofen.
8    Q.   So, you don't have any prescription
9 medications, is that fair?
10    A.   Besides the cough medicine,
11 that's -- that's it.
12    Q.   Okay.  Have you at any time had an OB/GYN
13 or primary care provider that we have not already
14 discussed?
15    A.   No.
16    Q.   So, Dr. Lo, who you began working with
17 three to four years ago, would have been your first
18 primary care provider?
19    A.   Yes.
20    Q.   What evidence do you have regarding
21 Dr. Akoda's background?

8 (Pages 26 - 29)

JA467

Elsa M. Powell                                                  March 27, 2019

Page 30

1    A.  What evidence do I have?

2        MS. CLARY:  Let me --

3  BY MR. CATHELL:

4    Q.  If any.  If any.

5        MS. CLARY:  I'm just going to object to

6  the overbroad nature, but you can answer as best

7  you can.

8        THE WITNESS:  I don't -- I'm not

9  understanding the question.

10 BY MR. CATHELL:

11   Q.  Okay.  Do you have any evidence

12 regarding -- you yourself -- let me strike that.

13       These questions pertain only to you, not

14 what you've learned from your attorneys.  But just

15 I'm trying to explore what you personally have

16 either in your possession or your knowledge, is

17 that fair?

18   A.  That's fair.

19   Q.  Okay.  Do you have any evidence yourself

20 regarding Dr. Akoda's background?

21   A.  No.

Page 31

1    Q.  It's not a trick question.  I'm just --

2  want to make sure I cover everything.

3        Do you have any evidence regarding

4  whether Dr. Akoda was licensed to practice medicine

5  in Maryland?

6    A.  No.

7    Q.  Do you have any evidence regarding

8  whether Dr. Akoda was licensed to practice medicine

9  in Virginia?

10   A.  No.

11   Q.  What evidence do you have regarding

12 Dr. Akoda's training as a doctor?

13   A.  None.

14   Q.  Do you know where Dr. Akoda went to

15 medical school?

16   A.  No.

17   Q.  Do you know where Dr. Akoda did his

18 residency?

19   A.  No.

20   Q.  Do you know what a residency is?

21   A.  I'm assuming it's a medical school for

Page 32

1  doctors.

2    Q.  Do you know what goes into successfully

3  completing a medical residency?

4    A.  Years of training and hard dedication.

5    Q.  Do you know whether Dr. Akoda

6  successfully completed a medical residency?

7    A.  No.

8    Q.  Do you know if Dr. Akoda passed all

9  national examinations in order to complete his

10 residency?

11   A.  No.

12   Q.  Do you know whether Dr. Akoda passed or

13 failed any medical examinations?

14   A.  No.

15   Q.  Do you know whether Dr. Akoda was board

16 certified by the American Board of Obstetrics and

17 Gyn -- and Gynecology?

18   A.  No.

19   Q.  Do you know what is entailed with -- in

20 order for a physician to become board certified?

21   A.  No, I do not.

Page 33

1    Q.  Were you aware that Dr. Akoda took a

2  written board examination and passed?

3    A.  No, I do not.

4    Q.  Were you aware that Dr. Akoda took an

5  oral examination and passed?

6    A.  No.

7    Q.  What do you know about how Dr. Akoda

8  began using the name Akoda?

9    A.  Nothing.  I thought he was born with it.

10   Q.  Do you know when Dr. Akoda began using

11 the name Akoda?

12   A.  No.

13   Q.  Do you know why he began using the name

14 Akoda?

15   A.  No.

16   Q.  Do you know what ECFMG certification

17 stands for?

18   A.  Yes.

19   Q.  What is that?

20   A.  It's -- it's where they decide who's

21 qualified, which -- which foreign doctor is

9 (Pages 30 - 33)

Elsa M. Powell                                    March 27, 2019

Page 34

1  qualified to practice.

2    Q.  The acronym stands for Educational

3  Commission for Foreign Med- -- Medical Graduates?

4    A.  (Nodding head yes.)

5    Q.  Were you aware that to be certified a

6  foreign medical graduate takes an examination

7  administered by ECFMG?

8    A.  No.

9    Q.  Do you know whether Dr. Akoda took such

10  an examination?

11    A.  No.

12    Q.  Do you know how many times Dr. Akoda

13  successfully passed the ECFMG examinations?

14    A.  No.

15    Q.  Do you know under which names Dr. Akoda

16  took the ECFMG examinations?

17    A.  No.

18    Q.  Do you know whether Dr. Akoda was

19  certified by ECFMG?

20    A.  No.

21    Q.  Do you have any information regarding

Page 35

1  what occurred with Dr. Akoda's ECFMG

2  certifications?

3    A.  No.

4    Q.  Are you aware of a lawsuit pending in the

5  United States Federal District Court in

6  Philadelphia against ECFMG regarding their

7  certification of Dr. Akoda?

8    A.  Yes.

9    Q.  Okay.  What is your knowledge of that

10  lawsuit?

11    A.  What is my knowledge of that lawsuit?

12    Q.  I can rephrase.  Are you -- are you a

13  Plaintiff in that lawsuit?

14    A.  Yes.

15    Q.  And we're not -- I'm not going to get

16  into what you know as a result of conversations

17  with your attorneys, but I just want to explore

18  peripherally.

19        Are you represented by the law

20  firm -- law firm, Schochor, Federico and Staton, in

21  that lawsuit?

Page 36

1        MS. CLARY:  I'm going to object, and she

2  can certainly answer just yes or no.

3        MR. CATHELL:  Right.

4        THE WITNESS:  Yes.

5  BY MR. CATHELL:

6    Q.  And are you a -- to your knowledge, are

7  you a class Plaintiff in that lawsuit?

8    A.  Yes.

9    Q.  Have you been deposed in that lawsuit?

10    A.  I'm sorry?

11    Q.  I assume -- you told me earlier you

12  haven't sat for a deposition, but -- so I assume

13  you have not been deposed in that lawsuit

14  yet, --

15    A.  No.

16    Q.  -- correct?  Is what you know about

17  Dr. Akoda limited to what information your Counsel

18  has provided you?

19    A.  Yes.

20    Q.  Do you have any evidence outside of what

21  your Counsel has advised you about Dr. Akoda?

Page 37

1    A.  No.

2    Q.  How did you -- and, again, no discussions

3  with your attorneys.  How did you come to be a

4  client of the Schochor, Federico and Staton law

5  firm regarding this claim and the Philadelphia

6  claim?

7        MS. CLARY:  I'm going to object and

8  instruct her not to answer anything with respect to

9  not just discussions that we had, but contacts that

10  she had with our office.

11        In terms of any discussions that she may

12  have had with others not involved or people who are

13  not employed by our law firm who may have -- I

14  don't want to make a speaking objection.  I just

15  want her to be clear as to what she can talk about

16  and what I'm instructing her not to answer.

17        I don't have a problem, and you're -- I

18  want you to answer the question with respect to how

19  somebody told you about Dr. Akoda and how you

20  were -- how you got in touch with us, but once the

21  phone call or whatever that first contact was with

Elsa M. Powell                                                    March 27, 2019

Page 38

1  us, anything from that point forward, I'm going to
2  instruct you not to answer.
3        THE WITNESS: Okay.
4        MR. CATHELL: So, one second. Note our
5  response from the prior depositions.
6  BY MR. CATHELL:
7    Q.  Let me ask you a more pointed question,
8  understanding Counsel's objection, which we needed
9  to get on the record.
10      What caused you to first reach out to the
11  Schochor, Federico and Staton law firm?
12   A.  Well, a friend of mine called me and told
13  me about the situation. So, she gave me the
14  number. She said, I need you to call this number.
15  So, I asked her why? Whose number is this? So,
16  she said, you just need to know that Dr. Akoda is
17  not a doctor. Call this number. So, that's when I
18  called the number.
19   Q.  Okay. You can stop there based on
20  Counsel's objection. Who was -- what's the name of
21  your friend that called you?

Page 39

1        THE WITNESS: Am I allowed to say it?
2        MS. CLARY: Yes.
3        THE WITNESS: Latisa.
4  BY MR. CATHELL:
5    Q.  Is that Latisa Gaymon?
6    A.  Yes.
7    Q.  Are you aware that Ms. Gaymon is also a
8  Plaintiff in this lawsuit?
9    A.  Yes.
10   Q.  And when did Dr. -- Ms. Gaymon call you,
11  if you recall?
12   A.  Some time in late 2018.
13   Q.  Late 2018?
14   A.  Some time in 2018. I can't really
15  remember the exact month.
16   Q.  And I know you told me that she said that
17  you needed to call a certain telephone number and
18  that she told you about the situation. Can you be
19  more specific as to what she told you?
20   A.  She told me that Dr. Akoda wasn't a real
21  doctor, and I was confused, and I didn't know what

Page 40

1  she was talking about. So, she said, if you don't
2  believe me, you can look it up. That's when I
3  Googled it, and that's when I read everything that
4  the news had provided.
5    Q.  Do you know how Ms. Gaymon knew that you
6  had been a patient of Dr. Akoda's?
7    A.  We met at the patient's -- at the office.
8    Q.  Okay. So, you met at the office in 2014
9  and remained friends, or at least acquaintances,
10  since --
11   A.  Yes.
12   Q.  -- that time? And do you recall what you
13  saw when you Googled the allegations? Was it a
14  specific website, a video, or advertisement?
15   A.  It was the news. It was FOX, NBC. They
16  had different links about how Dr. Akoda wasn't a
17  real doctor, and his name wasn't really Akoda.
18   Q.  How long between the time Ms. Gaymon
19  called you did you call the number that she gave
20  you?
21   A.  Two days after.

Page 41

1    Q.  Prior to this statement from your friend,
2  or the telephone call from your friend, you had no
3  prior -- you had no -- strike all of that.
4        Prior to the statement or the telephone
5  call by your friend, you had no prior complaints
6  about Dr. Akoda; is that correct?
7    A.  Complaints? Like how complaints? Like
8  formal complaints?
9    Q.  How -- how do you define complaints?
10       MS. CLARY: I'm going to object to the
11  form of the question. You can answer as best you
12  can.
13       THE WITNESS: Okay. I did have a couple
14  of -- of complaints and concern. When I was being
15  seen by him, he was flirtatious and inappropriate.
16  BY MR. CATHELL:
17   Q.  And we'll explore this more in a bit.
18  Anything other than being flirtatious or being
19  inappropriate?
20   A.  No.
21   Q.  Had you -- had you made those formal

11 (Pages 38 - 41)

Elsa M. Powell                                           March 27, 2019

Page 42

1  complaints to anybody?
2      A.  To one of the nurses at the -- the
3  doctor's office.
4      Q.  And which doctor's office was that?
5  Dr. Chaudry's?
6      A.  Dr. Chaudry's.
7      Q.  And do you remember the identity of the
8  nurse?
9      A.  She was an African American.
10     Q.  Older?  Younger?
11     A.  Older.
12     Q.  Short hair?  Long hair?
13     A.  Older.
14     Q.  Older.
15     A.  Short hair.
16     Q.  Did she speak with an accent, do you
17  know?
18     A.  No, she did not.
19     Q.  Did she have glasses?
20     A.  No, she did not.
21     Q.  And what was your specific complaint to

Page 43

1  this nurse?
2      A.  That he was very flirtatious, and when I
3  was getting my breasts examined, he would make
4  comments and say that I have wonderful breasts.
5      Q.  Can you describe what you mean by
6  flirtatious?
7          MS. CLARY:  Objection to the extent I
8  think she covered that, but go ahead.
9  BY MR. CATHELL:
10     Q.  To the extent you haven't covered it, do
11  you have anything else to further describe what you
12  mean by very flirtatious?
13     A.  He would be very flirtatious as in, oh,
14  you look very nice today.  You should marry me one
15  day.  At first, I thought it was like a joke, but
16  then, you know, he would constantly say comments
17  like that.  And when he said, oh, you have really
18  nice breasts, that's when I was like, okay,
19  this -- this is not professional.
20     Q.  On how many occasions -- on how many
21  occasions did he tell you you had very nice

Page 44

1  breasts?
2      A.  Two occasions.
3      Q.  And do you remember the date of those
4  statements?
5      A.  No, I do not remember the dates.
6      Q.  And on how many occasions was he very
7  flirtatious, what you've described as telling you,
8  you look nice or that he wants to marry you or
9  other flirtatious behavior?
10     A.  It was two or three times.
11     Q.  Were those on the same dates as when he
12  told you you had very nice breasts?
13     A.  A week apart.
14     Q.  And when did you bring this to the
15  attention of the nurse in Dr. Chaudry's office?
16     A.  The first time that he said that I had
17  nice breasts, I brought it to her attention.  I
18  also requested a female nurse while I was getting
19  my check-ups.
20     Q.  Do you recall the date that you told the
21  nurse?

Page 45

1      A.  No, I do not recall the date.
2      Q.  After telling the nurse in Dr. Chaudry's
3  office of the statement, what happened?
4  Did -- were you given a female nurse while being
5  examined?
6      A.  Yes.  She would be in the -- in the room.
7      Q.  And is it fair to say that your only
8  involvement with this specific nurse would have
9  been in Dr. Chaudry's office?
10     A.  Yes.
11     Q.  Did you report the inappropriate behavior
12  to anyone other than the nurse in Dr. Chaudry's
13  office?
14     A.  No.
15     Q.  Did the in- -- alleged inappropriate
16  touching or statements occur in the presence of any
17  other individual?  Bless you.
18     A.  No.  Bless you.
19         MS. CLARY:  Sorry.
20  BY MR. CATHELL:
21     Q.  And did they occur in the examination

12 (Pages 42 - 45)

JA471

Elisa M. Powell                                                    March 27, 2019

Page 46

1  room?

2    A.  Yes.

3    Q.  At -- at Dr. Chaudry's office?

4    A.  That's correct.

5    Q.  So, it's fair to say there were no

6  witnesses to the inappropriate statements or

7  touching?

8    A.  No.

9    Q.  Do you know whether there was any type of

10  recording, whether it's an audio recording or video

11  recording, of the inappropriate statements or

12  touching?

13    A.  I'm not -- I'm not sure.

14    Q.  You've told me that you reported that

15  Dr. Akoda commented on your breasts, and the first

16  time you told the nurse in Dr. Chaudry's office; is

17  that correct?

18    A.  That's correct.

19    Q.  And you also told me that that behavior

20  continued, I believe, two to three times; is that

21  correct?

Page 47

1    A.  That's correct.

2    Q.  Did you continue to report the

3  inappropriate conduct to the nurse or to anyone

4  else?

5    A.  Well, the nurse wasn't always there every

6  time I saw Dr. Akoda.  Sometimes she would be

7  there; sometimes she would not be there.

8    Q.  Did any of the alleged inappropriate

9  behavior -- behavior occur while the nurse was in

10  the examination room?

11    A.  No.

12    Q.  Again, without discussing specific

13  conversations that you may or may not have had with

14  an attorney, did you make an effort to reach out to

15  an attorney to investigate the -- what you've

16  described as the inappropriate statements or

17  touching?

18        MS. CLARY:  I'm going to object and

19  instruct her not to answer to the extent I believe

20  that's covered by the attorney/client privilege and

21  work product doctrine.

Page 48

1        MR. CATHELL:  And our -- our response,

2  just for the record, I don't think we've covered

3  this one, is that it is just soliciting counsel.

4  I'm not trying to get into the specific initial

5  conversation, just the action of deciding to retain

6  counsel or to investigate a potential claim, but I

7  note your objection, and we'll move on.

8  BY MR. CATHELL:

9    Q.  Were you ever -- strike that.

10        Did you ever make a claim for the alleged

11  inappropriate statement or contact of any kind?

12        MS. CLARY:  Objection.  Outside of this

13  litigation?

14  BY MR. CATHELL:

15    Q.  Outside of this litigation?

16    A.  No.

17    Q.  And I believe I asked you this, but --

18  so, I apologize if I'm asking it again.  Do you

19  know the name of the nurse?

20    A.  No, I do not.

21    Q.  Do you have any evidence that Dr. Akoda

Page 49

1  lacked OB/GYN training or skills?

2        MS. CLARY:  Objection to the extent I

3  think it's been asked and answered, but go ahead

4  again.

5        THE WITNESS:  No.

6  BY MR. CATHELL:

7    Q.  How did you become aware of Dr. Akoda as

8  an OB/GYN?

9    A.  I was referred to Dr. Chaudry's office.

10    Q.  And what were the circumstances under

11  which you were referred to Dr. Chaudry's office?

12        MS. CLARY:  Objection to the extent I

13  think she has talked about it, but you can go ahead

14  again.

15        THE WITNESS:  The female OB/GYN that I

16  was seeing at first, she only covered the first few

17  months of the pregnancy, so she referred me to

18  Dr. Chaudry's office.  I thought I was going to see

19  Dr. Chaudry, but that's when all of my visits were

20  with Dr. Akoda.

21  BY MR. CATHELL:

13 (Pages 46 - 49)

Elsa M. Powell                                              March 27, 2019

Page 50

1    Q.   Okay.  And did you ever see Dr. Chaudry

2    during that time?

3    A.   No.

4    Q.   I should ask a better question.  Were you

5    ever cared for or treated by Dr. Chaudry during

6    that time?

7    A.   Once at the hospital, after I had my

8    emergency surgery, he came to remove the bandages.

9    Q.   And that would have been the postpartum

10   surgical procedure that you underwent?

11   A.   No.  It was complications after I had my

12   son.

13   Q.   I know you told me your first contact

14   with Dr. Akoda would have been in April or May of

15   2014, correct?

16   A.   (Nodding head yes.)

17   Q.   And I -- may I assume that that first

18   contact occurred at the office of Dr. Chaudry?

19   A.   Correct.

20   Q.   And on the first date that you presented

21   to Dr. Chaudry, after being referred by your prior

Page 51

1    OB/GYN, were you seen by Dr. Akoda?

2    A.   I was.

3    Q.   And how often, following that initial

4    visit, were you seen by Dr. Akoda?

5    A.   It started every month, and then it was

6    every week.

7    Q.   When did it become every week, if you

8    recall?

9    A.   Around August/October.

10   Q.   So, leading up to as you became -- as it

11   became closer to delivery time, that's when you

12   started seeing Dr. Akoda every week, is that fair?

13   A.   That's correct.

14   Q.   And it's my understanding from your

15   medical records that all of your contacts with

16   Dr. Akoda, prior to the actual birth of Jaiden,

17   were at Dr. Chaudry's office; is that correct?

18   A.   That's correct.

19   Q.   Do you know approximately how many times

20   you received treatment from Dr. Akoda?

21        MS. CLARY:  Prenatally?

Page 52

1        MR. CATHELL:  Any.

2        MS. CLARY:  Okay.  Thank you.

3        THE WITNESS:  Any?  Geez, it was a few,

4    because after I had my son, I went for my

5    six -- six-week check-up with Dr. Akoda.

6    BY MR. CATHELL:

7    Q.   Do you recall what Dr. Akoda looked like?

8    A.   Yes.  African male.  He was about I will

9    say 6'1", older, glasses.

10   Q.   Okay.  Thank you.  Do you -- do you

11   recall what Dr. Akoda sounded like?

12   A.   Strong accent.

13   Q.   Other than what you've told me about as

14   far as the inappropriate statements or touching, do

15   you have any inter- -- are there any interactions

16   with Dr. Akoda that we -- that you have a specific

17   memory of that we haven't discussed?

18   A.   No.  Not including the delivery, right?

19   Q.   Well, just including everything.

20   A.   Okay.

21   Q.   I guess what I'm -- I', trying to get at,

Page 53

1    are there any interactions that you had with

2    Dr. Akoda prior to delivery of Jaiden that we have

3    not discussed?

4    A.   My six-week check-up, he did a procedure

5    at Dr. Chaudry's office.  He said I had an ovarian

6    cyst, and he did a procedure right there at the

7    office where he burned it.

8    Q.   And this would have been your six-week

9    postpartum check-up?

10   A.   Yeah.  Yes, sir.  That's the last time I

11   saw him.

12   Q.   Had you been having symptoms or signs of

13   an ovarian cyst?

14   A.   No.

15   Q.   What evidence do you have that Dr. Akoda

16   was affiliated with the Prince George's County

17   Hospital Center?

18   A.   My birth band.  The band they give you at

19   the hospital.

20   Q.   And do you still have that?

21   A.   I sure do.

14 (Pages 50 - 53)

Elsa M. Powell                                          March 27, 2019

Page 54

1    Q.   And if it's possible, I would ask that
2  we -- you provide that to your Counsel so we can
3  have a copy of it, okay?
4    A.   Okay.
5        MS. CLARY:  Okay.  That's fine.  We'll
6  make a copy of it so she can keep it for
7  sentimental reasons.
8        MR. CATHELL:  Yes.  That's what I said,
9  copy.
10       MS. CLARY:  Sure.
11       MR. CATHELL:  I know we have ours framed
12  and the whole nine yards.
13  BY MR. CATHELL:
14   Q.   What about -- what information was on the
15  birth band that led you to believe Dr. Akoda was
16  affiliated with the hospital?
17   A.   Well, his name was on it.  His name was
18  on it.
19   Q.   And do you recall the specific date that
20  you presented to Prince George's County Hospital to
21  deliver Jaiden?

Page 55

1    A.   September 13, 2014.
2    Q.   And what caused you to go to the hospital
3  at that time?
4    A.   I was getting induced.
5    Q.   And, to your knowledge, who made the
6  decision -- the medical decision to induce you?
7    A.   Dr. Akoda.
8    Q.   And did Dr. Akoda, in fact, induce you on
9  September 13, 2014?
10   A.   Yes.
11   Q.   And when you presented to the hospital,
12  throughout the course of your care, do you recall
13  being presented with various consent forms that you
14  ultimately read and signed?
15   A.   Yes, I remember them.
16       MR. CATHELL:  Can I see your Answers to
17  Interrogatories?
18       (Document tendered.)
19       MR. CATHELL:  I want to make sure my
20  Exhibit Numbers are correct.
21       (Whereupon, Powell Deposition Exhibit 2,

Page 56

1  Consent Form, marked for identification.)
2  BY MR. CATHELL:
3    Q.   Okay.  I'm showing you a two-page
4  document that is dated September 16, 2014, and the
5  exhibit sticker is on the first page.  If you'll
6  take a look at that document for me.
7        MS. CLARY:  That's the first page.
8  That's the second page.
9        (Whereupon, there was a pause for
10  document examination.)
11  BY MR. CATHELL:
12   Q.   And --
13   A.   Okay.
14   Q.   Could I have that back real quick?
15       (Document tendered.)
16  BY MR. CATHELL:
17   Q.   I couldn't see from where I'm sitting.
18  Is the -- is this your signature on the document
19  towards the bottom left of the second page?
20   A.   Yes.
21   Q.   And on the first page, there's a

Page 57

1  paragraph at top -- at the top that is titled
2  Physicians Not as Employees, is that -- are those
3  your initials at the end of that paragraph?
4    A.   Yes.
5    Q.   And did you read through this document
6  and understand its consents prior to signing it?
7    A.   No.  I'm not even going to lie.  I did
8  not read it.  They just said without it, if you
9  didn't sign it, they can't -- they couldn't give me
10  the -- the care that I needed.  And I was just
11  thinking about the care, and I needed to deliver my
12  baby, so I just signed it.
13       (Whereupon, Powell Deposition Exhibit Number 3,
14  Consent Form, marked for identification.)
15  BY MR. CATHELL:
16   Q.   I'm handing you a three-page document
17  that is labeled Exhibit 3.  On the first page, you
18  would agree those are your initials on the
19  left-hand column of that document?
20   A.   Okay.
21   Q.   Is that a yes or no?

15 (Pages 54 - 57)

Veritext Legal Solutions

JA474

Elsa M. Powell                                        March 27, 2019

Page 58

1    A.  Yes.  That's a yes.

2    Q.  On the second page, you would agree those

3  are your initials and your signature in two

4  locations on the document?

5    A.  Yes.

6    Q.  And the third page I'm just putting in

7  for completeness, but it doesn't have your

8  signature.

9        And, again, I apologize for all of the

10  exhibits, but Exhibit Number 4 is a three-page

11  document labeled Deposition Exhibit 4.

12        (Whereupon, Powell Deposition Exhibit 4,

13  Consent Form, marked for identification.)

14  BY MR. CATHELL:

15    Q.  It's a three-page document, and you would

16  agree that it is your signature on the third page

17  in the upper right-hand corner?

18        MS. CLARY:  I'm sorry, it's on the third

19  page?

20        MR. CATHELL:  Yes.

21        THE WITNESS:  Yes.

Page 59

1  BY MR. CATHELL:

2    Q.  Are you okay?  Do you need a break?

3    A.  No.  I'm good.

4        MS. CLARY:  I might need one in a few

5  minutes.  I don't want to interrupt you.

6        MR. CATHELL:  Now would be perfect.

7        MS. CLARY:  If you get -- have a good

8  stopping point.

9        MR. CATHELL:  Now would be perfect.

10        THE VIDEOGRAPHER:  This marks the end of

11  media unit number one.  Going off record.  The time

12  is 10:59 a.m.

13        (Recess taken -- 10:59 a.m.)

14        (After recess -- 11:07 a.m.)

15        THE VIDEOGRAPHER:  This marks the

16  beginning of media unit number two.  Going back on

17  record.  The time is 11:07 a.m.

18  BY MR. CATHELL:

19    Q.  Ms. Powell, do you have -- we had just

20  been talking about what evidence you have that

21  Dr. Akoda was affiliated with the Prince George's

Page 60

1  County Hospital Center, okay?

2    A.  Yes.

3        THE VIDEOGRAPHER:  Brian, your mic.

4  BY MR. CATHELL:

5    Q.  We had just been talking about what

6  evidence you had, if any, regarding Dr. Akoda's

7  affiliation with the Prince George's County

8  Hospital Center, correct?

9    A.  Correct.

10    Q.  And you mentioned the birth band that you

11  were given when you first presented to deliver

12  Jaiden?

13    A.  Correct.

14    Q.  Do you have any additional evidence

15  regarding Dr. Akoda's affiliation with Prince

16  George's County Hospital Center?

17    A.  Besides the band, that is it.

18    Q.  Was Dr. Akoda the first doctor you came

19  in contact with when you first made it to Prince

20  George's County Hospital Center on the 13th of

21  September?

Page 61

1    A.  Yes.

2    Q.  And I assume that was because it was a

3  planned induction, correct?

4    A.  Correct.

5    Q.  When you were seen by Dr. Akoda in

6  Dr. Chaudry's office, was there anything in the

7  office that led you to believe that Dr. Akoda was

8  affiliated with the hospital?

9    A.  No.

10    Q.  So, you understood that Dr. Akoda was in

11  private practice, correct?

12        MS. CLARY:  Objection.  You can answer.

13        THE WITNESS:  No, I did not know.

14  BY MR. CATHELL:

15    Q.  Following the first alleged inappropriate

16  action by Dr. Akoda when you were seeing him at

17  Dr. Chaudry's office, how many times did

18  you -- approximately how many times did you see

19  Dr. Akoda after that?

20    A.  After that, it's a few -- a few times

21  after that.

16 (Pages 58 - 61)

Elsa M. Powell                                                                    March 27, 2019

Page 62

1    Q.  Is it fair to classify those visits as

2  prenatal visits?

3    A.  Yes.

4    Q.  Did Dr. Akoda perform vaginal

5  examinations during those visits?

6    A.  Yes.

7    Q.  Did you find those examinations

8  inappropriate in any way?

9    A.  No.  I believed they were normal routine.

10    Q.  Is it fair to say that you never

11  discussed with Dr. Akoda the subject of hospital

12  privileges?

13    A.  No.

14    Q.  That was a bad question.  Did you ever

15  discuss with Dr. Akoda the subject of hospital

16  privileges?

17    A.  No.

18    Q.  Did you ever ask to see Dr. Akoda's

19  driver's license?

20    A.  No.

21    Q.  Or his passport?

Page 63

1    A.  No.

2    Q.  I assume you never asked Dr. Akoda if he

3  had any other names?

4    A.  No.

5    Q.  Did you see Dr. Akoda interact with staff

6  in any inappropriate way?

7    A.  No.  I didn't pay attention.

8    Q.  You would agree that the delivery of

9  Jaiden was performed successfully?

10    A.  The delivery, yes.  After the delivery,

11  no.

12    Q.  I'm going to get there.  I've looked

13  through your medical records, and I promise that

14  I'll get there, okay?

15    A.  (Nodding head yes.)

16    Q.  Were you satisfied with the medical

17  services that Dr. Akoda provided to you in

18  delivering Jaiden?

19    A.  Yes.

20    Q.  Were you satisfied with the medical

21  services that Dr. Akoda provided to you prior to

Page 64

1  coming to Prince George's County Hospital Center on

2  September 13, 2014?

3    A.  No.

4    Q.  And tell me why not, if it's a reason

5  that we haven't already discussed.

6    A.  The reason we discussed.

7    Q.  And that would be -- I assume that would

8  be the alleged inappropriate statements and

9  touching?

10    A.  Correct.

11    Q.  Putting those aside, but not intending to

12  mitigate those in any way or minimize those, were

13  you satisfied with the medical services that

14  Dr. Akoda provided to you prior to September 2014?

15    A.  Yes.

16      (Whereupon, Powell Deposition Exhibit 5,

17  Birth Band, marked for identification.)

18  BY MR. CATHELL:

19    Q.  And you've been kind enough to provide us

20  with a color picture of the birth band that you

21  described.  I've marked it as Exhibit 5.  If I can

Page 65

1  show it to you, and you can just briefly tell us

2  what it is for the record?

3    A.  It's my hospital band of when I went to

4  deliver Jaiden.

5    Q.  All right.  I was asking you about the

6  delivery, and you started to tell me that you

7  were -- you may have had a complication following

8  the delivery.  Can you tell us what that was?

9    A.  After I had Jaiden, I noticed that I was

10  bleeding out of the normal.  So, I panicked, and I

11  asked the nurse if she could please get the doctor,

12  Dr. Akoda.

13      So, she got him, and when he -- when he

14  came in, I explained to him that I was gushing out.

15  It was going through the sheets and in the hospital

16  bed, and I also had big blood clots.

17      So, he examined me, and he kept saying,

18  I'm sorry.  I should have detected it sooner.  I'm

19  so sorry.  I'm so sorry.  So, I was confused of

20  what was going on, and he told me he was going to

21  rush me to the OR.  I was going to get surgery.  I

17 (Pages 62 - 65)

JA476

Elsa M. Powell                                                   March 27, 2019

Page 66

1  was crying, devastated because I didn't know what
2  was going to happen with my son, and I didn't know
3  what was going to happen to me. I didn't know -- I
4  didn't know what was going on.
5        So, then there was this hospital employee
6  pushing me in the bed down to the OR, and I was put
7  to sleep. When I woke up, I had tubes everywhere.
8  I couldn't talk. I was crying.
9        Then -- probably like 30 minutes after,
10 then they took me to my room, and I remember the
11 same guy that rode me down to the OR told me that I
12 had lost a lot of blood and that they had -- they
13 did remove all of the blood clots, that they were
14 big, and that they did remove them all, but I did
15 lose a lot of blood.
16   Q.   And if I told you the name of that
17 medical procedure was the suction curettage, would
18 that -- does that ring a bell?
19   A.   No.
20   Q.   And do you recall what date that occurred
21 on?

