No. 20-2128

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

**Educational Commission for Foreign Medical Graduates,**

*Defendant-Appellant,*

v.

**Monique Russell, Jasmine Riggins, Elsa M. Powell, and Desire Evans, on
behalf of themselves and all others similarly situated,**

*Plaintiffs-Appellees.*

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania (Case No. 2:18-cv-05629-JDW)
The Honorable Joshua D. Wolson, District Judge

_____

**BRIEF OF *AMICI CURIAE* AMERICAN MEDICAL ASSOCIATION,
PENNSYLVANIA MEDICAL ASSOCIATION, AND ASSOCIATION OF
AMERICAN MEDICAL COLLEGES
IN SUPPORT OF DEFENDANT-APPELLANT
AND IN SUPPORT OF REVERSAL**

_____

Diana T. Huang
Leonard A. Nelson
AMERICAN MEDICAL ASSOCIATION
330 N. Wabash Ave.
Chicago, IL 60611
(312) 464-5000
diana.huang@ama-assn.org
leonard.nelson@ama-assn.org

## DISCLOSURE OF CORPORATE AFFILIATIONS

The American Medical Association, Pennsylvania Medical Society, and Association of American Medical Colleges hereby disclose that they have no parent corporations and that no corporation holds 10% or more of an ownership interest in any of the *amici*.


September 8, 2020                         s/ Diana T. Huang
                                          Diana T. Huang

                                          *Counsel for Amici Curiae*

# TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AFFILIATIONS ............................................... i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES .................................................................. iii

INTEREST OF *AMICI CURIAE* .............................................................1

SUMMARY OF ARGUMENT .................................................................3

ARGUMENT ..............................................................................4

I.   IMGs play an important role in supporting access to medical care in the United States. ....................................................................................4

II.  Under the substantive state law applicable to this case, "duty" and "breach" cannot be determined without analysis of individualized circumstances. ..........9

    A.   Maryland substantive law precludes class certification. ..........................10

    B.   District of Columbia substantive law precludes class certification. ...........11

    C.   Pennsylvania substantive law precludes class certification. ......................12

III.   Undesirable consequences weigh heavily against class certification............13

    A. Under Plaintiffs' theory, class certification will bring the exact harm complained of to class members.......................................................13

    B. Class certification will impede efforts to bring a critical population of physicians – and their medical expertise and care – to the United States.........14

CONCLUSION ..............................................................................18

# TABLE OF AUTHORITIES

## Cases

*Althaus ex rel. Althaus v. Cohen*, 562 Pa. 547, 756 A.2d 1166 (2000) .................12

*Getty Ref. & Mktg. Co. v. MT FADI B*, 766 F.2d 829 (3d Cir. 1985) ............. 16, 17

*Roe v. Doe*, 401 F. Supp. 3d 159 (D.D.C. 2019) .....................................................11

*Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931) ........................16

*Warr v. JMGM Group, LLC*, 433 Md. 170, 766 F.2d 829 (2013)...........................10

## Other Authorities

American Medical Association, Policy H-230.952, *Negligent Credentialing Actions Against Hospitals*...................................................................................18

Association of American Medical Colleges, *AAMC Criminal Background Service* ...................................................................................................................15

Educational Commission for Foreign Medical Graduates, Fact Card......................7

Federation of State Medical Boards, *Credentials Verification Process* ...................6

Federation of State Medical Boards, *Pathway to Medical Licensure in the United States*...................................................................................................................5

Hohn, Marcia D. *et al.*, *Immigrants in Health Care: Keeping Americans Healthy Through Care and Innovation*, The Immigrant Learning Center, Inc. & The Institute for Immigration Research (June 2016)...................................................8

Kirch, Darrell G. & Kate Petelle, *Addressing the Physician Shortage: The Peril of Ignoring Demography*, Journal of American Medical Association, Vol. 317, No. 19 (May 16, 2017). ...............................................................................................8

Letter from James L. Madara, MD, Exec. Vice President, CEO, Am. Med. Ass'n, to M. Pompeo, U.S. Dep't of State, and C. Wolf, U.S. Dep't of Homeland Security (June 26, 2020).........................................................................................8

