**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 20-2128

_____

MONIQUE RUSSELL; JASMINE RIGGINS;
ELSA M. POWELL; and DESIRE EVANS,

v.

EDUCATIONAL COMMISSION FOR FOREIGN
MEDICAL GRADUATES,

Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No. 2:18-cv-05629)
District Judge: Honorable Joshua D. Wolson

_____

Argued February 11, 2021

Before: RESTREPO, BIBAS, and PORTER, *Circuit Judges*

(Filed: September 24, 2021)

_____

William R. Peterson [ARGUED]
Morgan, Lewis & Bockius
1000 Louisiana Street, Suite 4000
Houston, TX 77002

Matthew D. Klayman
Brian W. Shaffer
Morgan Lewis & Bockius
1701 Market Street
Philadelphia, PA 19103
            *Counsel for Appellant*

Nicholas M. Centrella
Robin S. Weiss
Conrad O'Brien
1500 Market Street
West Tower, Suite 3900
Philadelphia, PA 19102

Brent P. Ceryes
Schochor Federico & Staton
1211 Saint Paul Street
Baltimore, MD 21202

Brenda Harkavy
Patrick A. Thronson [ARGUED]
Janet Janet & Suggs
4 Reservoir Circle, Suite 200
Baltimore, MD 21208
Scott L. Nelson
Public Citizen Litigation Group
1600 20th Street, N.W.
Washington, DC 20009

Paul M. Vettori
Law Offices of Peter G. Angelos
100 North Charles Street
One Charles Center, 22nd Floor
Baltimore, MD 21201

Cory L. Zajdel
Z Law
2345 York Road, Suite B-13
Timonium, MD 21093
     *Counsel for Appellee*

Diana Huang
American Medical Association
25 Massachusetts Avenue, N.W., Suite 600
Washington, DC 20001

Leonard A. Nelson
American Medical Association
330 North Wabash Avenue, Suite 39300
Chicago, IL 60611
     *Counsel for Amicus American Medical Association, Association of American Medical Colleges, and Pennsylvania Medical Society in support of Appellant*

Gilbert Dickey
McGuireWoods
201 North Tryon Street, Suite 3000
Charlotte, NC 28202

Matthew A. Fitzgerald
McGuireWoods
800 East Canal Street

Gateway Plaza
Richmond, VA 23219
>*Counsel for Amicus Chamber of Commerce in support*
>*of Appellant*

————————

OPINION OF THE COURT

————————

RESTREPO, *Circuit Judge*.

This case presents the question whether the District Court abused its discretion when it certified an "issue class" pursuant to Rule 23(c)(4) of the Federal Rules of Civil Procedure. We hold that it did. According to Rule 23(c)(4), "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." For "an action" to be "brought or maintained as a class action," the party seeking class status must satisfy Rule 23 and all its requirements. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Further, in *Gates v. Rohm & Haas Co.*, 655 F.3d 255 (3d Cir. 2011), we enumerated a "non-exclusive list of factors" relevant to assessing whether the certification of an issue class under Rule 23(c)(4) is "appropriate." *Id.* at 272 (quoting *Chiang v. Veneman*, 385 F.3d 256, 267 (3d Cir. 2004)). So when a party seeks to certify "particular issues" for class treatment, the district court must ask three questions. *First*, does the proposed issue class satisfy Rule 23(a)'s requirements? *Second*, does the proposed issue class fit within one of Rule 23(b)'s categories? *Third*, if it does, is it "appropriate" to certify this as an issue class? Fed. R. Civ. P. 23(c)(4). Here, lacking clear guidance, the District Court failed to determine whether the issues identified for class treatment fit within one of Rule 23(b)'s categories and then failed to explicitly consider a few of the *Gates*

factors. Accordingly, for the reasons that follow, we will vacate the District Court's issue-class certification and remand for further proceedings.

## I. FACTUAL BACKGROUND

### A. The Educational Commission for Foreign Medical Graduates

Graduates of foreign medical schools who wish to be accepted to a United States medical-residency program must have graduated from a recognized foreign institution, demonstrated English-language proficiency, and passed the first two steps of the United States Medical Licensing Examination. Defendant-Appellant Educational Commission for Foreign Medical Graduates ("the Commission") is a Philadelphia-based nonprofit that certifies that such graduates have satisfied those requirements.  The Commission carries out this function in two ways. First, it administers the English-language and medical examinations the foreign medical school graduates must pass.  Second, the Commission verifies, using primary sources, that the applicant received a medical degree from a qualifying institution.

As the central certification agency for graduates of foreign medical schools, the Commission also investigates what it calls "irregular behavior."  According to internal policies, the Commission may investigate "all actions or attempted actions on the part of applicants . . . that would or could subvert the examination, certification or other processes, programs, or services of [the Commission]." J.A. 254. The Commission's investigation of such behavior proceeds as follows. When the Commission receives an allegation that an applicant committed irregular behavior, it reviews the allegation and determines whether sufficient evidence supports the charge. If sufficient

evidence supports the charge, the Commission notifies the applicant of the allegation and invites him to submit a written explanation or present any other relevant information. The applicant may also request a hearing and hire legal counsel. After the applicant is heard, the Commission then determines whether, by a preponderance of the evidence, the applicant engaged in the irregular behavior that was charged. The Commission may take various disciplinary actions, up to and including permanent revocation of a certification. The charged individual has a right of appeal, but petitions to reconsider decisions are granted "only in extraordinary cases." *Id.* And whatever the case, if the Commission "determines that an individual engaged in irregular behavior, a permanent annotation to that effect will be included in the individual's [Commission] record." *Id.*