Page 67

1    A.   It was the same day I delivered.
2    Q.   The same day or the next day?
3    A.   September -- I believe it was the same
4  day, September 14.
5    Q.   Just for completeness, I'll hand you
6  the -- what I'll proffer are the consent forms for
7  the curettage, which I have marked as Exhibit 6.
8        (Whereupon, Powell Deposition Exhibit 6,
9  Consent Form, marked for identification.)
10 BY MR. CATHELL:
11   Q.   It's a two-page document. Will you agree
12 or would you agree that in the middle of both
13 pages, it -- that is your signature, please?
14   A.   Yes.
15   Q.   Yes as to both pages?
16   A.   Yes as to both pages.
17   Q.   Thank you. And it's my understanding
18 from your medical record that, despite what you've
19 just described, you made a full recovery and were
20 discharged on September 19th; is that correct?
21   A.   The 19th? Yes, that's correct. That is

Page 68

1  correct.
2    Q.   And it's my understanding from reading
3  the medical records that when you were discharged,
4  you had no ongoing signs or symptoms of -- of
5  hemorrhage or of any other injury; is that correct?
6    A.   That's correct.
7    Q.   Has a medical provider, meaning a doctor,
8  nurse, P.A., what have you, ever told you that
9  Dr. Akoda performed the delivery of Jaiden in a
10 manner that did not comply with the standard of
11 care?
12   A.   No.
13   Q.   Did Dr. -- has any medical provider ever
14 told you that Dr. Akoda's postpartum care, so in
15 the days after you gave birth to Jaiden, but before
16 you were discharged, has any medical provider told
17 you that Dr. Akoda's care of you during that time
18 did not comply with the standard of care?
19   A.   No.
20   Q.   You would agree that you did not have any
21 permanent injury as a result of the care provided

Page 69

1  to you by Dr. Akoda during your admission to Prince
2  George's County Hospital Center in September of
3  2014?
4    A.   No.
5    Q.   You would not agree?
6    A.   I -- besides trust issues, no, nothing
7  medical.
8    Q.   Between the time you were discharged in
9  September of 2014 and the time you received the
10 telephone call from Latisa Gaymon, had you
11 sustained any injury as a result of the care
12 provided to you by Dr. Akoda?
13   A.   No, no injuries.
14   Q.   So, it's my understanding, just so the
15 record is clear, that it is your claim that when
16 you learned of the allegations regarding
17 Dr. Akoda's license or credentialing from Latisa
18 Gaymon is when you first occurred -- incurred the
19 injury, correct?
20   A.   I'm sorry?
21   Q.   It's my understanding that the -- the

18 (Pages 66 - 69)

Page 70

1  telephone call to you from Latisa Gaymon is when
2  you first suffered the injury as a result of the
3  allegations surrounding Dr. Akoda?
4      A.  Yes.
5      Q.  When you first chose him as your
6  physician or when you -- strike that.
7          When you continued to see Dr. Akoda, were
8  you aware of his privileging status?
9      A.  No.
10     Q.  Did you do any research on his skills and
11 abilities?
12     A.  No.
13     Q.  Nothing he did during his care made you
14 feel he was not qualified or cared for you or
15 qualified to care for you appropriately, correct?
16     A.  No.  Correct.
17     Q.  At no time did you fire him as a
18 physician, correct?
19     A.  That's correct.
20     Q.  Do you accuse Dr. Akoda of any failure to
21 properly render medical care to you or your baby?

Page 71

1  I think we covered that.  You would agree your
2  answer to that would be no?
3      A.  No.  No.
4          MS. CLARY:  She said no.
5  BY MR. CATHELL:
6      Q.  I'm sorry.  I thought you said oh.
7          MS. CLARY:  You didn't get that nnh in
8  there.
9  BY MR. CATHELL:
10     Q.  Do you know of anyone else accusing
11 Dr. Akoda of any sexual -- of any sexual
12 impropriety or have any information of any kind on
13 that subject, other than what we've discussed?
14     A.  No.
15     Q.  And you -- I believe you told me your
16 last visit with Dr. Akoda was your six-week
17 postpartum visit, correct?
18     A.  Correct.
19     Q.  Have we discussed all of your claims
20 against Dr. Akoda for sexual misconduct?
21     A.  Yes.

Page 72

1      Q.  There is an -- a medical doctor involved
2  in this litigation named Dr. Susan Fiester.  Are
3  you familiar with Dr. Fiester?
4      A.  Yes.
5      Q.  Okay.  And did you meet with Dr. Fiester?
6      A.  Phone.
7      Q.  Meaning a telephone call?
8      A.  Yes.
9      Q.  And do you recall when that occurred?
10     A.  February.
11     Q.  Of 2019?
12     A.  2019.
13     Q.  Are you okay?
14     A.  Yes.  February or January 2019.
15     Q.  And do you recall how long the telephone
16 call was?
17     A.  I do not recall.
18     Q.  Was it hours, minutes?  You just have no
19 recollection?
20     A.  No recollection.
21     Q.  Where were you when you made the -- when

Page 73

1  you talked to Dr. Fiester on the call?
2      A.  Home.
3      Q.  Was anyone else present with you?
4      A.  My two-year-old daughter.
5      Q.  Were you and Dr. Fiester the only two
6  people on the -- on the telephone call?
7      A.  Yes.
8      Q.  And did she initiate the call to you?
9      A.  Yes.
10     Q.  Do you consider Dr. Fiester to be your
11 doctor?
12     A.  No.
13     Q.  Did Dr. Fiester provide you with any
14 treatment recommendations?
15     A.  No.
16     Q.  Did she refer you to any other healthcare
17 providers for treatment?
18     A.  No.
19     Q.  And I assume she didn't prescribe to you
20 any medication, correct?
21     A.  Correct.  She did not.

19 (Pages 70 - 73)

Elsa M. Powell                                          March 27, 2019

Page 74

1    Q.  Can you tell me what you recall about the
2  telephone interview with Dr. Fiester?
3    A.  We talked about the situation.  She
4  mainly asked me how did I feel.  She asked me to
5  give her a rundown of how was my delivery and
6  everything I experienced through the whole process
7  when I was under Dr. Akoda's care.
8    Q.  Did she share with you what any of the
9  other Plaintiffs that she had identified -- strike
10  that.
11        Did she share with you what any of the
12  other Plaintiffs that she had interviewed had
13  shared with her?
14    A.  No.
15    Q.  And in response to the question of how
16  did you feel about the situation, which I assume,
17  for the record, is the -- are the allegations
18  surrounding Dr. Akoda, correct?
19    A.  That's correct.
20    Q.  What did you tell her in response to the
21  question of how do you feel?

Page 75

1    A.  I feel betrayed.  I feel like I can't
2  trust any OB/GYNs any more, or doctors.
3        Every time I even take my oldest
4  daughter, I have to ask questions, check
5  credentials.
6        I trusted Dr. Akoda.  I trusted him with
7  my life.  I believed he was real.  I was very
8  disappointed, and I feel violated.
9    Q.  And I'm certainly not going to get into
10  any specifics regarding your -- your daughter.  You
11  said you take your daughter to an OB/GYN.  Is that
12  the same person that -- that you have -- that
13  you're scheduled to see?
14    A.  No.  Her -- her doctor.
15    Q.  Okay.
16    A.  I'm scared to go to an OB/GYN.
17    Q.  And I believe the other general question
18  that Dr. Fiester was asking, based on her report
19  and other information, is -- was how that -- how
20  you have been affected as a result of the
21  allegations; is that correct?

Page 76

1    A.  That's correct.
2    Q.  Okay.  And what did you tell her in
3  response to that question?
4    A.  That I don't -- I don't trust these
5  doctors any more.  I have a hard time trusting.  I
6  have a hard time even going to my OB/GYN myself.
7    Q.  Anything else?
8    A.  And that I feel kind of violated.
9    Q.  Anything else?  Any other -- strike that.
10        Has this impacted you in any other way?
11    A.  No.
12    Q.  I don't believe Dr. Fiester diagnosed you
13  with any physical or mental illness; is that
14  correct?
15    A.  That's correct.
16    Q.  Have you read the -- strike that.
17        A Complaint in litigation are the papers
18  that your attorneys file with the court to start
19  the proceedings.  With that understanding, have you
20  read the Complaint in this case?
21    A.  Yes.

Page 77

1    Q.  Do you know whether you read the
2  Complaint before it was filed?
3    A.  No.
4    Q.  Did you read the Complaint before it was
5  filed?
6    A.  What do you mean?
7    Q.  So, to start the litigation, your
8  attorneys would prepare a Complaint, and then to
9  actually start the lawsuit, they filed the
10  Complaint.
11    A.  Yes.  Yes.
12    Q.  Okay.  So, prior to them actually filing
13  it -- and you might not know, but prior to them
14  actually filing it, did you read the Complaint?
15    A.  Yes.
16    Q.  You did read it?
17    A.  I looked at it, yes.
18    Q.  Did you meet with your attorneys before
19  the Complaint was filed?
20        MS. CLARY:  I'm going to object and
21  instruct her not to answer that question as it's

20 (Pages 74 - 77)

Elsa M. Powell                                    March 27, 2019

Page 78

1 violative of the attorney/client privilege and work
2 product doctrine.
3        MR. CATHELL:  Since the -- understanding
4 that, and our response is noted.
5        MS. CLARY:  Sure.
6 BY MR. CATHELL:
7    Q.  I would also ask you questions about how
8 frequently you had met with your attorneys and how
9 many -- what you discussed as far as filing the
10 Complaint and those allegations.
11        It's my understanding that your Counsel
12 would instruct you not to answer, so I respect --
13 I -- I won't go through all of those questions,
14 but --
15        MS. CLARY:  I understand that those are
16 questions you would pose.  I do have the same
17 objections, and I understand your response is as we
18 have discussed.
19        MR. CATHELL:  Thank you.
20 BY MR. CATHELL:
21    Q.  Understanding your attorney's objections

Page 79

1 about your contact with them, I'm going to ask you
2 questions about your contact with other Plaintiffs,
3 okay?
4    A.  Okay.
5    Q.  Have you at any time -- I know you talked
6 to Latisa Gaymon.  Have you at any time talked to
7 any of the other Plaintiffs?
8    A.  No.
9    Q.  Okay.  Do you know any of the -- the
10 names of any of the other Plaintiffs?
11    A.  No.
12    Q.  Have you read any of the other papers
13 that have been filed in this court case?
14    A.  No, I have not.
15    Q.  Have you gone to court to any of the
16 hearings that have occurred?
17    A.  No.
18    Q.  And why not?
19    A.  I haven't gone.
20    Q.  Were you made aware of the hearings?
21    A.  Yes.

Page 80

1    Q.  Do you plan on going to court in terms of
2 any of the remaining hearings in this case?
3    A.  If my lawyers find it that I need to be
4 there, then, yes.
5    Q.  Do you know what class certification is?
6    A.  Yes.
7    Q.  What is it?
8    A.  The class action, it's a lawsuit with a
9 group that's been going through the same situation.
10    Q.  Do you know what causes of action are
11 being asserted in the Complaint?
12        MS. CLARY:  I'm going to object to the
13 extent that it's calling, the way you phrased it,
14 for a legal conclusion.  You can answer the best
15 you can.
16 BY MR. CATHELL:
17    Q.  If you know.  Do you know what the causes
18 of action are being -- are being asserted in the
19 Complaint?
20        MS. CLARY:  Same objection.  Go ahead.
21        THE WITNESS:  Yes.

Page 81

1 BY MR. CATHELL:
2    Q.  What are those?
3    A.  I don't recall right now.  I'm sorry.
4    Q.  Do you know what damages the Complaint is
5 seeking?
6        MS. CLARY:  Same objection as before.
7 You can go ahead and answer if you can.
8        THE WITNESS:  No, I don't.
9 BY MR. CATHELL:
10    Q.  Do you know -- know the names of the
11 Defendants that you are suing in the case?
12    A.  Yes, I do know the name.
13    Q.  And what is the name of the Defendants?
14    A.  Well, I know because I heard you say it
15 earlier, but I don't -- I don't remember them.
16    Q.  Have -- have you met with any of the
17 other Plaintiffs?
18    A.  No.
19    Q.  Including Latisa Gaymon?
20    A.  Besides social, if -- that's it.
21    Q.  When was the last time you were at a

21 (Pages 78 - 81)

Elsa M. Powell                                    March 27, 2019

Page 82

1 social event with Latisa?

2    A.  It was last Thanksgiving.

3    Q.  How would you describe the -- the

4 relationship between you and Latisa?  Are you

5 friends, acquaintances, family?

6    A.  Friends.

7    Q.  Are you aware that the Complaint is

8 asking the court to certify this case as a class

9 action?

10    A.  Yes.

11    Q.  Do you know what it means to proceed as a

12 class action?

13    A.  Yes.

14    Q.  And I think you already described your

15 understanding, so I'll spare you the follow-up

16 question.

17       Do you know how many proposed class

18 members there are?

19    A.  No.

20    Q.  Do you know which law firms represent the

21 proposed class members?

Page 83

1    A.  Yes.

2    Q.  And which firms are those?

3    A.  Well, I know this law firm, the one that

4 represents me.

5    Q.  Any others?

6    A.  Other than that, no, I don't know of any

7 others.

8    Q.  Do you know whether each member of the

9 proposed class is asserting the same claims as you

10 are?

11    A.  No, I do not know.

12    Q.  Have you tried to learn about the claims

13 of the other proposed class members in this case?

14    A.  No.

15    Q.  Have you determined whether your claims

16 are different than theirs in any way?

17    A.  No.

18    Q.  Do you know whether each member of the

19 proposed class is seeking the same damages as you

20 in this case?

21    A.  No.

Page 84

1    Q.  I'm assuming you are aware that you've

2 been designated as a class representative in this

3 lawsuit?

4    A.  Yes.

5    Q.  You're also aware that you've been

6 des- -- actually, I believe you told me you do not

7 know if you were designated as a class

8 representative in the federal lawsuit, correct?

9       MS. CLARY:  Objection.  I don't think you

10 asked her that.

11 BY MR. CATHELL:

12    Q.  Have you been designated as a class

13 representative in the federal suit against ECFMG?

14    A.  Yes.

15       MS. CLARY:  Hence, why I thought you did

16 not ask.

17 BY MR. CATHELL:

18    Q.  Do you know what it means to be

19 a -- strike that.

20       What is your role as a class

21 representative?

Page 85

1    A.  To be the voice of all of the ladies that

2 can't speak.

3    Q.  Why can't they speak?

4    A.  They could speak, but they can't speak

5 right here right now.  They can't tell you guys how

6 disgusted they feel, how violated, how hurt to

7 trust somebody who they called their doctor, and

8 come to find out, that doctor, who we put our life

9 in his hands, was a fraud.

10    Q.  Do you know whether there was a mediation

11 in this matter?

12    A.  No.

13    Q.  Have you --

14       MS. CLARY:  I'm sorry.  It's belated, but

15 I'd just object to the term mediation.  As a

16 nonlawyer, she may not know what that is.

17 BY MR. CATHELL:

18    Q.  Do you know whether the parties in this

19 case engaged in settlement talks in an effort to

20 settle the case?

21    A.  Yes.

22 (Pages 82 - 85)

JA481

Elsa M. Powell March 27, 2019

Page 86

1   Q. You do know that?

2   A. Yes, I do.

3   Q. Okay. And what is -- did you at any time

4 talk or correspond with the other Plaintiffs

5 regarding those settlement discussions?

6   A. No.

7   Q. Are you aware that a settlement offer was

8 made --

9   A. Yes.

10   Q. -- on behalf of the Defendants?

11   A. Yes.

12   Q. Okay. And what is your understanding as

13 to what that settlement offer was?

14   A. A thousand.

15   Q. And did you decline that settlement

16 offer?

17   A. Yes.

18   Q. And Ms. Clary is going to object, so if

19 you'll give her a second before answering. Do you

20 know whether you're responsible for paying any of

21 the costs and expenses of this litigation?

Page 87

1   MS. CLARY: Objection. I'm going to

2 instruct her not to answer for the reasons we've

3 discussed already.

4 BY MR. CATHELL:

5   Q. Did you --

6   MR. CATHELL: Thank you.

7 BY MR. CATHELL:

8   Q. Did you sign a retainer agreement with

9 Schochor, Federico and Staton?

10   MS. CLARY: I'm going to let you answer

11 yes or no, but I don't want you to disclose

12 anything further beyond a yes or a no answer.

13   THE WITNESS: Yes.

14 BY MR. CATHELL:

15   Q. And we would ask -- we will be asking

16 your attorney to provide it I know they object.

17   MR. CATHELL: But just, for the record, I

18 want to indicate that we are requesting the

19 retainer agreement.

20   MS. CLARY: I object. I think we've

21 covered the objection and your response, and we'll

Page 88

1 take it up later.

2 BY MR. CATHELL:

3   Q. Have you seen any of the documents that

4 have been produced by the Defendants in this case?

5   A. Yes, I did.

6   Q. Okay. What did you review?

7   A. There's been so many documents. I do not

8 remember.

9   Q. Do you know whether Dr. -- I'm sorry,

10 were you finished?

11   A. Yes.

12   Q. Okay. Do you know whether Dr. Akoda is a

13 defendant in this lawsuit or not?

14   A. No, I do not know.

15   Q. What is your understanding as to what the

16 allegations are in the federal suit against ECFMG?

17   MS. CLARY: Objection to the extent I do

18 think that was covered, but go ahead again.

19   THE WITNESS: They allowed him to

20 continue to practice without him having the proper

21 credentials that is needed.

Page 89

1 BY MR. CATHELL:

2   Q. What is your understanding of ECFMG's

3 role in certifying Dr. Akoda?

4   A. Could you repeat that?

5   Q. Sure. What is your understanding -- and

6 I'm asking you this as a result of your being in

7 that lawsuit.

8   What is your understanding of ECFMG's

9 role in certifying Dr. Akoda?

10   A. I do not recall. I don't remember.

11   Q. Do you have any knowledge as to what type

12 of background checks ECFMG conducts?

13   A. Birth certificate, Social Security,

14 passport.

15   Q. Other than the call you received from

16 Latisa Gaymon -- strike that.

17   You received a telephone call from

18 Ms. Gaymon. You then proceeded to Google the

19 allegations against Dr. Akoda.

20   Did you at any time see any advertising,

21 such as TV commercials, or social media links, or

23 (Pages 86 - 89)

Elsa M. Powell                                    March 27, 2019

Page 90

1 radio commercials regarding the all- -- sorry,
2 regarding the allegations?
3    A.   After the fact.
4    Q.   After what fact?
5    A.   After I already had contacted my lawyers.
6    Q.   And what do you recall -- again, not
7 anything related to them, but what do you recall
8 see -- recall seeing or hearing?
9    A.   On the radio, if you were a patient of
10 Dr. Akoda, please contact, and they said a phone
11 number.  You have been a victim of a scam.
12    Q.   Anything else?
13    A.   No.
14    Q.   And do you remember specifically, was it
15 a TV advertisement or -- I'm sorry, you said it was
16 a radio advertisement?
17    A.   Radio.
18    Q.   And do you recall specifically which law
19 firm was sponsoring that advertisement?
20    A.   I do not remember.  I don't recall which
21 firm it was.

Page 91

1    Q.   And hearing that advertisement -- strike
2 that.
3        Did you participate in any interview with
4 any media person or organization about your
5 involvement with Dr. Akoda?
6    A.   No.
7    Q.   Did you go on The Dr. Oz Show?
8    A.   No.
9    Q.   Were you contacted to go on The Dr. Oz
10 Show?
11    A.   No.
12    Q.   Is it fair to say that when you were
13 choosing your OB/GYN, you selected an OB/GYN based
14 upon the skill set of the physician?
15    A.   Yes.
16    Q.   And your concern was that he or she could
17 deliver your baby safely and healthy, correct?
18    A.   Yes.
19    Q.   And you did not care if your OB/GYN was a
20 man or a woman?
21    A.   No.

Page 92

1    Q.   And you did not care about the OB/GYN's
2 race?
3    A.   No.
4    Q.   Or nationality?
5    A.   No.
6    Q.   And you did not care about the exact
7 location of the OB/GYN, beyond being local,
8 correct?
9    A.   Well, at first, I didn't want to deliver
10 my child at PGH, but I didn't have no choice.
11    Q.   And why did you not have a choice?
12    A.   Because the doctor's office, that was the
13 only hospital they were associated with.
14    Q.   Is it fair to say that you not -- did not
15 care about the name of your physician?
16    A.   The name, no.
17    Q.   You agree that Dr. Akoda delivered your
18 baby safe -- safe and healthy?
19        MS. CLARY:  Objection.  I think it's been
20 covered, but go ahead.
21        THE WITNESS:  Yes.

Page 93

1 BY MR. CATHELL:
2    Q.   And it's my understanding that Jaiden is
3 four now, correct?
4    A.   Correct.
5    Q.   And I'm hopeful that Jaiden is currently
6 healthy; is that correct?
7    A.   Yes.
8    Q.   And was Jaiden the only baby you
9 delivered with Dr. Akoda?
10    A.   Yes.
11    Q.   At any time during any care and treatment
12 that Dr. Akoda provided to -- to you, did you ever
13 ask for a different doctor?
14    A.   No.
15    Q.   We talked briefly about the six-week
16 check -- postpartum check-up where you came back in
17 to see Dr. Akoda, and you mentioned that he
18 diagnosed you with a cyst at that time and had
19 removed that cyst, is that an accurate
20 representation of your testimony?
21    A.   That's correct.

24 (Pages 90 - 93)

JA483

Elsa M. Powell                                                    March 27, 2019

Page 94

1    Q.   And, to your knowledge, was the cyst, in
2    fact, removed at that time?
3    A.   I don't have -- he claimed he -- he
4    burned it.  I don't know.
5    Q.   Okay.  Fair enough.  If -- do you have
6    any ongoing signs or symptoms or injuries related
7    to the cyst?
8    A.   I had pain.  I went to the emergency room
9    at Southern Maryland Hospital, and they said I had
10   an ovarian cyst still.  And this is recently, last
11   year recently.  I also have cyst in my kidneys.
12   Q.   Okay.
13   A.   This is recently.  So, if it was removed,
14   I'm -- I don't know.
15   Q.   As -- okay.  Is -- has anyone -- strike
16   that.
17        Has any doctor told you that Dr. Akoda
18   didn't effectively remove the ovarian cyst at your
19   six-week postpartum appointment?
20   A.   No.
21   Q.   Do you have any reason to believe that

Page 95

1    the ovarian cyst that was discovered at Southern
2    Maryland is the same cyst or is related to the cyst
3    that Dr. Akoda removed?
4    A.   I -- I wouldn't be able to tell you.  I
5    don't -- I don't know.
6        MR. CATHELL:  I think we're finished, if
7    I could just look through my notes briefly.
8        THE WITNESS:  Okay.
9        MS. CLARY:  Sure.
10       MR. CATHELL:  You'll definitely be on the
11   road by 12.
12       (Whereupon, there was a pause for
13   document examination.)
14   BY MR. CATHELL:
15   Q.   I showed you your Answers to
16   Interrogatories and marked them an exhibit, but I
17   don't think I asked you the question of whether
18   they are accurate sitting here today or whether you
19   would want to make any additions or revisions to
20   the answers?
21       MS. CLARY:  Other than the one revision

Page 96

1    she mentioned earlier.  She talked about the -- an
2    employment change.
3        MR. CATHELL:  Right.
4    BY MR. CATHELL:
5    Q.   Other than that?
6    A.   Other than that, no.
7    Q.   Okay.
8        (Whereupon, there was a pause for
9    document examination.)
10       MR. CATHELL:  That's all I have, ma'am.
11   Thank you very much.
12       MS. CLARY:  She'll read and sign.
13       THE WITNESS:  Thank you.
14       THE VIDEOGRAPHER:  This concludes today's
15   videotape deposition of Elsa Powell.  This is media
16   unit number two of two.  Going off the record.  The
17   time is 11:49 a.m.
18       (Whereupon, the deposition of Elsa
19   Miguelina Powell was concluded at 11:49 a.m., and
20   the reading and signing of the transcript was not
21   waived.)

Page 97

1        Russell v. Dimensions
2        Elsa Miguelina Powell
3        INSTRUCTIONS TO THE WITNESS
4        Please read your deposition over
5    carefully and make any necessary corrections.  You
6    should state the reason in the appropriate space on
7    the errata sheet for any corrections that are made.
8        After doing so, please sign the errata
9    sheet and date it.
10       You are signing same subject to the
11   changes you have noted on the errata sheet, what
12   will be attached to the deposition.
13       It is imperative that you return the
14   original errata sheet to the deposing attorney
15   thirty (30) days of receipt of the deposition
16   transcript by you.  If you fail to do so, the
17   deposition transcript may be deemed to be accurate
18   and may be used in court.
19
20
21   Job #3269933

25 (Pages 94 - 97)

Veritext Legal Solutions

JA484

Elsa M. Powell                                                                  March 27, 2019

Page 98

1    Russell v. Dimensions

2        Elsa Miguelina Powell

3            ERRATA

4    PAGE  LINE  CHANGE

5      ---  ---  ------------------------

6      Reason:_____

7      ---  ---  ------------------------

8      Reason:_____

9      ---  ---  ------------------------

10     Reason:_____

11     ---  ---  ------------------------

12     Reason:_____

13     ---  ---  ------------------------

14     Reason:_____

15     ---  ---  ------------------------

16     Reason:_____

17     ---  ---  ------------------------

18     Reason:_____

19     ---  ---  ------------------------

20     Reason:_____

21   Job #3269933

Page 99

1        Russell v. Dimensions

2        Elsa Miguelina Powell

3        ACKNOWLEDGMENT OF DEPONENT

4        I, ELSA MIGUELINA POWELL, do hereby

5    certify that I have read the foregoing pages and

6    that the same is a correct transcription of the

7    answers given by me to the questions therein

8    propounded, except for the corrections or changes

9    in form or substance, if any, noted in the attached

10   errata sheet.

11     _____     _____

12     DATE           SIGNATURE

13

14

15

16

17

18

19

20

21   Job #3269933

Page 100

1    State of Maryland

2    County of Baltimore, to wit:

3        I, Michele D. Lambie, a Notary Public of

4    the State of Maryland, County of Baltimore, do

5    hereby certify that the within-named witness

6    personally appeared before me at the time and place

7    herein set out, and after having been duly sworn by

8    me, according to law, was examined by counsel.

9        I further certify that the examination

10   was recorded stenographically by me and this

11   transcript is a true record of the proceedings.

12       I further certify that I am not of

13   counsel to any of the parties, nor related to any

14   of the parties, nor in any way interested in the

15   outcome of this action.

16       As witness my hand this 8th day of April, 2019.

17   8th day of April 2019.

18

19       *Michele D. Lambie*

         Michele D. Lambie

20

21   My Commission Expires:  April 29, 2020

26 (Pages 98 - 100)

Veritext Legal Solutions

Maryland Rules of Procedure

Title 2, Chapter 400, Rule 2-415

(D) Signature and Changes

Unless changes and signing are waived by the

deponent and the parties, the officer shall submit

the transcript to the deponent, accompanied by a

notice in substantially the following form:

[Caption of case], NOTICE TO [name of deponent].

The enclosed transcript of your deposition in the

above-captioned case is submitted to you on [date

of submission of the transcript to the deponent]

for your signature and any corrections or other

changes you wish to make. All corrections and other

changes will become part of your sworn testimony.

After you have read the transcript, sign it and, if

you are making changes, attach to the transcript a

separate correction sheet stating the changes and

the reason why each change is being made. Return

the signed transcript and any correction sheet to

[name and address of officer before whom the

deposition was taken] no later than 30 days after

the date stated above. If you fail to return the

signed transcript and any correction sheet within

the time allowed, the transcript may be used

As if signed by you. See Rules 2-415 and 2-501 of
the Maryland Rules of Procedure.


Within 30 days after the date the officer mails or
otherwise submits the transcript to the
Deponent, the deponent shall (1) sign the
transcript and (2) note any changes to the form or
substance of the testimony in the transcript on a
separate correction sheet, stating the reason why
each change is being made. The officer promptly
shall serve a copy of the correction sheet on the
parties and attach the correction sheet to the
transcript. The changes contained on the correction
sheet become part of the transcript. If the
deponent does not timely sign the transcript, the
officer shall sign the transcript, certifying the
date that the transcript was submitted to the
deponent with the notice required by this section
and that the transcript was not signed and returned
within the time allowed. The transcript may then be
used as if signed by the deponent, unless the court
finds, on a motion to suppress under section (i)
(j) of this Rule, that the reason for the failure
to sign requires rejection of all or part of the
transcript.

(I) Further Deposition Upon Substantive Changes to
Transcript

If a correction sheet contains substantive changes,
any party may serve notice of a further deposition
of the deponent limited to the subject matter of
the substantive changes made by the deponent unless
the court, on motion of a party pursuant to
Rule 2-403, enters a protective order precluding
the further deposition.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

JA489

EXHIBIT 37

Desire Evans                                        March 28, 2019

                                              Page 1

1     IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY

2   MONIQUE RUSSELL, et al.  :

3     Plaintiffs          : Case No.:

4           Vs.           : CAL17-22761

5   DIMENSIONS HEALTH CORP., : CAL17-37091

6   et al.                : CAL18-07863

7     Defendants          :

8              --------------------

9

10          Deposition of DESIRE N. EVANS, was taken

11   via videotape on Thursday, March 28, 2019,

12   commencing at 10:04 a.m., at Schochor, Federico &

13   Staton, P.A., The Paulton, 1211 St. Paul Street,

14   Baltimore, Maryland, before MICHELE D. LAMBIE,

15   Notary Public.

16              --------------------

17

18

19

20

21    Reported By:  Michele D. Lambie, CSR-RPR

Desire Evans                                           March 28, 2019

Page 2

1  APPEARANCES:

2        ON BEHALF OF THE PLAINTIFFS:

3  Schochor, Federico & Staton, P.A.

4        TARA CLARY, ESQUIRE

5        tclary@sfspa.com

6        The Paulton

7        1211 St. Paul Street

8        Baltimore, Maryland 21202

9        (410) 234-1000

10

11        ON BEHALF OF THE DEFENDANTS:

12  Pessin Katz Law, P.A.

13        BRIAN M. CATHELL, ESQUIRE

14        bcathell@pklaw.com

15        901 Dulaney Valley Road, Suite 400

16        Towson, Maryland 21204

17        (410) 938-8800

18

19

20  ALSO PRESENT:  Sam Varipapa - Videographer

21

Page 3

1        EXAMINATION INDEX

2

   WITNESS:  DESIRE N. EVANS            PAGE

3     DIRECT BY MR. CATHELL            5

      CROSS BY MS. CLARY               122

4     REDIRECT BY MR. CATHELL          124

5

6        EXHIBIT INDEX

7     (Attached to Transcript.)

8                            MARKED

   DESIRE N. EVANS

9  Exhibit 1 Answers to Interrogatories      4

10  Exhibit 2 Consent Form                   85

11

12

13

14

15

16

17

18

19

20

21

Page 4

1        (Whereupon, Evans Deposition Exhibit 1,

2  Answers to Interrogatories, marked for

3  identification.)

4

5        THE VIDEOGRAPHER:  Good morning.  We are

6  now on the record at 10:04 a.m., March 28, 2019.

7        This is media unit number one in the

8  video-recorded deposition of Desire Evans taken in

9  the matter of Monique Russell, et al v. Dimensions

10  Health Corp., et al. filed in the Circuit Court for

11  Prince George's County, Case Numbers CAL17-22761,

12  CAL17-37091, and CAL 18-07863.

13        This deposition is being held at the

14  office of Schochor, Federico and Staton located at

15  1211 St. Paul Street, Baltimore, Maryland.

16        My name is Sam Varipapa on behalf of

17  Veritext, and I'm today's videographer.  The court

18  reporter is Michele Lambie, also on behalf of

19  Veritext.

20        At this time, will Counsel now state

21  their appearances and affiliations for the record

Page 5

1  beginning with the party that noticed this

2  proceeding?

3        MR. CATHELL:  Brian Cathell on behalf of

4  the Defendants.