National Resident Matching Program, *International Medical School Students and Graduates (IMGs) in the Match: What You Need to Know* ...................................5

Young, Aaron *et al.*, *FSMB Census of Licensed Physicians in the United States, 2018*, Journal of Medical Regulation, Vol. 105, No. 2 (2019).............................7

**Rules**

Federal Rules of Civil Procedure 23(b)(3) ................................................14

Federal Rules of Civil Procedure 23(c)(4)........................................ 9, 11

**Treatises**

1 McLaughlin on Class Actions (16th ed.), § 4:43. Class treatment of particular issues or claims under Rule 23(c)(4)—Issue certification ....................................9

4A American Law of Torts § 16:12..........................................................9

**Regulations**

42 C.F.R. § 413.80 .................................................................................7

## INTEREST OF *AMICI CURIAE*

*Amici,* the American Medical Association ("AMA"), the Pennsylvania Medical Society ("PAMED"), and the Association of American Medical Colleges ("AAMC"), submit this brief in support of Defendant/Appellant Educational Commission for Foreign Medical Graduates ("ECFMG") and in favor of reversal of the district court's decision on class certification.[1]

The AMA is the largest professional association of physicians, residents, and medical students in the United States. Additionally, through state and specialty medical societies and other physician groups seated in its House of Delegates, substantially all physicians, residents, and medical students in the United States are represented in the AMA's policy-making process. The AMA was founded in 1847 to promote the art and science of medicine and the betterment of public health, and these remain its core purposes. AMA members practice in every medical specialty and in every state.

PAMED is a Pennsylvania non-profit corporation that also represents physicians of all specialties. It is the largest physician organization in Pennsylvania. PAMED regularly participates as *amicus curiae* in cases raising important health

---

[1] *Amici* hereby certify that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund preparation or submission of this brief, and no person other than *amici* and their counsel contributed money intended to fund preparation or submission of the brief. All parties have consented to the filing of this brief.

care issues in Pennsylvania state and federal courts.

The AMA and PAMED submit this brief on their own behalf and as representatives of the Litigation Center of the American Medical Association and the State Medical Societies. The Litigation Center is a coalition among the AMA and the medical societies of each state and the District of Columbia. Its purpose is to represent the viewpoint of organized medicine in the courts.

The AAMC is a non-profit educational association whose members include all 155 accredited United States medical schools, nearly 400 major teaching hospitals and health systems, and 80 academic and scientific societies. Through these institutions and organizations, the AAMC serves the leaders of America's medical schools and teaching hospitals, and their more than 179,000 full-time faculty members, 92,000 medical students, 140,000 resident physicians, and 60,000 graduate students and postdoctoral researchers in the biomedical sciences.

*Amici* have an interest in ensuring that physicians in this country can provide quality medical care to as many patients as possible. Currently, and projected well into the future, there is a shortage of physicians, which would be far worse without the contributions from International Medical Graduates ("IMGs"). IMGs include American citizens who completed their basic medical education abroad and foreign nationals who wish to receive post-medical school training in the United States. Allowing class certification on issues of duty and breach in a claim based on

negligent infliction of emotional distress against an entity that has an important role in supporting IMGs' pathway to licensure would undermine access to medical care. *Amici* respectfully submit that the district court's decision on class certification should be reversed.

## SUMMARY OF ARGUMENT

The pathway to physician licensure in the United States is a rigorous, complex process that involves education, testing, and training with an interconnected web of organizations supporting the process along the way. For IMGs, an extra step in this process is obtaining ECFMG-certification, which confirms that the IMG has passed certain medical exams and presented proof of a medical degree obtained outside the United States; it does not vouch for the IMG's criminal or moral character. In this negligent infliction of emotional distress action, where Plaintiffs allege psychological harm to a class of patients on account of their doctor's misuse of a social security number, the district court was wrong to grant class certification.