## B.  A Foreign Doctor Named Charles Igberase

In early 1992, a man named Oluwafemi Charles Igberase applied to the Commission for certification. He eventually passed the medical-licensing and English-language examinations and was issued the Commission's certification. But no residency program accepted him. So, in March 1994, Igberase submitted a second application for certification to the Commission. In that application, however, Igberase rearranged his name ("Igberase Oluwafemi Charles" instead of "Oluwafemi Charles Igberase"); used a different date of birth (April 17, 1961 instead of April 17, 1962); and responded "No" to the question of whether he had ever previously submitted an application to the Commission. Igberase passed each required examination and was certified by the Commission for a second time. But in June 1995, the Commission learned that Igberase had obtained two of its certifications under different names and

dates of birth, and had lied on his second application about not seeking certification previously. So it invalidated Igberase's second certification and revoked the first, and informed the United States Medical Licensing Examination Committee of his deception. J.A. 237.

In 1996, Igberase applied to the Commission for certification for yet a third time. In this application, Igberase ditched his first two names and invented another one: "John Nosa Akoda." J.A. 263. As he had twice before, Igberase (as Akoda) eventually passed the medical-licensing and English-language examinations and received the Commission's certification. After receiving the certification as "Akoda," Igberase applied for and was admitted to a residency program in New Jersey. But in August 2000, the residency program learned that the social security number Akoda used in his application belonged to Igberase. The residency program informed the Commission of the inconsistency, provisionally suspended the doctor it knew as Akoda, and, after an internal investigation, in November 2000, dismissed him.

Once it learned of Akoda's possible misuse of Igberase's social security number, the Commission launched its own investigation. Based on the information it had received from the residency program, the Commission sent Akoda a "charge letter." In it, the Commission told Akoda that it had "received information alleging that you may have engaged in irregular behavior," specifically that he had twice before applied for certification using the name "Igberase." J.A. 284. The Commission told Akoda that the allegations "require[] an explanation," and granted him fifteen days to submit a written response. J.A. 285.

A week later, as Akoda, Igberase responded. He denied the allegations, telling the Commission that "[t]he identification numbers listed in your letter apparently belong to my

cousin Dr. Igberase Oluwafemi Charles, who left the country to practice, I believe, in South Africa." J.A. 287. Akoda admitted using Igberase's social security number but insisted that they were "two different persons who attended two different Colleges of Medicine." *Id.* He reiterated that he had "only taken the examination once in my name, John NOSA Akoda," and offered to provide the Commission with his passport if it requested it. J.A. 287.

The Commission official overseeing Akoda's case apparently did not buy the explanation. In a December 2000 memorandum intentionally not made part of Akoda's official file, the official wrote that he and others believed Igberase and Akoda were one in the same. J.A. 293. But the official concluded that he did not have enough evidence to recommend Akoda's case to the Commission's credentialling committee. So Akoda's credential remained active.

In October 2006, Igberase, again as "Akoda," applied to a residency program at Howard University Medical Center. As part of his application, he submitted to the Commission three letters of recommendation. But the Commission was suspicious of Akoda, so one of its officials attempted to verify the authenticity of these three letters of reference. The official sent each reference the recommendation letter submitted by Akoda and asked each whether the letter was authentic. The record does not reflect whether the official received a response from any of the references.

Despite the official's reservations, Igberase (as Akoda) was admitted to Howard's residency program. He successfully completed the program in 2011. After completing the program, he applied for and received a Maryland medical license using fake identification documents. That same year, he became a member of the medical staff at Prince George's Hospital Center and began seeing patients there.

In June 2016, law enforcement officials executed search warrants at Igberase's residence, medical office, and vehicle. They found fraudulent or altered immigration documents, medical diplomas, medical transcripts, letters of recommendation, and birth certificates. On November 15, 2016, Igberase signed a plea agreement. In it, he pleaded guilty to misuse of a social security account number to fraudulently obtain a Maryland medical license and admitted that "Akoda" was a pseudonym. *Id.*

The Commission subsequently invalidated Akoda's foreign-doctor certification, and the Maryland Board of Physicians revoked his medical license.

## C. Patients of Igberase sue the Commission

The named Plaintiffs are Monique Russell, Jasmine Riggins, Elsa Powell, and Desire Evans. Each received medical treatment from the doctor known as "Akoda," who was certified by the Commission in 1997. Igberase performed unplanned emergency cesarean-section surgery on Russell and Riggins and delivered Evans's and Powell's children. These Plaintiffs also seek to represent a class of similarly situated individuals who likewise received medical treatment from "Akoda." But the Plaintiffs (appellees here) did not sue Igberase. Instead, they sued the Commission, and asserted claims of negligent infliction of emotional distress arising out of the Commission's certification of Igberase as "Akoda."

Eventually, the district court certified a class of "All patients examined or treated in any manner by Oluwafemi Charles Igberase (a/ka [sic] Charles J. Akoda) beginning with his enrollment in a postgraduate medical education program at Howard University in 2007." J.A. 63-64. But the district court did not certify the class under any subsection of Rule 23(b).