5        MS. CLARY:  Tara Clary on behalf of the

6  Plaintiff.

7        THE VIDEOGRAPHER:  Michele, would you

8  administer oath?

9        DESIRE N. EVANS

10  the Deponent, called for examination by the

11  Defendants, being first duly sworn to tell the

12  truth, the whole truth, and nothing but the truth,

13  testified as follows:

14        DIRECT EXAMINATION

15     BY MR. CATHELL:

16     Q.  Good morning, Ms. Evans.  I introduced

17  myself off the -- off the record.  My name is

18  Brian.  Have you given a deposition before today?

19     A.  No, sir.

20     Q.  Okay.  So, just a few ground rules.  The

21  first is if you feed a break today for any reason

Desire Evans                                                    March 28, 2019

Page 6

1 or no reason, that is okay, and you can just let us
2 know.  We're happy to take a break for you to go to
3 the bathroom, to get more water, or just to get
4 some fresh air, okay?  So, we're not holding you
5 hostage, all right?
6     A.  Okay.
7     Q.  The second is she is taking down
8 everything that we say, and she can't take down
9 non-verbal responses, such as head nods or um-hums
10 or huh-uhs, things like that, so the responses
11 should be yes, no, I don't know, or another verbal
12 response, --
13     A.  Okay.
14     Q.  -- is that fair?
15     A.  Yes.
16     Q.  Okay.  If I ask you a question that you
17 don't understand, which is entirely possible,
18 please let me know, and I am happy to rephrase it
19 as many times as I need to so that you can
20 understand it, okay?
21     A.  Yes.

Page 7

1     Q.  If we're talking about times or a
2 situation that is confusing, please let me know
3 that, because I don't want you to answer questions
4 that you don't fully understand, and I'm happy to
5 clarify to the best -- to the extent that I can to
6 get the specific question out that you understand
7 so that you can provide an answer, okay?
8     A.  Yes.
9     Q.  Lastly, I know that we are going to be
10 talking about some sensitive topics today, and I
11 assure you it's not my goal, it's not my intent,
12 and I don't take any pleasure in asking you about
13 those things.
14         This is our opportunity to explore class
15 certification, and so there are certain issues
16 that -- in -- in our investigation that I need to
17 explore with you, --
18     A.  Okay.
19     Q.  -- okay?
20     A.  Yes.
21     Q.  Okay.  And what is your full name?

Page 8

1     A.  Desire Nicole Evans.
2     Q.  And what is your current address?
3     A.  4057 Parker Court, Waldorf, Maryland
4 20602.
5     Q.  And how long have you lived at that
6 address?
7     A.  About one year.
8     Q.  And what is your date of birth?
9     A.  March 25th, 1979.
10    Q.  And have you gone by any other names or
11 aliases?
12    A.  No, sir.
13    Q.  And it's my understanding that you are
14 married?
15    A.  Yes, and this is actually my married
16 name.  Sorry.
17    Q.  Okay.  That's all right.  Prior to being
18 married, what was your maiden name?
19    A.  Clifton.
20    Q.  And how many times have you been married?
21    A.  Once.

Page 9

1     Q.  And on what date were you married to
2 Mr. Evans?
3     A.  December 31st, 2015.
4     Q.  And you've remained married and living in
5 the same home since that time?
6     A.  Yes.
7     Q.  Okay.  How many children do you have?
8     A.  One.
9     Q.  And what is the child's name?
10    A.  Peyton.
11    Q.  With an A or an E?
12    A.  E.
13    Q.  And I assume Peyton was born in March of
14 2016?
15    A.  Yes.  March 17th, 2016.
16    Q.  And is Peyton a healthy child?
17    A.  Yes.
18    Q.  And has Peyton lived with you since his
19 birth on March 17th, --
20    A.  Yes.
21    Q.  -- 2016?

3 (Pages 6 - 9)

JA493

Desire Evans                                                                    March 28, 2019

Page 10

1    A.  Yes.

2    Q.  So, living in your home is, it's you,

3  Peyton, and Mr. Evans, correct?

4    A.  And Piper, our dog.

5    Q.  Okay.  Dogs count nowadays.

6        MS. CLARY:  Absolutely.

7  BY MR. CATHELL:

8    Q.  And at the time you became involved with

9  Dr. Akoda, and we're going to explore that in depth

10 in a few minutes, but in December of 2015, who was

11 living in your home?

12   A.  It was my husband and I.

13   Q.  Okay.  And you worked with your attorneys

14 in this case to provide information or to draft

15 Answers to Interrogatories, do you recall doing

16 that?

17   A.  Yes.

18   Q.  Okay.  And I have a copy of your signed

19 Answers to Interrogatories, which include, among

20 other information, a, a list of your residential

21 history, so I'm going to show you that.  I'll ask

Page 11

1  you if you signed the document, and then if you'll

2  just look at answer to Interrogatory Number 1, that

3  will save me the time of having to go through each

4  place that you lived, --

5    A.  Um-hum.

6    Q.  -- is that fair?

7    A.  Yes.

8        MS. CLARY:  Do you want the first

9  signature?

10       MR. CATHELL:  The second.  The last page,

11 please, or it may be the third.

12 BY MR. CATHELL:

13   Q.  Is that your signature?

14   A.  Yes.

15   Q.  And reviewing answer to Interrogatory

16 Number 1, is your residential history accurate as

17 you sit here today?

18   A.  Yes.

19       MS. CLARY:  Do you want her to keep this?

20       MR. CATHELL:  Sure.  We'll get back to

21 that.

Page 12

1        MS. CLARY:  Sure.

2  BY MR. CATHELL:

3    Q.  Do you hold any degrees or

4  certifications?

5    A.  No, not currently.

6    Q.  And what is your highest level of

7  education?

8    A.  I graduated high school, and I'm

9  currently in college now.

10   Q.  And what year did you graduate high

11 school?

12   A.  '97.

13   Q.  Okay.  And where are you in college?

14   A.  Strayer University.

15   Q.  And what are you studying?

16   A.  Cyber security.

17   Q.  We might need to retain you.  Our firm

18 was just attacked by ransom-ware.

19       MS. CLARY:  I heard this.  You were off

20 line for a week.  Was it like bliss or hell?

21       MR. CATHELL:  It was terrible.

Page 13

1        MS. CLARY:  Okay.

2        MR. CATHELL:  No phones, no email.

3        THE WITNESS:  Wow.

4        MS. CLARY:  I would have called that

5  bliss, but, you know, the other side of the table

6  here.

7  BY MR. CATHELL:

8    Q.  Are you currently employed?

9    A.  Yes.

10   Q.  And where are you employed?

11   A.  Blue Cross Blue Shield.

12   Q.  When do you -- when do you anticipate

13 receiving a degree from Strayer University?

14   A.  I should have my -- I won't have my

15 degree until 2021, but my first certification I'll

16 have in December.

17   Q.  And is -- are you working to obtain a

18 bachelor's --

19   A.  Yes.

20   Q.  -- or -- okay.  Bachelor's of Science?

21   A.  Yes, sir.

4 (Pages 10 - 13)

Veritext Legal Solutions

JA494

Desire Evans
March 28, 2019

Page 14

1    Q.   And what certification will you get in
2  December?
3    A.   My Comptiaa.  C-O-M-P-T-I-A-A.
4    Q.   And is that a cyber security
5  related --
6    A.   Yes.
7    Q.   -- certification?  Good for you.  In your
8  Answers to Interrogatories -- we're going to just
9  briefly talk about your employment history.
10      I believe in Interrogatory Number 16, if
11  you'll look, you listed out your past employment
12  positions?
13    A.   That would be page 16?  Is that what that
14  means, Number 16?
15    Q.   Yeah.  And I just realized I marked my
16  copy, so let me mark this copy.  That might
17  be --
18    A.   Oh, I see it.  I see, Number 16.
19      MS. CLARY:  You got it?
20      THE WITNESS:  Um-hum.
21      MR. CATHELL:  Let me switch the copies.

Page 15

1      (Document tendered.)
2  BY MR. CATHELL:
3    Q.   Thank you.
4    A.   Yes, sir.
5    Q.   Is your employment history as listed
6  accurate as you sit here today?
7    A.   Yes.
8    Q.   Okay.  You've been with CareFirst Blue
9  Cross Blue Shield since 2015, correct?
10    A.   Yes.
11    Q.   And you're a senior customer service
12  advisor?
13    A.   Yes.
14    Q.   Briefly describe for me your roles and
15  responsibilities there, please.
16    A.   I deal with customer issues, customer
17  complaints, benefit questions, resolving issues, or
18  escalation of iss-- -- issues, and that's about it.
19    Q.   And have you been full time there since
20  2015?
21    A.   Yes.

Page 16

1    Q.   And since 2015, have you missed any
2  significant period of time from work for any
3  reason, other than a vacation?
4    A.   Yes.
5    Q.   Okay.
6    A.   Currently, Sundays, since -- since this
7  has happened, I've been on FMLA.  I have 24 hours a
8  week to where I can, I guess, call out or if I have
9  to go to the doctors or I have a video appointment
10  with my doctors or whatever the case may be, so
11  I've missed a significant amount of work in the
12  past year and a half.
13    Q.   Okay.  Let's -- let's explore that more
14  when I -- when we get --
15    A.   Okay.
16    Q.   -- determine specific dates of -- of when
17  you learned about certain things.
18    A.   Um-hum.
19    Q.   And I promise, I'll come back to it.
20  Other than the FMLA --
21    A.   No.

Page 17

1    Q.   -- time off, have you missed any
2  significant time for work -- from work for any
3  reason, other than a vacation?
4    A.   Well, having my child.  Does that count?
5    Q.   Fair enough.
6    A.   Okay.
7    Q.   Other than a child or FMLA?
8    A.   No.
9    Q.   And you said you have 24 hours per week.
10  Does that mean you're working 24 hours per
11  week, --
12    A.   No.
13    Q.   -- or you're missing 24 hours a week?
14    A.   I'm missing 24 hours a week.
15    Q.   Okay.  And is that 24 hours per week that
16  you're missing reimbursed to you through FMLA?
17    A.   No.
18    Q.   Is FMLA permitting you to miss 24 hours
19  per week?
20    A.   Yes.  If I have PTO, I can use that, but
21  I don't have -- you don't get paid for FMLA.

5 (Pages 14 - 17)

Desire Evans
March 28, 2019

Page 18

1    Q.  Have you -- have you used PTO to satisfy
2    the 24 hours per week that you're missing?
3    A.  Sometimes, if I have it available.
4    Q.  Here today, do you have any PTO
5    available?
6    A.  No.
7    Q.  When will you next have PTO available?
8    A.  January 1st of 2020.
9    Q.  So, in January of each year, you're given
10   a, a certain amount of PTO time; is that correct?
11   A.  Yes.
12   Q.  In 2019, you were given a certain amount
13   of PTO time; is that correct?
14   A.  Yes.
15   Q.  And is it your testimony that you have
16   used your yearly allotment of PTO for 2019?
17   A.  Yes.
18   Q.  And how many hours or days, however it's
19   broken down, were you given in January of 2019 in
20   PTO?
21   A.  One hundred and 20 hours.

Page 19

1    Q.  So, that's approximately 15 workdays?
2    A.  (Nodding head yes.)
3    THE COURT REPORTER:  You have to answer
4    out loud.
5    MS. CLARY:  You have to answer.
6    THE WITNESS:  I'm sorry.  Yes.  I'm sorry
7    about that, ma'am.
8    MS. CLARY:  You're doing fine.
9    THE WITNESS:  Yes.
10   MS. CLARY:  Everybody does it.  You just
11   have to answer verbally so that when we look at the
12   transcript later, we don't see um-hum and huh-uh
13   and wonder what you meant.
14   THE WITNESS:  What, okay.
15   BY MR. CATHELL:
16   Q.  Prior to using -- well, I don't want to
17   get into yet specifically when you learned about
18   the allegations surrounding Dr. Akoda, because I
19   want to explore those fully, but how long have you
20   been using FMLA to support you in taking off the 24
21   hours per week?

Page 20

1    MS. CLARY:  I'm just going to object to
2    the extent I'm not sure it's an either/or.  I don't
3    want to make a speaking objection, but PTO, if
4    accrued, may be used sporadically, and FMLA is
5    used -- being used FMLA.
6    So, I'm assuming you're asking her when
7    she first started to need to use FMLA for the first
8    time?
9    MR. CATHELL:  Let me back up.  I
10   appreciate the clarification.
11   BY MR. CATHELL:
12   Q.  When did you first -- let's explore that
13   in a little bit when I -- when I bring in some
14   different timelines, okay?  I'll come back to it.
15   Prior to CareFirst Blue Cross Blue
16   Shield, you were employed with Arbitron --
17   A.  Um-hum.
18   Q.  -- correct?
19   A.  Yes.
20   Q.  As a customer service interviewer?
21   A.  Yes.

Page 21

1    Q.  And what were your roles and
2    responsibilities there?
3    A.  Making outbound calls to -- for Neilson
4    Ratings.
5    Q.  Okay.  And do you remember which month
6    you left Arbitron in 2015?
7    A.  September.
8    Q.  And why did you leave Arbitron?
9    A.  They closed.
10   Q.  The company closed?
11   A.  Yeah.  Nielsen bought it out.
12   Q.  And do you remember when you started with
13   CareFirst Blue Cross Blue Shield?
14   A.  June of 2015.
15   Q.  So, while you -- so, there was a period
16   of time where you were working for both Arbitron
17   and CareFirst Blue Cross Blue Shield?
18   A.  Correct.  We were aware that Arbitron was
19   closing ahead of time.
20   Q.  Prior to Arbitron, you were employed with
21   HealthStream Research as a medical interviewer?

Desire Evans                                                    March 28, 2019

Page 22

1    A.   Correct.

2    Q.   And what were your roles and

3 responsibilities there?

4    A.   Outbound calls, conducting healthcare

5 surveys for local hospitals.

6    Q.   And do you recall which hospitals you

7 were calling on behalf of?

8    A.   It was several.

9    Q.   Do you recall the names of the hospitals?

10   A.   No.

11   Q.   And why did you leave HealthStream

12 Research?

13   A.   I don't -- I don't recall.

14   Q.   So, I ask this question to everyone, so

15 it's not directed to you specifically.  Have you

16 since your 18th birthday, while represented by

17 counsel, ever pleaded guilty to or been convicted

18 of any crime, other than a minor traffic violation?

19   A.   No.

20       MS. CLARY:  Objection, but you can

21 answer.

Page 23

1        THE WITNESS:  Oh, sorry.

2        MS. CLARY:  That's okay.

3 BY MR. CATHELL:

4    Q.   Have you ever been a plaintiff or a

5 defendant in any other lawsuit?

6    A.   No.

7    Q.   Have you ever made a claim for injury

8 against any individual, business, or other entity?

9    A.   No.

10   Q.   Have you ever made a claim or complaint

11 of any kind against a healthcare provider, other

12 than the current lawsuit?

13   A.   No.

14   Q.   Have you ever made a Workers'

15 Compensation claim?

16   A.   No.

17   Q.   Have you ever suffered physical,

18 emotional, or sexual abuse of any kind by any

19 person at any time in your life?

20   A.   No.

21   Q.   Have you ever been injured physically,

Page 24

1 mentally, or emotionally in any way by any other

2 person at any time?

3    A.   No.

4    Q.   Have you ever been hospitalized, other

5 than to deliver a child?

6    A.   No.

7    Q.   Have you ever been diagnosed with a

8 condition that affects or limits your activities in

9 any way?

10   A.   No.

11   Q.   Have you ever been diagnosed with a

12 men- -- a mental illness of any kind at any time in

13 your life?

14   A.   No.

15   Q.   Have you taken any medications at any

16 time in your life for mental illness of any kind?

17   A.   Does that count now?  Current?

18       MS. CLARY:  At any time.

19       THE WITNESS:  Yes.

20 BY MR. CATHELL:

21   Q.   Correct.

Page 25

1    A.   Yes.

2    Q.   Okay.  And which medications have you

3 taken?

4    A.   Express -- Expressor -- Effexor.

5 Effexor.  Effexor, Ativan, Trazodone, Prozac.  I

6 think that's it.  I think.

7    Q.   Okay.  And are you currently taking all

8 four of those medications at the current time?

9    A.   Everything except for the Prozac, yes.

10   Q.   Okay.  So, you're taking Afexa, Ativan,

11 and Trazodone at the current time?

12   A.   Yes.

13   Q.   And --

14       MS. CLARY:  I think it's Effexor.

15       THE WITNESS:  Effexor.  Yes, I'm sorry.

16 BY MR. CATHELL:

17   Q.   Effexor.  How long have you been taking

18 these med- -- those three medications?

19   A.   I've been taking those three

20 medications -- one moment.  Feb -- February of

21 200- -- I don't remember if it was '17 or '18.  Can

7 (Pages 22 - 25)

Veritext Legal Solutions

JA497

Desire Evans

March 28, 2019

Page 26

1 you -- is that in my answer?

2        MS. CLARY:  It may or may not be.  If you

3 know, you can answer.

4        THE WITNESS:  Okay.

5        MS. CLARY:  If you don't know, tell him

6 you don't know.

7        THE WITNESS:  I don't remember.

8 BY MR. CATHELL:

9    Q.  And you also mentioned that you had taken

10 Prozac in the past, correct?

11   A.  Yes.

12   Q.  And when did you take Prozac?

13   A.  Well, Prozac, I was -- I was prescribed

14 Prozac, along with the Trazodone and the Ativan, at

15 first, and then they switched it to Effexor.  So,

16 it's been around the same amount of time I've been

17 taking all of them.  They just switched my

18 medications to something else.

19   Q.  Okay.  And who prescribed those

20 medications?

21   A.  My first -- the first one was Shanda

Page 27

1 Smith at Kaiser, and then now I'm seeing Elumi

2 Neuwamini (sic).

3    Q.  All right.  That one is definitely going

4 to need to be spelled.  Do you know how to spell

5 it?

6    A.  I don't.  I sent it -- I sent it to you

7 all yesterday, the name.

8        MS. CLARY:  I will -- I'm going to look

9 it up.

10       THE WITNESS:  I'm sorry.

11       MS. CLARY:  No.

12 BY MR. CATHELL:

13   Q.  So, in your answers -- and I'm happy to

14 show them to you, --

15   A.  Um-hum.

16   Q.  -- you're -- the last physician or

17 medical provider you report seeing was Shanda

18 Smith.

19   A.  Correct.

20   Q.  So, I don't believe the last individual

21 that you mentioned is -- is listed.  Can you say

Page 28

1 the name one more time so I can at least write it

2 down so I can ask you questions?

3    A.  Igim -- Igenmino.  Igemino.  I don't

4 know.  Igemial Nanamuju -- Nanmiju.  I literally

5 had to call Mr. Ceryes back yesterday with the

6 spelling of her name because I couldn't pronounce

7 it.

8    Q.  All right.  So, first, you were seeing

9 Dr. Smith?

10   A.  Yes.

11   Q.  And it's my understanding Dr. Smith is a

12 psychiatrist --

13   A.  Yes.

14   Q.  -- with Kaiser Permanente'?

15   A.  Yes.

16   Q.  And from what -- what time period were

17 you seeing Dr. Smith?

18   A.  From February of -- I want to say

19 February of '18 to June of '18 or July of '18.

20   Q.  February of 2018 to July of 2018?

21   A.  Yeah.

Page 29

1    Q.  And --

2    A.  Wait.  I don't remember when

3 I -- when I stopped seeing her.  My husband -- we

4 had to switch insurances, so I had to get another

5 doctor.  But we switched insurances in October, so

6 I'm thinking it was more October of '18.

7    Q.  And when you stopped seeing Dr. Smith in

8 October of '18, is that when you went to see

9 Dr. Namamichu?

10   A.  Yes.

11   Q.  Is Dr. Namamichu also a psychiatrist?

12   A.  Yes.

13   Q.  And have you continuously seen

14 Dr. Namamichu since October of 2018?

15   A.  Yes.

16   Q.  And when you were seeing Dr. Smith

17 starting in February of 2018, were you seeing her

18 continuously until October of 2018?

19   A.  Yeah.  Well, not seeing -- we -- we have

20 video calls or phone calls, yes.

21   Q.  And how often would you see Dr. Smith?

8 (Pages 26 - 29)

JA498

Desire Evans                                    March 28, 2019

Page 30

1    A.   On an as-needed basis, but usually
2    scheduled about twice a week.
3    Q.   And were those by weekly video
4    conference?
5    A.   No.  We video conferenced every time,
6    except for the first consultation.
7    Q.   So, you saw Dr. Smith in the office one
8    time, and then the remainder of the interactions
9    were by video conference, --
10   A.   Yes.
11   Q.   -- correct?
12   A.   Yes.
13   Q.   Did you see Dr. Namamichu in his office
14   at any time?
15   A.   Yes.  I saw her in the office.
16   Q.   It is a her?
17   A.   Um-hum.
18   Q.   I'm sorry.
19   A.   That's okay.
20   Q.   And how often have you been seeing
21   Dr. Namamichu?

Page 31

1    A.   I only see her for medication
2    maintenance, so it's a phone interview once a
3    month.
4    Q.   And how did you find Dr. Namamichu?
5    A.   Through my -- my goodness.  What's the
6    other name of that person that's not a
7    psychiatrist?  The one that can't prescribe
8    medicine.
9    Q.   A psychologist?
10   A.   A psychologist.  Through my psychologist.
11   I couldn't think of it.
12   Q.   Okay.  And who is your psychologist?
13   A.   Paul Donato.
14   Q.   Do you know how to spell his last name?
15   A.   D-O-N-A-T-O, I'm assuming.
16   Q.   And how long have you been seeing
17   Psychiatrist Donato or Psychologist Donato?
18   A.   Since about March -- no, no, no.  June of
19   '18.
20       MS. CLARY:  I have a name and a spelling.
21   Do you want me to jump in with it?

Page 32

1        MR. CATHELL:  Sure.
2        MS. CLARY:  Dr. Nnamani.
3        THE WITNESS:  Nnamani.
4        MS. CLARY:  The first name is
5    I-G-E-O-M-A, last name is N-N-A-M-A-N-I.
6        MR. CATHELL:  Okay.
7        MS. CLARY:  Igeoma Nnamani -- excuse me,
8    Nnamani.
9        MR. CATHELL:  Nnamani?
10       MS. CLARY:  Yes.  I have mad skills.
11   You're welcome.
12       MR. CATHELL:  Thank you very much.
13   BY MR. CATHELL:
14   Q.   We can agree that -- that the
15   psychologist -- the psychiatrist I've been
16   referring to as Dr. Namamichu is Dr. Nnamani,
17   correct?
18   A.   Yes.  Namamichu, yes.
19   Q.   You've been seeing psychologist
20   Dr. -- strike that.
21       You've been seeing Psychologist Donato

Page 33

1    since June of 2018, correct?
2    A.   Yes.
3    Q.   And do you currently see Mr. Donato?
4    A.   Not in the office, but we converse; yeah.
5    Q.   And how often do you receive treatment
6    from Mr. Donato?
7    A.   Also on an as-needed basis, but scheduled
8    twice a week.
9    Q.   Are those video conferences?
10   A.   Just phone conferences.  He doesn't have
11   video.  He's kind of old schooled.
12   Q.   Does Dr. Nnamani participate in video or
13   telephone conferences with you?
14   A.   Telephone, yes.
15   Q.   And how often do you speak to
16   Dr. -- speak or see on video Dr. Nnamani?
17   A.   Once a month for medication maintenance.
18   Q.   So, a typical week for you would have you
19   speaking to Psychologist Donato two times per week
20   on the telephone and Dr. Nnamani one time per month
21   on the telephone for medication maintenance?

9 (Pages 30 - 33)

JA499

Desire Evans                                                    March 28, 2019

Page 34

1    A.  Yes.

2    Q.  Did I miss anything regarding the

3  treatment you're receiving for any mental illness

4  as far as providers?

5    A.  No.

6    Q.  And when Dr. Smith prescribed to you the

7  four medications, understanding you were only

8  taking three at a time, did she make a diagnosis of

9  you at that time?

10    A.  Yes.

11    Q.  And what was the diagnosis?

12    A.  The diagnosis was, or is, depression,

13  anxiety, and PTSD.

14    Q.  And in -- was it Dr. Smith who diagnosed

15  you with those conditions?

16    A.  Yes.

17    Q.  And do you recall when she diagnosed you

18  with those conditions?

19    A.  I don't.  It was during her -- our first

20  visit.

21    Q.  So, that would have been in February

Page 35

1  2018, correct?

2    A.  (Nodding head yes.)

3    Q.  Yes?

4    A.  Yes.  I'm sorry.  Yes.

5    Q.  That's okay.

6    A.  Yes.

7    THE WITNESS:  I'm sorry, ma'am.

8    MS. CLARY:  You're doing fine.

9    THE WITNESS:  Okay.

10  BY MR. CATHELL:

11    Q.  To your knowledge, has Dr. Nnamani

12  diagnosed you with either the same conditions or

13  anything additional?

14    A.  Not that I'm aware of.

15    Q.  Has Dr. Nnamani recommended any

16  additional prescription medication for you?

17    A.  No.  She's actually the one who changed

18  my medication from Prozac to Effexor.

19    Q.  Okay.  Prior to February of 2018, had you

20  ever been diagnosed with depression?

21    A.  No.

Page 36

1    Q.  Prior to February of 2018, had you ever

2  been diagnosed with anxiety?

3    A.  No.

4    Q.  Prior to 2018, had you ever been

5  diagnosed with posttraumatic stress disorder?

6    A.  No.

7    Q.  Prior to February of 2018, had you taken

8  any medications at any time in your life for mental

9  illness of any kind?

10    A.  No.

11    Q.  Prior to 2018, had you felt depressed?

12    A.  No.

13    Q.  Prior to 2018, had you ever felt

14  anx- -- anxious?

15    A.  No.

16    Q.  Since beginning your medication regimen

17  in February of 2018, have you seen an improvement

18  in your depression?

19    A.  Some days, but for the most part, no.

20    Q.  And can you describe for me which days

21  or -- you see improvement and which days you don't?

Page 37

1    A.  It's kind of hard to say which days, but

2  sometimes I wake up, and I feel like I can go on

3  through my day and go to work just fine; some days

4  I can't get out of bed at all.

5    Q.  Since 200- -- since February of 2018,

6  have you seen an improvement in your anxiety?

7    A.  No.

8    Q.  So, it's fair to say the medications you

9  you've been taking since February 2018 have not

10  improved or reduced your anxiety, correct?

11    A.  Yes.

12    Q.  Since February 2018, when you began

13  taking the medications you've described, have you

14  seen an improvement or reduction in the symptoms of

15  posttraumatic stress disorder?

16    A.  No.

17    Q.  What is posttraumatic stress disorder, if

18  you know?

19    MS. CLARY:  Objection to the extent I

20  think it calls for psychiatric expertise, but you

21  can go ahead as best you can.

Veritext Legal Solutions

JA500

Desire Evans                                              March 28, 2019

Page 38

1       THE WITNESS: From my understanding, it's
2   a -- it's a -- it's me having -- it's me having
3   stress or -- for something that happened to me in
4   my past or anxiety or social anxiety.  That's it.
5   BY MR. CATHELL:
6       Q.  Did Dr. Smith ever give you her opinion
7   that your depression -- strike that.
8           Did Dr. -- Dr. Smith ever share with you
9   an opinion regarding the cause of your depression?
10      A.  No.
11      Q.  Did Dr. Smith ever share with you an
12  opinion regarding the cause of your anxiety?
13      A.  No.
14      Q.  Did Dr. Smith ever share with you her
15  opinion regarding the cause of your posttraumatic
16  stress disorder?
17      A.  No.
18      Q.  Is this -- is your answer to all three of
19  those questions the same for Dr. Nnamani?
20      A.  Yes.  Can I ask a question?  Are you
21  asking me if they gave me a reason for diagnosing

Page 39

1   me with those things?
2       Q.  So, I'm not allowed to ask you -- answer
3   your question, --
4       A.  Oh.
5       Q.  -- but I'm happy to rephrase it if you
6   don't understand.  I'm -- it's not a trick
7   question.
8       A.  Can I ask my lawyer?
9       Q.  What -- what -- let me -- let me
10  ask -- kind of ask -- did you not understand the
11  question?
12      A.  Well, I'm just making sure I answered it
13  correctly.
14      Q.  I -- I mean --
15          MS. CLARY:  If you don't ask her now, I
16  will later.  So, you might want to ask her now,
17  because the word "causation or cause" can have a
18  legal significance.  And, again, I'm not
19  trying -- I'm trying my very best not to make a
20  speaking objection, but I think what you're asking
21  her is, has anybody told her why she has the

Page 40

1   conditions that she testified to.
2           MR. CATHELL:  Right.
3   BY MR. CATHELL:
4       Q.  My -- my question was, did Dr. Smith
5   share with you her opinion as to the cause of your
6   depression?
7           MS. CLARY:  I'm going to object to the
8   form for the reasons I stated.  You can answer as
9   best you can.
10          THE WITNESS:  Okay.  So, I'm still going
11  to say, no, I think.
12  BY MR. CATHELL:
13      Q.  For the sake of going through the rest of
14  those, is the answer -- do your -- did Dr. Smith
15  share with you her opinion regarding the cause of
16  your anxiety?
17          MS. CLARY:  Same objection.  You can go
18  ahead.
19          THE WITNESS:  No.
20  BY MR. CATHELL:
21      Q.  Did Dr. Smith -- Smith share with you her

Page 41

1   opinion regarding the cause of your posttraumatic
2   stress disorder?
3           MS. CLARY:  Same objection.  You can go
4   ahead.
5           THE WITNESS:  No.
6   BY MR. CATHELL:
7       Q.  Did Dr. Nnamani share with you her
8   opinion regarding the cause of your depression?
9           MS. CLARY:  Same objection.
10          THE WITNESS:  No.
11  BY MR. CATHELL:
12      Q.  Did Dr. Nnamani share with you her
13  opinion regarding the cause of your anxiety?
14          MS. CLARY:  Same objection.  Go ahead.
15          THE WITNESS:  No.
16          MS. CLARY:  Can I have a continuing
17  objection?
18          MR. CATHELL:  Sure.
19          MS. CLARY:  Thank you.
20  BY MR. CATHELL:
21      Q.  Did Dr. Nnamani share with you her

11 (Pages 38 - 41)

Desire Evans

March 28, 2019

Page 42

1 opinion regarding the cause of your posttraumatic

2 stress disorder?

3    A.  No.

4    Q.  Have you ever been seen by a healthcare

5 specialist, other than an OB/GYN, other than

6 routine check-up care, such as mammography or

7 dermatologic screening?

8    A.  No.

9    Q.  Who is your primary care provider?

10    A.  I don't have a primary care provider.

11    Q.  When did you last have a primary care

12 provider?

13    A.  Before I had my son.  In 2016, I

14 guess -- 2015.

15    Q.  And who was your primary care provider at

16 that time?

17    A.  Dainty Jackson.

18    Q.  Dainty?

19    A.  (Nodding head yes.)

20    Q.  Is that a female?

21    A.  Yes.

Page 43

1    Q.  And do you know where Dr. Jackson was

2 located?

3    A.  Waldorf, Maryland.  I don't know the

4 exact address.

5    Q.  And how long had Dr. Jackson been your

6 primary care provider?

7    A.  I seen her one time.  She was assigned by

8 insurance.

9    Q.  Prior to seeing Dr. Jackson, did you have

10 a primary care provider?

11    A.  No.

12    Q.  Should I understand your answer to mean

13 you have never had a primary care provider prior to

14 seeing Dr. Jackson on the one occasion?

15    A.  Correct.  I didn't have insurance.

16    Q.  Do you currently have an OB/GYN?

17    A.  Nope.  No.  Sorry.

18    Q.  That's all right.  And when did you last

19 have an OB/GYN?