In its decision, the district court failed to properly analyze the first two elements of a claim sounding in negligence: duty and breach. Under the laws of the jurisdictions potentially at issue, these two elements require analyses that cannot be performed on a class level. Determining whether a duty exists requires, *inter alia*, evaluation of the harm incurred and the specific relationship of the parties. Here, the district court acknowledged that an analysis of harm incurred is not appropriate for

3

class treatment.

Class certification in this case would also result in undesirable consequences both for class members and for the medical community. Class members who previously were unaware of their doctor's misuse of a social security number would, under Plaintiffs' theory of the case, suffer emotional distress upon learning about it through class notice. This result alone should preclude class certification. Further, IMGs make up a large and critical portion of the physician population in this country, the need for which is exacerbated by an aging population and, presently, a pandemic. Allowing class certification would bring potential class liability to any entity that has a role in allowing IMGs – of which there are currently almost 223,000 in this country – to practice medicine, chilling the medical community's efforts to provide access to care across America and, in particular, in patient communities of need. For these and other reasons discussed more fully below, *amici* urge this court to reverse the district court's decision on class certification.

## ARGUMENT

### I. IMGs play an important role in supporting access to medical care in the United States.

Obtaining a license to practice medicine in the United States requires rigorous academic discipline, which is confirmed and amplified through a complex testing, application, and certification process involving numerous organizations. *See* Federation of State Medical Boards ("FSMB"), *Pathway to Medical Licensure in the*

*United States* ("Pathway to Licensure").[2] Prior to licensure, every state requires that, at a minimum, a graduate of a medical school receive at least one year – and in many cases, more – of post-graduate medical education, known as Graduate Medical Education ("GME"). *See id*. This is true for those who obtain their medical degree in the United States, and it is also true for IMGs. GME occurs through medical residency programs which are accredited by the Accreditation Council for Graduate Medical Education ("ACGME"). To enter into a residency program in the United States, IMGs must first obtain an ECFMG certification. *See* National Resident Matching Program ("NRMP"), *International Medical School Students and Graduates (IMGs) in the Match: What You Need to Know* ("ACGME requires IMGs who enter ACGME-accredited programs to be ECFMG-certified[.]").[3] The ECFMG certification requires two things: 1) passing scores on certain medical exams, and 2) primary source verification of the IMG's medical school transcript. *See id*. The residency application process for all resident-hopefuls (including non-IMGs) is centralized via the AAMC's Electronic Residency Application Service ("ERAS"). During the matching process, the NRMP and ECFMG conduct "weekly exchanges" regarding the examination certifications for IMG applicants. *Id*. Once an IMG

---

[2] *Available at* https://www.fsmb.org/siteassets/usmle-step3/pdfs/pathway-to-licensure.pdf.

[3] *Available at* https://www.nrmp.org/wp-content/uploads/2015/08/For-IMG-Eligibility-and-Verification.pdf.

successfully matches into a residency program, the program may conduct a background check on the IMG before an offer is confirmed; some hospitals and states may require a criminal background check on residents before they can start their training.

Upon completion of a residency program, an IMG who wishes to practice medicine in the United States must, like any other prospective physician, apply for a state medical license. Each state sets its own standards for licensure. The FSMB, through Federation Credentials Verification Services ("FCVS"), establishes a centralized way for the state boards to verify residents' credentials. State medical boards "rely on this centralized, uniform process for obtaining primary-source verified, education information for those applying for licensure." FSMB, *Credentials Verification Process*.[4] Working "with the appropriate education and training institutions to verify [a resident's] credentials," FCVS obtains primary source verification of, among other things, the resident's identity, medical education, and licensure examination history. *Id*. Of course, if the IMG chooses to apply for employment, her employer may also perform a background check as a condition of employment.