Instead, the court certified the class as an "issue class" pursuant to Rule 23(c)(4). The court certified the class with respect to these issues:

> (1) whether the Commission undertook or otherwise owed a duty to class members.

> (2) whether the Commission breached any duty that it owed to class members.

> (3) whether the Commission undertook or otherwise owed a duty to hospitals and state medical boards, such that it may be held liable to class members pursuant to the Restatement (Second) of Torts § 324A.

> (4) whether the defendant breached any duty that it owed to hospitals and state medical boards.

In short, the particular issues the district court certified for class treatment concern only the duty and breach elements of Plaintiffs' claim. The district court therefore left for individualized proceedings whether each Plaintiff was injured; whether the Commission's breach of the relevant duty (if it had a duty that was breached) actually and proximately caused those injuries; whether those injuries are due a particular amount of damages; and whether the Commission could raise any affirmative defense, including, presumably, whether each Plaintiff's consent to medical treatment by Igberase breaks the causal chain. In the wake of the Rule 23(c)(4) certification, the Commission successfully petitioned for leave to appeal under Rule 23(f). We must decide whether that certification was proper.

## II. THE LEGAL FRAMEWORK OF ISSUE-CLASS CERTIFICA-
TION

### A. Rule 23 outlines one procedure for pursuing aggregate litigation

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 n.6 (3d Cir. 2009) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982)). One reason the class action is an exceptional form of litigation is because final judgments in such actions may implicate the procedural and substantive rights of absent persons.

The Supreme Court recently reiterated the principle that absent persons may not be bound by federal-court judgments unless one of a limited number of historically recognized exceptions is satisfied. *See Taylor v. Sturgell*, 553 U.S. 880, 893 (2008). A "properly conducted" class action is one such exception. *Id.* at 894-95. A properly conducted class action requires that (1) "[t]he interests of the nonparty and her representative are aligned"; (2) "either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty"; and (3) there was "notice of the original suit to the persons alleged to have been represented." *Id.* at 900.

In the class context, "these limitations are implemented by the procedural safeguards in Federal Rule of Civil Procedure 23." *Id.* at 900-01. The procedural safeguards of Rule 23, in turn, are constitutionally mandated and "grounded in due process." *Id.* at 901. Rule 23 thus provides a constitutional safe harbor for litigants to pursue class treatment on behalf of absent persons. But the party seeking to certify a class "bears the burden of affirmatively demonstrating by a preponderance of

the evidence her compliance with the requirements of Rule 23." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015); *see also Reyes v. Netdeposit, LLC*, 802 F.3d 469, 485 (3d Cir. 2015) (discussing and clarifying preponderance of evidence standard in class certification determinations).

The requirements of Rule 23 are these. The party seeking class certification must demonstrate, first, that the requirements of Rule 23(a) are met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). To satisfy Rule 23(a), a plaintiff must "prove that there are in fact sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (internal quotation marks omitted).

Once beyond Rule 23(a)'s four prerequisites, plaintiffs then must seek to certify a class of one of three "types," each with additional requirements. *See* Fed. R. Civ. P. 23(b). For instance, Rule 23(b)(3), a provision at issue here, states that a class may be maintained where "questions of law or fact common to class members predominate over any questions affecting only individual members," and a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy."[1]

---

[1] There are two additional "types" of class actions maintainable under Rule 23(b). Rule 23(b)(1) allows a class to be maintained where "prosecuting separate actions by or against individual class members would create a risk of" either "(A) inconsistent or varying adjudications," or "(B) adjudications . . . that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Rule 23(b)(2), by contrast, applies when "the

Rule 23(c) provides two additional pathways to a form of class certification. Rule 23(c)(5) permits a district court, "[w]hen appropriate," to "divide[]" a class "into subclasses that are each treated as a class under [Rule 23]." So if a district court detects dissimilarities of interests between the putative class representative and absent class members, it may divide the full class into subclasses to isolate atypical issues or claims, or resolve conflicts of interest that otherwise would preclude full class certification. *See, e.g.*, *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 432 (3d Cir. 2016); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999) ("[A] class divided between holders of present and future claims . . . requires division into homogenous subclasses . . . with separate representation to eliminate conflicting interests of counsel."). And Rule 23(c)(4), the provision center stage here, states that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Pursuant to that provision, we have previously held that a district court may certify for class treatment issues that would, upon their resolution, determine a defendant's course of conduct. *See Chiang v. Veneman*, 385 F.3d 256 (3d Cir. 2004). In what follows, we examine the scope of issue-class certification under Rule 23(c)(4).