20    A.  When I had my son.

21    Q.  And what was the name of your last

Page 44

1 OB/GYN?

2    A.  J-A-V-A-K-A, Moore, M-O-O-R-E.

3    Q.  Prior to Dr. Moore, who was serving as

4 your OB/GYN?

5    A.  I went to -- I went to Moore OB/GYN, but

6 I just saw any.  I didn't have a, a particular

7 OB/GYN.

8    Q.  What years were -- did Dr. Moore or his

9 office serve as your OB/GYN?

10    A.  I moved to Maryland in -- I think I moved

11 to Maryland in 2013, so maybe about 2014 until I

12 had my son.

13    Q.  And did you have a -- have an OB/GYN

14 prior to 2014?

15    A.  No.  Not a regular OB/GYN, no.

16    Q.  When you say not a regular OB/GYN, were

17 you seeing OB/GYNs as needed?

18    A.  As needed, yeah.  I wasn't going for like

19 regular check-ups or anything.

20    Q.  When was the last time you saw a

21 healthcare provider of any kind?

Page 45

1    A.  Like physically?  Like went into their

2 office?

3    Q.  Yes.

4    A.  September of 2018.

5    Q.  And who was that?

6    A.  Dr. Nnamani.  October of 2018,

7 Dr. Nnamani.

8    Q.  Prior to seeing Dr. Nnamani, who was the

9 healthcare provider that you saw most recently?

10    A.  Shanda.

11    Q.  Is that Dr. Smith?

12    A.  Yes, and Dr. Donato as well.

13    Q.  Other than Dr. Nnamani, Dr. Smith, and

14 Dr. Donato, have you seen any other healthcare

15 providers since your child was born in March of

16 2016?

17    A.  No.

18    Q.  Have you gone to any hospitals, emergency

19 departments, or urgent care centers since March of

20 2016 to receive care or treatment?

21    A.  I did go to the emergency room, yes.

12 (Pages 42 - 45)

JA502

Desire Evans                                                          March 28, 2019

Page 46

1    Q.   And when was that?

2    A.   December, maybe.

3    Q.   Of 2018?

4    A.   '18.  Um-hum.

5    Q.   And what caused you to go to the

6    emergency department in December of 2018?

7    A.   I had a rup- -- ruptured cyst on my

8    ovary.

9    Q.   And which hospital did you go to?

10   A.   Charles County.  La Plata, I believe.

11   Q.   And I assume you were seen by healthcare

12   providers there?

13   A.   Yes.

14   Q.   Okay.  And what did those healthcare

15   providers do regarding the ruptured cyst on your

16   ovary?

17   A.   Gave me antibiotics.

18   Q.   And did the antibiotics have their

19   intended effect and resolve the cyst?

20   A.   Well, I'm no longer in pain.  I never

21   went to a follow-up appointment to find out.

Page 47

1    Q.   Do you happen to recall the names of any

2    of the healthcare providers who saw you at the

3    emergency department?

4    A.   No.

5    Q.   Have you at any time been seen by a

6    primary care provider that we haven't otherwise

7    discussed?

8    A.   No.

9    Q.   Other than Dr. Moore and Dr. Akoda, who

10   we're going to talk about, have you been seen by

11   any other OGB -- OB/GYN that we have not otherwise

12   discussed?

13   A.   No.

14   Q.   I know you've told me about the mental

15   health treatment you've been receiving.  Other than

16   that, have you -- since your alleged involvement

17   with Dr. Akoda -- seen any healthcare provider of

18   any kind for any issue you claim is related to your

19   involvement with Dr. Akoda?

20   A.   No.

21   Q.   And the four medications we discussed,

Page 48

1    understanding you're taking three at the current

2    time, are there any other medications that you

3    currently take that we have not discussed?

4    A.   No.

5    Q.   What pharmacy or pharmacies have you

6    filled prescriptions at in the last three years?

7    A.   Walmart, CVS, and Walgreens.

8    Q.   And are those in La Plata?

9    A.   Waldorf.

10   Q.   All are in Waldorf?

11   A.   Um-hum.  Yes.  Sorry.

12   Q.   That's okay.  Prior to March of

13   2016 -- well, strike that.

14        I recall reading in your Answers to

15   Interrogatories that you had been hospitalized in

16   2015 for a slip and fall; is that corr- -- is that

17   accurate?

18   A.   Oh, yeah.  I'm sorry.

19   Q.   And you described that incident as you

20   lost your footing and fell resulting in

21   hospital -- hospitalization for approximately one

Page 49

1    week at Washington Hospital Center, correct?

2    A.   Yes.

3    Q.   And any injuries you sustained as a

4    result of the slip and fall, have those since

5    resolved?

6    A.   Yes.

7    Q.   So, you don't have any lingering back

8    issues or bone issues?

9    A.   Not that I can contribute to that.

10   That -- I mean, I'm not a medical professional, so

11   I wouldn't know why my back was hurting.

12   Q.   The next series of questions I'm asking

13   for information just known by you or evidence that

14   you have, not information that was shared by your

15   attorney or that has been provided by your

16   attorney; is that fair?

17   A.   Yes.

18   Q.   Okay.  What evidence do you have

19   regarding Dr. Akoda's background?

20   A.   None.

21   Q.   What evidence do you have regarding

13 (Pages 46 - 49)

Desire Evans                                                      March 28, 2019

Page 50

1  whether Dr. Akoda was licensed in Maryland?
2      A.  None.
3      Q.  What evidence -- evidence do you have
4  regarding whether Dr. Akoda was licensed to
5  practice medicine in Virginia?
6      A.  None.
7      Q.  What evidence do you have regarding
8  Dr. Akoda's training as a medical doctor?
9      A.  None.
10     Q.  Do you know whether Dr. Akoda went to
11 medical school?
12     A.  I'm not aware.  I don't -- I'm not aware
13 if he went to medical school.
14     Q.  Do you know where Dr. Akoda did his
15 residency?
16     A.  No.
17     Q.  Do you know what a residency is?
18     A.  I think so.  To become a -- it's like an
19 internship for doctors.
20     Q.  Do you know whether Dr. Akoda
21 successfully completed a residency?

Page 51

1      A.  No.
2      Q.  Do you know if he passed all national
3  examinations to complete a residency?
4      A.  No.
5      Q.  Do you know whether Dr. Akoda was board
6  certified by the American Board of Obstetrics and
7  Gynecology?
8      A.  No.
9      Q.  Do you know what is entailed in becoming
10 board certified?
11     A.  No.
12     Q.  Were you aware that Dr. Akoda took
13 written and oral examinations and passed them to
14 become board certified?
15     A.  No.
16     Q.  What do you know about when Dr. Akoda
17 began using the name Akoda?
18     A.  Nothing.
19     Q.  Do you know why Dr. Akoda began using the
20 name Akoda?
21     A.  No.

Page 52

1      Q.  Do you know what ECFMG certification
2  stands for?
3      A.  No.
4      Q.  It stands for the Educational Commission
5  for Foreign Medical Graduates.  Were you aware that
6  to be certified a foreign medical graduate takes
7  an -- an examination administered by ECFMG?
8      A.  No.
9      Q.  Do you know whether Dr. Akoda took such
10 an examination?
11     A.  No.
12     Q.  How many times he successfully passed the
13 examination?
14     A.  No.
15     Q.  Do you have any evidence regarding how
16 many times Dr. Akoda took the examination?
17     A.  No.
18     Q.  Do you have any evidence regarding under
19 which what names Dr. Akoda took the examination?
20     A.  No.
21     Q.  Do you know whether Dr. Akoda was

Page 53

1  certified by ECFMG?
2      A.  No.
3      Q.  Is all of the information you have
4  regarding Dr. Akoda limited to that information
5  which has been provided to you by your counsel?
6      A.  Yes.
7      Q.  The next series of questions, if you will
8  just give your attorney time to object, I want to
9  be fair.
10         How did you come to be a client of
11 Schochor, Federico and Staton?
12         MS. CLARY:  I'm going to object.  I'm
13 going to let you answer up to the point that you
14 made first contact with us.
15         I assume what you're asking her is to
16 talk about how she got -- made her way here?
17         MR. CATHELL:  Let me -- let me rephrase
18 the question.
19 BY MR. CATHELL:
20     Q.  What -- when was the first you learned of
21 allegations surrounding Dr. Akoda?

14 (Pages 50 - 53)

Desire Evans                                          March 28, 2019

Page 54

1    A.  On the radio.

2    Q.  And do you recall when that was?

3    A.  Maybe fall of '18, but I can't be sure.

4    Q.  Do you recall which radio station you

5 were listening to?

6    A.  93.9.

7    Q.  And do you recall what the advertisement

8 said?

9    A.  Not verbatim, of course, but something to

10 the effect of, Doc -- Dr. Akoda -- if you were seen

11 by Dr. Akoda or something to that effect.

12    Q.  If you were seen by Dr. Akoda?

13    A.  Contact -- I -- I -- I can't remember

14 exactly.

15    Q.  And what did you do based on that

16 advertisement?

17    A.  I discussed it with my husband, and then

18 we contacted the lawyer's office.

19    Q.  How long between the time you heard the

20 radio advertisement did you wait before calling the

21 number that was on the advertisement?

Page 55

1        MS. CLARY:  You can answer that.

2        THE WITNESS:  The next day.

3 BY MR. CATHELL:

4    Q.  And do you recall which law firm you

5 spoke to when you made that initial call?

6    A.  This law firm.

7    Q.  Do you recall whether the radio

8 advertisement said anything, other than if you were

9 a patient of Dr. Akoda, you should call this

10 certain telephone number?  In other words, did it

11 say, state any allegations regarding Dr. Akoda?

12    A.  I really can't recall.

13    Q.  Other than the radio advertisement we've

14 discussed, did you --

15    A.  Can I go back?  It didn't say anything

16 about allegations, because I wasn't sure.  I

17 thought that it was like for a sexual assault or

18 something.  I wasn't exactly sure what the -- the

19 lawsuit was about.

20    Q.  When did you first become aware of what

21 the lawsuit was about?

Page 56

1        MS. CLARY:  I'm going to object to the

2 extent I think that now is going into discussions

3 that she would have had with counsel.

4        So, you can answer if you have an

5 understanding outside of any conversation you've

6 had with anybody here at this law firm.  Do you

7 understand what -- how I'm directing you?  He

8 wants --

9        MR. CATHELL:  Let me try to ask a better

10 question.

11        MS. CLARY:  Okay.

12 BY MR. CATHELL:

13    Q.  Prior to making the telephone call to

14 this law firm, --

15    A.  Um-hum.

16    Q.  -- did you have an understanding of what

17 the lawsuit was about?

18    A.  No.

19    Q.  Is any information you have regarding

20 what the lawsuit about -- lawsuit is about

21 information that was provided to you by your

Page 57

1 attorney as compared to information you saw on TV

2 or the Internet?

3        MS. CLARY:  I'm going to object.  Just

4 by the way you've phrased this, it's soliciting her

5 testifying about what information she got from us.

6 So, I'm not sure that she can parse that out with

7 the way that you phrased the question, so --

8 BY MR. CATHELL:

9    Q.  Since -- since hearing the radio

10 advertisement, have you seen -- have you heard any

11 other radio advertisements regarding Dr. Akoda?

12    A.  Like from other law firms?  Just in

13 general?

14    Q.  Just any radio advertisements.

15    A.  Oh, yes.

16    Q.  Okay.  And what did those radio

17 advertisements say?

18    A.  They -- a class action suit against

19 Charles Akoda, if you saw this doctor, give us a

20 call type situation.

21    Q.  Did any of the radio advertisements state

15 (Pages 54 - 57)

Desire Evans                                                    March 28, 2019

Page 58

1 the substance of the allegations surrounding
2 Dr. Akoda?
3    A.  No.
4    Q.  Have you at any time seen any television
5 advertisements regarding the allegations pertaining
6 to Dr. Akoda?
7    A.  No.
8    Q.  Did you at any time conduct an Internet
9 search regarding the allegations involving
10 Dr. Akoda?
11    A.  Yes.
12    Q.  Okay.  And tell me what you did.
13    A.  Well, I -- once I found out what
14 the -- you know, what the allegations were, I
15 looked him up, and I just wanted to see what the
16 story was behind it and what his real name was.
17 You know, I was just doing my own research on the
18 person who --
19    Q.  And what did you discover?
20    A.  I didn't discover anything new that
21 wasn't -- that I didn't know already.  I just

Page 59

1 discovered that he wasn't who he said he was when
2 he told me who he said he was -- who he was what he
3 said he was.
4    Q.  Anything else?
5    A.  No.
6    Q.  Other than the radio advertisements that
7 we've talked about and your Internet search and any
8 communications from your attorneys, have you
9 received any additional information regarding the
10 substance of the allegations against Dr. Akoda?
11    A.  No.
12    Q.  I asked you earlier if Dr. Akoda -- if
13 you knew whether Dr. Akoda had gone to
14 medical -- medical school or residency.  Do you
15 have an understanding or belief whether he had
16 gone -- undergone any medical training?
17    A.  No.  I just assumed that if he was at the
18 hospital, he would have training.
19    Q.  Do you know whether Dr. Akoda was trained
20 as an OB/GYN?
21    A.  No.

Page 60

1    Q.  Do you have any evidence that Dr. Akoda
2 lacked OB/GYN training or skills?
3    A.  No.
4    Q.  How did you become aware of Dr. Akoda as
5 an OB/GYN?
6    A.  He came into my room as I was about to
7 deliver my son.
8    Q.  And it's my understanding from your
9 medical chart that you had been receiving prenatal
10 care from Dr. Moore; is that correct?
11    A.  Correct.
12    Q.  And it's my understanding from your
13 medical chart, and other information, that your
14 first, and only, contact with Dr. Akoda occurred
15 immediately prior to and during the birth of your
16 child; is that correct?
17    A.  Correct.
18    Q.  And do you recall when you presented to
19 the Prince George's County Hospital Center to
20 deliver your child?
21    A.  On March 16th.

Page 61

1    Q.  When you first presented to Prince
2 George's County Hospital Center, you were seen by
3 Dr. Moore, correct?
4    A.  No.
5    Q.  If your medical records -- are you sure
6 you returned to PG County Hospital Center for
7 delivery on March 16th compared to March 14, 2016,
8 for example?
9    A.  Yeah.
10    Q.  Who was the first healthcare provider
11 that you came into contact with on March 16?
12    A.  A nurse.  I don't -- it was a nurse up
13 until my water broke.
14        THE WITNESS:  I'm sorry, am I doing that
15 to your computer?  I was shaking it.  I'm sorry.
16 BY MR. CATHELL:
17    Q.  And when did you first come into contact
18 with Dr. Akoda?  Immediately after your water
19 broke?
20    A.  About that, yes.
21    Q.  And did you know that Dr. Moore would not

                                              16 (Pages 58 - 61)

Page 62

1  be present?

2      A.   No.

3      Q.   And describe for me your interaction with

4  Dr. Akoda on --

5      A.   And it was 3-17 at this point.

6      Q.   March -- right, on March 17, 2016.

7      A.   He came in the room, and they set the

8  room up for delivery.  What else do you need to

9  know?  What else are you asking?  I'm sorry.

10     Q.   Describe your interaction with Dr. Akoda.

11  Tell me what happened when he came in the room

12  and -- and the care and treatment he provided to

13  you.

14     A.   He just said that he would be delivering

15  my baby, that he was the doctor on call.  He had

16  been there at the hospital for 16, 18 hours at that

17  time, and he would just be in charge of delivery.

18     Q.   Did you have an understanding as to

19  whether Dr. Akoda and Dr. Moore had a professional

20  relationship?

21     A.   No.  My understanding was that he was

Page 63

1  there on behalf of the hospital.

2      Q.   And what led you to -- to arrive at that

3  understanding?

4      A.   Because he had said he had already been

5  there for hours, which means that he wasn't there

6  for me.

7      Q.   Did you have any indication as to whether

8  Dr. Akoda and Dr. Moore worked together?

9      A.   No.

10     Q.   Was March 17, 2016 your only interaction

11  with Dr. Akoda?

12     A.   Yes.

13     Q.   What evidence, other than the statement

14  you told me that Dr. Akoda made, do you have that

15  Dr. Akoda was affiliated with the hospital?

16     A.   None.  That's just my assumption when you

17  go to a hospital.

18     Q.   I believe we left off Dr. -- when

19  Dr. Akoda said that he would be performing your

20  delivery.  Can you tell me what happened next,

21  please?

Page 64

1      A.   That was it.  He was in and out of the

2  room a lot up until I actually started pushing.

3  So, he was just in and out a lot, so it really

4  wasn't a lot of him explaining or introducing

5  himself.

6      Q.   Okay.  What happened next?

7      A.   So, then it's time for delivery.  So, I

8  was pushing.  It was only -- it wasn't a nurse in

9  the room at the time.  It was just the doctor and

10  my husband and my mom, and we were -- I'm pushing

11  and pushing, but my son wasn't coming out.  That

12  went on for several hours.  And in the process, he

13  started -- I don't know how to say it.  I don't

14  know how to say it.

15         MS. CLARY:  Do the best you can.

16         THE WITNESS:  Just say it?

17         MS. CLARY:  Just say it.

18  BY MR. CATHELL:

19     Q.   We're -- we're all adults here.

20     A.   I know, but it's just weird.  He started

21  like fondling with my lady parts, and my husband

Page 65

1  was asking him, like, why are you doing that?  And

2  he said that it was to stim- -- stimulate the baby

3  coming out, because my son wasn't coming out.

4         MS. CLARY:  Do you need a break?

5         THE WITNESS:  (Shaking head no.)

6         MS. CLARY:  Okay.  Brian, I am going to

7  need a break at some point.

8         MR. CATHELL:  Let's -- let's take a

9  break.

10        MS. CLARY:  -- so --

11        MR. CATHELL:  And then -- and then we can

12  just pick up where we've left off.

13        MS. CLARY:  If you want to finish like a

14  section, I can wait, but I just do need a bathroom

15  break, and I apologize.

16        MR. CATHELL:  Okay.

17        MS. CLARY:  Do you want to finish?

18        MR. CATHELL:  Yeah.

19        THE VIDEOGRAPHER:  Off the record.

20        MS. CLARY:  Well, hold on one second just

21  while we decide.

17 (Pages 62 - 65)

Desire Evans                                    March 28, 2019

Page 66

1        MR. CATHELL:  Yes, let me finish up just
2  this area.
3        MS. CLARY:  Okay.
4  BY MR. CATHELL:
5     Q.  So, understanding that it's
6  difficult --
7     A.  Um-hum.
8     Q.  -- or, frankly, not understanding
9  actually, but -- and I'm certainly not trying to
10  embarrass you, --
11     A.  Um-hum.
12     Q.  -- but it's a claim that you're making in
13  the case.
14     A.  I understand.
15     Q.  And so I would ask you to describe for me
16  when you say -- I think you said fuddling with your
17  lady parts.  Is there any better description you
18  can give us --
19     A.  He --
20     Q.  -- as to what he was doing?
21     A.  -- he was fingering my clitoris, I

Page 67

1  guess, --
2     Q.  Okay.
3     A.  -- if that makes sense.
4     Q.  And how -- how long was he doing that
5  for?
6     A.  He would do it for like a few seconds,
7  and then stop, and then go back and it again for
8  a few -- a few seconds, and then stop.
9     Q.  And --
10     A.  And that lasted for maybe five or six
11  minutes, I guess.  I'm just -- I'm just throwing a
12  number out there, before my husband was like, Yo,
13  like, what are you doing, Man?  And then that's
14  when he said that he -- my son wasn't coming out,
15  so he had -- that was a way for him to
16  stim- -- stimulate; lubrication I guess.  I don't
17  know.
18     Q.  And present in the room during this time
19  were your husband and your mother?
20     A.  My mom.  Um-hum.
21     Q.  Were any other healthcare providers in

Page 68

1  the room?  Healthcare providers meaning nurses,
2  aides, --
3     A.  No.
4     Q.  -- what have you in the
5  five-to-six-minute period?
6     A.  No.
7     Q.  When your husband asked Dr. Akoda what he
8  was doing, and Dr. Akoda allegedly explained why he
9  was doing that, did Dr. Akoda continue to touch you
10  in that way?
11     A.  Not as frequently.  So, it was like
12  before he just kept -- you know, it was like every
13  few seconds he was doing that, and then once my
14  husband said something, it wasn't -- he still did
15  it, but it was like maybe one or two times after
16  that.
17     Q.  Did Dr. Akoda say anything to you during
18  that time while he was touching you in that manner?
19     A.  Like telling me to, push, push.  He
20  was -- and he was calling me Baby and Momma, which
21  also was uncomfortable.

Page 69

1     Q.  Did he say anything else to you?
2     A.  No.
3     Q.  Did Dr. -- strike that.
4        Are you alleging any additional sexual
5  impropriety on behalf of Dr. Akoda, other than what
6  you've described for me?
7     A.  No.
8     Q.  To your knowledge, are there any audio
9  recordings of the statements or video recordings of
10  the acts that you've described?
11     A.  No.
12     Q.  Did you -- did you report Dr. Akoda's
13  behavior to anyone?
14     A.  I didn't.
15     Q.  To your knowledge, did your husband or
16  your mother report Dr. Akoda's behavior to anyone?
17     A.  No, sir.
18     Q.  Did -- I think we covered it in the last
19  question, but I just want to be clear for the
20  record.  Did you make any type of claim arising
21  from Dr. Akoda's behavior that you've just

18 (Pages 66 - 69)

Desire Evans                                              March 28, 2019

Page 70

1 described?

2   A.   No.

3   Q.   Did you contact, you or your husband or

4 your mother, to your knowledge, contact any police

5 department or law enforcement department regarding

6 the alleged sexual contact?

7   A.   No.

8   Q.   To your knowledge, were there any

9 additional witnesses to any of the alleged

10 inappropriate contact, other than those that you've

11 told me about?

12   A.   Not to my knowledge, no.

13   Q.   Did any other healthcare provider or

14 person that was around at the same time that you

15 and Dr. Akoda were together make any statements

16 regarding Dr. Akoda?

17   A.   No, not that I can recall.

18       MR. CATHELL:  Do you want to take a

19 break?

20       MS. CLARY:  If you don't mind.

21       THE VIDEOGRAPHER:  Stand by.  The time is

Page 71

1 now 11:14, and we are off the record.

2       (Recess taken -- 11:14 a.m.)

3       (After recess -- 11:23 a.m.)

4       THE VIDEOGRAPHER:  The time is now 11:23,

5 and we are back on the record.

6       You lost your microphone.  The clip is

7 still there.  The mic fell off.

8       MS. CLARY:  We had a clip problem

9 yesterday, and I'm just wondering if he's just

10 trying to steal a clip.

11       MR. CATHELL:  It's just what I need,

12 right?

13       MS. CLARY:  That's right.

14 BY MR. CATHELL:

15   Q.   All right.  So, we established -- I want

16 to back up just a few topics, Ms. Evans.  We

17 established that you started seeing Dr. Smith in

18 February of 2018, correct?

19   A.   Um-hum.

20       MS. CLARY:  Yes?

21       THE WITNESS:  Yes.  Sorry.

Page 72

1       MS. CLARY:  That's okay.

2 BY MR. CATHELL:

3   Q.   And we had talked earlier about time that

4 you had been missing from work?

5   A.   Yes.

6   Q.   And I wanted to come back to that, and

7 now that we know, generally, when you started

8 seeing Dr. Smith, I'd like to try to nail down time

9 frames, as best we can, as to when you started

10 missing work.

11   A.   Okay.

12   Q.   Okay.  When -- and I -- I believe you

13 told us that you heard the radio advertisement in

14 either the fall of 2017 or the fall of 2018.  Can I

15 assume that because you started seeing Dr. Smith in

16 February of 2018, you would have heard the radio

17 advertisement in the fall of 2017?

18   A.   No.  I was seeing Dr. Smith before I

19 heard the advertisement.

20   Q.   Okay.  And what caused you to go see

21 Dr. Smith?

Page 73

1   A.   I was -- I was very sad and depressed and

2 anxious and having a hard time working.  I was

3 missing a lot -- starting to miss a lot of time

4 from work, and I went to go see her to see if I

5 could get treatment and also to see if I can get

6 FMLA to help with the time that I was missing from

7 work.

8   Q.   And how long had you felt depressed,

9 anxious, and been missing work prior to seeing her

10 in February of 2018?

11   A.   Maybe like a year.

12   Q.   So, starting approximately in February

13 2017, you began feeling depressed, anxious, and

14 missing time from work?

15   A.   Yes.

16   Q.   And can you describe for us what it was

17 that was making you feel anxious and depressed?

18   A.   No.  Just every day life.  Like any

19 things that didn't bother me before, like started

20 bothering me.  I started noticing a decline in my

21 social interaction with people and not -- just not

19 (Pages 70 - 73)

Desire Evans                                                    March 28, 2019

Page 74

1  wanting to be bothered.
2    Q.  Do you know what was causing those
3  symptoms at that time?
4    A.  No.  No.
5    Q.  Were you working full-time at that time?
6    A.  Yes.
7    Q.  Was your husband working full time at
8  that time?
9    A.  Yes.
10   Q.  And what was happening with --
11      MS. CLARY:  Peyton?
12 BY MR. CATHELL:
13   Q.  -- Peyton while you both were working
14 full time?
15   A.  Peyton has always stayed home with me.  I
16 work from home.
17   Q.  Do you currently still work from home?
18   A.  I do.
19   Q.  And have you worked from home at all
20 times since March of 2016?
21   A.  Yes.

Page 75

1    Q.  So, you had been seeing Dr. Smith prior
2  to learning of the allegations surrounding
3  Dr. Akoda?
4    A.  Correct.
5    Q.  Had you been prescribed medication by
6  Dr. Smith prior to learning of the allegations
7  surrounding Dr. Akoda?
8    A.  Yes.
9    Q.  Once learning of the allegations
10 involving Dr. Akoda, how did your mental health
11 change at all, if it did?
12   A.  I want to say it got worse, because I
13 started to understand why I was feeling the way
14 that I was feeling, and also, I felt stupid
15 because -- because at first, I didn't know what the
16 allegations were.  I just knew that it was
17 Dr. Akoda, and I knew what he had done to me.  So,
18 I was assuming that that's what the allegations
19 were about.
20      So, it made me feel -- before contacting
21 them, it made me feel stupid that I didn't reach

Page 76

1  out to someone beforehand to discuss what had
2  happened to me.  So, it declined significantly.
3    Q.  And tell me how it declined
4  significantly.
5    A.  I became more withdrawn, more anxious,
6  and definitely I don't want -- I didn't want to see
7  a doctor after that.
8    Q.  And how many days from work did you miss
9  in 2017, given your testimony that in February of
10 2017 you began feeling depressed, anxious, and
11 started missing time from work?
12   A.  I don't know how many days.  It was
13 enough for me to use my PTO to where my job had to
14 extend an additional ten unpaid days for me.
15   Q.  Now, I assume that was accommodated
16 without the use of FMLA?
17   A.  Correct.
18   Q.  In 2018, how many days did you miss from
19 work, if you recall?
20   A.  I don't know how many days, but I do know
21 that my PTO was just used before the end of the

Page 77

1  year -- before September.
2    Q.  And tell me what happened in September.
3    A.  Well, I'm just saying before September it
4  was done.  I'm just giving you a timeline of how
5  much -- how fast I used it.
6    Q.  Sure.  Did there come a point in time
7  after you had extinguished your PTO that you needed
8  additional days?
9    A.  Um-hum.
10   Q.  Okay.  And --
11      MS. CLARY:  You have to say yes.
12      THE WITNESS:  Oh, I'm sorry.  Yes.
13 BY MR. CATHELL:
14   Q.  And how did your employer accomplish
15 that, if they did?
16   A.  They -- they don't.  They don't.  So,
17 that's -- that's -- they were able to extend me an
18 additional ten days of unpaid time off.
19   Q.  Also in 2018?
20   A.  Um-hum, (Nodding head yes.)
21      MS. CLARY:  Yes?

Veritext Legal Solutions

JA510

Desire Evans                                              March 28, 2019

Page 78

1 BY MR. CATHELL:

2    Q.   Okay.

3    A.   Yes.  Sorry.

4         MS. CLARY:  That's okay.  Everybody does

5 it.

6         THE WITNESS:  I'm old.  I keep

7 forgetting.

8         MS. CLARY:  Everybody does it, young and

9 old.

10 BY MR. CATHELL:

11    Q.   So, in your Answers to Interrogatories,

12 as well as potentially in the Complaint, I can't

13 represent that I know the specific part of the

14 Complaint attributed to you, but there's a, a

15 discussion of a lost wages claim.  So, that's what

16 I'm trying to understand is, how much time you're

17 missing from work.  You're using your PTO and then

18 any accommodations your -- your employer is making,

19 as well as actual time off --

20    A.   Um-hum.

21    Q.   -- okay?

Page 79

1    A.   Um-hum.  Yes.

2    Q.   All right.  So, you used your PTO in

3 2018.  You were then extended ten additional unpaid

4 days in 2018?

5    A.   Yes.

6    Q.   Did you miss any time, in addition to

7 your PTO and those ten unpaid days?

8    A.   Yes.

9    Q.   How many days did you miss in addition?

10    A.   I'm going to say an additional 15 days,

11 maybe.  I can't really say what for sure, but it's

12 quite often.

13    Q.   And I assume those days were unpaid?

14    A.   Yes.

15    Q.   And as a result of missing that time, has

16 your employer taken any adverse action regarding

17 your employment status?

18    A.   No.  That's why I needed to get FMLA.

19    Q.   And when did you get FMLA?

20    A.   February of '18.

21    Q.   February of 2018?

Page 80

1    A.   Yes.

2    Q.   And is there a certain amount of time

3 that your employer, in complying with FMLA, has

4 ensured you that you can miss per year without

5 losing your position or suffering another demerit,

6 if you will?

7    A.   No.  I have to renew my FMLA every six

8 months, and I'm also on ADA.

9    Q.   And how is that assisting you?

10    A.   Well, it -- that's how I'm able to work

11 from home, and it assists with my anxiety a lot

12 being around people.

13    Q.   Prior to giving birth in March of 2016,

14 were you working from home?

15    A.   No.

16    Q.   Did you ever work from home prior to

17 March of 2016?

18    A.   No.

19    Q.   So, following the birth of your

20 first -- of your child, Peyton, is when you began

21 staying home, correct?

Page 81

1    A.   Yes.

2    Q.   Or working from home?

3    A.   Yes.

4    Q.   So, as I understand your testimony, in

5 2018, you're claiming lost wages for approximately

6 25 unpaid days; is that correct?

7    A.   Yes.

8    Q.   And carrying over into 2019, we talked

9 earlier that you've used your paid time off?

10    A.   Yes.

11    Q.   Have you also been extended ten

12 additional days of unpaid leave?

13    A.   No.  They don't do that any more.

14    Q.   How many days in addition to

15 your -- strike that.

16         How many days over your PTO have you

17 taken off in 2019?

18    A.   What is this, March?  Give me a second.

19 Maybe 24 days.  I'm just -- I'm doing an

20 approximate six days a month times four.

21    Q.   Okay.  So, it's March --

21 (Pages 78 - 81)

Desire Evans                                                     March 28, 2019

Page 82

1    A.  So, three -- so 18.

2    Q.  So, if -- are -- the 18 or 24 days, is

3    that including the PTO that you told me I think was

4    15 days?

5    A.  Um-hum, (Nodding head yes.)

6        MS. CLARY:  Yes.

7    BY MR. CATHELL:

8    Q.  Okay.

9    A.  Yes.

10       THE WITNESS:  Sorry.

11       MS. CLARY:  That's okay.

12   BY MR. CATHELL:

13   Q.  All right.  So, in that scenario,

14   understanding that you're estimating, we would be

15   talking about three unpaid days to nine unpaid

16   days; is that correct?