Though ECFMG is just one of many organizations that have a role in ensuring that IMGs can and do practice medicine in the United States, ECFMG serves a

---

[4] *Available at* https://www.fsmb.org/fcvs/credentials-verification-process/.

special function as it relates to this important physician population. The ACGME accepts only ECFMG-certified IMGs, which means that an overwhelming majority of IMGs in the United States were at some point certified by ECFMG. Generally, Medicare – which provides reimbursement to hospitals for costs of training residents – will pay only for international residents who have been certified by ECFMG. *See* 42 C.F.R. § 413.80. IMGs are a critical part of the United States healthcare system. They comprise almost 223,000 licensed physicians, which approximates 23% of all licensed physicians in the United States. *See* Young, Aaron *et al.*, *FSMB Census of Licensed Physicians in the United States*, *2018*, Journal of Medical Regulation, Vol. 105, No. 2, 11 (2019).[5] In 2018 alone, ECFMG issued 9,431 certifications. *See* ECFMG, Fact Card.[6]

Of course, not everyone who applies is certified. After certification, some IMGs remain in the United States following completion of their training, many in rural or other underserved areas, thus increasing access to healthcare. *See* Hohn, Marcia D. *et al.*, *Immigrants in Health Care: Keeping Americans Healthy Through Care and Innovation*, The Immigrant Learning Center, Inc. & The Institute for

---

[5] *Available at* https://www.fsmb.org/siteassets/advocacy/publications/2018census.pdf.

[6] *Available at* https://www.ecfmg.org/forms/factcard.pdf.

Immigration Research, 10 (June 2016).[7] Others return to their home countries which are able to benefit from these well-trained physicians. Regardless, IMGs make up an important population of physicians in the United States, particularly in light of the current (and projected) shortage of physicians.[8] As the AMA's Chief Executive Officer, Dr. James Madara has said:

> Prior to the COVID-19 pandemic, the U.S. was already facing a serious shortage of physicians largely due to the growth and aging of the general population and the impending retirement of many physicians. Nearly 21 million people live in areas of the U.S. where foreign-trained physicians account for at least half of all physicians. As such, non-citizen IMGs play a critical role in providing health care to many Americans, especially in areas of the country with higher rates of poverty and chronic disease.

Letter from James L. Madara, MD, Exec. Vice President, CEO, AMA, to M. Pompeo, U.S. Dep't of State, and C. Wolf, U.S. Dep't of Homeland Security (June 26, 2020).[9]

---

[7] *Available at* https://www.immigrationresearch.org/system/files/health_care_report_FINAL_20160607.pdf.

[8] Kirch, Darrell G. & Kate Petelle, *Addressing the Physician Shortage: The Peril of Ignoring Demography*, Journal of American Medical Association, Vol. 317, No. 19 (May 16, 2017).

[9] *Available at* https://searchlf.ama-assn.org/undefined/documentDownload?uri=%2Funstructured%2Fbinary%2Fletter%2FLETTERS%2F2020-6-26-Letter-to-Wolf-and-Pompeo-re-Presidential-EO-Entry-Ban.pdf.

## II.    Under the substantive state law applicable to this case, "duty" and "breach" cannot be determined without analysis of individualized circumstances.

The district court recognized the problems with certifying a liability class in a case based on negligent infliction of emotion distress, reasoning that liability inherently involves individualized analyses regarding causation and damages. *See* Dkt. 57 at 22-25. Nonetheless, the district court went on to certify an issues class under Fed. R. Civ. P. 23(c)(4) for two elements of negligence – duty and breach.[10] According to the district court, these issues do not require individualized analyses based on specific plaintiffs. *See id*. at 25-28. As noted by class action experts, however, "[r]esolving on a classwide basis anything short of liability often does not materially advance the litigation, and does not ensure that all class member claims can productively be litigated at once, wasting judicial and party resources." 1 McLaughlin on Class Actions (16th ed.), § 4:43, Class treatment of particular issues or claims under Rule 23(c)(4)—Issue certification. This is certainly true here. Because of what is required to prove duty and breach as elements of negligence under any of the choice of law jurisdictions at issue in this case,[11] the district court

---

[10] "Generally, to state a claim for negligent infliction of emotional distress, a plaintiff must allege the traditional elements of negligence: duty, breach, causation, and damages." 4A American Law of Torts § 16:12.