---

party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

**B. Issue-class certification under Rule 23(c)(4) grants district courts broad but well-defined discretion to certify particular issues for class treatment**

Let us restate the text of Rule 23(c)(4). It says that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." The Rule, therefore, permits an issue class to be brought or maintained "as a class action." But with that permission comes restrictions. To be a "class action," a party must satisfy Rule 23 and all its requirements. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *In re Hydrogen Peroxide Antitrust Lit.*, 552 F.3d 305, 310 (3d Cir. 2008) ("[A] class may not be certified without a finding that each Rule 23 requirement is met."). In other words, "[i]n addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). A party seeking to certify "particular issues" for class treatment must show the same. That party must show that those issues "satisfy[] Rule 23(a)'s prerequisites" and that those issues are "maintainable under Rule 23(b)(1), (2), or (3)." *See id.*

But neither Rule 23(c)(4) nor its commentary outlines the "appropriate[ness]" inquiry, or discusses which types of "issues" might be suitable for class treatment and which may not be. At the provision's adoption, the Rules Committee, in its commentary, suggested that the issue-class device may be used to bifurcate the "adjudication of liability to the class" from follow-on proceedings needed to "prove the amounts of [class members'] respective claims." Fed. R. Civ. P. 23(c)(4) advisory committee's note to 1966 amendment. That commentary

does not illuminate much. In a typical Rule 23(b)(3) class action, for example, individualized damages determinations often remain after common questions have been decided. *See, e.g.*, *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 452-60 (2016); *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-70 (2013). Further, Rule 23(c)(4) talks about "issues," not "liability" (or "claims" or "causes of action"), so there is no obvious textual basis to limit issue-class certification to issues that, upon *their* resolution, necessarily establish a defendant's liability as to all claimants.

We explained Rule 23(c)(4)'s "appropriate[ness]" inquiry in *Gates v. Rohm & Haas*, 655 F.3d 255 (3d Cir. 2011). In *Gates*, we considered the appropriateness of issue-class certification for property owners who alleged that a chemical company's pollution decreased their property values. In 2005, Rohm & Haas acquired a chemical-processing plant in Ringwood, Illinois. *Id.* at 258. For the half-century or so prior to Rohm & Haas's acquisition, the Ringwood facility was owned and operated by a company called Morton International. *Id.* During at least some of that time, Morton dumped wastewater produced by its chemical processing into an on-site lagoon. *Id.* The wastewater contained vinylidene chloride, a molecule used in the production of vinyl chloride, which is important in the production of plastics and a known carcinogen. "In 1978, Morton ceased using the on-site lagoon and covered it." *Id.* But environmental testing in the 1970s and 1980s suggested that Morton's dumping of vinylidene chloride was polluting the surrounding environment. In 1973, for example, "tests of a shallow aquifer under the Ringwood facility showed elevated levels of ammonia and chloride." *Id.* And in 1984, water samples from wells that Morton had installed at Ringwood showed elevated levels of vinylidene chloride and vinyl chloride. *Id.*

In 2006, residents of a nearby residential village filed a class-action complaint alleging, among other things, that Morton's dumping of the vinylidene chloride caused their residential community to become less attractive and their property values to decrease.[2] *Id.* at 259, 271. Before the district court, with respect to their property damage claim, the plaintiffs moved to certify two classes—a Rule 23(b)(3) class of property owners who allegedly suffered loss in property values due to the defendants' contamination and an "issue only" class that would decide defendants' liability but leave damages for individual trials. *Id.* at 272.

The district court declined to certify either class. As to the plaintiffs' proposed Rule 23(b)(3) class, the district court found that common questions did not predominate over individual ones. The court observed "that resolution of [common] questions leaves significant and complex questions unanswered, including questions relating to causation of contamination, extent of contamination, fact of damages, and amount of damages." *Gates v. Rohm and Haas Co.*, 265 F.R.D. 208, 233-34 (E.D. Pa. 2010). The district court likewise rejected plaintiffs' attempt to certify a Rule 23(c)(4) issue class. The

---

[2] The plaintiffs' complaint asserted several claims for relief, including medical monitoring, property damage claims, relief under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, the Illinois Environmental Protection Act, 415 Ill. Comp. Stat. § 5/1 *et seq.*, and state-law fraudulent misrepresentation and willful and wanton misconduct claims. But they chose to proceed on a class basis only on the medical monitoring and property damage claims and, as noted, solely with regard to vinyl chloride exposure. *Gates*, 655 F.3d at 259.

court found that an issue class "would not advance the resolution of class members' claims" because, like in the Rule 23(b)(3) context, "the fact of damages and the amount of damages would remain following the class-wide determination of any common issues, and further that causation and extent of contamination would need to be determined at follow-up proceedings." *Gates*, 655 F.3d at 272 (quotation marks omitted). We affirmed.

In affirming the district court's decision not to certify a Rule 23(c)(4) issue class, we adopted a "non-exclusive list of factors [to] guide courts" faced with motions to certify particular issues. *Gates*, 655 F.3d at 273. *Id.* The factors, which number nine, are these:

1. the type of claim(s) and issue(s) in question;

2. the overall complexity of the case;

3. the efficiencies to be gained by granting partial certification in light of realistic procedural alternatives;

4. the substantive law underlying the claim(s), including any choice-of-law questions it may present and whether the substantive law separates the issue(s) from other issues concerning liability or remedy;

5. the impact partial certification will have on the constitutional and statutory rights of both the class members and the defendant(s);

6. the potential preclusive effect or lack thereof that resolution of the proposed issue class will have;

7. the repercussions certification of an issue(s) class will have on the effectiveness and fairness of resolution of remaining issues;

8. the impact individual proceedings may have upon one another, including whether remedies are indivisible such that granting or not granting relief to any claimant as a practical matter determines the claims of others;

9. and the kind of evidence presented on the issue(s) certified and potentially presented on the remaining issues, including the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s).