17   A.  Yes.

18   Q.  Okay.  And what is -- what is causing you

19   to take that time off?

20   A.  Sometimes -- sometimes I just can't get

21   out of bed; other times I actually get to work and

Page 83

1    can't focus on what's going on.  Other days I

2    just -- I don't feel well enough to get up.  I

3    just -- I'm depressed or my anxiety -- or I'm not

4    sleeping at night, so I can't get up in the

5    morning.  And a lot of times if I deal with a

6    person over the phone -- if I deal with a person

7    over the phone, it can -- in a -- in a negative

8    way, it affects me emotionally like for the rest of

9    the day.  So, I can't go back to work sometimes.

10       I mean, it really just depends because

11   anything can trigger me feeling sad or depressed or

12   worthless.

13   Q.  And if you were -- so, because you're

14   working from home, I assume when you were talking

15   about taking time off, you're calling in saying

16   that you're not available to work that day --

17   A.  Correct.

18   Q.  -- from home, correct?

19   A.  Correct.  Yeah.  We're talking about

20   going downstairs from my bedroom to my office; yes.

21   Q.  Has any healthcare provider given you the

Page 84

1    opinion that you cannot work because of your

2    anxiety?

3    A.  Yes.

4    Q.  Okay.  And which healthcare provider was

5    that?

6    A.  Dr. Donato.

7    Q.  And he was your psychologist?

8    A.  Yes.

9    Q.  And did he also offer the opinion that

10   you couldn't work because of your depression?

11   A.  Yes.

12   Q.  And has he declared that you can't work

13   as a result of any other condition?

14   A.  No.

15   Q.  Do you recall what Dr. Akoda looked like?

16   A.  Yeah.

17   Q.  Can you just briefly describe his

18   appearance for me?

19   A.  Tall, African with glasses.

20   Q.  Did he speak with an accent, do you know?

21   A.  Yes.

Page 85

1    Q.  And it's my understanding from your

2    records that your child was delivered successfully,

3    and healthy, and without complication; is that

4    correct?

5    A.  Yes.

6    Q.  Did you have any additional interactions

7    with Dr. Akoda that we haven't otherwise discussed?

8    A.  No.

9    Q.  Do you recall when you were admitted to

10   the OB service at PG County Hospital Center on

11   March 16, 2016 that you were --

12       MS. CLARY:  Excuse me.

13   BY MR. CATHELL:

14   Q.  -- that you executed a consent form?

15   A.  I'm -- I'm assuming.  I guess I did sign

16   it.

17       (Whereupon, Evans Deposition Exhibit 2,

18   Consent Form, marked for identification.)

19   BY MR. CATHELL:

20   Q.  I'm going to show you what's been marked

21   as Defense Exhibit 2.  The first page has the

22 (Pages 82 - 85)

Desire Evans                                                                    March 28, 2019

Page 86

1 exhibit sticker on it.

2    A.  Um-hum.

3    Q.  The second page, I will ask you if you

4 can identify the signature, which is on the

5 left-hand column towards the bottom, please.

6       (Whereupon, there was a pause for

7 document examination.)

8       THE WITNESS:  Yes.

9 BY MR. CATHELL:

10   Q.  Is that your signature on the second

11 page?

12   A.  Yes.

13   Q.  Also, on the first page, the top

14 paragraph, there is a paragraph starting with

15 the -- in all capital letters, Physicians Not As

16 Employees.  Would you agree that those are your

17 init- -- your initials at the conclusion of that

18 paragraph?

19   A.  Yes.

20   Q.  Did you ever see Dr. Moore -- strike

21 that.

Page 87

1       Were you ever seen by Dr. Moore at

2 Dr. Moore's private practice?

3    A.  Yes.

4    Q.  Was there anything in Dr. Moore's private

5 practice that led you to believe he was affiliated

6 with the Prince George's County Hospital Center?

7    A.  At his office, no, but that's what he

8 told me.

9    Q.  That's what Dr. Moore told you?

10   A.  Yeah.  That was the reason that's where

11 my delivery was scheduled.

12   Q.  And what did he tell you?

13   A.  That that's where he had privileges.

14   Q.  Is it -- is it your contention that you

15 were suffering from depression, anxiety, and the

16 sleepless nights prior to learning of the

17 Akoda -- the allegations surrounding Dr. Akoda?

18   A.  Yes.

19   Q.  Is it your contention that you were

20 suffering those things as a result of your

21 experience at Prince George's County Hospital

Page 88

1 Center in March of 2016?

2    A.  Yes.

3    Q.  Okay.  And describe that contention for

4 me, please.

5    A.  I wasn't feeling like that beforehand.

6 The experience that I had with him left --

7    Q.  Him being, just so the record is clear?

8    A.  Him being Dr. Akoda.  I'm sorry.  The

9 experience I had with Dr. Akoda left me feeling

10 uncomfortable with any kind of medical professional

11 directly after that.  I didn't even go for a

12 six-week check-up.  And me not knowing what to do

13 about how I -- how I felt I was treated during the

14 delivery of my son with the sexual things that he

15 were doing -- he was doing, I didn't know how to

16 handle that.  I didn't know if it was the right

17 thing to do.  I don't know if he was supposed to do

18 that, so I was going through a lot of stuff while

19 trying to raise a newborn just by going through

20 that whole -- that whole scenario.

21   Q.  That whole scenario being?

Page 89

1    A.  The -- the sex -- the way he treated me

2 sexually, the way that my son -- like I pushed my

3 son out was -- my son -- I was in delivery for 12

4 hours before they took me to -- before they took me

5 for a C-section, so it was -- it was just a, a very

6 long process that was draining, and I didn't leave

7 the hospital with the best -- like this was the

8 best-day-of-my-life feeling.

9    Q.  Did you report the -- did you report the

10 inappropriate contact by Dr. Akoda to your

11 psychiatrist, Dr. Smith, I believe?

12   A.  Yes.

13   Q.  Did you report it to Dr. Nnamani?

14   A.  Yes.

15   Q.  And did you report it to your

16 psychologist, Dr. Donato?

17   A.  Yes.

18   Q.  The Answers to Interrogatories we have

19 been referencing were received by us in July of

20 2018, so presumably you signed them before that

21 date, correct?

23 (Pages 86 - 89)

JA513

Desire Evans                                           March 28, 2019

Page 90

1    A.   Yes.

2    Q.   Does that in any way refresh your

3 recollection as to when you would have first

4 learned of the allegations surrounding Dr. Akoda as

5 a result of the radio advertisement you described?

6    A.   June or July of '18 or June or July of

7 that year.

8    Q.   Is it correct to say that you never

9 discussed with Dr. Akoda the subject of hospital

10 privileges?

11    A.   Is it safe to say that?

12    Q.   Yes.

13    A.   Yes.  Yeah, I didn't discuss that.

14    Q.   Did you ever ask to see Dr. Akoda's

15 driver's license?

16    A.   No.

17    Q.   His passport?

18    A.   No.

19    Q.   Did you ever ask if Dr. Akoda had any

20 names, other than Dr. Akoda?

21    A.   No.

Page 91

1    Q.   Did you see Dr. Akoda interact with staff

2 on any occasions?

3    A.   No.  Not interaction, no.  Just in and

4 out the room preparing to get the room set up for

5 delivery.

6    Q.   Did you see Dr. Akoda perform or act

7 inappropriately towards staff at any point?

8    A.   No.

9    Q.   You would agree that your -- the delivery

10 of Peyton was successful?

11    A.   Yeah, meaning that Peyton is fine, and he

12 came out fine, but there were -- like I said, I was

13 in labor for several hours before I actually had

14 the C-section.  So, it was -- it seemed like there

15 might have been some complications in that process,

16 because they could have just took me for a

17 C-section instead of having me push for all that

18 time.

19    Q.   Okay.  Has -- has anyone given you -- has

20 any medical provider or medical expert given you

21 the opinion that Dr. Akoda's actions on March 17,

Page 92

1 2016 did not comply with the standard of care?

2    A.   No.

3    Q.   You would agree that when Dr. Akoda came

4 in to care for you, you agreed to allow him

5 to -- to deliver your child and, otherwise, provide

6 medical care to you?

7    A.   Yes.

8    Q.   Have you researched or learned of any

9 additional information regarding his privileging

10 status, other than that which has been provided by

11 your attorneys?

12    A.   No.

13    Q.   Did anything Dr. Akoda do on March 17th,

14 2016 make you feel that he was not medically

15 qualified to care for you?

16         MS. CLARY:  Objection.  Other than what

17 she's testified to?

18 BY MR. CATHELL:

19    Q.   Other than what you've testified to?

20    A.   Other than what I've testified to, no.

21    Q.   Did you confront Dr. Akoda directly

Page 93

1 regarding the alleged inappropriate contact?

2    A.   No.  My husband did, and I didn't know

3 how to -- I didn't know what to do about it,

4 actually.

5    Q.   Did you at any time fire Dr. Akoda?

6    A.   Fire him?

7    Q.   As your physician.

8    A.   He wasn't my physician to fire him.

9    Q.   Did you have -- I'm sorry.  Go ahead.

10    A.   No, I was just saying, he wasn't my

11 physician to fire him.

12    Q.   At any time while Dr. Akoda was caring

13 for you on March 17, 2016, did you ask for another

14 physician to render assistance to you?

15    A.   No.  I was in labor, sir.

16    Q.   These are not judgmental questions.

17    A.   Okay.

18    Q.   I'm just asking questions --

19    A.   Oh, no.

20    Q.   -- that we believe are pertaining to

21 class certification.

24 (Pages 90 - 93)

Desire Evans                                          March 28, 2019

Page 94

1   A.  No.

2   Q.  We've established that at no time did you

3   report the event to anyone, other than your

4   husband, who was, obviously, witnessing it,

5   correct?

6   A.  Correct.

7   Q.  Do you know of anyone else accusing

8   Dr. Akoda of sexual impropriety?

9   A.  No.

10   Q.  Did any of the advertisements you heard

11   mention or discuss claims of sexual impropriety

12   against Dr. Akoda?

13   A.  No.

14   Q.  Are you aware that other -- strike that.

15       Are you aware if other Plaintiffs in this

16   lawsuit are claiming sexual impropriety on the part

17   of Dr. Akoda?

18   A.  I am not.

19   Q.  Did any of the information you found on

20   the Internet as a result of your Internet search

21   mention or describe any claims of sexual

Page 95

1   impropriety against Dr. Akoda?

2   A.  No, sir.

3   Q.  Did you have a life-threatening

4   experience when interacting with Dr. Akoda?

5   A.  No.

6   Q.  I believe you told me that you first

7   began having symptoms regarding your interaction

8   with Dr. Akoda approximately one year after

9   delivery; is that accurate?

10   A.  Yes.

11   Q.  And that would be approximately February

12   2017, correct?

13   A.  Correct.  Now, that's saying that the

14   symptoms -- realizing that the symptoms weren't

15   just regular symptoms from childbirth or being

16   depressed after having a baby, you know, or

17   something like that.  Does that change any -- okay.

18   Does that -- okay.  I just want to make sure that I

19   say that.

20       I always -- not always, but I felt -- I

21   didn't just start feeling that way a year after the

Page 96

1   fact.  I started realizing that it wasn't something

2   that was related to just the natural things of a

3   woman giving birth, if that makes sense.

4   Q.  I can't pretend to --

5   A.  To know --

6   Q.  -- to know about giving birth and making

7   sense, but I -- so, you -- the -- the symptoms

8   became apparent to you in February 2017, and it's

9   my understanding that you first saw Dr. Smith in

10   February of 2018?

11   A.  (Nodding head yes.)

12   Q.  Between February of 2017 and 2018, what

13   were you doing, if anything, to treat those

14   symptoms?

15   A.  Nothing.  I didn't have health insurance.

16   Q.  And when did you get health insurance?

17   A.  We got health insurance through my

18   husband's employer around I want to say maybe

19   October.  Because open enrollment is in September,

20   so maybe October of '17, maybe.

21   Q.  And have you maintained that health

Page 97

1   insurance since that time?

2   A.  Well, now we have health insurance

3   through my employer, but we've -- we've remained

4   having health insurance, not that one, but we do

5   have health insurance.

6   Q.  Did you have health insurance at the time

7   you gave birth to Peyton?

8   A.  I had Medicaid.

9   Q.  Had you reached out to Medicaid or to an

10   individual medical provider in an effort to receive

11   mental health treatment and whether that treatment

12   would be covered by Medicaid?

13   A.  No.  My Medicaid was only covering the

14   deliver -- the delivery of my son, because I

15   actually made too much money at my job to be

16   qualified for regular Medicaid, and then my job's

17   insurance didn't start until after -- after I would

18   have already been out of work.  So, I was able to

19   get emergency Medicaid for that period of time just

20   so I could have delivery.  So, I didn't have

21   Medicaid after delivering my son.

25 (Pages 94 - 97)

Veritext Legal Solutions

JA515

Desire Evans                                                        March 28, 2019

Page 98

1  Q.  Okay.  And upon seeking treatment with
2  Dr. Smith in February of 2018, did you immediately
3  tell Dr. Smith that you had been touched
4  inappropriately by Dr. Akoda?
5  A.  Yeah.  We discussed it, everything during
6  that first encounter.
7  Q.  Did you talk with a doctor named
8  Dr. Fiester in this case?
9  A.  I did.
10  Q.  And do you recall when you talked to
11  Dr. Fiester?
12  A.  I don't.  I don't know if it was -- I
13  want to say it was between maybe October and
14  December of '18, but I can't be sure.
15  Q.  Okay.
16  MR. CATHELL:  One second while I look for
17  that report, please.
18  (Whereupon, there was a pause for
19  document examination.)
20  BY MR. CATHELL:
21  Q.  How many times did you talk to

Page 99

1  Dr. Fiester?
2  A.  One time.
3  Q.  And did you meet with Dr. Fiester in
4  person?
5  A.  No.
6  Q.  How did you talk with Dr. Fiester?  Was
7  that over the telephone, --
8  A.  Yes.
9  Q.  -- or was that by video conference?
10  A.  It was over the telephone.
11  Q.  Have you met Dr. Fiester at any time?
12  A.  No.
13  Q.  And do you recall how long the interview
14  with Dr. Fiester lasted?
15  A.  More than an hour.
16  Q.  More than an hour?
17  A.  (Nodding head yes.)  Maybe an hour.
18  Q.  And were you asked to prepare anything
19  prior to the interview with Dr. Fiester?
20  A.  No.
21  Q.  Did you take any notes during the

Page 100

1  interview with Dr. Fiester?
2  A.  No.
3  Q.  Where were you when you spoke to
4  Dr. Fiester?
5  A.  Home.
6  Q.  Was anyone present?
7  A.  No.
8  Q.  Was anyone present with you while you
9  were talking to Dr. Fiester?
10  A.  No.
11  Q.  Had you discussed with anyone, other than
12  your attorneys, what to expect during the call with
13  Dr. Fiester?
14  A.  No.
15  Q.  Had you been provided any
16  information -- strike that.
17  What did Dr. Fiester ask you or -- or, if
18  you prefer, just describe for me the interview?
19  A.  We just talked about anything that might
20  have happened in my past, things that are going on
21  now, and what I felt -- how I felt about Dr. Akoda.

Page 101

1  Q.  And describe for me what you discussed
2  about things that occurred in the past.
3  A.  There were no trauma in my past.  Nothing
4  to talk about, really.
5  Q.  Okay.  You also mentioned that you
6  discussed things going on now.  Can you describe
7  that for me?
8  A.  Um-hum.  Like -- like work, every day
9  life, being a mom.  You know, just normal -- you
10  know, just how my life is on an everyday basis.
11  Q.  And you also said that you talked about
12  the things going on with Dr. Akoda?
13  A.  Um-hum.
14  Q.  What did you discuss in that regard?
15  A.  She asked me to explain to her exactly
16  what happened and how I felt about it, and I did
17  the same as I did with you just now.
18  Q.  Did you share with her any additional
19  information that we have not discussed today?
20  A.  No.
21  Q.  And did Dr. Fiester make any treatment

26 (Pages 98 - 101)

Desire Evans                                          March 28, 2019

Page 102

1 recommendations for you?
2    A.  She said that I should have some kind of
3 therapy, but I forget what the name of it was.
4    Q.  Had you shared with her that you had been
5 receiving therapy by Dr. Donato?
6    A.  Yes.  It was a specific kind of therapy.
7 EMI, EMD.  I haven't found anyone who specializes
8 in that yet.
9    Q.  Can you say that again, please?
10   A.  It was EMI or EMD or something to that
11 effect.  I can't remember the initials.
12   Q.  And do you have an understanding as to
13 what that specific treatment is designed to treat?
14   A.  It's-- I think it's a mechanism -- it
15 helps to deal with PTSD, I believe, and anxiety.
16   Q.  Have you been working with Drs. Donato
17 and Nnamani regarding your PTSD?
18   A.  Yes.
19   Q.  And we talked about Dr. Smith's diagnoses
20 of depression and anxiety.  When were you first
21 diagnosed with PTSD?

Page 103

1    A.  Through Dr. Donato.
2    Q.  And when did Dr. Donato first diagnose
3 you with that?
4    A.  During our first visit.
5    Q.  Which I under -- understand to be, I
6 believe, October of 2018; is that correct?
7    A.  That's when I -- no.  I saw Dr. Donato in the
8 summer of '18.  I saw Dr. Nnamani in October of
9 '18.
10   Q.  Other than Dr. Donato, did Dr. Smith or
11 Nnamani ever diagnose you with PTSD?
12   A.  No.  I only saw Dr. Smith once
13 face-to-face, and after that, it was phone
14 interviews.  And Dr. Nnamani was -- didn't do any
15 additional diagnosis.
16   Q.  Did Dr. Fiester diagnose you with
17 anything?
18   A.  No.
19   Q.  Do you consider Dr. Fiester to be your
20 doctor?
21   A.  No.

Page 104

1    Q.  Other than the recommendation of EIMED
2 therapy for the PTSD, did she make any other
3 treatment recommendations?
4    A.  No.
5    Q.  Did she at any time refer you to anyone
6 else for treatment?
7    A.  No.
8    Q.  Just to be clear for the record, did
9 Dr. Fiester diagnose you with depression?
10   A.  No.
11   Q.  Or anxiety?
12   A.  No.
13   Q.  Or PTSD?
14   A.  No.
15   Q.  Have you read the Complaint in this
16 matter?
17   A.  Yes.
18   Q.  Okay.  And do you know what the Complaint
19 is in a lawsuit?
20   A.  Yes.
21   Q.  And when did you first review the

Page 105

1 Complaint?
2    A.  I don't recall when I first reviewed it.
3    Q.  Did you review it prior to it being
4 filed?
5    A.  I don't know when it was filed.
6    Q.  Okay.
7       MR. CATHELL:  Do you have that?
8       MS. CLARY:  The Complaint?
9       MR. CATHELL:  Yeah.
10      MS. CLARY:  I have the Complaint.  I'm
11 not sure she would know -- well --
12      MR. CATHELL:  I don't think I'm really
13 going to follow up, but can I see just it?
14      MS. CLARY:  Yeah.  Sure.  It looks like
15 there's the date stamp.
16   (Document tendered.)
17      MR. CATHELL:  Yeah.
18   (Whereupon, there was a pause for
19 document examination.)
20 BY MR. CATHELL:
21   Q.  I believe your response was that you

                                27 (Pages 102 - 105)

Veritext Legal Solutions

JA517

Desire Evans                                                                    March 28, 2019

| Page 106 |
|---|
| 1  don't know whether you reviewed it -- |
| 2     A.   Correct. |
| 3     Q.   -- prior to it being filed, correct? |
| 4     A.   Um-hum. |
| 5          MS. CLARY:  Yes? |
| 6          THE WITNESS:  Yes. |
| 7  BY MR. CATHELL: |
| 8     Q.   How many times have you reviewed the |
| 9  Complaint? |
| 10    A.   Twice. |
| 11    Q.   If you'll give your attorney a second to |
| 12 object, please.  Did you meet with your attorneys |
| 13 before the Complaint was filed? |
| 14         MS. CLARY:  Objection, and I'm going to |
| 15 instruct you not to answer in that it's protected |
| 16 by the attorney/client privilege and work product |
| 17 doctrine. |
| 18         MR. CATHELL:  And note our response from |
| 19 prior depositions. |
| 20         MS. CLARY:  Sure. |
| 21 BY MR. CATHELL: |

| Page 107 |
|---|
| 1     Q.   I would ask you a series of questions, |
| 2  for the record, regarding your interactions with |
| 3  your counsel, how many times you have met with them |
| 4  in preparing the Complaint, in participation in |
| 5  preparing the Complaint, your general input in |
| 6  preparing the Complaint, as well as the -- the |
| 7  contact you've had with them regarding this class |
| 8  certification process. |
| 9          It's my understanding your attorney is |
| 10 going to object to those questions.  I just want to |
| 11 make sure the record is clear that I would ask |
| 12 them, that we take exception to the objection to |
| 13 the extent we think they're relevant for class |
| 14 certification, and so I will move on. |
| 15         MS. CLARY:  Fair enough.  I do object.  I |
| 16 note your exception. |
| 17 BY MR. CATHELL: |
| 18    Q.   Have you been in contact with any of the |
| 19 other class Plaintiffs? |
| 20    A.   No. |
| 21    Q.   Have you read any of the papers that have |

| Page 108 |
|---|
| 1  been filed in court in this case, other than |
| 2  the -- the Complaint that we've already discussed? |
| 3     A.   No. |
| 4     Q.   Have you gone to any of the court |
| 5  hearings in this case? |
| 6     A.   No. |
| 7     Q.   And why not? |
| 8     A.   I didn't know I needed to be at them. |
| 9     Q.   Do you plan on going to future court |
| 10 hearings in this case? |
| 11    A.   If requested by my attorney. |
| 12    Q.   Will you be attending the hearing on |
| 13 class certification? |
| 14    A.   If -- if I need to be there. |
| 15    Q.   Do you know what class certification is? |
| 16    A.   Yes. |
| 17    Q.   Please tell me what your understanding |
| 18 is. |
| 19    A.   It's a, a lot of people with one issue, I |
| 20 guess, under one lawsuit instead of it all being |
| 21 individual ones. |

| Page 109 |
|---|
| 1     Q.   Do you know what causes of action are |
| 2  being asserted in the Complaint? |
| 3     A.   No. |
| 4     Q.   Do you know what damages the Complaint is |
| 5  seeking? |
| 6     A.   No. |
| 7     Q.   Do you know the names of the Defendants |
| 8  that you are suing in this case? |
| 9     A.   Dimensions Health Corp. |
| 10    Q.   Anyone else? |
| 11    A.   No. |
| 12    Q.   Is Dr. Akoda a defendant in this lawsuit? |
| 13    A.   No. |
| 14    Q.   I asked if you had been in contact with |
| 15 any of the other Plaintiffs, and you said, no.  I |
| 16 assume you haven't met with any of the other |
| 17 Plaintiffs? |
| 18    A.   Correct.  No. |
| 19    Q.   Do you know the names of any other |
| 20 Plaintiff? |
| 21    A.   I do not. |

28 (Pages 106 - 109)

JA518

Desire Evans                                                    March 28, 2019

Page 110

1    Q.   Are you aware that the Complaint is
2  asking the court to certify this case as a class
3  action?
4    A.   Yes.
5    Q.   And do you know how many proposed class
6  members there are?
7    A.   I do not.
8    Q.   Do you know which law firms represent the
9  proposed class members?
10   A.   No.
11   Q.   Do you know whether each member of the
12  proposed class is asserting the same claims as you
13  in the case?
14   A.   No.
15   Q.   Have you tried to learn about the claims
16  of the other proposed class members?
17   A.   No, sir.
18   Q.   Have you determined whether your claims
19  are different than yours in any way?
20   A.   No, sir.
21   Q.   Do you know whether each member of the

Page 111

1  proposed class is seeking the same damages as you
2  are in this case?
3    A.   I do not.
4    Q.   Are you aware that you've been designated
5  as a class representative in this lawsuit?
6    A.   Yes.
7    Q.   And do you know what it means to be a
8  class representative in a class action?
9    A.   Yes.
10   Q.   Please describe your understanding for
11  me.
12   A.   My understanding is that I am -- my case
13  is just an example of the overall cases to
14  represent everyone else.
15   Q.   And what is your role as a class
16  representative?
17   A.   Just to represent or to -- yeah, to give
18  the correct information to help represent everyone
19  else that's -- that can't be interviewed, I'm
20  assuming. I don't know.
21   Q.   And why would they not be able to be

Page 112

1  interviewed, if you know?
2    A.   I don't know. It's a lot of people, I
3  guess. I don't know. I'm assuming class action
4  means a lot of people, and that's a lot of
5  interviews. I'm not sure.
6    Q.   Do you know if there was a mediation in
7  this case? And if you don't understand what a
8  mediation is, I'm happy to rephrase the question.
9    A.   Yes. Yes, I'm aware.
10   Q.   Okay.
11       MS. CLARY:  She did a good job there,
12  didn't she?
13       MR. CATHELL:  Ready for law school.
14  BY MR. CATHELL:
15   Q.   Do you know what occurred at the
16  mediation?
17   A.   Yes.
18   Q.   And tell me your understanding of what
19  occurred, absent discussions with your attorneys.
20   A.   That there was a settlement offered and
21  rejected.

Page 113

1    Q.   Okay. Do you -- how much was the
2  settlement offer, do you know?
3    A.   $1,000.
4    Q.   $1,000 per Plaintiff, correct?
5    A.   Per Plaintiff.
6    Q.   Prior to the mediation, what involvement
7  did you have in determining what dollar amount
8  recovery would be acceptable to you and/or a
9  potential class?
10       MS. CLARY:  I'm going to object and
11  instruct her not to answer. That's protected by
12  both the attorney/client privilege and the work
13  product doctrine.
14       MR. CATHELL:  Note our response for the
15  record, please.
16  BY MR. CATHELL:
17   Q.   Do you know whether you are responsible
18  for paying any of the costs or expenses for this
19  litigation?
20       MS. CLARY:  Same objection, and I am -- I
21  am instructing her not to answer that question.

29 (Pages 110 - 113)

JA519

Desire Evans                                        March 28, 2019

Page 114

1  BY MR. CATHELL:

2     Q.  Did you sign a retainer agreement with

3  the Schochor law firm?

4        MS. CLARY:  I'm also going to object.

5  You can answer yes or no as to whether you signed

6  an agreement, a retainer with us.

7        THE WITNESS:  No -- yes.  I don't know

8  what -- I don't, because what is --

9  BY MR. CATHELL:

10    Q.  Just a yes or no.  Because I don't want

11 you to start --

12    A.  Okay.

13    Q.  She objected, --

14    A.  Okay.

15    Q.  -- and I don't want you to talk about you

16 things that --

17    A.  Okay.  So -- oh.

18    Q.  She objected.  If you don't know, it's

19 okay.  I -- I don't want you to explain and say

20 things that she objected to --

21    A.  I don't know.

Page 115

1     Q.  -- out of fairness to her.

2     A.  I don't know.

3     Q.  Okay.

4        MS. CLARY:  I can certainly proffer, if

5  you would like me to, that we do have a signed

6  agreement of retainer from Mrs. Evans, --

7        MR. CATHELL:  Thank you.

8        MS. CLARY:  -- but I'm going to object to

9  providing it.

10       MR. CATHELL:  Sure.

11       THE WITNESS:  Okay.

12 BY MR. CATHELL:

13    Q.  We would -- we would request production

14 of the retainer agreement.  That's something that

15 would be effected through your counsel.  They're

16 objecting to it, and it's an issue that will be

17 taken up with the court.  But I'm simply telling

18 you that, to put you on notice that if the court

19 were to decide that we could prevail, that we would

20 be able to obtain a copy of your retainer

21 agreement, okay?

Page 116

1     A.  (Nodding head yes.)

2     Q.  I would ask you questions -- additional

3  questions about the retainer agreement.  Counsel

4  has objected to those in prior depositions, and

5  we've noted our responses for the record.

6        MS. CLARY:  Agreed.

7  BY MR. CATHELL:

8     Q.  Have you seen any documents that were

9  produced by the Defendants in this case?

10    A.  No.

11       MS. CLARY:  Oh, I heard that.

12       THE WITNESS:  That's that 40 kicking in,

13 ma'am.

14 BY MR. CATHELL:

15    Q.  Do you know whether Dr. Akoda is a

16 Defendant in any other pending lawsuit?

17    A.  I do not know, sir.

18    Q.  Are you part of a class action lawsuit in

19 the United States Federal District Court in

20 Philadelphia against ECFMG regarding their

21 certification of Dr. Akoda?

Page 117

1     A.  I am.

2     Q.  Are you a class Plaintiff in that as

3  well?

4     A.  Yes.

5     Q.  Have you given a deposition in that case?

6     A.  No.

7     Q.  What is your understanding as to the

8  allegations in that lawsuit?

9     A.  That they didn't do proper

10 cre-- credentialing.

11    Q.  Based on your status as a class Plaintiff

12 in that lawsuit, do you have an understanding of

13 ECFMG's role in certifying Dr. Akoda?

14    A.  Yes.

15    Q.  And what is your understanding?

16    A.  That they have the obligation to make

17 sure that all of his documents are correct and that

18 he who -- he is who he says he is.

19    Q.  And do you know how ECFMG does its

20 certification?

21    A.  I do not.

30 (Pages 114 - 117)

JA520

Desire Evans
March 28, 2019

Page 118

1    Q.   Are you aware of the background checks
2 that ECFMG conducts?
3    A.   No, sir.
4    Q.   Earlier I was asking you questions about
5 radio advertisements, TV advertisements, and your
6 Internet search, and I probably should have phrased
7 this question as to include media coverage and not
8 just advertisements.
9         So, you told me that you didn't observe
10 any television advertisements, but have you at any
11 time observed television coverage regarding the
12 allegations against Dr. Akoda?
13    A.   Yes.
14    Q.   Okay.  And what was that?  What were
15 those -- what was that coverage that you observed?
16    A.   I don't know what news it was, but it was
17 on the news about Dr. Akoda.  I believe it said he
18 wasn't a doctor.
19    Q.   Anything else that you recall?
20    A.   No.
21    Q.   And the same for your Internet search,

Page 119

1 were there -- was there information you learned
2 through the Internet that was not an advertisement
3 regarding Dr. -- the allegations surrounding
4 Dr. Akoda?
5    A.   No.
6    Q.   Is that the same with the radio as well?
7    A.   Yes.
8    Q.   Did you participate in any interview with
9 any media person or organization about your
10 involvement with Dr. Akoda?
11    A.   No.
12    Q.   Did you go on The Dr. Oz Show?
13    A.   No.
14    Q.   Were you contacted to go on The Dr. Oz
15 Show?
16    A.   No.
17    Q.   Is it fair to say that when choosing your
18 OB/GYN, you selected based upon the skill set of
19 the physician?
20    A.   Yes.
21    Q.   And I assume your concern was that he or

Page 120

1 she could deliver your baby safe and healthy,
2 correct?
3    A.   When choosing one, yes.
4    Q.   You did not care if your OB/GYN was a man
5 or a woman?
6    A.   No.
7    Q.   You didn't care about the OB/GYN's race?
8    A.   No.
9    Q.   Or nationality?
10    A.   No.
11    Q.   And you did not care about the exact
12 location of the physician, beyond he or she being
13 local to the area, correct?
14    A.   Correct.
15    Q.   You agree that you did not care about the
16 OB/GYN's name alone?
17    A.   No.
18    Q.   In other words, would you have not
19 selected an OB/GYN based upon that OB/GYN's
20 specific name?
21    A.   No.  No.