[11] *Amici* agree with ECFMG that various state laws are implicated in this matter, and that it is not a foregone conclusion that Pennsylvania law controls the entire

was wrong to certify an issues class.

### A.    Maryland substantive law precludes class certification.

In Maryland, duty as an element of negligence is determined by the following factors:

> *[F]oreseeability of harm* to the plaintiff, the degree of certainty that the plaintiff *suffered the injury*, the closeness of the connection between the defendant's conduct and the *injury suffered*, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.

*Warr v. JMGM Group, LLC*, 433 Md. 170, 182, 70 A.3d 347, 354 (2013) (emphasis added). The first three factors involve analyzing the harm, or damage, to the plaintiff. In the second and third factors, one must evaluate the actual "injury suffered" – not some potential generalized harm. The importance that Maryland places on the "injury suffered" as part of the test of whether a duty exists is quite clear. In other words, one cannot accurately determine whether a duty exists under Maryland law without analyzing whether the plaintiff suffered damages. Here, inquiry of any damage suffered, as the district court has already stated, is inherently a plaintiff-specific exercise. *See* Dkt. 57 at 22-25 (declining to certify issue class on liability).

---

matter. *See* at Dkt. 57 at 9. As such, *amici* will analyze the potential state laws at issue: Maryland, Pennsylvania, and the District of Columbia.

As such, a Fed. R. Civ. P. 23(c)(4) class relating to issues of duty and breach is untenable.

## B.    District of Columbia substantive law precludes class certification.

In the District of Columbia, the determination of whether a duty in a negligence action exists "is ultimately a question of fairness and involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." *Roe v. Doe*, 401 F. Supp. 3d 159, 165 (D.D.C. 2019) (citations omitted). The parties' relationship is "*the key* to determining whether the defendant ha[s] a legally enforceable duty to the plaintiff." *Id.* (citations omitted).

It is unclear what relationships – if any – current class members have with ECFMG, but resolving this question would necessarily involve plaintiff-specific investigations, which is unsuitable for class treatment. Further, issues that were certified for class treatment by the district court include issues of third-party liability – for example, (1) whether ECFMG undertook or otherwise owed a duty to hospitals and state medical boards, and (2) whether, if such a duty existed, ECFMG breached it. *See* Dkt. 58 at 2.

As detailed above, ECFMG-certified IMGs enter into residency programs and practice medicine all over the United States. ECFMG's relationship with the different hospitals and state medical boards at issue cannot be glossed over and

assumed to be similar for purposes of class treatment. Some of these institutions likely have their own processes for evaluating an employee's credentials and background. The nature of ECFMG's relationships with these entities requires thorough and individualized consideration. As such, under District of Columbia law, issues of ECFMG's duty – and breach of that duty – are not proper for class treatment.

### C.    Pennsylvania substantive law precludes class certification.

In Pennsylvania, duty as an element of negligence is:

> necessarily rooted in often amorphous public policy considerations, which may include our perception of history, morals, justice and society. The determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution.

*Althaus ex rel. Althaus v. Cohen*, 562 Pa. 547, 553, 756 A.2d 1166, 1169 (2000) (citations omitted). Like the District of Columbia, Pennsylvania requires a duty inquiry that examines the relationship of the parties. As discussed above, that factor makes class certification on issues of duty and breach unwarranted. *See* II.B, *supra*. Like Maryland, courts in Pennsylvania assess the foreseeability of the "harm incurred" to determine whether a duty exists. As discussed above, that factor requires individualized analysis, rather than class treatment. *See* II.A, *supra*.

At bottom, in all the jurisdictions whose substantive laws may control this

case, the element of duty (and breach of that duty) cannot be analyzed without looking at each class member's circumstance. Contrary to the district court's decision, this case is not suitable for class treatment on the issues of duty and breach.