When assembled, the *Gates* factors construct a functional framework to aid the district courts tasked with resolving issue-class certification questions.[3] But *Gates* did not define which "issues" would be appropriate for class treatment or,

---

[3] The *Gates* factors grew out of our opinion in *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169 (3d Cir. 2009). In *Hohider*, we provided relevant considerations on when a district court may wish "to carve at the joints to form issue classes." *Gates*, 655 F.3d at 273. As source for the factors, the *Hohider* court cited the American Law Institute's "Proposed Final Draft of the Principles of the Law of Aggregate Litigation." *Hohider*, 574 F.3d at 200-02. By the time *Gates* issued, the ALI had finalized the Principles, and we incorporated many of them as the factors district courts should consider in assessing whether to certify an issue class. *Gates*, 655 F.3d at 273.

more importantly, which would not. Specifically, *Gates* did not answer whether the term "particular issues" in Rule 23(c)(4) could encompass claim elements (like duty or breach, or causation or reliance) and defenses (like consent or intervening cause), or if the "particular issues" that the district court could certify "when appropriate" must be limited to questions that would resolve a defendant's liability.

At several points, *Gates* appears to suggest that the certified "issues" should (perhaps except in exceptional circumstances) be able to resolve a defendant's liability. *See, e.g.*, *id.* at 272 ("[T]he [district] court declined to certify a liability-only class."); *id.* at 273 ("The trial court here did not abuse its discretion by declining to certify a liability-only issue class when it found liability inseverable from other issues that would be left for follow-up proceedings."); *id.* ("Nor did the court err in finding no marked division between damages and liability."); *id.* at 274 ("Plaintiffs have neither defined the scope of the liability-only trial nor proposed what common proof would be presented."); *id.* ("A trial on whether the [issues proposed] is unlikely to substantially aid resolution of the substantial issues on liability and causation.").

Reading "issues" in Rule 23(c)(4) to exclude claim elements is supported by later cases from our Court. In *Gonzalez v. Corning*, 885 F.3d 186 (3d Cir. 2018), for example, the only published opinion from this Court to apply *Gates*, we reiterated that issue-class certification "*might* be appropriate" if "liability is capable of classwide treatment but damages are not[.]" *Id.* at 202-03 (emphasis added). Said another way, issue-class certification *is not* appropriate if class-wide resolution of the "issues" does not resolve liability. *See id.* (noting that declining issue-class certification was appropriate because plaintiffs offered "no theories of *liability* for which classwide treatment is apt") (emphasis added).

But at various other points, *Gates* suggests that claim elements *may* be appropriate for issue-class treatment in certain circumstances. For example, the *Gates* Court "agreed" with the district court's finding that an issue class was not feasible and would not advance the resolution of class members' claims because "both the fact of damages and the amount of damages would remain following the class-wide determination of any common issues, and further that causation and extent of contamination would need to be determined at follow-up proceedings." *Gates*, 655 F.3d at 272 (quoting district court). In other words, for the district court, the fact that claim elements (like causation) would remain after resolution of the class issues was a *reason* for the inappropriateness of certifying an issue class. But neither the district court nor the court of appeals concluded that claim elements remaining after resolution of class issues *barred* issue-class certification.

Viewing *Gates* to permit the certification of issues that do not resolve liability comports with our pre-*Gates* caselaw. In *Chiang v. Veneman*, 385 F.3d 256 (3d Cir. 2004), we noted "that courts commonly use Rule 23(c)(4) to certify some *elements* of liability for class determination, while leaving other elements to individual adjudication—or, perhaps more realistically, settlement." *Id.* at 267 (emphasis added). So there, we affirmed the district court's certification of an issue class limited to determining the defendant's course of conduct (whether a federal agency placed "thousands of Virgin Islanders, almost all of whom were Black, Hispanic, or female," on a "phony, illegal waiting list" when those individuals sought to apply to a "loan program[] intended to help low income rural families obtain homes and make repairs to existing homes," *id.* at 259-60, 263), but left for subsequent individual adjudication the issue of whether those individuals were eligible for the loans in the first place. *Id.* at 267.

Other courts of appeals have permitted the certification of non-liability issue classes in analogous circumstances. The Seventh Circuit, for example, has affirmed the certification of an issue class where the issues, once resolved, stopped short of establishing a defendant's liability to any claimant. *See, e.g.*, *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012) (in employment case, endorsing the use of a Rule 23(c)(4) issue class to determine the disparate impact of a challenged corporate policy, with "separate trials . . . to determine which class members were actually adversely affected . . . and if so what loss each class member sustained"); *cf. Pella Corp. v. Saltzman*, 606 F.3d 391, 393-94 (7th Cir. 2010) (in consumer fraud case, upholding certification of Rule 23(b)(3) class when common issues left components of causation for individualized determination).

Moreover, the text of Rule 23(c)(4) supports the reading that the "issues" a district court may certify for class treatment need not be limited to those that decide a party's liability. The Rule permits an action to be brought or maintained as a class action "with respect to particular issues," not just those that decide liability. We therefore hold that district courts may certify "particular issues" for class treatment even if those issues, once resolved, do not resolve a defendant's liability, provided that such certification substantially facilitates the resolution of the civil dispute, preserves the parties' procedural and substantive rights and responsibilities, and respects the constitutional and statutory rights of all class member and defendants.