Page 121

1    Q.   And you've agreed earlier in the
2 deposition, I believe, that Dr. Akoda delivered
3 your baby safe and healthy, correct?
4    A.   Yes.
5    Q.   We've established that you have one
6 child.  How many pregnancies have you had?
7    A.   Two.
8    Q.   Okay.  And when was the second pregnancy?
9    A.   That was the second pregnancy.
10    Q.   When was the first pregnancy?
11    A.   Maybe a year and a half prior.
12    Q.   And I apologize, but what -- what -- what
13 did that pregnancy result in?
14    A.   A miscarriage.
15    Q.   And were you under the care of an OB/GYN
16 during that pregnancy?
17    A.   No.  I had a miscarriage early in the
18 pregnancy.
19         MR. CATHELL:  I believe we're finished.
20 If I could just look at my notes, please.
21         THE WITNESS:  Yes, sir.

31 (Pages 118 - 121)

JA521

Desire Evans                                                        March 28, 2019

Page 122

1      THE VIDEOGRAPHER:  Do you want to stay on
2  the record?
3      MS. CLARY:  I have just one follow-up
4  question.
5      MR. CATHELL:  Okay.
6      MS. CLARY:  Why don't I do that while you
7  look at your notes, if you don't mind.
8      MR. CATHELL:  Go ahead.
9           CROSS-EXAMINATION
10  BY MS. CLARY:
11  Q.  I apologize if -- if you've covered this
12  already, but going back to how you were feeling
13  emotionally after the delivery of your son and
14  after the time in which you sought care, can you
15  help us understand whether you had a worsening of
16  how you were feeling after you found out that
17  Dr. Akoda was not who he said he was?
18  A.  Yes.
19  Q.  Can you describe for us how things got
20  worse for you --
21  A.  Um-hum.

Page 123

1  Q.  -- at that point in time?
2  A.  Yeah.  So, after that, as I mentioned, I
3  definitely didn't want to see a doctor after that.
4  I already didn't want to see a doctor anyway
5  because of how I felt he was inappropriate with me,
6  but wasn't sure if that was really the process of
7  having a baby.  I never had a baby before,
8  so -- and his explanation seemed like it was valid.
9  You know, this is what I need to do in order for
10  the baby to come out, you know.
11      So, realizing that that wasn't the case
12  and that I didn't say anything was extremely --
13  that's -- I think that's the one thing that made it
14  worse to me, was that I didn't say anything
15  beforehand.  I didn't do anything beforehand.
16      So, it made me feel -- I don't know the
17  word to use.  I -- I started feeling more
18  worthless.  Like I couldn't even stand up for
19  myself at that point, so that's how it got worse
20  for me, not being able to stand up for myself and
21  not being able to see a doctor at all because you

Page 124

1  don't know.
2      MS. CLARY:  Thank you.
3           REDIRECT EXAMINATION
4      BY MR. CATHELL:
5  Q.  Just in following up with that.  What --
6  one thing that we -- I was trying to explore --
7  A.  Um-hum.
8  Q.  -- is you just -- you just said in
9  response to your counsel that your condition
10  worsened when you realized that his contact with
11  you wasn't the case, meaning -- I think you were
12  meaning that you realized that the contact he had
13  with you, you realized may have been inappropriate;
14  is that fair?
15  A.  Correct.
16  Q.  And my questions earlier were designed to
17  try to determine when you learned or figured out or
18  understood that his contact with you may have been
19  inappropriate, and it's my understanding that the
20  radio advertisements you heard did not discuss any
21  type of substance of the allegations regarding

Page 125

1  Dr. Akoda, correct?
2  A.  Correct.
3  Q.  And the Internet articles that you read
4  did not include any of the substance against
5  Dr. Akoda, except that I think you told me they
6  suggested he may be a fraudulent doctor; is that
7  fair?
8  A.  That's correct.
9  Q.  Was there anything, outside of what you
10  learned from your attorney, that caused you to
11  believe that Dr. Akoda's contact with you was
12  inappropriate?
13      MS. CLARY:  Objection to the extent I
14  think she's covered that, but you can go ahead
15  again.
16      THE WITNESS:  Well, first, I always felt
17  it was inappropriate because of the way it made me
18  feel; however, me not being a medical professional
19  or never having a baby before, I didn't know if
20  what he was doing was actually a valid thing that
21  you do when someone is giving birth to stimulate

32 (Pages 122 - 125)

Veritext Legal Solutions

JA522

Desire Evans                                                    March 28, 2019

Page 126

1 delivery.
2       So, after I think I spoke to my cousin,
3 who's a doctor, I spoke to my mom, and I spoke to
4 my husband, and they let me know that my feelings
5 were valid, and no, he wasn't supposed to do that,
6 and you are one hundred percent okay with feeling
7 the way that you feel.
8 BY MR. CATHELL:
9    Q.  And when did you have those conversations
10 with your cousin, your doctor -- I'm sorry, your
11 cousin, your husband, and your mother?
12    A.  Well, my husband and my mom immediately
13 after.  You know, like, you know, maybe a week or
14 so after going through the process of bringing the
15 baby home and all of that, and probably my cousin,
16 maybe a few weeks after that.
17    Q.  And so it was during those conversations
18 that you came to the understanding that the contact
19 Dr. Akoda made with you, that you've described for
20 me earlier, was inappropriate?
21    A.  Correct.  I have validation that it was

Page 127

1 inappropriate, because I always believed that it
2 was.
3    Q.  And did you share with your -- you said
4 your cousin is a doctor?
5    A.  Yes.
6    Q.  Did you share with your doctor or
7 your -- I'm sorry.  Strike all of that.
8       Did you share with your cousin the
9 specifics of the alleged sexual impropriety against
10 Dr. Akoda?
11    A.  By me, yes.
12    Q.  And what's your cousin's name?
13    A.  Tyrell Newton, M.D.
14    Q.  And is Dr. Newton a doctor in Maryland?
15    A.  No.
16    Q.  And where does he live or practice?
17    A.  North -- Florida.  Jacksonville, Florida.
18    Q.  To your knowledge, did Dr. Newton report
19 to anyone the alleged sexual contact?
20    A.  No.
21    Q.  Are there any claims that you are making,

Page 128

1 Ms. Evans, that we haven't, otherwise, discussed
2 today?
3    A.  No, sir.
4    Q.  You were discharged three days following
5 the birth of Peyton, correct?
6    A.  Yes.
7    Q.  And it seems to me that your medical
8 records suggest that you were discharged to recover
9 without complication?
10    A.  Yes.
11       MR. CATHELL:  That's all I have.  Thank
12 you very much.
13       THE WITNESS:  Thank you.
14       MS. CLARY:  She'll read and sign.  You're
15 all done.
16       THE VIDEOGRAPHER:  All right.  Stand by.
17       This concludes today's video-recorded
18 deposition of Desire Evans.  The time is now 12:27,
19 and we are off the record.
20       (Deposition concluded at 12:27 p.m.)
21

Page 129

1       Russell, et al. v. Dimensions Health Corp., et al
2            Desire N. Evans
3       INSTRUCTIONS TO THE WITNESS
4       Please read your deposition over
5 carefully and make any necessary corrections.  You
6 should state the reason in the appropriate space on
7 the errata sheet for any corrections that are made.
8       After doing so, please sign the errata
9 sheet and date it.
10       You are signing same subject to the
11 changes you have noted on the errata sheet, what
12 will be attached to the deposition.
13       It is imperative that you return the
14 original errata sheet to the deposing attorney
15 thirty (30) days of receipt of the deposition
16 transcript by you.  If you fail to do so, the
17 deposition transcript may be deemed to be accurate
18 and may be used in court.
19
20
21

33 (Pages 126 - 129)

JA523

Desire Evans
March 28, 2019

Page 130

```
1     Russell, et al. v. Dimensions Health Corp., et al.
2         Desire N. Evans
3         ERRATA
4     PAGE  LINE  CHANGE
5     ---  ---  -------------------------
6     Reason:_____
7     ---  ---  -------------------------
8     Reason:_____
9     ---  ---  -------------------------
10    Reason:_____
11    ---  ---  -------------------------
12    Reason:_____
13    ---  ---  -------------------------
14    Reason:_____
15    ---  ---  -------------------------
16    Reason:_____
17    ---  ---  -------------------------
18    Reason:_____
19    ---  ---  -------------------------
20    Reason:_____
21    Job #3269942
```

Page 131

```
1     Russell, et al. v. Dimensions Health Corp., et al
2         Desire N. Evans
3         ACKNOWLEDGMENT OF DEPONENT
4     I, DESIRE N. EVANS, do hereby certify
5     that I have read the foregoing pages and that the
6     same is a correct transcription of the answers
7     given by me to the questions therein propounded,
8     except for the corrections or changes in form or
9     substance, if any, noted in the attached errata
10    sheet.
11    _____    _____
12    DATE           SIGNATURE
13
14
15
16
17
18
19
20
21    Job #3269942
```

Page 132

```
1     State of Maryland
2     County of Baltimore, to wit:
3         I, Michele D. Lambie, a Notary Public of
4     the State of Maryland, County of Baltimore, do
5     hereby certify that the within-named witness
6     personally appeared before me at the time and place
7     herein set out, and after having been duly sworn by
8     me, according to law, was examined by counsel.
9         I further certify that the examination
10    was recorded stenographically by me and this
11    transcript is a true record of the proceedings.
12        I further certify that I am not of
13    counsel to any of the parties, nor related to any
14    of the parties, nor in any way interested in the
15    outcome of this action.
16        As witness my hand this 11th day of April, 2019.
17
18        Michele D Lambie
          Michele D. Lambie
19
20
21    My Commission Expires:  April 29, 2020
```

34 (Pages 130 - 132)

Veritext Legal Solutions

JA524

EXHIBIT 38

September 19, 2019


Danielle S. Dinsmore, Esquire
Paul M. Vettori, Esquire
Law Offices of Peter G. Angelos
One Charles Center
100 N. Charles Street
Baltimore, Maryland 21201

                    Re: Monique Russell, et al. v. Educational Commission for Medical
                    Graduates, Case No. 2:18-cv-05629-JW


Dear Ms. Dinsmore and Mr. Vettori:

    You have asked me to review this matter and provide a report of my expert opinions with
respect to this matter.  This is my report.

    Attached is my Rule 26 case list.  Also attached is my Curriculum Vitae, which includes a
list of all publications I have authored.

    I am billing my time for review and preparation of my report at $ 500 per hour and my time
for deposition and trial at $ 5000 per day.

    I have reviewed and considered the documents you have provided to me, which include bates
stamped documents you obtained from ECFMG, documents obtained from the Akoda criminal
case, the Maryland Board of Physician's decision and the depositions (with exhibits) of William
Kelly and Kara Corrado.

    The following is a summary of the facts considered by me in forming my opinions:

    On April 6, 1992 ECFMG received an application from Oluwafemi Charles Igberase to take
the Foreign medial graduate examination in the Medical Sciences and the ECFMG English Test.
He provided ECFMG with a diploma from the University of Ibadan dated June 19, 1987.
Igberase failed both the basic medical science and clinical science components of the FMGEMS
and passed the ECFMG English test.  He failed the Day 1 test again but passed it on the third try.
On October 4, 1993, after he successfully completed steps 1 and 2 of the USMLE, ECFMG
issued to him certificate number 0-482-700.

    On March 30, 1994, ECFMG received an application from Igberase Oluwafemi Charles to
take Steps 1 and 2 of the USMLE examinations. He provided a date of birth that was different
than the date of birth provided by Igberase.  The diploma he submitted was the identical diploma
that had been submitted by Igberase.  On December 14, 1994, after Charles successfully
completed the USMLE examinations, ECFMG issued to him certificate number 0-519-573-0.

Confidential Communication with Attorney

At some point after this, for reasons that do not appear in the records, ECFMG became suspicious that Igberase and Charles were one and the same person and began an investigation. Igberase/Charles explained his actions in a handwritten letter dated July 14, 1995 in which he admitted he had lied about not taking the examination previously and why he rearranged his names.  As a result of the investigation, the ECFMG Committee on Medical Education Credentials invalidated certificate number 0-519-573-0 issued to Charles and revoked certificate number 0-482-700-2 issued to Igberase.  Charles appealed the decision which led to a hearing on July 10, 1996.  The ECFMG Review Committee for Appeals affirmed the decision of the ECFMG Committee on Medical Education Credentials to revoke certificate number 0-482-700-2 but limited the length of the revocation to a period of five years from July 10, 1996, i.e., to July 10, 2001.  Thereafter, the ECFMG Committee on Medical Education Credentials extended the length of this revocation for a yet to be specified period of time and, ultimately, revoked permanently this certificate.

On January 3, 1996 and again on August 30, 1996, ECFMG received an application from John Nosa Akoda to take Steps 1 and 2 of the USMLE examinations.  He provided ECFMG with a diploma from the University of Benin dated February 6, 1998. On August 18, 1998, after he successfully completed the required examinations, ECFMG issued to him certificate number 0-553-258-5. Although his applications did not include a social security number, at some time in 1998 he provided ECFMG with social security number xxx-xx- 9065.

On July 1, 1998 Akoda entered the graduate residency program at Jersey Shore Medical Center.  On July 24, 1998, ECFMG received a Request for Permanent Revalidation of Standard ECFMG Certificate from Akoda due to his having entered this program. On September 2, 1998, ECFMG sent this validated form.

 By letter dated August 11, 2000 from James McCorkel, M.D. to Rice Holmes, ECFMG was notified that the Jersey Shore Medical Center graduate residency program in which Akoda was enrolled was investigating allegations that Akoda had used a social security number issued to a person named Oluwafemi Charles Igberase. ECFMG advised Dr. McCorkel that Akoda had provided ECFMG with social security no. xxx-xx-9065. This is the same number Akoda provided to the Jersey Shore Medical Center.

ECFMG sent Akoda a "charge letter" dated August 22, 2000 advising Akoda that ECFMG had received information alleging that Akoda may have engaged in irregular behavior.  This letter was based on the matters presented by Dr. McCorkel.  Akoda responded by representing to ECFMG that Igberase Oluwafemi Charles was his cousin and admitting that he had used his cousin's social security number.  Akoda provided ECFMG with a Nigerian passport and a Nigerian "international driving permit."

The Jersey Shore Medical Center dismissed Akoda from its graduate residency program because he used a false social security number – that of his cousin Charles Igberase - and because the green card he had provided the hospital was inconsistent with a subsequent green card he also provided.

JA527

Confidential Communication with Attorney

On December 22, 2000, William Kelly, Manager of the Medical Education Credentials Department of ECFMG, wrote a memorandum to Stephen S. Seeling, JD, Vice President of Operations of ECFMG, in which Mr. Kelly stated "[t]his memorandum is being written separately since I did not think it should be made part of the official file." He advised Mr. Seeling that both he and Dr. McCorkel believed Igberase and Akoda were one and the same person. He concluded that he did not think there was enough information for the ECFMG Credentials Committee.

In October 2006, Akoda used the ERAS of ECFMG to apply to Howard University Medical Center for a graduate residency program, which included three letters of reference. In connection with this process, ECFMG attempted to verify the authenticity of these three letters of reference but never received responses from the persons passed off as references for Akoda.

Akoda successfully completed a graduate residency program at Howard University Medical Center. He was licensed to practice medicine in Maryland and Virginia, and was granted privileges at Prince Georges' Hospital Center based on application and submission of required documentation including an ECFMG certificate.

The following are my opinions, which are based on the matters set out above and my education, training and experience:

ECFMG is the only organization that certifies that IMG's have successfully completed medical education at an approved foreign medical school and that they have successfully completed the required medical examinations. Without an ECFMG certification, an IMG cannot sir for required licensing exams, obtain a medical license, will not be accepted into a graduate medical education program and cannot obtain hospital privileges. The standard of care applicable to ECFMG's certification process requires ECFMG to adopt reasonable policies and procedures and to follow those procedures to ensure that IMG's comply with all requirements for certification. ECFMG has undertaken to provide certification services which are necessary for the protection of the general public. Its failure to exercise reasonable care in providing these services increases the risk of harm to the general public, including plaintiffs. Licensing agencies, medical schools and hospitals, among others, rely upon ECFMG to act reasonably in performing these services.

It is my opinion, held to a reasonable degree of professional certainty, that ECFMG failed to adopt appropriate policies for certification of IMG's, failed to exercise reasonable care in its certification of Akoda and failed to exercise reasonable care in its investigation of allegations made about Akoda and that these failures caused harm to the named plaintiffs and members of the class.

While it is accurate to say that certification by ECFMG is only one of the steps needed for a foreign medial graduate to obtain a license to practice medicine in the United States, it is a requirement without which an IMG cannot obtain a license. It is also a required certification for entering residency and obtaining hospital privileges. If ECFMG had acted reasonably, it would have denied certification to Akoda, and would have revoked Akoda's certificate, he would not have been able to enter the Howard University residency program, he would not have been able

3

JA528

Confidential Communication with Attorney

to obtain a Maryland medical license, he would not have been granted privileges at Prince Georges' Medical Center, and he would not have been able to harm the plaintiffs.

The ECFMG certification process and investigation of suspicious or irregular behavior by ECFMG is important to ensure that individuals seeking to act as physicians treating patients are qualified and meet professional standards of honesty, morality and character. These qualities are critical to the physician patient relationship.

ECFMG breached the standard of care in, among others, the following ways:

Failing to adopt written policies and procedures for the certification of IMG's;

Failing to adopt written policies and procedures for the investigation of allegations of irregular behavior;

Failing to investigate the differences in the name on Akoda's medical school diploma and the name on his applications submitted to ECFMG;

Failing to investigate fully the relationship between Igberase and Akoda;

Failing to reasonably investigate Akoda's diploma from the University of Ibadan;

Failing to reasonably investigate discrepancies in official medical school seal on documents submitted for Akoda;

Failing to deny the requested waiver of a medical school confirmation of Akoda photograph based on the explanation of the Nigerian postal system not providing a rapid delivery;

Failing to deny the Akoda application due to it being incomplete;

Failing to reasonably investigate the allegations made by Dr. McCorkel;

Failing to refer Akoda to the Medical Education Credentials Committee;

Failing to follow its own procedures with respect to the charge letter sent to Akoda on August 22, 2000;

Failing to reasonably investigate the social security number provided to ECFMG by Akoda;

Failing to temporarily suspend pending investigation and discontinue to verify ECFMG certifications after Dr. McCorkel's allegation, admission by Akoda of using another's social security number and the ECFMG Investigator's concern that Akoda and Igberase were the same person.

4

JA529

Confidential Communication with Attorney

Failing to compare photographs of Igberase and Akoda in its files;

Failing to reasonably act when Akoda admitted to identity theft in use of another's social security number;

Failing to conclude that the person – Charles -- who appeared for hours at the July 10, 1996 appeal hearing and the person who appeared in Mr. Kelly's office on September 27, 2000 – Akoda – were the same person;

Failing to investigate the authenticity of the passport and green card produced to Mr. Kelly by Akoda when he came to Mr. Kelly's office on September 27, 2000;

Failing to follow up on the conclusion reached by Mr. Kelly and Dr. McCorkel that Igberase and Akoda were the same person.

It is my opinion, to a reasonable degree of professional certainty, that, had there been written policies and procedures for the certification of IMG's, these would have included requirements that ECFMG investigate fully the differences in the name on Akoda's medical school diploma and the name on his applications.

It is my opinion, to a reasonable degree of professional certainty, that, had there been written policies and procedures for the certification of IMF's, these would have included requirements that ECFMG investigate fully discrepancies in Akoda'a application and submitted materials.

It is my opinion, to a reasonable degree of professional certainty, that, had there been written policies and procedures for the certification of IMG's and investigations of irregular behavior, these would have included requirements that ECFMG investigate and refer to the Medical Education Credentials Committee in situations of identity fraud.

It is my opinion, to a reasonable degree of professional certainty, that, had ECFMG properly investigated the allegations of irregular behavior against Akoda, ECFMG would have referred the matter to the Medical Education Credentials Committee and that committee would have found that Akoda engaged in irregular behavior, which would have resulted in his certification being revoked.

It is my opinion, to a reasonable degree of professional certainty, that these failures on the part of ECFMG to comply with the standard of care were the direct cause of Akoda being certified by ECFMG and which are the direct cause of the harms caused to the plaintiffs and the members of the class.

JA530

Confidential Communication with Attorney

Very truly yours,

David Samuel Markenson, MD

EXHIBIT 40



# BURROUGHS
*HEALTHCARE CONSULTING NETWORK*

## REPORT

**In the matter of**

## Jane Monique Russell, Jasmine Riggins, Elsa Powell, and Desire Evans

**v.**

## Educational Commission for Foreign Medical Graduates (ECFMG)

Prepared for

Jonathan Schochor, Esq. and Brent Ceryes, Esq.
Schochor. Federico, and Staton, PA
1211 Saint Paul Street
Baltimore, Maryland 21202

Report Date: September 21, 2019

_____

Jonathan H. Burroughs, MD, MBA, FACHE, FAAPL
President and CEO, The Burroughs Healthcare Consulting Network, Inc.

**TABLE OF CONTENTS:**

A.   Professional Background and Training -------------------------------------------------------------page 3

B.   Recent Publications------------------------------------------------------------------------------------------page 5

C.   Sources of Information------------------------------------------------------------------------------------page 8

D.   Introduction--------------------------------------------------------------------------------------------------page 10

E.   Opinion--------------- ------------------------------------------------------------------------------------page 10

F.   Foundations of Opinion --------------------------------------------------------------------------------page 10

G.   Conclusion and Final Commentary------------------------------------------------------------------page 29

H. Fee Schedule--------------------------------------------------------------------------------------------------page 31

JA534

A.  **Professional Training and Background:**

**Jonathan H. Burroughs, MD, MBA, FACHE, FAAPL:**

**Healthcare professional with:**

- **30-year clinical experience as an emergency physician**
- **16 year management experience as medical director of three emergency departments and increasing physician leadership roles**
- **9 year experience on a governing board of a not for profit healthcare entity**
- **15-year experience as a healthcare administrative consultant with > 1,500 clients in all 50 states focusing on all areas of the physician/healthcare executive interface, population health, clinical integration, and healthcare transformation**
- **Author of "Redesign the Medical Staff Model-A Guide to Collaborative Change" published in 2015 by Health Administration Press and winner of the 2016 James A. Hamilton Award for outstanding healthcare management book of the year**
- **Author/Editor of "Fundamental Operational Components for High Performing Healthcare Enterprises" published in 2018 by Health Administration Press**
- **Participant as a healthcare administrative expert in 95 legal cases since 2010 (see attached CV for details)**

- Johns Hopkins University, Baltimore, MD (BA-1972; graduated first in class senior year)
- Case Western Reserve School of Medicine, Cleveland, OH (MD-1977)
- University of California, Davis Medical Center, Sacramento, CA (Resident in Family Medicine-1977-1980)
- University of Massachusetts Affiliated Hospitals, Pittsfield, MA (Resident in General Surgery-1980-1981)
- Board Certified Emergency Physician (1981-2015) with 30 years of clinical experience (1978-2008)
- Medical Director, Emergency Departments (1982-1988; 2006-2008)
- Faculty, Director's Academy, American College of Emergency Physicians (ACEP)
- Introduced EMS defibrillation (1982) and EMS automated defibrillation (1985) into the field (Eastern US) in conjunction with Mickey Eisenberg, University of Washington, Seattle, PhysioControl, and Dartmouth Hitchcock Medical Center
- President of the Medical Staff, Memorial Hospital, North Conway, NH (2000-2004)
- Past President of the Medical Staff, Memorial Hospital, North Conway, NH (2004-2008)
- Board Member, Memorial Hospital, North Conway, NH (2000-2008)
- American Association for Physician Leadership (formerly American College of Physician Executives), Tampa, FL (Certified Physician Executive 2004 and Fellow of the American College of Physician Executives 2005-)
- Faculty, American Association for Physician Leadership (formerly American College of Physician Executives) (2005-)
- University of Massachusetts Eisenberg School of Business, Amherst, MA (MBA 2008; graduated first in class and elected into Beta Gamma Sigma, international honor society for business schools )
- Senior Consultant and Director of Education, The Greeley Company, Danvers, MA (2004-2012): worked with over 700 healthcare organizations and medical staffs to perform the following functions- physician leadership training (top rated educator and speaker), bylaws redesign, credentialing/privileging redesign, peer review redesign, medical staff assessment and redesign, physician-hospital alignment strategies, physician-hospital contracting, alternative dispute resolution, expert witness for corporate negligence cases (credentialing/privileging, peer review, performance management, corrective action and fair/judicial hearings), coaching for physicians and management regarding performance management, behavioral, and health issues, OPPE/FPPE, accreditation compliance, legal/regulatory compliance, author or co-author of the following books: *The Complete Guide to FPPE (2012), Medical Staff Leadership Essentials (2011), Engage and Align the Medical Staff and Hospital Management: Expert Strategies and Field Tested Tools* (2010), *A Practical Guide to Managing Disruptive and Impaired Physicians* (2010), *The Top 40 Medical Staff Policies and Procedures,* Fourth Edition (2010), *Emergency Department On-Call Strategies: Solutions for Physician-Hospital Alignment* (2009), and *Peer Review Best Practices: Case Studies and Lessons Learned* (2008).
- Fellow of the American College of Healthcare Executives (2012-)
- Faculty of the American College of Healthcare Executives (2013-), faculty for twelve hour cluster program "Redesign the Medical Staff for Healthcare Reform", and winner of a national development grant (with David Nash, MD) to create a twelve hour cluster program entitled

"Leading in a Changing Environment-Population Health" and of a development grant with John Byrnes, MD and Rich Priore, FACHE to create a twelve hour cluster program entitled "Physician Leadership Essentials-Management Skills", frequent national speaker at ACHE Congress, Chicago, Illinois.

- Co-creator of ACHE National Cluster Program entitled "Monetizing Quality in a Pay for Value Era"
- Co-creator of AAPL National Programs entitled "The CMO Academy" and "Optimizing Clinical and Financial Performance through Physician-C Suite Collaboration"
- NAMSS Faculty and featured in national webinars, meetings, and state chapter programs
- President and CEO, The Burroughs Healthcare Consulting Network, Inc. (2012-): work with physicians and healthcare organizations throughout the nation and beyond on clinical, management, governance, and business solutions to optimize quality/service and minimize costs. Network includes some of the nation's top healthcare consultants
- Cumulative work with over 1,500 healthcare organizations and systems in 50 states on: physician leadership academies, physician engagement/alignment strategies, physician performance strategies, medical staff redesign (credentialing/privileging, peer review, performance management, strategic medical staff development planning, medical staff structures/functions, medical staff and corporate bylaws), service line development, contracting strategies, population health, quality/safety/service/cost structure optimization, leadership (board, management, physician) retreats and facilitations, population health, clinical integration
- Author of "Redesign the Medical Staff Model-A Collaborative Approach", published by Health Administration Press, January, 2015 (2016 James A. Hamilton Book Award for outstanding healthcare management book)
- Author of monthly national healthcare blog on Hospital Impact, a Fierce Healthcare Publication, Washington, DC
- Frequent contributor to Board Room Press, a publication of The Governance Institute, San Diego, California
- Healthcare Legal Consulting with an emphasis in: negligent credentialing, negligent peer review, fair/judicial hearings, physician performance management, medical appropriateness, false claims act, corporate negligence and compliance
- Member of the American Health Lawyers Association (AHLA): presenter and contributor to association publications and American College of Legal Medicine (ACLM).

**B. Recent Publications:**

1. Burroughs, Jon (editor and author), "Essential Operational Components for High Performing Healthcare Enterprises," Health Administration Press, September, 2018.
2. Burroughs, Jon., "Redesign the Medical Staff Model-A Collaborative Approach," Health Administration Press, November,2015 (Winner of the 2016 James A. Hamilton Award for Outstanding Healthcare Management Book)
3. Burroughs, Jonathan H., "21st Century Skills for Accountable Boards," The Board Room Press, The Governance Institute, February 2019.
4. Burroughs, Jon, "How to Build a Population Health Program," Pediatric Focus, The Governance Institute, December, 2018.
3. Burroughs, Jon, "Rethinking Physician Documentation," Healthcare Executive, May-June, 2018, pages
4. Burroughs, Jon, Rural Focus: "Rural Healthcare: A Vision for 2018, The Governance Institute, March, 2018.
5. Burroughs, Jonathan H., Industry Voices: "The ACA is Flawed but a New Legal Threat could set the US Healthcare System back Decades," Fierce Healthcare, February 28, 2018.
6. Burroughs, Jonathan H., Hospital Impact: "Medicaid on the Chopping Block for 2018." Fierce Healthcare, February 6, 2018.
7. Burroughs, Jonathan H., Hospital Impact: "Why Funding of the Children's Health Insurance Program Matters," Fierce Healthcare, January 9, 2018.
8. Burroughs, Jonathan H., Hospital Impact: "Why Doctors should Oversee, Not Conduct Clinical Documentation, Fierce Healthcare, December 7, 2017.
9. Burroughs, Jonathan H. et al,"ACHE Roundtable: A focus on Physician Leadership," Healthcare Executive, volume 32, number 6, November/December, 2017, pp 20-26.
10. Burroughs, Jonathan H., Hospital Impact: "Medical Staff Services Professionals-A New Role for the 21st Century," Fierce Healthcare, August 31, 2017.
11. Burroughs, Jonathan H., Hospital Impact: "Death of the Skinny Repeal Bill and why Covered Lives Matter," Fierce Healthcare, August 3, 2017.
12. Burroughs, Jonathan H., Hospital Impact: "What's Next for the AHCA? Hopefully, pragmatic solutions to healthcare policy dilemmas," Fierce Healthcare, June 8, 2017.
13. Burroughs, Jonathan H., Hospital Impact: "The Meadows-MacArthur Amendment is Strike Two for the American Health Care Act", Fierce Healthcare, May 1, 2017.
14. Burroughs, Jonathan H., "What it takes to be a Top Performing Organization," NAMSS Synergy, May-June, 2017.
15. Burroughs, Jonathan H., "Hospital Impact-CBO Report Reveals Republican Healthcare Bill is Political Position," Fierce Healthcare, March 16, 2017.
16. Burroughs, Jonathan H., "Hospital Impact-A Closer Look at the GOP's 'Replace then Repeal' Proposal, Fierce Healthcare, February 22, 2017.
17. Burroughs, Jonathan H., "Hospital Impact-No Consensus in Sight for the Republican ACA Replacement," Fierce Healthcare, February 2, 2017.
18. Burroughs, Jonathan H., "Hospital Impact-The Implications of Donald Trump's ACA Executive Order," Fierce Healthcare, January 25, 2017.
19. Burroughs, Jon, "Regain Lost Luster with Modern Medicine Ideas," Physician Leadership Journal, Volume 4, Issue 1, January/February, 2017.
20. Burroughs, Jonathan H., "Hospital Impact-Drug Companies Win, Patient Safety Loses with the 21st Century Cures Act, Fierce Healthcare, December 15, 2016.
21. Burroughs, Jonathan H., "Hospital Impact-Why the GOP will not Repeal the Affordable Care Act in its Entirety," Fierce Healthcare, November 16, 2016.
22. Burroughs, Jonathan H., "Industry Voices: For President Candidates, Two very Different Views on Healthcare, Fierce Healthcare, November 7, 2016.
23. Burroughs, Jonathan H., "Three Keys to Giving Healthcare Consumers what they Want," Hospital Impact, September 26, 2016.
24. Burroughs, Jonathan H., "Everything you need to know about the New CMS Cardiac Bundled Payment Program," Hospital Impact, August 17, 2016.
25. Burroughs, Jonathan H., "Healthcare Policy Implications of the Presidential Election," Hospital Impact, July 14, 2016.
26. Burroughs, Jonathan H., "MACRA is Now! A Roadmap to Compliance," Hospital Impact, June 15, 2016.
27. Burroughs, Jonathan H., "End Physician Burnout by Allowing Doctors to be Doctors Again," Hospital Impact, May 12, 2016.
28. Burroughs, Jonathan H., "Clinical Pharmacist-An Essential Member of the Healthcare Team," Hospital Impact, April 21, 2016.