## III.    Undesirable consequences weigh heavily against class certification.

### A.    Under Plaintiffs' theory, class certification will bring the exact harm complained of to class members.

The harm that Plaintiffs claim in this action is the emotional distress they allegedly suffered when they learned that their doctor, Dr. John Nosa Akoda, misused a social security number. *See* Dkt. 32-1 at 7-8 ("[Plaintiff Russell] has suffered from emotional distress as a result of learning about Akoda's conduct… As a result of what [Plaintiff Riggins] learned about Akoda, she has suffered emotional distress… [Plaintiff Powell] has experienced emotional distress after learning that [Akoda] treated her on false pretenses… [Plaintiff Evans] has suffered emotional distress upon learning that physician whom she trusted for medical care misrepresented his identity.").

Ironically, if a class is certified as the district court allowed, hundreds of unnamed class members who were previously unaware of Dr. Akoda's conduct would become aware of that fraud due to the class action notice and would – according to Plaintiffs – suffer emotional distress. This is exactly the type of "undesirable result" that the Federal Rules of Civil Procedure contemplate as weighing *against* class certification. *See* Fed. R. Civ. P. 23(b)(3), Advisory

13

Committee Notes ("Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, *without sacrificing procedural fairness or bringing about other undesirable results*.") (emphasis added).

Thus, whether the predominance requirement of Fed. R. Civ. P. 23(b)(3) is evaluated solely within the breach or duty issue class or whether it is evaluated with respect to the case as a whole (*see* discussion, Dkt. 57 at 7-9), the result of any class certification in this case is the same: hundreds of class members who suffered no injury from Dr. Akoda's past conduct will learn of his fraud and will, according to Plaintiffs, suffer emotional distress. Plaintiffs would upset the ancient maxim – first, do no harm. This is an untenable position, an undesirable result, and should be a nonstarter to class certification.

**B.    Class certification will impede efforts to bring a critical population of physicians – and their medical expertise and care – to the United States.**

Allowing class certification for a claim based on emotional distress against ECFMG would not only result in potentially dire consequences for ECFMG, but also for the broader medical community and the country as a whole. ECFMG reviews on the order of 20,000 applications for certification per year. ECFMG serves as an information clearinghouse for IMGs considering applying for a United States GME

position. While the certification process is critically important, ECFMG does not hold itself out to vouch for the criminal, moral, or general background character of all applicants – indeed, it would be impracticable to do so.

To analogize, when a student graduates from medical school after four years with a medical degree, the degree signifies that the student is ready to enter into a residency training program for the purpose of learning how to become a medical practitioner who, over time and with appropriate supervision and teaching, becomes able to work as an independent practitioner. The degree does not guarantee a student's criminal background or moral character.[12] Similarly, an ECFMG certification means that the IMG has passed certain medical exams and presented proof that she graduated from medical school in a foreign country – in essence, that the IMG is prepared for the medical training that a residency program provides. It does not mean that the IMG has never committed wrongs or has a pristine background.[13] Each institution that sponsors a medical residency program is responsible for conducting its own background check of each resident according to

---

[12] Though some medical schools in the United States may require a background check as a condition of acceptance into medical school, the background check does not account for conduct that occurs after a student's entry into medical school. *See* AAMC Criminal Background Service, *available at* https://students-residents.aamc.org/applying-medical-school/article/criminal-background-check-service/.

[13] Indeed, ECFMG does not (and is not expected to) perform background checks.

state laws and the institution's policies.

Class certification in this case would mean that ECFMG could potentially be liable for hundreds of cases of emotional distress because one of the hundreds of thousands of IMGs that have ever been certified by ECFMG misused a social security number – not because of medical treatment or training. While Plaintiffs attempt to frame this case in terms of ECFMG's conduct, the real triggering conduct in this case is Dr. Akoda's conduct regarding his identity. The district court's decision would open the floodgates to ECFMG's potential liability, anchoring liability to the conduct of any and all IMGs that have ever been ECFMG-certified. *See Getty Ref. & Mktg. Co. v. MT FADI B*, 766 F.2d 829, 833 (3d Cir. 1985) (quoting *Ultramares Corp. v. Touche*, 255 N.Y. 170, 179, 174 N.E. 441, 444 (1931)) (in a negligence action, noting that "[a]bsent drawing the line where it now is, a court could plausibly decide that wave upon wave of successive … consequences were foreseeable," which would extend "liability in an indeterminate amount for an indeterminate time to an indeterminate class"). This would be potentially disastrous to ECFMG's ability to continue its important role in allowing IMGs – a much needed population given the physician shortage – to continue their education and practice medicine in this country. *See* discussion at Section I, *supra*.