\* \* \* \* \*

In sum, district courts tasked with resolving motions to certify issue classes must make three determinations. First,

does the proposed issue class satisfy Rule 23(a)'s require-
ments? Second, does the proposed issue class fit within one of
Rule 23(b)'s categories? Third, if the proposed issue class does
both those things, is it "appropriate" to certify these issues as a
class? Fed. R. Civ. P. 23(c)(4). The first two steps will be in-
formed by general class-action doctrine. The third step will be
informed by *Gates*. *See Hohider v. United Parcel Serv., Inc.*,
574 F.3d 169, 201 (3d Cir. 2009). In other words, Rule 23(a)
and Rule 23(b) decide if the proposed issues *can* be brought or
maintained as class action, while the *Gates* factors determine
whether they *should*.

## III. DISCUSSION

Guided by Rule 23(c)(4) and *Gates*, in this case, we
must determine whether the District Court appropriately certi-
fied for class treatment whether the Commission owed a rele-
vant legal duty to the Plaintiffs that it subsequently breached,
but left for individual proceedings whether Plaintiffs were in-
jured; whether the Commission's breach of the relevant duty
actually and proximately caused those injuries; whether those
injuries are due a particular amount of damages; and whether
the Commission's affirmative defenses (including, presuma-
bly, that each Plaintiff consented to medical treatment by Ig-
berase) can refute Plaintiffs' claim.

We review the District Court's decision to certify the
duty and breach issues of Plaintiffs' negligent infliction of
emotion distress claim for abuse of discretion. *Gates*, 655 F.3d
at 262. A district court abuses its discretion if its "decision rests
upon a clearly erroneous finding of fact, an errant conclusion
of law or an improper application of law to fact." *Id.* (quoting
*In re Hydrogen Peroxide*, 552 F.3d 305, 320 (3d Cir. 2009)).
Whether the district court employed the correct legal standard

is reviewed *de novo*. *In re Hydrogen Peroxide*, 471 F.3d at 312 (citing *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 32 (2d Cir. 2006)). Conducting that review, we conclude that the District Court abused its discretion.

### A. The District Court erred in certifying this issue class

Two reasons, each independently sufficient, support the conclusion that the District Court misapplied *Gates* when it certified for class treatment the duty and breach elements of Plaintiffs' negligent infliction of emotional distress claim.

*First*, the District Court did not determine whether the duty and breach elements of Plaintiffs' claim satisfied Rule 23(b)(3). The Court correctly observed that *Gates* does not require Plaintiffs seeking issue-class certification to prove that their cause of action as a whole satisfies Rule 23(b)(3). J.A. 42-43 ("[The Commission]'s argument that the Court should require Plaintiffs to satisfy Rule 23(b)(3)'s predominance requirement before turning to these factors parrots one of the camps that the Third Circuit acknowledged but refused to join in *Gates*. Because the Third Circuit rejected that view, this Court must do the same."); *see also* J.A. 56 ("Having determined that Plaintiffs can satisfy the Rule 23(a) factors, the Court turns to the question of whether to certify an issues class under Rule 23(c)(4)."). But while *Gates* does not require Plaintiffs seeking issue-class certification to prove that their cause of action as a whole satisfies a subsection of Rule 23(b), for reasons we have explained, Rule 23(c)(4) does require that the Plaintiffs demonstrate that the issues they seek to certify satisfy one of Rule 23(b)'s subsections. On remand, the Plaintiffs may

be able to make such a showing, but we will leave that inquiry to the District Court to consider in the first instance.[4]

*Second*, separate and apart from the District Court's failure to determine whether the duty and breach elements of Plaintiffs' claim satisfied any subsection of Rule 23(b), the Court also failed to rigorously consider several *Gates* factors.

---

[4] The Commission also insists that the District Court erred in finding that Plaintiffs' satisfied Rule 23(a)'s typicality and adequacy requirements. Appellant Br. 18-19. It argues the Plaintiffs are atypical and inadequate class representatives because they propose to inflict emotional distress on absent class members currently ignorant of the underlying allegations, and that Plaintiffs' decision to seek relief only for their emotional distress makes them inadequate representatives of absent class members who have suffered physical injuries. Neither argument is persuasive. For one, we find no support for the proposition that absent class members ignorant of their potential legal injury might cause named plaintiffs (who are aware of their injury) to be inadequate or atypical class representatives. For another, if the District Court determines that some cognizable subset of absent class members may also have live legal claims for physical injuries, then it has ample tools at its disposal to manage those divergences, including by creating subclasses pursuant to Rule 23(c)(5) or the notice requirements of Rule 23(c)(4).We have "set a low threshold for typicality." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 428 (3d Cir. 2016) (internal quotations omitted). And "[e]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." *Id.*

For example, the Court does not explicitly discuss whether the effect certification of the issue class will have on the effectiveness and fairness of resolution of remaining issues. Many other actors played a role in Igberase's fraud, including the residency programs that admitted and trained him, the state medical boards that licensed him, the hospitals that gave him privileges, the specialty board that certified him, and the law enforcement officers (state and federal) who investigated him. If an issue-class jury finds that the Commission owed Plaintiffs a legal duty that it subsequently breached, the Commission may face undue pressure to settle, even if their breach did not cause Plaintiffs' harm.