29.     Burroughs, Jonathan H., "When it comes to Patient Safety-Culture is Everything," Hospital Impact, March 17, 2016.
30.     Burroughs, Jonathan H., "How MACRA is Hastening the Demise of Fee for Service," Hospital Impact, February 18, 2016.
31.     Burroughs, Jonathan H., "The Ten Traits of a Great Healthcare Organization," Hospital Impact, January 21, 2016.
32.     Burroughs, Jonathan H., "Five Steps to Staging and Integrating a Population Health Program," Hospital Impact, December 10, 2015.
33.     Burroughs, Jonathan H., "The Supreme Court and the ACA Contraception Mandate-Deja Vu All over Again," Hospital Impact, November 12, 2015.
34.     Burroughs, Jonathan H., "ICD-10: Collaborative Ways to Reduce Operating Costs," Hospital Impact, October 29, 2015.
35.     Burroughs, Jonathan H., "Medical Overuse and why Fee for Service must Go," Hospital Impact, September 3, 2015.
36.     Burroughs, Jonathan H., "Medicare's Potential Reimbursement for End of Life Discussion: A Big Step Forward," Hospital Impact, July 23, 2015.
37.     Burroughs, Jonathan H., "Ken Cohn- In Tribute to a Colleague and a Friend," Hospital Impact, July 16, 2015.
38.     Burroughs, Jonathan H., "Activity Base Costing Helps Providers Deliver High Quality Low Cost Care," Hospital Impact, May 20, 2015.
39.     Burroughs, Jonathan H., "Strategies to Survive a Brave New Value Based World," Hospital Impact, April 1, 2015.
40.     Burroughs, Jonathan H. and Nash, David, "Population Health and the Disruptive Innovative Business Models Necessary to Support It," Boardroom Press, April 2015
41.     Burroughs, Jonathan H., "Are you ready for E-Health Invasion?" Hospital Impact, February 19, 2015.
42.     Burroughs, Jonathan H., "How the Unraveling of the Affordable Care Act could Affect Providers," Hospital Impact, January 14, 2015.
43.     Burroughs, Jonathan H., "Ebola-Fear not Facts Drive Frenzy," Hospital Impact, November 13, 2014.
44.     Burroughs, Jonathan H., "St. Luke's Population Health Programs Promote Innovation," Hospital Impact, October 23, 2014.
45.     Burroughs, Jonathan H., "Silence can Kill: Doctors, Nurses, and Staff must hold each other Accountable," Hospital Impact, September 4, 2014.
46.     Burroughs, Jonathan H., "Disruptive Innovation in Healthcare: Are you ready?" The Governance Institute's E-Briefings, Volume 11, Number 7, September, 2014.
47.     Burroughs, Jonathan H., "Involving Physicians in Strategic Planning," Hospital Impact, August 6, 2014.
48.     Burroughs, Jonathan H., "What Does the Hobby Lobby Ruling mean for Healthcare and the Separation of Church and State?" Hospital Impact, July 2, 2014.
49.     Burroughs, Jonathan H., "Population Health is the Next Big Thing," Hospital Impact, June 5, 2014.
50.     Burroughs, Jonathan H., and Bartholomew, Kathleen, "New Ways for Physicians and Nurses to Work Together, " Physician Executive Journal, Volume 40, Number 3, May-June, 2014.
51.     Burroughs, Jonathan H., "Same Sex Marriage, Human Rights, and Affordable Healthcare," Hospital Impact, May 1, 2014.
52.     Burroughs, Jonathan H., "Actuarial Management Key to Changing Industry," Hospital Impact, March 19, 2014.
53.     Burroughs, Jonathan H., "Large Employers and the Drive for Healthcare Transformation," Hospital Impact, February 4, 2014.
54.     Burroughs, Jonathan H., "The ACA and the Separation of Church and State," Hospital Impact, January 23, 2014.
55.     Burroughs, Jonathan H., "More Unintended Consequences of Healthcare Reform," Hospital Impact, December 3, 2013.
56.     Burroughs, Jonathan H., "Healthcare Leaders face Unintended Consequences of Reform," Hospital Impact, November 25, 2013.
57.     Burroughs, Jonathan H., "The Origins of Healthcare-Aviation Comparisons," Hospital Impact, October 22, 2013.
58.     Burroughs, Jonathan H., "Six Strategies Hospital Should Steal from the Airline Industry," Hospital Impact, September 17, 2013.
59.     Burroughs, Jonathan H., "Informal Doc Leaders-A Help or Hindrance?" Hospital Impact, August 5, 2013.
60.     Burroughs, Jonathan H., "Physician Engagement-Must Dos," Hospital Impact, July 10,

2013.
61.     Burroughs, Jonathan H., "Physicians are not the only ones losing their Autonomy in Healthcare Reform," The Governance Institute's E-Briefings, Volume 10, Number 4, July, 2013.
62.     Burroughs, Jonathan H., "Physician Engagement-What Not to Do," Hospital Impact, June 24, 2013.
63.     Burroughs, Jonathan H., "Just what is Healthcare Reform Anyway?" Hospital Impact, May 20, 2013.
64.     Burroughs, Jonathan H., "Is there Life after a Data Bank Report?", Physician Executive Journal, March-April, 2013.
65.     Burroughs, Jonathan H., "How to Handle Medical Professional Conduct Violations," Hospital Impact, March 27, 2013.
66.     Burroughs, Jonathan H., "How Healthcare Leaders can Prevent Doc Suspension," Hospital Impact, February 27, 2013.
67.     Burroughs, Jonathan H., "Why it matters if States don't Expand Medicaid," Hospital Impact, January 23, 2013.
68.     Burroughs, Jonathan H., "Is there Life for Docs after a Data Bank Report?" Hospital Impact, December 17, 2012.
69.     Burroughs, Jonathan H., "Trends in Governance for New Care Delivery Models," Boardroom Press, December, 2012.
70.     Burroughs, Jonathan H., "Revisiting the Key Components of the Affordable Care Act," Hospital Impact, November 24, 2012.
71.     Burroughs, Jonathan H., "Dealing with the Aging Physician Advocacy or Betrayal," The Physician Executive," 38:6, November-December 2012.
72.     Burroughs, Jonathan H., "What If? Two Post-Elections Scenarios for Healthcare," Hospital Impact, October 24, 2012.
73.     Burroughs, Jonathan H., "Succession Planning-Luxury or Necessity?" Hospital Impact, October 10, 2012.
74.     Burroughs, Jonathan H., "More ways to Reduce Hospital Readmissions," Hospital Impact, September 19, 2012.
75.     Burroughs, Jonathan H., "Reducing Readmissions: It's Harder than it Looks," Hospital Impact, September 12, 2012.
76.     Burroughs, Jonathan H., "New Models in Hospital-Physician Governance," Boardroom Press, August, 2012.
77.     Burroughs, Jonathan H., "More of what Health Reform Doesn't Do," Hospital Impact, July 31, 2012.
78.     Burroughs, Jonathan H., "What the Affordable Care Act Doesn't Do," Hospital Impact, July 26, 2012.
79.     Burroughs, Jonathan H., "Improve Hospital-Doc Alignment with Job Expectations and Incentives," Hospital Impact, June 13, 2012.
80.     Burroughs, Jonathan H., "Tips to Optimize Doc-Nurse Relationships," Hospital Impact, May 3, 2012.
81.     Burroughs, Jonathan H., "Have Physician-Nurse Relationships Improved?" Hospital Impact, April 11, 2012.

**C.  Sources of Information: Monique Russell, Jasmine Riggins, Elsa Powell, and Desire Evans v. Educational Commission for Foreign Medical Graduates (ECFMG)**

1.  Jane Doe 1-10 v. Dimensions Healthcare System Class Action Complaint
2.  Final Decision and Order re Charles Akoda MD v. Maryland State Board of Physicians (7/10/17)
3.  United States District Court Judgment against Charles Akoda (3/2/17)
4.  Virginia Department of Health Professions Order of Mandatory Suspension (4/25/17)
5.  Deposition of William C. Kelly, ECFMG with Exhibits (8/20/19)
6.  Information Booklet ECFMG Certification and Application Step 1 and Step 2 of the United States Medical Licensing Exam (USMLE) and ECFMG English Test (1996)
7.  United States Medical Licensing Examination (USMLE) Bulletin of Information (1996)
8.  ECFMG Information Booklet (1995)
9.  Education Commission for Foreign Medical Graduates Application Form (7/95)
10.  Correspondence from William C. Kelly to Dr. Charles Olufemi Igberase (6/22/95)
11.  Correspondence from Dr. Igberase Oluwafemi Charles to William C. Kelly (7/14/95)
12.  Correspondence from William C. Kelly to Kenneth Cotton, USMLE (12/7/95)
13.  Birth Certificate of Igberase Oluwafemi-Charles (4/7/62)
14.  Correspondence from William C. Kelly to Dr. Igberase Olufemi-Charles (12/7/95)
15.  USMLE Application completed by Dr. Femi Charles Igberaese (10/23/00)
16.  Correspondence from William C. Kelly to "Dr. Femi Charles Igberaese (11/16/00)
17.  Correspondence from William C. Kelly to Dr. Igberase Oluwafemi-Charles (5/3/01)
18.  Correspondence from "Dr. Femi Charles Igberase" to William C. Kelly (6/17/01)
19.  Correspondence from William C. Kelly to "Dr. Oluwafemi Charles Igberase (5/22/02)
20.  USMLE Application completed by Dr. Charles Oluwafemi Igberaese (3/13/02)
21.  Medical Diploma from the University of Ibadan to Dr. Charles Igberaese Oluwafemi (6/18/96)
22.  Correspondence from William C. Kelly to Dr. Igberase Oluwafemi-Charles (11/12/02)
23.  Medical Diploma from the University of Ibadan to Dr. Charles Olufemi Igberase (6/19/87)
24.  Correspondence from William C. Kelly to Dr. Charles Igberaese Oluwafemi (7/22/02)
25.  Correspondence from Susan Deltsch to Dr. Charles Ugberaese Oluwafemi (6/17/03)
26.  Correspondence from Ms. Kara Corado, JD to Dr. John Nosa Akoda (12/19/16)
27.  Correspondence from Lisa Cover, MHA to National and International Professional Societies and Licensing Boards re ECFMG Irregular Behavior and Associated Actions/Sanctions (3/1/17)
28.  USMLE Application completed by Dr. John Nosa Akoda (12/31/95)
29.  USMLE Application completed by Dr. John Nosa Akoda (8/29/96)
30.  Medical Diploma from the University of Benin to Dr. Johnbull Enosakhare Akoda (2/6/88)
31.  ECFMG Standard Certificate Awarded to Dr. John Nosa Akoda (8/18/97)
32.  Printouts of Dr. John Nosa Akoda's ECFMG Record
33.  Correspondence from Stephen S. Seeling, JD (ECFMG) to James McCorkel, PhD, Jersey Shore Medical Center (8/22/00)
34.  Request for Permanent Validation of Standard ECFMG Certificate by Dr. John-Charles Akoda (9/2/98)
35.  Correspondence from James McCorkel, PhD, Jersey Shore Medical Center to Rice Holms, ECFMG (8/11/00)
36.  Correspondence from Stephen Seeling, JD to James McCorkel, PhD (8/22/00)
37.  Correspondence from William C. Kelly to Dr. John Akoda (8/22/00)

38. Memorandum from William C. Kelly to Dr. John Akoda File (8/28/00)
39. Correspondence from Dr. John Akoda to William C. Kelly (8/29/00)
40. Correspondence from William C. Kelly to Dr. John Akoda File (9/13/00)
41. Correspondence from William C. Kelly to Dr. John Akoda File (9/27/00)
42. Republic of Nigeria Passport for John Nosakhane Charles Akoda Birthdate 1/1/59
43. Transcript of Appeal Procedures ECFMG for Igberase Oluwafemi Charles (7/10/96)
44. Notes of Telephone Conversation with William C. Kelly and Dr. McCorkel re Dr. Akoda (10/5/00)
45. E-mail correspondence from John Akoda, MD (Ferni Charles) to William C. Kelly (12/21/00)
46. Correspondence from William C. Kelly to Dr. John Akoda's File (12/21/00)
47. Memorandum from William C. Kelly to Stephen S. Seeling, JD (12/22/00)
48. Correspondence from Ramon Heard, Senior Investigator, Office of Professional Discipline, New York to Stephen S. Seeling, JD (12/17/02)
49. Correspondence from William C. Kelly to Ramon Heard (1/14/03)
50. Correspondence from Ramon Heard to William C. Kelly (3/31/03)
51. Correspondence from William C. Kelly to Ramon Heard (4/29/03)
52. ERAS Residency Application Submission Form for John C. Nosa Akoda, MD (10/3/06)
53. Letter of Reference for Dr. Akoda from Dr. Charles A. Francis, MD (10/1/06)
54. Correspondence from William C. Kelly to Dr. Charles A. Francis, MD (11/22/06)
55. Letter for reference for Dr. John-Charles Nosa Akoda from Dr. A.O. Roberts, Head of OBGYN, University of Ibadan, Nigeria (8/20/06)
56. Correspondence from William C. Kelly to Dr. A.O. Roberts (11/22/06)
57. Letter for Reference for Dr. John-Charles Akoda from Phil Robertson, MD, Medical Director of MaxiCare Inc. (9/28/06)
58. Correspondence from William C. Kelly to Phil Robertson, MD (11/22/06)
59. ECFMG Computer Printout for Dr. Akoda's file (8/14/00)
60. Deposition of Stephen Seeling, JD, Vice President of Operations, ECFMG (9/16/19)
61. Deposition of Kara Corado, JD, Current VP of Operations ECFMG (9/10/19)
62. Maryland State Board of Physicians Final Decision and Order re Charles Akoda, MD (7/10/17)
63. Virginia Department of Health Professions Order of Mandatory Suspension re Charles Akoda, MD (4/25/17)
64. Educational Commission for Foreign Medical Graduates Website (https://www.ecfmg.org/)

D.   Introduction:

Mr. Schochor and Mr. Ceryes have asked me to articulate my expert opinions as to the issues of corporate responsibility of the Educational Commission for Foreign Medical Graduates (ECFMG) pursuant to its certification of Oluwafemi Charles Igberase AKA Johnbull Enosakhare Akoda AKA multiple other aliases.

E.   Expert Opinions

I.      **To a reasonable degree of professional and administrative certainty, the Educational Commission for Foreign Medical Graduates (ECFMG) negligently certified Oluwafemi Charles Igberase AKA Johnbull Enosakhare Akoda AKA multiple other aliases which placed residency programs and the public at risk for having an unqualified individual and self-acknowledged felon providing medical services to those who rely on ECFMG to serve as an effective "gatekeeper" upon which the healthcare system can rely to protect the public from inadvertent harm**

F.   Foundations for Expert Opinion

1.   **Background of the Educational Commission for Foreign Medical Graduates (ECFMG) and its mission**

Established in 1956 as a private not for profit organization, The Evaluation Service for Foreign Medical Graduates (ESFMG) was established to meet the growing needs of the US healthcare industry to utilize foreign medical graduates to fulfill rapidly growing demand both in its graduate medical education (GME) programs and in the US healthcare system at large. The organization then changed its name to the Educational Council for Foreign Medical Graduates (ECFMG) and developed the first ECFMG certification program which consisted of a basic sciences exam and English language proficiency test. In 1958, the organization administered its first exams and certified its first foreign medical graduates. The AMA and AHA recognized ECFMG as the primary certifying body for foreign medical graduates seeking to enter the United States healthcare system. In 1974, ECFMG merged with the Commission of Foreign Medical Graduates (CFMG) and the combined organization was named the Educational Commission for Foreign Medical Graduates and combined the certification exam with conducting research on international medical graduates and monitoring the visas for exchange foreign medical visitors (currently the J-1 visa program). Over the years, it has grown its database entitled the Electronic Portfolio of International Credentials (EPIC) to be a primary source verification tool for healthcare organizations with regards to foreign medical graduates. ECFMG partnered with the National Board of Medical Examiners to create the United States Medical Licensure Examination (USMLE) which now includes Step 1 (basic sciences), Step 2CK (clinical knowledge), Step 2CS (clinical skills), and Step 3

(clinical management in ambulatory settings) as well as an English Proficiency examination. Other programs include:

- Exchange Visitor Sponsorship Program (EVSP) for J-1 visa recipients
- Electronic Residency Application Service (ERAS) to transmit credentialing data to potential residency programs
- Certification Verification Services (CVS) that confirms ECFMG certification or accreditors and outside agencies
- ECFMG Certificate Holders' Office (ECHO) which helps foreign medical graduates who become ECFMG certified to stay in touch with ECFMG
- Foundation for Advancement of International Medical Education and Research (FAIMER) which performs research to enrich foreign medical education
- GEMx which is a program that promotes foreign medical graduate exchanges

Through its work, ECFMG has enabled international medical graduates (IMGs) to integrate into the US healthcare system and IMGs now make up 25% of the physician workforce in this country. Today, ECFMG has over 800 employees and net assets of over $165 million and is the pre-eminent 'gatekeeper' for foreign medical graduates who wish to enter the United States healthcare system.

**2. The primary purpose of ECFMG is to serve as a 'gatekeeper' to ensure that foreign medical graduates meet established criteria to transition into the United States Healthcare System**

ECFMG states the following on its website as its mission: "The ECFMG promotes quality health care for the public by certifying international medical graduates for entry into U.S. graduate medical education, and by participating in the evaluation and certification of other physicians and health care professionals nationally and internationally. In conjunction with its Foundation for Advancement of International Medical Education and Research (FAIMER), and other partners, it actively seeks opportunities to promote medical education through programmatic and research activities."

To be certified by ECFMG, a foreign medical graduate must successfully complete the following requirements:

- ✓ **A medical school listed in the "World Directory of Medical Schools" which meets ECFMG's requirements**
- ✓ **Complete a medical school listed in the "World Directory of Medical Schools" during eligible years per ECFMG**
- ✓ **Submit an application for the ECFMG Certification Examination that includes a confirmation of identity, local address, and medical school graduation**
- ✓ Pass the medical science examination requirement (USMLE Step 1 and Step 2 CK)
- ✓ Pass the clinical skills requirement (USMLE Step 2 CS)
- ✓ Pass the English Proficiency Examination

Once the certification process is successfully completed, the candidate is awarded an ECFMG Certificate that is numbered and dated. This certificate and its number must be referenced when applying for a medical license or ACGME residency program in the United States.

Among its stated purposes, ECFMG includes the following:

> ➢ **Certify the readiness of international medical graduates** for entry into graduate medical education and health care systems in the United States through an evaluation of their qualifications.
> ➢ **Verify credentials** and provide other services to health care professionals worldwide.

Finally, ECFMG states the following as its core values:

"Improving world health through excellence in medical education in the context of ECFMG's core values of collaboration, professionalism and accountability."

Thus, through its certification process, ECFMG **certifies the readiness of international medical graduates, verifies credentials, confirms the identity, local address, and medical school graduation of its foreign medical graduate applicants,** and improves world health through its accountability to the healthcare entities it serves as both a 'gate keeper' and a repository of information with regards to the qualifications of FMGs who desire to enter the US healthcare system.

**3. US Licensure Bodies, ACGME accredited Residency Programs and the public at large rely on ECFMG to serve as an effective 'gatekeeper'**

US Licensure bodies, ACGME accredited residency programs rely on ECFMG's ability to: certify the readiness of international medical graduates, verify credentials, confirm the identity, local address, and medical school graduation of its foreign medical graduate applicants and this was confirmed in the 30 (b) (6) deposition of Kara Corado, JD, Current Vice President of Operations at ECFMG:

"Do hospitals rely on ECFMG to provide primary-source verification of a physician's medical credentials as part of the application process? A- I'm not sure if hospitals have a requirement to primary-source verified medical education credentials. **If they do, they can use an ECFMG certification report to indicate whether or not a physician is certified by ECFMG which would include primary-source verification of their medical education credentials.** Q. You're aware that hospitals do use ECFMG for that purpose? A. Yes." (pages 42-43)

**Commentary:** Hospitals are required to primary source verify a physician's medical education and training as well as his/her identity (through at least two separate sources), and nationality (eligibility to apply and meet the organization's criteria for membership and privileges.
**"Q. What's in an ECFMG report to the hospital? A. The status report would contain the physician's name; date of birth; the name of the medical school, and the country of the medical school where they went to school; their year of graduation; whether or not they are ECFMG certified, and what the**

**validity of that certification is, whether it's valid indefinitely or expired**, et cetera; and there may be score information on examinations, it depends on who the recipient of the report is. **Q. Was that also true back in the late 1990s when Akoda was applying for residency programs? A. Yes.** Q. Was that also true in the mid-2000s when Akoda was applying for residency programs? A. Yes." (pages 44-45)

**"Q. Is it ECFMG's expectation that state medical boards will rely on reports of ECFMG certification status for any purpose? A. Yes. Q. Is it ECFMG's expectation that residency programs, such as that at Howard University, would rely on ECFMG status for any purpose? A. Yes, to demarcate that that person met the certification so they could enter GME among whatever other requirements the program had. Q. It is ECFMG's expectation that hospitals that are considering whether to grant clinical privileges to a physician rely on ECFMG status for any purpose? A. I think it would be fair to say that they have the same expectation as the licensing board and the residency programs have on the status reports; on ECFMG providing information about certificate status."** (pages 247-248)

Stephen Seeling, JD, Former Vice President of Operations at ECFMG agrees:

**"Q.    Generally speaking, was it your understanding that residency programs would not attempt to verify a foreign medical graduate's diploma on their own but instead would rely upon determination of that diploma's veracity or   authenticity? A-Generally speaking, I think that's true."** (page 26)

**Commentary:**

Thus, while it is true that licensure bodies, ACGME accredited residency programs and other accreditors (The Joint Commission) perform their own assessments of the qualifications of physicians working within the US healthcare system, they rely on ECFMG to accurately verify the: **the readiness of international medical graduates, verifies credentials, confirms the identity, local address, and medical school graduation of its foreign medical graduate applicants entering the US healthcare system.**

4. **Oluwafemi Charles Igberase AKA Johnbull Enosakhare Akoda AKA multiple other aliases established himself as engaging in multiple confirmed examples of 'irregular behavior' violating the established requirements of ECFMG**

According to the 1996 United States Medical Licensing Examination (USMLE) Bulletin of Information: **Irregular behavior includes all actions on the part of applicants or examinees....that subvert or attempt to subvert the examination process. Specific examples of irregular behavior include but are not limited to the following: ....falsifying information on the application or registration forms; impersonating an examinee** or engaging a proxy to take the examination;...**In addition to actions described in this section, appropriate legal action will be taken when any such infringement has occurred.** If upon review and analysis of all available information, it is determined that irregular behavior has occurred, an annotation of this determination will be entered in the applicant's USMLE

record and will appear on applicable score reports and on transcripts. All medical licensing authorities having received a transcript for this examinee in the past will receive an updated transcript. **If it is determined that the irregular behavior threatens the future integrity of the examination system, the examinee may be barred from future USMLE steps. The USMLE program reserves the right to bar an individual from USMLE or to have special test administration procedures implemented when information on behavior of examinees on USMLE or on predecessors of the USMLE system indicates such actions may be necessary to ensure the security of USMLE**" (pages 22-25)

On October, 1991 a man by the 'name' of Oluwafemi Charles Igberase enters the United States on a non-immigrant visa. Mr. Igberase allegedly completes his PG-1 and PG-2 years in the Department of OBGYN at the University of Ibadan in Nigeria with outstanding standardized testing scores (99%tile) from June, 1990-July, 1992 despite the fact that he entered the United States in October, 1991.

In November, 1991, Mr. Igberase applies for a social security number and receives a social security number ending 5054 with a birth date of April 17, 1962.

In March 31, 1992 Mr. Igberase submits an application to the Educational Commission for Foreign Medical Graduates (ECFMG) certification utilizing the name Oluwafemi Charles Igberase utilizing the SSN ending 5054 and a birth date of April 17, 1962

According to William C. Kelly, Mr. Igberase did not complete his application to ECFMG properly:

"Q. We have the section here which requests a certification from medical school official regarding the photograph that is included as part of the application. To your understanding, Mr. Kelly, what is the purpose of having a medical school official certify that the photograph, signature, and information on the form accurately applies to the individual named above? A. My recollection it was to help confirm this was the individual who went to that medical school. Q. Now, in this particular application on behalf of Igberase, there is no certification from a medical school official, correct? A. That is correct. Q. However, there is an option as I understand it that there would be a notarized -- a signature from a Notary and an explanation as to why the form could not be signed in the presence of a medical school dean; is that correct? A. That is correct. Q. Those are two separate options that the applicant can select in completing this application? A. Yes. Q. On this particular application there's no explanation provided at all, correct? A. On this form, that is correct. Q. With respect to this form, it would not represent a completed application on behalf of Igberase? A. Yeah, I don't know that I would say – all the information is not on this form..." (Deposition of William C. Kelly, pages 181-183)

The following events transpired between 1992 and 1994:

July, 1992: Mr. Igberase fails both the basic medical science and clinical science of the ECFMG certification exam.

January, 1993: Mr. Igberase fails the basic medical science portion of the ECFMG certification exam.

September, 1993: Mr. Igberase sits for the three step United States Medical Licensing Exam (USMLE) and fails step 1.

1992-September 1993: Mr. Igberase sits for ECFMG certification examination and passes all three parts under the name of Oluwafemi Charles Igberase and a false birth date.

March, 1994: Mr. Akoda applies for a second ECFMG certification under the name of Igberase Oluwafemi Charles.

August, 1994-September 1994: Mr. "Charles" passes all three parts of the USMLE.

According to the 1995 ECFMG Information Booklet, no steps that have been passed can be repeated within a seven-year period:

1995: ECFMG Information Booklet:

 "Is there a limit to the number of times an applicant can take Step 1 and Step 2?

Answer:  For purposes of ECFMG certification, there is no limit on the number of attempts of step 1 and step 2 until one or both steps have been passed. **If one step is passed, applicants may not repeat that step and will have seven years to pass the other step**….If the other step is not passed within a maximum of seven years, the applicant's previous passing score will no longer be valid and the entire process must be repeated." (page 1)


In January, 1995, Mr. Igberase applies for a second social security number ending 9065 under the name of Charles Oluwafemi Igberase, Jr. and a false birth date

According to a June 22, 1995 Correspondence from William C. Kelly, Manager of Medical Education to Mr. Charles Olufemi Igberase,  Mr. Kelly documents the following to Mr. Charles Olufemi Igberase:

•        Dr. Igberase misrepresented that he had never taken the ECFMG examination before or completed a prior ECFMG application (September, 1994)
•        Dr. igberase represented his name as Igberase Oluwafemi Charles (September, 1994)
•        Dr. Igberase represented his birth date as 4/17/61 (September, 1994)
•        He was issued a prior ECFMG/USMLE identification number of 0-519-573-0
•        He represented his name as Oluwafemi Charles Igberase (July, 1992)
•        He represented his birth date as 4/17/62 (July, 1992)
•        He failed both step 1 and step 2 in July, 1992
•        He failed step 1 in September, 1992
•        He failed step 1 and passed step 2 and the English test in January, 1993
•        He passed step 1, met the medical educational credentialing requirement and was issued an ECFMG Certificate # 0-482-700-2 in July, 1993
•        Contrary to ECFMG rules (see booklet), he repeated step 1 in September, 1994 which he passed

Mr. Charles is asked to provide immediate input and provides the following correspondence back to Mr. Kelly in July 14, 1995: Mr. Charles admits that he:

• Attempted to get into to "150" residency programs but that his ECFMG scores were not competitive enough
• Knowingly lied about having taken the tests before in order to get a new identification number and to improve upon his ECFMG scores
• The error in date of birth (1961 v. 1962) was inadvertent (actual birthdate is 4/17/62)
• Actual name is Igberase Oluwafemi-Charles (0-519-573-0)

As a part of the application process, Mr. Igberase signed and agreed to abide by the following statement:

July, 1995: Education Commission for Foreign Medical Graduates Application Form
Part C: Certification by Applicant

**"I hereby certify that the information in this application is true and accurate to the best of my knowledge** and that the photographs enclosed are recent photographs of me."

**"I understand that the 1)falsification of this application or the 2) submission of any false educational documents to ECFMG….or any other conduct that subverts or attempts to subvert the examination process may be sufficient cause for ECFMG to bar me from the examination, to terminate my participation in the examination, to withhold or invalidate the results of my examination, to withhold a certificate, to revoke a certificate, or to take other appropriate action."**

As a result, on December 7, 1995 The ECFMG Committee revokes Mr. Akoda's ECFMG certification due to the discovery that he submitted two separate applications utilizing two different names with two different SSNs, and two different dates of birth.

That day, William C. Kelly notifies Mr. Igberase the following:
Correspondence from William C. Kelly to Mr. Igberase Olufemi-Charles (12/7/95):

Formal actions of ECFMG Committee on Medical Education Credentials include:

• Revoke the first standard ECFMG Certificate issued under the number 0-482-700-2
• Invalidate the second standard ECFMG Certificate issued under the second number 0-519-573-0
• Report the actions to USMLE Committee on Irregular Behavior for further determination as deemed appropriate

In December 31, 1995 Mr. Igberase applies for the USMLE examination under one of his aliases John Nosa Akoda. He states that he graduated from the University of Benin, Nigeria (10/87), birthdate 1/1/59, no social security number, no prior exam or ECFMG number, could not sign in front of medical school dean due to inconsistent mail delivery.

1996: United States Medical Licensing Examination (USMLE) Bulletin of Information unequivocally states that:

**"Your identity will be verified before you are admitted to the testing room and at other times during the examination."**  (page 17)

On March 7, 1996, ECFMG receives a request from Dr. Charles to appeal the decision to revoke his ECFMG Standard Certificate numbered 0-482-700-2.

It should be noted that Mr. Igberase and Mr. Akoda provide different medical school diplomas for the ECFMG credentialing process:

June 19, 1987: Medical Diploma from the University of Ibadan to Dr. Charles Olufemi Igberase

**There is no   verification that the confirmation of this diploma was ever verified as being true and accurate.**

February 6, 1988: Medical Diploma from the University of Benin to Dr. Johnbull Enosakhare Akoda

**There is no verification that the confirmation of this diploma was ever verified as being true and accurate.**

Thus, since one person cannot complete both schools within eight months, it is clear that one or both diplomas is not genuine and that Mr. Igberase AKA Mr. Akoda may or may not be a physician and have completed medical school in Nigeria.

On July 10, 1996, Mr. Charles appears before an appeals board of ECFMG in Washington DC consisting of Floyd Malveaux, MD, PhD, Marvin M. Dunn, MD, and Alexander H. Williams III and they uphold the original decision except that they limit the revocation of the ECFMG Standard Certificate numbered 0-482-700-2 to five years from July 10, 1996-July 10, 2001 at which time the certificate may be reinstated if he meets all other eligibility criteria.

On August 29, 1996, a USMLE Application is completed by Dr. John Nosa Akoda.  Mr. Akoda applies for a third application for ECFMG Certification under the name of John Nosa Akoda utilizing a false Nigerian Passport. Again, no social security number, same false birthdate, and he applied for prior exam with ECFMG number the year prior but was unable to make the exam.

Mr. Akoda passes all three steps of the USMLE and receives a third ECFMG Certification under the Akoda name (ECFMG Number 0-553-258-5) on August 18, 1997.