Class certification in this case also has detrimental consequences for the greater medical community. As discussed in Section I, *supra*, a host of organizations

plays a role in ensuring that an IMG is successfully matched with a residency program. Thereafter, the residency program will generally have its own way of vetting and credentialing the incoming IMG. If the IMG chooses to continue to practice medicine in the United States after her time in residency, her place of employment also likely has its own way of credentialing the potential employee, which will usually include a background check. Against this backdrop, if class certification were allowed in this case, one could envision a situation where every single entity that had some role in allowing IMGs to train or work in the United States would be susceptible to class action liability for emotional distress plaintiffs due to the conduct – including conduct that has nothing to do with medical treatment or patient care – of any and all IMGs across the country. As discussed above, almost 223,000 IMGs currently practice medicine in various medical schools, hospitals, governmental bodies, and private practice entities across the nation. The district court's decision could unleash a deluge of negligence actions based on emotional distress against these organizations and those with any role in vetting and credentialing the almost 223,000 IMGs. *See Getty Ref. & Mktg. Co.*, 766 F.2d at 833 (discussing the problem with extending liability if courts were to decide that "wave upon wave of successive … consequences were foreseeable").

*Amici* recognize the detrimental effect that negligent credentialing actions would have on the medical community. *See* AMA Policy H-230.952, *Negligent*

*Credentialing Actions Against Hospitals* (noting that "'negligent credentialing' lawsuits undermine the overall integrity of the credentialing process, potentially resulting in adverse impacts to patient access and quality of care").[14] The detrimental effect would be felt even more so with class actions based on negligent credentialing. The result of the district court's decision is certainly against the public interest, as it would impede or chill efforts by the medical community to allow an important population of physicians to provide care in this country.

## CONCLUSION

For the foregoing reasons, *amici* respectfully urge this Court to reverse the decision on class certification and remand for further proceedings.

September 8, 2020                    Respectfully submitted,

                                     s/ Diana T. Huang
                                     Diana T. Huang
                                     Leonard A. Nelson
                                     AMERICAN MEDICAL ASSOCIATION
                                     330 N. Wabash Ave.
                                     Chicago, IL 60611
                                     (312) 464-5000
                                     diana.huang@ama-assn.org
                                     leonard.nelson@ama-assn.org

                                     *Counsel for Amici Curiae*

---

[14] *Available at* https://policysearch.ama-assn.org/policyfinder/detail/Credentialing?uri=%2FAMADoc%2FHOD.xml-H-230.952.xml.

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This brief complies with the type-volume limits because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments), this brief contains 4,029 words, based on the "Word Count" feature of Microsoft Word.

This brief complies with the typeface and type style requirements because this brief has been prepared in a proportionally-spaced typeface using Microsoft Office Word in 14-point Times New Roman.

September 8, 2020                    s/ Diana T. Huang
                                     Diana T. Huang

                                     *Counsel for Amici Curiae*

## ELECTRONIC DOCUMENT CERTIFICATE

Pursuant to Local Rule of Appellate Procedure 31.1(c), the undersigned hereby certifies that:

- The text of the electronic brief is identical to the text in the paper copies.

- A virus-detection program, Paloalto Networks Cortex XDR, has been run on the electronic brief, and no virus was detected.

September 8, 2020                              s/ Diana T. Huang
                                               Diana T. Huang

                                               *Counsel for Amici Curiae*

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Local Rule of Appellate Procedure 46.1(e), the undersigned hereby certifies that she is a member of the bar of the United States Court of Appeals for the Third Circuit.


September 8, 2020                    s/ Diana T. Huang
                                     Diana T. Huang

                                     *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

September 8, 2020                          s/ Diana T. Huang
                                          Diana T. Huang

                                          *Counsel for Amici Curiae*