Relatedly, the District Court did not rigorously consider what efficiencies would be gained by resolution of the certified issues. To be sure, the District Court briefly discussed the efficiencies of a single trial and broached other options with the parties. J.A. 60-61. But more was needed. To prove their claim that the Commission negligently inflicted emotional distress, Plaintiffs will need to show (as with all causes of action arising under state tort law) duty, breach, cause, and harm. But the District Court certified an issue class with respect to the duty and breach elements only. So even if the District Court finds that the Commission owed a relevant legal duty to the Plaintiffs that it subsequently breached, each Plaintiff, in individual proceedings, will have to prove that they were injured; that the Commission's breach of the relevant duty actually and proximately caused those injuries; that those injuries are due a particular amount of damages; and that the Commission's affirmative defenses (including, presumably, each Plaintiff's consent to medical treatment by Igberase) are not decisive.

The District Court may also wish to consider whether the duty and breach elements of Plaintiffs' negligent infliction

of emotional distress claim are suitable for issue-class treat-ment. Under Pennsylvania law, for example, to determine whether the Commission owed the Plaintiffs a relevant legal duty, the class jury will have to weigh several factors, includ-ing the "foreseeability of the harm incurred." *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166, 1169 (Pa. 2000) (citations omitted). And once beyond the class trial, to determine and measure emotional damages, each individual jury will have to assess the degree of the Commission's negligence as to each Plaintiff. *See Spence v. Bd. of Educ. of the Christina Sch. Dist.*, 806 F.2d 1198, 1202 (3d Cir. 1986) (finding no abuse of dis-cretion where the District Court joined for trial the issues of liability and damages for emotional distress, explaining that "emotional distress damages must be evaluated in light of all the circumstances surrounding the alleged misconduct"). So the issue-class jury, like each individual jury, may need to con-sider evidence regarding the harm the Commission allegedly caused. And each individual jury, like the issue-class jury, may need to consider evidence regarding the Commission's overall conduct, which likely will include the nature of the legal duty it owed Plaintiffs (if any) and the extent to which it breached that duty. *Gates* disfavors this. *See* 655 F.3d at 273 (holding that "the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s)" counsels against certification of those common issues).

Of course, the District Court may very well be correct that "there are efficiencies to be gained by certifying a class on these issues because it will allow for a single trial with a single, preclusive determination about [the Commission]'s conduct, rather than the presentation of the same evidence about [the Commission] again, and again, and again to separate juries." J.A. 60. Duty is an issue of law. Therefore, it must be decided separately from breach, causation, and damages. *See Sharpe v.*

*St. Luke's Hosp.*, 821 A.2d 1215, 1219 (Pa. 2003). It is true that deciding if the Commission had a duty to investigate requires balancing several factors. *Id.* But none of that requires individual evidence, for each patient shared the same distanced relationship of trust with the Commission. Likewise, breach would require only common evidence: How much investigating did the Commission do? Did it know or should it have known that Igberase was a fraud? Did it take enough steps to investigate him based on warnings received from various parties, including the New Jersey residency program? Should it have followed up in later years once Igberase was admitted to another residency program? No absent class member would have anything special to add in her individual trial. There will be plenty left for individual proceedings, but these major issues could be resolved on a class-wide basis.[5]

---

[5] These two reasons are sufficient to support our decision to vacate the District Court's certification for class treatment the duty and breach elements of Plaintiffs' negligent infliction of emotional distress claim. But there may yet be other problems with the issue class, including the possibility that Plaintiffs' legal claim implicates multiple states' laws. Under *Gates*, a district court, tasked with resolving a motion to certify an issue class, must assess the "substantive law underlying the claim(s), including any choice-of-law questions [that law] may present." 655 F.3d at 273. Here, the District Court concluded that the various state laws that may be implicated do not meaningfully differ and that Pennsylvania law would govern anyway. *Russell v. Educational Comm'n for Foreign Med. Graduates*, 2020 WL 1330699, at *4-5 (E.D. Pa. Mar. 23, 2020). That seems like a close question. It may well be true that Pennsylvania has the greatest interest in this case (the Commission's alleged tortious conduct occurred here, after all), but various other states

## B. The Commission's remaining arguments for reversal are unavailing or inapposite

The Commission and its amicus offer two additional bases on which to reverse the District Court. The Commission first argues that "the plain text of Rule 23 and the cases interpreting it" demand that "the party seeking to certify a class must satisfy one of the prongs of Rule 23(b)" and, "[b]ecause the district court failed to find that Named Plaintiffs satisfied Rule 23(b)(3) or any other prong of Rule 23(b), the class certification must be reversed." Appellant's Br. 39; *see also* Brief for U.S. Chamber of Commerce as Amici Curiae Supporting Appellant 5-16.

That is not accurate. A majority of the courts of appeals have concluded that in appropriate cases Rule 23(c)(4) can be used even though full Rule 23(b)(3) certification is not possible due to the predominance infirmities. That view, the so-called "broad view," has been adopted or supported by the Second, Fourth, Sixth, Seventh, and Ninth Circuits.[6] Under the broad

---

have a substantial interest in the resolution of the claims, too. But because the conflict-of-law question was briefed before the District Court in the context of a motion for class certification, we will leave it to the District Court to determine which state's law applies to each Plaintiff's claim, if the question of which state's law applies becomes relevant in future proceedings.