On, September, 1998, Mr. Akoda applies for a third social security number ending 7353 under the name of Oluwafemi Igberase with a false birthdate and uses this SSN to fraudulently apply for federal education loans for his children.

JA549

In 1999, Mr. Akoda applies for and receives a fourth social security number ending 1623.

**Commentary:** It is clear that Mr. Igberase AKA Mr. Akoda falsified his name, social security number, birthdate, ECFMG Number, passport, and statements alleging he had never taken the USMLE exam on any prior occasion innumerable times and had one his ECFMG certificates invalidated and the preceding one revoked for five years due to 'irregular behavior'. Mr. Igberase AKA Mr. Akoda clearly intended to defraud the Educational Commission for Foreign Medical Graduates and engage in 'irregular behavior' over an eight-year period and thus undermined the security and integrity of the ECFMG certification process.

5.    **Charles Olufemi Igberase AKA Johnbull Enosakhare Akoda AKA multiple other aliases confirmed to ECFMG that he engaged in social security and identity fraud**

On August 11, 2000, Dr. James McCorkel, Residency Director at Jersey Shore Medical Center, Neptune City, New Jersey where Mr. Akoda was serving as a resident wrote to Rice Holms at ECFMG inquiring as to whether "Dr." Akoda went under aliases with differing birthdates, ECFMG certificate numbers, dates of graduation from medical school and social security numbers.

The matter is referred to Stephen Seeling, JD, Vice President of Operations who responds to Dr. McCorkel on August 22, 2000 confirming that "Dr." Akoda has three identities, two social security numbers, three dates of birth, two medical schools and three ECFMG numbers.

August 22, 2000: Correspondence from Stephen S. Seeling, JD (ECFMG) to James McCorkel, PhD, Jersey Shore Medical Center

**"An inquiry is made as to whether Dr. John Nosa Akoda (birthdate 1/1/59)  end social security number of 9065 has another identity and ECFMG shares their information regarding Olafuwemi Charles Igberase with a different birthdate (4/17/62), medical school, ECFMG number 0-482-700-2, end social security number 5054 and the recent revocation of his ECFMG Standard Certificate due to irregular behavior. In addition, they shared that this physician is also "Dr. Igberase Olafuwemi Charles" (birthdate 4/17/61) and ECFMG Identification Number 0-519-573-0 without any social security number. This ECFMG Certificate was invalidated in November, 1995."**

That same day, William C. Kelly writes to "Dr." Akoda sharing the allegations and investigation at Jersey Shore Medical Center and requests an immediate explanation.

On August 29, 2000, "Dr." Akoda responds to Mr. Kelly and claims that the allegations that he has at least three identities is false and that Dr. Igberase Olafuwemi-Charles is his cousin who is now practicing in South Africa. He does acknowledge that he utilized Dr. Charles' social security number while awaiting his own.

On September 27, 2000, **Dr. Akoda stops by ECFMG to reiterate that he is not "Dr." Charles although he utilized his ("Dr." Charles') social security number and left copies of his Nigeria Passport and International Driving Permit.**

On December 21, 2000 Mr. Kelly is notified by Dr. McCorkel that "Dr." Akoda has been suspended from Jersey Shore Medical Center (he choses not to appeal the decision) on November 17, 2000 for the following reasons:

- **Used a false social security number to apply to the hospital (of his 'cousin' Charles Igberase)**
- **The two green cards utilized had different numbers, names, expiration dates, and dates of birth**

On December 22, 2000, William C. Kelly informs Stephen S. Seeling, JD that he believes that "Dr." John Akoda and "Dr." Igberase are one and the same person because:

- **Dr. McCorkel has information from an unnamed informant**
- **Dr. Igberase does not respond to his attempts to contact him**
- **Dr. Igberase's address is 'correct'; however, his phone number is not**
- **Dr. Akoda responds to Dr. Igberase's e-mail requests**

On April 18, 2001 the ECFMG Committee on Medical Education Credentials met to discuss the falsified application from "Dr. Femi Charles Igberaese" and decided to:

- Extend the revocation of ECGME Certificate for an unspecified period and to notify the Federation of State Medical  Boards Action Data Bank,  Graduate Medical Residency Program Directors, Canadian Licensing entities and refer the matter to the USMLE Committee on Irregular Behavior

On March 13, 2002, a USMLE Application completed by Dr. Charles Oluwafemi Igberaese. A birthdate is listed as 3/1/67 with 'non-guaranteed mailing system', no prior ECGME identification number, no prior exam history, and no social security number listed

On May 22, 2002, William C. Kelly notifies "Dr. Oluwafemi Charles Igberase  that the ECGME Medical Education Credentials Committee met again in May, 2002 and decided to permanently revoke his Standard ECFMG Certificate and to report his irregular behavior to The Federation of State Medical Boards, to the Graduate Medical Education Program Directors, and other interested entities.

On July 22, 2002, William C. Kelly notifies  "Dr." Charles Igberaese Oluwafemi  that there were irregularities in the March 13, 2002 application in which he checked that he had no prior ECFMG number and had never taken a prior examination, a date of birth of March 1, 1967, a medical school diploma from the University of Ibadan, Nigeria dated June 18, 1996, attested that the information provided was

true and accurate. Mr. Kelly requests an explanation within 15 days of receipt and that he is ineligible to sit for any examinations.

On November 12, 2002, William C. Kelly notifies "Dr."  Igberase Oluwafemi-Charles (ECFMG NO. 0-482-700-2) that the ECGME Medical Education Credentials Committee met and affirmed to permanently revoke his Standard ECFMG Certificate and to report his irregular behavior to the USFLE, The Federation of State Medical Boards, to the Graduate Medical Education Program Directors, and other interested entities.

On June 17, 2003, Susan Deltsch notifies "Dr." Charles Ugberaese Oluwafemi (6/17/03) that the USMLE Committee on Irregular Behavior has determined that Dr. Oluwafemi's behavior through the multiple applications has been irregular and thus recommend that:There be a permanent bar to him taking a USMLE exam until such time as a State Licensing Board requests that he be permitted to take the exam based upon his full disclosure of the events which led to this decision.

In 2006, Mr. Akoda is accepted into a second residency program utilizing a false permanent resident card utilizing the name John-Charles Akoda and a social security number provided by another individual in 1999.

In August 20, 2006 there are three letters of reference for "Dr." John-Charles Nosa Akoda including references from:

1. Dr. A.O. Roberts, Head of OBGYN, University of Ibadan, Nigeria (who could not be identified nor found) who states that "Dr." Akoda completed his PG-1 and PG-2 years OBGYN Residency Program from June, 1990-July, 1992 despite the fact that "Dr." Akoda was documented as being in the United States throughout a significant part of that timeframe

2. September 28, 2006 letter of Reference for "Dr." John-Charles Akoda from Phil Robertson, MD, Medical Director of MaxiCare Inc. (which is not found on the internet with any url address and who could not be identified nor found) and which states that Dr. Akoda received his New York State nursing license through this corporation

3. Letter of Reference for Dr. Akoda from Dr. Charles A. Francis, MD (who could not be identified nor located)

In March, 2007, Mr. Akoda is accepted into yet another residency program and from 2008-2012: Prince George's Hospital Center permits Mr. Akoda to rotate through its premises as a resident in medicine and surgery

**In 2011, Mr. Akoda applies for a Maryland medical license utilizing a false permanent resident card and a false Nigerian passport as well as the SSN ending 1623 under the name Charles John Nosa Akoda**

On September 14, 2011, The State of Maryland issues Mr. Akoda a medical license under the name of Charles John Nosa Akoda (#D73049)

From March, 2012- September 30, 2016,  **Mr. Akoda applies for medical staff membership and privileges as an OBGYN at Prince George's Hospital Center utilizing a false permanent address and false Maryland driver's license and serves on staff fraudulently as an OBGYN attending**

On March 1, 2012, Mr. Akoda submits a Medicare enrollment application under the SSN 1623, a false Maryland Driver's license, and the Akoda name and is denied because he does not provide an accurate social security number/

**On June 1, 2016, The United States Attorney indicts Mr. Akoda for fraud and aggravated identity theft. The indictment includes eleven aliases including Charles John Nosa Akoda.**

**On June 9, 2016, Law enforcement issues search warrants on Mr. Akoda and discover false: passports, social security numbers (ending 1623 under John Charles N. Akoda), Nigerian passport, and US visa in Akoda's name. In addition, other fraudulent or altered documents relating to immigration, medical diplomas, medical transcripts as well as letters of recommendation and birth certificates are found. They also found fraudulent bank applications filed under the fourth SSN 1623.**

**On October 19, 2016, Mr. Akoda receives an indictment charging him with additional social security fraud, false statements regarding a healthcare matter, an additional count of identity theft and fraud as well as misuse of an immigration document.**

**On September 30, 2016, Mr. Akoda allows his medical license to expire while under investigation per the Maryland Board of Physicians contrary to State law.**

**On November 15, 2016, Mr. Akoda pleads guilty to social security fraud as a part of plea bargain**

**On March 2, 2017, Mr. Akoda is sentenced to six months in prison as well as three years supervised release and home detention for six months and a fine of $100**

**On April 4, 2017, The attorney general files a motion to revoke Mr. Akoda's Maryland medical license**

**On April 25, 2017, Virginia Department of Health Professions Order of Mandatory Suspension re Charles Akoda, MD and his right to renew his medical license in Virginia is suspended**

**On July 10, 2017, Mr. Akoda's Maryland medical license is revoked**

**Commentary:**

As a credentialing expert for almost two decades who has reviewed thousands of credentialing files as both a medical staff leader and national healthcare administrative consultant, who has participated and testified in many negligent credentialing law suits and who has written chapters and articles on the subject, this may be the greatest case of deliberate certification and credentialing fraud that I have encountered. There are so many deliberate uses of fraudulent techniques by Mr. Akoda AKA Igberase that I cannot count nor inventory them.

It is unclear to me and has not in any way been verified in this case:

A.   That Mr. Akoda/Igberase/Charles is who he says he is
B.   What the true birthdate of this individual is
C.   What the true country of origin of this individual is
D.   Whether this individual attended and completed any undergraduate medical education and is in fact a physician or not
E.   What the true social security number of this individual is
F.   What the true purpose of his residence in the United States is
G.   Who or what is providing him with the wealth of false and fraudulent documentation that he has utilized (and may be continuing to utilize)
H.   Whether he continues to 'practice medicine' in the United States with or without a medical or DEA license
I.   The motivation of the 'informant' who tipped Dr. McCorkel off to the nature of Mr. 'Akoda's' deceptions

Thus, this case raises serious concerns as to ECFMG's commitment to its own self-professed certification process and to the wellbeing and safety of the public whom it ultimately serves.

**6.   ECFMG claims that it has no obligation to the public to screen foreign medical graduates who violate the law and who may be a risk to the healthcare system at large**

The primary purpose of certification and credentialing is to protect the public from potentially unqualified or even dangerous professionals. It is true that the state licensure bodies, ACGME accredited residency programs and hospitals have their own unique credentialing programs with varied credentialing criteria that must be applied to screen potential candidates. That being said, the Educational Commission for Foreign Medical Graduates (ECFMG) also has its own certification process based upon criteria outlined in its website and articulated by its executives and managers under oath.

First, ECFMG agrees on its web site that it has a primary responsibility to protect the public and to ensure that quality healthcare is delivered in the United States by its foreign medical graduates who receive ECFMG certification:
"Overview
**ECFMG is a world leader in promoting quality health care**—serving physicians, members of the medical education and regulatory communities, health care consumers, and those researching issues in medical education and health workforce planning."

JA554

"**ECFMG's commitment to promoting excellence in international medical education** led to the establishment of its nonprofit foundation, the Foundation for Advancement of International Medical Education and Research (FAIMER®)"

"The values of ECFMG are expressed in its vision statement:
**Improving world health through excellence in medical education in the context of ECFMG's core values of collaboration, professionalism and accountability.**"

"The purposes (goals) that actuate and accomplish ECFMG's mission are to:
**Certify the readiness of international medical graduates for entry into graduate medical education and health care systems in the United States through an evaluation of their qualifications**."

"**Verify credentials and provide other services to health care professionals worldwide**."

**Improve the quality of health care by providing research and consultation services to institutions that evaluate international medical graduates for entry into their country**."

"**EPIC (Electronic Portfolio of International Credentials) is a powerful tool to help them evaluate the credentials of their physician applicants, providing the assurance that those credentials have been authenticated through primary-source verification, a best practice.**"

"**ECFMG's electronic Credentials Verification is an innovative, web-based program for international medical schools that makes the process of verifying credentials faster, easier, and more efficient. This program enables schools to verify the credentials of their graduates electronically and replaces the paper-based verification process.**"

"**Evaluating the readiness of IMGs to enter graduate medical education (GME) programs in the United States has long been a concern of medical organizations, hospitals, state licensing agencies, and the public.**"

"**In 2006, ECFMG celebrated 50 years of promoting excellence in international medical education. Established to evaluate the qualifications of IMGs entering GME in the United States, ECFMG has grown to meet the needs of physicians, health care consumers, medical educators, researchers in medical education and health workforce planning, licensing and credentialing agencies, and those involved in the evaluation and certification of health care professionals, both in the United States and abroad.**"

These goals and values were shared by executives and management of ECFMG through their sworn testimony:
"**ECFMG works on behalf of domestic regulatory authorities to protect the public through its programs and services including primary source verification of physician credentials? A. I would say yes.** Q. Would it be accurate to say that ECFMG protects the public by, among other ways, seeing that foreign medical graduates have completed an acceptable medical education? A. In that that's part of the

Page **24** of **30**

certification process, yes. **Q. And would it be accurate to say that ECFMG serves to protect the public by seeing to it that foreign medical graduates can successfully pass the requirements of the USLME examinations? A. Yes.**" (Deposition of William C. Kelly, page 24)

"ECFMG serves the public in a number of ways. Our original program which was **the certification program severs the public in ensuring that those physicians that are educated outside of the U.S. and Canada meet certain minimum requirements** in order to enter an accredited residency program in the United States. We also serve the public in facilitating an appropriate review of them, at the same time making sure that we are efficient about doing it, because IMGs -- or International Medical Graduates represent about 25 percent of the physicians that are working in the United States. **So, it's important from a physician-workforce point of view to make sure we have qualified physicians.** So in those two broad ways I would say that we serve the public." (Deposition of Kara Corado, page 40)

**"Q. Part of ECFMG's mission is to promote public health, correct? A. Part of ECFMG's mission is to promote public health and to protect the public, yes."** (Deposition of Kara Corado, page 47)

**"Q. Do you believe patients have the right to be treated by physicians who are appropriately credentialed? A- Yes. Do you believe that patients have the right to not be treated by physicians who have obtained ECFMG certification based on false pretenses? A- Yes."** (Deposition of Kara Corado, pages 52-53)

**"Q-...one of the things that ECFMG does for foreign medical graduates is to check and make sure they went to medical school, correct? A- Yes. Q. And so part of that process is establishing that a medical diploma provided by an applicant is authentic? A. Correct. Q. Another aspect of ensuring that applicants have attended medical school is making sure that the medical diploma submitted by the applicant actually belongs to the applicant. Fair? A- I think that's fair"**

**"Q. Generally speaking, was it your understanding that residency programs would not attempt to verify a foreign medical graduate's diploma on their own but instead would rely upon determination of that diploma's veracity or authenticity? A-Generally speaking, I think that's true."**

**"Q-Did you have an understanding, while employed with ECFMG, as to whether state medical boards required ECFMG certification for foreign medical graduates in order to license a physician? A- For an unrestricted license, most states, if not all states, would require ECFMG certification." (Deposition of Stephen Seeling, JD, pages 23-26)**

Thus, ECFMG makes a strong statement to the public that its primary goals and objectives include the protection of the public through the use of credentialing criteria to evaluate foreign medical graduates who desire to enter the US healthcare system.

Unfortunately, there were significant lapses pertaining to the case of Mr. Akoda AKA Igberase AKA multiple aliases that were acknowledged by members of the management team at ECFMG.

As a reminder ECFMG attests that among its certification criteria are:

JA556

ECFMG certifies the readiness of international medical graduates, verifies credentials, confirms the identity, local address, and medical school graduation of its foreign medical graduate applicants, and improves world health through its accountability to the healthcare entities it serves as both a 'gate keeper' and a repository of information with regards to the qualifications of FMGs who desire to enter the US healthcare system.

❖ Mr. Kelly testifies that Mr. Igberase submits an application in 1992 in which there is NO certification by his medical school of Mr. Igberase's photo (which would confirm that he attended that school) nor was there a notarized statement as to why the Dean's Office of the Medical School could not certify the school, thus rendering the application 'incomplete' and ineligible to be processed:

"Q. We have the section here which requests a certification from medical school official regarding the photograph that is included as part of the application. To your understanding, Mr. Kelly, what is the purpose of having a medical school official certify that the photograph, signature, and information on the form accurately applies to the individual named above? A. My recollection it was to help confirm this was the individual who went to that medical school. Q. Now, in this particular application on behalf of Igberase, there is no certification from a medical school official, correct? A. That is correct. Q. However, there is an option as I understand it that there would be a notarized -- a signature from a Notary and an explanation as to why the form could not be signed in the presence of a medical school dean; is that correct? A. That is correct. Q. Those are two separate options that the applicant can select in completing this application? A. Yes. Q. On this particular application there's no explanation provided at all, correct? A. On this form, that is correct. Q. With respect to this form, it would not represent a completed application on behalf of Igberase? A. Yeah, I don't know that I would say – all the information is not on this form, yes. (Deposition of William C. Kelly, pages 181-183)

❖ On September 27, 2000, Mr. Akoda stopped by ECFMG to reiterate that he is not Dr. Charles although he utilized his social security number and left copies of his Nigeria Passport and International Driving Permit. Mr. Kelly does nothing to verify the Nigerian Passport nor the International Driving Permit to ensure that they are valid and belong to the individual identified, despite the fact that the State and Social Security Departments have ample capability to perform such verifications. He also makes no attempt to notify the Department of Justice or Social Security Department that Mr. Akoda and Mr. Igberase may be one and the same individual and that Mr. Akoda may be involved in social security fraud and thus may be in the United States under a false identity.

"Q. And did you ever go back and check the date of birth on his passport in comparison with the date of birth on Exhibit 33, his request for permanent revalidation of standard ECFMG certificate? A. I don't know if I did. Q. Do you know how you would go about checking the authenticity of a Nigerian passport? A. Do I know? Q. Did you know at that time? A. I may have." (Deposition of William C. Kelly, page 127)

"I Googled Nigerian passports and that search tells me that a Nigerian passport has eight digits and one letter. How many digits do you see on the passport that I just marked as an exhibit? A. Are you talking about the passport number? Q. Yes, sir. A. It looks like one letter and six numbers -- six digits. Q. I think it is seven. A. Counting zero, yes." (Deposition of William C. Kelly, page 129)

"Q. So either before Akoda came into your office on September 27 or after he came into your office, did you undertake any investigation of your database to try to determine whether Akoda and Igberase were one and the same person? A. I don't remember. Q. If you, either before or after September" 27, had gone into the database to look for a photograph of Igberase and looked for a photograph of Akoda, you could have done that? A. I believe I could have, yes. Q. You didn't do that? A. I don't know if I did. (Deposition of William C. Kelly, pages 130-131)

"Q. Again, "he has given us a passport that appears to confirm his identify as John Akoda." You didn't verify the authenticity of that passport, did you? A-I don't remember. Q. Would it be safe or fair for me to assume that if you had verified the accuracy or authenticity of his passport, you would have made a statement to that effect somewhere? A. Yes." (Deposition of William C. Kelly, pages 149-150)

❖ Despite the fact that Mr. Kelly suspected that Mr. Akoda and Mr. Igberase were the same individual, he never compared photographs with their respective applications to compare, nor did he consider referring the matter to a federal agency that would have had software tools to compare photographs for both authenticity and potential match.

"you had the ability to look up all the computer photographs of Igberase and Akoda to verify whether they were one and the same person, correct? A-Yes. Q. And you didn't do that, correct? Q. So for example, when he came into your office, you could have looked at photographs on the computer, correct? A. Yes, that is correct. Q. Or when he left the office, you could have done it? A. That is correct. Q. And you didn't? A. I don't remember doing it. (Deposition of William C. Kelly pages 154-155)

❖ Mr. Kelly acknowledges that despite the overwhelming evidence of fraud and willful deception on the part of Mr. Akoda, Mr. Igberase, and his other aliases as of 2000, the ECFMG failed to take definitive action until 2016, despite the fact that this gentleman was actively caring for patients through various residencies and training programs during that time.

"Q. Well, I think we've also established that as of this date in late December 2000, you were present during the July 10, 1996 appeal hearing where Charles testified, correct? A. Yes. Q. And you had the ability to hear him testify at that proceeding? A. Yes. Q. And you heard him talk to you in your office in September 2000, correct? A. When he came to the office, yes. Q. And you knew according to Doctor McCorkel, at least, that Akoda had presented false green cards, correct? A. He had stated that, yes. Q. You could have but didn't verify that the passport that Akoda gave you when he came to the your office was authentic, correct?  A. I did not verify the passport. Q. And as of late December 2000, you knew that Jersey Shore Medical Center has dismissed Akoda from its residency program, correct? A. Yes. Q. You knew that was at least in part due to the fact he used someone else's Social Security number? A. Yes. Q. And you sent Igberase an e-mail at the address he provided and Akoda replied to it. We've already established that, correct? A. Yes. Q. You were really surprised at that, correct? A. Apparently, yes. Q. So Doctor McCorkel told you that he believed Igberase and Akoda were

one and the same person as of December 2000, correct? A. Yes. Q. And you also believed Igberase and Akoda were one and the same person, correct? A. Yes. Q. And you were so concerned about this that you wrote a memorandum to Stephen Seeling that you didn't think should be made part of the file, correct? A. Yes. Q. And in your original letter to Akoda after Doctor McCorkel contacted ECFMG, you told him that all of the information would be referred to the ECFMG committee on medical credentials for review, correct? A. Yes. Q. You didn't do that, right? A. Correct Q. So despite all of these things that we just went over for the last couple of hours and in this last series of questions, ECFMG took no action against Akoda until December 2016 following his conviction, isn't that true? A. I don't know that. Q. Prior to the time you left in 2015, had ECFMG taken any action against Akoda? A. I don't recall. Q. Would you admit in having made a mistake? A. Would I admit? Q. Yes. A. If I had, yes. Q. Would you admit that you made a mistake not referring Akoda to the ECFMG credentials committee? A. I don't think it was a mistake. (Deposition of William C. Kelly, pages 155-158)

❖ ECFMG has no verification of Mr. Akoda's nursing New York State nursing license, despite the fact that Mr. Akoda AKA Mr. Igberase attests to have completed two separate medical schools in Nigeria and has no record of having ever attended nursing school anywhere.

"Do you know whether there's any document in ECFMG's files that ever reflects that Igberase was licensed as a nurse in New York? A. Separate from this statement here? Q. Separate from the information here. A. I have no knowledge." (Deposition of William C. Kelly, page 161)

❖ Mr. Kelly acknowledged that ECFMG only enters certain information from a foreign medical graduate's USMLE application and not the complete set of data which would have enable cross comparisons of similar applications to see if they differed in a significant way

"Would ECFMG do that, I mean, input the information on the application any time an IMG submitted this application, this type of application? A. The procedure was to enter some, but not all of the information from the application." (Deposition of William C. Kelly, page 31)

❖ None of Mr. Akoda's letters of recommendation were verified as being true and accurate by Mr. Kelly

"Q. In this particular case you reviewed with Mr. Vettori a series of letters that you wrote in response to an application written by Akoda asking those individuals to verify that the letters of recommendation were authentic. Do you recall that? A. Yes. Q. Is that not something that you would do in the normal course? A. That was not a routine procedure. Q. And as far as what is reflected in the record and to the best of your recollection, none of those individuals responded to your letters, correct? A. That is correct." (Deposition of William C. Kelly, pages 196-197)

❖ Mr. Kelly acknowledged that Mr. Johnbull Nosa Akoda was certified by ECFMG and allowed to be licensed and apply to an ACGME accredited residency program despite the fact that ECFMG never primary source verified his medical school credentials, thus failing to perform one of ECFMG's vital functions

"This is a medical degree of some sort, a purported medical degree for Johnbull Nosa Akoda. In your review of the medical chart, you never received a medical degree in the name of John Nosa Akoda, correct? A. There is none in these records. Q-Despite the fact that ECFMG had not received a medical

diploma in the name of John Nosa Akoda, it nevertheless certified that John Nosa Akoda had satisfied the requirements of ECFMG and could proceed on with residency training. Fair?A. And apply to residency training, yes." (Deposition of William C. Kelly, page 208)

❖ Mr. Kelly makes the decision to not submit Mr. Akoda to the ECFMG Credentials Committee despite the fact that there is a mountain of evidence by 2000 (as documented above) that Mr. Akoda AKA Mr. Igberase AKA Multiple Aliases engaged to multiple episodes of deception and fraud involving his name, birthdate, social security number, address, medical school etc.

"In this particular case you made the decision in 2000 that this -- the Akoda matter should not proceed to the credentialing committee, correct? A. It was my belief that it should not at that time go to the credentialing committee, yes. Q. Did you -- and ultimately you were the one responsible for, following discussion with staff as to making that decision whether it should or should not. Fair? A. At that time, yes. Q. And so in this situation what were the risks or what were the potential bad outcomes or consequences that would be associated with bringing this issue to the credentialing committee for their consideration? A. That there was not enough information for them to be make an informed decision." (Deposition of William C. Kelly, page 216)

❖ Ironically, Kara Corado, JD, Current VP of Operations testified that there were clear ECFMG policies and procedures guiding when ECFMG managers should refer matters of concern to the ECFMG Credentials Committee.

"Q. Is there another set of polices called -- that governs when to refer cases to the credentialing committee? A. There are procedures that we follow that would govern that. Did any procedure exist before that time that applied to how the organization should conduct irregular behavior investigations and when the staff should refer matters to the creds committee? A. Yes, those procedures that were documented in 2015 were the procedures that staff had been using at least since I started working directly on cases of irregular behavior, which is 2008 onward, and my understanding would be prior to that as well." (Deposition of Kara Corado, JD, pages 57-58 and page 60)

❖ She also testified that the acts that occurred with the Akoda/Igberase series of applications would be sufficient to warrant a referral to the ECFMG Credentials Committee

"So the policies and procedures on irregular behavior indicate that if staff determines there is sufficient evidence of irregular behavior the matter will be referred to the credentials committee. A. Sufficient evidence, it depends on the case. For example, if it's a falsified credential and the school responded and said the diploma is false, then that response would be sufficient evidence to make an allegation of irregular behavior on a falsified credential." (Deposition of Kara Corado, JD, page 77)

❖ Ms. Corado acknowledges that at no time did ECFMG ever certify the authenticity of Mr. Akoda's medical school diploma

"Q. So at no point in evaluating Akoda's credentials and qualifications did ECFMG receive an original or a certified copy of his diploma or registration certificate, correct? A- That's correct." (Deposition of Kara Corado, JD, page 219)

❖ Most significant of all is that Kara Corado, JD, VP of Operations testified under oath that

ECFMG had no obligation to primary source verify or to validate a foreign medical graduate's identity, social security number or to refer issues pertaining to criminal activity (e.g. social security fraud) as a part of its credentialing process which is in contradiction to its own credentialing criteria published on its website and to management's other sworn testimony regarding the obligation of ECFMG to protect the public and to support the quality of healthcare provided by its certificate holders

"ECFMG's review of applicants that attempt to subvert it's policies and procedures is an important role that it has, but specifically that we have a role to detect whether an individual is or isn't that individual isn't part of our certification program." (Deposition of Kara Corado, JD, page 223)

"A. So when we certify the status of an ECFMG certificate, we are not certifying to the organization necessarily the identity of the individual, but that an individual with that name and date of birth has met the requirements for certification and what the validity is of their certificate and where they went to medical school. Q. Is ECFMG certifying to the recipients of the ECFMG certification information that the applicant's social security number is accurate? A. No. Q. Is ECFMG certifying to the recipient of the ECFMG certification that the location of the birth is accurate? A. No." (Deposition of Kara Corado, JD, page 242)

G.  Conclusion:

I.    To a reasonable degree of professional and administrative certainty, the Educational Commission for Foreign Medical Graduates (ECFMG) negligently certified Charles Oluwafemi Igberase AKA Johnbull Enosakhare Akoda AKA multiple other aliases which placed residency programs and the public at risk for having an unqualified individual and self-acknowledged felon providing medical services to those who rely on ECFMG to serve as an effective "gatekeeper" upon which the healthcare system can rely to protect the public from inadvertent harm.

Final Commentary:

The Educational Commission for Foreign Medical Graduates (ECFMG) failed to ascertain at any time the true identity, birthdate, social security number, address, and completion of medical education of Mr. Akoda AKA Mr. Igberase AKA multiple aliases and by so doing placed state licensing boards, ACGME accredited residency program, hospitals and the community at large at risk for receiving care and services by an unqualified individual who may or may not be a physician and who may or may not meet ECFMG's self-professed certification standards, in violation of the applicable standards of care.

Had ECFMG  complied with the administrative standard of care, "Mr." Akoda, would not have been issued an ECFMG certificate, would not have been able to participate in a residency at Howard University and would not have been issued a Maryland medical license. Without an ECFMG certificate, "Mr." Akoda would not have been able to obtain a Maryland license nor had access to the Plaintiffs and members of the class and therefore he would not have caused them any harm.

According to ECFMG's website: "ECFMG Certification is an effective screening mechanism for ensuring that IMGs in patient care situations have met minimum standards." (https://www.ecfmg.org/certification/index.htm) "To be eligible for certification by ECFMG, an international medical graduate (IMG) must meet the following requirements. Medical School Requirements: The physician's medical school must meet requirements established by ECFMG. Schools that meet all requirements will be listed in the World Directory of Medical Schools as meeting eligibility requirements for their students and graduates to apply to ECFMG for ECFMG Certification and examination. The Application for ECFMG Certification requires applicants to confirm their identity, contact information, and graduation from or enrollment in a medical school that is listed in the World Directory of Medical Schools (World Directory) as meeting eligibility requirements for its students and graduates to apply to ECFMG for ECFMG Certification and examination. As part of the application, international medical students/graduates must also confirm their understanding of the purpose of ECFMG Certification and release certain legal claims." (https://www.ecfmg.org/certification/requirements-for-certification.html)

Thus, ECFMG requires of itself to fulfill these self-avowed credentialing criteria and had at its use its own credentialing committee and countless federal agencies to assist in a deeper investigation into the true identity of Mr. Akoda AKA Mr. Igberase AKA Multiple Aliases to ensure that the licensure bodies, residency programs, hospitals, and potential patients would be assured that the individual certified by ECFMG was who he attested that he was and that he was in fact a physician and not an individual alleging to be a physician without any formal or required medical training.

While it is true that licensing, residency, accreditation, and hospital organizations have their own credentialing requirements, ECFMG had and has an independent duty to the public to ensure that its certification procedures follow internal policies and are effective at protecting the public from imposters who seek to defraud the United States healthcare system and place the public at risk.

Unfortunately, ECFMG negligently failed to follow its own internal policies/procedures and in so doing, failed in its duty to protect the public and thus the potential quality of care provided by this foreign medical graduate whom it was committed to appropriately certify according to its own published criteria.

All of these opinions are stated to a degree of reasonable administrative and professional probability.

I further reserve the right to modify or add expert opinions as additional information becomes available, including remaining expert witness depositions and any further discovery.

H. **Fee Schedule:** $600/hour for expert legal consultation and for deposition (plus travel); $8,000/day + travel for trial testimony