[6] For discussions of the broad view from these courts of appeals, see, *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006) (permitting issue certification "regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement''); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 439-45 (4th Cir. 2003) (holding that courts may employ Rule 23(c)(4) to certify a class as to one claim even

view, courts apply the Rule 23(b)(3) predominance and superiority prongs after common issues have been identified for class treatment under Rule 23(c)(4). The broad view permits

---

though all of the plaintiffs' claims, taken together, do not satisfy the predominance requirement); *Martin v. Behr Dayton Thermal Prods.*, 896 F.3d 405 (6th Cir. 2018) (noting that "Rule 23(c)(4) contemplates using issue certification . . . where common questions predominate within certain issues and where class treatment of those issues is the superior method of resolution"); *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012) ("Rule 23(c)(4) provides that 'when appropriate, an action may be brought or maintained as a class action with respect to particular issues.' The practices challenged in this case present a pair of issues that can most efficiently be determined on a class-wide basis, consistent with the rule just quoted."), *abrogated on other grounds by Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 559 (7th Cir.), *reh'g and suggestion for reh'g en banc denied*, (7th Cir. Aug. 3, 2016); *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) ("A district court has the discretion to split a case by certifying a class for some issues, but not others, or by certifying a class for liability alone where damages or causation may require individualized assessments."); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)[] and proceed with class treatment of these particular issues.").

utilizing Rule 23(c)(4) even where predominance has not been (or cannot be) satisfied for the cause of action as a whole.

The Fifth Circuit, however, in a footnote adopted what is known as "the narrow view," which prohibits issue-class certification if Rule 23(b)(3) predominance has not been satisfied for the cause of action as a whole. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996) ("A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial."). But *Castano*'s approach has not been adopted by any other circuit, and subsequent caselaw from the Fifth Circuit suggests that any potency the narrow view once held has dwindled. *See Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 603 (5th Cir. 2006) (noting that bifurcation might serve "as a remedy for the obstacles preventing a finding of predominance" but that the plaintiffs had not made such a proposal to the district court).[7]

---

[7] Further, the Advisory Committee on Civil Rules appears to agree that issues can be certified for class treatment even if predominance cannot be satisfied for the action as a whole. At their April 2015 meeting, the Committee noted that "[a] major reason for considering possible rule amendments to deal with issue classes is that there has seemed to be a split in the circuits about whether they can only be allowed if (b)(3) predominance is established." *See* Rule 23 Subcommittee Report, in Advisory Committee on Civil Rules 243-99 (Apr. 9-10, 2015). But the Committee went on to note that "recent reports suggest that all the circuits are coming into relative agreement that in appropriate cases Rule 23(c)(4) can be used *even though full Rule*

The Commission's attempts to avoid the majority view by arguing not so much that full-class Rule 23(b)(3) certification must *precede* Rule 23(c)(4) certification, but that the District Court here failed to consider Rule 23(b)(3) at all. But "certifying a Rule 23(c)(4) class is analytically independent from the predominance inquiry under Rule 23(b)(3)," though predominance concerns may be relevant to both. *See Gonzalez v. Corning*, 885 F.3d 186, 202 (3d Cir. 2018) ("While Plaintiffs are correct to point out that the appropriateness of certifying a Rule 23(c)(4) class is analytically independent from the predominance inquiry under Rule 23(b)(3), a case may present concerns relevant to both.").

Amicus Chamber of Commerce offers yet another reason to reverse the District Court: that the District Court's Rule 23(c)(4) ruling, if adopted, "will permit a flood of abusive class actions, with troubling and far-reaching consequences for businesses, shareholders, employees, customers, and the judicial system." Brief for U.S. Chamber of Commerce as Amici Curiae Supporting Appellant 16-18. The Chamber's concerns seem overblown. Even capacious rules for issue-class certification (which we do not purport to advance in this holding) likely will not encourage "a flood of abusive class actions" because few lawyers will have an incentive to file them. Any lucrative potential payday for class action lawyers arises from securing a damages award, not from obtaining an order on a particular issue. That order, which can be thought of as a type of declaratory judgment, may eventually transform into a judgment awarding damages, but even then it is not clear that the future individualized proceedings would be controlled by the

---

23(b)(3) *certification is not possible* due to the predominance requirement." *Id.* at 280 (emphasis added).

lawyers that won the issue-class order. In any case, even if a lawyer could obtain a quasi-declaratory ruling on a subset of common issues, the transformation of the case from a proposed class action to a set of individualized proceedings would spoil any settlement leverage that the lawyer had. Of course, the lawyer representing the class would prefer a favorable issue-class order to no order at all, but the defendant, once facing just individualized proceedings, could return to the very tactics that may have given it an advantage in the first place. From the defense perspective, such tactics could have the added benefit of deterring other class-action lawyers from attempting similar bifurcated class actions in the future.

* * * * *

Because the District Court failed to determine whether the proposed issues satisfied a subsection of Rule 23(b), and because it failed to rigorously analyze several *Gates* factors, we will vacate the District Court's issue-class certification and remand for further proceedings consistent with this opinion.

## IV. CONCLUSION

For these reasons, we vacate the District Court's Order certifying for aggregate treatment the duty and breach elements of Plaintiffs' negligent infliction of emotional distress claim, and remand for further proceedings consistent with this opinion.